ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | **IN THE COURT OF COMMON PLEAS** |
| **COUNTY OF UNION** | **SIXHTEENTH JUDICIAL CIRCUIT** |
| CITY OF UNION, SOUTH CAROLINA, | C.A. No.: 2024-CP-44-_____ |
| *Plaintiff*, | |
| v. | |
| MILLIKEN & COMPANY; SUMINOE TEXTILE OF AMERICA CORPORATION; and TIETEX INTERNATIONAL, LTD., | **SUMMONS** (JURY TRIAL DEMANDED) |
| *Defendants*. | |

**TO THE DEFENDANTS ABOVE-NAMED:**

YOU ARE HEREBY SUMMONED and required to answer the Complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to the Complaint upon the subscribers at 291 S. Pine Street, Spartanburg, South Carolina 29302, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the Complaint, judgment by default will be rendered against you for the relief demanded in the Complaint.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com

glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

December 16, 2024

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF UNION** | ) | **SIXTHTEENTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| CITY OF UNION, SOUTH CAROLINA, | ) | C.A. No.: 2024-CP-44-_____ |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MILLIKEN & COMPANY; SUMINOE | ) | |
| TEXTILE OF AMERICA CORPORATION; | ) | **COMPLAINT** |
| and TIETEX INTERNATIONAL, LTD., | ) | (JURY TRIAL DEMANDED) |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

Plaintiff, CITY OF UNION, SOUTH CAROLINA, by and through the undersigned counsel, brings this action against the above-named Defendants for compensatory and punitive damages, injunctive relief, and abatement of a nuisance, and alleges as follows:

## STATEMENT OF THE CASE

1. Plaintiff, City of Union, South Carolina, brings this action to address Defendants' ongoing contamination of the Broad River and Plaintiff's properties with certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); perfluorohexane sulfonate ("PFHxS"); and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").

2. As Plaintiff has recently discovered, Defendants have discharged and continue to discharge products that contain or degrade to these PFAS to the Broad River, which travel downstream to Plaintiff's water intake, thereby contaminating Plaintiff's properties and the domestic water supply for over 34,000 water customers in Union County. Plaintiff seeks a

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated and ongoing PFAS contamination.

3.    Plaintiff provides potable water to Union County residents. It owns and occupies two properties at issue in Union County. At 108 Calhoun Street, Union, South Carolina 29379, Plaintiff operates its surface water treatment plant ("SWTP") and related buildings, improvements, and equipment that make up its water treatment system. Plaintiff's other property abuts the Broad River at 1269 River Road, Lockhart, South Carolina 29364, where its water intake withdraws raw water from the Broad River for treatment at the SWTP before distribution to customers.

4.    Defendants own and/or operate industrial facilities upstream of Plaintiff's water intake and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes. Defendants then discharge wastewater contaminated with these products to surface waters in the Broad River upstream of Plaintiff's water intake, either directly or via certain wastewater treatment plants ("WWTPs"). These WWTPs include the A. Manning Lynch WWTP in Spartanburg, South Carolina; the Broad River WWTP in Gaffney, South Carolina; and the Inman WWTP in Inman, South Carolina.

5.    Industrial wastewater from Defendants' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes, are discharged to the Broad River or tributaries thereof, and flow downstream to Plaintiff's SWTP. As a direct and proximate result of Defendants' actions, Plaintiff has suffered losses to the use and enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with dangerous concentrations of PFAS.

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

6.     Defendants' PFAS contaminate Plaintiff's water source at concentrations exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, Defendants' PFAS.

7.     As a result of Defendants' intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring Defendants to fund the acquisition, installation, and operation of water treatment technologies at Plaintiff's SWTP that will remove Defendants' PFAS from drinking water. In addition, based on Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

## DISCLAIMER

8.     Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

9.     Plaintiff brings no cause of action against, and seeks no relief from, any Defendant under federal law or statute.

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to Article V of the Constitution of the State of South Carolina and sections 5-7-30 and 14-1-80 of the South Carolina Code.

11.     This Court has personal jurisdiction over all Defendants, consistent with due process and South Carolina's long-arm statute, section 36-2-803 of the South Carolina Code.

12.     Venue is also properly in this Court pursuant to sections 15-7-10 and -30 of the South Carolina Code because the subject of the action is for injuries sustained to Plaintiff's property located in Union County, and the most substantial part of Defendants' alleged acts or omissions giving rise to Plaintiff's claims occurred in Union County. *See id.* at § 15-7-30(B) ("If there is more than one defendant, the action may be tried in any county where the action properly may be maintained against one of the defendants pursuant to this section.").

**PARTIES**

**I.     Plaintiff**

13.     Plaintiff is a municipal corporation organized and existing under the laws of South Carolina. S.C. CODE ANN. §§ 5-7-10, *et seq.*; 5-31-610. Through its Public Works Department, Plaintiff provides potable water services to its customers.

14.     Plaintiff owns two properties at issue. The first is located at 108 Calhoun Street Union, South Carolina 29379, where Plaintiff operates its SWTP. Approximately 10 miles to the northeast, Plaintiff owns land riparian to the Broad River, where it operates a surface water intake that supplies raw water to the SWTP.

15.     Plaintiff's SWTP provides potable water to residents of Union County.

4

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## II.     Defendants

16.     Defendant **Milliken & Company ("Milliken")** is a Delaware corporation with its principal place of business in South Carolina. Milliken owns and operates at least four industrial facilities at issue in this case: the Magnolia Finishing Plant and Allen Plant, located respectively at 157 and 164 New Milliken Road, Blacksburg, South Carolina 29702; the Dewey Plant, located at 1440 Campton Road, Inman, South Carolina 29349; and the Spartanburg Headquarters, located at 920 Milliken Road, Spartanburg, South Carolina 29303. At each location, Milliken uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in textile finishing, chemical manufacturing, and additional operations in the textile industry. As part of their processes, each Milliken facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to surface waters: the Magnolia Finishing Plant and Allen Plant to the Broad River via direct discharge; the Dewey Plant to Lawson's Fork Creek, an upstream tributary of the Broad River, via the Inman WWTP; and the Spartanburg Headquarters to the Pacolet River, an upstream tributary of the Broad River, via the A. Manning Lynch WWTP. The Inman and A. Manning Lynch WWTPs cannot remove Milliken's PFAS, which they discharge upstream of the Broad River and Plaintiff's water intake. Milliken's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water source.

17.     Defendant **Suminoe Textile of America Corporation ("Suminoe")** is a South Carolina corporation that owns and operates an industrial facility located at 10 Commerce Drive, Gaffney, South Carolina 29340. There, Suminoe uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of its processes, the Suminoe facility discharges industrial wastewater contaminated with

5

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

products that contain or degrade to these PFAS to the Broad River WWTP. The Broad River WWTP cannot remove Suminoe's PFAS, which it discharges to Peoples Creek, an upstream tributary of the Broad River, and Plaintiff's water intake. Suminoe's PFAS resist environmental degradation, flow downstream from Peoples Creek into the Broad River, and thereby contaminate Plaintiff's properties and its water source.

18.    Defendant **Tietex International, Ltd. ("Tietex")** is a South Carolina corporation that owns and operates an industrial facility located at 3010 N. Blackstock Road, Spartanburg, South Carolina 29301. There, Tietex uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of nonwoven fabric products. As part of its processes, the Tietex facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch WWTP cannot remove Tietex's PFAS, which it discharges to the Pacolet River upstream of the Broad River and Plaintiff's water intake. Tietex's PFAS resist environmental degradation, flow downstream from the Pacolet River to the Broad River, and thereby contaminate Plaintiff's properties and its water source.

## FACTUAL ALLEGATIONS

### I.    Background and Hazards of PFAS

19.    PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

20.    The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are colloquially termed "forever chemicals," as terminal PFAS have no known environmental

6

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

21.     There are both polymer and non-polymer PFAS. Non-polymer PFAS include well-known substances like PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals). Polymer PFAS include fluoropolymers and side-chain fluorinated polymers that are often the active chemistry in PFAS products utilized by Defendants.

22.     There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS—meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are all terminal PFAS.

23.     Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

24.     PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water. Exposure is dose-additive, meaning that exposure to low levels of multiple PFAS, which individually would pose little or no risk, can result in a combined dose capable of causing adverse health effects.

25.     While there are thousands of different PFAS chemicals, current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, PFBS, and GenX Chemicals. Depending on the type of PFAS, negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

26.    PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues in the United States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

27.    Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and environmentally persistent, and some short-chain PFAS products nevertheless still contain PFOA and PFOS and their precursors. Terminal short-chain PFAS include PFBS and GenX Chemicals.

28.    Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS. U.S.E.P.A., *Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)* (Jan. 8, 2009), *available at* https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf. The advisory levels were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems." *Id.*

8

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

29.    On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water. Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016). Superseding the 2009 provisional levels, the 2016 levels for PFOA and PFOS were 70 ppt, independently or in the aggregate. EPA explained that its new health advisories "identify the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."

30.    EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals." *Id.*

31.    On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels. Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022). EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"—finding "associations between PFOA and/or PFOS

9

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer." *Id.* Concerned with the public health implications of its data, EPA issued interim levels pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

32.     Simultaneously, EPA also issued health advisories for the first time covering PFBS and GenX Chemicals. EPA reported that "GenX Chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer." *Id.* For PFBS, it noted studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

33.     In March of 2023, EPA issued proposed maximum contaminant level ("MCL")s and maximum contaminant level goal ("MCLG")s for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals. PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142). An MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

34.     At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe." *Id.* Therefore, it proposed MCLG levels for both chemicals at zero ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny

10

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found." *Id.*

35.     Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PFHxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA: 10 ppt; PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety." *Id.* If greater than 1.0, then "potential risk is indicated." *Id.*

36.     EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses." U.S.E.P.A., *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution* (Dec. 14, 2023), *available at* https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

37.     EPA finalized its proposed MCLs and MCLGs on April 10, 2024. U.S.E.P.A., *PFAS Nat'l Primary Drinking Water Regulation Rulemaking* (Apr. 10, 2024), *available at* https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version). In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children." U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking*

11

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

*Water Regulation* (Apr. 10, 2024); *see also* U.S.E.P.A., *Final PFAS Nat'l Drinking Water Regulation Landing Page*, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

38.    The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts." U.S.E.P.A., *Presentation: Overview EPA PFAS NPDWR* (Apr. 10, 2024). According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk." U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024).

39.    EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations. By 2027, Plaintiff must begin conducting and reporting regular PFAS monitoring, and by 2029, Plaintiff must comply with all MCLs. Plaintiff has conducted a diligent investigation into this issue, is seeking to address it in an expedited manner, and for this reason seeks prompt relief from the Court.

## II.    Contamination of the Broad River with PFAS

40.    Plaintiff's surface water intake rests on the Broad River in Lockhart, South Carolina, which draws water from the river for treatment at Plaintiff's SWTP before distribution to customers.

41.    Defendants' industrial facilities, and/or their applicable WWTPs, operate along the Broad River or one of its tributaries upstream of Plaintiff's water intake.

12

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

42. PFAS sampling of the Broad River upstream of Plaintiff's water intake confirms the presence of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals throughout the river system. These PFAS flow downstream and contaminate the water at Plaintiff's water intake at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intake confirms the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source.

43. Defendants are, or were, owners and operators of manufacturing plants upstream of Plaintiff's water intake. In their industrial processes, Defendants utilize, or utilized, products that contain or degrade to PFOS, PFOA, PFHxS, PFNA, PFBS, and/or GenX Chemicals. Defendants' industrial processes generate industrial wastewater containing these PFAS, which Defendants ultimately discharge to surface waters upstream of Plaintiff's water intake.

44. Defendants' PFAS and their precursors flow downstream to Plaintiff's water intake, damaging Plaintiff's property and contaminating its water source.

45. Plaintiff's SWTP utilizes conventional water treatment technologies to treat raw water, none of which remove PFAS. Instead, Plaintiff's SWTP requires new water treatment technologies to do so.

46. All Defendants knew or should have known that conventional water treatment technologies used by direct discharger Defendants and WWTPs cannot remove PFAS from wastewater. All Defendants also knew or should have known that their treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

### III.    Defendants have harmed Plaintiff and Plaintiff's community.

47. For decades and unknown to Plaintiff, Defendants have discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Broad River and its

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

tributaries, which caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's health advisories, MCLGs, and MCLs. Indeed, absent new treatment technologies, Plaintiff cannot use its properties and property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

48.     Defendants' conduct has proximately caused the contamination of the Broad River and of Plaintiff's land, its SWTP, and its water distribution system with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals—including PFOA and PFOS at concentrations above EPA's MCLGs and MCLs.

49.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, or negligently engaged in conduct or omissions that proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties, its right to use the Broad River, and has caused Plaintiff additional past, present, and future injury to property.

50.     Despite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, PFBS, and GenX Chemicals are hazardous to human health, Defendants, directly or indirectly, discharged industrial wastewater contaminated with these chemicals into the Broad River, which they knew or should have known contaminated Plaintiff's properties.

## FIRST CAUSE OF ACTION

### Private Nuisance

51.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

52.     Plaintiff is a municipal corporation engaged in constructing, operating, maintaining, improving, and extending a water distribution system for residents of Union County. It uses its properties for those purposes, including the withdrawal of raw water from the Broad

14

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

River, the treatment of raw water, and the distribution of treated water to customers in Union County.

53.    Plaintiff owns riparian land abutting the Broad River, and Plaintiff has a property right in the reasonable use of these waters, including for the provision of water to its customers.

54.    Through the conduct described herein, Defendants created, contributed to, and/or maintained a nuisance; that is, the contamination of the Broad River, with PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors at concentrations exceeding those EPA deems unsafe for consumption.

55.    Due to Defendants' contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

56.    Defendants' contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties, interferes with Plaintiff's properties and its riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

57.    Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

58.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to Defendants' contamination of the Broad River and Plaintiff's property, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

59.    In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

60.    The ongoing contamination of the Broad River and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its riparian use of the Broad River to supply potable water to its customers.

61.    Defendants' interference with Plaintiff's use of its properties can be abated by funding the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

62.    Defendants are jointly and severally liable to Plaintiffs for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## SECOND CAUSE OF ACTION

### Public Nuisance

63.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

64.    Plaintiff is a municipal corporation engaged in constructing, operating, maintaining, improving, and extending a water distribution system for residents of Union County. It uses its properties for those purposes, including the withdrawal of raw water from the Broad River, the treatment of raw water, and the distribution of treated water to customers in Union County.

65.    Plaintiff's customers use the water Plaintiff provides for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

16

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

66.     Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use—and thus free from contamination by Defendants' PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX Chemicals. Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

67.     Plaintiff has sustained special injuries as a result of Defendants' public nuisance, including but not limited to, the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by EPA; expenses associated with future acquisition, installation, and operation of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of Defendants' contamination; interference with Plaintiff's riparian right to use the Broad River; interference with the use of Plaintiff's SWTP and water distribution system; and lost revenue.

68.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to Defendants' contamination of the Broad River and Plaintiff's properties.

69.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

70.     As a result of the nuisance caused by Defendants, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

71.     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

72.     Defendants' ongoing contamination constitutes a continuing threat to public health, safety, and order, and it constitutes irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

73.     Defendants' contamination of potable water with unsafe concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals can be abated by requiring Defendants to fund the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

74.     Defendants are jointly and severally liable to Plaintiffs for all damages resulting from this nuisance, and the costs of abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

### THIRD CAUSE OF ACTION

**Trespass**

75.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

76.     Plaintiff owns, possesses, and actively exercises its right to use its land, SWTP, and related buildings, improvements, and equipment that make up its water distribution systems.

77.     Defendants intentionally discharged and continue to discharge PFAS to their applicable WWTPs, respectively, notwithstanding that they knew and/or reasonably should have known that:

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

(a)     these WWTPs cannot remove their PFAS from wastewater before discharging to surface waters upstream of Plaintiff's water intake on the Broad River;

(b)     Plaintiff draws water from the Broad River for the provision of potable water to its customers;

(c)     water Plaintiff draws from the Broad River is contaminated with the PFAS the Defendants discharge to these WWTPs; and, thereby,

(d)     water contaminated with high concentrations of these Defendants' PFAS invades Plaintiff's properties.

78.     Defendant Milliken intentionally and directly discharged and continues to directly discharge PFAS to the Broad River from the Magnolia Finishing Plant and Allen Plant, notwithstanding that Milliken knew and/or reasonably should have known that:

(a)     Plaintiff draws water from the Broad River for the provision of drinking water to its customers;

(b)     water Plaintiff draws from the Broad River is contaminated with the PFAS that Milliken discharges to the River; and, thereby,

(c)     water contaminated with Milliken's PFAS invades Plaintiff's properties.

79.     Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals at concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

80.     Defendants' invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

81.     Defendants intend that, while using PFAS in their industrial processes, PFAS-containing wastewater generated by those processes be discharged to their applicable WWTPs. Milliken further intends and/or intended that, while using PFAS in its industrial processes at the Magnolia Finishing Plant and Allen Plant, PFAS-containing wastewater be directly discharged to the Broad River. Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and riparian rights.

82.     Defendants' conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTP, and related buildings, improvements, and equipment that make up its water treatment and distribution systems. The damage to Plaintiff's properties is the direct and proximate result of Defendants' intentional conduct.

83.     As a direct, proximate, and foreseeable result of Defendants' trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

84.     Defendants' ongoing trespasses can be abated by requiring Defendants to fund the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

85.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

86.     Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the direct

20

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

and/or indirect discharge of these PFAS into surface waters upstream of Plaintiff's SWTP, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

87.    Defendants knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, and dose-additive; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters—including the Broad River—were vulnerable to the contamination that has taken and now takes place.

88.    Defendants nonetheless negligently, recklessly, wantonly, and/or willfully breached their duty in causing products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to escape their premises and contaminate the Broad River, thereby interfering with Plaintiff's property rights and injuring Plaintiff's properties.

89.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including but not limited to loss in value; the cost of removing Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals; future costs of acquiring, installing, and operating adequate water treatment technologies; and other damages to be proved at trial.

90.    Defendants are jointly and severally liable to Plaintiffs for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands trial by jury, and respectfully requests that the Court grant the following relief:

(a)    Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(b)    Enter a judgment and decree against all Defendants requiring them to abate their trespasses onto Plaintiff's properties;

(c)    Enter a judgment and decree against all Defendants, jointly and severally, requiring them to remove their PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX chemicals from Plaintiff's water systems by funding the acquisition, installation, and operation of treatment technology capable of removing them;

(d)    Enter a judgment against all Defendants, jointly and severally, for past, present, and future compensatory damages in such amounts as the evidence shows Plaintiff to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, as applicable, in an amount sufficient to punish and penalize Defendants, and to deter them from repeating their wrongful conduct, and all costs; and

(e)    Award such other relief and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)

22

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

December 16, 2024

ELECTRONICALLY FILED - 2024 Dec 16 4:25 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

23

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**MOTION FOR PRO HAC VICE ADMISSION OF HANNAH CORY CALDWELL**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Hannah Cory Caldwell, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. As of the date of the filing of this motion, no one has entered an appearance as counsel of record for any defendant in this matter.

Mrs. Caldwell is a member in good standing with her local bar association, and the Verified

1

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary

information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 30, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /Marghretta H. Shisko*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

2

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
## IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| The City of Union, South Carolina, | 2024-CP-44-00558 | In the Court of Common Pleas Sixteenth Judicial Circuit |
| **Plaintiff** | **Case No.** | **Tribunal** |
| **vs.** | | |
| Milliken & Company; Suminoe Textile of America Corporation; Tietex International, Ltd., | **Mailing Address of Tribunal:** | 210 West Main Street |
| **Defendant** | | Union, SC 29379 |

Comes now ___Hannah Cory Caldwell_____, applicant herein, and respectfully represents the following:

1. Applicant resides at:

428 Glenwood Road
**Street Address**

| Birmingham, AL | Jefferson | Alabama | 35216 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |

205-271-7113
**Telephone**

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C._____, with offices at

2131 Magnolia Avenue South
**Street Address**

| Birmingham | Jefferson | Alabama | 35205 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 205-328-2200 | 205-370-6021 | 205-324-7896 | hcaldwell@corywatson.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

3. Applicant has been retained personally or as a member of the above-named law firm by

The City of Union, South Carolina_____ to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since ___September 19th___ of ___2019_____, Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of ___Alabama_____ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

5.  List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/19/2019 |
| United States District Court Northern District of Alabama | 10/24/2019 |
| United States District Court Southern District of Alabama | 10/24/2019 |
| United States District Court Middle District of Alabama | 10/24/2019 |
| Alabama State Courts | 10/24/2019 |
|  |  |
|  |  |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

> Yes

6.  Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency?  If yes, give particulars, e.g., jurisdiction, court date.

> No

7.  Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked?  If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

> No

8.  Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

> No

9.  Please be aware that local counsel must be Rule 403 certified.  Local counsel of record associated

with Applicant in this case is ___Marghretta Shisko___ of the ___John B. White Jr., P.A.___

law firm, which has offices at:

291 S. Pine Street/ P. O. Box 2465 (29304)
**Street Address**

| Spartanburg | Spartanburg | South Carolina | 29302 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 864-594-5988 | 864-590-3907 | 864-594-5870 | mshisko@johnbwhite.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

*Page 2 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

100106
_____

South Carolina Bar Number
(You must provide Bar Number)

10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See attached Exhibit A |
| --- |

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
| --- |

12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this ___27th___ day of _December_, 20_24_

_Harold Caldwell_
APPLICANT

*Page 3 of 4*

# VERIFICATION

STATE OF  ALABAMA                    )

COUNTY OF  JEFFERSON                 )

I,          Hannah Cory Caldwell                        , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

APPLICANT/AFFIANT

Subscribed and sworn to before me this _27th_ day of _December_, 20 _24_

_____
(Notary Signature)

Notary Public for the State of _Alabama_

My Commission Expires: _June 24, 2028_

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this _30th_ day of _December_, 20 _24_

_____
LOCAL COUNSEL OF RECORD

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this _30th_ day of _December_, 20 _24_

_____

*Page 4 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC, et al | Active | 10/18/2024 | John B. White | Granted |
| City of Florence, South Carolina v. Burlington Industries, Inc. | Active | 12/11/2024 | Marghretta Shisko | Pending |
| South Carolina Public Service Authority a/k/a Santee Cooper, an Agency of the State of South Carolina v. China Jushi USA Corporation, et al | Active | 12/11/2024 | John B. White | Pending |
| Grand Strand Sewer and Water Authority v. Aladdin Manufacturing Corporation, et al | Active | 12/27/24 | Marghretta Shisko | Pending |
| Laurens County Water and Sewer Commission v. Cone Mills Receiver, LLC, et al | Active | 12/27/24 | Marghretta Shisko | Pending |

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that _____ Hannah Cory Caldwell _____ was duly and legally admitted to practice law by the Supreme Court of Alabama on _____ September 19, 2019 _____ and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on _____ December 5, 2024 _____ with the seal of the Supreme Court of Alabama attached.



*Megan B. Rhodebeck*
Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

January 9, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:     The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Hannah Cory Caldwell be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Hannah Cory Caldwell
        Marghretta Shisko

FILED
UNION COUNTY, SC
2025 JAN 13 PH 2:17
CLERK OF COURT
Stephanie Kitchens

ELECTRONICALLY FILED - 2025 Jan 06 11:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF HANNAH CORY CALDWELL**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff City of Union, South Carolina, to admit Hannah Cory Caldwell, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Jan 06 11:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



Union Common Pleas

**Case Caption:**     City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**     2024CP4400558

**Type:**     Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-01-06 11:05:18     page 2 of 2

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**MOTION FOR PRO HAC VICE ADMISSION OF HAMILTON JORDAN**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Hamilton Jordan, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. As of the date of the filing of this motion, no one has entered an appearance as counsel of record for any defendant in this matter.

Mr. Jordan is a member in good standing with his local bar association, and the Verified

1

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary

information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 30, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /Marghretta H. Shisko*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

2

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
# IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| The City of Union, South Carolina, | 2024-CP-44-00558 | In The Court Of Common Pleas Sixteenth Judicial Circuit |
| Plaintiff | Case No. | Tribunal |
| vs. | | |
| Milliken & Company; Suminoe Textile of America Corporation; and Tietex International, Ltd., | Mailing Address of Tribunal: | 210 West Main Street |
| | | Union, SC 29379 |
| Defendant | | |

Comes now __Hamilton Jordan__ , applicant herein, and respectfully represents the following:

1. Applicant resides at:

1209 Pine Street, Apt. 503
**Street Address**

| | | | |
|---|---|---|---|
| Nashville | Davidson | Nashville | 37203 |
| **City** | **County** | **State** | **Zip Code** |

615-205-6691
**Telephone**

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C. , with offices at

1033 Demonbreun St. #300
**Street Address**

| | | | |
|---|---|---|---|
| Nashville | | Tennessee | 37203 |
| **City** | **County** | **State** | **Zip Code** |
| 615-903-4660 | 334-714-1783 | 866-327-4000 | hjordan@corywatson.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

3. Applicant has been retained personally or as a member of the above-named law firm by

The City of Union, South Carolina to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since __October 19th__ of __2017__ , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of __Tennessee__ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Tennessee Supreme Court | 10/19/2017 |
| Tennessee State Courts | 10/19/2017 |
| United States District Court Eastern District of Tennessee | 3/16/2022 |
| United States District Court Middle District of Tennessee | 10/21/2019 |
| North Carolina State Courts | 7/21/2023 |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is ____Marghretta Shisko____ of the ____John B. White, Jr., P.A.____

law firm, which has offices at:

291 S. Pine Street/ P.O. Box 2465 (29304)
Street Address

Spartanburg                  Spartanburg              South Carolina            29302
City                         County                   State                     Zip Code

864-594-5988                 864-590-3907             864-594-5870              mshisko@johnbwhitelaw.com
Primary Telephone            Cell Phone               Fax Number                Email Address

*Page 2 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

100106
_____
South Carolina Bar Number
(You must provide Bar Number)

    10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See Attached Exhibit A |
|---|

Grand Strand Water And Sewer Authority v. Aladdin Manufacturing Corporation, et al Active  8/21/204 Marghretta H. Shisko Pending

    11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

    12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____20th_____ day of _____December_____, 20 24

_____
APPLICANT

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# VERIFICATION

STATE OF <u>TENNESSEE</u>                )

COUNTY OF <u>DAVIDSON</u>                )

I, <u>Hamilton Jordan</u>                , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

<u>APPLICANT/AFFIANT</u>

Subscribed and sworn to before me this <u>20th</u> day of <u>December</u> , 20 <u>24</u>

<u>Skyler Van Leemput</u>
(Notary Signature)

Notary Public for the State of <u>Alabama</u>

My Commission Expires: <u>9/15/28</u>

*(Notary seal: SKYLER VAN LEEMPUT — MY COMMISSION EXPIRES SEPTEMBER 15, 2028 — NOTARY PUBLIC STATE OF ALABAMA)*

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this <u>30th</u> day of <u>December</u> , 20 <u>24</u>

<u>LOCAL COUNSEL OF RECORD</u>

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this <u>30th</u> day of <u>December</u> , 20 <u>24</u>

*Page 4 of 4*

Exhibit A

### Application to Appear *Pro Hac Vice* in South Carolina

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Laurens County Water and Sewer Commission v. Cone Mills Receiver, LLC, et al | Active | 8/21/2024 | Marghretta Shisko | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/21/2024 | Marghretta Shisko | Granted |
| The City of Union, South Carolina v. Milliken & Company, et al | Active | 12/20/2024 | Marghretta Shisko | Pending |

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## Supreme Court of Tennessee

## Certificate of Good Standing

I, James M. Hivner, Clerk of the Supreme Court of the State of Tennessee, do hereby certify that

### Hamilton G. Jordan

is a licensed and practicing attorney of the Courts of this State, having been admitted to practice on October 19, 2017, and is presently in good standing. The Supreme Court is the Court of last resort in Tennessee.

In testimony whereof, I have set my hand and affixed the seal of the Court on this the 20th day of December, 2024.

James M. Hivner
Clerk of the Supreme Court of Tennessee

By: _Kim Meador, D.C._
        Kim Meador, D.C.

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

January 9, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:     The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Hamilton Jordan be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M. J. Thames
Bar Admissions Coordinator

cc:     Hamilton Jordan
        Marghretta Shisko

FILED
UNION COUNTY, SC
2025 JAN 13 PM 2:17
CLERK OF COURT
Stephanie Kitchens

ELECTRONICALLY FILED - 2025 Jan 06 11:13 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF UNION | FOR THE SIXTEENTH JUDICIAL CIRCUIT |

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF HAMILTON JORDAN**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff City of Union, South Carolina, to admit Hamilton Jordan, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Union Common Pleas

**Case Caption:**    City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**    2024CP4400558

**Type:**    Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-01-06 11:12:52    page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 06 11:13 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**MOTION FOR PRO HAC VICE ADMISSION OF FRANK JEROME TAPLEY**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Frank Jerome Tapley, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. As of the date of the filing of this motion, no one has entered an appearance as counsel of record for any defendant in this matter.

Mr. Tapley is a member in good standing with his local bar association, and the Verified

1

Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary

information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 30, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /Marghretta H. Shisko*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

2

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE* IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| City of Union, South Carolina, | 2024-CP-44-00558 | In The Court Of Common Pleas Sixteenth Judicial Circuit |
|---|---|---|
| Plaintiff | Case No. | Tribunal |

vs.

| Milliken & Company; Suminoe Textile of America Corporation; and Tietex International, Ltd., | Mailing Address of Tribunal: | 210 West Main St. |
|---|---|---|
| Defendant | | Union, SC 29379 |

Comes now ___Frank Jerome Tapley___ , applicant herein, and respectfully represents the following:

1. Applicant resides at:

230 Lucerne Blvd.
**Street Address**

| Homewood | Jefferson | Alabama | 35209 |
|---|---|---|---|
| City | County | State | Zip Code |

205-207-7112
**Telephone**

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C. , with offices at

2131 Magnolia Avenue South
**Street Address**

| Birmingham | Jefferson | Alabama | 35205 |
|---|---|---|---|
| City | County | State | Zip Code |
| 205-328-2200 | 205-370-1116 | 205-324-7896 | jtapley@corywatson.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

3. Applicant has been retained personally or as a member of the above-named law firm by

City of Union, South Carolina to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since ___September 26th___ of ___2003___ , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of ___Alabama___ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/27/2003 |
| Florida Supreme Court | 4/25/2006 |
| Tennessee Supreme Court | 2/17/2022 |
| United States District Court Northern District of Alabama | 10/22/2003 |
| United States District Court Middle District of Alabama | 10/22/2003 |
| United States District Court Southern District of Alabama | 10/22/2003 |
| Please see the attachment for remaining court admission information. | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency?  If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked?  If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9. Please be aware that local counsel must be Rule 403 certified.  Local counsel of record associated

with Applicant in this case is ___Marghretta Shisko___ of the ___John B. White, Jr., P.A.___

law firm, which has offices at:

291 S. Pine Street/ P.O. Box 2465 (29304)

**Street Address**

| Spartanburg | Spartanburg | South Carolina | 29302 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 864-594-5988 | 864-590-3907 | 864-594-5870 | mshisko@johnbwhite.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

*Page 2 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

100106
_____
South Carolina Bar Number
(You must provide Bar Number)

     10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

> Yes - See attached Exhibit A

     11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

> Yes

     12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____27th_____ day of _December_, 20_24_

_____
APPLICANT

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# VERIFICATION

STATE OF ALABAMA _____ )

COUNTY OF JEFFERSON _____ )

I, _____ Frank Jerome Tapley _____, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___27th___ day of ___December___, 20 _24_

_____
(Notary Signature)

Notary Public for the State of ___Alabama___

My Commission Expires: ___June 24, 2028___

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this ___30th___ day of ___December___, 20 _24_

_____
LOCAL COUNSEL OF RECORD

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___30th___ day of ___December___, 20 _24_

_____

*Page 4 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**ATTACHMENT TO PRO HAC VICE APPLICATION OF FRANK JEROME TAPLEY**

| Court | Date Admitted: |
|---|---|
| USDC Northern District of Florida | 12/16/2005 |
| USDC Middle District of Florida | 6/13/2007 |
| USDC Southern District of Indiana | 12/16/2011 |
| US Court of Appeals for the 9th Circuit | 12/30/2011 |
| USDC Southern District of Florida | 4/18/2012 |
| USDC Western District of Wisconsin | 5/24/2013 |
| US Court of Appeals for the 5th Circuit | 6/30/2015 |
| US Court of Appeals for the 11th Circuit | 8/23/2017 |
| US Eastern District of Arkansas | 11/11/2019 |
| US Western District of Arkansas | 11/11/2019 |
| US Court of Appeals for the 6th Circuit | 5/13/2021 |
| USDC Western District of Tennessee | 2/15/2023 |
| United States Supreme Court | 3/20/2023 |
| USDC Northern District of Ohio | 4/13/2023 |
| USDC Eastern District of Tennessee | 5/25/2023 |
| USDC Middle District of Tennessee | 8/14/2023 |
| Alabama state courts | 9/27/2003 |
| Florida state courts | 4/25/2006 |
| Tennessee state courts | 2/17/2022 |

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Woodruff-Roebuck Water District v. AFL Telecommunications, LLC, et al | Active | 7/9/2024 | Marghretta Shisko | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/22/2024 | John B. White | Granted |
| Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC, et al | Active | 8/22/2024 | John B. White | Granted |
| South Carolina Public Service Authority v. China Jushi USA Corporation, et al | Active | 12/11/2024 | John B. White | Pending |
| City of Florence, South Carolina v. Burlington Industries, Inc. | Active | 12/11/2024 | Marghretta Shisko | Pending |

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that _____ **Frank Jerome Tapley** _____ was duly and legally admitted to practice law by the Supreme Court of Alabama on _____ September 26, 2003 _____ and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on _____ December 4, 2024 _____

with the seal of the Supreme Court of Alabama attached.



*Megan B. Rhodebeck*

Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

January 9, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:     The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Frank Jerome Tapley be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Frank Jerome Tapley
Marghretta Shisko

FILED
UNION COUNTY, SC
2025 JAN 13 PH 2:17
CLERK OF COURT
Stephanie Kitchens

ELECTRONICALLY FILED - 2025 Jan 06 11:10 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF FRANK JEROME TAPLEY**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff City of Union, South Carolina, to admit Frank Jerome Tapley, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Jan 06 11:10 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



Union Common Pleas

**Case Caption:**     City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**     2024CP4400558

**Type:**     Order/Pro Hac Vice


So Ordered

/s William A. McKinnon, #2761, Circuit Judge


Electronically signed on 2025-01-06 10:54:37     page 2 of 2

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CASE NO. 2024-CP-44-00558

**MOTION FOR PRO HAC VICE ADMISSION OF ROBERT AKIRA WATSON**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Robert Akira Watson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. As of the date of the filing of this motion, no one has entered an appearance as counsel of record for any defendant in this matter.

Mr. Watson is a member in good standing with his local bar association, and the Verified

1

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary

information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 30, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /Marghretta H. Shisko*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

2

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE* IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | In The Court Of Common Pleas Sixteenth Judicial Circuit |
|---|---|---|
| City of Union, South Carolina, | 2024-CP-44-00558 | |
| Plaintiff | Case No. | Tribunal |
| vs. | | |
| Milliken & Company; Suminoe Textile Of America Corporation; and Tietex International, Ltd., | Mailing Address of Tribunal: | 210 West Main St. |
| | | Union, SC 29379 |
| Defendant | | |

Comes now <u>Robert Akira Watson</u>, applicant herein, and respectfully represents the following:

1. Applicant resides at:

<u>5816 Southhall Rd.</u>
Street Address

| Birmingham, AL | Jefferson | Alabama | 35222 |
|---|---|---|---|
| City | County | State | Zip Code |

<u>205-207-7121</u>
Telephone

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

<u>Cory Watson, P.C.</u>, with offices at

<u>2131 Magnolia Avenue South</u>
Street Address

| Birmingham | Jefferson | Alabama | 35205 |
|---|---|---|---|
| City | County | State | Zip Code |
| 205-328-2200 | 205-354-3666 | 205-324-7896 | awatson@corywatson.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

3. Applicant has been retained personally or as a member of the above-named law firm by

<u>City of Union, South Carolina</u> to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since <u>September 25th</u> of <u>2020</u>, Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of <u>Alabama</u> where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/25/2020 |
| United States District Court Northern District of Alabama | 11/16/2020 |
| United States District Court Southern District of Alabama | 12/2/2020 |
| Alabam state courts | 9/25/2020 |
| | |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Yes

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency?  If yes, give particulars, e.g., jurisdiction, court date.

No

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked?  If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9. Please be aware that local counsel must be Rule 403 certified.  Local counsel of record associated

with Applicant in this case is ___Marghretta Shisko___ of the ___John B. White, Jr., P.A.___

law firm, which has offices at:

291 S Pine Street/ P.O. Box 2465 (29304)

_____
Street Address

| Spartanburg | Spartanburg | South Carolina | 29305 |
|---|---|---|---|
| City | County | State | Zip Code |
| 864-594-5988 | 864-590-3907 | 864-594-5870 | mshisko@johnbwhite.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

*Page 2 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

100106
_____
South Carolina Bar Number
(You must provide Bar Number)

10.     Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See attached Exhibit A |
|---|

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____ 27th _____ day of _December_, 20 _24_

_____
APPLICANT

*Page 3 of 4*

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# VERIFICATION

STATE OF ___Alabama_____ )

COUNTY OF _____Jefferson_____ )

I, _____Robert Akira Watson_____, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___27th___ day of ___December_____, 20 _24_

_____
(Notary Signature)

Notary Public for the State of ___Alabama___

My Commission Expires: ___June 24, 2028___

*[Notary Seal: TARA LEIGH CLONTS, MY COMMISSION EXPIRES JUNE 24, 2028, NOTARY PUBLIC, STATE OF ALABAMA]*

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this _30th_____ day of _December_, 20 24____

_____
LOCAL COUNSEL OF RECORD

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this _30th_ day of _December_____, 20 24___

_____

*Page 4 of 4*

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Woodruff-Roebuck Water District v. AFL Telecommunications, LLC, et al | Active | 7/3/2024 | Marghretta Shisko | Granted |
| Laurens County Sewer Commission v. Cone Mills Receiver, LLC, et al | Active | 8/21/2024 | Marghretta Shisko | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/22/2024 | Marghretta Shisko | Granted |
| South Carolina Public Service Authority v. China Jushi USA Corporation, et al | Active | 12/11/2024 | Marghretta Shisko | Pending |
| City of Florence, South Carolina v. Burlington Industries, Inc. | Active | 12/11/2024 | Marghretta Shisko | Pending |

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that _____ Robert Akira Watson _____ was duly and legally admitted to practice law by the Supreme Court of Alabama on _____ September 25, 2020 _____ and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on _____ December 4, 2024 _____ with the seal of the Supreme Court of Alabama attached.



*Megan B. Rhodebeck*

Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama

ELECTRONICALLY FILED - 2024 Dec 30 3:56 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

January 9, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:    The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Robert Akira Watson be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:    Robert Akira Watson
       Marghretta Shisko

FILED
UNION COUNTY, SC
2025 JAN 13 PM 2: 17
CLERK OF COURT
Stephanie Kitchens

ELECTRONICALLY FILED - 2025 Jan 06 11:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF ROBERT AKIRA WATSON**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff City of Union, South Carolina, to admit Robert Akira Watson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Jan 06 11:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



Union Common Pleas

**Case Caption:**    City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**    2024CP4400558

**Type:**    Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-01-06 11:09:58    page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 06 11:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF HANNAH CORY CALDWELL**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff City of Union, South Carolina, to admit Hannah Cory Caldwell, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Jan 06 11:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



Union Common Pleas

**Case Caption:**     City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**     2024CP4400558

**Type:**     Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-01-06 11:05:18      page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 06 11:13 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF HAMILTON JORDAN**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff City of Union, South Carolina, to admit Hamilton Jordan, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Union Common Pleas

**Case Caption:**    City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**    2024CP4400558

**Type:**    Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-01-06 11:12:52    page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 06 11:13 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jan 06 11:10 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF UNION | FOR THE SIXTEENTH JUDICIAL CIRCUIT |

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF FRANK JEROME TAPLEY**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff City of Union, South Carolina, to admit Frank Jerome Tapley, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Jan 06 11:10 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



Union Common Pleas

**Case Caption:**    City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**    2024CP4400558

**Type:**    Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-01-06 10:54:37    page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 06 11:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF UNION | FOR THE SIXTEENTH JUDICIAL CIRCUIT |

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF ROBERT AKIRA WATSON**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff City of Union, South Carolina, to admit Robert Akira Watson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Jan 06 11:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



Union Common Pleas

**Case Caption:**    City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**    2024CP4400558

**Type:**    Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-01-06 11:09:58    page 2 of 2



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

January 9, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:    The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Hannah Cory Caldwell be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely

M.J. Thames
Bar Admissions Coordinator

cc:    Hannah Cory Caldwell
       Marghretta Shisko

FILED
UNION COUNTY, SC
2025 JAN 13 PH 2:17
CLERK OF COURT
Stephanie Kitchens



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

January 9, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:    The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Hamilton Jordan be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M. J. Thames
Bar Admissions Coordinator

cc:    Hamilton Jordan
       Marghretta Shisko

FILED
UNION COUNTY, SC
2025 JAN 13 PH 2:17
CLERK OF COURT
Stephanie Kitchens



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

January 9, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:    The City of Union, South Carolina v. Milliken & Company, et al.

     Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Robert Akira Watson be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:    Robert Akira Watson
Marghretta Shisko

FILED
UNION COUNTY, SC
2025 JAN 13 PH 2:17
CLERK OF COURT
Stephanie Kitchens

STATE OF SOUTH CAROLINA
COUNTY OF UNION

IN THE COURT OF COMMON PLEAS
FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY; SUMINOE TEXTILE
OF AMERICA CORPORATION; AND TIETEX
INTERNATIONAL, LTD..,

Defendants.

C.A. No. 2024-CP-44-00558

**ACCEPTANCE OF SERVICE
ON BEHALF OF
MILLIKEN & COMPANY**

Pursuant to Rule 4(j), SCRCP, I hereby accept and acknowledge service and my receipt via email of the Summons and Complaint in the above captioned matter on behalf of Defendant Milliken & Company ("Milliken"), effective this 16th day of January, 2025, with no further service on Milliken being necessary.

Jameson B. Carroll
Carroll & Weiss LLP
2870 Peachtree Rd. NW, Ste. 193
Atlanta, GA 30305-2918
404-514-5061
jcarroll@carrollweiss.com

*Counsel for Milliken & Company*

ELECTRONICALLY FILED - 2025 Jan 17 10:12 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jan 17 5:32 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**STATE OF SOUTH CAROLINA**

**COUNTY OF SPARTANBURG**

**IN THE COURT OF COMMON PLEAS**

**SEVENTH JUDICIAL CIRCUIT**

Woodruff-Roebuck Water District,

Plaintiff,

v.

AFL Telecommunications, LLC *et al.*,

Defendants.

C.A. No. 2024-CP-42-02480

---

**STATE OF SOUTH CAROLINA**

**COUNTY OF GREENWOOD**

**IN THE COURT OF COMMON PLEAS**

**EIGHTH JUDICIAL CIRCUIT**

Greenwood Commissioners of Public Works,

Plaintiff,

v.

Cone Mills Receiver, LLC *et al.*,

Defendants.

C.A. No. 2024-CP-24-00735

---

**STATE OF SOUTH CAROLINA**

**COUNTY OF LAURENS**

**IN THE COURT OF COMMON PLEAS**

**EIGHTH JUDICIAL CIRCUIT**

Laurens County Water and Sewer Commission,

Plaintiff,

v.

Cone Mills Receiver LLC *et al.*,

Defendants.

C.A. No. 2024-CP-30-00734

ELECTRONICALLY FILED - 2025 Jan 17 5:32 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**STATE OF SOUTH CAROLINA**

**COUNTY OF HORRY**

**IN THE COURT OF COMMON PLEAS**

**FIFTEENTH JUDICIAL CIRCUIT**

Grand Strand Water and Sewer Authority,

Plaintiff,

v.

Aladdin Manufacturing Corporation *et al.*,

Defendants.

C.A. No. 2024-CP-26-05523

---

**STATE OF SOUTH CAROLINA**

**COUNTY OF FLORENCE**

**IN THE COURT OF COMMON PLEAS**

**TWELFTH JUDICIAL CIRCUIT**

City of Florence, South Carolina,

Plaintiff,

v.

Aladdin Manufacturing Corporation *et al.*,

Defendants.

C.A. No. 2024-CP-21-02844

---

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**NINTH JUDICIAL CIRCUIT**

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

Plaintiff,

v.

China Jushi USA Corporation *et al.*,

Defendants.

C.A. No. 2024-CP-08-03336

ELECTRONICALLY FILED - 2025 Jan 17 5:32 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**STATE OF SOUTH CAROLINA**

**COUNTY OF UNION**

**IN THE COURT OF COMMON PLEAS**

**SIXTEENTH JUDICIAL CIRCUIT**

| | |
|---|---|
| City of Union, South Carolina,<br><br>Plaintiff,<br>v.<br><br>Milliken & Company *et al.*,<br><br>Defendants. | C.A. No. 2024-CP-44-00558 |

**STATE OF SOUTH CAROLINA**

**COUNTY OF LAURENS**

**IN THE COURT OF COMMON PLEAS**

**EIGHTH JUDICIAL CIRCUIT**

| | |
|---|---|
| City of Clinton, South Carolina,<br><br>Plaintiff,<br>v.<br><br>Fibertex Nonwovens, Inc. *et al.*,<br><br>Defendants. | C.A. No. 2025-CP-30-00005 |

## PLAINTIFFS' STATUS CONFERENCE STATEMENT

Plaintiffs in this consolidated litigation[1] are local and regional public utilities and water authorities who share a common challenge: the contamination of their water sources and properties with certain perfluoroalkyl substances ("PFAS").

---

[1] The undersigned represent Plaintiffs Woodruff-Roebuck Water District; Greenwood Commissioners of Public Works; Laurens County Water and Sewer Commission; Grand Strand Water and Sewer Authority; City of Florence, South Carolina; South Carolina Public Service Authority (Santee Cooper); City of Union, South Carolina; and City of Clinton, South Carolina. Pursuant to the Supreme Court's consolidation order, this litigation also includes additional local public utilities and water authorities.

ELECTRONICALLY FILED - 2025 Jan 17 5:32 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

The Environmental Protection Agency's recent publications mark a significant advancement in the scientific understanding of PFAS toxicity. While the EPA previously advised that PFOA and PFOS—the two most studied PFAS compounds—could be safely consumed at levels of up to 70 parts per trillion ("ppt") over a lifetime, the agency now makes clear that **no safe level exists** for consuming these chemicals. Building on this understanding, the EPA has enacted maximum contaminant levels under the Safe Drinking Water Act for PFOA, PFOS, and four additional PFAS types ("MCL PFAS"). These regulations prohibit water authorities from delivering drinking water containing MCL PFAS concentrations above these newly defined thresholds, with enforcement to begin in 2029.

However, like the vast majority of water providers, Plaintiffs rely on conventional water treatment technologies that are unable to remove PFAS. And MCL PFAS, including PFOA and PFOS, currently contaminate their drinking water, which leaves Plaintiffs' treatment plants at levels above the EPA limits. Not only does the PFAS contamination pose an obstacle to Plaintiffs' legal compliance and injure Plaintiffs' property interests—according to the EPA, it directly threatens public health and the environment. Indeed, even if Plaintiffs were subject to no regulation, the EPA's stance alone compels that Plaintiffs act to protect their own interests and those of their customers and communities.

Plaintiffs serve cities and counties across the state, providing water to over 800,000 residences and businesses. When accounting for spouses, children, employees, tenants, patients, and other individuals in these communities, the PFAS contamination problem in Plaintiffs' water supplies impacts **well over a million South Carolina residents**—approaching or exceeding 25% of the state's population.

The contamination spreads through South Carolina's rivers, lakes, and streams—surface waters that Plaintiffs are authorized to withdraw, treat, and provide to customers. It is largely driven by private industries that utilize MCL PFAS in their manufacturing processes, generating PFAS-laden wastewater. These industries discharge wastewater into local treatment plants, which process and release it into the same surface waters that Plaintiffs rely on for drinking water. Unfortunately, as at Plaintiffs' water facilities, PFAS bypass the conventional treatment systems used by wastewater treatment plants and flow unhindered into the state's surface waters. These contaminated waters then pass through Plaintiffs' water plants just as easily and into homes and businesses across the state.

Plaintiffs commenced this litigation not only to protect their own rights, but also because the PFAS contamination presents a critical public health and infrastructural challenge—a burden that neither Plaintiffs nor their customers can, or should, bear alone. Plaintiffs' surface water treatment plants require upgraded treatment technologies to provide PFAS-free water. And Plaintiffs believe that the financial burden of these upgrades should not fall on their drinking water customers and communities, who bear no responsibility for this contamination. Instead, those who caused and profited from the contamination must be held accountable to ensure this crisis is justly resolved. Plaintiffs are seeking to do so both comprehensively and urgently.

Plaintiffs have named numerous industries as defendants due to their alleged discharge of PFAS-contaminated wastewater, either directly to South Carolina surface waters or indirectly through their applicable wastewater treatment providers. Plaintiffs also anticipate adding as defendants the chemical suppliers of PFAS-discharging defendants upon receiving discovery revealing their identities. Thus, Plaintiffs anticipate that the number of parties and scope of discovery in this litigation will be significant.

ELECTRONICALLY FILED - 2025 Jan 17 5:32 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jan 17 5:32 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Discovery topics will include:

- The identities of the suppliers of products containing or degrading to MCL PFAS used by Defendants;

- The type and volume of PFAS-containing products supplied to and used by Defendants;

- The industrial processes employed by Defendants who use these products and cause their discharge;

- The chemical composition of the products at issue, including the mechanisms by which the MCL PFAS are present in the products;

- The fate and transport of these products—i.e., the means by which they are used, disposed of, and eventually reach surface waters, Plaintiffs' water sources, and Plaintiffs' properties;

- Defendants' historical knowledge of the chemical properties of, and the environmental and health risks posed by, these products; and

- Instructions, if any, from Defendants' chemical suppliers as to the nature of these products and their proper disposal.

Based on the experience of Plaintiffs' counsel in litigating PFAS cases involving complex topics of chemistry, industry history, and fate and transport, Plaintiffs believe that this discovery will require extensive document production, witness testimony from officers and employees of Plaintiffs and all Defendants, and property inspections.

The volume of complex matters in this case presents unique challenges in organizing and managing recurring issues—both in discovery and in substantive litigation.

Plaintiffs, therefore, make the following recommendations:

1. *Appointment of Leadership*. Leadership counsel will provide the Court with the means for efficiently contacting all parties in each case for scheduling matters, and it will aid the parties in informally resolving issues that require consent or agreement among the parties.

2. *Consolidated Case Number*. A consolidated case number provides a centralized docket for all filings concerning consolidated matters.

3. *Initial Disclosures*. Core discovery topics applicable to all cases can be covered at the outset in each case, including the following:

ELECTRONICALLY FILED - 2025 Jan 17 5:32 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

    a.   Sales records of products containing MCL PFAS;

    b.   Identification of suppliers of MCL PFAS;

    c.   Applicable insurance policies;

    d.   The analytical results of any PFAS testing conducted by the responding party;

    e.   Previous depositions in other cases by any party concerning PFAS; and

    f.   Identification of experts.

4. *Discovery Protocols.* Standard discovery protocols inform the parties of this Court's expectations in how to approach matters that can otherwise cause delay, such as disputes and scheduling difficulties. Protocols should cover matters such as:

    a.   Objections to written discovery, including the prohibition of both boilerplate and general objections, and requiring clarity as to whether the responding party is withholding responsive information based on an objection;

    b.   Special interrogatories;

    c.   Property inspection procedures, including scheduling and setting protocols for PFAS-sampling methods and parameters;

    d.   Standard procedures for resolving discovery disputes, including meet and confer processes and resolution with the Court;

    e.   Privilege logs;

    f.   Document requests made to Plaintiffs via the Freedom of Information Act;

    g.   Subpoenas;

    h.   Production of documents and electronically stored information;

    i.   Deposition scheduling and conduct; and

    j.   Protective orders, including confidentiality designations for documents and testimony produced in discovery.

5. *Periodic Conferences before the Court.* Regular conferences before this Court will aid efficiencies in many ways, including dispute resolution and maintaining discovery scheduling.

6. *Consolidated Briefing.* Except for motions involving facts unique to a particular Defendant, consolidated briefing will prevent frequent repetition and bloat from overburdening the parties and the Court, while maintaining full and fair representation of the parties' views on the facts and their legal arguments.

7. *Setting Trial Dates.* Firm trial dates aid all parties in completing discovery and readying the case for resolution. Plaintiffs recommend January 2027.

ELECTRONICALLY FILED - 2025 Jan 17 5:32 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Due to the volume of parties and factual complexities in these cases, Plaintiffs believe that a Case Management Order streamlining these matters as outlined above will significantly contribute to resolving this case in the most efficient and timely manner possible.

Respectfully submitted,

 */s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiffs*

January 17, 2025

# The Supreme Court of South Carolina

RE:  PFAS Litigation

_____

## O R D E R

_____

Pursuant to the provisions of Article V, Section 4 of the South Carolina Constitution, I find that assigning a single circuit judge to dispose of all matters arising out of the PFAS litigation currently pending and to be filed in the state court system will promote the effective and expeditious disposition of this litigation through uniform rulings and will conserve the judicial resources of the parties, their counsel, and the judiciary.  Therefore,

IT IS ORDERED that the Honorable Grace Gilchrist Knie be vested with exclusive jurisdiction to hear and dispose of all PFAS litigation cases.  Judge Knie shall decide all pretrial motions and other pretrial matters, including appropriate scheduling deadlines and admission of counsel *pro hac vice* pursuant to Rule 404, SCACR, arising out of the PFAS cases filed in the state court system. Judge Knie shall have jurisdiction in all circuits in the state to dispose of all pretrial matters arising out of the PFAS litigation and may schedule such hearings as may be necessary at any time without regard as to whether there is a term of court scheduled.

IT IS FURTHER ORDERED that for administrative purposes and convenience, upon the filing of a new action involving PFAS litigation, the clerk of court shall notify Judge Knie, via email, of such filing within five business days. This notification shall include the case caption, including the docket number, as well as the name of the attorney or party signing the pleadings.  Judge Knie shall then direct the clerk of court as to the preferred method for transmitting the pleadings and additional filings to her office.

IT IS FURTHER ORDERED that Judge Knie shall have jurisdiction to issue case management orders directing the consolidation of certain pretrial matters within the PFAS litigation.

IT IS FURTHER ORDERED that this is not a consolidation for trial purposes.  At the conclusion of all pretrial matters, any party may move to have

ELECTRONICALLY FILED - 2025 Jan 23 2:57 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

trial ready cases transferred to the trial roster of the court of original jurisdiction or the court of appropriate venue for trial. Judge Knie shall preside over the trials of all PFAS cases.

This order shall remain in effect until amended or rescinded by the Chief Justice.

_____ C.J.
FOR THE COURT
John W. Kittredge
Chief Justice of South Carolina

Columbia, South Carolina
August 14, 2024

ELECTRONICALLY FILED - 2025 Jan 23 2:57 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jan 23 2:57 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# The Supreme Court of South Carolina

RE: Local PFAS Litigation

## ORDER

Pursuant to the provisions of Article V, section 4 of the South Carolina Constitution, I find that assigning a single circuit judge to dispose of all matters arising out of the PFAS litigation brought by publicly-owned water providers seeking damages within their local districts (Local PFAS Litigation) currently pending and to be filed in the state court system will promote the effective and expeditious disposition of this litigation through uniform rulings and will conserve the judicial resources of the parties, their counsel, and the judiciary. Therefore,

IT IS ORDERED that the Honorable Grace Gilchrist Knie be vested with exclusive jurisdiction to hear and dispose of all Local PFAS Litigation cases. Judge Knie shall decide all pretrial motions and other pretrial matters, including appropriate scheduling deadlines and admission of counsel *pro hac vice* pursuant to Rule 404, SCACR, arising out of the Local PFAS Litigation cases filed in the state court system. Judge Knie shall have jurisdiction in all circuits in the state to dispose of all pretrial matters arising out of the Local PFAS Litigation and may schedule such hearings as may be necessary at any time without regard to whether there is a term of court scheduled.

IT IS FURTHER ORDERED that for administrative purposes and convenience, upon the filing of a new action involving Local PFAS Litigation, the clerk of court shall notify Judge Knie, via email, of such filing within five business days. This notification shall include the case caption, including the docket number, as well as the name of the attorney or party signing the pleadings. Judge Knie shall then direct the clerk of court as to the preferred method for transmitting the pleadings and additional filings to her office.

IT IS FURTHER ORDERED that Judge Knie shall have jurisdiction to issue case management orders directing the consolidation of certain pretrial matters within the Local PFAS Litigation.

ELECTRONICALLY FILED - 2025 Jan 23 2:57 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

IT IS FURTHER ORDERED that this is not a consolidation for trial purposes. At the conclusion of all pretrial matters, any party may move to have trial ready cases transferred to the trial roster of the court of original jurisdiction or the court of appropriate venue for trial. Judge Knie shall preside over the trials of all Local PFAS Litigation cases.

This order supersedes the PFAS Litigation Order dated August 14, 2024, and shall remain in effect until amended or rescinded by the Chief Justice.

John W. Kittredge
Chief Justice of South Carolina

Columbia, South Carolina
October __7__, 2024

ELECTRONICALLY FILED - 2025 Jan 24 8:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA     )    IN THE COURT OF COMMON PLEAS
COUNTY OF SPARTANBURG     )
             )
             )
IN RE:            )
             )      NOTICE
             )    OF STATUS CONFERENCE
PFAS LITIGATION       )
COORDINATED DOCKET    )
             )
             )
_____ )

A status conference has been set in the PFAS Litigation cases for 11:00 a.m. on Friday, January 24, 2025, at the Spartanburg County Courthouse in Courtroom 6D and will be on Judge Knie's virtual courtroom.

Counsel has been notified via electronic mail.

IT IS SO ORDERED at Spartanburg, South Carolina this 23rd day of January, 2025.

Honorable Grace Gilchrist Knie
Circuit Judge
S.C. PFAS Litigation



ELECTRONICALLY FILED - 2025 Feb 03 9:59 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF |
|---|---|---|
| COUNTY OF UNION | ) | COMMON PLEAS |

STATE OF SOUTH CAROLINA          )          IN THE COURT OF
COUNTY OF UNION                          )          COMMON PLEAS
                                                          )
                                                          )
City of Union, South Carolina           )
                                    Plaintiff,     )          **AFFIDAVIT OF SERVICE**
                         vs.                      )
                                                          )
Milliken & Company; Suminoe Textile of   )
America Corporation; and Tietex          )
International, LTD.                          )
                                    Defendant.  )          Case No. 2024-CP-44-00558

I, **Clay Scruggs**, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service:

**SERVED:** Christy Paysour, Registered Agent for Suminoe Textile of America Corporation

**WITH:** Letter from John B. White Jr., P.A., Summons (Jury Trial Demanded) and Complaint (Jury Trial Demanded)

**AT:** 10 Commerce Drive, Gaffney, SC 29340

**ON:** January 28, 2025 at 9:18am

**MANNER OF SERVICE:** Personally

_____
SIGNATURE OF PROCESS SERVER

SUBSCRIBED AND SWORN to before me this _28th_ day of _January_, 2025.

_____
NOTARY PUBLIC for the state of South Carolina.
My Commission Expires: _Feb. 23, 2028._

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF UNION | ) | CASE NO: 2024-CP-44-00558 |
| | ) | |
| City of Union, South Carolina, | ) | |
| | ) | |
| Plaintiff, | ) | **AFFIDAVIT OF SERVICE** |
| | ) | |
| vs. | ) | |
| | ) | |
| Milliken & Company; Suminoe | ) | |
| Textile of America Corporation; and | ) | |
| Tietex International, LTD, | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned, Debbie Brothers being duly sworn, says that she served the foregoing: **COVER LETTER, SUMMONS AND COMPLAINT** in the above captioned action upon the Defendant **TIETEX INTERNATIONAL, LTD** by delivering the same to:

( ) the individual personally

(X) **BRITTANY HARRIS-COOK, Agent for Paracorp Incorporated, Registered Agent** person served as authorized/designated to receive service for the defendant and leaving one copy of same at **1205 Pendleton Street, Suite 525, Columbia, SC** on the **4th day** of **February, 2025,** at **8:40 a.m.**

The Affiant further says, that upon information and belief, she know the person so served to be the defendant mentioned and described in the documents served and that the affiant is not a party to nor interested in the action.

_Debbie Brothers_
Debbie Brothers

SWORN TO before me this 5 day
of _February_ ,2025.
_Mcarthur Lewis_
Notary Public for S.C.
My Commission Expires: 3-6-2025

ELECTRONICALLY FILED - 2025 Feb 10 3:12 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF UNION** | ) | **SIXTEENTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| CITY OF UNION, SOUTH CAROLINA, | ) | C.A. No. 2024-CP-44-00558 |
| | ) | |
| *Plaintiff,* | ) | **PFAS Litigation Coordinated Docket** |
| | ) | |
| v. | ) | |
| | ) | |
| MILLIKEN & COMPANY; SUMINOE | ) | |
| TEXTILE OF AMERICA | ) | |
| CORPORATION; and TIETEX | ) | |
| INTERNATIONAL, LTD., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

### MILLIKEN & COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendant MILLIKEN & COMPANY ("Milliken"), pursuant to Rules 8(a), 12(b)(1), and 12(b)(6) of the South Carolina Rules of Civil Procedure, hereby submits its Memorandum of Law in Support of its Motion to Dismiss all claims asserted against it in Plaintiff's Complaint, respectfully stating as follows:

### INTRODUCTION

Plaintiff's four causes of action against Milliken arise from allegations Milliken used per- and polyfluoroalkyl chemicals (known as "PFAS") at four of its facilities in South Carolina; Milliken discharged those chemicals, often to wastewater treatment facilities; the facilities did not treat the wastewater properly, and PFAS flowed into plaintiff's water intakes. Plaintiff contends it will have to upgrade its facilities to remove PFAS to meet new U.S. Environmental Protection Agency ("EPA") standards set to take effect in 2029, and demands Milliken and its codefendants foot the bill.

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Despite those allegations, plaintiff's Complaint does not state a claim against Milliken. Based on the allegations in the Complaint itself, plaintiff's claims fail for four reasons:

1. **The claims are not ripe.** Plaintiff contends it will be required to acquire, install, and operate new "water treatment technologies" in the future, but the Complaint itself acknowledges it is currently testing its water to determine whether and to what extent it is over the future limit – if that limit survives court challenges and the change in presidential administrations. At this point, whether plaintiff will need to undertake any work is in question.

2. **Milliken did not control the discharge at issue.** Plaintiff itself admits two of the facilities discharged their wastewater to treatment plants ("WWTPs"), and there is no allegation Milliken violated any permit or regulation in doing so. It is the Inman and A. Manning Lynch WWTPs that are alleged to have discharged PFAS into rivers upstream from plaintiff's intakes on the Broad River. It is the operators of those facilities, not Milliken, who may be liable for any failure to remove PFAS from their discharge, and for discharging them in a manner that could impact plaintiff. For that reason, Milliken did not owe plaintiff a duty of care to support a negligence claim and its actions cannot form the basis for a nuisance claim as to those two facilities.

3. **An alleged contamination of public waters is not a private nuisance.** South Carolina law does not permit a claim for private nuisance for an act that affects the general public.

2

4.  **Voluntary acceptance of intangible matter cannot be a trespass.** Plaintiff's

trespass claim fails for two reasons: PFAS molecules constitute "intangible"

matter, and plaintiff brought any PFAS onto its property by its own actions.

For all those reasons, plaintiff's claims fail as a matter of law and should be dismissed.

## ARGUMENT AND CITATION TO AUTHORITY

### A.  PLAINTIFF'S CLAIMS ARE NOT RIPE FOR ADJUDICATION

#### 1.  A claim is not ripe for adjudication until there is a cognizable injury.

"A threshold inquiry for any court is a determination of justiciability, i.e., whether the

litigation presents an active case or controversy." *Peoples Fed. Sav. & Loan Ass'n of S.C. v. Res.*

*Plan. Corp.*, 358 S.C. 460, 477, 596 S.E.2d 51, 60 (2004) (quoting *Lennon v. S.C. Coastal*

*Council,* 330 S.C. 414, 415, 498 S.E.2d 906, 906 (S.C. App. 1998)). Justiciability includes

whether the plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc.*, 390 S.C. 188,

193, 701 S.E.2d 730, 732 (2010) (citing *Jackson v. State*, 331 S.C. 486, 490 n.2, 489 S.E.2d 915,

917 n.2 (1997)). Where, as explained below, a claim presents only "a contingent, hypothetical or

abstract dispute," the claim is not ripe for adjudication and must be dismissed. *See Pee Dee Elec.*

*Co-op., Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983); *see*

*also Peoples Fed. Sav. & Loan Ass'n of S.C.*, 358 S.C. at 477, 596 S.E.2d at 60 ("A justiciable

controversy is a real and substantial controversy which is ripe and appropriate for judicial

determination, as distinguished from a contingent, hypothetical or abstract dispute.") (citation

omitted).[1] *See also Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 361 S.C. 544,

---

[1] *See also Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 294 (4th Cir. 2022) (claim is unripe if "plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'") (citation omitted); *South Carolina v. U.S.*, 912 F.3d 720, 730 (4th Cir. 2019) (claim unripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quoting *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013))).

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

557, 606 S.E.2d 752, 759 (2004) (affirming dismissal of complaint where claims were contingent in nature and therefore not yet ripe for adjudication).[2]

### 2. Plaintiff has not shown it will need to act to meet new EPA standards.

In this case, plaintiff's own allegations demonstrate it has not yet suffered any legally cognizable injury due to PFAS, and in fact it might never suffer such injury. Indeed, while EPA's standards for "maximum contaminant levels" ("MCLs") of PFAS became final in April 2024 (Compl. ¶ 37), it has not yet been determined how, if at all, the rule will impact the plaintiff or its ability to provide acceptable drinking water. Most importantly, plaintiff will not be required to comply with the MCLs until April 26, 2029. (*Id.* ¶ 39). Prior to that date is a three-year "initial monitoring" period that runs through April 26, 2027. (*Id.*; *see also* PFAS Nat'l Primary Drinking Water Reg., 89 Fed. Reg. 32,532, 32,633 (Apr. 26, 2024) (codified at 40 CFR Parts 141 and 142).)

Plaintiff does not allege any facts demonstrating it will have to take action of any sort to comply with the 2029 MCLs. In fact, plaintiff has not alleged that it has incurred any costs or expenses whatsoever due to the presence of PFAS in its source water. Rather, it is seeking "expenses associated with *future* acquisition, installation, and operation of required treatment technologies." (Compl. ¶¶ 67, 89 (emphasis added)). Nothing in the Complaint indicates plaintiff has changed its operations either since EPA finalized the MCLs in April or as a result of any PFAS in the Broad River.

---

[2] *See also Kiawah Prop. Owners Grp. v. Pub. Serv. Comm'n of S.C.*, 357 S.C. 232, 242-43, 593 S.E.2d 148, 154 (2004) (no justiciable controversy where plaintiffs "assert only that the loan provisions may have some negative impact in the future" on water utility's customers); *McClanahan v. Richland Cnty. Council*, 350 S.C. 433, 441, 567 S.E.2d 240, 244 (2002) (property owner's claim based on adoption of land use plan not yet implemented is unripe); *see also, e.g.*, *Tracy v. Tracy*, 384 S.C. 91, 100, 682 S.E.2d 14, 18 (S.C. App. 2009) (determining case not ripe for review where appellant not yet exposed to liability due to appellee's conduct).

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

### 3. The standards at issue may never go into effect.

This status quo may continue indefinitely. Plaintiff's testing during the initial monitoring period may indicate plaintiff will not have to make any capital investments to remain in compliance with applicable regulations. And that's if the MCLs go into effect at all: In June 2024, three sets of plaintiffs filed challenges to the EPA's PFAS rule in actions currently pending before the D.C. Circuit Court of Appeals. *See* Pet. for Rev., *The Chemours Co. v. EPA*, No. 24-1192 (D.C. Cir. June 10, 2024)[3]; Pet. for Rev, *Nat'l Assoc. of Mfrs. v. EPA*, No. 24-1191 (D.C. Cir. June 10, 2024)[4]; Pet. for Rev, *Am. Water Works Assoc. v. EPA*, No. 24-1188 (D.C. Cir. June 7, 2024)[5]. Changes to the MCLs that could result from these cases could also affect the extent to which plaintiff must take any action to comply, if at all; and the MCLs could simply be changed or eliminated entirely based on differing priorities of the incoming Trump Administration.[6] Indeed, the effective date for the new MCLs were paused 60 days for review by executive order on January 20, 2025, along with other similarly situated pending rules.[7] These circumstances preclude plaintiff's claims from being ripe at this time. *See Jowers v. S.C. Dep't of Health & Env't Control*, 423 S.C. 343, 364, 815 S.E.2d 446, 457 (2018) (finding action was not ripe because claim "depends on there being no changes to the law regarding surface water withdrawals"). Because of these numerous contingencies and the resulting uncertainty, the facts alleged by plaintiff demonstrate at most "the mere threat of potential injury," which is "too contingent or remote to support present adjudication." *Waters v. S.C. Land Res. Cons. Comm'n*, 321 S.C. 219, 228, 467 S.E.2d 913, 918 (1996) (quoting *Thrifty Rent-A-Car Sys., Inc. v. Thrifty*

---

[3] Available at https://www.epa.gov/system/files/documents/2024-06/chemours- v.-epa_d.c.cir_.pdf.
[4] Available at https://www.fbm.com/content/uploads/2024/06/24-1191_Documents.pdf.
[5] Available at https://www.awwa.org/Portals/0/AWWA/Government/062124Insiders/AWWA-v- EPA-No-1188-DC-Cir-Filed-Petition.pdf.
[6] *See, e.g.,* https://www.usatoday.com/story/news/investigations/2024/11/08/water-activists-worried-about-trump-presidency/76110402007/.
[7] https://www.whitehouse.gov/presidential-actions/2025/01/regulatory-freeze-pending-review/.

*Auto Sales of Charleston, Inc.*, 849 F. Supp. 1083, 1086 (D.S.C. 1991)). For this reason alone, plaintiff's claims are not ripe for adjudication and should be dismissed.

**4.  South Carolina law does not allow a public utility like plaintiff to recover the costs of providing its statutory services.**

Plaintiff's claims should also be dismissed because it is a public utility authorized by statute to provide a service to the public at large. Under the municipal cost recovery rule, a public entity cannot recover in tort the cost incurred in providing its services – for example, a fire department cannot sue a person who left a space heater plugged in for the cost of its response. *See*, *e.g.*, *Walker County v. Tri-State Crematory*, 284 Ga. App. 34, 36–37 (2007) (county cannot sue crematorium for cost occurred in cleaning up contaminated site); *Pittsburgh v. Equitable Gas*, 512 A.2d 83, 84 (Pa. Cmwlth. Ct. 1986) (city cannot sue gas provider for cost of emergency response after explosion).

Here, plaintiff is authorized – and, indeed, directed – to provide clean water to residents in its service area pursuant to the State Safe Water Drinking Act, S.C. Code § 44-55-10, *et seq.*, and enabling regulations. But nothing in the statute authorizes a public water utility to recover the cost of providing that service from an entity it contends makes that service necessary. *See id.*; *see also United States v. Standard Oil Co. of Cal.*, 332 U.S. 301 (1947) (reversing judgment for federal government seeking recovery for cost of treating soldier insured in accident because recovery not authorized by Congress); *Pittsburgh*, 512 A.2d at 84 (city may not recover absent authorization from legislature). Nor has any South Carolina court authorized a claim as plaintiff purports to assert here. It should be dismissed.

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

### B.  PLAINTIFF'S NEGLIGENCE CLAIM FAILS FOR A LACK OF DUTY

#### 1.  A duty requires a relationship between the parties, not mere foreseeability of injury.

It is well-settled in South Carolina (and everywhere) that an "essential element in a negligence action is 'the existence of a legal duty of care owed by the defendant to the plaintiff.'" *Shaw v. Psychemedics Corp.*, 426 S.C. 194, 197, 826 S.E.2d 281, 282 (2019) (quoting *Oblachinski v. Reynolds*, 391 S.C. 557, 561, 706 S.E.2d 844, 845-46 (2011)). "If there is no duty, then the defendant in a negligence action is entitled to judgment as a matter of law." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 135-36, 638 S.E.2d 650, 656 (2006) (citing *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999)). "An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *McPherson v. CSX Transp., Inc.*, No. 4:16-cv-2725, 2017 WL 1135291, at *2 (D.S.C. Mar. 27, 2017) (citing *Madison ex rel. Bryant*, 371 S.C. at 136, 638 S.E.2d at 656-57). "However, South Carolina courts 'will not extend the concept of a legal duty of care in tort liability beyond reasonable limits,'" and without more, "[f]oreseeability of injury, in and of itself, does not give rise to a duty." *Shaw*, 426 S.C. at 198, 826 S.E.2d at 283 (quoting *McCullough*, 373 S.C. at 48, 644 S.E.2d at 46); *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.*, 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003).

#### 2.  Milliken does not owe a legal duty of care to the plaintiff.

Here, plaintiff does not allege any facts that suggest the existence of a relationship between it and Milliken sufficient to establish a legal duty of care. Plaintiff does not allege any duty "created by statute, a contractual relationship, status, property interest, or some other special circumstance," but instead alleges only that the "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an

7

unreasonable risk of harm to others." (*See* Compl. ¶ 86). But South Carolina does not recognize or impose such a broad and oversimplified duty of care. Just the opposite, because under South Carolina law, "***one who has no control owes no duty***." *Miller v. City of Camden*, 329 S.C. 310, 314, 494 S.E.2d 813, 815 (1997) (citing *Clark v. Greenville Cnty.*, 313 S.C. 205, 209, 437 S.E.2d 117, 119 (1993) (emphasis added)); *see also Ellis v. Tall Ships Charleston, LLC*, 593 F. Supp. 3d 253, 268 (D.S.C. 2022) ("Under South Carolina law, there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." (quoting *Faile v. S.C. Dep't of Juv. Just.*, 350 S.C. 315, 334, 566 S.E.2d 536, 546 (2002))).

Plaintiff concedes two Milliken locations disposed their wastewater to the Inman and A. Manning Lynch WWTPs, in accordance with their permits, so those treatment facilities could treat the wastewater. Milliken had no further duty to ensure that the either WWTP would treat the wastewater in a way that avoids any risk of harm to third parties – in fact, it had no power to do so – and therefore owed no duty to the plaintiff. *See, e.g.*, *Oulla v. Velazques*, 427 S.C. 428, 444, 831 S.E.2d 450, 458 (S.C. App. 2019) (sod manufacturer that placed pallets on truck trailer that later fell, leading to accident, did not owe legal duty to injured motorist to ensure pallets were properly secured). As a result of the absence of any duty, plaintiff's Fourth Cause of Action in the Complaint should be dismissed as to the Dewey and headquarters locations.

### C.  MILLIKEN IS ENTITLED TO DISMISSAL OF BOTH NUISANCE CLAIMS

1.  **Milliken cannot be liable for nuisance because it lacked control over the property directly responsible for the alleged nuisance.**

    a.  **Control is an essential element of nuisance.**

Under black letter South Carolina law, Milliken cannot be held liable to plaintiff under a nuisance theory based upon its alleged disposal of industrial wastewater at the Tosch's Creek and Little River WWTPs, which Milliken did not own, operate, or control. (*See* Compl. ¶ 81

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

(Milliken intends its wastewater 'be discharged to [its] applicable WWTPs"). Rather, nuisance law is primarily a mechanism for resolving "conflicting interests of landowners," and to effect a "balancing of the[ir] correlative rights." *See DeBorde v. St. Michael & All Angels Episcopal Church*, 272 S.C. 490, 502, 252 S.E.2d 876, 882 (1979); *Winget v. Winn-Dixie Stores, Inc.*, 242 S.C. 152, 159, 130 S.E.2d 363, 367 (1963). For that reason, the South Carolina Supreme Court has made clear that "one who has no control over property at the time of the alleged nuisance cannot be held liable therefor." *Clark v. Greenville Cnty.*, 313 S.C. 205, 210, 437 S.E.2d 117, 119 (1993). As such, in the absence of allegations evidencing control, a nuisance claim fails and must be dismissed. *See id.*; *see also Weatherford v. E.I. Dupont de Neumours & Co.*, No. 4:22-cv-1427, 2023 WL 11015357, at *6 (D.S.C. Sept. 27, 2023) (dismissing nuisance claim because "Plaintiffs have not alleged Defendants had control over the PFAS once they were sold to the textile plants").

### b. The Supreme Court has already ruled defendants cannot be liable for delivering waste to a landowner who allegedly causes nuisance.

The South Carolina Supreme Court's decision in *Clark v. Greenwood County* is directly on point. In that case, the plaintiffs were property owners who alleged their properties had been contaminated by hazardous chemical waste disposed of at a nearby landfill. *See* 313 S.C. at 206-07, 437 S.E.2d at 118. As a result, the property owners filed suit against five corporations that had used the landfill. *Id.* at 207, 118. The trial court ruled that because the corporate respondents did not own or control the landfill, "no action for private nuisance could be maintained against the corporate respondents." *Id.* at 209, 119. On appeal, the Supreme Court affirmed, explaining that "[t]he only issue we need address is whether one must own or have control of the property allegedly used as a nuisance;" and held ***control was indeed a prerequisite to any action for nuisance***: "[W]e now hold one who has no control over property at the time of the alleged

9

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

nuisance cannot be held liable therefor." *Id.* at 209-10, 119. Thus, because "appellants neither alleged nor produced any evidence the corporate respondents had control over the landfill or the hazardous waste once it was deposited at the landfill," the court concluded that "the trial judge correctly ruled the corporate respondents could not be liable for nuisance because they had no control over the property allegedly used as a nuisance." *Id.* at 210, 119.

Here, plaintiff's Complaint alleges the Inman and A. Manning Lynch WWTPs – not Milliken – discharged wastewater into "surface waters upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie." (Compl. ¶ 77(a). Just like in *Greenwood County*, the allegation in this case is that two Milliken facilities discharged wastewater *to* the Inman and A. Manning Lynch WWTPs, which occurs prior to (and entirely separate and apart from) any discharge *by* the Inman and A. Manning Lynch WWTPs. (*See id.* ¶¶ 4, 16, 77). Because Milliken had no control over the Inman and A. Manning Lynch WWTPs, it "had no control over the property allegedly used as a nuisance." *See Greenwood Cnty.*, 313 S.C. at 210, 437 S.E.2d at 119. Accordingly, plaintiff's private and public nuisance claims against Milliken – the First and Second Causes of Action – both fail as a matter of law as to the Dewey plant and Milliken's headquarters and must be dismissed.

### 2. Plaintiff's private nuisance claim also fails because plaintiff alleges an injury to the public at large.

Plaintiff's private nuisance claim against Milliken should also be dismissed because the alleged contamination of a public water body cannot form the basis of a claim for private nuisance. "A private nuisance affects only one person or a determinate number of persons," whereas a "nuisance is public because of the danger to the public which might have been created." *See Baltzeger v. Carolina Midland Ry. Co.*, 54 S.C. 242, 248, 32 S.E. 358, 360 (1899); *Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 81, 382 S.E.2d 463, 469 (S.C. App.

10

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

1989) ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured.").[8]

Plaintiff's Complaint makes clear its claims against Milliken are based on the alleged contamination of the Broad River, the location of plaintiff's water intakes. (Compl. ¶¶ 1-5, 16.) Plaintiff's nuisance claim therefore involves an alleged nuisance that is "public in nature," which "will not support a private nuisance claim." *See Rhodes*, 636 F.3d at 96-97. For this additional reason, the First Cause of Action for private nuisance should be dismissed.

### D. MICROSCOPIC PARTICLES BROUGHT IN VOLUNTARILY CANNOT FORM THE BASIS OF A TRESPASS CLAIM

#### 1. South Carolina follows the traditional rule that a trespass requires "an invasion by a physical, tangible thing."

The Supreme Court has definitively stated South Carolina follows the traditional rule that "only recognizes intrusions by physical, tangible things as capable of constituting a trespass." *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 152, 747 S.E.2d 468, 480 (2013). Under the traditional rule, the interference must be "with the right to exclusive possession," as opposed to "merely interfer[ing] with the right to use and enjoyment." *Id.* at 151, 747 S.E.2d at 480. Thus, intrusions by "microscopic particulates" or similarly intangible "infiltration[s] of contaminants onto a plaintiff's property" – while potentially giving rise to a nuisance claim – do not constitute an actionable trespass under South Carolina law. *Id.* at 144-52, 476-80.

In adhering to the traditional rule that requires "an invasion by a physical, tangible thing," the Supreme Court recognized it was "an imperfect rule" that may not incorporate the pure

---

[8] *See also Charleston Dev. Co. v. Alami*, 433 S.C. 533, 547-48, 860 S.E.2d 687, 695 (S.C. App. 2021) (a private nuisance "produces damage to but one or two persons, and cannot be said to be public."); *accord Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96-97 (4th Cir. 2011) ("when a release of pollutants directly affects a municipal water supply and does not interfere with any private water source, such as a well drilled on private property, the presence of the pollutants in the public water supply will not support a private nuisance claim.").

11

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

scientific definition of matter. *Id.* at 150, 479. Nevertheless, the court held the traditional rule remained "superior" to the alternate rules which require the adoption of an uncertain "substantiality requirement," because it "possesses the virtues of clarity, ease of implementation, and ability to serve as a guide for future conduct" that will "yield a stable rule as to what rises to the level of a trespass." *Id.* at 149-51, 479-80. The Court further explained that the traditional rule preserves "the distinction between trespass and nuisance," whereas "the divergent view would transform trespass into nuisance," thereby "leav[ing] property owners with less, rather than more, protection of their property rights." *Id.* at 151-52, 480.

By retaining the traditional rule, the Supreme Court expressly rejected "divergent" cases in Oregon and Alabama, which held intrusions of "fluoride particles" and "sulfoxide emissions" respectively were sufficient to constitute a trespass despite their "intangible nature." *Id.* at 146-49, 747 S.E.2d at 477-78 (rejecting *Martin v. Reynolds Metals Co.*, 342 P.2d 790 (1959) and *Borland v. Sanders Lead Co.*, 369 So. 2d 523 (Ala. 1979)). Instead, the Court followed the Michigan Court of Appeals' decision in *Adams v. Cleveland-Cliffs Iron Co.* that concluded dust is "not actionable in trespass" because "dust, along with other forms of airborne particulate, does not normally present itself as a significant physical intrusion," but instead "become[s] a part of the ambient circumstances" of the space on which it settles. *See Babb,* 405 S.C. at 149-50, 747 S.E.2d at 479; *see also* 237 Mich. App. 51, 67-70, 602 N.W.2d 215, 222-24 (1999).

### 2. Plaintiff alleges trespass only by "intangible matter."

In this case, plaintiff's trespass claim is based on the alleged contamination from PFAS molecules, which are precisely the kind of "intangible matter" the Supreme Court held "are insufficient to constitute a trespass." *See Babb*, 405 S.C. at 144-52, 747 S.E.2d at 476-80. Indeed, plaintiff's own Complaint demonstrates PFAS molecules are microscopic particles — measured, if at all, in the parts per ***trillion*** – that cannot be visibly seen, felt, or otherwise perceived in water

12

or any other medium. (*See* Compl. ¶¶ 28-29, 31-32, 35, 38). Moreover, the damages plaintiff alleges from the PFAS contamination are not to its right to the exclusive possession of its property but are based on the alleged "losses to the use and enjoyment of its property rights" (*id*. ¶ 5) and the alleged "interference with Plaintiff's right to use and enjoy its properties" (*id*. ¶ 49), which can be remedied only through a claim for nuisance, not trespass. *Babb*, 405 S.C. at 139, 149-52, 747 S.E.2d at 473, 479-80.  For these reasons, plaintiff's allegations do not state an actionable claim for trespass under South Carolina law, and its Third Cause of Action should be dismissed.

### 3. Plaintiff does not enjoy exclusive possession of the water from the Broad River.

Plaintiff's trespass claim also fails for other reasons. First, plaintiff does not sufficiently allege a physical invasion of its property. As the South Carolina Supreme Court has made clear, trespass protects only the "right to *exclusive* possession." *See Babb*, 405 S.C. at 150-51, 747 S.E.2d at 479- 80 (2013) (emphasis added). Here, plaintiff does not hold an exclusive right to the water from the Broad River, only a riparian right of reasonable use. *See White v. Whitney Mfg. Co.*, 60 S.C. 254, 265, 38 S.E. 456, 460 (1901) (it is a "well-settled rule of law" that while a riparian owner has "an equal right to the use of the water which flows in the stream adjacent to his lands . . . [h]e has no property in the water itself, but a simple usufruct").

### 4. Any PFAS allegedly on plaintiff's property was drawn there by plaintiff's own actions.

Second, though plaintiff alleges PFAS contamination is present on its property, it concedes this alleged contamination only occurs as a result of its own actions, when plaintiff turns on its water pumps to draw water from the Broad River. (Compl. ¶¶ 77-78). That does not constitute an actionable trespass under South Carolina law, which must be based on "an affirmative act" by the defendant, and "the invasion of the land must be intentional." *Snow v.*

13

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

*City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (S.C. App. 1991). An act is only intentional if "done with knowledge that it will to a substantial certainty result in the entry of the foreign matter" on the plaintiff's land. *Sales v. S.C. Dep't of Transp.*, No. 2014-000582, 2016 WL 3607225, at *2 (S.C. App. June 30, 2016) (quoting Restatement (Second) of Torts § 158 cmt. i (1965)). Here, there could be no "substantial certainty" PFAS would enter plaintiff's property, because it can only occur when plaintiff affirmatively acts to activate of its water pumps. Plaintiff's affirmative action to pump water onto its property is the third additional reason its trespass claim fails: any PFAS allegedly enters its property through its own voluntary decision. *See Ravan v. Greenville Cnty.*, 315 S.C. 447, 464, 434 S.E.2d 296, 306 (S.C. App. 1993) ("The essence of trespass is the unauthorized entry onto the land of another."). *See also Util. Bd. of Tuskegee v. 3M Co.*, No. 2:22-cv-420, 2023 WL 1870912, at *16 (M.D. Ala. Feb. 9, 2023) (dismissing similar trespass claim asserted by water system because "unlike other indirect trespasses, Defendants' PFAS did not cross onto UBT's boundary line by a natural process. Rather, UBT pulls the water onto its property through an intake system from a public waterway (over which UBT does not have exclusive possession)"). Just as it was in that case, plaintiff's Third Cause of Action should be dismissed.

## CONCLUSION

Plaintiff's claims against Milliken are not ripe because it is uncertain whether it will ever suffer the injury alleged. Even if the claims were valid despite those proscriptions, each claim would fail because they are not supported by South Carolina law. Milliken's motion should be granted and all claims against it dismissed.

14

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Respectfully submitted, this 12th day of February, 2025.

*/s/ Rachael L. Anna*
Rachel L. Anna (SC Bar No. 100486)
Rita Bolt Barker (SC Bar No. 77600)
WYCHE, P.A.
200 East Broad Street, Suite 400
Greenville, SC 29601-2892
Tel: (864) 242-8200
Fax: (864) 235-8900
ranna@wyche.com
rbarker@wyche.com

-and-

Jameson B. Carroll (*pro hac vice* admission to be sought)
Michael Weiss (*pro hac vice* admission to be sought)
CARROLL & WEISS LLP
2870 Peachtree Rd NW, Suite 193
Atlanta, GA 30305-2918
Tel: (404) 514-5061
jcarroll@carrollweiss.com
mweiss@carrollweiss.com

*ATTORNEYS FOR DEFENDANT*
*MILLIKEN & COMPANY*

15

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2025 I served a copy of the foregoing **MILLIKEN & COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** on all counsel of record by CM/ECF Electronic Delivery, and on the Defendants, via USPS First Class Mail, addressed as follows:

Suminoe Textile of America Corporation
c/o Christy Paysour
10 Commerce Drive
Gaffney, SC 29340

Tietex International, Ltd.
c/o Paracorp Inc.
2 Office Park Court, Suite 103
Columbia, SC 29223

*s/ Rachael L. Anna*
Rachael L. Anna

ELECTRONICALLY FILED - 2025 Feb 12 4:40 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

February 12, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:     The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Hirlye Ray Lutz III be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Hirlye Ray Lutz III
        John B. White, Jr.



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

February 12, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:    The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Brett Cooper Thompson be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:    Brett Cooper Thompson
John B. White, Jr.

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**MOTION FOR PRO HAC VICE ADMISSION OF HIRLYE RAY LUTZ, III**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Hirlye Ray Lutz, III, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Lutz's admission and received no objection.

Mr. Lutz is a member in good standing with his local bar association, and the Verified

1

Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary

information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: February 19, 2025

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /John B. White, Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

2

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# EXHIBIT

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
## IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

The City of Union, South Carolina,
**Plaintiff**

vs.

Milliken & Company; Suminoe Textile of America Corporation; and Tietex International, Ltd.,
**Defendant**

2024-CP-44-00558
**Case No.**

In The Court of Common Pleas
Sixth Judicial Circuit
**Tribunal**

**Mailing Address of Tribunal:**

210 West Main Street
Union, SC 29379

Comes now ___Hirlye Ray Lutz, III___ , applicant herein, and respectfully represents the following:

1.  Applicant resides at:

███████████
**Street Address**

███████████    Jefferson    Alabama    ████████
**City**    **County**    **State**    **Zip Code**

████████████
**Telephone**

2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C. , with offices at

2131 Magnolia Avenue South
**Street Address**

Birmingham    Jefferson    Alabama    35205
**City**    **County**    **State**    **Zip Code**

205-328-2200    205-914-1502    205-324-7896    rlutz@corywatson.com
**Primary Telephone**    **Cell Phone**    **Fax Number**    **Email Address**

3.  Applicant has been retained personally or as a member of the above-named law firm by

The City of Union, South Carolina    to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4.  Since   September 26th of  2006 , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of   Alabama   where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/26/2006 |
| United States District Court Northern District of Alabama | 10/19/2006 |
| United States District Court Middle District of Alabama | 10/19/2006 |
| United States District Court Southern District of Alabama | 10/19/20006 |
| United States District Court Western District of Wisconsin | 5/24/2013 |
| United States District Court Southern District of Indiana | 12/16/2011 |
| Please see the attachment below for remaining courts. | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Yes

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

No

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is ___John B. White, Jr.___ of the ___John B. White, Jr., P.A.___

law firm, which has offices at:

291 S. Pine Street/ P.O. Box 2465 (29304)

| | | | |
|---|---|---|---|
| Street Address | | | |
| Spartanburg | Spartanburg | South Carolina | 29302 |
| City | County | State | Zip Code |
| 864-594-5988 | 894-590-8701 | 894-594-5870 | jwhite@johnbwhitelaw.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

5996
_____

South Carolina Bar Number
(You must provide Bar Number)

    10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See Attached Exhibit A |
|---|

    11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

    12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____28_____ day of _____January_____, 20 _25_

_____
APPLICANT

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# VERIFICATION

STATE OF ___ALABAMA___ )

COUNTY OF ___JEFFERSON___ )

I, ___HIRLYE RAY LUTZ, III___ , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

___APPLICANT/AFFIANT___

Subscribed and sworn to before me this ___28___ day of ___January___, 20 ___25___

___(Notary Signature)___

Notary Public for the State of ___Alabama___

My Commission Expires: ___10/22/2028___

*HEATHER L. JONES*
*MY COMMISSION EXPIRES*
*OCTOBER 22, 2028*
*NOTARY PUBLIC*
*STATE OF ALABAMA*

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this ___10th___ day of ___February___, 20 ___25___

___LOCAL COUNSEL OF RECORD___

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___10th___ day of ___February___, 20 ___25___

*Page 4 of 4*

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**ATTACHMENT TO PRO HAC VICE APPLICATION OF HIRLYE R. LUTZ, III**

| Court | Date Admitted: |
|---|---|
| US Court of Appeals for the 9th Circuit | 12/30/2011 |
| US Court of Appeals for the 11th Circuit | 2/5/2014 |
| US Court of Appeals for the 5th Circuit | 6/30/2015 |

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina for Hirlye R. Lutz, III**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Woodruff-Roebuck Water District v. AFL Telecommunications, LLC, et al | Active | 7/3/2024 | John B. White | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/22/2024 | Marghretta Shisko | Granted |
| Laurens County Water & sewer Commission v. Cone Mills Receiver, LLC, et al | Active | 9/4/2024 | John B. White, Jr. | Granted |
| South Carolina Public Service Authority v. China Jushi USA Corporation, et al | Active | 12/11/2024 | Marghretta Shisko | Granted |
| City of Florence v. Aladdin Manufacturing Corporation | Active | 12/27/2024 | Marghretta Shisko | Granted |
| City of Clinton v. Fibertex Nonwovens, Inc., et al | Active | 1/27/2025 | John B. White, Jr. | Pending |
| Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC, et al | Active | 1/28/2025 | John B. White, Jr. | Pending |
| The Gaffney Board of Public Works v. Bommer Industries, Inc., et al | Active | 1/28/2025 | John B. White, Jr. | Pending |

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that _____ **Hirlye Ray Lutz III** _____ was duly and legally admitted to practice law by the Supreme Court of Alabama on _____ September 26, 2006 _____ and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on _____ December 5, 2024 _____ with the seal of the Supreme Court of Alabama attached.



*Megan B. Rhodebeck*

Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

February 12, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:     The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Hirlye Ray Lutz III be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Hirlye Ray Lutz III
John B. White, Jr.

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF HIRLYE RAY LUTZ, III**

Having considered the Motion of John B. White, Jr., on behalf of Plaintiff City of Union, South Carolina, to admit Hirlye Ray Lutz, III, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Feb 24 2:24 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 24 2:24 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



Union Common Pleas

**Case Caption:**    City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**    2024CP4400558

**Type:**    Order/Pro Hac Vice


So Ordered

/s William A. McKinnon, #2761, Circuit Judge


Electronically signed on 2025-02-24 13:24:57    page 2 of 2

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

| | |
|---|---|
| CITY OF UNION, SOUTH CAROLINA,<br><br>                              Plaintiff,<br>            v.<br><br>MILLIKEN & COMPANY, *et al.*,<br><br>                              Defendants. | CASE NO. 2024-CP-44-00558<br><br>**MOTION FOR PRO HAC VICE ADMISSION OF BRETT COOPER THOMPSON** |

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Brett Cooper Thompson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Thompson's admission and received no objection.

Mr. Thompson is a member in good standing with his local bar association, and the Verified

1

Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary

information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: February 19, 2025

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /John B. White, Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

2

# EXHIBIT

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
# IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

The City of Union, South Carolina,
_____
Plaintiff

vs.

Milliken & Company; Suminoe Textile of America Corporation; and Tietex International, Ltd.,
_____
Defendant

2024-CP-44-00558
_____
Case No.

Mailing Address of Tribunal:

In The Court of Common Pleas
Sixth Judicial Circuit

Tribunal

210 West Main Street

Union, SC 29379

Comes now  Brett Cooper Thompson _____, applicant herein, and respectfully represents the following:

1. Applicant resides at:

**Street Address** ████

████  Jefferson  Alabama  ████

**City**  **County**  **State**  **Zip Code**

████

**Telephone**

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C. _____, with offices at

2131 Magnolia Avenue South

**Street Address**

| Birmingham | Jefferson | Alabama | 35205 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 205-328-2200 | 615-870-8952 | 205-324-7896 | bthompson@corywatson.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

3. Applicant has been retained personally or as a member of the above-named law firm by

The City of Union, South Carolina _____ to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since   September 30th of  2011 _____, Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of

Alabama _____ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

5.   List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/30/2011 |
| United States District Court Northern District of Alabama | 10/19/2011 |
| United States District Court Middle District of Alabama | 10/19/2011 |
| United States District Court Southern District of Alabama | 3/7/2018 |
|  |  |
|  |  |
|  |  |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Yes

6.   Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency?   If yes, give particulars, e.g., jurisdiction, court date.

No

7.   Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked?   If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8.   Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked?  If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9.   Please be aware that local counsel must be Rule 403 certified.  Local counsel of record associated

with Applicant in this case is ___John B. White, Jr._____ of the ___John B. White, Jr., P.A._____

law firm, which has offices at:

291 S. Pine Street/ P.O. Box 2465 (29304)
_____
**Street Address**

| Spantanburg | Spantanburg | Alabama | 29302 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 864-594-5988 | 864-590-8701 | 864-594-5870 | jwhite@johnbwhitelaw.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

*Page 2 of 4*

5996

South Carolina Bar Number
(You must provide Bar Number)

10.     Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

Yes - See Attached Exhibit A

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

Yes

12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____28 th_____ day of _____January_____, 20 _25_

_____
APPLICANT

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# VERIFICATION

STATE OF ___ALABAMA___ )

COUNTY OF ___JEFFERSON___ )

I, ___BRETT COOPER THOMPSON___ , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this __28th__ day of __January__ , 20 __25__

_____
(Notary Signature)

Notary Public for the State of __Alabama__

My Commission Expires: __10/22/2028__

HEATHER L. JONES
MY COMMISSION EXPIRES
OCTOBER 22, 2028
NOTARY PUBLIC
STATE OF ALABAMA

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this __10th__ day of __February__ , 20 __25__

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this __10th__ day of __February__ , 20 __25__

_____

*Page 4 of 4*

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina for Brett C. Thompson**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Woodruff-Roebuck Water District v. AFL Telecommunications, LLC, et al | Active | 7/3/2024 | John B. White | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/22/2024 | John B. White | Granted |
| Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC, et al | Active | 8/22/2024 | John B. White | Granted |
| South Carolina Public Service Authority v. China Jushi USA Corporation, et al | Active | 12/13/2024 | John B. White | Granted |
| City of Florence v. Aladdin Manufacturing Corporation | Active | 12/27/2024 | Marghretta Shisko | Granted |
| City of Clinton v. Fibertex Nonwovens, Inc., et al | Active | 1/27/2025 | John B. White, Jr. | Pending |
| The Gaffney Board of Public Works v. Bommer Industries, Inc., et al | Active | 1/28/2025 | John B. White, Jr. | Pending |
| Laurens County Water and Sewer Authority v. Cone Mills Receiver, LLC, et al | Active | 1/28/2025 | John B. White, Jr. | Pending |

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 19 5:17 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that **Brett Cooper Thompson** was duly and legally admitted to practice law by the Supreme Court of Alabama on **September 30, 2011** and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on **December 4, 2024** with the seal of the Supreme Court of Alabama attached.



Megan B. Rhodebeck

Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

February 12, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:    The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Brett Cooper Thompson be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:    Brett Cooper Thompson
       John B. White, Jr.



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

February 12, 2025

The Honorable Melanie Lawson
Clerk of Court
P.O. Box 703
Union, SC 29379-0703

RE:    The City of Union, South Carolina v. Milliken & Company, et al.

Case No.: 2024-CP-44-00558

Dear Ms. Lawson:

I certify that the Office of Bar Admissions has received a verified application requesting Hirlye Ray Lutz III be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:    Hirlye Ray Lutz III
       John B. White, Jr.

ELECTRONICALLY FILED - 2025 Feb 19 5:13 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 24 2:24 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF HIRLYE RAY LUTZ, III**

Having considered the Motion of John B. White, Jr., on behalf of Plaintiff City of Union, South Carolina, to admit Hirlye Ray Lutz, III, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Union Common Pleas

**Case Caption:**    City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**    2024CP4400558

**Type:**    Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-02-24 13:24:57    page 2 of 2

ELECTRONICALLY FILED - 2025 Feb 24 2:24 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 24 2:24 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

FOR THE SIXTEENTH JUDICIAL CIRCUIT

CITY OF UNION, SOUTH CAROLINA,

Plaintiff,

v.

MILLIKEN & COMPANY, *et al.*,

Defendants.

CASE NO. 2024-CP-44-00558

**ORDER GRANTING PRO HAC VICE ADMISSION OF BRETT COOPER THOMPSON**

Having considered the Motion of John B. White, Jr., on behalf of Plaintiff City of Union, South Carolina, to admit Brett Cooper Thompson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Feb 24 2:24 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



Union Common Pleas

**Case Caption:**     City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**     2024CP4400558

**Type:**     Order/Pro Hac Vice

So Ordered

/s William A. McKinnon, #2761, Circuit Judge

Electronically signed on 2025-02-24 13:25:27     page 2 of 2

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| | ) | |
| COUNTY OF UNION | ) | SIXTEENTH JUDICIAL CIRCUIT |
| | ) | |
| City of Union, South Carolina, | ) | Civil Action No.  2024-CP-44-00558 |
| | ) | |
| Plaintiff, | ) | **PFAS Litigation Coordinated Docket** |
| | ) | |
| vs. | ) | |
| | ) | **TIETEX INTERNATIONAL, LTD'S** |
| Milliken & Company; Suminoe Textile | ) | **MOTION TO DISMISS** |
| of America Corporation; and Titex | ) | |
| International, LTD., | ) | |
| | ) | |
| Defendants. | ) | |

Tietex International, LTD ("Tietex") respectfully moves for dismissal of Plaintiff's Complaint with prejudice, or in the alternative, for a more definite statement pursuant to SCRCP Rule 12(e).

## SUMMARY OF GROUNDS

Tietex moves for the dismissal of Plaintiff's Complaint on the following grounds:

1. Plaintiff lacks standing to bring this lawsuit;

2. Tietex does not owe Plaintiff a duty of care;

3. Plaintiff's negligence claim fails because it does not allege sufficient facts to constitute a breach by Tietex of any duty of care it may have owed Plaintiff;

4.  Plaintiff's negligence claim fails because it does not allege sufficient facts to establish Plaintiff suffered a cognizable injury under South Carolina law;

5. Plaintiff's private nuisance claim fails because Plaintiff's alleged damages are not recoverable under a claim for private nuisance or continuing nuisance and Tietex has not unreasonably interfered with Plaintiff's property;

1

6. Plaintiff's public nuisance claim fails because Plaintiff does not allege that Tietex committed any unlawful act; and

7. Plaintiff's claim for trespass fails because Plaintiff does not allege Tietex committed any intentional act which resulted in chemicals being present in Plaintiff's water.

## **BACKGROUND**

Plaintiff is a municipal corporation in Union County, South Carolina. Cmplt. ¶ 13. Plaintiff owns and operates a surface water treatment plant ("Plaintiff's SWTP") in Union County that provides potable water to the residents of Union County. *Id.* at ¶ 14-15. Plaintiff also owns land riparian to the Broad River, where it operates a surface water intake that supplies raw water to Plaintiff's SWTP. *Id.* at ¶ 14. On December 16, 2024, Plaintiff filed a Complaint against Tietex, Milliken & Company ("Milliken"), and Suminoe Textile of America Corporation ("Suminoe") (collectively the "Defendants") asserting causes of action for private nuisance, public nuisance, trespass, negligence, and gross negligence and/or recklessness as a result of the Defendants' alleged contamination of the Broad River and Plaintiff's properties with toxic per- and polyfluoroalkyl substances ("PFAS").

PFAS is a collective name for a group of manufactured chemicals. *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas. There are thousands of different PFAS. *Id.* Per the United States Environmental Protection Agency ("EPA"), many PFAS break down very slowly and can build up over time in people, animals and the environment. *Id.* PFAS can be present in water, soil, air, food and materials found in homes and workplaces. *Id.* In November 2024, the EPA released a PFAS Strategic Roadmap, that summarizes what the EPA has learned about PFAS and the fact that the EPA has years of

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

research and legislation ahead of it to address PFAS in drinking water. *See* EPA's PFAS Strategic Roadmap.[1]

Plaintiff alleges that Milliken owns and operates industrial facilities in the South Carolina counties of Spartanburg and Cherokee. Cmplt. at ¶ 16. Plaintiff further alleges that Milliken discharges wastewater contaminated with products containing PFAS to three locations: directly into the Broad River, to the Inman Waste Treatment Plant ("Inman WWTP") and to the A. Manning Lynch Wastewater Treatment Facility ("Lynch WWTP"). *Id.* The Inman WWTP is owned and operated by the City of Inman, South Carolina. The Lynch WWTP is owned and operated by Spartanburg Water, a utility company owned by the City of Spartanburg, South Carolina. Plaintiff also alleges that the Inman WWTP and the Lynch WWTP are unable to remove PFAS from the water before they discharge to the Broad River directly or via the Broad River's upstream tributaries. *Id.* Plaintiff asserts that Milliken therefore causes the Broad River to be contaminated with PFAS upstream of Plaintiff's SWTP, thereby contaminating Plaintiff's potable water. *Id.*

Plaintiff alleges that Suminoe owns and operates an industrial facility in Gaffney County, South Carolina. *Id.* at 17. Plaintiff further alleges that Suminoe discharges wastewater contaminated with products containing PFAS to the Broad River Wastewater Treatment Plant ("Broad WWTP"), and the Broad WWTP ultimately discharges to the Broad River upstream of Plaintiff's SWTP. *Id.* The Broad WWTP is owned and operated by Blacksburg Public Works, a utility company that services Gaffney County. Plaintiff alleges that because the Broad WWTP cannot remove PFAS, Suminoe therefore contaminates Plaintiff's SWTP downstream. *Id.*

---

[1] https://www.epa.gov/system/files/documents/2024-11/epas-pfas-strategic-roadmap-2024_508.pdf

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Tietex is a South Carolina corporation that owns and operates a facility in Spartanburg County. Plaintiff alleges that Tietex discharges its wastewater to the Lynch WWTP. *Id.* at 18. Plaintiff again alleges that the Lynch WWTP cannot remove the PFAS, and by discharging its wastewater to the Lynch WWTP, Tietex indirectly contaminates the Plainitff's potable water because the Lynch WWTP discharges to the Broad River upstream of Plaintiff's SWTP. *Id.*

## **ARGUMENT**

### I. **Plaintiff Does Not Have Standing to Bring this Lawsuit**

Plaintiff's claims should be dismissed because Plaintiff lacks standing to bring the instant lawsuit. "An organization has standing only if it alleges that it or its members will suffer an individualized injury; a mere interest in a problem is not enough." *Carolina Alliance for Fair Employment v. S.C. Dep't of Labor, Licensing & Regulation*, 337 S.C. 476, 487, 523 S.E.2d 795, 800 (Ct. App. 1999). The United States Supreme Court has established the following requirements to show standing:

(1) The plaintiff must suffer an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2) The injury is fairly traceable to the challenged action of the defendant; and

(3) It is likely, as opposed to merely speculative, that the injury will be redressed by favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992). Plaintiff's allegations fail to satisfy each of the elements required for standing.

#### a. **Plaintiff Does Not Have an Actual Injury**

First, Plaintiff has not alleged that it has suffered an actual injury which is concrete and particularized as a direct result of Tietex's action or inaction. Rather, Plaintiff alleges generally that it has been damaged by Tietex's alleged use of chemicals but fails to explain this injury. In

4

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

fact, Plaintiff specifically asserts that the Lynch WWTP is the entity that has failed to remove PFAS from Plaintiff's water, not Tietex. Cmplt. ¶ 18. Instead of pleading facts to establish that Plaintiff has been injured by Tietex, Plaintiff merely prays for the remedy it seeks – the replacement of a new water treatment system to occur sometime in the future. *Id.* at ¶¶ 6-7, 45. It is elementary that an injury is a prerequisite to a remedy, yet Plaintiff ignores this requirement. Additionally, Plaintiff asserts that Tietex is responsible for replacing its water system, although Plaintiff does not allege its water system is functioning improperly. Finally, Plaintiff fails to establish how its "conventional water treatment technologies," which Plaintiff alleges are insufficient, equates to an injury to Plaintiff by Tietex. *See id.* at ¶ 45.

### b. Plaintiff Does Not Allege an Action or Inaction Committed by Tietex

Second, Plaintiff cannot establish standing because it has not alleged that Tietex committed any wrong. Plaintiff asserts vague and conclusory statements against all Defendants that they caused it harm because of their use of chemicals in their manufacturing processes. However, Plaintiff's Complaint fails to lay a foundation to allege any action or inaction committed by Tietex that could be traceable to the alleged unpled injury, which supposedly requires the replacement of a new water system. Plaintiff's failure in this regard is especially highlighted when this Court considers the fact that Tietex is not located in the city of Union or Union County. Tietex is located in Spartanburg County, and its facility is not on or near any bodies of water. The Complaint is devoid of allegations which state how the alleged chemicals released by Tietex have made their way from its landlocked facility to the city of Union's surface water intake on the Broad River in Lockhart, South Carolina. Furthermore, Plaintiff has not alleged how regulations proposed by the EPA on public utilities have any application to Tietex. Plaintiff has also not alleged the basis for

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

its authority to impose such government regulations on Tietex, which is located well outside of its jurisdiction.

Plaintiff also disclaims any cause of action related to the Defendants' general use or disposal of chemicals associated with aqueous film forming foam ("AFFF"). *Id.* ¶¶ 8-9. However, Plaintiff fails to allege that it has been injured specifically by Tietex's non-AFFF chemicals. By excluding any causes of action related to AFFF-associated chemicals but failing to distinguish the AFFF chemicals from the non-AFFF chemicals, Plaintiff has failed to specify concrete claims against Tietex.

Even assuming—as this Court must for the purposes of this Motion—that the facts of this Complaint are true and Tietex did release chemicals into the navigable waters of the upstate of South Carolina which made their way to the City of Union, Plaintiff's allegations are hardly traceable to Tietex. Stated another way, Plaintiff has not alleged and cannot allege that any of the various chemicals found in its water are particularly from Tietex just because Tietex released chemicals into upstream navigable waters. Moreover, Plaintiff has failed to make a single allegation establishing that there is causal connection between the navigable waters of the upstate and the city of Union's drinking water. Instead, Plaintiff asserts without basis that because Plaintiff's surface water intake is downstream of the Pacolet River, and the Pacolet River is one of the Broad River's tributaries, and because the Lynch WWTP discharges to the Pacolet River without having removed PFAS, then Tietex, despite being landlocked and not near the Pacolet River, must have contaminated Plaintiff's water. Cmplt. ¶¶ 18; 78. This falls short of an injury fairly traceable to Tietex.

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

### c. Plaintiff Does Not Allege Its Injury Will Be Redressed

Third, having failed to identify any injury incurred by Plaintiff or any wrong by Tietex, Plaintiff has not, and cannot, establish the third element: that it is likely, rather than speculative, any injury will be redressed by a favorable decision.

Plaintiff also cannot establish standing because, pursuant to the free public services doctrine, a public utility should not be allowed to recover the costs of carrying out its public services from a tortfeasor whose conduct caused the need for the services unless there is specific statutory authorization. 32 A.L.R. 6th 261 (2008). There is no South Carolina statute or caselaw that allows Plaintiff, a public utility, to transfer the cost of providing clean water to a private, third party entity. Accordingly, Plaintiff lacks standing to bring this matter in tort against a private, third party.

Finally, Plaintiff has not alleged the basis for its authority to control, police, regulate, or impose restrictions on the navigable waters or entities which are not located within its city limits. For these reasons, Plaintiff lacks standing to bring the instant suit.

## II. Tietex Does Not Owe the Plaintiff a Duty

Tietex does not owe Plaintiff a duty of care. Even assuming Tietex does owe Plaintiff a duty of care, Plaintiff has not alleged as much. "A tortfeasor's duty arises from his relationship to the injured party." *Ravan v. Greenville County*, 315 S.C. 447, 467, 434 S.E.2d 296, 308 (1993) citing *South Carolina State Ports Authority v. Booz–Allen & Hamilton, Inc.*, 289 S.C. 373, 376, 346 S.E.2d 324, 325–26 (1986). Some relationship must exist between the one alleged to have inflicted injury and the party claiming injury, by which the former owes some duty to the latter. 57A Am. Jur.2d Negligence § 78 (1989). Where this relationship is "too attenuated," a duty will

7

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

not arise. *South Carolina State Ports Authority*, 289 S.C. at 377, 346 S.E.2d 324, 325-26 (1986). "The concept of duty in tort liability must not be extended beyond reasonable limits." *Id.*

Tietex does not have any relationship either by contract, statute, property interest, or otherwise with Plaintiff. The location of the parties also strains any connection that could be formed between them as Tietex is located in Spartanburg County, South Carolina and Plaintiff's interests are in Union County, South Carolina. Moreover, Tietex is not located on or near any waters. Thus, Tietex, a private entity located in a landlocked area outside of Plaintiff's jurisdiction, does not owe a duty to Plaintiff as to its water source in Union, South Carolina.

Plaintiff vaguely alleges, "Defendants have a duty to use due care in handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing . . . indirect discharge of these PFAS into surface waters upstream of Plaintiff's [surface water treatment plant." Cmplt. ¶ 86. However, Plaintiff's allegations are devoid of any reference to the existence of a duty owed to Plaintiff by Tietex under statute, contract, relationship between the parties, status, property interest, or special circumstances. In this instance, Plaintiff's relationship, if any, to Tietex is too attenuated for a duty to reasonably arise. Accordingly, Plaintiff's claims should be dismissed.

### III. Plaintiff's Claims Should be Dismissed Pursuant to SCRCP 12(b)(6)

Plaintiff's claims also fail to state facts sufficient to constitute causes of action upon which this Court could grant Plaintiff relief against Tietex. Pursuant to SCRCP Rule 12(b)(6), "[a] claim may be dismissed when the defendant demonstrates that the plaintiff has failed to allege facts sufficient to establish a cause of action." *Disabato v. South Carolina Association of School Administrators*, 404 S.C. 433, 441, 746 S.E.2d 329, 333 (2013). "A ruling on a motion to dismiss

8

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

pursuant to Rule 12(b)(6) must be based solely on the factual allegations set forth in the complaint, and the court must consider all well-pled allegations as true." *Id*. (citing *Gressette v. S.C. Elec. & Gas Co.*, 370 S.C. 377, 378-79, 635 S.E.2d 538, 538 (2006)).  However, "on a 12(b)(6) motion, the court is required to presume all well pled facts, not propositions of law, to be true." *HHHunt Corp. v. Town of Lexington*, 389 S.C. 623, 635, 699 S.E.2d 699, 705 (Ct. App. 2010). A plaintiff "cannot transform an unsupported proposition of law into a statement of fact" to avoid dismissal under Rule 12(b)(6). *Id.*  Plaintiff has failed to allege facts sufficient to establish a cause of action against Tietex for negligence, private nuisance, public nuisance and trespass.  Therefore, the Court should dismiss Plaintiff's complaint against Tietex.

### a.  Plaintiff Fails to Allege Facts Sufficient to Prove Negligence

Plaintiff has failed to allege sufficient facts to prove that any breach by Tietex proximately caused Plaintiff's injuries.  To state a cause of action for negligence under South Carolina law, Plaintiff must show: (1) a duty of care owed by Tietex; (2) a breach of the duty by a negligent act or omission; (3) damages resulting from that negligent act or omission; and (4) that the damages were proximately caused by the negligent conduct. *Savannah Bank, N.A. v. Stalliard*, 734 S.E.2d 161, 163-64 (2012).

### i.  No Duty of Care Owed by Tietex

As discussed above, Plaintiff has not plead facts sufficient to establish a relationship between Plaintiff and Tietex.  Tietex does not have any relationship either by contract, statute, property interest, or otherwise with Plaintiff.  Without a relationship between the parties, Plaintiff cannot establish that Tietex owed Plaintiff any duty.  Failing to allege a duty flowing from Tietex to Plaintiff, there is no actionable negligence. *Wadford v. South Carolina Public Service Authority*, 2024 WL 4700561 at *3 (D.S.C. filed September 6, 2024)  (quoting *Bishop v. S.C. Department of*

*Mental Health*, 331 S.C. 79, 81, 502 S.E.2d 78, 81 (1998)). Thus, even taking Plaintiff's allegations as true as required by Rule 12(b)(6), Plaintiff has not alleged any facts to support the existence of a duty by Tietex to Plaintiff. Therefore, Plaintiff's claim for negligence must fail.

### ii.   No Breach of a Duty by Tietex

Even if the Court finds Tietex owed a duty to Plaintiff, Plaintiff also fails to allege any breach of that duty by Tietex. Plaintiff does not make any allegations in its complaint as to the actions or inactions taken by Tietex, specifically, which led to Plaintiff's demand for a new water treatment facility and "technologies." Additionally, Plaintiff impermissibly lumps together all Defendants and ascribes liability to them as a group. This style of pleading is insufficient to place Tietex on notice of the allegations against it. Based on the facts as alleged in the Complaint, Tietex has no knowledge of its alleged wrong and as such, cannot meaningfully prepare its defense. *See Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 574, 743 S.E.2d 778, 785 (2013) ("It is elementary that the principal purpose of pleadings is to inform the pleader's adversary of legal and factual positions which he will be required to meet on trial."). Therefore, having not alleged facts sufficient to establish that Tietex has breached any duty possibly owed to Plaintiff, Plaintiff's claim for negligence must fail.

### iii.   No Damages Proximately Caused by Tietex

In addition to having to allege an injury to have standing to bring this action, South Carolina requires a Plaintiff to establish an injury or property damage to establish a negligence claim. *Babb v. Lee County Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468, 481 (2013). Plaintiff's claim for negligence therefore also fails because Plaintiff has failed to plead facts sufficient to establish it suffered a cognizable injury under South Carolina law. As detailed above, Plaintiff's demand for "new water treatment technologies" to remove PFAS from its drinking water, does not establish

10

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

an injury. *See* Cmplt. ¶¶ 6-7, 45. Plaintiff's alleged need for future installation of a water system to remove PFAS so that Plaintiff can comply with regulations proposed by the EPA, which do not apply to Tietex, is an insufficient basis for damages and does not assert an injury as required for a claim for negligence.

Therefore, having failed to state facts sufficient to establish a claim for negligence, the Court should dismiss Plaintiff's negligence claim pursuant to SCRCP Rule 12(b)(6).

### b. Plaintiff Fails to Allege Facts Sufficient for a Private Nuisance Claim

Plaintiff's claim for private nuisance must also be dismissed. The traditional concept of a nuisance requires a landowner to demonstrate that the defendant unreasonably interfered with his ownership or possession of the land. *See Ravan v. Greenville County*, 315 S.C. 447, 464, 434 S.E.2d 296, 306 (Ct. App. 1993). In its first cause of action, "Private Nuisance," Plaintiff asserts that Defendants' have maintained a nuisance through their alleged contamination of the Broad River. *See* Cmplt. ¶ 54. This is not a private nuisance. A private nuisance is a real injury to land that "produces damage to but one or two persons, and cannot be said to be public." *Charleston Development Company, LLC v. Alami*, 433 S.C. 533, 548, 860 S.E.2d 687, 695 (Ct. App. 2021). Instead, Plaintiff essentially alleges a continuing nuisance. A continuing nuisance is defined as a nuisance that is intermittent or periodical and is described as one which occurs so often that it is said to be continuing although it is not necessarily constant or unceasing. *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 286, 543 S.E.2d 563, 566-67 (Ct. App. 2001) citing 58 Am. Jur. 2d Nuisances § 28 (1989). Plaintiff's claim for nuisance against Tietex fails for two reasons:

### i. Plaintiff's Alleged Damages are Not Recoverable Under a Nuisance Claim

First, Plaintiff's damages theory is incompatible with a claim for nuisance. In *Babb v. Lee County Landfill SC, LLC*, 747 S.E.2d 468, 475 (S.C. 2013), the South Carolina Supreme Court

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

held the damages recoverable for trespass or nuisance are strictly limited to damages to one's property interests. Plaintiff has not alleged any damages related to Plaintiff's property interest. Plaintiff seeks damages related to the cost of installing a new water treatment system. These allegations of damages are insufficient because they are unrecoverable under a claim of nuisance. Therefore, Plaintiff's nuisance claim fails because Plaintiff does not seek damages recoverable under a claim for nuisance.

### ii.    Tietex Has Not Unreasonably Interfered with Plaintiff's Property

Second, Plaintiff's claim for nuisance fails because Plaintiff has not alleged that Tietex has unreasonably interfered with Plaintiff's drinking water. Plaintiff has only vaguely asserted that Tietex deliberately interfered with the water located upstream from the city of Union. The problems with Plaintiff's allegations are that Plaintiff, as the city of Union, does not own or control the navigable waters located outside the city of Union. There is not a single allegation in the Complaint that Tietex acted in the city or county of Union to unreasonably interfere with Plaintiff's drinking water. A claim for nuisance specifically requires Tietex to have unreasonably interfered with Plaintiff's ownership or use of its land. Plaintiff has not and cannot allege it owns or controls the waters outside of the city of Union. Therefore, Plaintiff's claim for private, or continuing, nuisance fails because Plaintiff has not alleged Tietex that has interfered with water or land that Plaintiff owns or controls.

### c.    Plaintiff Fails to Allege Facts Sufficient for a Public Nuisance Claim

Plaintiff's claim for a public nuisance must likewise be dismissed. "A public nuisance exists wherever acts or conditions are subversive to public order, decency, or morals, or constitute an obstruction of public rights. Such nuisances *always* arise out of unlawful acts." *Johnston v. Anderson Regional Landfill, LLC*, 2024 WL 1287202, at *4 (D.S.C. March 26, 2024) citing *State*

12

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

*v. Turner*, 198 S.C. 487, 495, 18 S.E.2d 372, 375 (1942) (emphasis added). Plaintiff makes the broad and vague allegation that "Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order." Cmplt. ¶ 66.  However, Plaintiff has failed to allege that Tietex has committed any unlawful act. Indeed, Plaintiff's entire suit, including its nuisance claim, is based on the EPA's proposed "new drinking water regulations" which do not apply to Tietex.  *Id.* at ¶ 6. Thus, Plaintiff has not, and cannot, allege that Tietex has committed any unlawful act.  As such, Plaintiff's claim for public nuisance should be dismissed.

### d.  Plaintiff Has Failed to Allege an Intentional Act by Tietex for Trespass

Plaintiff's claim for trespass also fails. South Carolina law is clear—a trespass claim requires that the trespasser intend the act that resulted in the entry onto the plaintiff's property. *See Babb v. Lee County Landfill SC, LLC*, 405 S.C. 129, 148-49, 747 S.E.2d 468, 478 (2013) (stating a claim for trespass requires "an intentional doing of the act which results in the invasion"); *see also Snow v. City of Union*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991) ("Trespass is an intentional tort; and while the trespasser, to be liable, need not intend or expect the damaging consequence of his entry, he must intend the act which constitutes the unwarranted entry on another's land."). Plaintiff fails to allege any intentional action committed by Tietex for the purpose of discharging PFAS into Plaintiff's potable drinking water.  Therefore, Plaintiff's trespass claim must fail.

### CONCLUSION

On the foregoing grounds, Tietex respectfully requests this Court grant its Motion to Dismiss, dismissing all of Plaintiff's claims with prejudice, and grant any further relief as justice may require.

ELECTRONICALLY FILED - 2025 Feb 25 5:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

In the alternative, Plaintiff should be ordered to amend the Complaint to provide a more definite statement of its allegations against Tietex. SCRCP Rule 12(e) provides that a party may move for a more definite statement before filing a responsive pleading when "a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required" to respond. SCRCP Rule 12(e).   Plaintiff's allegations against Tietex are vague, ambiguous and virtually non-existent. As the Complaint is drafted, it is impossible for Tietex to respond to allegations which group it together with other defendants and fail to specify the wrongs allegedly committed by Tietex.

Respectfully Submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

s/Samuel W. Outten
Samuel W. Outten
SC Bar No. 4295
E-Mail: sam.outten@nelsonmullins.com
Laura T. McDonald
SC Bar No. 15997
E-Mail: laura.mcdonald@nelsonmullins.com
Megan Rushton
SC Bar No. 104241
E-Mail: megan.rushton@nelsonmullins.com
Post Office Box 10084 (29603-0084)
Greenville, SC  29601
(864) 373-2300

*Attorneys for Tietex International, LTD*

Greenville, South Carolina
February 25, 2025

14

ELECTRONICALLY FILED - 2025 Feb 27 4:47 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:
PFAS LITIGATION COORDINATED
DOCKET

City of Union, South Carolina,

Plaintiff,

v.

Milliken & Company; Suminoe Textile of
America Corporation; and Tietex
International, Ltd.,

Defendants.

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

C.A. No.: 2024-CP-44-00558

DEFENDANT SUMINOE TEXTILE OF
AMERICA CORPORATION'S
MOTION TO DISMISS PLAINTIFF'S
COMPLAINT

Defendant Suminoe Textile of America Corporation ("Suminoe") hereby moves the Court

to dismiss Plaintiff's Complaint as to Suminoe pursuant to South Carolina Rules of Civil Procedure

8, 12(b)(1), and 12(b)(6) and other applicable law.

Plaintiff City of Union, South Carolina ("Union" or "Plaintiff") is a municipal corporation

organized under the laws of the State of South Carolina. (Plaintiff's Complaint ¶13). Union

allegedly owns and operates a surface water treatment plant located at 108 Calhoun Street, Union,

South Carolina 29379 (the "SWTP"). Plaintiff also owns land riparian to the Broad River 10 miles

northeast of the SWTP, where it operates a surface water intake that supplies raw water to its

SWTP. (*Id.* ¶14). Union's SWTP provides water to residents of Union County. (*Id.* ¶15).

Plaintiff's claims involve per- and polyfluoroalkyl and related substances ("PFAS"). (*Id.*

¶¶ 1, 19-39, & 42.) There are multiple types of PFAS. Further, PFAS have dozens of uses in

industrial, commercial, and consumer applications, have been used for decades, and are ubiquitous.

1

Plaintiff asserts the following four causes of action against the named Defendants: (1) Private Nuisance; (2) Public Nuisance; (3) Trespass; and (4) Negligence, Gross Negligence, and/or Recklessness. The basis of Plaintiff's claims against Suminoe is that Suminoe conveyed wastewater that allegedly contained PFAS to the Wastewater Treatment Plant in Gaffney, South Carolina that is owned and operated by the Gaffney Board of Public Works ("Gaffney BPW WWTP"). (*Id.* ¶¶ 4, 17.) The Gaffney Board of Public Works is a special purpose district organized and existing under the laws of South Carolina. In turn, after further treatment, the Gaffney BPW WWTP discharged water containing PFAS that allegedly came from Suminoe into Peoples Creek, which is an upstream tributary of the Broad River, and upstream from Union's properties and water intakes for its SWTP. (*Id.*)

Suminoe owns a manufacturing facility located in Gaffney, South Carolina where it produces and sells automobile interior furnishings, principally seat fabrics, floor mats, and carpets. Suminoe began operations in its Gaffney facility in April of 2003. Suminoe does not make, sell, or distribute PFAS, and Plaintiff does not allege that it does. Further, Suminoe's operations and its discharges are regulated by governmental authorities, and Plaintiff does not allege that Suminoe or the Gaffney BPW WWTP have operated in violation of their permits.

An additional premise of Plaintiff's claims is that the United States Environmental Protection Agency ("EPA") recently proposed a dramatic reduction in the allowable amount of certain PFAS in drinking water to 4 parts per *trillion.* (*Id.* ¶¶ 19-39.) But that EPA regulation, which is being challenged in multiple lawsuits, does not require or mandate compliance until **2029.** (*Id*. ¶ 39.) Plaintiff alleges that it may be able to meet the potential future requirement only by incurring unspecified and unknown expenses (*See id. ¶¶* 58, 67 ("expenses associated with **future**

2

ELECTRONICALLY FILED - 2025 Feb 27 4:47 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Feb 27 4:47 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

acquisition … of required treatment technologies"), 73 (seeking funding of "the acquisition … of new water treatment technology"); 84, and 89.)

Plaintiff's claims against Suminoe should be dismissed as premature, contingent, speculative, and not justiciable because the subject EPA regulation does not yet require compliance and is subject to change, and Plaintiff is not currently required to and has not purchased treatment technologies to comply with that potential future requirement, and it is entirely speculative what measures, if any, Plaintiff may be required to take in the future.

In addition, Suminoe does not discharge PFAS into the Broad River -- or any other body of water. As alleged by Plaintiff, Suminoe conveys its wastewater to Gaffney BPW WWTP for treatment, and Suminoe cannot and does not control what Gaffney BPW WWTP does any more than citizens who use consumer products resulting in PFAS discharges into their wastewater can direct and control the activities of public utilities handling their wastewater.

Plaintiff does not have a private right of action to assert the claims in this case, including enforcement of an EPA regulation that does not yet require compliance.

Plaintiff's private nuisance claims should be dismissed as to Suminoe because it does not control the source of the alleged nuisance or the property owned by numerous entities and individuals between the Gaffney BPW WWTP and Plaintiff's property and facilities. In addition, any alleged contamination of a public body of water cannot state a claim for private nuisance.

Plaintiff's trespass claim against Suminoe should be dismissed for the additional reason that the alleged PFAS particles are intangible in nature such that they cannot constitute a trespass. Further, Plaintiff lacks exclusive possession and control of the subject watershed. In addition, any alleged presence of PFAS particles at Plaintiff's facilities occurs only as a result of Plaintiff deliberately drawing the subject water into its facilities.

3

ELECTRONICALLY FILED - 2025 Feb 27 4:47 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Plaintiff's negligence claim should be dismissed as to Suminoe on the grounds that Plaintiff has failed to allege facts sufficient to state a plausible claim that Suminoe owes a duty to Plaintiff or that any conduct by Suminoe was a proximate cause of damages to Plaintiff.

Plaintiff's claims cannot proceed because of the municipal cost recovery rule (also known as the "free public services doctrine"), which provides a public governmental entity, such as Plaintiff, cannot recover for alleged expenditures made (or to be made) in the performance of governmental functions (e.g., future upgrading of water treatment plants).

Plaintiff's claims cannot proceed because of primary jurisdiction, where under the South Carolina State Safe Drinking Water Act, exclusive enforcement of Plaintiff's claims rests with the South Carolina Department of Environmental Services.

Plaintiff's Complaint fails to state facts sufficient to constitute a claim for an award of its attorneys' fees or prejudgment interest.

This motion will be supported by a memorandum of law and exhibits to be submitted to the Court, the Court's record in this matter, and any additional arguments that may be presented to the Court.  In addition, to the extent applicable to this Defendant, Suminoe joins in arguments submitted for dismissal by any other co-defendants in this action.

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

By: s/ Robert Y. Knowlton
Robert Y. Knowlton, S.C. Bar No. 3589
John P. Boyd, S.C. Bar No. 72412

February 27, 2025

1201 Main Street, 22nd Floor (29201)
Post Office Box 11889
Columbia, SC 29211-1889
(803) 779-3080
bknowlton@hsblawfirm.com
jboyd@hsblawfirm.com

4

ELECTRONICALLY FILED - 2025 Feb 27 4:47 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Frank T. Davis, S.C. Bar No. 66291
Jonathan D. Klett, S.C. Bar. 103208
One North Main, 2nd Floor
(864) 240-3211
fdavis@hsblawfirm.com
jklett@hsblawfirm.com

*Attorneys for Defendant Suminoe Textile of America Corporation*

5

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
|---|---|
| COUNTY OF UNION | SIXTEENTH JUDICIAL CIRCUIT |
| | |
| IN RE:<br>PFAS LITIGATION COORDINATED DOCKET | C.A. No.: 2024-CP-44-00558 |
| City of Union, South Carolina,<br><br>                    Plaintiff,<br><br>v.<br><br>Milliken & Company; Suminoe Textile of America Corporation; and Tietex International, Ltd.,<br><br>                    Defendants. | MEMORANDUM IN SUPPORT OF DEFENDANT SUMINOE TEXTILE OF AMERICA CORPORATION'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT |

Pursuant to Rules 8, 12(b)(1), 12(b)(6), and 12(f) of the South Carolina Rules of Civil Procedure, Defendant Suminoe Textile of America Corporation ("Suminoe" or "Defendant") respectfully submits this Memorandum in Support of its Motion to Dismiss Plaintiff City of Union, South Carolina's ("Union" or "Plaintiff") Complaint as to Suminoe.

## **INTRODUCTION**

This action arises from the United States Environmental Protection Agency's ("EPA") recent regulation to modify the amount of per- and polyfluoroalkyl substances ("PFAS") chemicals in drinking water. The regulation is set to take effect in 2029. At the outset, Plaintiff's claims should be dismissed as the dispute is not ripe for adjudication, and therefore, this Court lacks subject matter jurisdiction to hear this case. Because the basis of Plaintiff's Complaint involves the EPA's PFAS regulation that has not even gone into effect, Plaintiff's claims are not ripe for adjudication. At this point, it is speculative as to whether the regulation will even be in effect in 2029, or if subsequent administrations or federal courts will overturn or alter the regulation.

1

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Moreover, assuming that the EPA's regulation does go into effect in 2029, the costs, if any, Plaintiff will ultimately have to undertake to comply with the EPA's regulation are theoretical. Plaintiff cannot recover for potential future expenses that it *might* incur in connection with its acquisition, installation, and operation of new water treatment technology in accordance with the EPA's regulation.

Second, the Court should dismiss Plaintiff's claims as the Court lacks subject matter jurisdiction under the theory of primary jurisdiction. Under the South Carolina State Safe Drinking Water Act, exclusive enforcement of the claims in the Complaint rests with the South Carolina Department of Environmental Services ("SCDES"), formerly known as the South Carolina Department of Health and Environmental Control. This administrative agency is better able to address the issues in the Complaint, not the Court. Additionally, under the municipal cost recovery rule (also known as the "free public services doctrine"), a public governmental entity like Plaintiff cannot recover for expenditures in the performance of governmental functions, such as the alleged future expenditures in the Complaint.

Notwithstanding the jurisdictional issues in the Complaint, Plaintiff's claims against Suminoe for (1-2) private nuisance and public nuisance, (3) trespass, and (4) negligence should be dismissed because Plaintiff fails to state facts sufficient to support these claims. Both of Plaintiff's nuisance claims fail on account of Plaintiff's lack of exclusive ownership interest in Peoples Creek or the Broad River (hereinafter the "Public Waterbodies"), and its public nuisance claim specifically fails because Plaintiff is not the proper plaintiff to assert this claim absent any special injury. The Complaint fails to allege any special injury.

Moreover, Plaintiff fails to allege the elements necessary to support a trespass claim. Plaintiff does not enjoy exclusive ownership of the Public Waterbodies. Additionally, the South

2

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Carolina Supreme Court has held that only invasions of physical tangible things may give rise to trespass, in contrast to the PFAS molecules which are intangible matter. Further, Plaintiff has not alleged a cognizable harm in trespass nor intentional invasion, as defined by South Carolina law.

Plaintiff's claim for negligence fails because Suminoe owes no affirmative duty to Plaintiff. As discussed in greater detail below, Plaintiff's claims against Suminoe fail as a matter of law and should be dismissed.

Plaintiff's claim for attorney's fees should be dismissed because Plaintiff has failed to allege a contractual, statutory, or other proper basis for such a claim in this case. In addition, Plaintiff's claim for prejudgment interest should be dismissed because its claim is not for a sum certain, but rather one for an unliquidated amount of damages.

## FACTUAL ALLEGATIONS[1]

Plaintiff is a municipal corporation organized under the laws of the State of South Carolina. (Complaint ¶13). Union owns and operates a surface water treatment plant located at 108 Calhoun Street, Union, South Carolina 29379 (the "SWTP"). Plaintiff also owns land riparian to the Broad River 10 miles northeast of the SWTP, where it operates a surface water intake that supplies raw water to its SWTP. (*Id.* ¶14). Union's SWTP provides water to residents of Union County. (*Id.* ¶15).

Plaintiff's claims involve per- and polyfluoroalkyl and related substances ("PFAS"). (*Id.* ¶¶ 1, 19-39, & 42.) There are multiple types of PFAS. Further, PFAS have dozens of uses in industrial, commercial, and consumer applications, have been used for decades, and are ubiquitous.

---

[1] For purposes of this motion only, the allegations in the Complaint are assumed to be true even though Suminoe expressly denies the allegations regarding its use and discharge of PFAS and other allegations in Plaintiff's Complaint.

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Plaintiff's Complaint asserts the following four causes of action against the named Defendants: (1) Private Nuisance; (2) Public Nuisance; (3) Trespass; and (4) Negligence, Gross Negligence, and/or Recklessness.

The basis of Plaintiff's claims against Suminoe is that Suminoe conveyed wastewater that allegedly contained PFAS to the Wastewater Treatment Plant in Gaffney, South Carolina that is owned and operated by the Gaffney Board of Public Works ("Gaffney BPW WWTP"). (*Id. ¶¶* 4, 17.) The Gaffney Board of Public Works is a special purpose district organized and existing under the laws of South Carolina. In turn, after further treatment, the Gaffney BPW WWTP discharged water containing PFAS that allegedly came from Suminoe into Peoples Creek, which is an upstream tributary of the Broad River, and upstream from Union's properties and water intakes for its SWTP. (*Id.*)

Suminoe owns a manufacturing facility located in Gaffney, South Carolina where it produces and sells automobile interior furnishings, principally seat fabrics, floor mats, and carpets. Suminoe began operations in its Gaffney facility in April of 2003. Suminoe does not make, sell, or distribute PFAS, and Plaintiff does not allege that it does. Further, Suminoe's operations and its discharges are regulated by governmental authorities, and Plaintiff does not allege that Suminoe or the Gaffney BPW WWTP have operated in violation of their permits.

An additional premise of Plaintiff's claims is that the United States Environmental Protection Agency ("EPA") recently proposed a dramatic reduction in the allowable amount of certain PFAS in drinking water to 4 parts per *trillion.* (*Id. ¶¶* 19-39.) But that EPA regulation, which is being challenged in multiple lawsuits, does not require or mandate compliance until **2029.** (*Id*. ¶ 39.) Plaintiff alleges that it may be able to meet the potential future requirement only by incurring unspecified and unknown expenses. (*See id. ¶¶* 58, 67 ("expenses associated with **future**

4

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

acquisition … of required treatment technologies"), 73 (seeking funding of "the acquisition … of new water treatment technology"); 84, and 89.)

## LEGAL STANDARD

South Carolina is a fact-pleading state that requires a plaintiff to plead the ultimate facts and a statement of facts constituting a cause of action. Rule 8(a), SCRCP. A complaint must contain factual allegations regarding each essential element of a viable cause of action, and failure to plead facts sufficient to constitute a cause of action warrants dismissal under Rule 12(b)(6), SCRCP. *See Doe v. Marion*, 361 S.C. 463, 470, 605 S.E.2d 556, 561 (Ct. App. 2004) (affirming dismissal under Rule 12(b)(6) where plaintiffs failed to allege sufficient facts to support their negligence claim).

Rule 12(b)(1), SCRCP, provides a case may be dismissed in full when the court lacks subject matter jurisdiction over the issues in the case. Subject matter jurisdiction cannot be conferred by consent of the parties and cannot be waived by the parties. *Atlanta Skin & Cancer Clinic, P.C. v. Hallmark Gen. Partners, Inc*., 320 S.C. 113, 121, 463 S.E.2d 600, 605 (1995). Further, a judgment of a court without subject matter jurisdiction is void. *Coon v. Coon*, 364 S.C. 563, 566, 614 S.E.2d 616, 617 (2005).

Under Rule 12(b)(6) of the South Carolina Rules of Civil Procedure, a party may move to dismiss a claim based on a failure to state facts sufficient to constitute a cause of action. *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). In considering a motion to dismiss, the court must base its ruling solely on allegations set forth in the operative pleading. *Id.* Based on the facts alleged, the "question is whether, in the light most favorable to the [nonmoving party], and with every doubt resolved in his behalf, the [pleading] states any valid claim for relief." *Doe*, 373 S.C. at 395, 645 S.E.2d at 247-48 (citation omitted).

5

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Under Rule 12(f), of the South Carolina Rules of Civil Procedure, the Court "[m]ay order stricken from any pleading any insufficient defense or any redundant, immaterial, or impertinent, or scandalous matter." Rule 12(f), SCRCP. A motion to strike is generally addressed to the sound discretion of the court. *Huggins v. Winn-Dixie Greenville, Inc.,* 252 S.C. 353, 166 S.E.2d 297 (1969).

**ARGUMENT**

### I.     Plaintiff's claims are not ripe for adjudication.

First and foremost, Plaintiff's claims in this lawsuit are not ripe for adjudication and, therefore, this Court does not have subject matter jurisdiction over the claims. "A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy." *Lennon v. S.C. Coastal Council*, 330 S.C. 414, 415, 498 S.E.2d 906, 906 (Ct. App. 1998). This includes an inquiry into whether Plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc.*, 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010). A claim is not ripe and should be dismissed when it presents "a contingent, hypothetical or abstract dispute." *Pee Dee Elec. Co-op., Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983).

The Complaint confirms that Plaintiff has not yet suffered the injury for which it seeks recovery and therefore presents a hypothetical and abstract dispute. Although the EPA published PFAS drinking water standards in April, 2024, it has not yet been determined how, if at all, the rule will impact Plaintiff. Complaint ¶ 37. The EPA regulation, which is being challenged in multiple lawsuits, does not require compliance until 2029. *Id.* at ¶ 39. In the Complaint, Plaintiff argues that Suminoe should pay "expenses associated with future acquisition, installation, and operation of required treatment technologies." *Id.* at ¶ 67. Plaintiff thus implicitly admits that it is not currently required to—and has not—purchased treatment technologies to comply with the

6

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

possible future regulation. Instead, Plaintiff seeks to recover damages for "the mere threat of potential injury," as the EPA regulation does not yet require compliance and is subject to change. *Waters v. S.C. Land Resources Comm.*, 321 S.C. 219, 228, 467 S.E.2d 913, 918 (1996). Since it is premature and entirely speculative what measures, if any, Plaintiff may be required to take in the future, Plaintiff's claims are not ripe for adjudication and should be dismissed.

**II.     The Court lacks subject matter jurisdiction over this action which may only be heard by the South Carolina Department of Environmental Services.**

The Court lacks subject matter jurisdiction over this action which may only be heard by SCDES on the basis of primary jurisdiction. "Primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case, the judicial process is suspended pending referral of such issues to the administrative body for its view." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956) (internal quotation marks omitted).

The South Carolina State Safe Drinking Water Act (the "Act") reflects the regulatory framework under which the legislature entrusted SCDES with addressing the exact harm alleged here. *See* S.C. Code Ann. § 44-55-10, *et seq.* The Act prohibits any person from "render[ing] a public water system, or part or portion of a public water system, inoperable or unusable by means of contamination . . . ." *Id.* at § 44-55-80(B). The Act exclusively vests enforcement authority in SCDES and, if requested by SCDES, the Attorney General. *Id.* at §§ 44-55-60 through 44-55-100. Under the Act, violators are liable to the State, not the public water system, and damages are limited to actual damages sustained. *Id.* at §§ 44-5590(B)(1), 44-55-1520. Because the exclusive enforcement of these issues rests with SCDES, this Court should dismiss this case to allow SCDES to exercise primary jurisdiction.

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

### III.    Plaintiff fails to allege facts necessary to support a private nuisance claim.

Plaintiff's claim for private nuisance fails because it concerns the contamination of a public body of water and Plaintiff lacks any property interest in the public waterbody to which it alleges Suminoe discharged PFAS. "The traditional concept of a nuisance requires a landowner to demonstrate that the defendant unreasonably interfered with his ownership or possession of the land." *FOC Lawshe Ltd. P'ship v. Int'l Paper Co*., 352 S.C. 408, 413, 574 S.E.2d 228, 231 (Ct. App. 2002) (quoting *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 286, 543 S.E.2d 563, 566 (Ct. App. 2001)). A private nuisance "produces damage to but one or two persons, and cannot be said to be public." *Charleston Dev. Co., LLC v. Alami*, 433 S.C. 533, 548, 860 S.E.2d 687, 695 (Ct. App. 2021) (quoting *Deason v. S. Ry. Co.*, 142 S.C. 328, 334, 140 S.E.2d, 575, 577 (1927)); *see also Baltzeger v. Carolina Midland Ry. Co.*, 54 S.C. 242, 248, 32 S.E. 358, 360-61 (1899) ("A private nuisance affects only one person or a determinate number of persons." (quoting 16 Am. & Eng. Enc. Law, 926)).

First, Suminoe did not unreasonably interfere with Plaintiff's ownership or possession of the waterways because Suminoe does not discharge any water into Peoples Creek, the Broad River, or any other waterway. Rather, as alleged in the Complaint, Suminoe conveys its wastewater to the Gaffney BPW WWTP, like other private citizens. Complaint ¶ 17. Once Suminoe conveys its wastewater to the Gaffney BPW WWTP, it has no control over the treatment or filtration of the wastewater. Therefore, any interference with Plaintiff's property as a result of PFAS entering the watershed is not an interference caused by Suminoe.

Further, Plaintiff is just one of the many riparian landowners with property located along the Broad River. Accordingly, Plaintiff cannot sustain its private nuisance claim as the alleged

harm is inherently "public in nature," which cannot support a private nuisance claim. *See Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011).

### IV.     Plaintiff fails to allege facts necessary to support a public nuisance claim.

a.     <u>Plaintiff is not the proper plaintiff to bring a public nuisance claim</u>.

"While a public nuisance cause of action can be used to remedy harms suffered by the public generally, typically only the State may assert this cause of action." *Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 78, 753 S.E.2d 846, 852 (2014) (citing *Brown v. Hendricks*, 211 S.C. 395, 400, 45 S.E.2d 603, 605 (1947) ("a private action does not lie to abate a public nuisance.")). This power is generally reserved for the state Attorney General under the *parens patriae* authority. *See Condon v. State*, 354 S.C. 634, 641, 583 S.E.2d 430, 434 (2003) (stating Attorney General's "authority in his capacity as the chief legal officer of the State to institute actions involving the welfare of the State and its citizens, including vindication of wrongs committed collectively against the citizens of the State"); *Cnty. of Lexington v. City of Columbia*, 303 S.C. 300, 301, 400 S.E.2d 146, 147 (1991) (holding that "political subdivision[s] of the State," such as cities and counties, "lack[] the sovereignty to maintain such a suit under the doctrine of *parens patriae*" and therefore can only bring suit pursuant to an infringement of the local government's "own propriety interest or statutory rights").

The South Carolina Attorney General has brought such an action. *The State of South Carolina, ex rel. Alan M. Wilson, v. 3M Company, et al*, Complaint, Case No. 2023-CP-40-04111 (S.C. Ct. Comm. Pleas Aug. 7, 2023), removed and now pending in federal court, Case No. 2:23-cv-05979-RMG. In that action, the State of South Carolina brought an action based upon its statutory authority to protect State natural resources and property, and its common law police power. *Id*. at ¶ 25. The State of South Carolina asserted several causes of action including (1)

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

public nuisance; (2) private nuisance; (3) trespass; (4) Violation of South Carolina Unfair Trade Practices Act. *Id.* ¶¶ 170-204. Proceeding with a public nuisance claim in this case would result in duplicative litigation and the risk of inconsistent rulings.

> b.    Plaintiff does not allege a special injury to its real or personal property.

Plaintiff's public nuisance claim should be dismissed because Plaintiff does not allege a special injury to its real or personal property. *See* Complaint ¶ 2. In South Carolina, a private party may only bring a private civil suit for a public nuisance "if he suffered special injury to his real or personal property." *Carnival Corp.*, 407 S.C. at 78, 753 S.E.2d at 852. Courts have defined a special injury as an "individual or specific damage in addition to that suffered by the public" that must be "of a special character, distinct and different from the injuries suffered by the public generally." *Id.* (citations omitted); *see also Rhodes*, 636 F.3d at 96-98 (4th Cir. 2011) (rejecting public nuisance claim based on alleged PFAS contamination to municipal water supply where plaintiff failed to allege injury different from that "suffered by other members of the public.").

Additionally, Plaintiff does not allege an injury to its own real or personal property. Plaintiff attempts to assert a "special injury" as to the "loss of use of its properties" under the EPA regulation. However, as discussed in more detail below, Plaintiff does not have any ownership interest in the waterways outside of its limited, reasonable, riparian use of the waterways. Complaint ¶ 67 (arguing that Plaintiff's special injuries include "the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by the EPA"); *id* at ¶ 3 ("Plaintiff's other property abuts the Broad River . . . where its water intake withdraws raw water from the Broad River for treatment at the SWTP"). As such, Plaintiff fails to allege that Suminoe caused any special injury to its real or personal property, and Plaintiff's claim for public nuisance fails as a matter of law. As Plaintiff has a

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

riparian right of reasonable use in the waterways, "[h]e has no property in the water itself, but a simple usufruct." *White v. Whitney Mfg. Co.*, 60 S.C. 254, 38 S.E. 456 (1901); Complaint ¶ 3.

   c. The proper measure of damages for a nuisance cause of action is the lost value of the property.

Plaintiff cannot recover the damages alleged for the cost of removing PFAS or to fund "measures necessary" to prevent PFAS from continuing to threaten public health and safety, including acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTP to remove PFAS.  Complaint ¶¶ 68-71.

Rather, the "only proper" measure of damages for a nuisance cause of action is "the lost rental value of the property" for a temporary nuisance.  *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 139, 747 S.E.2d 468, 473 (2013). For a continuing or permanent nuisance, the measure of damages is the "diminution in the market value of the property."  *Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 359, 559 S.E.2d 327, 338 (Ct. App. 2001).  As a result, whether the alleged nuisance is characterized as temporary, continuing, or permeant, Plaintiff cannot recover for the costs of acquisition, installation, or new water treatment technology at Plaintiff's SWTP to remove PFAS.  Rather, Plaintiff's damages under a nuisance theory, if any, should be limited to the difference of the property's rental or market value.

   d. Plaintiff's claim for damages regarding acquisition, installation, and operation of new water treatment technology should be stricken.

South Carolina case law is clear that the proper recovery of damages under a nuisance cause of action is the diminution of property value.  *Babb*, 405 S.C. at 141-142, 747 S.E.2d at 475; *Hedgepath*, 348 S.C. at 359, 559 S.E.2d at 338.  A motion to strike, challenging a theory of recovery in the complaint, is comparable to a motion to dismiss under Rule 12(b)(6), SCRCP. *McCormick v. England*, 328 S.C. 627, 632, 494 S.E.2d 431, 433 (Ct.App.1997).  Under South

Carolina case law, it is clear that if Plaintiff's cause of action were to survive this motion to dismiss, Plaintiff cannot recover damages for acquisition, installation, and operation of new water treatment technology. Plaintiff's sole recovery, if any, is limited to the diminution of their property value.

**V.     Plaintiff fails to allege facts necessary to support a trespass claim.**

Plaintiff fails to state a claim for trespass.  "Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property . . . .  To constitute actionable trespass, there must be an affirmative act, invasion of land must be intentional, and harm caused must be the direct result of that invasion."  *Hawkins v. City of Greenville*, 358 S.C. 280, 296, 594 S.E.2d 557, 565-66 (Ct. App. 2004).  In this case, Plaintiff fails to adequately allege invasion of Plaintiff's exclusive possession of property by a tangible matter or that the invasion onto its property was intentional and unauthorized.  For these reasons, Plaintiff's trespass claim should be dismissed.

a.     <u>Plaintiff does not have exclusive possession over the waterways.</u>

Critically, Plaintiff's trespass claim should be dismissed because Plaintiff does not enjoy exclusive possession over the Public Waterbodies.  South Carolina courts are clear that trespass *only* protects one's right to the exclusive possession of his property, and Plaintiff does not have exclusive possession over the Public Waterbodies at the center of its trespass claim.  *Babb*, 405 S.C. at 139, 747 S.E.2d at 47.  "Under the common law, riparian property owners hold special rights allowing them to make 'reasonable use' of the water adjacent to their property."  *Jowers v. S.C. Dep't of Health & Env't Control*, 423 S.C. 343, 355, 815 S.E.2d 446, 452 (2018).  While it is well-settled in South Carolina that a riparian owner has "an equal right to the use of the water which flows in the stream adjacent to his lands . . . [h]e has no property *in the water itself*, but a simple usufruct."  *White*, 60 S.C. at 254, 38 S.E. at 459 (emphasis added).

12

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

In its Complaint, Plaintiff acknowledges that it "owns and occupies land abutting the Broad River." Complaint ¶ 12. Moreover, Plaintiff merely alleges that Plaintiff has a property right in the reasonable use of these waters, including for the "provision of water to its customers." *Id*. at ¶ 53. Because Plaintiff does not enjoy any ownership interest in the water itself, but rather, only an equal right to use of that water, it is well-settled law in South Carolina that Plaintiff does not enjoy exclusive enjoyment of property to sustain a claim for trespass. *See White*, 60 S.C. at 254, 38 S.E. at 456; *Jowers*, 423 S.C. at 355, 815 S.E.2d at 452.

      b.    <u>PFAS particles are intangible matter that cannot support a trespass claim.</u>

Even if Plaintiff had exclusive possession of the Public Waterbodies, Plaintiff's trespass claim fails because PFAS are intangible matter and any alleged contamination is not an invasion by a physical, tangible thing as required by South Carolina law. "South Carolina adheres to the traditional rule requiring an invasion by a physical, tangible thing for a trespass to exist." *Babb*, 405 S.C. at 145, 747 S.E.2d at 476. In *Babb*, the Court analyzed, and rejected, a line of trespass cases that would allow trespass claims based on intangible invasions. *Id.* 405 S.C. at 150-52, 747 S.E.2d at 480-81 (concluding that allowing trespass actions for "microscopic and atomic particles" would lead to public uncertainty as to what constitutes a trespass and "would transform trespass into nuisance" where plaintiffs could recover for "even the most ephemeral intrusion.").

In *Babb*, the Court rejected alternatives to the traditional rule and recognized that the traditional rule remains "superior" as it promotes "clarity, ease of implementation, and ability to serve as a guide for future conduct" that will "yield a stable rule as to what rises to the level of a trespass." *Id.* 405 S.C. at 149-151, 747 S.E.2d 480 (*rejecting Martin v. Reynolds Metals Co.*, 221 Or. 86, 99-100, 32 P.2d 790 (Or. 1959) and *Borland v. Sanders Lead Co.*, 369 So. 523 (Ala. 1979) (holding that "an emission of lead particulates, and SO 2, invisible to the naked eye, which

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

emissions [had] settled on [Plaintiff's] property" did not constitute a trespass as "there is a point where the entry is so lacking in substance that the law will refuse to recognize it.")).  The South Carolina Supreme Court expressly rejected the "divergent" *Borland* decision "where the plaintiffs sued a lead smelter for lead and sulfoxide emissions they alleged settled on and damaged their property." *Id.* (citing *Borland*, 369 So.2d at 525-26).  The *Babb* Court went further to criticize the *Borland* decision and its absurd consequences in noting that the *Borland* holding even stated "it 'might appear, at first blush, . . . that every property owner in this State would have a cause of action against any neighboring industry which emitted particulate matter into the atmosphere, or even a passing motorist, whose exhaust emissions come to rest upon another's property.'" *Id.* (quoting *Borland*, 369 So.2d at 529).

The South Carolina Supreme Court noted the value of the traditional rule lying in that the dimensional test "stood as a bulwark excluding from trespass those intrusions not substantial enough to affect the right to exclusive possession." *Babb*, 405 S.C. at 150, 747 S.E.2d at 479 (emphasis added).  The Court further highlighted that "without the dimensional test, even the most ephemeral intrusion—the exhaust from a passing car, the sound waves from the neighbors talking, or even a sneeze that carry onto one's land—would constitute a trespass and an entitlement to at least nominal damages." *Id*.  Further, the court emphasized that the traditional rule "preserves the distinction between trespass and nuisance," whereas "the divergent view would transform trespass into nuisance," thereby "leav[ing] property owners with less, rather than more, protection of their property rights." *Id*. at 152, 747 S.E.2d at 480.

In adopting the traditional rule, the Court followed the Michigan Court of Appeals' decision in *Adams v. Cleveland-Cliffs Iron Co*. which concluded that dust is "not actionable in trespass" because "dust, along with other forms of airborne particulate, does not normally present

14

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

itself as a significant physical intrusion," but rather "become[s] part of the ambient circumstances of th[e] space" on which it settles. 237 Mich. App. 51, 67-70, 602 N.W. 2d 215, 222-24 (Mich. 1999). In *Adams*, the Michigan court held "[w]here the possessor of land is menaced by noise, vibrations, or ambient dust, smoke, soot, or fumes, the possessory interest implicated is that of *use and enjoyment, not exclusion*, and the vehicle through which a plaintiff normally should seek a remedy is the doctrine of nuisance." *Id.* at 67, 602 N.W.2d at 222 (emphasis in original).

This case presents issues that are nearly identical to those in *Babb*, and by extension *Adams*. While, in *Babb*, the alleged trespass consisted of an "invisible odor," here, the PFAS particles are similarly microscopic and are "visibly undetectable." *Babb*, 405 S.C. at 146, 747 S.E.2d at 477 (citation omitted); *see* Complaint ¶ 28 (acknowledging that PFAS molecules are measured in parts per trillion). As a result, the PFAS particles are exactly the type of "intangible matter" that the South Carolina Supreme Court held is "insufficient to constitute a trespass" as the intrusion of particles does not interfere with the exclusive possession of land. *Babb*, 405 S.C. at 146, 747 S.E.2d at 477. Following the holding of the *Babb* decision and applying the dimensional test to the present case can only yield one result—PFAS particles do not constitute a trespass because they are intangible. *See Babb,* 405 S.C. at 150, 747 S.E.2d at 479.

In a similar case, the plaintiff argued that PFAS are distinct from the "invisible odors" in *Babb* because, "unlike a temporal disturbance of odor or quickly dissipating particulate, [PFAS] persists in the environment." *The State of South Carolina, ex. rel Alan M. Wilson v. 3M Co. et al.*, Judge Coble Order Den. Mot. to Dismiss, at 6, Case No. 2023-CP-40-04111 (S.C. Ct. Comm. Pleas July 23, 2024). This argument is not persuasive as it critically ignores the *tangibility* component of *Babb* and instead imposes a *temporality* requirement which the *Babb* court does not impose. Temporal disturbances of odor, quickly dissipating particulate, and PFAS are all

15

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

*intangible*.  As discussed above, PFAS are measured in *parts per trillion*—which is undoubtedly intangible.  *Babb* held that trespass only exists for a physical, tangible thing—which PFAS is not.

> c.  Plaintiff fails to allege *any* affirmative act by Suminoe constituting an intentional and unauthorized entry upon Plaintiff's property.

Even if the Court finds that PFAS is tangible matter, Plaintiff's claim for trespass still fails because Plaintiff does not allege Suminoe's entry upon its property is intentional or unauthorized. Trespass under South Carolina law requires that a defendants' "affirmative act [and] invasion of the land must be intentional . . . ." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991).  South Carolina law is explicit that to be intentional, "[the trespasser] must intend [the] act which constitutes the unwarranted entry on another's land."  *Id.* 305 S.C. at 553, 409 S.E.2d at 802.  "Intent is proved by showing that the defendant acted voluntarily and that he knew or should have known the result would follow from his act."  *Id.*

First, Plaintiff's Complaint does not contain any allegation involving an affirmative act by Suminoe.  In fact, Suminoe does not discharge wastewater into Peoples Creek, the Broad River, or any other waterway.  Suminoe conveys its wastewater to Gaffney BPW WWTP for treatment. Complaint ¶ 17.  Suminoe does not control the method or manner the Gaffney BPW WWTP uses to treat its wastewater.  Because Suminoe does not discharge its wastewater into the Peoples Creek, the Broad River, or any other body of water, Plaintiff cannot establish that Suminoe affirmatively and intentionally discharged PFAS into the Public Waterbodies.

Second, Plaintiff concedes that PFAS contamination has only occurred as a result of Plaintiff's own actions in deliberately drawing the subject water into its facilities.  *Id.* at ¶¶ 77, 80. ("[E]ach separate invasion of PFAS-contaminated water constitutes a new trespass every time Plaintiff's water pumps are active.").  As a result, it is not an alleged affirmative act by Suminoe

16

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

that directly caused an invasion, but rather Plaintiff's intervening activation of its water pumps that brought the alleged PFAS molecules onto its property.

Moreover, Plaintiff fails to allege any plausible factual basis for a claim that Suminoe intended to cause or actually caused PFAS to enter Plaintiff's SWTP intake on Broad River, which is 10 miles from Suminoe's plant. Because Plaintiff cannot show that Suminoe directly caused an intentional invasion of Plaintiff's property, Plaintiff's trespass claim should be dismissed.

d. <u>The proper measure of damages for a trespass cause of action is the value of the property</u>.

As discussed above with nuisance, Plaintiff cannot recover the damages alleged for lost property value, cost of removing PFAS, fund "measures necessary" to prevent PFAS from continuing to threaten public health and safety, including acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTP to remove PFAS as a result of any alleged trespass. Complaint ¶¶ 68-71.

Under South Carolina law, the "only proper" measure of damages for a temporary trespass is "the lost rental value of the property." *Babb*, 405 S.C. at 141-142, 747 S.E.2d at 475. For a continuing or permanent trespass, the measure of damages is the "diminution in the market value of the property." *Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 359, 559 S.E.2d 327, 338 (Ct. App. 2001). As a result, whether the alleged trespass is characterized as temporary, continuing, or permanent, Plaintiff cannot recover for the costs of acquisition, installation, or new water treatment technology at Plaintiff's SWTP to remove PFAS. Plaintiff's damages, if any, should be limited to the difference of the property's rental or market value as a result of the alleged trespass. In the event the Court allows Plaintiff's trespass claim to go forward, Plaintiff's claim for damages regarding acquisition, installation, and operation of new water treatment technology should be

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

stricken as a matter of law.  Plaintiff is not entitled to this measure of damages under a trespass claim.

**VI.     Plaintiff fails to allege facts sufficient to state a claim for negligence against Suminoe.**

Plaintiff's negligence claim against Suminoe fails as well.  To prevail in an action for negligence, a plaintiff must establish that: "(1) defendant owes a duty of care to the plaintiff, (2) defendant breached the duty by a negligent act or omission, (3) defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) plaintiff suffered an injury or damages." *Steinke v. S.C. Dep't of Labor, Licensing & Regulation,* 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999).  "The absence of any one of these elements renders the cause of action insufficient." *Washington v. Lexington Cty. Jail,* 337 S.C. 400, 405, 523 S.E.2d 204, 206 (Ct.App.1999).

a.     Suminoe does not owe Plaintiff a duty of care.

It is well-settled under South Carolina law that "[a]n essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Huggins v. Citibank, N.A.,* 355 S.C. 329, 332, 585 S.E.2d 275, 276 (2003).  There can be no negligence liability unless the parties "have a relationship recognized by law as providing the foundation for a duty to prevent an injury." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.,* 373 S.C. 43, 48, 644 S.E.2d 43, 46 (2007).  Such a duty "may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *Madison ex rel. Bryant v. Babcock Ctr., Inc.,* 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006).  The existence of a duty is a question of law for the Court, not the jury.  *McCord v. Laurens Cnty. Health Care Sys.,* 429 S.C. 286, 296, 838 S.E.2d 220, 225 (Ct. App. 2020).

18

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Furthermore, foreseeability of the alleged injury alone does not give rise to a duty absent such a relationship. *See Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.,* 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003). "Absent a legally recognized duty, the defendant in a negligence action is entitled to a judgment as matter of law." *Wright v. S.C. Dep't of Transportation*, 437 S.C. 184, 191, 877 S.E.2d 788, 791 (Ct. App. 2022), *reh'g denied* (Sept. 23, 2022), *cert. denied* (May 24, 2023) (*citing Cole v. Boy Scouts of Am.*, 397 S.C. 247, 251, 725 S.E.2d 476, 478 (2011).

Plaintiff fails to plead any facts, or otherwise establish, a duty of care owed by Suminoe to Plaintiff. Plaintiff's conclusory allegation, that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others, which includes preventing the direct and/or indirect discharge of these PFAS into Peoples Creek or the Broad River, thereby interfering with Plaintiff's property rights and injuring Plaintiff's" is insufficient to support a negligence claim. Complaint ¶ 86. In effect, Plaintiff posits that simply because Suminoe handles PFAS as a byproduct of its materials that it owes a duty of care in disposing of the PFAS. Plaintiff's claim fails because not only does Suminoe not dispose of PFAS into Peoples Creek, or the Broad River, but, additionally, because South Carolina does not adopt such a broad understanding of duty.

Moreover, even if the EPA's recent regulation to modify the amount of PFAS in drinking water were the basis of Plaintiff's negligence claim, as explained above, the regulation might take effect in 2029 and therefore cannot, at this time, serve as a basis to establish that Suminoe owes a duty of care to Plaintiff. Even still, if the hypothetical future expense of complying were foreseeable, South Carolina law holds that "foreseeability of injury, in and of itself, does not give rise to a duty." *Charleston Dry Cleaners*, 355 S.C. at 618, 586 S.E.2d at 588 (*citing South Carolina*

19

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

*State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 289 S.C. 373, 376, 346 S.E.2d 324, 325 (1986)). Because no duty exists between Plaintiff and Suminoe, Plaintiff's negligence claim fails as a matter of law.

      i.    <u>Suminoe does not owe Plaintiff a duty under the voluntary assumption of duty doctrine under Restatement (Second) of Torts § 323</u>.

Any voluntary assumption of duty theory is misplaced. Although "[t]he common law ordinarily imposes no duty on a person to act if "an act is voluntarily undertaken . . . the actor assumes the duty to use due care." *Miller v. City of Camden*, 329 S.C. 310, 314, 494 S.E.2d 813, 815 (1997). While the law imposes this duty on a volunteer, the question whether such a duty arises in a given case may depend on the existence of particular facts. *Id*.

The recognition of a voluntarily assumed duty in South Carolina jurisprudence is rooted in the Restatement of Torts, which states:

> One who undertakes, gratuitously or for consideration, *to render services to another which he should recognize as necessary for the protection of the other's person or things*, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (emphasis added). This theory, although recognized by South Carolina Courts is generally limited to situations where the defendant voluntary undertakes an action for the benefit or protection of the plaintiff.

South Carolina courts have historically been reluctant to expand the voluntary assumption of duty beyond the circumstances set forth in Restatement (Second) § 323 as undertaking any activity would open oneself up to liability. *See Staples v. Duell*, 329 S.C. 503, 510, 494 S.E.2d 639, 643 (Ct. App. 1997) (declining to impose duty on as a result of inspecting his property for dead trees as doing so "would create the highly undesirable precedent of encouraging rural

20

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

landowners to shield their eyes and never inspect their land."); *Johnson v. Robert E. Lee Acad., Inc.*, 401 S.C. 500, 506, 737 S.E.2d 512, 515 (Ct. App. 2012).; *Underwood v. Coponen*, 367 S.C. 214, 219, 625 S.E.2d 236, 239 (Ct. App. 2006) (refusing to extend the voluntary assumption of duty doctrine where the defendant voluntarily trimmed a tree located on his property that, when untrimmed, would block drivers' view of a stop sign.).

The relationship between Suminoe and Plaintiff does not fit within the parameters of Restatement (Second) of Torts § 323. First, § 323 contemplates a party relying on the rendering of services to another for the other's protection. Even assuming Suminoe acted voluntarily in allegedly disposing PFAS, Suminoe produces and sells automobile interior furnishings. It did not render a service to Plaintiff or undertake any action for Plaintiff's benefit or protection. Expanding the court's interpretation of the voluntary assumption of a duty to encompass the present situation would conflict with its longstanding skepticism toward the consequences of such an extension.

> ii.   Suminoe does not owe Plaintiff a duty under the voluntary assumption of duty doctrine under Restatement (Second) of Torts § 324A.

To the extent that Plaintiff attempts to argue that Suminoe owes a duty as a result of a voluntary action under Restatement (Second) § 324A, South Carolina law is explicit that it does not adopt such broad understanding of duty.

> One who undertakes, gratuitously or for consideration, *to render services to another which he should recognize as necessary for the protection of a third person or his things*, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A. The rule stated in § 324A is an application of the one stated in § 323. Restatement (Second) of Torts § 324A cmt a. First and foremost, the Complaint

21

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

does not allege that any voluntary action by Defendants was undertaken as a service to Plaintiff. Second, South Carolina has specifically rejected Section 324A. *Oulla v. Velazques*, 427 S.C. 428, 444, 831 S.E.2d 450, 458 (Ct. App. 2019); *Miller*, 329 S.C. at 315 n.2, 494 S.E.2d at 815 n.2 (1997) ("We decline to adopt the expanded liability of Restatement 2d of Torts § 324A (1965)."). In *Oulla*, the Court reiterated the long-held standard that "foreseeability of injury, in the absence of a duty to prevent that injury, is an insufficient basis on which to rest liability." 427 S.C. at 444, 831 S.E.2d at 458 (holding that "[a]lthough it was likely foreseeable the pallets of sod were a danger to other drivers, such as the Oullas, if they were not properly secured, our supreme court has rejected the idea that one who undertakes a duty to render services to another should recognize a duty to third persons.").

"[T]here is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Madison ex. rel. Bryant v. Babcock Ctr., Inc*, 371 S.C. 123, 136, 638 S.E.2d 650, 656. Moreover, "one who has no control owes no duty." *Miller,* 329 S.C. at 314, 494 S.E.2d at 815 (1997). Because Suminoe delivers its industrial wastewater to the Gaffney BPW WWTP pursuant to a permit issued by Gaffney BPW WWTP, Suminoe has no duty to ensure Gaffney BPW WWTP treats the wastewater in a way that does not risk harm to third parties and, thus, Suminoe owes no duty to Plaintiff. *See, e.g., Oulla*, 427 S.C. at 444, 831 S.E.2d at 458.

    b.  <u>Suminoe is not the proximate cause of Plaintiff's alleged damages.</u>

Proximate cause requires proof of: (1) causation-in-fact, and (2) legal cause. *J.T. Baggerly v. CSX Transp., Inc*., 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006) (citing *Bramlette v. Charter–Medical–Columbia*, 302 S.C. 68, 72, 393 S.E.2d 914, 916 (1990)). Causation-in-fact is proved by establishing the injury would not have occurred "but for" the defendant's negligence, and legal cause is proved by establishing foreseeability. *Id.*

22

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Suminoe does not discharge PFAS into Peoples Creek, the Broad River —or any other body of water. As alleged by Plaintiff in the Complaint, Suminoe conveys its wastewater to Gaffney BPW WWTP for treatment. Complaint ¶ 17. Suminoe cannot, and does not, control how Gaffney BPW WWTP treats and filters its water any more than any other citizen who uses consumer products resulting in PFAS discharge into their wastewater can direct and control the activities of public utilities.

Because Gaffney BPW WWTP —not Suminoe— is responsible for filtering, treating, and discharging the water in accordance with SCDES, and other state and federal regulations, Suminoe cannot be the "but for" cause of PFAS entering any other, downstream, wastewater treatment plants as alleged by Plaintiff. *See S*.C. Code Ann. § 44-55-10, *et seq.* Therefore, Plaintiff does not establish the required element of causation to sustain its negligence claim against Suminoe.

c.    Plaintiff has suffered no damages.

Damages are a required element of a negligence claim. *Babb*, 405 S.C. at 153, 747 S.E.2d at 481. "Generally, under South Carolina law, the damages element requires a plaintiff to establish physical injury or property damage." *Id.*

Plaintiff fails to allege cognizable damages because Plaintiff has not yet (and may never) incur costs to comply with the EPA regulation. Other than the alleged future expenses to comply with the Rule, the Complaint asserts only conclusory allegations of harm. (*See, e.g.,* Complaint ¶¶ 49, Plaintiff's Prayer for Relief (alleging unspecified "past, present, and future injury to property."). These allegations are plainly insufficient to withstand a motion to dismiss. *Jones v. Gilstrap*, 288 S.C. 525, 528, 343 S.E.2d 646, 648 (Ct. App. 1986) (holding that, even under the liberal standard for a motion to dismiss, mere conclusory allegations, unsupported by allegations

23

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

of fact, are insufficient).  Consequently, Plaintiff's negligence claim should be dismissed on this basis as well.

VII.    **The Court should dismiss, or in the alternative strike, plaintiff's requests for attorney's fees and prejudgment interest.**

a.    <u>Plaintiff has not identified any applicable statute or contract providing for an award of attorney's fees.</u>[2]

Plaintiff is not entitled to attorneys' fees in this case.  Under the "American Rule," the parties to a lawsuit generally bear the responsibility of paying their own attorneys' fees. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 561, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).  There are limited exceptions to the American Rule, such as when attorney's fees are authorized by contract or by statute. *Seabrook Island Prop. Owners' Ass'n v. Berger*, 365 S.C. 234, 238, 616 S.E.2d 431, 434 (Ct. App. 2005).  "In South Carolina, the authority to award attorney's fees can come only from a statute or be provided for in the language of a contract.  There is no common law right to recover attorney's fees." *Harris–Jenkins v. Nissan Car Mart, Inc.*, 348 S.C. 171, 176, 557 S.E.2d 708, 710 (Ct. App. 2001) (citations omitted).

---

[2] Where there is no South Carolina appellate court opinion on point, South Carolina courts are instructed to follow federal court decisions. *Gardner v. Newsome Chevrolet-Buick, Inc.*, 304 S.C. 328, 404 S.E.2d 200 (1991).  Pursuant to a Rule 12 motion, a request for attorney's fees may be dismissed if the plaintiff fails to sufficiently identify and allege a statutory or contractual basis for such award. *Gregg v. Am. Coll. of Med. Genetics & Genomics*, No. CV 3:22-01218-MGL, 2023 WL 2047504, at *9 (D.S.C. Feb. 16, 2023) (dismissing requests for attorney's fees pursuant to Rule 12(b)(6) where plaintiff "failed to identify a basis for asserting . . . attorney['s] fees."); *Hinkle v. Cont'l Motors, Inc*., No. CV 9:16-3707-RMG, 2017 WL 4776992, at *6 (D.S.C. Oct. 20, 2017) (dismissing a claim for attorney's fees pursuant to Rule 12(b)(6) when plaintiff failed to "identify [any] contractual or statutory basis for an award of attorney's fees, and the prayers for attorney's fees."); *USAA Cas. Ins. Co. v. Barker, No. CV 3:23-02087-MGL, 2024 WL 549726*, at *1 (D.S.C. Feb. 12, 2024) (dismissing claim for attorney's fees upon motion to dismiss where hallicscounterclaim plaintiff failed to allege she has or will incur attorneys' fees as a result of her counterclaim).

24

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

In this case, Plaintiff fails to plead any contract that permits the recovery of attorneys' fees as a separate element of damages. Therefore, Plaintiffs' prayer for relief for attorneys' fees should be dismissed.

        b        <u>Plaintiff's does not identify a statute or contract entitling it to prejudgment interest on an unliquidated claim</u>.[3]

Plaintiff is not entitled to prejudgment interest in this case. "[South Carolina] law allows prejudgment interest on obligations to pay money from the time when, either by agreement or by operation of law, the payment is demandable, if the sum is certain or capable of being reduced to certainty, even if the parties do not agree on the amount of the obligation." S.C. Code Ann. § 34-31-20(a); *Brooklyn Bridge, Inc. v. S.C. Ins. Co.*, 420 S.E.2d 511, 513 (Ct. App. 1992) (citation omitted). "The proper test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose." *Smith-Hunter Constr. Co., Inc. v. Hopson*, 365 S.C. 125, 128, 616 S.E.2d 419, 421 (2005) (citation omitted).

In terms of prejudgment interest, the general rule is that it is not recoverable on an unliquidated claim in the absence of agreement or statute. *QHG of Lake City, Inc. v. McCutcheon*, 360 S.C. 196, 205, 600 S.E.2d 105, 109 (Ct. App. 2004) (citing *Builders Transp., Inc. v. South Carolina Property & Cas. Ins. Guar. Ass'n*, 307 S.C. 398, 406, 415 S.E.2d 419, 424 (Ct. App. 1992).

---

[3] Where there is no South Carolina appellate court opinion on point, South Carolina courts are instructed to follow federal court decisions. *Gardner*, 304 S.C. 328, 404 S.E.2d 200 (1991). Pursuant to a Rule 12 motion, a request for prejudgment interest may be dismissed if the plaintiff fails to sufficiently identify and allege a statutory or contractual basis for such award. *Thompson v. Wright Nat'l Flood Ins. Co.*, No. 9:18-CV-2372-BHH, 2019 WL 11271196, at *3 (D.S.C. July 3, 2019) (dismissing request for prejudgment interest pursuant to Rule 12(b)(6) where prejudgment interest was not recoverable under the applicable insurance policy).

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Here, Plaintiff's claims are not a sum certain or capable of being reduced to any certainty. Because Plaintiff will not be required to comply with the EPA's regulation until 2029, any proposed amount of damages for future compliance with the EPA's regulation are speculative and cannot be fixed by conditions existing at the time the claim arose—especially seeing as Plaintiff's claims cannot properly arise until 2029. Therefore, as Plaintiff does not identify any statute or agreement authorizing prejudgment interest as to its unliquidated amount of damages, Plaintiffs' prayer for relief for prejudgment interest should be dismissed.

        c.      <u>In the alternative to dismissing Plaintiff's claim for attorney's fees and prejudgment interest, this court should strike Plaintiff's claims.</u>

In the alternative to dismissing Plaintiff's claim for attorney's fees or prejudgment interest, this court should strike Plaintiff's claim. A motion to strike, challenging a theory of recovery in the complaint, is comparable to a motion to dismiss under Rule 12(b)(6), SCRCP. *McCormick v. England*, 328 S.C. 627, 632, 494 S.E.2d 431, 433 (Ct. App. 1997). As discussed above, Plaintiff fails to assert any theory under contract or statute allowing for the recovery of attorney's fees or prejudgment interest. Therefore, this court should strike Plaintiff's claims for both attorney's fees and prejudgment interest.

**VIII.    The municipal cost recovery rule (also known as the "free public services doctrine") precludes the speculative damages Plaintiff seeks in its Complaint.**

Plaintiff is not entitled to recover costs incurred for its performance of its functions as a special purposed district. Under the municipal cost recovery rule, also known as the "free public service doctrine," public expenditures made in the performance of governmental functions are not recoverable in tort. *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 315-17, 67 S.Ct. 1612 (1947) (holding that the "exercise of judicial power to establish [] new liability . . . would be intruding within a field properly within [the legislature's] control"). Attempts by governmental bodies to sue product manufacturers over response costs are an end run around the democratic

26

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

process. *See Int'l Bhd. of Teamsters, Local 734 Health & Welfare Fund v. Philip Morris, Inc.*, 196 F.3d 818, 825 (7th Cir. 1999) ("[I]t is no part of the judicial function . . . to decree a sudden, *ex post* shift in the financial consequences of selling a consumer product by attaching what would amount to a regressive excise tax."); *Torres v. Putnam Cnty.*, 246 Ga. App. 544, 548, 541 S.E.2d 133, 137 n.4 (Ga. App. 2000) (allegation that defendant "caus[ed] the county to spend money enforcing its laws and protecting its citizens" failed to state a claim).

Plaintiff is a "municipal corporation organized and existing under the laws of South Carolina that provides potable water and wastewater services to its customers." Complaint ¶ 13. Under S.C. Code of Laws § 5-1-10, *et seq*, a municipal corporation may "furnish water to persons for reasonable compensation and charge a minimum and reasonable sewerage charge for maintenance or construction of such sewerage system within such city or town or special service district. S.C. Code Ann. § 5-31-670. As a public, governmental entity, Plaintiff cannot claim relief from the Court for alleged damages to its facilities. *See* Complaint ¶ 13.

## CONCLUSION

For the foregoing reasons, Suminoe respectfully requests that the Court grant its motion to dismiss Plaintiff's Complaint as to Suminoe. The claims in which Plaintiff seeks exorbitant damages are exactly those contemplated and restricted by the South Carolina Supreme Court in *Babb*. Allowing Plaintiff to move forward on its claims will undoubtedly create a chilling effect and uncertainty on what actions give rise to liability. This ambiguity would "result in inefficient behavior because persons would forego some legally permissible and socially and economically beneficial activities due to uncertainty" as to whether the operation of these facilities result in liability. *Babb*, 405 S.C. at 151, 747 S.E.2d at 480; *see also* Isaac Ehrlich & Richard A Posner, *An Economic Analysis of Legal Rulemaking*, 3 J. Legal Stud. 257, 262-64 (1974) (discussing the

ELECTRONICALLY FILED - 2025 Mar 24 2:33 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

social costs and economic efficiencies imposed by imprecise legal standards).  The extension of liability Plaintiff proposes would lead to untenable and inappropriate social and economic consequences.  Suminoe requests that the Court enforce South Carolina law and dismiss this case.

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

By: _s/Robert Y. Knowlton_____
Robert Y. Knowlton, S.C. Bar No. 3589
John P. Boyd, S.C. Bar No. 72412
1201 Main Street, 22nd Floor (29201)
Post Office Box 11889
Columbia, SC 29211-1889
(803) 779-3080
bknowlton@hsblawfirm.com
jboyd@hsblawfirm.com

Frank T. Davis, S.C. Bar No. 66291
Jonathan D. Klett, S.C. Bar No. 103208
One North Main, 2nd Floor
(864) 240-3211
fdavis@hsblawfirm.com
jklett@hsblawfirm.com

*Attorneys for Defendant Suminoe Textile of America Corporation*

March 24, 2025

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA
COUNTY OF UNION

IN THE COURT OF COMMON PLEAS
SIXTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

Milliken & Company; Suminoe Textile of America Corporation; and Tietex International, Ltd.,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

Plaintiff, City of Union, South Carolina ("Union"), hereby submits this Response in Opposition to all pending motions to dismiss filed by Defendants Milliken & Company ("Milliken"), Suminoe Textile of America Corporation ("Suminoe"), and Tietex International, Ltd. ("Tietex") (collectively, "Defendants"). Because Union's well-pled Complaint contains more than sufficient factual grounds supporting its entitlement to relief against all Defendants, Union respectfully requests that the Court deny Defendants' motions.

**BACKGROUND**

For decades, Milliken, Suminoe, and Tietex have knowingly and recklessly poisoned the Broad River with toxic per- and polyfluoroalkyl substances ("PFAS"), contaminating Union's properties and the drinking water supplied to Union's customers with hazardous "forever chemicals." Compl. ¶¶ 1–2, 20. Union relies on and uses the Broad River as a vital source to draw and supply drinking water to thousands of water customers, but Defendants' PFAS contamination

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

threatens the health of Union's customers and harms Union's properties, including, for example, its water treatment and distribution infrastructure. *Id.* at ¶¶ 2, 24–25, 48, 72. These man-made forever chemicals do not break down naturally in the environment, and they cannot be removed with traditional water treatment processes. *Id.* at ¶¶ 5–6. As a result of Defendants' PFAS pollution, Union's water treatment system cannot provide water to over 34,000 customers that is not contaminated with these dangerous chemicals. *Id.* at 2, 5–7.

Defendants own and operate industrial facilities upstream of Union's drinking water intake on the Broad River, and they have used and continue to use PFAS chemicals in their manufacturing operations. *Id.* at ¶¶ 16–18. Defendants' operations generate PFAS-laden wastewater, which they directly or indirectly discharge to the Broad River and its tributaries. *Id.* Milliken owns and operates four industrial facilities at issue, two of which discharge PFAS-contaminated wastewater directly to surface waters (the Magnolia Plant and the Allen Plant) and two of which discharge PFAS-contaminated wastewater to upstream public wastewater treatment plants (the Dewey Plant and the headquarters location). *Id.* at ¶ 16, 77–78. Like Milliken's Dewey Plant and headquarters location, Suminoe and Tietex discharge PFAS-contaminated wastewater to upstream public wastewater treatment plants ("WWTPs"). *Id.* at ¶ 17–18. These WWTPs cannot remove these forever chemicals from Defendants' wastewater, and the polluted water passes through any wastewater treatment processes. *Id.* at ¶¶ 4–5. Thus, regardless of whether Defendants discharge directly or indirectly to surface waters, their PFAS-contaminated water migrates downstream to Union's intake in Lockhart, causing injury to Union and its properties. *Id.* at ¶¶ 5, 40, 43–44, 47–50.

Milliken, Suminoe, and Tietex all knew or should have known that their chosen methods for disposing of their PFAS-contaminated wastewater would cause harm downstream. *Id.* at ¶¶

2

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

43–50. By their very nature, PFAS chemicals are persistent in the environment and resist natural breakdown methods and water treatment methods, which is why Defendants used them to manufacture their textile and fabric products. *Id.* at ¶¶ 16–17, 19–20, 43. Their stability, resistance, and ability to repel oil and water, however, also make PFAS an environmental menace and a hazard to human health. *Id.* at ¶¶ 19–20, 24–25.

The Environmental Protection Agency ("EPA") and numerous scientific studies have linked PFAS exposure to serious human health effects, including immune system suppression, thyroid disorders, liver damages, reproductive and developmental harms (particularly in infants and pregnant women), and kidney, testicular, and liver cancers. *Id.* at ¶¶ 24–25, 30–34, 37. While PFAS chemicals are used in a variety of products, a major source of human PFAS exposure is through consuming PFAS-contaminated drinking water. *Id.* at 19, 24.

In March of 2023, EPA issued proposed maximum contaminant levels ("MCLs")—the enforceable maximum contaminant level that may be permissibly delivered to any public water system user (based on existing detection technology)—and maximum contaminant level goals ("MCLGs")—the maximum contaminant level in drinking water at which adverse human health effects are not known or anticipated to occur—for certain types of PFAS. *Id.* at ¶ 33. Then, in April 2024, EPA issued its first ever binding regulatory limit for PFAS in drinking water, setting MCLs at 4 parts per trillion ("ppt") for PFOA and PFOS, 10 ppt for certain other PFAS chemicals, and using a "hazard index" approach to control mixtures of those other PFAS chemicals. *Id.* at ¶¶ 37–38. At that time, EPA also set MCLGs for PFOA and PFOS at *zero* ppt because there is *no* safe level of exposure to these two PFAS. *Id.*

Public drinking water systems such as Union must comply with the enforceable MCLs by April 2029, but the MCLGs make clear than any level of PFOA and PFOS in drinking water

3

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

presents a risk of health impacts. *Id.* at ¶¶ 37–38. PFAS levels at Union's drinking water source currently exceed both levels, and Union's water treatment system was never designed to, and cannot, remove Defendants' PFAS contamination from the water. *Id.* at ¶¶ 6–7, 47–48. As a direct and foreseeable result of Defendants' wrongful PFAS contamination, Union cannot provide drinking waters to its customers that is free of PFAS contamination, and Union's property rights and properties—e.g., its land, surface water treatment plant, distribution lines, and other infrastructure—have all been polluted and harmed by Defendants' PFAS contamination. *Id.* at ¶¶ 40–50, 52–55, 64–68, 76–78, 86, 88–89. Union has suffered, currently suffers, and will continue to suffer significant harm and property injuries caused by Defendants, and it seeks both monetary and equitable relief to remedy that harm and protect its community from the consumption of Defendants' PFAS. *Id.* at ¶¶ 6–7, 47–50, 60–61, 72–73, Prayer for Relief.

## STANDARD

South Carolina's pleading rules state that "[e]ach averment of a pleading shall be simple concise, and direct," and do not require any "technical forms of pleading." Rule 8(e)(1), SCRCP. Courts must liberally construe pleadings "to do substantial justice to all parties." Rule 8(f), SCRCP; *Quality Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000). Pleadings provide notice to litigants of the issues in the case—"It is elementary that the principal purpose of pleadings is to inform the pleader's adversary of legal and factual positions which he will be required to meet on trial." *Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 574, 743 S.E.2d 778, 785 (2013) (quoting *S.C. Nat'l Bank v. Joyner*, 289 S.C. 382, 387, 346 S.E.2d 329, 332 (Ct. App. 1986)). While a complaint must plead facts showing that the plaintiff is entitled to relief, the complaint need not allege "the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987); Rule 8(a), SCRCP.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

A motion under Rule 12(b)(6), SCRCP, tests the legal sufficiency of a plaintiff's complaint, but "it is not a vehicle for addressing the underlying merits" of the claims asserted. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925 (Ct. App. 2022). A court should only dismiss a claim under this rule if it fails "to state facts sufficient to constitute a cause of action." Rule 12(b)(6), SCRCP. In considering a Rule 12(b)(6) motion, "the trial court must base its ruling solely on allegations set forth in the complaint." *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). Additionally, the court "must presume all well pled facts to be true" and "every doubt" should be resolved in the plaintiff's favor. *Morrow Crane Co. v. T.R. Tucker Constr. Co.*, 296 SC. 427, 429, 373 S.E.2d 701, 702 (Ct. App. 1988); *Cole Vision Corp. v. Hobbs*, 394 S.C. 144, 149, 714 S.E.2d 537, 539 (2011). The court should deny the motion "[i]f the facts and inferences drawn from the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, would entitle the plaintiff to relief on any theory." *Spence*, 368 S.C. at 116, 628 S.E.2d at 874. "Further, the complaint should not be dismissed merely because the court doubts the plaintiff will prevail in the action," *Plyler v. Burns*, 373 S.C. 637, 645, 647 S.E.2d 188, 192 (2007), and "novel questions of law should not ordinarily be resolved on a Rule 12(b)(6) motion," *Chestnut v. AVX Corp.*, 413 S.C. 224, 227, 776 S.E.2d 82, 84 (2015).

A motion under Rule 12(f), SCRCP, raises objections to "any insufficient defense or any redundant, immaterial, impertinent or scandalous matter" in a pleading. A court ruling on a Rule 12(f) motion "decides whether a party should be allowed to plead a defense or other matter." *Alladin Plastics, Inc. v. Wintenna, Inc.*, 301 S.C. 90, 93, 390 S.E.2d 370, 372 (Ct. App. 1990). The court should deny a motion to strike if it "raises merely a doubtful question or the case is such that justice may be promoted by a trial on the merits." *Mayes v. Paxton*, 313 S.C. 109, 115, 437 S.E.2d 66, 69 (1993). Additionally, when a defendant moves to strike and "challenges a theory of recovery

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

in the complaint, [it] is in the nature of a motion to dismiss," and the same standards applicable to a Rule 12(b)(6) motion must be used to evaluate the Rule 12(f) motion. *Grazia v. S.C. State Plastering, LLC*, 390 S.C. 562, 567, 703 S.E.2d 197, 199 (2010).

## ARGUMENT

### A. Defendants' motions fail for many of the same reasons argued by Plaintiffs in other PFAS cases.

Milliken, Suminoe, and Tietex all make arguments that are virtually identical to those that have been asserted by discharger defendants in PFAS cases filed by other public water systems in South Carolina. These include recurring arguments based on justiciability, whether Defendants' PFAS contamination can constitute an actionable trespass or nuisance, the existence of a duty and other elements of negligence, the "free public services doctrine" or "municipal cost recovery rule," primary jurisdiction, and Plaintiffs' requests for relief.

To avoid further duplication, Union incorporates by reference the arguments contained in the Consolidated Opposition filed by Plaintiffs Greenwood Commissioners of Public Works and Laurens County Water and Sewer Authority ("GW/L Opp'n," attached as **Ex. 1**), the Consolidated Opposition of Grand Strand Water and Sewer Authority ("GSWSA Opp'n," attached as **Ex. 2**), and the Supplemental Memorandum filed by Plaintiffs Greenwood Commissioners of Public Works and Laurens County Water and Sewer Authority ("GW/L Supp. Memo.," attached as **Ex. 3**), as well as the arguments made by Plaintiffs' counsel at the motions hearings on March 11 and 12, 2025. (*See* Mar. 11, 2025 Hr'g Tr., attached as **Ex. 4**; Mar. 12, 2025 Hr'g Tr., attached as **Ex. 5**). Union further incorporates by reference the arguments contained in the March 28, 2025 responses in opposition filed by Plaintiffs South Carolina Public Service Authority, aka Santee Cooper, and Gaffney Board of Public Works.

6

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

As repeatedly briefed and argued to the Court, Defendants' arguments for dismissal fail for the following reasons:

*Union's claims are justiciable.*[1] Defendants' justiciability arguments rest on a false presupposition (contrary to the pleadings) that Union's only injuries are its future need to comply with PFAS MCLs. This fails for the simple reason that Union explicitly and repeatedly pleads past, present, and future property injuries from Defendants' PFAS contamination. *See* GW/L Opp'n, at § III.A; GSWSA Opp'n, at § III.A. Accordingly, Defendants' standing and ripeness arguments fail.

*Defendants intentionally intruded on Union's property with tangible PFAS-contaminated wastewater, to which Union did not consent.*[2] South Carolina law is clear that intrusions of chemically contaminated water—such as Defendants' PFAS contaminated water here—constitute tangible, physical invasions. *See* GW/L Opp'n, at § III.B.1; GSWSA Opp'n, at § III.B.1. Likewise, where a defendant knows or should know that its intentional conduct will lead to a physical invasion, as is pled here, there is actionable trespass. *See* GW/L Opp'n, at § III.B.2; GSWSA Opp'n, at § III.B.2.

*Defendants had the requisite control, and their PFAS contamination created both a public and private nuisance and undermined the use and enjoyment of Union's property.*[3] Defendants had direct control over their PFAS products and their facilities, from which they discharged them, either directly to upstream surface waters or to WWTPs knowing that the PFAS passed through

---

[1] *See* Milliken's Mem. in Supp. of Mot. to Dismiss Pl.'s Compl. ("Milliken MIS"), at 3–6; Suminoe's Mem. in Supp. of Mot. to Dismiss Pl.'s Compl. ("Suminoe MIS"), at 6–7; Tietex's Mem. in Supp. of Mot. to Dismiss Pl.'s Compl. ("Tietex MIS"), at 4–7.

[2] Milliken MIS, at 11–14; Suminoe MIS, at 12–17; Tietex MIS, at 13.

[3] Milliken MIS, at 8–11; Suminoe MIS, at 8–9, 10–11; Tietex MIS, at 11–13.

7

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

those WWTPs. *See* GW/L Opp'n, at § III.C.1; GSWSA Opp'n, at § III.C.1. Further, Union's Complaint makes clear that Defendants' contamination of "public waters" also contaminated Union's own property, which South Carolina law recognizes as a nuisance. *See* GW/L Opp'n, at § III.C.2; GSWSA Opp'n, at § III.C.2.

*Union sufficiently alleges negligence, including a duty of care, breach thereof, causation, and cognizable damages, and Union did not assume any risk.*[4] Plaintiff sufficiently alleges duties of care under South Carolina law, including the failure to exercise due care in Defendants' operation of their facilities and in creating a substantial risk of injury to Plaintiff. *See* GW/L Opp'n, at § III.D.1; GSWSA Opp'n, at § III.D.1; GW/L Supp. Memo. Defendants breached these duties by discharging hazardous chemicals to South Carolina surface waters. *See* GW/L Opp'n, at § III.D.2; GSWSA Opp'n, at § III.D.2. Defendants' discharge of PFAS proximately caused Union's injuries. *See* GW/L Opp'n, at § III.D.3. The invasion of these chemicals into Union's property constitutes well-pled injuries to that property. *See* GW/L Opp'n, at § III.D.4; GSWSA Opp'n, at § III.D.3. Finally, Union did not somehow assume the risk of PFAS contamination by acting as a water provider. *See* GW/L Opp'n, at § III.D.5; GSWSA Opp'n, at § III.D.4.

*The South Carolina Department of Environmental Services ("DES") does not have primary jurisdiction over this matter.*[5] Union's claims for nuisance, trespass, and negligence are

---

[4] Milliken MIS, at 7–8; Suminoe MIS, at 18–24; Tietex MIS, at 7–11.

[5] Suminoe MIS, at 7. Suminoe argues this "Court lacks subject matter jurisdiction over this action[,] which may only be heard by SCDES on the basis of primary jurisdiction." Suminoe MIS, at 7. This conflates subject matter jurisdiction, which is "a court's constitutional or statutory power to adjudicate a case," *Johnson v. S.C. Dep't of Prob.*, 372 S.C. 279, 284, 641 S.E.2d 895, 897 (2007), with primary jurisdiction, a discretionary doctrine that "does not deprive the court of jurisdiction." *Smith v. Clark/Smoot/Russell, A JV*, 796 F.3d 424, 431 (4th Cir. 2015) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)); *see also Stewart v. T-Mobile USA, Inc.*, C.A. No. 4:14-cv-02086-PMD, 2014 U.S. Dist. LEXIS 198466, at *6 (D.S.C. Oct. 8, 2014) ("The decision

8

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

well within the Court's competence, and there is no evidence that DES has taken any action to control Defendants' PFAS discharges. Therefore, there is no basis for the Court to dismiss or stay Union's claims on the basis of primary jurisdiction by DES. *See* GW/L Opp'n, at § III.H; GSWSA Opp'n, at § III.J.

*The Municipal Cost Recovery Rule does not apply to this litigation.*[6] The Municipal Cost Recovery Rule, also known as the Free Public Services Doctrine, is not recognized in South Carolina. Even if it were, it would not apply to Union because its provision of drinking water to its customers is neither free nor public. *See* GW/L Opp'n, at § III.E; GSWSA Opp'n, at § III.E.

*Dismissing or striking Union's requests for attorney's fees and prejudgment interest would be improper.*[7] Suminoe's suggestion that this Court should dismiss or strike Plaintiff's requests for attorney's fees and prejudgment interest is procedurally improper at this stage of the litigation, and Union's requests are supported by South Carolina law. *See* GSWSA Opp'n, at § III.I.

**B.      Defendants' new arguments in this case fail as well.**

In addition to the arguments above, which have been address in prior briefing and arguments, Defendants assert several new arguments in this action, which Union addresses below.

**1.      Union has adequately alleged wrongdoing by all Defendants.**

Tietex argues that Union has not adequately alleged wrongdoing by Tietex, asserting the Complaint "asserts vague and conclusory statements against all Defendants that they caused it harm because of their use of chemicals in their manufacturing process." Tietex MIS, at 5. But

---

to refer an action to an agency under the primary jurisdiction doctrine is a matter committed to the sound discretion of the trial court.").

[6] Milliken MIS, at 6; Suminoe MIS, at 26–27; Tietex MIS, at 7.

[7] Suminoe MIS, at 24–26.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Tietex ignores that Union's Complaint pleads more than enough facts to demonstrate that each of the defendants have injured Union through their use, disposal, and discharge of PFAS-contaminated water, including factual allegations regarding the location of Tietex's industrial facility, its use of PFAS in its manufacturing processes, and how its PFAS-polluted wastewater ends up in Union's water source. *See* Compl. ¶ 18. This is more than sufficient to place Tietex on notice of the factual and legal issues in this case, *see Langston v. Niles*, 265 S.C. 445, 455, 219 S.E.2d 829, 833 (1975), Tietex has more than enough information to be able to respond to the Complaint (and each of its separately-stated causes of actions), and there is no basis for requiring "a more definite statement," Rule 12(e), SCRCP.

**2.    Union's public nuisance claim does not seek to vindicate the rights of the State or its citizens.**

Suminoe argues that Union is "not the proper plaintiff to bring a public nuisance claim" because typically only the South Carolina Attorney General may assert this cause of action under his *parens patriae* authority. Suminoe MIS, at 9–10. But South Carolina law is clear that even private citizens may bring a public nuisance claim when they have suffered a special injury. *See Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 78, 753 S.E.2d 846, 852 (2014) (noting that while a public nuisance claim "to remedy harms suffered by the public generally" must typically be brought by the State, "[a] private person may bring a private civil suit for a public nuisance . . . if he suffered a special injury to his real or personal property").

Here, Union has sued on its own behalf for special injuries to its properties, which include Union's real property, its SWTP, its distribution system, and related infrastructure. *See* Compl. ¶¶ 5–7. Union is not seeking to vindicate the rights of the State as a whole or its citizens, but Union instead seeks to recover for special, unique injuries to Union that are different in kind from those by the general public. *Cf. Belton v. Wateree Power Co.*, 123 S.C. 291, 302, 115 S.E. 587, 590

10

(1922) ("[A] private citizen may maintain a civil action for damages or abatement with respect to a public nuisance upon allegation . . . of such obstruction and of direct and special damages resulting to him, different in kind from what the public may sustain."). As a result, Union's public nuisance claim is appropriately brought. The Attorney General's separate action brought on behalf of the State against PFAS suppliers (and not dischargers such as Defendants here) is entirely irrelevant to Union's own public nuisance claim, and there is no risk of "duplicative litigation" or "inconsistent rulings" (which, even if they existed, would not be a basis for dismissing the claim for relief).

> **3.    The remedies available for public nuisance, private nuisance, and trespass are not limited to the value of Union's real property.**

Suminoe and Tietex both argue that Union cannot recover the costs of funding of new water treatment technology under a nuisance cause of action because "the 'only proper' measure of damages" is either "the lost rental value of the property" or "diminution in the market value of the property." Suminoe MIS, at 11–12; Tietex MIS, at 11–12. Suminoe also argues that Union is limited to the same damages under its trespass cause of action. Because Union's Complaint adequately pleads claims for public nuisance, private nuisance, and trespass, it satisfies the pleading standards, and it would be premature at this stage to determine what types of damages and remedies Union might be entitled to recover. In addition to being premature, Defendants' arguments are legally incorrect.

Defendants' position relies on a misapplication of *Babb v. Lee Cnty. Landfill S.C., LLC*, 405 S.C. 129, 139, 141–42, 747 S.E.2d 468, 473, 475 (2013), and *Hedgepath v. AT&T*, 348 S.C. 340, 359, 559 S.E.2d 327, 338 (Ct. App. 2001)), and is contrary to South Carolina law, which allows for both abatement of, and the recovery of damages resulting from, a continuing nuisance or trespass. *See Home Sales, Inc. v. N. Myrtle Beach*, 299 S.C. 70, 81, 382 S.E.2d 463, 469 (Ct.

11

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

App. 1989) ("Private nuisances are actionable, *either for their abatement*, as in the case before us, *or for damages*." (emphases added)); *id.* at 82, 382 S.E.2d at 469 ("A private nuisance for which a plaintiff seeks an injunction, as they did in this case, or damages, as it might have, is a tort."); *Winget v. Winn-Dixie Stores*, 242 S.C. 152, 130 S.E.2d 363, 369 (1963) ("The abatement of a nuisance does not affect the right to recover damages for its past existence." (quoting 39 Am. Jur. 389 § 128)); *Ray v. City of Rock Hill*, 428 S.C. 358, 370, 834 S.E.2d 464, 470–71 (Ct. App. 2019) ("The central issue in distinguishing a continuing trespass from a permanent trespass is whether abatement of the trespass is reasonably and practically possible."), *overruled in part on other grounds by State v. Wallace*, 440 S.C. 537, 892 S.E.2d 310 (2023); *Knight v. Waggoner*, 359 S.C. 492, 496, 597 S.E.2d 894, 896 (Ct. App. 2004) (noting the "trespasses are of a continuing nature and appear to be reasonably and practicably abatable").

*Babb* must be read in context. For one, *Babb* only applies to private nuisances, and it does not apply to public nuisance claims. *Id.* at 137 n.1, 747 S.E.2d at 472 n.1. Also, the South Carolina Supreme Court answered five certified questions from the district court, two of which asked about the types of damages that the plaintiffs could recover for trespass and private nuisance under the facts of that case:

> Under South Carolina law, when a plaintiff seeks recovery for a temporary trespass or [private] nuisance (asserting claims for annoyance, discomfort, inconvenience, interference with their enjoyment of their property, loss of enjoyment of life, and interference with mental tranquility and abandoning all claims for loss of use, diminution in value, and personal injury), are the damages limited to the lost rental value of the property?
>
> . . .
>
> Is the maximum amount of compensatory damages a plaintiff can receive in any trespass or [private] nuisance action (temporary or permanent) the full market value of the plaintiff's property where no claim for restoration or cleanup costs has been alleged?

12

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

*Babb*, 405 S.C. at 136, 747 S.E.2d at 472. The plaintiffs in *Babb* did not assert any injury to their real or personal property caused by "odors emanating from [Defendants'] landfill," nor did they even allege a "claim for restoration or cleanup costs." *Id.* at 135–36, 747 S.E.2d at 471–72. The plaintiffs also did not seek to abate the trespass and nuisance. *See id.*

Thus, the *Babb* court's analysis and opinion was limited to the context of recoverable damages where the plaintiffs did not have any physical damages to their property, had not incurred any costs or expenses to repair or remediate any property, and did not seek any forward-looking remedy. In that context, the Supreme Court reasoned that

> allowing recovery for personal annoyance and discomfort under the guise of trespass and nuisance would be the stealth recognition of an entirely new tort. The damages recoverable for trespass and nuisance being strictly limited to damages to one's property interests, the only proper measure of them is the value of the property.

*Id.* at 141, 747 S.E.2d at 474.

In so reasoning, the *Babb* court relied on *Gray v. Southern Facilities, Inc.*, 256 S.C. 558, 183 S.E.2d 438 (1971), where the plaintiff did not allege a nuisance claim and did not have any physical damage to his real or personal property, did not have to make any repairs, and did not seek any form of abatement or injunctive relief. *See* 256 S.C. at 562–65, 567–68, 183 S.E.2d at 440–41, 442. Instead, the plaintiff asserted a negligence claim and sought to recover the diminution in value to his real property as damages for permanent injury to the property on a theory of "reputational injury"—"an asserted diminution in market value resulting, not from any physical injury, but from a psychological factor." *Id.* at 569, 183 S.E.2d at 443. While acknowledging a "general rule" that diminution in market value or depreciation in rental or usable value is the measure of damages for injury *to real property*, the Supreme Court found it unnecessary "to decide whether not, or under what circumstances, damages might be recovered for injury to the reputation

13

of real property" because the plaintiff's evidence at trial was purely "speculative." *Id.* at 570–71, 183 S.E.2d at 443–44.

Similarly, *Hedgepath*, and *Ravan v. Greenville County*, which *Hedgepath* cites in relevant part, are distinguishable and do not restrict Union's remedies as Suminoe suggests. *See* Suminoe MIS, at 11. In *Hedgepath*, the court differentiated between a continuing nuisance, where "abatement is reasonably and practically possible," and a permanent nuisance, where there's "no possibility of abatement" such that "the injury is fixed and goes to the whole value of the land." Both *Hedgepath* and *Ravan* were limited to damages where the plaintiffs claimed *permanent* injury to their property. *See Hedgepath*, 348 S.C. at 359, 559 S.E.2d at 338; *Ravan*, 315 S.C. at 465, 434 S.E.2d at 307. These cases are not controlling where, as here, a plaintiff does not seek recovery solely for "permanent injury" to real property under a nuisance or trespass theory.

Because neither cleanup costs nor abatement were at issue in *Babb* (or in *Gray*), the holding is limited, and it cannot be read as limiting the available remedies under private nuisance or trespass theories in all cases to the difference in the market or rental value of real property. In other words, *Babb* does not prevent Union from recovering other types of past, present, and future costs to remedy and abate Defendants' previous and ongoing nuisance and trespass.[8] *Cf. Kelly v. Para-Chem S.*, 311 S.C. 223, 226, 428 S.E.2d 703, 705 (1993) (ruling the trial court's damages charge that plaintiff could "recover 'all damages which were naturally the proximate consequence of the alleged trespass'" "correctly advised the jury of the damages recoverable"); *Mercer v. Phillips*, 318 S.C. 453, 454–56, 458 S.E.2d 427, 428–29 (1995) (observing that injunctive relief is available

---

[8] Punitive damages are also recoverable for property rights violations in tort actions, including on claims for private nuisance and trespass. *See Hollis v. Stonington Dev't, LLC*, 394 S.C. 383, 397–98, 714 S.E.2d 904, 911–12 (Ct. App. 2011); *Jenkins v. Few*, 391 S.C. 209, 220–21, 705 S.E.2d 457, 463 (Ct. App. 2010) (upholding jury's award of actual and punitive damages where jury found the defendant liable for conversion, civil conspiracy, and trespass to personal property).

14

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

to remedy a nuisance and "a finding of damages is not a prerequisite to the issuance of an injunction"); *Winget v. Winn-Dixie Stores*, 130 S.E.2d 363, 369, 242 S.C. 152 (1963) ("The abatement of a nuisance does not affect the right to recover damages for its past existence."); *Hollis v. Stonington Dev't, LLC*, 394 S.C. 383, 393, 714 S.E.2d 904, 909 (Ct. App. 2011) (affirming punitive damages award, but reducing the amount, where plaintiffs elected the private nuisance cause of action and the jury's actual damages award was based on evidence of costs of repair and restoration, loss of use and enjoyment, and expenses incurred before trial). *See also* GW/L Opp'n, at 43-44 (explaining how the equitable status of the abatement remedy provides the Court "significant discretion to tailor relief in order to affect whatever justice under the given circumstances requires").

## CONCLUSION

In sum, Defendants have not shown any reason why Union's claims against them should not proceed. The complaint alleges sufficient facts to support Union's claims for private nuisance, public nuisance, trespass, and negligence, and there is no reason to strike any of its allegations. Union respectfully requests that the Court deny Defendants' motions in full.

*Signature Page Follows*

15

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

F. Jerome Tapley (*pro hac vice*)
Hirlye R. "Ryan" Lutz, III (*pro hac vice*)
Brett C. Thompson (*pro hac vice*)
R. Akira Watson (*pro hac vice*)
Hunter Phares (S.C. Bar No. 107158)
Hannah C. Caldwell (*pro hac vice*)
Hamilton Jordan (*pro hac vice*)
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
Phone: 205-328-2200
Fax:     205-324-7896
rlutz@corywatson.com
jtapley@corywatson.com
bthompson@corywatson.com
awatson@corywatson.com
hphares@corywatson.com
hcaldwell@corywatson.com
hjordan@corywatson.com

*Attorneys for Plaintiff City of Union, South Carolina*

March 28, 2025

16

# EXHIBIT 1

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA
COUNTY OF GREENWOOD

IN THE COURT OF COMMON PLEAS
EIGHTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

Greenwood Commissioners of Public Works,

*Plaintiff*,

v.

Cone Mills Receiver, LLC *et al.*,

*Defendants*.

C.A. No. 2024-CP-24-00735

STATE OF SOUTH CAROLINA
COUNTY OF LAURENS

IN THE COURT OF COMMON PLEAS
EIGHTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

Laurens County Water and Sewer Commission,

*Plaintiff*,

v.

Cone Mills Receiver, LLC *et al.*,

*Defendants*.

C.A. No. 2024-CP-30-00734

i

## PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiffs, Greenwood Commissioners of Public Works ("GCPW") and Laurens County

Water and Sewer Commission ("LWSC") (collectively "Plaintiffs"), hereby respond to all

pending motions to dismiss filed by Defendants Cryovac, Inc. and Cryovac, LLC (collectively

"Cryovac"); First Source Worldwide, LLC ("First Source"); Fitesa Simpsonville, Inc. ("Fitesa");

Milliken & Company ("Milliken"); Opperman Webbing, Inc. ("Opperman"); T&S Brass and

Bronze Works, Inc. ("T&S"); and Unichem Specialty Chemicals, LLC ("Unichem").[1]

---

[1] Each Defendant filed separate memoranda in support of their motions to dismiss, which share uniform pagination for each's respective briefing in GPCW's and LWSC's cases. In citations, Plaintiffs abbreviate these memoranda to "MIS" as applicable to both cases.

ii

## TABLE OF CONTENTS

INDEX OF ACRONYMS .................................................................................................... v

I.    FACTUAL BACKGROUND ..................................................................................... 1

II.   STANDARD OF REVIEW ....................................................................................... 3

III.  ARGUMENT ............................................................................................................ 5

    A.    Plaintiffs' claims for relief are justiciable. .................................................. 5

        1.    Plaintiffs clearly have standing to seek relief for past, present, and future property injuries........................................................................................................... 5

        2.    Defendants' position is self-defeating. ....................................................... 8

    B.    Plaintiffs state actionable claims for trespass. .......................................... 10

        1.    The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law. ......................... 10

        2.    Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiffs' properties constitute affirmative, intentional acts.............. 12

    C.    Plaintiffs state actionable claims for public and private nuisance. .............................. 15

        1.    Plaintiffs allege that Defendants controlled their properties and products that cause the contamination of Lake Greenwood and Plaintiffs' properties. .......................... 15

        2.    Plaintiffs have suffered private property injuries that confer rights of action for both private and public nuisance.................................................................................. 18

    D.    Plaintiffs state actionable claims for negligence........................................................ 24

        1.    Defendants owed Plaintiffs duties of care................................................. 24

        2.    Plaintiffs sufficiently allege that Unichem breached its duties.............................. 30

        3.    Plaintiffs sufficiently allege that Unichem's breach proximately caused Plaintiffs' injuries................................................................................................. 32

        4.    Plaintiffs allege actionable damages. ....................................................... 34

        5.    Plaintiffs have not assumed the risk of PFAS contamination. ................................. 34

    E.    The "free public services doctrine" does not apply here, if it exists in South Carolina at all. ............................................................................................................ 36

    F.    Plaintiffs' claims against Milliken are not barred by the statute of limitations. ........... 39

        1.    Milliken cannot genuinely maintain that Plaintiffs' claims are both unripe and time-barred. ............................................................................................. 40

        2.    The limitations period continues to run as to Plaintiffs' nuisance and trespass claims. .................................................................................................... 41

        3.    In any event, Milliken ignores the discovery rule.................................................. 45

G.      Defendants' causation arguments should be rejected. ................................... 46

1.      Cryovac's and Unichem's traceability arguments are premature............................ 46

2.      The Mauldin Road WWTP's receipt and discharge of Unichem's contaminated wastewater is not a superseding cause. ....................................... 48

H.      This Court should not stay this case or decline jurisdiction. ...................................... 50

I.      The Mauldin Road WWTP is not a necessary party. ...................................... 53

IV.     CONCLUSION...................................................................................................... 54

**INDEX OF ACRONYMS**

**Chemical Substances**

| | |
|---|---|
| **PFAS** | Perfluoroalkyl and polyfluoroalkyl substances. Refers to the entire class of synthetic chemicals known for their water-, grease- and stain-resistant properties. |
| **PFOS** | Perfluorooctane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOS. |
| **PFOA** | Perfluorooctanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOA. |
| **PFNA** | Perfluorononanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFHxS** | Perfluorohexane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFBS** | Perfluorobutanesulfonic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **HFPO-DA** | Hexafluoropropylene Oxide Dimer Acid. Also referred to as "GenX chemicals." One of the six PFAS regulated under the Safe Drinking Water Act |
| **MCL PFAS** | Refers to all PFAS subject to maximum contaminant levels and maximum contaminant level goals under the Safe Drinking Water Act. Includes PFOA, PFOS, PFNA, PFHxS, PFBS, and HFPO-DA (aka "GenX chemicals") |

**Regulatory and Legal Terms**

| | |
|---|---|
| **DES** | South Carolina Department of Environmental Services, formerly known as the Department of Health and Environmental Control ("DHEC"). |
| **MCL** | Maximum Contaminant Level. Enacted and enforced pursuant to regulations passed under the Safe Drinking Water Act. Stands for the maximum allowable level of a contaminant that a public water system may deliver to a user. |
| **MCLG** | Maximum Contaminant Level Goal. Enacted pursuant to regulations passed under the Safe Drinking Water act. Stands for the maximum level of |

| | a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons will occur. |
|---|---|
| **SDWA** | Safe Drinking Water Act. The congressional legislation authorizing regulations that, among other things, set MCLs and MCLGs. |
| **SCSDWA** | South Carolina Safe Drinking Water Act. The state-level analogue to the SDWA. |
| **WWTP** | Wastewater Treatment Plant. A facility that receives wastewater from residential and/or industrial users. |
| **SWTP** | Surface Water Treatment Plant. A facility used by public water systems, like Plaintiffs, that withdraws water from a water source, treats the water to make it fit for human consumption, and distributes the water to users. |

## I.  FACTUAL BACKGROUND

For decades, Defendants have knowingly and recklessly poisoned the Reedy River, the Saluda River, and Lake Greenwood with toxic per- and polyfluoroalkyl substances ("PFAS"). Plaintiffs rely on these vital water sources to supply potable drinking water to tens of thousands of South Carolinians. Greenwood & Laurens First Amended Complaints (collectively "Complaints"), ¶¶ 1-3. Defendants, all operators of industrial facilities, have systematically discharged PFAS into the rivers that feed Lake Greenwood, causing pervasive and ongoing contamination that threatens the health of these residents and undermines Plaintiffs' use of their properties, including their water treatment and distribution infrastructure. *Id.* at ¶¶ 4–6, 45–52. Defendants' pollution has rendered Plaintiffs' water treatment systems incapable of producing water free from chemicals that the Environmental Protection Agency ("EPA") deems unsafe for consumption, or that even meets the basic safety standards set by EPA. *Id.* at ¶¶ 7, 53–56.

Plaintiffs are public water utilities responsible for supplying safe drinking water to their respective communities. *Id.* at ¶¶ 13–15. GCPW serves approximately 23,500 residents in Greenwood and Abbeville Counties, drawing water from Lake Greenwood via its surface water treatment plant ("SWTP") on the Lake's western bank. GCPW Complaint, ¶¶ 2, 3, 13–15. Located on the opposite bank, the LWSC draws water from Lake Greenwood via a pump station, treats the water at its SWTP, and supplies it to approximately 40,000 residents in Laurens County. LWSC Complaint, ¶¶ 2, 3, 13–15.

Concentrated in the Greenville metro area upstream, Defendants—companies engaged in textile, chemical, and other manufacturing operations—utilize products that contain or degrade to PFAS in their industrial processes and discharge the resulting PFAS-containing wastewater to municipal wastewater treatment plants ("WWTPs"). Complaints, ¶¶ 4, 5, 16–23, 48. The receiving WWTPs use conventional methods that are ineffective at treating PFAS. *Id.* at ¶¶ 49–

51. Therefore, Defendants' PFAS-contaminated wastewater passes through the treatment works into the Reedy and Saluda Rivers unabated, flowing downstream to Lake Greenwood. *Id.* at ¶¶ 45–47, 49–51.

Defendants knew, or at least should have known, that their discharges of PFAS-containing wastewater would endanger downstream communities like Plaintiffs'. *Id.* at ¶¶ 52, 56. The chemicals are colloquially termed "forever chemicals" because of their extraordinary persistence and resistance to breakdown via environmental mechanisms as well as most treatment methods to purify wastewater and drinking water. *Id.* at ¶¶ 5–6, 24–25. Once released into water sources, PFAS remain indefinitely, migrating through surface water and groundwater and accumulating in human and animal tissues, which are the chemicals' ultimate environmental sink. *Id.* at ¶¶ 25, 27, 29. Nevertheless, the very persistence and chemical stability that make PFAS such an environmental menace also make them attractive for industrial applications like Defendants'. *Id.* at ¶¶ 24–25.

EPA and numerous scientific studies have linked exposure to PFAS to serious adverse human health effects, including kidney, testicular, and liver cancer; immune system suppression; thyroid disorders; liver damage; and reproductive and developmental harm, particularly in infants and pregnant women. *Id.* at ¶¶ 30, 35, 36, 37, 39. Guided by the evolving science, EPA issued health advisories for the two most studied PFAS compounds, perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), in 2009 and 2016. *Id.* at ¶¶ 33–35. In 2022, the agency dramatically reduced the health advisory levels for these compounds to near zero parts per trillion ("ppt"). *Id.* at ¶¶ 36–37. Finally, in April 2024, EPA issued its first ever binding regulatory limit for PFAS in drinking water—setting "maximum contaminant levels" ("MCLs") at 4 ppt for PFOA and PFOS and at 10 ppt for perfluorononanoic acid ("PFNA"),

perfluorobutane sulfonate ("PFBS"), perfluorohexane sulfonate ("PFHxS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals"), and using a "hazard index" approach to control mixtures of PFNA, PFBS, PFHxS, and GenX Chemicals. *Id.* at ¶¶ 42–43. EPA also set a purely health-based "maximum contaminant level goal" ("MCLG") for PFOA and PFOS at zero ppt—reflecting the fact that there is no safe level of exposure to these compounds. *Id.* at ¶¶ 38–39, 43. MCL compliance is due by April 2029. *Id.* at ¶ 44.

As a direct and foreseeable result of Defendants improper, ongoing use and disposal of PFAS, Plaintiffs' properties have been contaminated by Defendants' PFAS—including their land, SWTPs, and supporting infrastructures. *Id.* at ¶¶ 53–55. Worse, Plaintiffs cannot currently provide potable drinking water that is free of these toxic chemicals. *Id.* at ¶¶ 53–56. Plaintiffs' water treatment systems were never designed to, and in fact do not, remove PFAS. *Id.* at ¶¶ 6, 53–56. Plaintiffs now suffer, and will continue to suffer, significant property injuries resulting in enormous operational and financial burdens. *Id.* at ¶¶ 53–56. Plaintiffs seek both monetary and equitable relief to remedy the past, present, and future PFAS contamination of their properties and protect their communities from the consumption of Defendants' PFAS. *Id.* at ¶¶ 6–7, 53–56, 66–67, 78–79, Prayer for Relief.

## II.  STANDARD OF REVIEW

"Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action." *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). "In considering such a motion, the trial court must base its ruling solely on allegations set forth in the complaint." *Id.* "If the facts and inferences drawn from the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, would entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to state a claim is improper." *Id.* "A motion to dismiss under Rule 12(b)(6) should not be granted if

3

facts alleged and inferences reasonably deducible therefrom entitle the plaintiff to relief under any theory." *Id.* "When considering such motion, the court must regard all properly pleaded factual allegations as admitted." *Falk v. Sadler*, 341 S.C. 281, 286, 533 S.E.2d 350, 353 (Ct. App. 2000). "It is a well-settled principle that in resolving a Rule 12(b)(6) motion to dismiss, the court is limited to a consideration of the allegations contained within the four corners of the complaint." *Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 559, 713 S.E.2d 604, 608 (2011).

Pleadings are to be liberally construed "to do substantial justice to all parties." *Quality Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000) (quoting Rule 8(f), SCRCP). "The purpose of pleadings is to place the adversary on notice as to what the issues are." *Langston v. Niles*, 265 S.C. 445, 455, 219 S.E.2d 829, 833 (1975). Rule 8, SCRCP, "requires a litigant to plead the ultimate facts which will be proved at trial, not the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987). "Ultimate facts fall somewhere between the verbosity of evidentiary facts and the sparsity of 'legal conclusions.'" *RoTec Servs., Inc. v. Encompass Servs., Inc.*, 359 S.C. 467, 473, 597 S.E.2d 881, 884 (Ct. App. 2004) (quoting *Watts v. Metro Sec. Agency*, 346 S.C. 235, 240, 550 S.E.2d 869, 871 (Ct. App. 2001)). A motion to dismiss should not be granted "if facts sufficient to constitute a cause of action can be fairly gathered from the complaint, however uncertain, defective, or imperfect the allegations of the complaint may be." *Riedman Corp. v. Jarosh*, 289 S.C. 191, 192, 345 S.E.2d 732, 733 (Ct. App. 1986). "Further, a judgment on the pleadings is considered to be a drastic procedure by our courts." *Russell v. City of Columbia*, 305 S.C. 86, 89, 406 S.E.2d 338, 339 (1991).

Rule 12(b)(6) permits the trial court to address the sufficiency of a pleading stating a claim, but it is not a vehicle for addressing the underlying merits of the claim. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925, (S.C. App. 2021).

### III. ARGUMENT

**A.     Plaintiffs' claims for relief are justiciable.**

Defendants' primary grounds for dismissal are that Plaintiffs' claims are not justiciable—reasoning that Plaintiffs will suffer no injury until the compliance deadline for PFAS MCLs arrives. Cryovac MIS, at 6–7; First Source MIS, at 3–6; Fitesa MIS, at 5–8; Milliken MIS, at 3–7; Opperman MIS, at 3–6; T&S MIS, at 5–10; Unichem MIS, at 3–5. This argument is easily resolved, and its flaws are immediately apparent:

(1)     *It distorts Plaintiffs' claims*. Defendants recast Plaintiffs' case as fundamentally concerning regulatory compliance issues rather than what they actually are: straightforward state-law claims arising from past, present, and future property injuries. South Carolina law unquestionably empowers Plaintiffs to seek redress for them.

(2)     *It is inherently self-contradictory*. Defendants assert that Plaintiffs' only injuries are their need to comply with PFAS MCLs. But if the financial burdens of MCL compliance were Plaintiffs' injuries—and they are not—Plaintiffs would still have standing under Defendants' own premise.

**1.     Plaintiffs clearly have standing to seek relief for past, present, and future property injuries.**

Defendants argue that because enforcement of PFAS MCLs will not begin until April 2029, Plaintiffs' obligations to comply remain speculative. They also cite pending litigation in the D.C. Circuit[2] to suggest that the PFAS MCLs might change, further speculating that any injury Plaintiffs face is uncertain. Both contentions fail for the same reason: they assert, contrary

---

[2] *See Am. Water Works Ass'n v. Env't Prot. Agency*, No. 24-118 (D.C. Cir. Oct. 7, 2024).

5

to the pleadings, that Plaintiffs' injuries arise from regulatory obligations rather than from Defendants' ongoing contamination of their properties.

Plaintiffs' complaints speak for themselves. These are not regulatory compliance claims but straightforward state-law causes of action based on Defendants ongoing contamination of their land, SWTPs, infrastructures, and water sources with PFAS chemicals. *See* Complaints, ¶¶ 1–7, 57–95. According to the nation's leading authority on environmental science and public health, no level of these chemicals—PFOA and PFOS in particular—is safe for human consumption.[3] And according to the operative pleadings, Defendants knew this well before EPA publicized it, and they have in the past and continue to introduce them into Plaintiffs' properties and water sources. *See* Complaints, ¶¶ 53–56.

The injuries resulting from Defendants' contamination are not hypothetical—they are real, present harms. Among other injuries, Plaintiffs have:

- lost the ability to supply water free from unsafe concentrations of PFAS, *id.* at ¶ 73;

- incurred significant costs in investigating and identifying the sources of PFAS contamination, *id.*;

- suffered the presence of hazardous chemicals in their water treatment plants, supporting infrastructure, and water sources, which they have a legal right to use, *id.*; and

---

[3] Notably, neither EPA's scientific findings concerning PFOA and PFOS, nor its MCL Goal of zero ppt for each chemical, is challenged in the D.C. Circuit litigation that Defendants emphasize. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734 (D.C. Cir. Oct. 7, 2024); **Ex. 2**, Br. for Pet'rs Nat'l Ass'n of Mfrs., Am. Chemistry Council, and The Chemours Co., *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078731 (D.C. Cir. Oct. 7, 2024). Instead, the parties challenge MCLs for mixtures of PFHxA, PFNA, PFBS, and GenX Chemicals, and they complain that EPA's enforceable limits for PFOA and PFOS were too close to the MCL Goals to be economically feasible, posing risks to water affordability. *See id.*; *see also* **Ex. 3**, Resp't Proof Br., No. 24-1188, Doc. 2091318 (D.C. Cir. Dec. 23, 2024) (EPA brief, highlighting that "no Petitioner has articulated any challenge to EPA's regulatory determinations for PFOS and PFOA or its Goals for those contaminants").

6

- experienced diminution in property value. *Id.*

Nothing about these injuries is "conjectural" or "contingent" on future events.[4] *See Jowers v.*

*S.C. Dep't of Health & Env't Servs.*, 423 S.C. 343, 353, 815 S.E.2d 446, 451 (2018). Courts

routinely recognize chemical contamination of private property as a property injury. *See infra* §§

B, C, D.

Ripeness and standing, though distinct, "boil down to the same question" here: whether

Plaintiffs have already sustained an actual injury. *See Susan B. Anthony List v. Driehaus*, 573

U.S. 149, 158 n.5 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8

(2007)) (standing and ripeness can merge when the issue is whether an injury has occurred);

*Crescent Homes SC, LLC v. CJN, LLC*, 2024 WL 4831180, at 7 (S.C. Nov. 20, 2024) (South

Carolina justiciability principles align with federal "case or controversy" requirements). Under

the operative pleadings and controlling law, the only answer is yes.

Defendants cannot rewrite Plaintiffs' claims to suit their motions. The allegations set

forth ongoing and future property injuries from PFAS contamination—not injuries tied to the

burdens of complying with a regulatory standard. Taking the pleadings as alleged, as the Court

must, resolves the question of justiciability.

---

[4] Several Defendants selectively isolate Plaintiffs' allegations that they will incur "expenses associated with future acquisition, installation, and operation" of PFAS filtration for the dual propositions that (1) these are the only damages Plaintiffs seek and (2) these damages hinge on the need to comply with MCLs. *See, e.g.,* Milliken MIS, at 5; Opperman MIS, at 2; Unichem MIS, at 4. Both are plainly false. *See* Complaints, ¶ 62, 64, 73, 76, 88, 94. In reality, Plaintiffs listed the expenses of installing treatment technologies to remove Defendants' PFAS as one of many "special injuries" they have incurred that are different "in kind" from the public's injury of being exposed to Defendants' PFAS in drinking water. *Id.* at ¶ 73.

7

## 2.     Defendants' position is self-defeating.

Defendants' arguments do not just mis-frame this case. Even taking their framework at face value, it collapses under its own contradictions. Their principal authority, *American Water Works Association*, involves associations representing water authorities—like Plaintiffs— challenging the PFAS MCLs. But Defendants miss why those associations have standing to do so: ***their members face concrete, imminent financial harm due to compliance costs***. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734, at 15–17 (D.C. Cir. Oct. 7, 2024);[5] *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592–93 (D.C. Cir. 2023). Thus, even under Defendants' own framing—that Plaintiffs' injuries stem only from MCL compliance—the very litigation they cite demonstrates why Plaintiffs would have standing to act now. *See id.*

Defendants cannot have it both ways: Plaintiffs' cases cannot be unripe based on litigation acknowledging the present, ***ripe*** financial burdens imposed by MCL compliance. As that litigation shows, compliance is neither remote nor contingent. EPA itself recognizes that it demands significant, long-term capital improvements:

> For purposes of this [economic analysis], the EPA assumes that the [PFAS MCLs] will be promulgated in 2024. As the final rule will grant a 2-year nationwide extension date for MCL compliance, this analysis assumes that capital improvements *(i.e., installation of treatment technologies)* for systems taking action under the rule take effect five years after the date on which the regulations is promulgated, or in 2029.

**Ex. 4**, U.S. Env't Prot. Agency, *Econ. Analysis for the Final Per- and Polyfluoroalkyl Substances Nat'l Primary Drinking Water Regul.*, at 2–3 (2024), EPA Doc. No. EPA-815-R-24-001 (emphasis added) (hereafter "*Economic Analysis*"); *see also* U.S. Env't Prot. Agency, *PFAS Nat'l*

---

[5] EPA has not challenged the associations' standing. *See* **Ex. 3**, Resp't Proof Br., *Am. Water Works Assoc.*, No. 24-118, Doc. 2091318.

*Primary Drinking Water Regul.*, 89 Fed. Reg. 32532, 32533 (2024) ("EPA is extending the compliance deadline for all systems nationwide to meet the MCL to allow additional time for capital improvements."). This process is extensive, costly, and time-consuming. Among other things, it requires pilot programs to test treatment methods, engineering analyses to evaluate and select the best treatment option, facility design, bidding and contract negotiations, material procurement, and full-scale construction. *See Econ. Analysis*, Table 5-11 (setting out cost elements for implementing water treatment upgrades). History teaches that this takes years.[6] Defendants' notion that Plaintiffs must wait until April 26, 2029 is belied by their own reasoning.

Defendants' true position is this: they speculate that Plaintiffs' already-ripe case might become moot[7] if regulations change. That is not how justiciability works. Since *Marbury v. Madison*, 5 U.S. 137 (1803), courts adjudicate existing disputes like this one. The only

---

[6] For example, in the building phase alone, it took the West Morgan – East Lawrence Water & Sewer Authority over four years to complete its new reverse osmosis treatment facility designed to remove PFAS. *See* WHNT News 19, *Lawsuit funded water treatment plant being built in Lawrence County* (Feb. 17, 2020) (construction begins in Feb. 2020), *available at* https://whnt.com/news/lawsuit-funded-water-treatment-plant-being-built-in-lawrence-county; W. Morgan – E. Lawrence Water & Sewer Auth., *JD Sims – RM Hames Water Facility* (distribution of reverse osmosis-treated water begins May 1, 2024), *available at* https://dev.dv1ojdbghmtyn. amplifyapp.com/JDsimsRMHamesWaterFacility. And despite completing its pilot program in April of 2018, Brunswick County, North Carolina has still not completed construction of its reverse osmosis system. *See* Brunswick Cnty, N.C., *Gen-X / PFAS Information FAQs - What is Brunswick County doing to remove PFAS contaminates from drinking water?* (initiated pilot program to determine best method to remove PFAS from drinking water, choosing reverse osmosis), *available at* https://www.brunswickcountync.gov/ Faq.aspx?QID=447; Brunswick Cnty., N.C., *Northwest Water Treatment Plant Expansion & Reverse Osmosis Treatment Upgrades* (reverse osmosis will be operational by spring 2025).

[7] Mootness is a third component of justiciability, where a case for which a plaintiff has standing at its outset becomes moot due to events that occur during the case's pendency. *See Sloan v. Greenville Cnty.*, 356 S.C. 531, 547, 552, 590 S.E.2d 338, 347, 349 (2003). By arguing that the MCLs might change in a way that affects Plaintiffs' cases, Defendants are masking mootness under the veil of ripeness.

9

"hypothetical" posed is a change in existing, legally binding law. Defendants' position turns Article III on its head.

**B.    Plaintiffs state actionable claims for trespass.**

**1.    The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law.**

Defendants argue that Plaintiffs allege only invasions of intangible substances that do not amount to trespass under South Carolina law. *See* Cryovac MIS, at 12–13; Milliken MIS, at 14–15; First Source MIS, at 8–9; Fitesa MIS, at 8–9; Opperman MIS, at 8–10; T&S MIS, at 14; Unichem MIS, at 10–12. They rely on *Babb v. Lee Cnty. Landfill SC, LLC*, where the South Carolina Supreme Court answered various certified questions on property-related torts. 405 S.C. 129, 747 S.E.2d 468 (2013). As to trespass, the *Babb* court held that South Carolina law does not recognize a claim arising "solely from invisible odors" because the law requires "intrusions by physical, tangible things." *Id.* at 144–52, 747 S.E.2d at 476–80. Defendants maintain that "PFAS molecules" are intangible, "microscopic" particles that fall outside this threshold. *See, e.g.,* First Source MIS, at 10; Milliken MIS, at 14.

At least one South Carolina court has explicitly rejected Defendants' argument. In *State of South Carolina v. 3M Company*, the Richland County Court of Common Pleas distinguished *Babb* in this way:

> [The State]'s trespass claim does not stem from an invisible odor, but rather from identifiable and measurable amounts of PFAS product resulting in contamination that the State alleges, unlike a temporal disturbance of odor or quickly dissipating particulate, persists in the environment and contaminates the State natural resources and property "indefinitely."

**Ex. 5**, Order, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111, at 6 (S.C. Ct. Comm. Pl. July 23, 2024).

10

The same holds true here, but these cases are even further removed from *Babb*. Defendants have discharged **wastewater** carrying **PFAS products**—indisputably tangible substances—into Plaintiffs' properties. *See* Complaints, ¶¶ 2–5, 16–23, 82–89. Before and after *Babb*, South Carolina courts have repeatedly held that chemical contamination via water is actionable trespass, even if individual contaminants are microscopic. *See, e.g.*, *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 423, 453 S.E.2d 908, 912 (1995) (noting jury returned trespass verdict in favor of plaintiffs whose properties were either within plume of chemically-contaminated groundwater or adjacent to contaminated creek); *Kelly v. Para-Chem S., Inc.,* 311 S.C. 223, 224–26, 428 S.E.2d 703, 704 (1993) (affirming jury verdict on trespass via groundwater contamination); *Weatherford v. E.I. du Pont & Co.*, 2023 WL 11015357, at *5 (Sept. 27, 2023) (plaintiff stated claim for trespass under South Carolina law involving PFAS contamination via wastewater discharges to river and agricultural sludge); *Tillman v. Highland Indus., Inc.*, 486 F. Supp. 3d 1026, 1040–41 (D.S.C. 2020) (under South Carolina law, plaintiff stated trespass claim concerning PCB contamination of plaintiff's property via stormwater discharge pipe); *Shockley v. Hoechst Celanese Corp.*, 793 F. Supp. 670, 672–74 (D.S.C. 1992) (under South Carolina law, a jury can find a trespass where defendant's chemicals migrated to plaintiff's land through groundwater), *aff'd*, 996 F.2d 1212 (4th Cir. 1993) (affirming plaintiff's verdict on trespass); *see also In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995) (under South Carolina law, whether defendant trespassed onto plaintiffs' properties with TCE-contaminated groundwater submitted to jury); *cf. Babb*, 405 S.C. at 143, 747 S.E.2d at 476 (labeling water a "physical invasion").

Defendants' misconstruction of *Babb* ignores decades of precedent recognizing that chemical contamination via water is a physical invasion sufficient for trespass. According to

11

Plaintiffs' allegations—which must be accepted as true at this stage—Defendants' products and wastewater physically invaded and altered Plaintiffs' properties (and continue to do so). Complaints, ¶¶ 16–23, 48–54, 82–89. This is classic trespass under South Carolina law.

### 2. Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiffs' properties constitute affirmative, intentional acts.

Defendants also claim that Plaintiffs' allegations foreclose any finding that they affirmatively or intentionally intruded onto Plaintiffs' properties. Cryovac MIS, at 11–12; Milliken MIS, at 16–17; First Source MIS, at 13–14; Fitesa MIS, at 10–11; Opperman MIS, at 12–14; T&S MIS, at 15; Unichem MIS, at 10–11. They reason that intent is necessarily absent because their PFAS-contaminated wastewater first passes through WWTPs and into Lake Greenwood before Plaintiffs "voluntarily" withdraw it. *See id.* Defendants are mistaken: intent exists where, as alleged, they know the consequences of their affirmative acts.

There is no dispute here that, for actionable trespass, "there must be an affirmative act, the invasion of the land must be intentional, and the harm caused must be the direct result of that invasion." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). But a trespasser need only "intend the act which constitutes the unwarranted entry onto another's land"—he "need not intend the damaging consequence of his entry." *Id.* Thus, Plaintiffs have sufficiently alleged intent "by showing that [Defendants] acted voluntarily" in their discharges and "that [they] knew or should have known the result that would follow": the entry into and contamination of Plaintiffs' properties.[8]

---

[8] Most Defendants point out that Plaintiffs lack the right of exclusive possession of Lake Greenwood. *See, e.g.*, Milliken MIS, at 16; T&S MIS, at 14. This is true but irrelevant. Plaintiffs never alleged a trespass of Lake Greenwood, but instead that Defendants trespassed "into [their] properties, including [their] SWTP[s], and related buildings, improvements, and equipment that make up [their] water treatment and distribution system[s]." Complaints, ¶ 87.

Plaintiffs' allege exactly that. Their complaints explicitly state that Defendants conducted their discharges when they knew or should have known:

- that their respective WWTPs cannot remove PFAS from their wastewater before they pass through to the Reedy and Saluda Rivers;

- Plaintiffs draw water from Lake Greenwood for the provision of potable water to their customers;

- the water Plaintiffs draw from Lake Greenwood is contaminated with PFAS they discharged; and

- water contaminated with their PFAS products invades Plaintiffs' properties.

Complaints, ¶¶ 48–52, 82–83. This is more than sufficient to allege affirmative, intentional acts under South Carolina law. Defendants' primary authority is easily distinguished on this very ground—where the plaintiff *admitted* that the defendant lacked the requisite intent. *See Snow*, 305 S.C. at 554, 409 S.E.2d at 802-03 ("Mr. Snow himself testified that the City did *not* intentionally allow the water to escape onto his property.").

The fact that Defendants' contaminated wastewater passes through their WWTPs and into Plaintiffs' water intakes does not negate their intent. As numerous cases show, where a defendant knows or should know an invasion will occur as a result of its conduct, then the requisite intent is established—regardless of intervening events.[9] *See Weatherford*, 2023 WL 11015357, at *5 (where supplier of PFAS products knew of PFAS hazards and the textile processes used by their customers that results in their discharge to surface waters, continuing sale without warning and concealing the dangers was sufficiently affirmative and intentional for trespass); *Comm'rs of*

---

[9] This aligns with fundamental principles of causation. "An intervening force may be a superseding cause that relieves an actor from liability, but *for there to be relief from liability, the intervening cause must be one that could not have been reasonably foreseen or anticipated*" by the actor. *Glenn v. 3M Co.*, 440 S.C. 34, 74, 890 S.E.2d 569, 590 (2023) (quoting *Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 590, 784 S.E.2d 670, 676 (2016)).

*Pub. Works of Charleston v. Costco Wholesale Corp.*, 2021 WL 5908758, at *8 (D.S.C. Dec. 13, 2021) (defendants' sale of mislabeled flushable wipes are "affirmative or willful acts, even if the actual flushing of the wipes into the Plaintiff's sewer system is done by third parties"); *Shockley*, 793 F. Supp. at 673–74 (jury could find trespass where defendant intentionally delivered hazardous chemicals to independent chemical reclamation facility, from which defendant knew or should have known the chemicals invaded plaintiffs' properties). This case is no different: the controlling allegations state that Defendants knew their PFAS products passed through their applicable WWTPs and invaded Plaintiffs' properties. Complaints, ¶¶ 48–52, 82–83.[10]

Several Defendants frame Plaintiffs' water withdrawal as an issue of consent or authorization instead of intent, arguing that withdrawing water from Lake Greenwood *authorizes* the invasion of their PFAS-contaminated wastewater. *See* Fitesa MIS, at 10 ("Plaintiff[s themselves] authorized the entry of the water onto [their] propert[ies]."); T&S MIS, at 15 (running water intakes "invites and authorizes" the PFAS contamination of Plaintiffs' properties). Defendants cite no authority for this radical proposition. By that logic, any water provider consents to chemical contamination simply by performing its essential function—even when that contamination directly compromises its purpose.

---

[10] Defendants' appeal to Alabama trespass law also fails. Many cite *Utilities Bd. of Tuskegee v. 3M Co.*, 2023 WL 1870912, at *16 (M.D. Ala. 2023) for the proposition that trespass must occur by "natural process" instead of withdrawal from Lake Greenwood. Nothing in South Carolina law requires that trespass occur by "natural process"—a trespass occurs where a defendant affirmatively acts and knows or should know that an intrusion will occur. *See Snow*, 305 S.C. at 553, 409 S.E.2d at 802; *Weatherford*, 2023 WL 11015357, at *5; *Costco*, 2021 WL 5908758, at *8. Likewise, Alabama law allows consent to trespass even where obtained by fraud or mistake—precisely what 3M argued in *Tuskegee*. *See Tuskegee*, Def. 3M Co.'s Mot. to Dismiss, 2022 WL 18357105 (Oct. 3, 2022); *see also Evans v. Walter Indus., Inc.*, 579 F. Supp. 2d 1349, 1370 (N.D. Ala. 2008) ("The alleged contamination with hazardous substances, even if fraudulently concealed by Defendants, does not negate the Plaintiff's consent. Even consent procured by fraud will negate a trespass claim."). Not so in South Carolina. *See Costco*, 2021 WL 5908758, at *8.

14

Even if Plaintiffs implicitly authorized some water to enter their property, that does not extend to the wrongful introduction of PFAS-contaminated wastewater. *See* Complaints, ¶ 84. On the contrary, consent is no defense when an entry abuses or exceeds the scope of authorization. *See Costco*, 2021 WL 5908758, at *8 (flushing mislabeled wipes into the plaintiff's sewer system not authorized and invited because "consent to enter property is not a defense to trespass 'if a wrongful act is done in excess of and in abuse of authorized entry'" (*quoting Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999) (applying South Carolina law)). Defendants identify nothing in the pleadings suggesting that Plaintiffs knew of and consented to entry of harmful PFAS that their treatment systems cannot remove. *See* Fitesa MIS, at 10; T&S MIS, at 15. In fact, the only pleadings on this issue are Plaintiffs' *express disavowals* of consent. *See* Complaints, ¶ 84.

The pleadings allege all that is required to state a claim for trespass. Defendants affirmatively and intentionally discharged PFAS-contaminated wastewater, knowing it would ultimately invade Plaintiffs' properties. The path their contaminated wastewater followed was known, predictable, and foreseeable; and the performance of Plaintiffs' routine operations in no way authorizes the entry of hazardous chemicals.

**C.    Plaintiffs state actionable claims for public and private nuisance.**

**1.    Plaintiffs allege that Defendants controlled their properties and products that cause the contamination of Lake Greenwood and Plaintiffs' properties.**

Each Defendant argues that it lacked the requisite "control" over its contribution to the nuisance. *See* Cryovac MIS, at 10; Milliken MIS, at 11–12; First Source MIS, at 6–8; Fitesa MIS, at 13–14; Opperman MIS, at 6–8; T&S MIS, at 15–17; Unichem MIS, at 7–9. As some put it, they "had no control over the instrumentality alleged to have caused the nuisance 'at the time of the alleged nuisance.'" Fitesa MIS, at 13 (quoting *Clark v. Greenville Cnty.*, 313 S.C. 205,

210, 437 S.E.2d 117, 119 (1993)); Cryovac MIS, at 10 (same); Unichem MIS, at 7 (same). Put plainly, Defendants disclaim control over their PFAS-contaminated wastewater that they continually discharge to maintain an ongoing PFAS contamination. The argument defeats itself: Defendants assert powerlessness over a problem they not only created but actively perpetuate.

Defendants rest their arguments on a shared, but flawed, premise that they merely discharge PFAS-contaminated wastewater to WWTPs, and the nuisance occurs only when the WWTPs release Defendants' PFAS. This reduces to one misdirection: labelling the WWTPs' properties as the source of the PFAS contamination instead of their own. *See* Complaints, ¶¶ 17–23, 48–52.  Defendants' blame-shifting is an artificial attempt to sever control that, in reality, masks a misplaced causation argument.

Defendants principally rely on *Clark v. Greenville County*, but *Clark* exposes Defendants' sleight-of-hand. There, plaintiffs asserted nuisance claims against corporate defendants that sent hazardous chemicals to a landfill, which contaminated the plaintiffs' nearby properties. 313 S.C. at 209, 437 S.E.2d at 119. The *Clark* court explained:

> Generally, a private nuisance is "that class of wrongs that arises from the unreasonable, unwarrantable, or unlawful use by a person *of his own property, personal or real.*" Nuisance law is based on the premise that "[e]very citizen holds his property subject to the implied obligation that he will use it in such a way as not to prevent others from enjoying the use of their property."

*Id.* (quoting *Peden v. Furman Univ.*, 155 S.C. 1, 16, 151 S.E. 907, 912 (1930)).

Upholding the trial court's summary judgment in the defendants' favor, the court reasoned that the plaintiffs "neither alleged nor produced any evidence [that] the [defendants] had control over the landfill or the hazardous waste once it was deposited at the landfill." *Id.* at 210, 437 S.E.2d at 119. Thus, the defendants "could not be liable for nuisance because they had no control over ***the property allegedly used as a nuisance***." *Id.* (emphasis added).

16

*Clark*'s reasoning certainly applies, but not in the way that Defendants' claim. The "property allegedly used as a nuisance" here does not belong to the WWTPs, which received Defendants' contaminated wastewater, but to Defendants themselves.[11] *Id.* Plaintiffs have alleged Defendants:

- ***own and control*** the PFAS products they use and dispose of at their industrial plants, *see* Complaints, ¶¶ 17–23, 48–52; and

- ***own and control*** the industrial plants where they use PFAS products, generate PFAS-laden wastewater, and continually discharge it through a direct connection to the WWTPs, aware that it passes through the WWTPs and to Plaintiffs' properties. *See id.*

According to the operative pleadings, Defendants knowingly use their "own property, personal [and] real" in a way that "prevent[s Plaintiffs] from enjoying the use of their property." *Clark*, 313 S.C. at 209, 437 S.E.2d at 119. Holding them responsible is not only consistent with *Clark*— it is precisely what *Clark* demands.

Defendants repeatedly discharge their own PFAS-contaminated wastewater from their own facilities, fully aware that it bypasses the WWTPs ***unchanged*** and flows directly into surface waters and Plaintiffs' properties. *See* Complaints, ¶¶ 17–23, 47–52. Yet Defendants fragment their control into isolated snapshots—where it exists only at the moment of discharge and vanishes the moment it enters the WWTP. This strains credulity. WWTPs do not add to, modify, or affect Defendants' PFAS in any way; they are connected to Defendants by direct sewer lines and merely pass through what Defendants introduce. Complaints, ¶¶ 17–23. Defendants' position would allow industrial polluters to endlessly discharge toxins to surface waters yet have "no control" because the current carries them downstream. *But see infra* at 22

---

[11] Defendants cannot unilaterally redefine the "property allegedly used as a nuisance" to be the WWTPs. *See Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 557, 713 S.E.2d 604, 607 (2011) ("In considering a motion to dismiss pursuant to Rule 12(b)(6), SCRCP, the circuit court must base its ruling solely upon the allegations set forth on the face of the complaint.").

17

n.16 (compiling nuisance cases of downstream contamination). *Clark* does not support—let alone require—this absurd result.[12]

In the end, Defendants' argument is not about control. They do not even dispute that they own both the PFAS products they discharge and the facilities from which those discharges originate. Shifting blame to their WWTPs does nothing to extinguish their control over what Plaintiffs allege are the sources of the nuisance—it merely proposes that WWTPs are superseding causes. But where Defendants knowingly discharged PFAS products into a system they knew did not remove it—as the controlling allegations say—this too fails as a matter of law. *See Glenn*, 440 S.C. at 74, 890 S.E.2d at 590; *see also Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (1989) ("In order to constitute an actionable nuisance, a wrongful act of the defendant must be shown and the maintenance of the nuisance must be the natural and proximate cause of the injury suffered by the plaintiff." (citation omitted)).

**2.      Plaintiffs have suffered private property injuries that confer rights of action for both private and public nuisance.**

Because the Reedy River, Saluda River, and Lake Greenwood are "public water bodies," Defendants also assert that Plaintiffs suffer no private property injuries that could support either a public or private nuisance. Cryovac MIS, at 10–11; Milliken MIS, at 13; First Source MIS, at

---

[12] Milliken separately argues that it cannot have control over past discharges at the Judson Mill because it no longer owns it. Milliken MIS, at 12 n.10. This fails for the same reasons. PFAS persist in the environment and do not simply dissipate with time. When Milliken owned it, Milliken controlled the Judson Mill and the PFAS products it discharged, knowing the hazardous properties and persistence of the products it discharged and the consequences downstream. Despite the passing of time, Milliken controlled its PFAS products and its mill when it mattered for legal purposes. The Restatement reflects this logical rule. *See* RESTATEMENT (SECOND) OF TORTS, § 840A (Oct. 2024 Update) (a seller of land "upon which there is a condition involving a nuisance for which he would be subject to liability if he continued in possession remains subject to liability for the continuation of the nuisance after he transfers the land").

18

8–10; Fitesa MIS, at 11–12; Opperman MIS, at 8–10; T&S MIS, at 17; Unichem MIS, at 9. In doing so, Defendants ignore Plaintiffs' allegations to manufacture grounds for dismissal. The pleadings clearly establish that Defendants' contamination directly injures Plaintiffs' private properties—precisely the injuries required for both private and public nuisance. *See, e.g., Overcash v. S.C. Elec. and Gas Co.*, 364 S.C. 569, 573, 614 S.E.2d 619, 620–21 (2005).

The "well-beaten path" of South Carolina nuisance law provides a clear and consistent framework. *Id.* Like trespass, private nuisance protects property interests—but while trespass protects exclusive possession, nuisance law remedies interferences with use and enjoyment. *Babb*, 405 S.C. at 139, 747 S.E.2d at 473.

Public nuisances are distinct from private nuisances, not in the nature of the wrongful act, but in the rights and number of people affected. *Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22.[13] Public nuisance protects *public* rights—such as public order, health, and morals. *Id.* As such, public nuisances are by default redressable only by public authorities. *See id.* at 573–74, 614 S.E.2d at 621; *Burrell v. Kirkland*, 242 S.C. 201, 204, 130 S.E.2d 470, 471 (1963); *Bowlin v. George*, 239 S.C. 429, 434, 123 S.E.2d 528, 530 (1962). But if a public nuisance also causes "special injury" to an individual, that person has standing to sue both for his private injury and to abate the entire public nuisance. *See id.*[14]

---

[13] *See also Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469 ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured."); *State v. Turner*, 198 S.C. 487, 18 S.E.2d 372, 376 (1942) (a public nuisance "affects the surrounding community generally or the people of some local neighborhood; it is sufficient if it operates upon such members of the public as are brought into contact with the conditions that constitute the alleged nuisance"); *Morison v. Rawlinson*, 193 S.C. 25, 32, 7 S.E.2d 635, 638 (1940) ("A nuisance to be a public nuisance must be in a particular place or where the public frequently congregate, or where members of the public are likely to come within the range of its influence . . . .").

[14] This has been called a "mixed nuisance" because, "while producing injury to the public at large, [it] does some special damage to some individual or class of individuals." 23 S.C. Jur.

ELECTRONICALLY FILED - 2025 Aug 26 12:39 PM - GREENVILLE - COMMON PLEAS - CASE#2024CP2304735

Courts have "encounter[ed] difficulty" in defining "special injury" in both private and public nuisance contexts, but a consistent principle emerges. *Bowlin*, 239 S.C. at 432, 123 S.E.2d at 530. A private nuisance is actionable if it interferes with a private property right—even if many others suffer similarly. *Id.* at 434, 123 S.E.2d at 530–31 ("[A]n injury to private property . . . is in its nature special and peculiar, and does not cause a damage which can properly be said to be common or public, however, numerous may be the cases of similar damage arising from the same cause." (quoting *Wesson v. Washburn Iron Co.*, 95 Mass. 95, 103–04 (1866)); *accord Brown v. Hendricks*, 211 S.C. 395, 401, 45 S.E.2d 603, 605–06. The key distinction is whether the nuisance affects a *public* right (shared by all) or a *private* right (tied to property). *See Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31. Private property injuries are "special" because they involve specific, legal interests—not a general harm to the public. *Id.* at 435, 123 S.E.2d at 531 ("[Plaintiff] is not complaining of the violation of a right of a public nature or one held in common with the rest of the public. He alleges the invasion of a private right, namely, the interference with the reasonable enjoyment of his property and the depreciation in its value. We think it is quite clear that he is entitled to maintain this action.").

In the public nuisance context, courts ask whether the plaintiff's injury is "different in kind and not merely in degree from that suffered by the public at large." *Huggin v. Gaffney Dev.*, 229 S.C. 340, 344, 92 S.E.2d 883, 884–85 (1956). This aligns with private nuisance cases, highlighting the same "in kind" difference between public and private rights. *Id.* at 344–45, 92 S.E.2d at 884–85 (holding that a landowner adjacent to public road suffered an injury different in kind from the public because the obstruction of a public road deprived him of property access

---

Public Nuisance, § 4 (Feb. 2025) (citing *Deason v. S. Ry. Co.*, 142 S.C. 328, 338, 140 S.E.2d 575, 579 (1927)).

and economic value, whereas the public merely lost use of the road); *see also Jones v. Seaboard Air Line Ry. Co.*, 67 S.C. 181, 192, 45 S.E. 188, 192–93 (1903) (a landowner's rights to use riparian land undisturbed and to free access of the stream are different "in kind" from the public right to navigate the waterway). Indeed, the South Carolina Supreme Court recently reaffirmed that "special" injuries are those affecting real and personal property rights—not personal injury or public harms. *See Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22.

South Carolina law thus provides a firm foundation: a private property injury is inherently special because it implicates private property rights, not public ones. *See id.*; *Bowlin*, 239 S.C. at 432–34, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85. This means two things:

(1)   A private nuisance claim concerning private property injury is not barred merely because others suffer similar harm; and

(2)   A plaintiff with a private property injury suffers a harm "different in kind" from a violation of a public right.

These principles apply squarely to Plaintiffs' nuisance claims. As authorized water providers and property owners, Plaintiffs use their properties *specifically* to provide clean water to customers. Complaints, ¶¶ 58, 70. By saturating the Reedy River, Saluda River, Lake Greenwood, and even Plaintiffs' plants and infrastructures with chemicals that EPA deems unsafe for consumption, Defendants have not just *interfered with* Plaintiffs' property use—they have damaged Plaintiffs' properties directly and *fundamentally compromised* their use and Plaintiffs' essential business. Complaints, ¶¶ 53, 58–73. The resulting injuries are both undeniable and expressly detailed in the pleadings, including:

- Plaintiffs' inability to use their properties to provide their customers with drinking water free from Defendants' chemicals;

- the costs of investigating the cause of the contamination and upgrading Plaintiffs' facilities so that they can remove Defendants' chemicals; and

21

- diminution in property value.

*Id.* These are not "general public" harms; they are discrete, property-based injuries recognized under South Carolina law. *See Babb*, 405 S.C. at 129–144, 747 S.E.2d at 472–76; *Bowlin*, 239 S.C. at 434–35, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

In the face of these well-pleaded injuries, Defendants miss the point by focusing on the subject surface waters being "public waters." *See, e.g.,* T&S MIS, at 17; Milliken MIS, at 13. While the surface waters at issue may be "public,"[15] the property injuries alleged are *private*. And a century of South Carolina caselaw confirms that contaminating public waters still results in private injury when it interferes with private property rights. *See, e.g., Johnson*, 317 S.C. at 422, 453 S.E.2d at 912–13 (Defendants' chemicals migrated not only through groundwater, but also down creek and injured property of several plaintiffs adjacent to creek); *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96 (holding that a riparian landowner adjacent to a navigable waterway suffered an injury different in kind from the public's lost navigational use, where obstructions altered the river's natural flow, causing direct harm to the landowner's property and agricultural use).[16]

---

[15] Plaintiffs assume for sake of argument that Lake Greenwood is a "public water body," though Defendants cite no authority for this proposition.

[16] *See also Bailey v. Lyman Printing & Finishing Co.*, 245 S.C. 13, 17–24, 138 S.E.2d 410, 415 (1964) (even non-riparian landowners stated nuisance claim where gases from waste discharged to Middle Tyger River interfered with plaintiffs' use and enjoyment of their homes); *Conestee Mills v. City of Greenville*, 160 S.C. 10, 13–14, 158 S.E. 113, 114–15 (1931) (sewage contamination of the Reedy River flowed downstream, interfering with the plaintiff's use of its property adjacent to the river); *Duncan v. Union-Buffalo Mills Co.*, 110 S.C. 302, 306, 96 S.E. 522, 523–24 (1918) (sewage discharged to Buffalo Creek interfered with use and enjoyment of downstream land owners adjacent to Buffalo Creek); *Lowe v. Ottaray Mills*, 93 S.C. 420, 424–26, 77 S.E. 135, 136–37 (1913) (cotton mill discharged sewage to creek upstream of plaintiff's property, which rendered his land unfit for use as dairy farm); *Williams v. Haile Gold Mining Co.*, 85 S.C. 1, 5–7, 66 S.E. 117, 118 (1909) (chemically-contaminated mine tailings discharged to stream, interfering with downstream owner's ability to farm his land).

Nor can Defendants equate Plaintiffs' private injuries with the "injury allegedly suffered by the public at large." *See, e.g.*, Fitesa MIS, at 13 (arguing Plaintiffs' inability to supply PFAS-free water is "no different than the injury allegedly suffered by public at large"); Milliken MIS, at 13 (same). The "injury allegedly suffered by the public at large" is community-wide exposure to PFAS-contaminated drinking water—a *public health* issue. Complaints, ¶¶ 71–72. *See Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22; *Home Sales*, 299 S.C. at 81, 382 S.E.2d 469. Plaintiffs are not suffering this injury to greater "degree" than the public, e.g., by exposure to more PFAS than others, or by suffering PFAS-related illness. Needless to say, Plaintiffs do not consume water at all. Instead, their lands, SWTPs, and infrastructures are directly subjected to chemical contamination, undermining their essential use and causing substantial devaluation—private property injuries "different in kind" to the public drinking water exposure. *See Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85; *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96.[17]

Even Defendants' own authorities undermine their positions. They lean on cases where municipal water *customers* asserted private nuisance claims based on the PFAS contamination of water they purchased from their utilities. *See Rhodes v. E.I. du Pont de Nemours and Co.*, 636 F.3d 88, 92–93, 96–97 (4th Cir. 2011); *Priselac v. Chemours Co.*, 2022 WL 909406, at *1, 5 (E.D.N.C. Mar. 28, 2022). Their holdings—that the interest in clean drinking water is only a

---

[17] Defendants identify nothing inside or outside the pleadings showing that *any* other persons (1) withdraw water from Lake Greenwood, much less for the purpose of selling drinking water; (2) suffer direct property contamination; or (3) have suffered any property injury as a result of the contamination. Even if such persons exist, Plaintiffs' injuries would still be different in kind from the public exposed to Defendants' PFAS in drinking water. *See Jones*, 67 S.C. at 191–202, 45 S.E. at 192–93 (alleged right violated was "not the right of navigation, or any other right which [the plaintiffs] held in common with the public, but the right to the unimpaired use of their lands on the banks of the river" as riparians); *see also Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22; *Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

public interest not redressable by private nuisance—are both unremarkable and consistent with Plaintiffs' own allegations. Plaintiffs affirm that this as a public interest in their complaints— contrasting the public drinking water exposure from the direct contamination, devaluation, and interference with their own private properties and business operations. Complaints, ¶¶ 71–73. Defendants' authority **underscores** this dispositive difference: while the *Priselac* water customers' interest in PFAS-free drinking water from the Cape Fear Public Utility Authority was "shared equally" with the general public, 2022 WL 909406, at *5, the Authority itself stated a claim for private nuisance for interference with its own property in its own PFAS-contamination case. *See Cape Fear Pub. Util. Auth. v. Chemours Co. FC, LLC*, 2019 WL 13300188, at *6 (E.D.N.C. Apr. 19, 2019). This exact, and sensible, distinction applies here.

Defendants have indeed created and continue to maintain a public health issue affecting tens of thousands within Plaintiffs' communities. But Plaintiffs alone bear the burden of commercially supplying clean water, while their private properties suffer direct PFAS contamination and interference with their essential functions. These are private, intimately unique, and "special" injuries that Defendants cannot ignore or circumvent.[18]

**D.    Plaintiffs state actionable claims for negligence.**

**1.    Defendants owed Plaintiffs duties of care.**

Many Defendants uniformly cite the same or similar case law stating that a duty of care may only be created "by statute, a contractual relationship, status, property interest, or some

---

[18] In passing, Unichem argues in conclusory fashion that "nothing is a nuisance which the law itself authorizes." Unichem MIS, at 9–10 (quoting *Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469). Setting aside its unsupported suggestion that discharging PFAS is "lawful," Unichem ignores hornbook law that purported "lawful" conduct "may become a nuisance by reason of circumstances, location, or surroundings." *Neal v. Darby*, 282 S.C. 277, 286, 318 S.E.2d 18, 23 (Ct. App. 1984) (holding that a federally and state-permitted landfill could constitute a nuisance due to its location near residential areas and a primary water source).

24

other special circumstance" to argue that they owe Plaintiffs no duty with respect to their discharge of PFAS. T&S MIS, at 17–18; Opperman MIS, at 15; Milliken MIS, at 9–10; First Source MIS, at 15; Fitesa MIS, at 15. In doing so, however, they conflate two fundamental tenets of South Carolina tort law: (1) while an *affirmative* duty to act may only be created in certain circumstances, (2) once a party voluntarily undertakes an act, it must exercise due care in doing so.

Defendants rely on the false presupposition that Defendants are innocent third parties whom Plaintiffs haled into court for their failure to remedy PFAS pollution caused (or not remediated) by others. This is not so. Instead, by voluntarily engaging in their various industries, Defendants were required under South Carolina law to do so with due care. That is the duty underpinning Plaintiffs' negligence claims, a duty long recognized in this State. *See Joyner v. S.C. Ry. Co.*, 26 S.C. 49, 51–52, 1 S.E. 52, 53 (1887) ("[T]he law has determined as a general rule . . . that the presence of due care negatives negligence, and that the absence of such care constitutes negligence."). This Court should not allow Defendants to obfuscate their roles in the pollution of South Carolina waters and attempt to escape liability through a distortion of South Carolina tort law.

A fair and complete statement of the law Defendants invoke is:

> An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance. Moreover, it has long been the law that one who assumes to act, even though under no obligation to do so, thereby becomes obligated to act with due care.

*Madison v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006) (citations omitted); *see also Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992) ("At common law, where there is no duty to act, but an act is voluntarily undertaken, the actor assumes a duty to use due care."); *Rayfield v. S.C. Dep't of Corr.*, 297 S.C. 95, 100–01, 374

S.E.2d 910, 913 (Ct. App. 1988) ("Ordinarily, the common law imposes no duty on a person to act. An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance. It follows that a person usually incurs no liability for failure to take steps to benefit others or to protect them from harm *not created by his own wrongful act*. In other words, a person has no duty to protect another from harm *inflicted by a third person*." (emphases added)).

Plaintiffs do not allege that Defendants owed them a duty of care to control others, ensure a third party (such as a WWTP) removed PFAS from South Carolina waters, or warn Plaintiffs about PFAS discharged by others. Instead, Plaintiffs allege that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others." Complaints, ¶ 91. Importantly, Plaintiffs do not invoke an affirmative duty disconnected from the conduct Defendants voluntarily performed at their industrial facilities—the law thus requires no contract, statute, special relationship between Plaintiffs and Defendants, or other prerequisite to establish their duties. *See Edward's of Byrnes Downs v. Charleston Sheet Metal Co.*, 253 S.C. 537, 542, 172 S.E.2d 120, 122 (1970) (recognizing there is a "common law duty to exercise due care to avoid injury or damage to others").[19]

Almost a century ago, the South Carolina Supreme Court approved the following jury instruction concerning the requirement to act with due care:

---

[19] Many defendants also argue they had no duty of care to Plaintiffs because the PFAS they discharged passed through a WWTP before reaching Plaintiffs' property and they therefore lacked "control" over it. This is a disingenuous argument that the Court should ignore. Although Defendants may have not had control over the PFAS after it left their facilities, or when it passed through the WWTPs, they certainly had control over the PFAS before discharging it into the environment, and that is the point in time out of which their duty to Plaintiffs arises.

> Negligence is the failure to exercise due care. The law enjoins upon every individual, you and me and every individual each in our conduct with reference to anybody else, the duty of exercising due care under all of the circumstances attending our activities, and the failure to exercise that due care which the surrounding circumstances justly require is called negligence, and if one is injured by reason of that negligence, if that negligence itself, that failure to exercise due care under the circumstances is the direct cause of bringing about some injury or damage to the person of another, then that negligence we call actionable.

*Parker v. Simmons*, 163 S.C. 42, 54, 161 S.E. 169, 173 (1931). This duty remains to this day.

Additionally, Defendants owe Plaintiffs a duty because, in discharging PFAS, they "created a situation that they knew or should have known posed a substantial risk of injury" to Plaintiff. *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 294, 688 S.E.2d 125, 130 (2010); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").[20]

South Carolina courts have consistently recognized that parties who release pollution into the environment owed a duty to those exposed to the pollutants and were thus subject to negligence liability. For example, in *Chestnut v. AVX Corp.*, the plaintiff property owners brought suit against the defendant, a manufacturer of electronic components the production of which involved a degreasing chemical called trichloroethylene ("TCE"). 413 S.C. 224, 226, 776 S.E.2d 82, 83 (2015). The plaintiffs alleged that "TCE escaped respondent's plant and migrated beyond

---

[20] The Restatement further supports the fact that Defendants misconstrue or misrepresent the duty they owe to Plaintiffs, as is explained above. *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 cmt. l ("*Relationship with affirmative duties to act*. The general duty rule contained in this Section is conditioned on the actor's having engaged in conduct that creates a risk of physical harm. Section 37 states the obverse of this rule: In the absence of conduct creating a risk of harm to others, an actor ordinarily has no duty of care to another."); *id.* § 37 ("An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable.").

27

the boundaries of respondent's property, contaminating surrounding properties and groundwater." *Id.* In evaluating the plaintiffs' negligence claim on appeal, the Supreme Court found "the complaint sufficiently [pled] a negligence cause of action." *Id.* at 228, 776 S.E.2d at 84. The court explained,

> In *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013), we held a plaintiff could maintain an environmental negligence suit based upon offensive odors if the complaint alleged either "physical injury [to the plaintiff] or property damage." *Id.* at 153, 747 S.E.2d at 481. Here, appellants have pled all four elements of a negligence claim: *duty*, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is "worthless," "damaged," and "devalued" by the "harmful" and "dangerous" chemicals on the real property that adjoins their properties.

*Id.* (emphasis added). If defendants can be held liable under a negligence theory for their discharge of TCE or "offensive odors" into the environment, so too can the defendants in this litigation be held liable for their discharge of PFAS.

Similarly, in *Ravan v. Greenville County*, several landowners sued Greenville County in its capacity as the operator of a landfill, along with several corporate entities that disposed of waste at the landfill, for damage to their properties. 315 S.C. 447, 452, 434 S.E.2d 296, 299 (Ct. App. 1993). Waste Management of South Carolina, Inc., as successor in interest to Spartan Waste Control, was included as a defendant due to Spartan's disposal of toxic chemicals at the landfill on behalf of industrial plants, which later contaminated a plaintiff's property. *Id.* at 466–67, 434 S.E.2d 296, 308. On appeal, Waste Management argued it did not owe a duty of care to the affected plaintiff, and if a duty existed, it was limited to the safe transport of the waste to the landfill. *Id.* at 467, 434 S.E.2d at 308. The court agreed "that the duty of a mere hauler of hazardous waste extends only to the safe transport of the waste while it is in the hauler's possession and control," *id.* at 468, 434 S.E.2d at 309; however, because Waste Management, and not its customers, chose the location for disposal of the waste, its "role consisted of more

28

than the mere hauling of waste to the landfill." *Id.* at 469, 434 S.E.2d at 309. "Thus, the facts of this case support the conclusion that a duty of care was owed by Spartan Waste to" the affected landowner. *Id.*

Here too, Defendants released PFAS into the environment, and it passed through a third party (in *Ravan*, a landfill, and here, the WWTPs) before reaching Plaintiff's property. As in *Ravan*, Defendants owe a duty of care to Plaintiff. *See also Conestee Mills v. Greenville*, 160 S.C. 10, 27, 158 S.E. 113, 119 (1931) (finding the City of Greenville, as the entity that built and constructed the city's sewer system, was liable to a downstream property owner for discharge of the sewage into the Reedy River, which then contaminated the plaintiff's property); *id.* at 26, 158 S.E. at 119 ("It is the duty of the commissioners of the sewer district to construct the sewer so that it will not become a nuisance to any neighborhood or to any particular inhabitant thereof; and it is the duty of the city, after the sewer has been turned over to it, to avoid the same result by properly maintaining and repairing the sewer after it is constructed." (quoting *Jones v. Sewer Improv. Dist.*, 177 S.W. 888, 889 (Ark. 1915))); *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 540 (D.S.C. 2024) (finding the plaintiffs' allegations that the defendant landfill, which allowed "'pollution, noxious fumes, odors, dust, gases including methane gas, particulate matter, and trash' to escape from their property and invade Plaintiffs' properties," and that the defendant owed the plaintiffs a duty of reasonable care, were "sufficient to state a claim for negligence" and defeat the defendant's motion to dismiss).

Finally, other courts who have recently considered this question in the context of PFAS contamination consistently rule that defendants such as those in this litigation owe a duty of care to those injured by the PFAS. *See, e.g.*, *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1324 (N.D. Ga. 2021) (finding the defendants "have a duty to exercise reasonable care in their use and disposal

29

of unreasonably dangerous chemicals such as PFAS and/or products containing PFAS in operating their various . . . facilities to avoid pollution of the State's waterways and injury to members of the downstream public who consume the water as part of their public drinking water supply"); *Ryan v. Greif, Inc.*, 708 F. Supp. 3d 148, 164 (D. Mass. 2023) (agreeing with the magistrate judge's ruling that "facilities that use and dispose of PFAS-contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal, owe foreseeable victims of such contamination a duty of care"); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1331 (N.D. Ga. 2022) (ruling a discharger of PFAS "has a duty to exercise reasonable care in its use and disposal of unreasonably dangerous chemicals such as PFAS to avoid pollution of state waterways and injury to downstream water users"); *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 398 (D.N.J. 2021) (finding "Defendants had a duty of care with regard to the proper handling of PFAS"); *see also Peeler v. SRG Glob. Coatings, LLC*, C.A. No. 1:23-CV-23-SNLJ, 2024 WL 4625640, at *6-7 (E.D. Mo. Oct. 30, 2024); *Brown v. Corteva, Inc.*, C.A. No. 7:23-CV-1409-D, 2024 WL 4229937, at *4 (E.D.N.C. Sep. 18, 2024); *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021); *Utils. Bd. of Tuskegee v. 3M Co.*, C.A. No. 2:22-CV-420-WKW, 2023 WL 1870912, at *9-11 (M.D. Ala. Feb. 9, 2023).

### 2.    Plaintiffs sufficiently allege that Unichem breached its duties.

Unichem uniquely argues Plaintiffs fail to sufficiently allege it breached its duty. Unichem MIS, at 13–14. This is false—Plaintiffs' more than adequately plead all elements of negligence, giving Unichem notice of the claims brought against it. That is all the law requires.

Rules 8 and 12(b)(6) control here.

> In considering a motion to dismiss under Rule 12(b)(6), a court must base its ruling solely on the allegations set forth in the complaint. If the facts alleged and inferences reasonably deducible therefrom, viewed in the light most favorable to

the plaintiff, would entitle the plaintiff to relief on any theory, dismissal under Rule 12(b)(6) is improper.

*Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 74–75, 753 S.E.2d 846, 850 (2014) (citation omitted). "The purpose of a pleading is fair notice to the opponent and the court." *Watts v. Metro Sec. Agency*, 346 S.C. 235, 240, 550 S.E.2d 869, 871 (Ct. App. 2001) (quoting James F. Flanagan, *South Carolina Civil Procedure* 59 (2d ed. 1996)). "In this state, Rule 8, SCRCP, mandates that a pleading contain 'ultimate facts' rather than 'evidentiary facts' to state a cause of action." *Id.* (quoting Flanagan, *South Carolina Civil Procedure* at 58–59). "Ultimate facts fall somewhere between the verbosity of 'evidentiary facts' and the sparsity of 'legal conclusions.'" *Id.* (quoting Flanagan, *South Carolina Civil Procedure* at 59).

Plaintiffs allege that Defendants owed Plaintiffs "a duty to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others, *which includes preventing the direct and/or indirect discharge of these PFAS*" to South Carolina waters. Complaints, ¶ 91. Plaintiffs also allege Defendants breached this duty by allowing PFAS "to escape their premises and contaminate" South Carolina waters. *Id.* ¶ 93. In support, Plaintiffs allege that each Defendant, including Unichem, discharged PFAS-contaminated wastewater at specific industrial facilities, and water sampling has confirmed the presence of PFAS in the bodies of water to which the defendants directly or indirectly discharge their wastewater. *Id.* at ¶¶ 23, 47.

These allegations, "and [the] inferences reasonably deducible therefrom, viewed in the light most favorable to" Plaintiffs, state negligence claims and provide fair notice to Defendants, including Unichem. *Carnival Corp.*, 407 S.C. at 74–75, 753 S.E.2d at 850. Requiring more, such as the precise process by which the PFAS leaves Defendants' facilities, will be revealed through the discovery process and is not mandated by Rule 8, SCRCP. *See Watts*, 346 S.C. at 240, 550

31

S.E.2d at 871; *Hardwick v. Liberty Mut. Ins. Co.*, 243 S.C. 162, 168, 133 S.E.2d 71, 73 (1963) ("This court has held many times that when the facts are peculiarly within the knowledge of the defendant, the plaintiff is not required to plead with the certainty that might otherwise be required.").

### 3. Plaintiffs sufficiently allege that Unichem's breach proximately caused Plaintiffs' injuries.

Unichem's causation arguments fail as well—Plaintiffs have sufficiently pleaded that its breaches proximately caused their injuries.

"Proximate cause requires proof of both causation in fact and legal cause." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id.* at 88–89, 502 S.E.2d at 83 (citation omitted). "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." *Id.* at 89, 502 S.E.2d at 83. "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.*

At this stage, Plaintiffs must only plead—not *prove*—causation. *See Hurd v. Williamsburg Cnty.*, 353 S.C. 596, 613, 579 S.E.2d 136, 145 (Ct. App. 2003) ("Ordinarily, the question of proximate cause is one of fact for the jury . . . ." (quoting *McNair v. Rainsford*, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998))). They have done so.

As for causation in fact, Plaintiffs allege that PFAS are man-made chemicals that do not occur naturally in the environment, Defendants each discharged PFAS into a body of water upstream of Plaintiff's properties, PFAS does not naturally degrade in the environment, and the PFAS Defendants discharged flowed downstream onto Plaintiff's properties, thereby harming it.

32

Complaints, ¶¶ 16–25. Although Plaintiffs' properties have been contaminated by multiple sources of PFAS, these allegations, along with the inferences reasonably deducible therefrom, are enough to sufficiently plead that Defendants are "but for" causes of their injuries.

"As to legal cause, 'foreseeability is considered "the touchstone . . . ," and it is determined by looking to the natural and probable consequences of the defendant's act or omission.' In most cases, foreseeability ends up being addressed as question of fact for the jury." *Wickersham v. Ford Motor Co.*, 432 S.C. 384, 390, 853 S.E.2d 329, 332 (2020) (quoting *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006)). A plaintiff is not required to prove "the defendant should have foreseen the particular event which occurred but merely that the defendant should have foreseen his or her [wrongful conduct] would probably cause injury to someone." *Hurd*, 353 S.C. at 613, 579 S.E.2d at 145 (citing *Greenville Mem'l Auditorium v. Martin*, 301 S.C. 242, 245, 391 S.E.2d 546, 547–48 (1990)).

Here, Plaintiffs' injuries were the "natural and probable consequences" of Defendants' wrongful conduct and were, therefore, foreseeable. Again, Plaintiffs allege that PFAS do not naturally degrade in the environment and Defendants knew that PFAS are hazardous to human health, Complaints, ¶¶ 24–25, 56; thus, it was entirely foreseeable to Defendants that the PFAS, once discharged from their facilities, would persist in South Carolina waters and invade the properties of downstream landowners. Moreover, the fact that Defendants' wastewater in some cases flowed through a WWTP before reaching Plaintiff's property does not change this analysis, as Plaintiffs also allege that Defendants knew or should have known that the WWTPs were unable to remove Defendants' PFAS from the water they treated and discharged. Complaints, ¶ 52. *See Bishop*, 331 S.C. at 89, 502 S.E.2d at 83 ("The intervening negligence of a third person will not excuse the first wrongdoer if such intervention ought to have been foreseen in the

33

exercise of due care. In such case, the original negligence still remains active, and a contributing cause of the injury.").

### 4.     Plaintiffs allege actionable damages.

Several Defendants argue Plaintiffs' negligence claims should be dismissed because they have not alleged physical injury or damage to their property. T&S MIS, at 20–21; Opperman MIS, at 16–17; First Source MIS, at 16–17. For reasons already discussed, *see supra* §§ B & C, this is baseless. The pleadings are replete with allegations that Defendants have contaminated and injured Plaintiffs' *properties. See, e.g.,* Complaints, ¶¶ 1–2, 5, 94. *See Chestnut v. AVX Corp.*, 413 S.C. 224, 228, 776 S.E.2d 82, 84 (2015) ("Here, appellants have pled all four elements of a negligence claim: duty, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is 'worthless,' 'damaged,' and 'devalued' by the 'harmful' and 'dangerous' chemicals on the real property that adjoins their properties.").

Defendants label Plaintiff's damages allegations as "unexplained and conclusory," lacking "facts showing that anything other than water from a public waterway has or could have been damaged by PFAS." Opperman MIS, at 16; First Source MIS, at 16. This only ignores the pleadings: Defendants have put toxic and environmentally persistent chemicals that are unsafe to consume in drinking water into the lands, SWTPs, and infrastructure of water providers. To the extent Plaintiff's allegations on the damage to their properties are concise, this merely reflects that their property injuries are obvious.

### 5.     Plaintiffs have not assumed the risk of PFAS contamination.

T&S argues that by voluntarily assuming the role of a drinking water provider, which necessarily requires the intake of South Carolina's waters, Plaintiffs have assumed the risk of PFAS exposure and contamination. T&S MIS, 19–20. This is incorrect.

34

In South Carolina, assumption of risk can be either express or implied. *See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 333 S.C. 71, 79, 508 S.E.2d 565, 569 (1998). "Implied assumption of risk is further divided into the categories of 'primary' and 'secondary' implied assumption of risk." *Id.* Here, T&S argues that Plaintiffs' drinking water operations "constitute[] a primary implied assumption of the risk for any alleged injury [they] now complain[] of." T&S MIS, at 19.

"Primary implied assumption of risk arises when the plaintiff impliedly assumes those risks that are *inherent* in a particular activity." *Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. "Primary implied assumption of risk is not a true affirmative defense, but instead goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff." *Id.* ("In its primary sense, implied assumption of risk focuses not on the plaintiff's conduct in assuming the risk, but on the defendant's general duty of care. . . . Clearly, primary implied assumption of risk is but another way of stating the conclusion that a plaintiff has failed to establish a prima facie case [of negligence] by failing to establish that a duty exists." (quoting *Perez v. McConkey*, 872 S.W.2d 897, 902 (Tenn. 1994))).

But as demonstrated above, T&S and other Defendants owed Plaintiffs a duty "to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others." Complaints, ¶ 91. Plaintiffs incorporate their arguments concerning the existence of Defendants' duty of care, which are dispositive here.

Regardless, PFAS contamination is not a risk inherent in the provision of potable water to Plaintiff's customers. *See Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. As Plaintiffs allege, PFAS are "man-made chemicals that do not occur naturally in the environment." Complaints, ¶ 24. As a result, if it were not for Defendants' tortious conduct in discharging PFAS to the

35

environment, there would be no PFAS in Plaintiffs' water supply. Neither T&S nor other

Defendants should be allowed to create a hazard that did not previously exist, then attempt to

escape liability by shielding itself behind the very same risk it created. T&S also argues Plaintiffs

"freely and voluntarily" exposed themselves to PFAS, T&S MIS, 19–20, but this also misses the

mark. Plaintiffs are required to provide potable water to their customers, and they must intake

and process water from Lake Greenwood, regardless of the contaminants in the water. It strains

credulity to suggest that Plaintiffs have freely and voluntarily exposed themselves to Defendants'

PFAS.

**E.      The "free public services doctrine" does not apply here, if it exists in South Carolina at all.**

Multiple Defendants argue that the free public services doctrine (also known as the

municipal cost recovery rule) bars Plaintiffs from recovering the costs they incur from removing

Defendants' PFAS from the drinking water they supply to their customers. *See* Fitesa MIS, at 16;

Milliken MIS, at 6–7; T&S MIS, at 10–12; Unichem MIS, at 14. The free public services

doctrine is underdeveloped, if existing at all, in South Carolina jurisprudence.[21] Nevertheless, in

certain jurisdictions it generally provides "that absent specific statutory authorization or damage

to government-owned property, a county [or other governmental entity] cannot recover the costs

of carrying out public services from a tortfeasor whose conduct caused the need for the services."

*Johnson v. 3M Co.*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021) (emphasis removed) (quoting

*Walker Cnty. v. Tri-State Crematory*, 642 S.E.2d 324, 327 (Ga. App. 2007)). Defendants' only

---

[21] Defendants cite no South Carolina cases in support of their arguments, and Plaintiffs' Westlaw searches for "free public services doctrine" and "municipal cost recovery rule" returned no South Carolina cases addressing the doctrine. As a result, dismissal should not be granted on this basis. *See Madison v. Am. Home Prod. Corp.*, 358 S.C. 449, 451, 595 S.E.2d 493, 494 (2004) ("As a general rule, important questions of novel impression should not be decided on a motion to dismiss.").

real basis for applying the doctrine here is the fact that Plaintiffs are governmental entities. *See* Fitesa MIS, at 16; Milliken MIS, at 6–7; T&S MIS, at 10–12; Unichem MIS, at 14.

The free public services doctrine rests on the premise that legislative authorities have the power to allocate the costs of providing "free" public services as they see fit, such as "spread[ing] [costs] by taxes," or by authorizing recovery "by statute or regulation." *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 323, 324 (9th Cir. 1983). By that rationale, courts should not intrude upon these legislative determinations about cost allocation by permitting tort recovery. *Id.* at 324 (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 314–17 (1947)) ("If the government has chosen the bear the costs for reasons of economic efficiency, or even as a subsidy to the citizens and their businesses, the decision implicates fiscal policy; the legislature and its public deliberative processes, rather than the court, is the appropriate forum to address such fiscal concerns.").

Even if ultimately recognized in this jurisdiction, the free public services doctrine does not apply here for the simple reason that Plaintiffs' respective provision of drinking water "to paying customers is neither free nor public as contemplated by the doctrine." *See Johnson*, 563 F. Supp. 3d at 1311. Rather, Plaintiffs only provide drinking water to those customers who pay for the service. *See generally* Complaints (repeatedly stating that Plaintiffs supply drinking water to *customers*).

As *Flagstaff* clarifies, "it is the identity of the claimant and the nature of the cost that combine" under the doctrine "to deny recovery." 719 F.2d at 324. By focusing only on either Plaintiff's "identity" as a governmental entity to invoke the free public services doctrine, Defendants erroneously bypass "the nature of the cost" for which the doctrine precludes

37

recovery.[22] Here, the costs of the enhanced water treatment for which each Plaintiff seeks relief are "not free for all the public" at the point of use. *Johnson*, 563 F. Supp. 3d at 1311; *see also* S.C. Code Ann. § 5-31-1150 (it is a misdemeanor for a person to use municipal water without a contract for water service). Unlike the costs of fire or police services, which are allocated across the public via taxes, the Legislature has authorized municipalities and special purpose districts like GCPW and LWSC, respectively, to charge water and sewer users for these services. S.C. Code Ann. § 5-31-670. Indeed, it is telling that ***none*** of Defendants' authorities involve the free public services doctrine barring recovery by a water, sewer, or other public utility—or any service funded by billing customers.

In addition, the free public service doctrine recognizes exceptions for "where the acts of a private party create a public nuisance which the government seeks to abate" and "where the government incurs expenses to protect its own property." *Flagstaff*, 719 F.2d at 324; *see also Johnson*, 563 F. Supp. 3d at 1311 (indicating doctrine does not apply where recovery is sought for "damage to government-owned property"). Both Plaintiffs plainly allege both a public nuisance and damage to their properties. *See, e.g.*, Complaints ¶¶ 1–3, 5–7, 14, 53, 55, 56, 69–80.

Furthermore, in a case involving a challenge to the water rate set by the City of Conway, the Supreme Court recognized that a public water provider "has a proprietary interest" in the water it sells to its customers, "as evidenced by [its] unilateral ability to sell or lease it." *Sloan v.*

---

[22] T&S at least acknowledges that "the nature of the cost" is part of the analysis. Ultimately, however, T&S fails to properly apply this factor to "the services provided by Plaintiff[s]" by simply assuming that because they are generic "municipal services," the funding for Plaintiffs' provision of drinking water has already been set in stone by the Legislature. T&S MIS, at 12. In so doing, T&S collapses "the nature of the cost" into Plaintiffs' identities as governmental entities—really focusing only on this governmental status just as the other Defendants do.

38

*City of Conway*, 347 S.C. 324, 329, 555 S.E.2d 684, 686 (2001). It is such water (along with Plaintiffs' other properties), in which each Plaintiff has a proprietary interest, that has been damaged by Defendants' tortious conduct. By stating the free public services doctrine applies to "public expenditures made in the performance of ***governmental functions***" (emphasis added)— not proprietary functions, at least Fitesa, T&S, and Unichem, in fact, appear to expressly concede that the doctrine does not apply to the present cases. *See* Fitesa MIS, at 16; T&S MIS, at 10; Unichem MIS, at 14.

Finally, Milliken contends that Plaintiffs must identify a specific statute or South Carolina judicial decision "that authorizes a public water utility to recover the cost of providing" clean water from a tortfeasor. Milliken MIS, at 7. This argument has no support from any of the authorities Milliken cites, and in any case, as Plaintiffs have already demonstrated, the free public services doctrine does not apply to Plaintiffs' provision of drinking water to paying customers as a general matter, nor to claims involving damage to government property or for public nuisance.

### F.     Plaintiffs' claims against Milliken are not barred by the statute of limitations.

Plaintiffs' claims against Milliken center on its former Judson Mill complex, which historically discharged PFAS to the Reedy River system via the Mauldin Road WWTP and which continues to leach these toxic chemicals directly into a tributary of the Reedy River today. *See* Complaints, ¶ 20. Milliken argues these claims are time-barred because it ceased manufacturing operations at Judson Mill in 2015 and sold the property in 2017. Milliken MIS, at 7–8. Because it ceased operations at Judson Mill in 2015, Milliken further argues that the doctrines of continuing nuisance and continuing trespass do not apply to extend the statute of limitations. Milliken MIS, at 8–9.

Because Rule 12(b)(6) "tests the sufficiency of the complaint," a motion to dismiss under this provision "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *Harrell v. BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 533 (D.S.C. 2021) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). As such, "courts may only resolve a statute of limitations defense at the motion to dismiss stage if 'all facts necessary to the affirmative defense ***clearly appear*** on the face of the complaint.'" *Id.* (cleaned up) (quoting *Goodman*, 494 F.3d at 464); *see also Spence v. Spence*, 368 S.C. 106, 123 628 S.E.2d 869, 878 (2006) ("[A]n affirmative defense ordinarily may not be asserted in a motion to dismiss under Rule 12(b)(6) unless the allegations of the complaint demonstrate the existence of the affirmative defense.").

Milliken cannot meet its burden of showing that Plaintiffs' claims are barred by the statute of limitations.

### 1. Milliken cannot genuinely maintain that Plaintiffs' claims are both unripe and time-barred.

Milliken argues in the same briefing both that Plaintiffs' claims are barred by the passage of time and that Plaintiffs "ha[ve] not yet suffered any legally cognizable injury due to PFAS, and in fact might never suffer such injury." Milliken MIS, at 4. This contradiction is irreconcilable: a lawsuit cannot be time-barred and unripe at the same time.

South Carolina law underscores the absurdity of this position. A tort generally becomes actionable when the injury occurs. *See Murphy v. Owens-Corning Fiberglas Corp.*, 356 S.C. 592, 598, 590 S.E.2d 479, 482 (2003). But the statute of limitations begins to run "from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct" at issue. *Dean v. Ruscon Corp.*, 321 S.C. 360, 363, 468 S.E.2d 645, 647 (1996).

These principles define when claims accrue and expire, but Milliken argues that Plaintiffs' claims exist in a quantum state—both too late and too early at once. This is nonsense. Both propositions cannot be true at the same time—it must be one or neither (as indeed is the case because Plaintiffs have suffered actionable injuries and have brought claims well within the limitations period). By advancing these two irreconcilable positions, Milliken undermines the credibility of both.

### 2. The limitations period continues to run as to Plaintiffs' nuisance and trespass claims.

South Carolina recognizes the closely related doctrines of continuing nuisance and continuing trespass. *See Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 357, 559 S.E.2d 327, 337 (Ct. App. 2001). A continuing nuisance is an "unreasonable interference with the plaintiff's use and enjoyment of his property" "that is intermittent or periodical" or "which occurs so often that it is said to be continuing although it is not necessarily constant or unceasing." *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 286, 543 S.E.2d 563, 566 (Ct. App. 2001). Likewise, a continuing trespass is "any intentional invasion of the plaintiff's interest in the exclusive possession of his property" that "is intermittent or periodical and occurs so often it is said to be continuing, although it is not necessarily constant or unceasing." *Parker v. Plexico*, 2008 WL 9843973, at *2 (Ct. App. June 27, 2008) (quoting *Hedgepath*, 348 S.C. at 357, 559 S.E.2d at 337).

Continuing nuisances and trespasses are distinguished from permanent nuisances and trespasses according to whether "abatement is reasonably and practically possible." *Silvester*, 344 S.C. at 287, 543 S.E.2d at 567. The classification of a nuisance or trespass as continuing versus permanent has implications for the statute of limitations:

> When the nuisance [or trespass] is continuing and the injury is abatable, the statute of limitations does not run merely from the original intrusion on the property and

41

cannot be a complete bar. Rather, a new statute of limitations begins to run after each separate invasion of the property.

*Id.* (citations omitted).

Here, Plaintiffs have plainly alleged that the public and private nuisances and trespasses upon their properties posed by Milliken's Judson Mill are continuing: During the time it operated the facility, Milliken "used products that contain or degrade to [MCL PFAS] in the manufacture of textile products," and it discharged the resulting "industrial wastewater contaminated with . . . PFAS" to the local WWTP, which in turn discharged Milliken's PFAS to the Reedy River. Complaints, ¶ 20. Crucially, Milliken's historically-discharged PFAS are highly "persisten[t] in the environment," *id.* at ¶ 25; "remain in the environment from decades of legacy industrial use," *id.* at ¶ 31; and "have caused, ***and continue to cause***, contamination" of Plaintiffs' water supplies such that "Plaintiff[s] cannot use [their] property and property rights to provide water that is either free of all PFOA or PFOS, or compliant with EPA's MCLs." *Id.* at ¶ 53 (emphasis added).

Plaintiffs also aver that because "Milliken did not remediate Judson Mill upon its closure, . . . the site remains contaminated with [MCL] PFAS and their precursors that migrate to Brushy Creek and the Reedy River via groundwater migration and stormwater discharges." *Id.* at ¶ 20; *see also id.* at ¶¶ 66 (alleging "continuing irreparable injury" to Plaintiffs' "use and enjoyment" of property "for which there is no adequate remedy at law"), 78 (alleging "continuing threat to public health, safety, and order"), 85 (alleging "Defendants' invasions of Plaintiff[s'] properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff[s'] water pumps are active").

Furthermore, Plaintiffs allege that abatement to redress the ongoing injuries caused by the nuisance and trespasses is "reasonably and practicably possible," *Silvester*, 344 S.C. at 287, 543 S.E.2d at 567, via "the acquisition, installation, and operation of water treatment technologies at

42

Plaintiff[s'] SWTP[s] that will remove Defendants' PFAS from drinking water." *Id.* at ¶¶ 7. Consequently, Plaintiffs plead claims for nuisance and trespass against Milliken for which the statute of limitations continues to run.

Milliken's only real objection to this application of continuing nuisance and trespass doctrines is that Milliken cannot abate the PFAS discharges from the Judson Mill because it no longer owns or controls the site today. Milliken MIS, at 8–9. It contends that requiring Defendants to fund water treatment technology capable of removing their PFAS from Plaintiffs' drinking water "is not abatement" but "simply compensating a plaintiff for its injury." *Id.* at 8.

Milliken's understanding of abatement is too narrow. Abatement is an equitable remedy, and courts in equity have significant discretion to tailor relief in order to affect whatever justice under the given circumstances requires. *See Carter v. Lake City Baseball Club*, 218 S.C. 255, 269–70, 272–73, 62 S.E.2d 470, 476–77, 478 (1950) (restating courts' equitable power "to issue mandatory injunctions to abate existing nuisances," and enjoining school from hosting professional baseball games); S.C. Code Ann. § 15-43-20 (authorizing "action[s] in equity" to abate nuisances); 58 AM. JUR. 2D *Nuisances* § 261 (Jan. 2025 update) ("[C]ourts of equity have jurisdiction to grant relief against either public or private nuisances by compelling their abatement or enjoining them."); *id.* at § 262 ("Equity has jurisdiction in the case of a continuing nuisance, and according to some authority, such jurisdiction continues even though the acts contributing to such nuisance have been discontinued prior to commencement of the suit."); *see also Thomerson v. DeVito*, 430 S.C. 246, 253 n.4, 259, 844 S.E.2d 378, 382 n.4, 385 (2020) (reaffirming that "[a] request for monetary relief" does not necessarily "convert what is otherwise an equitable claim to a legal claim"). Regardless of whether Milliken is presently able to stop PFAS from migrating from the Judson Mill into the Reedy River, implementing enhanced

43

water treatment at Plaintiffs' facilities is a feasible and practical way to abate the nuisances and trespasses Plaintiffs complain of. It is therefore within a court's equitable power to order Milliken to assist this effort.

In addition, Plaintiffs note that among the relief they seek is the equitable remedy of "a declaratory judgment." Complaints, ¶ 2. Pursuant to section 15-53-120 of the South Carolina Code, "[f]urther relief based on a declaratory judgment or decree may be granted whenever necessary or proper." Should the Court declare that Plaintiffs' property rights are being infringed by Defendants' tortious conduct, and that the presence of Defendants' PFAS in Plaintiffs' water sources and drinking water constitute a nuisance, then "necessary and proper" relief could include ordering Defendants to fund abatement efforts on Plaintiffs' properties. *See, e.g.*, *Bank of Augusta v. Sanchez Motor Co.*, 249 S.C. 53, 60, 152 S.E.2d 676, 679 (1967) (quoting 22 AM. JUR. 2D *Declaratory Judgments* § 100) (holding that "consequential or incidental relief" may be granted under the declaratory judgment statute); *Robinson v. Asbill*, 328 S.C. 450, 452–53, 492 S.E.2d 400, 401 (App. 1997) (same); *Paduch v. City of Johnson City*, 896 S.W.2d 767 (Tenn. 1995) (holding that "[t]he further relief authorized by" Tennessee's analogous statute "may include the award of damages"); 22 AM. JUR. 2D *Declaratory Judgments* § 253 (Jan. 2025 update) (providing that the further incidental and consequential relief pursuant to a declaratory judgment may include monetary damages and injunctive relief).

Finally, Milliken misapplies *Hedgepath*. *See* Milliken MIS, at 9. While *Hedgepath* did involve a defendant ceasing operations and selling the contaminated site, this fact was incidental to the claims being time-barred—not the basis for the court's decision. *See Hedgepath*, 348 S.C. at 358–59, 559 S.E.2d 337–38. Nothing in *Hedgepath* establishes a general rule that a defendant's cessation of harmful conduct triggers the limitations period or that a nuisance ceases

44

to be continuing. *See id*. Instead, the *Hedgepath* plaintiffs' claims were barred because they really alleged a permanent nuisance, as demonstrated by the "single indivisible injury to their property for alleged permanent injury by pollution," to which the discovery rule applied. *Id*. The *Hedgepath* plaintiffs' arguments about a continuing nuisance were a red herring. *See id*. at 358, 559 S.E.2d at 337. Here, by contrast, Plaintiffs clearly plead a continuing nuisance, with injuries to their property rights and to public health that will continue for as long as the contamination persists. *See* Complaints, ¶¶ 55, 66, 74, 76, 78, 85, 88.

### 3. In any event, Milliken ignores the discovery rule.

As stated above, South Carolina follows the discovery rule. *Dean*, 321 S.C. at 363, 468 S.E.2d at 647 (statute begins to run "from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct"). When this date occurs "is an objective, rather than a subjective, question." *Hedgepath*, 348 S.C. at 356, 559 S.E.2d at 336. Milliken must therefore demonstrate that based on the face of their respective complaints, Plaintiffs had notice of their claims against Milliken earlier than August 23, 2021 (i.e., three years from when Plaintiffs added Milliken to the lawsuits). *See Spence*, 368 S.C. at 123 628 S.E.2d at 878.

Milliken attempts to bootstrap this notice by pointing to Plaintiffs' allegation that Milliken operated the Judson Mill "between approximately 1960 and 2015." Milliken MIS, at 7. But the closure of a facility, without more, does not provide a downstream water utility—which Milliken stresses is "60 miles away" from Plaintiffs' SWTPs, *id.* at 12 n.10—notice that it has claims against the operator of that facility for polluting its drinking water supply with unsafe concentrations of PFAS. By improperly conflating the date of its facility closure with the date triggering the statute of limitations, Milliken fails to carry its burden in arguing its affirmative defense.

45

**G.     Defendants' causation arguments should be rejected.**

**1.     Cryovac's and Unichem's traceability arguments are premature.**

Cryovac and Unichem seek dismissal on grounds that Plaintiffs fail to sufficiently allege that "the PFAS allegedly discharged by [these Defendants] is the same PFAS that is allegedly present in the water Plaintiff[s] draw[] from Lake Greenwood." Cryovac MIS, at 8; *see also* Unichem MIS, at 6–7. They point to Plaintiffs' allegations that PFAS have been used in many different applications, are environmentally persistent, are water soluble and highly mobile in water bodies, and "remain in the environment from decades of legacy use." Cryovac MIS, at 6 (citing Complaints, ¶¶ 25, 29, 31); Unichem MIS, at 8 (same). These characteristics, according to Defendants, fatally undercut Plaintiffs' allegations that they caused Plaintiffs' injuries because they raise the specter that the PFAS contaminating Plaintiffs' water sources and properties originates from "some other third party." Unichem MIS, at 6; *see also* Cryovac MIS, at 8–9.

These arguments are premature and conflate the pleading standard at this early stage of litigation with actual proof of Plaintiffs' claims. *See Skydive Myrtle Beach, Inc. v. Horry Cnty.*, 426 S.C. 175, 180, 826 S.E.2d 585, 587 (2019) ("Rule 12(b)(6) . . . address[es] the sufficiency of a pleading stating a claim; it is not a vehicle for addressing the underlying merits of the claim.").[23] Proof of Plaintiff's claims will of course require discovery, including expert discovery, pertaining to the "fate and transport" of the PFAS at issue—from their discharge at Defendants' facilities, to the WWTPs and surface waters receiving these facilities' wastewater, and downstream to Plaintiffs' water intakes. Right now, Plaintiffs have pleaded more than

---

[23] Challenges to subject matter jurisdiction implicate Rule 12(b)(1) for which Defendants may introduce evidence outside the pleadings—however, neither Cryovac nor Unichem have done so. Their facial challenge must accept the facts as pleaded. *See Springmasters, Inc. v. D&M Mfg.,* 303 S.C. 528, 531–32, 402 S.E.2d 192, 193–94 (Ct. App. 1991).

enough facts to demonstrate that PFAS discharged by Cryovac and Unichem have contaminated

Plaintiffs' water sources and properties:

- Cryovac and Unichem discharge wastewater contaminated with MCL PFAS and/or their precursors to the Lower Reedy WWTP and Mauldin Road WWTP, respectively, as a result of these Defendants' usage of products containing or degrading to these PFAS in their industrial processes. *See* Complaints, ¶¶ 17, 21; *see also id.* at ¶ 48.

- The Lower Reedy and Mauldin Road WWTPs both use "conventional wastewater treatment methods to treat wastewater, which are unable to remove PFAS." *Id.* at ¶¶ 49–50.

- As a result, the Lower Reedy and Mauldin Road WWTPs both discharge effluent "contaminated with Defendants'"—which includes Cryovac's and Unichem's—products that contain or degrade to [MCL PFAS] into the Reedy River upstream of Lake Greenwood." *Id.*

- "PFAS sampling of the Saluda River, Reedy River, and Lake Greenwood confirms the presence of [MCL PFAS] throughout these bodies of water, . . . at levels exceeding EPA's MCLs and MCLGs at [Plaintiffs'] water intakes. Indeed, sampling at [Plaintiffs'] water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source." *Id.* at ¶ 47.

- Plaintiffs' "existing water treatment processes cannot remove" PFAS from the drinking water Plaintiffs provide their customers. *Id.* at ¶ 6.

- Therefore, in order to provide drinking water that is free from Cryovac, Unichem, and other Defendants' PFAS, Plaintiffs must implement new treatment technologies that are capable of removing PFAS. *Id.* ¶¶ 6, 53.

In arguing that the environmental persistence, water solubility, and mobility of PFAS

undermine allegations of causation, Cryovac and Unichem have it backwards. These are the very

qualities that explain how the chemicals resist breakdown and travel many miles downstream to

Plaintiffs' water intakes—a distance that Cryovac and Unichem also criticize. *See* Cryovac MIS,

at 9 (quoting Complaints, ¶ 45) ("Plaintiff alleges that the rivers where the defendants allegedly

discharge wastewater-containing PFAS 'flow downstream through Greenville, South Carolina

and, from there, feed Lake Greenwood ***roughly 35 miles downstream***.'"); Unichem MIS, at 6–7

("Likewise, Plaintiff does not provide facts supporting that any PFAS allegedly used by Unichem

47

in the short time it has owned the facility migrated more than 50 miles to Plaintiff's water intakes.").

Clearly, the possible existence of other sources of PFAS does not negate Plaintiffs' unambiguous allegations that Cryovac and Unichem are themselves sources. *See Gentry v. Yonce*, 337 S.C. 1, 5, 522 S.E.2d 137, 139 (1999) (providing that the complaint must be viewed "in the light most favorable to the plaintiff, and with every doubt resolved in his behalf," when deciding a Rule 12(b)(6) motion), *overruled in part on other grounds by Proctor v. Whitlark & Whitlark, Inc.*, 414 S.C. 318, 778 S.E.2d 888 (2015); *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1353–54 (N.D. Ga. 2021) (denying dismissal based on argument that "because PFAS are ubiquitous, Plaintiff fails to state a claim against [defendant]"). Existing South Carolina PFAS cases already bear this out. *See, e.g.*, **Ex. 5**, Order on MTDs, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111, at 4 (S.C. Ct. Comm. Pl. July 23, 2024) (holding State's allegations that PFAS manufacturers produced PFAS and PFAS-containing products, "caused widespread contamination of the State's natural resources and property," and contaminated "identifie[d] areas in the State" "adequately pled causation"); *Weatherford v. E.I. du Pont de Nemours & Co.*, No. 4:22-cv-01427-RBH, 2023 WL 11015357, at *4–5 (D.S.C. Sept. 27, 2023) (holding that allegations of PFAS' persistence and tendency to leach from wastewater and biosolids, of defendants' knowledge about PFAS and their customer's manufacturing processes, and of defendants failure to provide proper disposal instructions to their customer sufficiently alleged proximate causation).

### 2. The Mauldin Road WWTP's receipt and discharge of Unichem's contaminated wastewater is not a superseding cause.

Unichem further argues that Plaintiffs' claims should be dismissed on the basis that the PFAS "in Lake Greenwood was *not* put there by Unichem," because Unichem sends its PFAS

48

laden wastewater to the Mauldin Road WWTP, which then discharges Unichem's PFAS to the river system feeding Lake Greenwood. Unichem MIS, at 7. In substance, Unichem argues that the Mauldin Road WWTP's actions—receiving Unichem's wastewater and not removing the PFAS from this wastewater—are a superseding cause that terminates Unichem's liability. As already discussed above, the controlling allegations foreclose this argument.

"The touchstone of proximate cause in South Carolina is foreseeability," meaning that "the injury in question occurred as a natural and probable consequence of the defendant's act." *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 463, 494 S.E.2d 835, 842–43 (Ct. App. 1997). "For an intervening force to be a superseding cause that relieves an actor from liability, the intervening cause must be a cause that could not have been reasonably foreseen or anticipated." *Id.* at 467, 494 S.E.2d at 844.

The Mauldin Road WWTP's actions here do not constitute a superseding cause. Plaintiffs allege that Unichem "discharges industrial wastewater contaminated with products that contain or degrade to [MCL] PFAS to the Mauldin Road WWTP," Complaints, ¶ 23, which "utilizes conventional wastewater treatment methods" that "are unable to remove PFAS." *Id.* at ¶ 49. The pleadings allege that Unichem possessed actual or constructive knowledge of these facts: "All Defendants knew or should have known that th[e] [Mauldin Road, Lower Reedy, and Piedmont Regional] WWTPs utilize conventional treatment methods for wastewater that cannot remove Defendants' PFAS." *Id.* at ¶ 52. Further, "[a]ll Defendants also know or should have known that the WWTPs discharge treated effluent contaminated with their PFAS chemicals to the [Reedy and Saluda] rivers, contaminating the water that Plaintiff[s] draws for [their] customers." *Id.*; *see also id.* at ¶ 83.

49

The Amended Complaints plainly demonstrate that the Mauldin Road WWTP was a foreseeable, passive conduit for Unichem's PFAS to enter the river system and contaminate Plaintiffs' downstream water sources and facilities.[24] Courts presiding over PFAS contamination cases have rejected very similar superseding causation arguments by entities that supply PFAS-containing products to customers that discharge those products directly or indirectly (via WWTPs) to surface waters. *See Weatherford*, 2023 WL 11015357, at *4–5 (also drawing attention to plaintiffs' allegations "that PFAS are not biodegradable, persist in the environment and the human body, and leach into the groundwater and soil as a result of the wastewater created during the normal textile processes"); *see also Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1332–33 (N.D. Ga. 2022).

**H.     This Court should not stay this case or decline jurisdiction.**

Fitesa and T&S ask the Court to stay or dismiss these cases so that they can be referred to the South Carolina Department of Environmental Services ("DES"). Fitesa MIS, at 3, 16–17; T&S MIS, at 21–23. They invoke the doctrine of primary jurisdiction as the basis for the stay or dismissal, vaguely contending that "the legislature [has] entrusted [DES] with addressing the exact harm alleged here" via the South Carolina State Safe Drinking Water Act ("SCSDWA"), S.C. Code Ann. §§ 44-55-10 to -120. Fitesa MIS, at 17; T&S MIS, at 22. This unjustified delay tactic falls well outside the scope of the primary jurisdiction doctrine. *See Local Union No. 189, Amalgamated Meat Cutters Etc. v. Jewel Tea Co., Inc.*, 381 U.S. 676, 686 (1965) (Frankfurter, J., dissenting) ("[T]he doctrine of primary jurisdiction is not a doctrine of futility; it does not require resort to 'an expensive and merely delaying administrative proceeding when the case must

---

[24] This rebuttal applies equally to Unichem's proximate causation argument. *See* Unichem MIS, at 13–14.

50

eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency.'" (quoting *Fed. Mar. Bd. v. Isbrandtsen Co.*, 356 U.S. 481 (1958))).

Where a case or a factual issue therein is beyond "the conventional experience of judges" and "within the special competence" of an administrative agency, the primary jurisdiction doctrine provides courts discretion to stay a case or dismiss it without prejudice in order to refer the matter to the agency. *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996); *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956); *see also Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 449–50 (M.D.N.C. 2015). The doctrine is intended to promote "desirable uniformity" in regulation and leverage "the expert and specialized knowledge of the agenc[y] involved." *W. Pac. R.R. Co.*, 352 U.S. at 64.

This case involves only South Carolina common law claims, including claims of private and public nuisance, trespass, and negligence, gross negligence, and/or recklessness. These claims are firmly within this Court's conventional experience and competence. *See Nix v. The Chemours Company FC*, 2023 WL 6471690, at *6 (E.D.N.C. Oct. 4, 2023) (observing the plaintiffs' state law property claims "fit comfortably within" the court's expertise but not the state environmental agency's). Plaintiffs assert no claims under the SCSDWA, its federal analogue, or any other state or federal statute.

To invoke DES's purported exclusive authority to enforce the SCSDWA, Defendants suggest that the SCSDWA preempts cases such as this, involving common law claims against upstream polluters for contaminating a public water supply. *See* Fitesa MIS, at 3, 17; T&S MIS, at 22. But nothing in the plain text of the act indicates a legislative desire to do so. Moreover, courts interpreting the federal SDWA have routinely held that the statute does not preempt state

51

common law claims. *See, e.g.*, *Russell v. Tyson Farms, Inc.*, 450 F. Supp. 3d 1266, 1271, 1273 (N.D. Ala. 2020); *Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 597–98 (M.D. La. 2003); *Hartwell Corp. v. Superior Court*, 38 P.3d 1098, 1107 (Cal. 2002). Defendants' notion that DES possesses some unique authority or expertise necessary to resolving this case is belied by the fact the PFAS MCLs were issued *by EPA*, not DES.

Plaintiffs are also unaware of—and neither Fitesa nor T&S identify—any action by DES to control the PFAS discharges by either Defendant.[25] This reality reinforces the conclusion that a judgment for Plaintiffs would not interfere with DES's regulation of PFAS. *See Parris*, 595 F. Supp. 3d at 1313 (emphasizing that the Georgia environmental agency "has not initiated a rulemaking or other administrative proceeding to regulate the discharge of PFAS from industrial sources in Georgia" and has not "taken enforcement action against [defendant]," in denying stay). And even if DES was currently taking action against Fitesa's or T&S's PFAS discharges, that, too, would not necessarily require staying or dismissing this case under primary jurisdiction doctrine. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5–6; *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 683 (W.D. Mich. 2021); *Cape Fear Pub. Util. Auth. v. The Chemours Company FC, LLC*, 2019 WL 13300188, at *10 (E.D.N.C. Apr. 19, 2019); *Dew v. E.I. du Pont de Nemours and Co.*, 2019 WL 13117100, at *10 (E.D.N.C. Apr. 17, 2019); *Yadkin Riverkeeper*, 141 F. Supp. 3d at 451.

Finally, Fitesa and T&S are not the first defendants in a PFAS contamination lawsuit to assert primary jurisdiction as grounds for a stay or dismissal. To date, most—and very likely *all*—of these attempts have been unsuccessful. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5–6; *Parris*, 595 F. Supp. 3d at 1312–13; *Zimmerman*, 542 F. Supp. 3d at 683; *Cape Fear Pub. Util. Auth.*,

---

[25] To be clear, DES has recently begun to include monitoring requirements for PFAS when discharge permits come up for renewal. However, these monitoring requirements do not set limits for the amount of PFAS that permittees may release via their wastewater discharges.

52

2019 WL 13300188, at \*10; *Dew*, 2019 WL 13117100, at \*10. Defendants' attempt should meet the same result.

**I.     The Mauldin Road WWTP is not a necessary party.**

"It is well-settled that a plaintiff has the sole right to determine which co-tortfeasor(s) she will sue." *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 345, 698 S.E.2d 559, 560 (2010); *see also Smith v. Tiffany*, 419 S.C. 548, 564, 799 S.E.2d 479, 488 (2017) (recognizing "two centuries of common law establishing a plaintiff's right to choose which tortfeasors, if any, she will sue"). Setting itself against this foundational principle, T&S argues that the Mauldin Road WWTP is an "indispensable party" under Rule 19. But T&S's basis is not Rule 19—it only rehashes Defendants' misplaced blame towards their WWTPs for the PFAS contamination that the Complaints allege Defendants knew passed through. T&S MIS, at 13–14.

T&S carries the burden on its motion to dismiss, but it does not even explain how Rule 19 applies. The Rule says:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Rule 19(a), SCRCP. Put differently, Rule 19 only requires the joinder of "necessary parties"— "one whose rights must be ascertained and settled before the rights of the parties to the action can be determined." *Ex parte Gov't Employee's Ins. Co. v. Goethe*, 373 S.C. 132, 137, 644 S.E.2d 699, 701 (2007) (quoting *Slatton v. Slatton*, 289 S.C. 128, 130, 345 S.E.2d 248, 249 (1986)).

T&S does not carry its burden—nor can it. Complete relief between Plaintiffs and T&S can be achieved without involving any WWTP, which have no "interest relating to the subject of

53

[this] action." Rule 19(a)(2). This Court "ha[s] no need to ascertain or settle [the WWTPs'] rights before it determine[s] the rights of" the current parties to this action, and joinder would be improper. *Goethe*, 373 S.C. at 136, 644 S.E.2d at 701; *see also id.* at 137, 644 S.E.2d at 701 (finding a party's joinder is unnecessary when its interest "is merely tangential to" the action).

## IV. CONCLUSION

Based on the foregoing, Plaintiffs GCPW and LWSC respectfully ask that this Court deny Defendants' motions in full and allow all of Plaintiffs' claims to survive dismissal and proceed to discovery in this litigation.

Respectfully submitted,

    */s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiffs*

February 28, 2025

54

# EXHIBIT 2

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

Aladdin Manufacturing Corp. *et al.*,

*Defendants*.

C.A. No. 2024-CP-26-05523

## PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff, Grand Strand Water and Sewer Authority ("GSWSA" or "Plaintiff"), hereby

responds to all pending motions filed by Defendants Domtar Paper Company, LLC ("Domtar");

Elevate Textiles, Inc. ("Elevate"); Fiber Industries, LLC ("Fiber"); GFL Environmental USA,

Inc. ("GFL"); Mohawk Industries, Inc. and Aladdin Manufacturing Corporation (collectively

"Mohawk"); Nan Ya Plastics Corporation, America ("Nan Ya"); PRET Advanced Materials, LLC

("PRET"); Red Rock Disposal, LLC ("RRD"); Sampson County Disposal, LLC ("SCD"); and

Waste Industries, LLC ("Waste Industries").[1]

---

[1] Defendants filed separate memoranda in support of their motions to dismiss, which share uniform pagination for each's respective briefing in this case. In citations, Plaintiff abbreviates these memoranda to "MIS." Plaintiff references consolidated briefing filed by GFL and Waste Industries as "GFL MIS," and it references consolidated briefing filed by RRD and SCD as "RRD MIS."

i

**TABLE OF CONTENTS**

INDEX OF ACRONYMS ................................................................................................................ iv

I.     FACTUAL BACKGROUND ............................................................................................. 1

II.    STANDARD OF REVIEW ................................................................................................ 4

III.   ARGUMENT ...................................................................................................................... 5

   A.   Plaintiff's claims for relief are justiciable. .................................................................. 5

      1.   Plaintiff clearly has standing to seek relief for past, present, and future property injuries. ........................................................................................................................ 6

      2.   Defendants' position is self-defeating. ................................................................... 8

   B.   Plaintiff states actionable claims for trespass. ........................................................... 10

      1.   The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law. .......................... 10

      2.   Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiff's properties constitute affirmative, intentional acts. ............ 12

   C.   Plaintiff states actionable claims for public and private nuisance. ............................. 16

      1.   Plaintiff alleges that Defendants controlled their properties and products that cause the contamination of Plaintiff's properties and upstream surface waters. ................ 16

      2.   Plaintiff has suffered private property injuries that confer rights of action for both private and public nuisance. .................................................................................... 19

   D.   Plaintiff states actionable claims for negligence. ....................................................... 25

      1.   Defendants owed Plaintiff duties of care. .............................................................. 25

      2.   Plaintiff sufficiently alleges that PRET and Nan Ya proximately caused Plaintiff's injuries. .................................................................................................................... 31

      3.   Plaintiff alleges actionable damages. ..................................................................... 33

      4.   Plaintiff has not assumed the risk of PFAS contamination. ................................... 33

   E.   The "free public services doctrine" does not apply here, if it exists in South Carolina at all. ............................................................................................................................. 35

   F.   The Safe Drinking Water Act does not preempt Plaintiff's claims. ............................ 38

   G.   Defendants' causation arguments should be rejected. ................................................. 40

      1.   Plaintiff sufficiently alleges that its injuries are fairly traceable to Elevate's and Nan Ya's conduct. .......................................................................................................... 40

      2.   PRET's causation arguments are also unavailing. ................................................. 43

   H.   This Court has personal jurisdiction over RRD and SCD. ......................................... 46

1.     Because Plaintiff has voluntarily dismissed GFL and Waste Industries, the Court need not consider their motions. ..................................... 47

2.     North Carolina law governs Plaintiff's claims against RRD and SCD..................... 47

3.     This Court has personal jurisdiction over RRD and SCD. ...................................... 48

I.     Plaintiff properly seeks an award of attorney's fees and prejudgment interest. ........... 53

J.     This Court should not stay this case or decline jurisdiction. ....................................... 54

K.     The United States is not a necessary party.................................................................. 57

IV.     CONCLUSION............................................................................................................. 64

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2605523

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

## INDEX OF ACRONYMS

**Chemical Substances**

| | |
|---|---|
| **PFAS** | Perfluoroalkyl and polyfluoroalkyl substances. Refers to the entire body of synthetic chemicals known for their water-, grease- and stain-resistant properties. |
| **PFOS** | Perfluorooctane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOS. |
| **PFOA** | Perfluorooctanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOA. |
| **PFNA** | Perfluorononanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFHxS** | Perfluorohexane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFBS** | Perfluorobutanesulfonic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **HFPO-DA** | Hexafluoropropylene Oxide Dimer Acid. Also referred to as "GenX chemicals." <br><br> One of the six PFAS regulated under the Safe Drinking Water Act |
| **MCL PFAS** | Refers to all PFAS subject to maximum contaminant levels and maximum contaminant level goals under the Safe Drinking Water Act. Includes PFOA, PFOS, PFNA, PFHxS, PFBS, and HFPO-DA (aka "GenX chemicals") |

**Regulatory and Legal Terms**

| | |
|---|---|
| **DES** | South Carolina Department of Environmental Services, formerly known as the Department of Health and Environmental Control ("DHEC"). |
| **MCL** | Maximum Contaminant Level. Enacted and enforced pursuant to regulations passed under the Safe Drinking Water Act. Stands for the maximum allowable level of a contaminant that a public water system may deliver to a user. |
| **MCLG** | Maximum Contaminant Level Goal. Enacted pursuant to regulations passed under the Safe Drinking Water act. Stands for the maximum level of |

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2605523

| | a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons will occur. |
|---|---|
| **SDWA** | Safe Drinking Water Act. The congressional legislation authorizing regulations that, among other things, set MCLs and MCLGs. |
| **SCSDWA** | South Carolina Safe Drinking Water Act. The state-level analogue to the SDWA. |
| **WWTP** | Wastewater Treatment Plant. A facility that receives wastewater from residential and/or industrial users. |
| **SWTP** | Surface Water Treatment Plant. A facility used by public water systems, like Plaintiff, that withdraws water from a water source, treats the water to make it fit for human consumption, and distributes the water to users. |

## I.  FACTUAL BACKGROUND

For decades, Defendants have knowingly and recklessly poisoned the Pee Dee River Watershed,[2] the Waccamaw River, and the Intracoastal Waterway with toxic per- and polyfluoroalkyl substances ("PFAS"). Plaintiff relies on these vital water sources to supply potable drinking water to over 100,000 South Carolinians. Second Amended Complaint ("Complaint"), ¶¶ 1–3. Defendants, all operators of industrial facilities, have systematically discharged PFAS into these waters, causing pervasive and ongoing contamination that threatens the health of these residents and undermines Plaintiff's use of its properties, including its water treatment and distribution infrastructure. *Id.* at ¶¶ 4–6, 48–62. Defendants' pollution has rendered Plaintiff's water treatment systems incapable of producing water free from chemicals that the Environmental Protection Agency ("EPA") deems unsafe for consumption, or that even meets the basic safety standards set by EPA. *Id.* at ¶¶ 7, 63–66.

Plaintiff is a special purpose district responsible for supplying safe drinking water to over 115,000 residents in Horry County. *Id.* at ¶¶ 2–3, 15–17. Plaintiff operates two surface water treatment plants ("SWTPs"): the Bull Creek SWTP and the Myrtle Beach SWTP. *Id.* at ¶ 16. The Bull Creek SWTP draws water from Bull Creek, which branches off the main stem of the Great Pee Dee River just upstream from the SWTP's intake, whereas the Myrtle Beach SWTP draws water from the Intracoastal Waterway.

Upstream from Plaintiff, at various locations within the Pee Dee River Watershed, Defendants—companies currently and formerly engaged in textile and other manufacturing operations—have utilized products that contain or degrade to PFAS in their industrial processes and discharge the resulting PFAS-containing wastewater either directly to surface waters or to

---

[2] By "Pee Dee River Watershed," Plaintiff refers to the Great Pee Dee River, Little Pee Dee River, Lynches River, Lumber River, Lake Swamp, Black Creek, Bull Creek, and the tributaries thereof.

1

municipal wastewater treatment plants ("WWTPs"). *Id.* at ¶¶ 4–5, 18–26, 51. In addition, some Defendants are engaged in waste management operations that generate PFAS-containing leachate wastewater, which these Defendants haul to an upstream WWTP for disposal. *Id.* at ¶¶ 22, 54. The treatment works used by "direct" discharger Defendants and the WWTPs that receive wastewater from "indirect" discharger Defendants use conventional methods that are ineffective at treating PFAS. *Id.* at ¶¶ 5, 18–26, 62. Therefore, Defendants' PFAS-contaminated wastewater passes through the treatment works into the Pee Dee River Watershed unabated, flowing downstream to Bull Creek. *Id.* at ¶¶ 48–55.

Plaintiff's Bull Creek and Myrtle Beach SWTPs were never designed to, and in fact do not, remove PFAS. *Id.* at ¶¶ 6, 56, 61, 63–66. The same is true of the Bucksport Regional WWTP and Conway WWTP that Plaintiff also operates. *Id.* at ¶¶ 57–60. "Because the Bull Creek SWTP cannot remove Defendants' PFAS from the water Plaintiff draws from Bull Creek, the water that sewer customers send to the Bucksport and Conway WWTPs remains contaminated with Defendants' PFAS." *Id.* at ¶ 59. The Bucksport and Conway WWTPs discharge Defendants' PFAS to the Waccamaw River, which carries the pollutants downstream to the Intracoastal Waterway, where they contaminate the Myrtle Beach SWTP and the drinking water Plaintiff treats at this facility. *Id.* at ¶¶ 60–61.

Defendants knew, or at least should have known, that their discharges of PFAS-containing wastewater would endanger downstream communities like Plaintiff's. *Id.* at ¶¶ 62, 66. The chemicals are colloquially termed "forever chemicals" because of their extraordinary persistence and resistance to breakdown via environmental mechanisms as well as most treatment methods to purify wastewater and drinking water. *Id.* at ¶¶ 5–6, 27–28. Once released into water sources, PFAS remain indefinitely, migrating through surface water and groundwater

2

and accumulating in human and animal tissues, which are the chemicals' ultimate environmental sink. *Id.* at ¶¶ 28, 30, 32. Nevertheless, the very persistence and chemical stability that make PFAS such an environmental menace also make them attractive for industrial applications like Defendants'. *Id.* at ¶¶ 27–28.

EPA and numerous scientific studies have linked exposure to PFAS to serious adverse human health effects, including kidney, testicular, and liver cancer; immune system suppression; thyroid disorders; liver damage; and reproductive and developmental harm, particularly in infants and pregnant women. *Id.* at ¶¶ 33, 38–40, 42. Guided by the evolving science, EPA issued health advisories for the two most studied PFAS compounds, perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), in 2009 and 2016. *Id.* at ¶¶ 36–38. In 2022, the agency dramatically reduced the health advisory levels for these compounds to near zero parts per trillion ("ppt"). *Id.* at ¶¶ 39–40. Finally, in April 2024, EPA issued its first ever binding regulatory limit for PFAS in drinking water—setting "maximum contaminant levels" ("MCLs") at 4 ppt for PFOA and PFOS and at 10 ppt for perfluorononanoic acid ("PFNA"), perfluorobutane sulfonate ("PFBS"), perfluorohexane sulfonate ("PFHxS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals"), and using a "hazard index" approach to control mixtures of PFNA, PFBS, PFHxS, and GenX Chemicals. *Id.* at ¶¶ 45–46. EPA also set a purely health-based "maximum contaminant level goal" ("MCLG") for PFOA and PFOS at zero ppt—reflecting the fact that there is no safe level of exposure to these compounds. *Id.* at ¶¶ 41–42, 46. The MCLs compliance is due by April 2029. *Id.* at ¶ 47.

As a direct and foreseeable result of Defendants' improper, ongoing use and disposal of PFAS, Plaintiff's properties have been contaminated by Defendants' PFAS—including their land, SWTPs, and supporting infrastructures. *Id.* at ¶¶ 63–66. Worse, Plaintiff cannot currently provide

3

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

potable drinking water that is free of these toxic chemicals. *Id.* at ¶ 63. Plaintiff now suffers, and will continue to suffer, significant property injuries resulting in enormous operational and financial burdens. *Id.* at ¶ 65. Plaintiff seeks both monetary and equitable relief to remedy the past, present, and future PFAS contamination of its properties and protect its community from the consumption of Defendants' PFAS. *Id.* at ¶¶ 6–7, 74–77, 86–89, 99–101, 110, Prayer for Relief.

## II.  STANDARD OF REVIEW

"Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action." *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). "In considering such a motion, the trial court must base its ruling solely on allegations set forth in the complaint." *Id.* "If the facts and inferences drawn from the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, would entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to state a claim is improper." *Id.* "A motion to dismiss under Rule 12(b)(6) should not be granted if facts alleged and inferences reasonably deducible therefrom entitle the plaintiff to relief under any theory." *Id.* "When considering such motion, the court must regard all properly pleaded factual allegations as admitted." *Falk v. Sadler*, 341 S.C. 281, 286, 533 S.E.2d 350, 353 (Ct. App. 2000). "It is a well-settled principle that in resolving a Rule 12(b)(6) motion to dismiss, the court is limited to a consideration of the allegations contained within the four corners of the complaint." *Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 559, 713 S.E.2d 604, 608 (2011).

Pleadings are to be liberally construed "to do substantial justice to all parties." *Quality Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000) (quoting Rule 8(f), SCRCP). "The purpose of pleadings is to place the adversary on notice as to what the issues

are." *Langston v. Niles*, 265 S.C. 445, 455, 219 S.E.2d 829, 833 (1975). Rule 8, SCRCP, "requires a litigant to plead the ultimate facts which will be proved at trial, not the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987). "Ultimate facts fall somewhere between the verbosity of evidentiary facts and the sparsity of 'legal conclusions.'" *RoTec Servs., Inc. v. Encompass Servs., Inc.*, 359 S.C. 467, 473, 597 S.E.2d 881, 884 (Ct. App. 2004) (quoting *Watts v. Metro Sec. Agency*, 346 S.C. 235, 240, 550 S.E.2d 869, 871 (Ct. App. 2001)). A motion to dismiss should not be granted "if facts sufficient to constitute a cause of action can be fairly gathered from the complaint, however uncertain, defective, or imperfect the allegations of the complaint may be." *Riedman Corp. v. Jarosh*, 289 S.C. 191, 192, 345 S.E.2d 732, 733 (Ct. App. 1986). "Further, a judgment on the pleadings is considered to be a drastic procedure by our courts." *Russell v. City of Columbia*, 305 S.C. 86, 89, 406 S.E.2d 338, 339 (1991).

Rule 12(b)(6) permits the trial court to address the sufficiency of a pleading stating a claim, but it is not a vehicle for addressing the underlying merits of the claim. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925, (S.C. App. 2021).

### III. ARGUMENT

**A.    Plaintiff's claims for relief are justiciable.**

Defendants' primary grounds for dismissal are that Plaintiff's claims are not justiciable—reasoning that Plaintiff will suffer no injury until the compliance deadline for PFAS MCLs arrives. Domtar MIS, at 3–5; Elevate MIS, at 3–6; Fiber MIS, at 5–6; GFL MIS, at 8–10; Mohawk MIS, at 4–5; Nan Ya MIS, at 4–8; PRET MIS, at 8–9; RRD MIS, at 7–9. This argument is easily resolved, and its flaws immediately apparent:

> (1)    *It distorts Plaintiff's claims.* Defendants recast Plaintiff's case as fundamentally concerning regulatory compliance issues rather than what they actually are: straightforward state-law claims arising from past, present, and future property

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

injuries. South Carolina law unquestionably empowers Plaintiff to seek redress for them.

(2) *It is inherently self-contradictory.* Defendants assert that Plaintiff's only injuries are its need to comply with PFAS MCLs. But if the financial burdens of MCL compliance were Plaintiff's injuries—and they are not—Plaintiff would still have standing under Defendants' own premise.

### 1.     Plaintiff clearly has standing to seek relief for past, present, and future property injuries.

Defendants argue that because enforcement of PFAS MCLs will not begin until April 2029, Plaintiff's obligations to comply remain speculative. They also cite pending litigation in the D.C. Circuit[3] to suggest that the PFAS MCLs might change, further speculating that any injury Plaintiff faces is uncertain. Both contentions fail for the same reason: they assert, contrary to the pleadings, that Plaintiff's injuries arise from regulatory obligations rather than from Defendants' ongoing contamination of their properties.

Plaintiff's complaint speaks for itself. These are not regulatory compliance claims but straightforward state-law causes of action based on Defendants' ongoing contamination of its land, SWTP, infrastructure, and water sources with PFAS chemicals. *See* Complaint, ¶¶ 1–7, 67–111. According to the nation's leading authority on environmental science and public health, no level of these chemicals—PFOA and PFOS in particular—is safe for human consumption.[4] And

---

[3] *See Am. Water Works Ass'n v. Env't Prot. Agency*, No. 24-118 (D.C. Cir. Oct. 7, 2024).

[4] Notably, neither EPA's scientific findings concerning PFOA and PFOS, nor its MCL Goal of zero ppt for each chemical, is challenged in the D.C. Circuit litigation that Defendants emphasize. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734 (D.C. Cir. Oct. 7, 2024); **Ex. 2**, Br. for Pet'rs Nat'l Ass'n of Mfrs., Am. Chemistry Council, and The Chemours Co., *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078731 (D.C. Cir. Oct. 7, 2024). Instead, the parties challenge MCLs for mixtures PFHxA, PFNA, PFBS, and GenX Chemicals, and they complain that EPA's enforceable limits for PFOA and PFOS were too close to the MCL Goals to be economically feasible, posing risks to water affordability. *See id.*; *see also* **Ex. 3**, Resp't Proof Br., No. 24-1188, Doc. 2091318 (D.C. Cir. Dec. 23, 2024) (EPA brief, highlighting that "no Petitioner has

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603528

according to the operative pleadings, Defendants knew this well before EPA publicized it, and they have in the past and continue to introduce them into Plaintiff's properties and water sources. *See* Complaint, ¶¶ 63–66.

The injuries resulting from Defendants' contamination are not hypothetical—they are real, present harms. Among other injuries, Plaintiff has:

- lost the ability to supply water free from unsafe concentrations of PFAS, *id.* at ¶ 83;

- incurred significant costs in investigating and identifying the sources of PFAS contamination, *id.*;

- suffered the presence of hazardous chemicals in its water treatment plants, supporting infrastructure, and water sources, which they have a legal right to use, *id.*; and

- experienced diminution in property value. *Id.*

Nothing about these injuries is "conjectural" or "contingent" on future events.[5] *See Jowers v. S.C. Dep't of Health & Env't Servs.*, 423 S.C. 343, 353, 815 S.E.2d 446, 451 (2018). Courts routinely recognize chemical contamination of private property as a property injury. *See infra* §§ B, C, D.

Ripeness and standing, though distinct, "boil down to the same question" here: whether Plaintiff has already sustained an actual injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007))

---

articulated any challenge to EPA's regulatory determinations for PFOS and PFOA or its Goals for those contaminants").

[5] Several Defendants selectively isolate Plaintiff's allegations that it will incur "expenses associated with future acquisition, installation, and operation" of PFAS filtration for the dual propositions that (1) these are the only damages Plaintiff seeks and (2) these damages hinge on the need to comply with MCLs. *See, e.g.,* Fiber MIS, at 6; GFL MIS, at 9; Mohawk MIS, at 4–5. Both are plainly false. *See* Complaint, ¶ 72, 74, 83, 86, 101, 110. In reality, Plaintiff listed the expenses of installing treatment technologies to remove Defendants' PFAS as one of many "special injuries" it has incurred that are different "in kind" from the public's injury of being exposed to Defendants' PFAS in drinking water. *Id.* at ¶ 83.

7

(standing and ripeness can merge when the issue is whether an injury has occurred); *Crescent Homes SC, LLC v. CJN, LLC*, 2024 WL 4831180, at *7 (S.C. Nov. 20, 2024) (South Carolina justiciability principles align with federal "case or controversy" requirements). Under the operative pleadings and controlling law, the only answer is yes.

Defendants cannot rewrite Plaintiff's complaint to suit their motions. The allegations set forth ongoing and future property injuries from PFAS contamination—not injuries tied to the burdens of complying with a regulatory standard. Taking the pleadings as alleged, as the Court must, resolves the question of justiciability.

### 2. Defendants' position is self-defeating.

Defendants' arguments do not just mis-frame this case. Even taking their framework at face value, it collapses under its own contradictions. Their principal authority, *American Water Works Association*, involves associations representing water authorities—like Plaintiff—challenging the PFAS MCLs. But Defendants miss why those associations have standing to do so: ***their members face concrete, imminent financial harm due to compliance costs***. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734, at 15–17 (D.C. Cir. Oct. 7, 2024);[6] *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592–93 (D.C. Cir. 2023). Thus, even under Defendants' own framing—that Plaintiff's injuries stem only from MCL compliance—the very litigation they cite demonstrates why Plaintiff would have standing to act now. *See id.*

Defendants cannot have it both ways: Plaintiff's case cannot be unripe based on litigation acknowledging the present, ***ripe*** financial burdens imposed by MCL compliance. As that

---

[6] EPA has not challenged the associations' standing. *See* **Ex. 3**, Resp't Proof Br., *Am. Water Works Assoc.*, No. 24-118, Doc. 2091318.

litigation shows, compliance is neither remote nor contingent. EPA itself recognizes that it demands significant, long-term capital improvements:

> For purposes of this [economic analysis], the EPA assumes that the [PFAS MCLs] will be promulgated in 2024. As the final rule will grant a 2-year nationwide extension date for MCL compliance, this analysis assumes that capital improvements *(i.e., installation of treatment technologies)* for systems taking action under the rule take effect five years after the date on which the regulations is promulgated, or in 2029.

**Ex. 4**, U.S. Env't Prot. Agency, *Econ. Analysis for the Final Per- and Polyfluoroalkyl Substances Nat'l Primary Drinking Water Regul.*, at 2–3 (2024), EPA Doc. No. EPA-815-R-24-001 (emphasis added) (hereafter "*Economic Analysis*"); *see also* U.S. Env't Prot. Agency, *PFAS Nat'l Primary Drinking Water Regul.*, 89 Fed. Reg. 32532, 32533 (2024) ("EPA is extending the compliance deadline for all systems nationwide to meet the MCL to allow additional time for capital improvements."). This process is extensive, costly, and time-consuming. Among other things, it requires pilot programs to test treatment methods, engineering analyses to evaluate and select the best treatment option, facility design, bidding and contract negotiations, material procurement, and full-scale construction. *See Econ. Analysis*, Table 5-11 (setting out cost elements for implementing water treatment upgrades). History teaches that this takes years.[7] Defendants' notion that Plaintiff must wait until April 26, 2029 is belied by their own reasoning.

---

[7] For example, in the building phase alone, it took the West Morgan – East Lawrence Water & Sewer Authority over four years to complete its new reverse osmosis treatment facility designed to remove PFAS. *See* WHNT News 19, *Lawsuit funded water treatment plant being built in Lawrence County* (Feb. 17, 2020) (construction begins in Feb. 2020), *available at* https://whnt.com/news/lawsuit-funded-water-treatment-plant-being-built-in-lawrence-county; W. Morgan – E. Lawrence Water & Sewer Auth., *JD Sims – RM Hames Water Facility* (distribution of reverse osmosis-treated water begins May 1, 2024), *available at* https://dev.dv1ojdbghmtyn. amplifyapp.com/JDsimsRMHamesWaterFacility. And despite completing its pilot program in April of 2018, Brunswick County, North Carolina has still not completed construction of its reverse osmosis system. *See* Brunswick Cnty, N.C., *Gen-X / PFAS Information FAQs - What is Brunswick County doing to remove PFAS contaminates from drinking water?* (initiated pilot program to determine best method to remove PFAS from drinking water, choosing reverse osmosis), *available at* https://www.brunswickcountync.gov/ Faq.aspx?QID=447; Brunswick

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

Defendants' true position is this: they speculate that Plaintiff's already-ripe case might become moot[8] if regulations change. That is not how justiciability works. Since *Marbury v. Madison*, 5 U.S. 137 (1803), courts adjudicate existing disputes like this one. The only "hypothetical" posed is a change in existing, legally binding law. Defendants' position turns Article III on its head.

**B.      Plaintiff states actionable claims for trespass.**

**1.      The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law.**

Defendants argue that Plaintiff alleges only invasions of intangible substances that do not amount to trespass under South Carolina law. *See* Domtar MIS, at 5–7; Elevate MIS, at 9–11; Fiber MIS, at 7–8; GFL MIS, at 12–13; Mohawk MIS, at 8–9; Nan Ya MIS, at 12–13; PRET MIS, at 14–15; RRD MIS, at 11–12. They rely on *Babb v. Lee Cnty. Landfill SC, LLC*, where the South Carolina Supreme Court answered various certified questions on property-related torts. 405 S.C. 129, 747 S.E.2d 468 (2013). As to trespass, the *Babb* court held that South Carolina law does not recognize a claim arising "solely from invisible odors" because the law requires "intrusions by physical, tangible things." *Id.* at 144-52, 747 S.E.2d at 476-80. Defendants maintain that "PFAS molecules" are intangible, "microscopic" particles that fall outside this threshold. *See, e.g.,* Mohawk MIS, at 9; RRD MIS, at 11.

---

Cnty., N.C., *Northwest Water Treatment Plant Expansion & Reverse Osmosis Treatment Upgrades* (reverse osmosis will be operational by spring 2025).

[8] Mootness is a third component of justiciability, where a case for which a plaintiff has standing at its outset becomes moot due to events that occur during the case's pendency. *See Sloan v. Greenville Cnty.*, 356 S.C. 531, 547, 552, 590 S.E.2d 338, 347, 349 (2003). By arguing that the MCLs might change in a way that affects Plaintiff's case, Defendants are masking mootness under the veil of ripeness.

At least one South Carolina court has explicitly rejected Defendants' argument. In *State of South Carolina v. 3M Company*, the Richland County Court of Common Pleas distinguished *Babb* in this way:

> [The State]'s trespass claim does not stem from an invisible odor, but rather from identifiable and measurable amounts of PFAS product resulting in contamination that the State alleges, unlike a temporal disturbance of odor or quickly dissipating particulate, persists in the environment and contaminates the State natural resources and property "indefinitely."

**Ex. 5**, Order, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111, at 6 (S.C. Ct. Comm. Pl. July 23, 2024).

The same holds true here, but these cases are even further removed from *Babb*. Defendants have discharged **wastewater** or **leachate** carrying **PFAS products**—indisputably tangible substances—into Plaintiff's properties. *See* Complaint, ¶¶ 2–5, 18–26, 92–101. Before and after *Babb*, South Carolina courts have repeatedly held that chemical contamination via water is actionable trespass, even if individual contaminants are microscopic. *See, e.g.*, *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 423, 453 S.E.2d 908, 912 (1995) (noting that jury returned trespass verdict in favor of plaintiffs whose properties were either within plume of chemically-contaminated groundwater, or adjacent to contaminated creek); *Kelly v. Para-Chem S., Inc.,* 311 S.C. 223, 224-26, 428 S.E.2d 703, 704 (1993) (affirming jury verdict on trespass via groundwater contamination); *Weatherford v. E.I. du Pont & Co.*, 2023 WL 11015357, at \*5 (Sept. 27, 2023) (plaintiff stated claim for trespass under South Carolina law involving PFAS contamination via wastewater discharges to river and agricultural sludge); *Tillman v. Highland Indus., Inc.*, 486 F. Supp. 3d 1026, 1040–41 (D.S.C. 2020) (under South Carolina law, plaintiff stated trespass claim concerning PCB contamination of plaintiff's property via stormwater discharge pipe); *Shockley v. Hoechst Celanese Corp.*, 793 F. Supp. 670, 672–74 (D.S.C. 1992) (under South Carolina law, a jury can find a trespass where defendant's chemicals migrated to

11

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

ELECTRONICALLY FILED – 2025 Mar 28 4:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2605523

plaintiff's land through groundwater), *aff'd*, 996 F.2d 1212 (4th Cir. 1993) (affirming plaintiff's verdict on trespass); *see also In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995) (under South Carolina law, whether defendant trespassed onto Plaintiff's properties with TCE-contaminated groundwater submitted to jury); *c.f. Babb*, 405 S.C. at 143, 747 S.E.2d at 476 (labeling water a "physical invasion").

Defendants' misconstruction of *Babb* ignores decades of precedent recognizing that chemical contamination via water is a physical invasion sufficient for trespass. According to Plaintiff's allegations—which must be accepted as true at this stage—Defendants' products and wastewater physically invaded and altered Plaintiff's properties (and continue to do so). Complaint, ¶¶ 18–26, 51–64, 92–101. This is classic trespass under South Carolina law.

**2.    Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiff's properties constitute affirmative, intentional acts.**

Defendants also claim that Plaintiff's allegations foreclose any finding that they affirmatively or intentionally intruded onto Plaintiff's properties. Domtar MIS, at 7–8; Elevate MIS, at 12–13; Fiber MIS, at 8–10; GFL MIS, at 14–15; Mohawk MIS, at 9–10; Nan Ya MIS, at 14–16; PRET MIS, at 15–17; RRD MIS, at 13–14. They reason that intent is necessarily absent because their PFAS-contaminated wastewater first passes through WWTPs and into the Pee Dee River Watershed and Waccamaw River before Plaintiff "voluntarily" withdraws it. *See id.* Defendants are mistaken: intent exists where, as alleged, they know the consequences of their affirmative acts.

There is no dispute here that, for actionable trespass, "there must be an affirmative act, the invasion of the land must be intentional, and the harm caused must be the direct result of that invasion." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). But a trespasser need only "intend the act which constitutes the unwarranted entry onto another's

land"—he "need not intend the damaging consequence of his entry." *Id.* Thus, Plaintiff have sufficiently alleged intent "by showing that [Defendants] acted voluntarily" in their discharges and "that [they] knew or should have known the result that would follow": the entry into and contamination of Plaintiff's properties.[9]

Plaintiff alleges just that. Its complaint explicitly states that Defendants conducted their discharges when they knew or should have known:

- that their respective WWTPs cannot remove PFAS from their wastewater before they pass through to the Pee Dee River Watershed and Waccamaw River, in the case of industrial users of the Lake City, Johnsonville, and Lumberton WWTPs;

- that their PFAS wastewater is discharged directly to the Great Pee Dee River or Black Creek, in the case of direct dischargers of wastewater;

- Plaintiff draws water from Bull Creek and the Intracoastal Waterway for the provision of potable water to its customers;

- the water Plaintiff draws from both sources is contaminated with PFAS Defendants discharged; and

- water contaminated with their PFAS products invades Plaintiff's properties.

Complaint, ¶¶ 51–62, 92–93. This is more than sufficient to allege affirmative, intentional acts under South Carolina law. Defendants' primary authority is easily distinguished on this very ground—where the plaintiff *admitted* that the defendant lacked the requisite intent. *See Snow*, 305 S.C. at 554, 409 S.E.2d at 802-03 ("Mr. Snow himself testified that the City did *not* intentionally allow the water to escape onto his property.").

---

[9] Most Defendants point out that Plaintiff lacks the right of exclusive possession of Bull Creek, the Intracoastal Waterway, and upstream surface waters. *See, e.g.,* Domtar MIS, at 6–7; Elevate MIS, at 11–12. This is true but irrelevant. Plaintiff never alleged a trespass of Bull Creek or the Intracoastal Waterway, but instead that Defendants trespassed "into Plaintiff's properties, including its land, SWTP, and related buildings, improvements, and equipment that make up its water distribution system." Complaint, ¶ 99.

13

The fact that some Defendants' contaminated wastewater first passes through their WWTPs—or that other Defendants' direct discharges take place many miles upstream—does not negate their intent. As numerous cases show, where a defendant knows or should know an invasion will occur as a result of its conduct, then the requisite intent is established—regardless of intervening events.[10] *See Weatherford*, 2023 WL 11015357, at *5 (where supplier of PFAS products knew of PFAS hazards and the textile processes used by their customers that results in their discharge to surface waters, continuing sale without warning and concealing the dangers was sufficiently affirmative and intentional for trespass); *Comm'rs of Pub. Works of Charleston v. Costco Wholesale Corp.*, 2021 WL 5908758, at *8 (D.S.C. Dec. 13, 2021) (defendants' sale of mislabeled flushable wipes are "affirmative or willful acts, even if the actual flushing of the wipes into the Plaintiff's sewer system is done by third parties"); *Shockley*, 793 F. Supp. at 673–74 (jury could find trespass where defendant intentionally delivered hazardous chemicals to independent chemical reclamation facility, from which defendant knew or should have known the chemicals invaded Plaintiff's properties). This case is no different: the controlling allegations state that Defendants knew their PFAS products passed through their applicable WWTPs and invaded Plaintiff's properties. Complaint, ¶¶ 51–62, 92–93.[11]

---

[10] This aligns with fundamental principles of causation. "An intervening force may be a superseding cause that relieves an actor from liability, but *for there to be relief from liability, the intervening cause must be one that could not have been reasonably foreseen or anticipated*" by the actor. *Glenn v. 3M Co.*, 440 S.C. 34, 74, 890 S.E.2d 569, 590 (2023) (quoting *Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 590, 784 S.E.2d 670, 676 (2016)).

[11] Defendants' appeal to Alabama trespass law also fails. Many cite *Utilities Bd. of Tuskegee v. 3M Co.*, 2023 WL 1870912, at *16 (M.D. Ala. 2023) for the proposition that trespass must occur by "natural process" instead of withdrawal from Bull Creek and the Intracoastal Waterway. Nothing in South Carolina law requires that trespass occur by "natural process"—a trespass occurs where a defendant affirmatively acts and knows or should know that an intrusion will occur. *See Snow*, 305 S.C. at 553, 409 S.E.2d at 802; *Weatherford*, 2023 WL 11015357, at *5; *Costco*, 2021 WL 5908758, at *8. Likewise, Alabama law allows consent to trespass even where obtained by fraud or mistake—precisely what 3M argued in *Tuskegee*. *See Tuskegee*, Def. 3M

Several Defendants frame Plaintiff's water withdrawal as an issue of consent or authorization instead of intent, arguing that withdrawing water from Bull Creek and the Intracoastal Waterway *authorizes* the invasion of their PFAS-contaminated wastewater. *See* Mohawk MIS, at 9 ("Plaintiff *voluntarily* draws water into its facility by activating its pumps."). Defendants cite no authority for this radical proposition. By that logic, any water provider consents to chemical contamination simply by performing its essential function—even when that contamination directly compromises its purpose.

Even if Plaintiff implicitly authorized some water to enter its properties, that does not extend to the wrongful introduction of PFAS-contaminated wastewater. *See* Complaint, ¶ 148. On the contrary, consent is no defense when an entry abuses or exceeds the scope of authorization. *See Costco*, 2021 WL 5908758, at *8 (flushing mislabeled wipes into the plaintiff's sewer system not authorized and invited because "consent to enter property is not a defense to trespass 'if a wrongful act is done in excess of and in abuse of authorized entry'" (*quoting Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999) (applying South Carolina law)). Defendants identify nothing in the pleadings suggesting that Plaintiff knew of and consented to entry of harmful PFAS that their treatment systems cannot remove. In fact, the only pleadings on this issue are Plaintiff's *express disavowals* of consent. *See* Complaint, ¶ 148.

Plaintiff alleges all that is required to state a claim for trespass. Defendants affirmatively and intentionally discharged PFAS-contaminated wastewater, knowing it would ultimately

---

Co.'s Mot. to Dismiss, 2022 WL 18357105 (Oct. 3, 2022); *see also Evans v. Walter Indus., Inc.*, 579 F. Supp. 2d 1349, 1370 (N.D. Ala. 2008) ("The alleged contamination with hazardous substances, even if fraudulently concealed by Defendants, does not negate the Plaintiff's consent. Even consent procured by fraud will negate a trespass claim."). Not so in South Carolina. *See Costco*, 2021 WL 5908758, at *8.

15

invade Plaintiff's properties. The paths their contaminated wastewater followed were known, predictable, and foreseeable; and the performance of Plaintiff's routine operations in no way authorizes the entry of hazardous chemicals.

**C.    Plaintiff states actionable claims for public and private nuisance.**

   **1.    Plaintiff alleges that Defendants controlled their properties and products that cause the contamination of Plaintiff's properties and upstream surface waters.**

Both operators of separate landfills, RRD and SCD argue that they lacked the requisite "control" over the source of the nuisance. RRD MIS, at 9–10. They emphasize that "nuisance law is a mechanism for resolving 'conflicting interests of ***landowners***,'" RRD MIS, at 9, and since they send PFAS-contaminated leachate[12] to the Lumberton WWTP, they contend that they lack the requisite control. *Id.* Put plainly, Defendants disclaim control over their PFAS-contaminated leachate that they continually dispose of to maintain an ongoing PFAS contamination. The argument defeats itself: Defendants assert powerlessness over a problem they not only created but actively perpetuate.

RRD and SCD rest their argument on a flawed premise that they merely sent PFAS-contaminated leachate to the Lumberton WWTP, and the nuisance occurs only when the WWTP releases their PFAS. *Id.* at 9. This reduces to one misdirection: labelling the Lumberton WWTP's property as the source of the PFAS contamination instead of their own. *See* Complaint, ¶¶ 22, 54–62.  This deflection is an artificial attempt to sever control that, in reality, masks a misplaced causation argument.

---

[12] Leachate is the polluted wastewater that forms when rain or other liquids seep through landfilled wastes, carrying chemicals and other pollutants with it.
.

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

Defendants principally rely on *Clark v. Greenville County*, but *Clark* exposes their sleight-of-hand. There, plaintiffs asserted nuisance claims against corporate defendants that sent hazardous chemicals to a landfill, which contaminated the Plaintiff's nearby properties. 313 S.C. at 209, 437 S.E.2d at 119. The *Clark* court explained:

> Generally, a private nuisance is "that class of wrongs that arises from the unreasonable, unwarrantable, or unlawful use by a person *of his own property, personal or real.*" Nuisance law is based on the premise that "[e]very citizen holds his property subject to the implied obligation that he will use it in such a way as not to prevent others from enjoying the use of their property."

*Id.* (quoting *Peden v. Furman Univ.*, 155 S.C. 1, 16, 151 S.E. 907, 912 (1930)).

Upholding the trial court's summary judgment in the defendants' favor, the court reasoned that the plaintiffs "neither alleged nor produced any evidence [that] the [defendants] had control over the landfill or the hazardous waste once it was deposited at the landfill." *Id.* at 210, 437 S.E.2d at 119. Thus, the defendants "could not be liable for nuisance because they had no control over ***the property allegedly used as a nuisance***." *Id.* (emphasis added).

*Clark*'s reasoning certainly applies, but not in the way that Defendants' claim. The "property allegedly used as a nuisance" here does not belong to the WWTPs, which received Defendants' contaminated leachate, but to Defendants themselves.[13] Here, Defendants ***are the landfill***, and they control the PFAS-contaminated leachate that they send from their own properties to the Lumberton WWTP, aware that the PFAS passes through to Plaintiff's properties. Complaint, ¶¶ 22, 54. According to the operative pleadings, Defendants knowingly use their "own property, personal [and] real" in a way that "prevent[s Plaintiff] from enjoying the use of

---

[13] Defendants cannot unilaterally redefine the "property allegedly used as a nuisance" to be the Lumberton WWTP. *See Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 557, 713 S.E.2d 604, 607 (2011) ("In considering a motion to dismiss pursuant to Rule 12(b)(6), SCRCP, the circuit court must base its ruling solely upon the allegations set forth on the face of the complaint.").

17

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

[its] property." *Clark*, 313 S.C. at 209, 437 S.E.2d at 119. Holding them responsible is not only consistent with *Clark*—it is precisely what *Clark* demands.

Defendants repeatedly send their own PFAS-contaminated leachate from their own landfills, fully aware that it bypasses the WWTPs ***unchanged*** and flows directly into surface waters and Plaintiff's properties. *See* Complaint, ¶¶ 22, 50, 54–62. Yet Defendants fragment their control into isolated snapshots—where it exists only at the moment of their custody and vanishes the moment it enters the WWTP. This strains credulity. The Lumberton WWTP does not add to, modify, or affect Defendants' PFAS in any way, and it merely passes through what Defendants introduce. Complaint, ¶ 22. Defendants' position would allow industrial polluters to endlessly discharge toxins to surface waters yet have "no control" because the current carries them downstream. *See infra* at 23 n.17 (compiling nuisance cases of downstream contamination). *Clark* does not support—let alone require—this absurd result.

In the end, Defendants' argument is not about control. They do not even dispute that they own the Red Rock Disposal and Sampson County Landfills or that they control the PFAS-contaminated leachate they send to the Lumberton WWTP. Shifting blame to the WWTP does nothing to extinguish their control over what Plaintiff alleges are the sources of the nuisance—it merely proposes that the WWTP is a superseding cause. But where Defendants knowingly send PFAS-contaminated leachate into a system they knew did not remove PFAS—as the controlling allegations say—this too fails as a matter of law. *See Glenn*, 440 S.C. at 74, 890 S.E.2d at 590, *supra* at 14 n.10; *Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (1989) ("In order to constitute an actionable nuisance, a wrongful act of the defendant must

18

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2601523

be shown and the maintenance of the nuisance must be the natural and proximate cause of the injury suffered by the plaintiff." (citation omitted)).[14]

> **2. Plaintiff has suffered private property injuries that confer rights of action for both private and public nuisance.**

Because the Pee Dee River Watershed, the Waccamaw River, and the Intracoastal Waterway are "public water bodies," Defendants also assert that Plaintiff suffers no private property injuries that could support either a public or private nuisance. Domtar MIS, at 5; Elevate MIS, at 7–8; Fiber MIS, at 10; GFL MIS, at 11–12; Mohawk MIS, at 6–7; Nan Ya MIS, at 9–10; PRET MIS, at 8–9; RRD MIS, at 10–11. Defendants ignore Plaintiff's allegations to manufacture grounds for dismissal. The pleadings clearly establish that Defendants' contamination directly injures Plaintiff's private properties—precisely the injuries required for both private and public nuisance. *See, e.g., Overcash v. S.C. Elec. and Gas Co.*, 364 S.C. 569, 573, 614 S.E.2d 619, 620-21 (2005).

The "well-beaten path" of South Carolina nuisance law provides a clear and consistent framework. *Id.* Like trespass, private nuisance protects property interests—but while trespass protects exclusive possession, nuisance law remedies interferences with use and enjoyment. *Babb*, 405 S.C. at 139, 747 S.E.2d at 473.

---

[14] PRET asserts a similar control argument without citation to authority. *See* PRET MIS, at 10. The same reasoning forecloses dismissal for PRET: it owns and controls the PFAS products and its facility from which it discharges those products, knowing that they bypass the Johnsonville WWTP and continually contaminate Plaintiff's properties adjacent to Bull Creek and its supporting infrastructure. Complaint, ¶ 26, 62, 65–66. PRET also states that it could not have interfered with Plaintiff's use of its property adjacent to the Intracoastal Waterway and its Myrtle Beach SWTP because the Johnsonville WWTP does not discharge upstream of either. PRET MIS, at 10. Plaintiff's complaint explains why this is incorrect. Complaint, ¶¶ 68–69. The same PFAS that bypass the Johnsonville WWTP and Plaintiff's Bull Creek SWTP, and ultimately flow to customers' taps, also flow in the sewer water received by Plaintiff's Bucksport and Conway WWTPs. *Id.* These WWTPs cannot remove PRET's PFAS any more than the Johnsonville WWTP, and they pass through to the Waccamaw River upstream of the Myrtle Beach SWTP. *Id.*

Public nuisances are distinct from private nuisances, not in the nature of the wrongful act, but in the rights and number of people affected. *Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22.[15] Public nuisance protects *public* rights—such as public order, health, and morals. *Id.* As such, public nuisances are by default redressable only by public authorities. *See id.* at 573–74, 614 S.E.2d at 621; *Burrell v. Kirkland*, 242 S.C. 201, 204, 130 S.E.2d 470, 471 (1963); *Bowlin v. George*, 239 S.C. 429, 434, 123 S.E.2d 528, 530 (1962). But if a public nuisance also causes "special injury" to an individual, that person has standing to sue both for his private injury and to abate the entire public nuisance. *See id.* [16]

Courts have "encounter[ed] difficulty" in defining "special injury" in both private and public nuisance contexts, but a consistent principle emerges. *Bowlin*, 239 S.C. at 432, 123 S.E.2d at 530. A private nuisance is actionable if it interferes with a private property right—even if many others suffer similarly. *Id.* at 434, 123 S.E.2d at 530–31 ("[A]n injury to private property . . . is in its nature special and peculiar, and does not cause a damage which can properly be said to be common or public, however, numerous may be the cases of similar damage arising from the same cause." (quoting *Wesson v. Washburn Iron Co.*, 95 Mass. 95, 103–04 (1866)); *accord Brown v. Hendricks*, 211 S.C. 395, 401, 45 S.E.2d 603, 605–06. The key distinction is whether

---

[15] *See also Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469 ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured."); *State v. Turner*, 198 S.C. 487, 18 S.E.2d 372, 376 (1942) (a public nuisance "affects the surrounding community generally or the people of some local neighborhood; it is sufficient if it operates upon such members of the public as are brought into contact with the conditions that constitute the alleged nuisance"); *Morison v. Rawlinson*, 193 S.C. 25, 32, 7 S.E.2d 635, 638 (1940) ("A nuisance to be a public nuisance must be in a particular place or where the public frequently congregate, or where members of the public are likely to come within the range of its influence . . . .").

[16] This has been called a "mixed nuisance" because, "while producing injury to the public at large, [it] does some special damage to some individual or class of individuals." 23 S.C. Jur. Public Nuisance, § 4 (Feb. 2025) (citing *Deason v. S. Ry. Co.*, 142 S.C. 328, 338, 140 S.E.2d 575, 579 (1927)).

20

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2600523

the nuisance affects a *public* right (shared by all) or a *private* right (tied to property). *See Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31. Private property injuries are "special" because they involve specific, legal interests—not a general harm to the public. *Id.* at 435, 123 S.E.2d at 531 ("[Plaintiff] is not complaining of the violation of a right of a public nature or one held in common with the rest of the public. He alleges the invasion of a private right, namely, the interference with the reasonable enjoyment of his property and the depreciation in its value. We think it is quite clear that he is entitled to maintain this action.").

In the public nuisance context, courts ask whether the plaintiff's injury is "different in kind and not merely in degree from that suffered by the public at large." *Huggin v. Gaffney Dev.*, 229 S.C. 340, 344, 92 S.E.2d 883, 884–85 (1956). This aligns with private nuisance cases, highlighting the same "in kind" difference between public and private rights. *Id.* at 344–45, 92 S.E.2d at 884–85 (holding that a landowner adjacent to public road suffered an injury different in kind from the public because the obstruction of a public road deprived him of property access and economic value, whereas the public merely lost use of the road); *see also Jones v. Seaboard Air Line Ry. Co.*, 67 S.C. 181, 192, 45 S.E. 188, 192–93 (1903) (a landowner's rights to use riparian land undisturbed and to free access of the stream are different "in kind" from the public right to navigate the waterway). Indeed, the South Carolina Supreme Court recently reaffirmed that "special" injuries are those affecting real and personal property rights—not personal injury or public harms. *See Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22.

South Carolina law thus provides a firm foundation: a private property injury is inherently special because it implicates private property rights, not public ones. *See id.*; *Bowlin*, 239 S.C. at 432–34, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85. This means two things:

21

(1)    A private nuisance claim concerning private property injury is not barred merely because others suffer similar harm; and

(2)    A plaintiff with a private property injury suffers a harm "different in kind" from a violation of a public right.

These principles apply squarely to Plaintiff's nuisance claims. As an authorized water provider and property owner, Plaintiff uses its properties *specifically* to provide clean water to customers. Complaint, ¶¶ 68, 80. By saturating the Pee Dee River Watershed, Bull Creek, the Waccamaw River, Intracoastal Waterway, and even Plaintiff's plants and infrastructures with chemicals that EPA deems unsafe for consumption, Defendants have not just *interfered with* Plaintiff's property use—they have damaged Plaintiff's properties directly and *fundamentally compromised* their use and Plaintiff's essential business. Complaint, ¶¶ 63–66, 71–74, 82–88. The resulting injuries are both undeniable and expressly detailed in the pleadings, including:

- Plaintiff's inability to use its properties to provide its customers with drinking water free from Defendants' chemicals;

- the costs of investigating the cause of the contamination and upgrading Plaintiff's facilities so that it can remove Defendants' chemicals; and

- diminution in property value.

*Id.* These are not "general public" harms; they are discrete, property-based injuries recognized under South Carolina law. *See Babb*, 405 S.C. at 129–144, 747 S.E.2d at 472–76; *Bowlin*, 239 S.C. at 434–35, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

In the face of these well-pleaded injuries, Defendants miss the point by focusing on the subject surface waters being "public waters." While the surface waters at issue may be "public," the property injuries alleged are *private*. And a century of South Carolina caselaw confirms that contaminating public waters still results in private injury when it interferes with private property rights. *See, e.g., Johnson*, 317 S.C. at 422, 453 S.E.2d at 912–13 (Defendants' chemicals migrated not only through groundwater, but also down creek and injured property of several

22

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2601523

plaintiffs adjacent to creek); *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96 (holding that a riparian landowner adjacent to a navigable waterway suffered an injury different in kind from the public's lost navigational use, where obstructions altered the river's natural flow, causing direct harm to the landowner's property and agricultural use).[17]

Nor can Defendants equate Plaintiff's private injuries with the "injury allegedly suffered by the public at large." *See, e.g.,* Elevate MIS, at 9 (arguing Plaintiff's inability to supply PFAS-free water is the same as the public injury). The "injury allegedly suffered by the public at large" is community-wide exposure to PFAS-contaminated drinking water—a *public health* issue. Complaint, ¶¶ 81–82. *See Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22; *Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469. Plaintiff is not suffering this injury to greater "degree" than the public, e.g., by exposure to more PFAS than others, or by suffering PFAS-related illness. Needless to say, Plaintiff does not consume water at all. Instead, its lands, SWTPs, and infrastructures are directly subjected to chemical contamination, undermining their essential use and causing substantial devaluation—private property injuries "different in kind" to the public

---

[17] *See also Bailey v. Lyman Printing & Finishing Co.*, 245 S.C. 13, 17–24, 138 S.E.2d 410, 415 (1964) (even non-riparian landowners stated nuisance claim where gases from waste discharged to Middle Tyger River interfered with Plaintiff's use and enjoyment of their homes); *Conestee Mills v. City of Greenville*, 160 S.C. 10, 13–14, 158 S.E. 113, 114–15 (1931) (sewage contamination of the Reedy River flowed downstream, interfering with the plaintiff's use of its property adjacent to the river); *Duncan v. Union-Buffalo Mills Co.*, 110 S.C. 302, 306, 96 S.E. 522, 523–24 (1918) (sewage discharged to Buffalo Creek interfered with use and enjoyment of downstream land owners adjacent to Buffalo Creek); *Lowe v. Ottaray Mills*, 93 S.C. 420, 424–26, 77 S.E. 135, 136–37 (1913) (cotton mill discharged sewage to creek upstream of plaintiff's property, which rendered his land unfit for use as dairy farm); *Williams v. Haile Gold Mining Co.*, 85 S.C. 1, 5–7, 66 S.E. 117, 118 (1909) (chemically-contaminated mine tailings discharged to stream, interfering with downstream owner's ability to farm his land).

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2601523

drinking water exposure. *See Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85; *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96.[18]

Defendants' own authorities underscore the flaw in their arguments. They lean on cases where municipal water *customers* asserted private nuisance claims based on the PFAS contamination of water they purchased from their utilities. *See, e.g.,* Mohawk MIS, at 7 (citing *Rhodes v. E.I. du Pont de Nemours and Co.*, 636 F.3d 88, 92–93, 96–97 (4th Cir. 2011); *Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1233 (D. Mass. 1986)). Their holdings—that the interest in clean drinking water is only a public right—are both unremarkable and consistent with Plaintiff's own allegations. Plaintiff affirms that this as a public interest in its complaint— contrasting the public drinking water exposure from the direct contamination, devaluation, and interference with its own private properties and business operations. *Compare* Complaint, ¶¶ 81–82, *with id.* at ¶ 83. Defendants can neither ignore the property injuries that Plaintiff expressly alleges nor conflate them with the public exposure to PFAS-contaminated drinking water.

Defendants have indeed created and continue to maintain a public health issue affecting over a hundred thousand people within Plaintiff's community. But Plaintiff alone bears the burden of commercially supplying clean water, while its private properties suffer direct PFAS

---

[18] Defendants identify nothing inside or outside the pleadings showing that *any* other persons (1) withdraw water from Bull Creek and the Intracoastal Waterway, much less for the purpose of selling drinking water; (2) suffer direct property contamination; or (3) have suffered any property injury as a result of the contamination. Even if such persons exist, Plaintiff's injuries would still be different in kind from the public exposed to Defendants' PFAS in drinking water. *See Jones*, 67 S.C. at 191–202, 45 S.E. at 192–93 (alleged right violated was "not the right of navigation, or any other right which [the plaintiffs] held in common with the public, but the right to the unimpaired use of their lands on the banks of the river" as riparians); *see also Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22; *Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

contamination and interference with their essential functions. These are private, intimately unique, and "special" injuries that Defendants cannot ignore or circumvent.

**D.    Plaintiff states actionable claims for negligence.**

**1.    Defendants owed Plaintiff duties of care.**

Many Defendants uniformly cite the same or similar case law stating that a duty of care may only be created "by statute, a contractual relationship, status, property interest, or some other special circumstance" to argue that they owe Plaintiff no duty with respect to their discharge of PFAS. PRET MIS, at 17; Elevate MIS, at 14; RRD MIS, at 14; Nan Ya MIS, at 16; Mohawk MIS, at 11; Fiber MIS, at 12; GFL MIS, at 15; Domtar MIS, at 8. In doing so, however, they conflate two fundamental tenets of South Carolina tort law: (1) while an *affirmative* duty to act may only be created in certain circumstances, (2) once a party voluntarily undertakes an act, it must exercise due care in doing so.

Defendants rely on the false presupposition that Defendants are innocent third parties whom Plaintiff haled into court for their failure to remedy PFAS pollution caused (or not remediated) by others. This is not so. Instead, by voluntarily engaging in their various industries, Defendants were required under South Carolina law to do so with due care. That is the duty underpinning Plaintiff's negligence claims, a duty long recognized in this State. *See Joyner v. S.C. Ry. Co.*, 26 S.C. 49, 51–52, 1 S.E. 52, 53 (1887) ("[T]he law has determined as a general rule . . . that the presence of due care negatives negligence, and that the absence of such care constitutes negligence."). This Court should not allow Defendants to obfuscate their roles in the pollution of South Carolina waters and attempt to escape liability through a distortion of South Carolina tort law.

A fair and complete statement of the law Defendants invoke is:

25

ELECTRONICALLY FILED – 2025 Mar 28 2:34 PM – HORRY – COMMON PLEAS – CASE#2024CP2605523

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

> An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance. Moreover, it has long been the law that one who assumes to act, even though under no obligation to do so, thereby becomes obligated to act with due care.

*Madison v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006) (citations omitted); *see also Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992) ("At common law, where there is no duty to act, but an act is voluntarily undertaken, the actor assumes a duty to use due care."); *Rayfield v. S.C. Dep't of Corr.*, 297 S.C. 95, 100–01, 374 S.E.2d 910, 913 (Ct. App. 1988) ("Ordinarily, the common law imposes no duty on a person to act. An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance. It follows that a person usually incurs no liability for failure to take steps to benefit others or to protect them from harm *not created by his own wrongful act*. In other words, a person has no duty to protect another from harm *inflicted by a third person*." (emphases added)).

Plaintiff does not allege that Defendants owed it a duty of care to control others, ensure a third party (such as a WWTP) removed PFAS from South Carolina waters, or warn Plaintiff about PFAS discharged by others. Instead, Plaintiff alleges that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others." Complaint, ¶ 103. Importantly, Plaintiff does not invoke an affirmative duty disconnected from the conduct Defendants voluntarily performed at their industrial facilities—the law thus requires no contract, statute, special relationship between Plaintiff and Defendants, or other prerequisite to establish their duties. *See Edward's of Byrnes Downs v. Charleston Sheet*

26

ELECTRONICALLY FILED – 2025 Mar 28 2:34 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

*Metal Co.*, 253 S.C. 537, 542, 172 S.E.2d 120, 122 (1970) (recognizing there is a "common law duty to exercise due care to avoid injury or damage to others").[19]

Almost a century ago, the South Carolina Supreme Court approved the following jury instruction concerning the requirement to act with due care:

> Negligence is the failure to exercise due care. The law enjoins upon every individual, you and me and every individual each in our conduct with reference to anybody else, the duty of exercising due care under all of the circumstances attending our activities, and the failure to exercise that due care which the surrounding circumstances justly require is called negligence, and if one is injured by reason of that negligence, if that negligence itself, that failure to exercise due care under the circumstances is the direct cause of bringing about some injury or damage to the person of another, then that negligence we call actionable.

*Parker v. Simmons*, 163 S.C. 42, 54, 161 S.E. 169, 173 (1931). This duty remains to this day.

Additionally, Defendants owe Plaintiff a duty because, in discharging PFAS, they "created a situation that they knew or should have known posed a substantial risk of injury" to Plaintiff. *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 294, 688 S.E.2d 125, 130 (2010); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").[20]

---

[19] Many Defendants also argue they had no duty of care to Plaintiff because the PFAS they discharged passed through a WWTP before reaching Plaintiff's property and they therefore lacked "control" over it. This is a disingenuous argument that the Court should ignore. Although Defendants may have not had control over the PFAS after it left their facilities, or when it passed through the WWTPs, they certainly had control over the PFAS before discharging it into the environment, and that is the point in time out of which their duty to Plaintiff arises.

[20] The Restatement further supports the fact that Defendants misconstrue or misrepresent the duty they owe to Plaintiff, as is explained above. *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 cmt. l ("*Relationship with affirmative duties to act.* The general duty rule contained in this Section is conditioned on the actor's having engaged in conduct that creates a risk of physical harm. Section 37 states the obverse of this rule: In the absence of conduct creating a risk of harm to others, an actor ordinarily has no duty of care to another."); *id.* § 37 ("An actor whose conduct has not created a risk of physical or emotional

27

South Carolina courts have consistently recognized that parties who release pollution into the environment owed a duty to those exposed to the pollutants and were thus subject to negligence liability. For example, in *Chestnut v. AVX Corp.*, the plaintiff property owners brought suit against the defendant, a manufacturer of electronic components the production of which involved a degreasing chemical called trichloroethylene ("TCE"). 413 S.C. 224, 226, 776 S.E.2d 82, 83 (2015). The plaintiffs alleged that "TCE escaped respondent's plant and migrated beyond the boundaries of respondent's property, contaminating surrounding properties and groundwater." *Id.* In evaluating the Plaintiff's negligence claim on appeal, the Supreme Court found "the complaint sufficiently [pled] a negligence cause of action." *Id.* at 228, 776 S.E.2d at 84. The court explained,

> In *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013), we held a plaintiff could maintain an environmental negligence suit based upon offensive odors if the complaint alleged either "physical injury [to the plaintiff] or property damage." *Id.* at 153, 747 S.E.2d at 481. Here, appellants have pled all four elements of a negligence claim: *duty*, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is "worthless," "damaged," and "devalued" by the "harmful" and "dangerous" chemicals on the real property that adjoins their properties.

*Id.* (emphasis added). If defendants can be held liable under a negligence theory for their discharge of TCE or "offensive odors" into the environment, so too can the defendants in this litigation be held liable for their discharge of PFAS.

Similarly, in *Ravan v. Greenville County*, several landowners sued Greenville County in its capacity as the operator of a landfill, along with several corporate entities that disposed of waste at the landfill, for damage to their properties. 315 S.C. 447, 452, 434 S.E.2d 296, 299 (Ct. App. 1993). Waste Management of South Carolina, Inc., as successor in interest to Spartan Waste

---

harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable.").

28

Control, was included as a defendant due to Spartan's disposal of toxic chemicals at the landfill on behalf of industrial plants, which later contaminated a plaintiff's property. *Id.* at 466–67, 434 S.E.2d 296, 308. On appeal, Waste Management argued it did not owe a duty of care to the affected plaintiff, and if a duty existed, it was limited to the safe transport of the waste to the landfill. *Id.* at 467, 434 S.E.2d at 308. The court agreed "that the duty of a mere hauler of hazardous waste extends only to the safe transport of the waste while it is in the hauler's possession and control," *id.* at 468, 434 S.E.2d at 309; however, because Waste Management, and not its customers, chose the location for disposal of the waste, its "role consisted of more than the mere hauling of waste to the landfill." *Id.* at 469, 434 S.E.2d at 309. "Thus, the facts of this case support the conclusion that a duty of care was owed by Spartan Waste to" the affected landowner. *Id.*

Here too, Defendants released PFAS into the environment, and it passed through a third party (in *Ravan*, a landfill, and here, the WWTPs) before reaching Plaintiff's property. As in *Ravan*, Defendants owe a duty of care to Plaintiff. *See also Conestee Mills v. Greenville*, 160 S.C. 10, 27, 158 S.E. 113, 119 (1931) (finding the City of Greenville, as the entity that built and constructed the city's sewer system, was liable to a downstream property owner for discharge of the sewage into the Reedy River, which then contaminated the plaintiff's property); *id.* at 26, 158 S.E. at 119 ("It is the duty of the commissioners of the sewer district to construct the sewer so that it will not become a nuisance to any neighborhood or to any particular inhabitant thereof; and it is the duty of the city, after the sewer has been turned over to it, to avoid the same result by properly maintaining and repairing the sewer after it is constructed." (quoting *Jones v. Sewer Improv. Dist.*, 177 S.W. 888, 889 (Ark. 1915))); *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 540 (D.S.C. 2024) (finding the Plaintiff's allegations that the defendant landfill,

29

which allowed "'pollution, noxious fumes, odors, dust, gases including methane gas, particulate matter, and trash' to escape from their property and invade Plaintiff's properties," and that the defendant owed the plaintiffs a duty of reasonable care, were "sufficient to state a claim for negligence" and defeat the defendant's motion to dismiss).

Finally, other courts that recently considered this question in the context of PFAS contamination consistently rule that defendants such as those in this litigation owe a duty of care to those injured by the PFAS. *See, e.g.*, *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1324 (N.D. Ga. 2021) (finding the defendants "have a duty to exercise reasonable care in their use and disposal of unreasonably dangerous chemicals such as PFAS and/or products containing PFAS in operating their various . . . facilities to avoid pollution of the State's waterways and injury to members of the downstream public who consume the water as part of their public drinking water supply"); *Ryan v. Greif, Inc.*, 708 F. Supp. 3d 148, 164 (D. Mass. 2023) (agreeing with the magistrate judge's ruling that "facilities that use and dispose of PFAS-contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal, owe foreseeable victims of such contamination a duty of care"); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1331 (N.D. Ga. 2022) (ruling a discharger of PFAS "has a duty to exercise reasonable care in its use and disposal of unreasonably dangerous chemicals such as PFAS to avoid pollution of state waterways and injury to downstream water users"); *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 398 (D.N.J. 2021) (finding "Defendants had a duty of care with regard to the proper handling of PFAS"); *see also Peeler v. SRG Glob. Coatings, LLC*, C.A. No. 1:23-CV-23-SNLJ, 2024 WL 4625640, at *6-7 (E.D. Mo. Oct. 30, 2024); *Brown v. Corteva, Inc.*, C.A. No. 7:23-CV-1409-D, 2024 WL 4229937, at *4 (E.D.N.C. Sep. 18, 2024); *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021);

30

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - HORRY - COMMON PLEAS - CASE#2024CP2603523

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2605523

*Utils. Bd. of Tuskegee v. 3M Co.*, C.A. No. 2:22-CV-420-WKW, 2023 WL 1870912, at *9-11 (M.D. Ala. Feb. 9, 2023).

  **2.  Plaintiff sufficiently alleges that PRET and Nan Ya proximately caused Plaintiff's injuries.**

  PRET and Nan Ya argue that they could not have proximately caused Plaintiff's injuries as a matter of law. PRET MIS, at 18–19; Nan Ya MIS, at 4. This fails under straightforward principles.

  "Proximate cause requires proof of both causation in fact and legal cause." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id.* at 88–89, 502 S.E.2d at 83 (citation omitted). "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." *Id.* at 89, 502 S.E.2d at 83. "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.*

  At this stage, Plaintiff must only plead—not *prove*—causation. *See Hurd v. Williamsburg Cnty.*, 353 S.C. 596, 613, 579 S.E.2d 136, 145 (Ct. App. 2003) ("Ordinarily, the question of proximate cause is one of fact for the jury . . . ." (quoting *McNair v. Rainsford*, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998))). It has done so.

  As for causation in fact, Plaintiff alleges that PFAS are man-made chemicals that do not occur naturally in the environment, Defendants each discharged PFAS into a body of water upstream of Plaintiff's properties, PFAS does not naturally degrade in the environment, and the PFAS Defendants discharged flowed downstream onto Plaintiff's properties, thereby harming it. Complaint, ¶¶ 18–28. Although Plaintiff's properties have been contaminated by multiple

31

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2600523

sources of PFAS, these allegations, along with the inferences reasonably deducible therefrom, are enough to sufficiently plead that Defendants are "but for" causes of their injuries.

"As to legal cause, 'foreseeability is considered "the touchstone . . . ," and it is determined by looking to the natural and probable consequences of the defendant's act or omission.' In most cases, foreseeability ends up being addressed as question of fact for the jury." *Wickersham v. Ford Motor Co.*, 432 S.C. 384, 390, 853 S.E.2d 329, 332 (2020) (quoting *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006)). A plaintiff is not required to prove "the defendant should have foreseen the particular event which occurred but merely that the defendant should have foreseen his or her [wrongful conduct] would probably cause injury to someone." *Hurd*, 353 S.C. at 613, 579 S.E.2d at 145 (citing *Greenville Mem'l Auditorium v. Martin*, 301 S.C. 242, 245, 391 S.E.2d 546, 547–48 (1990)).

Here, Plaintiff's injuries were the "natural and probable consequences" of Defendants' wrongful conduct and were, therefore, foreseeable. Again, Plaintiff alleges that PFAS do not naturally degrade in the environment and Defendants knew that PFAS are hazardous to human health, Complaint, ¶¶ 27–28, 66; thus, it was entirely foreseeable to Defendants that the PFAS, once discharged from their facilities, would persist in South Carolina waters and invade the properties of downstream landowners. Moreover, the fact that Defendants' wastewater in some cases flowed through a WWTP before reaching Plaintiff's properties does not change this analysis, as Plaintiff also alleges that Defendants knew or should have known that the WWTPs were unable to remove Defendants' PFAS from the water they treated and discharged. Complaint, ¶ 62. *See Bishop*, 331 S.C. at 89, 502 S.E.2d at 83 ("The intervening negligence of a third person will not excuse the first wrongdoer if such intervention ought to have been foreseen

32

in the exercise of due care. In such case, the original negligence still remains active, and a contributing cause of the injury.")

### 3.    Plaintiff alleges actionable damages.

Several Defendants argue Plaintiff's negligence claim should be dismissed because it has not alleged physical injury or damage to their property. Fiber MIS, at 13; GFL MIS, at 16–17; Mohawk MIS, at 12–13; Nan Ya MIS, at 17–18; PRET MIS, at 20; RRD MIS, at 15–16. For reasons already discussed, *see supra* §§ B & C, this is baseless. The pleadings are replete with allegations that Defendants have contaminated and injured Plaintiff's *properties. See, e.g.,* Complaint, ¶¶ 1–7, 18–26, 55, 61, 63–65, 110. *See Chestnut v. AVX Corp.*, 413 S.C. 224, 228, 776 S.E.2d 82, 84 (2015) ("Here, appellants have pled all four elements of a negligence claim: duty, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is 'worthless,' 'damaged,' and 'devalued' by the 'harmful' and 'dangerous' chemicals on the real property that adjoins their properties.").

Defendants label Plaintiff's damages allegations as "unexplained and conclusory," lacking "facts showing that anything other than water from a public waterway has or could have been damaged by PFAS." Nan Ya MIS, at 17; *see also* GFL MIS, at 16; Mohawk MIS, at 12; PRET MIS, at 20; RRD MIS, at 15. This simply ignores the pleadings: Defendants have put toxic and environmentally persistent chemicals that are unsafe to consume in drinking water into the lands, SWTPs, and infrastructure *of a water provider*. To the extent Plaintiff's allegations on the damage to its properties are concise, this merely reflects that its property injuries are obvious.

### 4.    Plaintiff has not assumed the risk of PFAS contamination.

T&S argues that by voluntarily assuming the role of a drinking water provider, which necessarily requires the intake of South Carolina's waters, Plaintiff has assumed the risk of PFAS exposure and contamination. T&S MIS, 19–20. This is incorrect.

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2605523

In South Carolina, assumption of risk can be either express or implied. *See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 333 S.C. 71, 79, 508 S.E.2d 565, 569 (1998). "Implied assumption of risk is further divided into the categories of 'primary' and 'secondary' implied assumption of risk." *Id.* Here, T&S argues that Plaintiff's drinking water operations "constitute[] a primary implied assumption of the risk for any alleged injury [they] now complain[] of." T&S MIS, at 19.

"Primary implied assumption of risk arises when the plaintiff impliedly assumes those risks that are *inherent* in a particular activity." *Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. "Primary implied assumption of risk is not a true affirmative defense, but instead goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff." *Id.* ("In its primary sense, implied assumption of risk focuses not on the plaintiff's conduct in assuming the risk, but on the defendant's general duty of care. . . . Clearly, primary implied assumption of risk is but another way of stating the conclusion that a plaintiff has failed to establish a prima facie case [of negligence] by failing to establish that a duty exists." (quoting *Perez v. McConkey*, 872 S.W.2d 897, 902 (Tenn. 1994))).

But as demonstrated above, T&S and other Defendants owed Plaintiff a duty "to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others." Complaint, ¶ 103. Plaintiff incorporates its arguments concerning the existence of Defendants' duty of care, which are dispositive here.

Regardless, PFAS contamination is not a risk inherent in the provision of potable water to Plaintiff's customers. *See Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. As Plaintiff alleges, PFAS are "man-made chemicals that do not occur naturally in the environment." Complaint, ¶ 27. As a result, if it were not for Defendants' tortious conduct in discharging PFAS to the

34

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

environment, there would be no PFAS in Plaintiff's water supply. Neither T&S nor other Defendants should be allowed to create a hazard that did not previously exist, then attempt to escape liability by shielding itself behind the very same risk it created. T&S also argues Plaintiff "freely and voluntarily" exposed itself to PFAS, T&S MIS, 19–20, but this also misses the mark. Plaintiff is required to provide potable water to their customers, and it must intake and process water from Bull Creek and the Intracoastal Waterway, regardless of the contaminants in the water. It strains credulity to suggest that Plaintiff has freely and voluntarily exposed itself to Defendants' PFAS.

**E.      The "free public services doctrine" does not apply here, if it exists in South Carolina at all.**

Multiple Defendants argue that the free public services doctrine (also known as the municipal cost recovery rule) bars Plaintiff from recovering the costs it incurs from removing Defendants' PFAS from the drinking water they supply to their customers. *See* Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22–23. The free public services doctrine is underdeveloped, if existing at all, in South Carolina jurisprudence.[21] Nevertheless, in certain jurisdictions it generally provides "that absent specific statutory authorization or damage to government-owned property, a county [or other governmental entity] cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Johnson v. 3M Co.*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021) (emphasis removed) (quoting *Walker Cnty. v. Tri-State Crematory*, 642 S.E.2d 324, 327 (Ga. App. 2007)). Defendants' only

---

[21] Defendants cite no South Carolina cases in support of their arguments, and Plaintiff's Westlaw searches for "free public services doctrine" and "municipal cost recovery rule" returned no South Carolina cases addressing the doctrine. As a result, dismissal should not be granted on this basis. *See Madison v. Am. Home Prod. Corp.*, 358 S.C. 449, 451, 595 S.E.2d 493, 494 (2004) ("As a general rule, important questions of novel impression should not be decided on a motion to dismiss.").

ELECTRONICALLY FILED – 2025 Mar 28 4:34 PM – HORRY – COMMON PLEAS – CASE#2024CP2600523

real basis for applying the doctrine here is the fact that Plaintiff is a governmental entity. *See* Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22–23.

The free public services doctrine rests on the premise that legislative authorities have the power to allocate the costs of providing "free" public services as they see fit, such as "spread[ing] [costs] by taxes," or by authorizing recovery "by statute or regulation." *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 323, 324 (9th Cir. 1983). By that rationale, courts should not intrude upon these legislative determinations about cost allocation by permitting tort recovery. *Id.* at 324 (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 314–17 (1947)) ("If the government has chosen the bear the costs for reasons of economic efficiency, or even as a subsidy to the citizens and their businesses, the decision implicates fiscal policy; the legislature and its public deliberative processes, rather than the court, is the appropriate forum to address such fiscal concerns.").

Even if ultimately recognized in this jurisdiction, the free public services doctrine does not apply here for the simple reason that Plaintiff's provision of drinking water "to paying customers is neither free nor public as contemplated by the doctrine." *See Johnson*, 563 F. Supp. 3d at 1311. Rather, Plaintiff only provides drinking water to those customers who pay for the service. *See generally* Complaint (repeatedly stating that Plaintiff supplies drinking water to *customers*).

As *Flagstaff* clarifies, "it is the identity of the claimant and the nature of the cost that combine" under the doctrine "to deny recovery." 719 F.2d at 324. By focusing only on either Plaintiff's "identity" as a governmental entity to invoke the free public services doctrine, Defendants erroneously bypass "the nature of the cost" for which the doctrine precludes

recovery.[22] Here, the costs of the enhanced water treatment for which Plaintiff seeks relief are "not free for all the public" at the point of use. *Johnson*, 563 F. Supp. 3d at 1311; *see also* S.C. Code Ann. § 5-31-1150 (it is a misdemeanor for a person to use municipal water without a contract for water service). Unlike the costs of fire or police services, which are allocated across the public via taxes, the Legislature has authorized special purpose districts like Plaintiff to charge water and sewer users for these services. S.C. Code Ann. § 5-31-670. Indeed, it is telling that ***none*** of Defendants' authorities involve the free public services doctrine barring recovery by a water, sewer, or other public utility—or any service funded by billing customers.

In addition, the free public service doctrine recognizes exceptions for "where the acts of a private party create a public nuisance which the government seeks to abate" and "where the government incurs expenses to protect its own property." *Flagstaff*, 719 F.2d at 324; *see also Johnson*, 563 F. Supp. 3d at 1311 (indicating doctrine does not apply where recovery is sought for "damage to government-owned property"). Plaintiff plainly alleges both a public nuisance and damage to its properties. *See, e.g.*, Complaint, ¶¶ 1–3, 5–7, 16, 63, 65–66, 79-90.

Furthermore, in a case involving a challenge to the water rate set by the City of Conway—one of Plaintiff's wholesale customers—the Supreme Court recognized that a public water provider "has a proprietary interest" in the water it sells to its customers, "as evidenced by [its] unilateral ability to sell or lease it." *Sloan v. City of Conway*, 347 S.C. 324, 329, 555 S.E.2d 684, 686 (2001). It is such water (along with Plaintiff's other properties), in which Plaintiff has a

---

[22] T&S at least acknowledges that "the nature of the cost" is part of the analysis. Ultimately, however, T&S fails to properly apply this factor to "the services provided by Plaintiff[s]" by simply assuming that because they are generic "municipal services," the funding for Plaintiff's provision of drinking water has already been set in stone by the Legislature. T&S MIS, at 12. In so doing, T&S collapses "the nature of the cost" into Plaintiff's identities as governmental entities—really focusing only on this governmental status just as the other Defendants do.

ELECTRONICALLY FILED – 2025 Mar 28 4:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

proprietary interest, that has been damaged by Defendants' tortious conduct. By stating the free public services doctrine applies to "public expenditures made in the performance of *governmental functions*" (emphasis added)—not proprietary functions, Defendants necessarily concede that the doctrine cannot apply here. Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22.

**F.      The Safe Drinking Water Act does not preempt Plaintiff's claims.**

Elevate and Nan Ya present vague, unsupported, and conclusory arguments that Plaintiff's claims "*may . . .* intrude on regulatory territory reserved for federal oversight" and "should be decided under federal law"—namely, the Safe Drinking Water Act ("SDWA"). Elevate MIS, at 5–6; Nan Ya MIS, at 7–8. They cite a single case merely listing the three types of federal preemption (express, field, and conflict) but do not state which type supposedly applies to Plaintiff's state common law claims, and they cite no other authority suggesting that Plaintiff's claims are preempted. Defendants' failure to identify—much less articulate—a preemption theory underscores that this argument lacks both substance and merit. *See Normandy Corp. v. S.C. Dep't of Educ.*, 386 S.C. 393, 409, 688 S.E.2d 136, 144 (Ct. App. 2009) ("Courts should not lightly infer preemption."); *see also Eggleston v. UPS*, 428 S.C. 373, 381, 834 S.E.2d 713, 717 (Ct. App. 2019) ("[W]hen a plaintiff invokes traditional elements of tort law and the issue of preemption arises, 'the courts almost uniformly have resolved against federal preemption.'" (quoting *Jimenez-Ruiz v. Spirit Airlines, Inc.*, 794 F. Supp. 2d 344, 348 (D.P.R. 2011)); *Jamison v. Ford Motor Co.*, 373 S.C. 248, 265, 644 S.E.2d 755, 763-64 (Ct. App. 2007) ("[C]ommon law tort actions are historically within the scope of the States' police powers and are safe from preemption by a federal statute unless Congress reveals a clear and manifest purpose to preempt.").

By contrast, it is *unambiguous* that the SDWA imposes no preemption here.

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

First, Defendants identify no SDWA provision that imposes express preemption—because there is none. *See generally* 42 U.S.C. §§ 300f to 300j-27. In fact, the SDWA contains several "savings clauses" that communicate exactly the opposite: that Congress intended to establish "a joint federal-state system" "to assure that water supply systems serving the public meet minimum national standards for protection of public health." *Manufactured Hous. Inst. v. United States EPA*, 467 F.3d 391, 401 (4th Cir. 2006). *See* 42 U.S.C.S. § 300g-2 (providing that "a State has primary enforcement responsibility for public water systems" if it meets certain requirements); 42 U.S.C.S. § 300g-3(e) ("Nothing in this title shall diminish any authority of a State or political subdivision to adopt or enforce any law or regulation respecting drinking water regulations or public water systems, but no such law or regulation shall relieve any person of any requirement otherwise applicable under this title."); 42 U.S.C.S. § 300j-8(e) ("Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute *or common law* to seek enforcement of any requirement prescribed by or under this title *or to seek any other relief*." (emphases added)).

By allowing states to assume "primary enforcement responsibility for public water systems," § 300g-2, and "adopt or enforce any law or regulation respecting drinking water regulations or public water systems," § 300g-3(e), Congress also clearly did not attempt to "occup[y] the field" of water pollution regulation such that it "left no room for the states to supplement it" when it enacted the SDWA. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (observing that "[a]lthough Congress intended to dominate the field of pollution regulation" in enacting the Clean Water Act, the Act's "saving clause negates the inference that Congress 'left no room' for state causes of action"); *Perry v. Fleetwood Enters.*, C.A. No. 2:06-

cv-502-MEF (WO), 2007 WL 2893410, at *5 (M.D. Ala. Sep. 28, 2007) ("The presence of a saving clause suggests that Congress did not intend to occupy the field.").

Nor do Plaintiff's claims conflict with the SDWA, as to implicate conflict preemption. "Implied conflict preemption occurs in one of two ways—either where compliance with both federal and state regulations is physically impossible or where the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Priester v. Cromer*, 401 S.C. 38, 44, 736 S.E.2d 249, 252 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Here, Plaintiff's claims do not preclude Defendants from complying with the SDWA, nor do the claims otherwise hinder the SDWA in any way. In fact, the goals of the SDWA are advanced through this litigation.

Defendants' arguments have not succeeded elsewhere. *See, e.g., State v. Monarch Chems., Inc.*, 443 N.Y.S.2d 967, 969 (N.Y. Sup. Ct. 1981) (considering whether the SDWA, along with other federal statutes, preempted state law, and finding "this argument lacks merit"); *Russell v. Tyson Farms, Inc.*, 450 F. Supp. 3d 1266, 1273 (N.D. Ala. 2020) (ruling the plaintiffs' "state law causes of action . . . are not preempted by the SDWA"); *accord Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 697–98 (2003) (holding that the SDWA did not completely preempt plaintiff's claims). Nor should they here.

**G.    Defendants' causation arguments should be rejected.**

**1.    Plaintiff sufficiently alleges that its injuries are fairly traceable to Elevate's and Nan Ya's conduct.**

Defendants Elevate and Nan Ya both make the identical conclusory assertion that Plaintiff lacks standing because it "has failed to allege facts which show a causal connection between Plaintiff's alleged injury and Defendant's conduct." Elevate MIS, at 7; Nan Ya MIS, at 8. Neither Defendant provides any explanation or support for this assertion. As a result, the Court should

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2600523

not consider it. *Cf. First Sav. Bank v. McClean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (S.C. 1994) (movant "deemed to have abandoned" issue on appeal where he "fails to provide arguments or supporting authority for his assertion").

Moreover, Plaintiff has pled more than enough facts to demonstrate that Elevate and Nan Ya's respective use and discharges of PFAS have caused injury to Plaintiff by contaminating its water sources and properties:

- Elevate and Nan Ya discharge wastewater contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals ("MCL PFAS") and/or their precursors directly to surface waters and indirectly to the Lake City WWTP, respectively, as a result of these Defendants' usage of products containing or degrading to these PFAS in their industrial processes. *See* Complaint, ¶¶ 20, 25; *see also id.* at ¶¶ 51–53.

- The treatment processes employed by Elevate's "Richmond Plant do[] not remove [its] PFAS," and those PFAS are discharged "into the Great Pee Dee River upstream of Plaintiff's Bull Creek intake." *Id.* at ¶ 20; *see also id.* at ¶ 52.

- Similarly, the treatment processes used by the Lake City WWTP, which receives Nan Ya's wastewater discharge, "cannot remove Nan Ya's PFAS, and the WWTP discharges water contaminated with Nan Ya's PFAS into Lake Swamp upstream of Bull Creek." *Id.* at ¶ 25; *see also id.* at ¶ 53.

- The Great Pee Dee River, which receives Elevate's PFAS-laden wastewater, flows downstream before branching off to Bull Creek, upon which Plaintiff's Bull Creek water intake is sited. *See id.* at ¶¶ 20, 48. Meanwhile, Lake Swamp, which receives Nan Ya's PFAS-laden wastewater, subsequently joins the Lynches River, then the Great Pee Dee River, and finally Bull Creek. *See id.* at ¶¶ 25, 48.

- "PFAS sampling of Bull Creek, the Great Pee Dee River, [and] Lynches River . . . confirms the presence of [MCL PFAS] throughout these bodies of water. These PFAS flow downstream and contaminate Plaintiff's water intake on Bull Creek at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source." *Id.* at ¶ 50.

- Plaintiff's "Bull Creek SWTP utilizes conventional water treatment technologies" that are not capable of removing PFAS. *Id.* at ¶ 56.

- Finished drinking water treated by Plaintiff's Bull Creek SWTP (and contaminated with Defendants' PFAS) is distributed to customers that are served by Plaintiff's Bucksport Regional WWTP and Conway WWTP for their sewer services. Neither of these WWTPs serves industrial users. *Id.* at ¶¶ 57–59.

41

- Plaintiff's Bucksport Regional and Conway WWTPs "utilize conventional wastewater treatment methods," which also cannot remove PFAS. These WWTPs "both discharge to the Waccamaw River upstream of the Intracoastal Waterway," which is the source water for Plaintiff's Myrtle Beach SWTP. *Id.* at ¶¶ 60–61.

- Like the Bull Creek SWTP, Plaintiff's Myrtle Beach SWTP uses conventional water treatment methods that do not remove PFAS. Hence, Defendants' PFAS that pass through the Bull Creek SWTP, Plaintiff's water distribution system, and into the Waccamaw River via Bucksport Regional and Conway WWTPs, then flow downstream into the Intracoastal Waterway, where they contaminate the source water for Plaintiff's Myrtle Beach SWTP. *Id.* at ¶ 61.

- In order to provide drinking water that is free from Elevate, Nan Ya, and other Defendants' PFAS and which complies with EPA's MCLs, Plaintiff must therefore implement new treatment technologies that are capable of removing PFAS. *Id.* at ¶¶ 6, 63.

*See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161–62 (4th Cir. 2000) (indicating Article III's fairly traceable standard is more lenient than tort causation, and holding that allegations that defendant discharged chemicals in excess or its permit limits that were also present in a downstream water body satisfied this standard); *see also, e.g.*, Order on MTDs, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111 (S.C. Ct. Comm. Pl. July 23, 2024) (attached as **Ex. 5**), at 4 (holding State's allegations that PFAS manufacturers produced PFAS and PFAS-containing products, "caused widespread contamination of the State's natural resources and property," and contaminated "identifie[d] areas in the State" "adequately pled causation"); *Weatherford v. E.I. du Pont de Nemours & Co.*, No. 4:22-cv-01427-RBH, 2023 WL 11015357, at *4–5 (D.S.C. Sept. 27, 2023) (holding that allegations of PFAS' persistence and tendency to leach from wastewater and biosolids, of defendants' knowledge about PFAS and their customer's manufacturing processes, and of defendants failure to provide proper disposal instructions to their customer sufficiently alleged proximate causation); *Braswell v. Colonial Pipeline Co.*, 395 F. Supp. 3d 641 (M.D.N.C. 2019) (holding allegations that plaintiffs "suffered 'a loss of use and enjoyment and property value as a direct and proximate cause result of

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP260353

[Colonial's] conduct, actions and inactions,'" and that the properties were "directly affected by the ongoing releases" and "inside 'the contamination plume,'" sufficiently alleged causation (quoting complaint)).

### 2. PRET's causation arguments are also unavailing.

PRET broadly advances two causation arguments. First is that "PRET does not discharge PFAS into the Lynches River—or any other body of water," but rather "conveys its wastewater to Johnsonville WWTP," which then discharges the effluent into the Lynches River, upstream from Plaintiff. PRET MIS, at 19; *see also id.* at 10, 12. This is a mislabeled, and misplaced, contention that the Johnsonville WWTP is a superseding cause. Second, PRET contends that "Plaintiff's claims against PRET in relation to Plaintiff's Myrtle Beach SWTP, must be dismissed because neither PRET nor the Johnsonville WWTP are upstream from the Myrtle Beach SWTP." *Id.* at 19; *see also id.* at 5, 10, 16. Both arguments lack merit.

#### a. The Johnsonville WWTP's receipt and discharge of PRET's contaminated wastewater is not a superseding cause.

"The touchstone of proximate cause in South Carolina is foreseeability," meaning that "the injury in question occurred as a natural and probable consequence of the defendant's act." *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 463, 494 S.E.2d 835, 842–43 (Ct. App. 1997). "For an intervening force to be a superseding cause that relieves an actor from liability, the intervening cause must be a cause that could not have been reasonably foreseen or anticipated." *Id.* at 467, 494 S.E.2d at 844.

The Johnsonville WWTP's actions here do not constitute a superseding cause. Plaintiff alleges that PRET "discharges industrial wastewater" that is contaminated "with products that contain or degrade to [MCL] PFAS to the Johnsonville WWTP," Complaint, ¶ 26, which "lack[s] filtration technologies to remove [PRET's] PFAS," *id.* at ¶ 53. As the complaint underscores,

43

PFAS are "persisten[t] in the environment," *id.* at ¶ 27, "cannot be adequately removed by conventional wastewater treatment processes," *id.* at ¶ 5, and "are highly mobile and water soluble," *id.* at ¶ 32. PRET is alleged to have possessed actual or constructive knowledge "that conventional water treatment technologies used by . . . WWTPs cannot remove PFAS from wastewater," and further "that [its] treated wastewater contaminates surface waters and the water Plaintiff draws for its customers," *id.* at ¶ 62; *see also id.* at ¶ 93. Thus, the operative pleading plainly demonstrates that the Johnsonville WWTP was a foreseeable passive conduit for PRET's PFAS to enter the river system and contaminate Plaintiff's downstream water sources and facilities. *See, e.g.*, *Weatherford*, 2023 WL 11015357, at \*4–5 (holding textile mill that used and discharged PFAS-containing products purchased from defendants did not constitute superseding cause); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1332–33 (N.D. Ga. 2022) (same).

PRET, however, obfuscates the issue by arguing it does not "control how Johnsonville WWTP treats and filters its water," and that "PRET cannot be the 'but for' cause of PFAS entering" downstream water supplies "[b]ecause Johnsonville WWTP—not PRET—is responsible for filtering, treating, and discharging the water in accordance with SCDES, and other state and federal regulations." PRET MIS, at 19; *see id.* at 10, 12.

As to the first contention: foreseeability, not control, is the test for a superseding cause. Plaintiff has, moreover, already addressed Defendants' control-based arguments against their nuisance liability. *See supra* § III.C.1. In brief, PRET, like other Defendants that discharge to a WWTP, satisfies the control element for nuisance by controlling whether it sends toxic chemicals to the Johnsonville WWTP, via its sewer connection, which PRET knows or should know are resistant to conventional treatment methods.

44

As to the second contention: while but-for causation is indeed a prerequisite to proximate causation, the complaint leaves no doubt that PRET's discharges are a but-for cause of a portion of the PFAS impacting Plaintiff. *See Small*, 329 S.C. at 463, 494 S.E.2d at 842 ("Proximate cause requires proof of both causation in fact and legal cause."). Plaintiff alleges that PFAS are "man-made chemicals that do not occur naturally in the environment," Complaint, ¶ 27; that PRET uses PFAS "in the manufacture of plastics and resins,"[23] *id.* at ¶ 26; and that, "[a]s part of its processes," PRET discharges PFAS-contaminated wastewater to the Johnsonville WWTP, *id.* Notably absent from the pleading is any allegation that the Johnsonville WWTP adds any PFAS to the effluent stream that is discharged to the Lynches River. Rather, as stated earlier, the complaint demonstrates that the Johnsonville WWTP is merely a (foreseeable) passive conduit for the PFAS discharged by PRET.

### b. PRET's extrinsic evidence concerns a disputed and, in any event, non-dispositive matter.

Plaintiff ably pleads that PFAS discharged by PRET as well as other Defendants on the Pee Dee Watershed upstream from Bull Creek contaminates not only Plaintiff's Bull Creek SWTP but also its Myrtle Beach SWTP, which draws water from the Intracoastal Waterway. *See supra* § III.G.1. However, PRET contends that it is not liable for any damages to the Myrtle Beach SWTP because this facility is not downstream from PRET's Johnsonville facility or the

---

[23] PRET asserts that its Johnsonville facility "recycles carpet." PRET MIS, at 6. The Court need not consider this statement for the purposes of deciding PRET's Motion to Dismiss. *See Johnson v. 3M Co.*, 563 F. Supp. 3d 1253, 1353–54 (N.D. Ga. 2021) (declining to consider defendant's argument that claims against it should be dismissed on the basis that the complaint mistakenly described its manufacturing activities). Nevertheless, Plaintiff notes that carpet recycling and "the manufacture of plastics and resins" are not necessarily mutually exclusive, and further that PFAS are known to have been extensively used in the manufacture of carpet and thus are present in post-consumer carpet. *See id.* at 1272 ("Due to their chemical stability and oil and water repellent properties, PFAS have been widely used in carpet and textile production to provide water and stain resistance."); *id.* at 1355–56 (denying motion to dismiss by carpet recycling facility).

ELECTRONICALLY FILED – 2025 Mar 28 2:34 PM – HORRY – COMMON PLEAS – CASE#2024CP2603528

Johnsonville WWTP. *See* PRET MIS, at 5, 10, 16, 19. In support, PRET submits extrinsic evidence that purports to show "Plaintiff's Myrtle Beach SWTP on the Intracoastal Waterway . . . *is not downstream* from the Johnsonville WWTP." *Id.* at 5 (emphasis in original); *see id.* at Exs. B, C, D, E.

PRET's attempt to bypass the pleadings is as misplaced as it is premature. *See Skydive Myrtle Beach, Inc. v. Horry Cnty.*, 426 S.C. 175, 180, 826 S.E.2d 585, 587 (2019) ("Rule 12(b)(6) . . . address[es] the sufficiency of a pleading stating a claim; it is not a vehicle for addressing the underlying merits of the claim."). Plaintiff's complaint expressly alleges that PFAS-contaminated water received by the Bull Creek SWTP also reaches the Myrtle Beach SWTP, in addition to explaining how. Complaint, ¶ 55–58. To wit, residential and industrial users of Bull Creek potable water send it via sewers to Plaintiff's WWTPs on the Waccamaw River, upstream of the Myrtle Beach SWTP. Since all plants involved utilize conventional treatment systems that do not remove Defendants' PFAS products, some of the PFAS that enter the Bull Creek SWTP also pass to the Myrtle Beach SWTP. *Id.* PRET's assertion that the Johnsonville WWTP is not upstream of the Myrtle Beach SWTP misses the point.

PRET's reliance on extrinsic evidence to dispute a complex hydrological and environmental fate issue—one that will be subject to expert discovery—only underscores why dismissal at this stage is improper. Moreover, PRET ignores additional environmental fate allegations that its evidence does not even address. Because Plaintiff's Complaint adequately pleads plausible causal pathways, and PRET's arguments rest on premature, contested, and irrelevant factual determinations, its motion should be denied.

**H.     This Court has personal jurisdiction over RRD and SCD.**

Defendants RRD and SCD contend that Plaintiff's claims against them should be decided under South Carolina law—not North Carolina law, as Plaintiff contends—and that the Court

46

ELECTRONICALLY FILED – 2025 Mar 28 2:34 PM – HORRY – COMMON PLEAS – CASE#2024CP2600523

lacks personal jurisdiction over these claims. For the reasons that follow, RRD and SCD are wrong on both counts.

1.      **Because Plaintiff has voluntarily dismissed GFL and Waste Industries, the Court need not consider their motions.**

After discussions with counsel for GFL and Waste Industries, Plaintiff agreed to voluntarily dismiss its claims against them without prejudice. Plaintiff filed a notice of voluntary dismissal of these defendants on February 28, 2025 *See* **Ex. 6**. Accordingly, the Court need not consider these motions, as they became moot upon filing of the voluntary dismissal.

2.      **North Carolina law governs Plaintiff's claims against RRD and SCD.**

RRD and SCD argue that "under South Carolina choice-of-law rules," specifically *lex loci delicti*, "South Carolina law applies to Grand Stand's claims" against them. *See* RRD MIS, at 4. Defendants are incorrect for a straightforward reason: under the present circumstances, South Carolina law is preempted, and federal law compels the application of North Carolina law.

The U.S. Supreme Court's decision in *International Paper Co. v. Ouelette*, 479 U.S. 481 (1987) requires this result. There, Vermont property owners sued a polluter under Vermont law for discharges originating in New York. *Id.* at 483–84. But the Court held that under the federal Clean Water Act ("CWA"), an affected state's law is preempted and "inapplicable to" pollution originating from an out-of-state point source. *Id.* at 497.

This ruling applies with full force here. Because Defendants send their PFAS-containing leachate to a point source that discharges to surface waters in North Carolina, *see* Complaint, ¶¶ 22, 54, South Carolina law cannot govern the claims against it. *Ouelette*, 479 U.S. at 497.

*Ouelette* also confirms that the CWA's preemptive force extends beyond substantive law. Choice-of-law rules that require applying an affected state's law to an out-of-state point source

47

are likewise preempted. *Id.* at 499 n.20. Thus, both South Carolina's substantive law and its choice-of-law rules are preempted. *Id.*

But *Ouelette* makes clear that CWA preemption "does not leave [Plaintiff] without a remedy." *Id.* at 497. Instead, courts can and should apply the law of the source state—here, North Carolina. *Id.* Doing so "would not frustrate the goals of the CWA as would a suit governed by [South Carolina] law" and is exactly what *Ouelette* endorses. *See id.* at 498–99 (finding "no basis for holding that Vermont is an improper forum" for applying New York law); *id.* at 500 ("Nothing in the Act prevents a court sitting in an affected State from hearing a common-law nuisance suit, provided that jurisdiction otherwise is proper."). On remand, the federal district court followed the Supreme Court's directive and applied the substantive law of the source state. *See Ouelette v. Int'l Paper Co.*, 666 F. Supp. 58, 62 (D. Vt. 1987). *Ouelette* calls for the same result here.

### 3.     This Court has personal jurisdiction over RRD and SCD.

RRD and SCD dispute personal jurisdiction on the grounds that they lack sufficient minimum contacts to demonstrate that they have purposefully availed themselves of the privilege of conducting activities within South Carolina. *See* RRD MIS, at 4–7. Both state that they are "not residents of South Carolina." RRD MIS, at 4. Defendants further state that their "sole business is operating [their respective] solid waste landfill[s] in North Carolina," which "do not accept waste from South Carolina," and that "[n]either Defendant does business, is registered to do business, . . . solicits business in South Carolina," or "own[s] any property or ha[s] any employees in South Carolina." RRD MIS, at 4–5.

As will be explained in greater detail below, because the landfills directly operated by RRD and SCD purposefully and knowingly send their PFAS-contaminated wastewater to a WWTP that discharges to a river that flows into South Carolina, this Court can exercise personal

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

jurisdiction over these Defendants. Lacking physical presence or other business operations in South Carolina are simply irrelevant to this jurisdictional determination.

A court's exercise of personal jurisdiction over an out-of-state defendant must conform with both South Carolina's Long-Arm Statute, section 36-2-803 of the South Carolina Code, and the U.S. Constitution's Due Process Clause. *S. Plastics Co. v. S. Com. Bank*, 310 S.C. 256, 259, 423 S.E. 128, 130 (1992). Because the Long-Arm Statute has been interpreted to be coextensive with the limits of due process, however, analysis under the Long-Arm Statute is folded into "whether the exercise of personal jurisdiction would violate due process." *Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005).

Due process requires "that the defendant possess sufficient minimum contacts with the forum state, so that he could reasonably anticipate being haled into court there." *Id.* at 491–92, 611 S.E.2d at 508. This determination is a "two-prong analysis." *Moosally v. W.W. Norton Co., Inc.*, 358 S.C. 320, 331, 594 S.E.2d 878, 884 (Ct. App. 2004). Under the first "power," or "purposeful availment," prong, the court must "find that the defendant directed its activities to residents of South Carolina and that the cause of action arises out of or relates to those activities." *Id.* at 331–32, 594 S.E. at 884. Under the second "fairness" prong, the court weighs factors including "the burden on the defendant, the extent of the plaintiff's interest, South Carolina's interest, efficiency of adjudication, and the several states' interest in substantive social policies." *Id.* at 332, 594 S.E.2d at 885. Finally, in making the foregoing determinations at the pre-trial stage, the court assesses the pleadings and also may consider extrinsic evidence. *Springmasters, Inc. v. D&M Mfg.*, 303 S.C. 528, 531–32, 402 S.E.2d 192, 193–94 (Ct. App. 1991).

49

Here, RRD and SCD have purposefully availed themselves to personal jurisdiction in South Carolina by collecting the PFAS-contaminated leachate generated by their respective landfills and transporting it to Lumberton, North Carolina's WWTP, where their PFAS predictably pass through the Lumberton WWTP's treatment processes, are discharged into the Lumber River, and flow downstream into South Carolina. Complaint, ¶¶ 20, 26, 46–48, 52–53, 60, 92. It is these very PFAS chemicals, which are traceable to Defendants' North Carolina landfill operations, that give rise to Plaintiff's claims. *Id*. SCD persists in this tortious course of conduct by continuing to haul leachate to Lumberton for disposal, whereas RRD ceased this practice only after these facilities were named in this lawsuit on August 16, 2024. *See* GFL MIS, Ex. A, at ¶¶ 5(b), (f) (providing that the RRD landfill ceased transporting leachate to the Lumberton WWTP as of December 10, 2024).

Moreover, Defendants have known since before this lawsuit was filed that PFAS are extremely persistent (and thus resistant to conventional wastewater treatment), mobile in the environment, and are often present in landfill leachate in high concentrations. *See* **Ex. 7** (May 7, 2024 CWA Notice of Intent Letter to SCD and other entities) at 6–19; *see also* Complaint, ¶¶ 28, 32, 62, 65–66, 94. In fact, in August 2024 (the same month they were named as Defendants in Plaintiff's lawsuit), SCD entered a proposed consent decree to address PFAS releases at the Sampson County Landfill. *See generally* **Ex. 8**.

This case is on all fours with decisions across the nation that have found an out-of-state defendant's discharges of substances that cross into the forum state establish minimum contacts. *See, e.g.*, *Ex parte Aladdin Mfg. Corp.*, 305 So.3d 214, 237–39 (Ala. 2019) (finding minimum contacts and personal jurisdiction where Georgia manufacturers knowingly discharged PFAS to the local WWTP, which passed through the WWTP and into the river, where the PFAS flowed

50

downstream to impact Alabama water utilities), *cert. denied,* 141 S. Ct. 1258 (2021); *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 577–78 (9th Cir. 2018) (finding purposeful availment and personal jurisdiction where Canadian smelter discharged wastes into the Columbia River that were transported downstream to Washington), *cert. denied*, 139 S. Ct. 2693 (2019); *Horne v. Mobile Area Water & Sewer Sys.*, 897 So.2d 972 (Miss. 2004) (finding minimum contacts and personal jurisdiction where Alabama utility knowingly released floodwaters that damaged downstream Mississippi property owners), *cert. denied*, 544 U.S. 922 (2005); *Triad Hunter, LLC v. Eagle Natrium, LLC*, 132 N.E.3d 1272, 1284–86 (Ohio Ct. App. 2019) (finding minimum contacts and personal jurisdiction where West Virginia mining operation injected brine solution that crossed into Ohio and disrupted Ohio drilling operation).

*Aladdin* is especially apposite: Like this case, *Aladdin* involved the contamination of a public water utility's property and water source with PFAS originating from out-of-state defendants' operations. 304 So. 3d at 222–23. Also like this case, the Georgia defendants argued that the actions of a third-party WWTP, which received their contaminated wastewater and discharged it to the river, insulated them from personal jurisdiction in Alabama. *Compare id.* ("The remaining defendants also argue that Dalton Utilities' treatment of the remaining defendants' wastewater, or its alleged failure to do so, is an intervening cause that breaks the chain of causation."), *with* RRD MIS, at 6 ("It is only Lumberton's unilateral actions in treating and discharging wastewater that allegedly connect Defendants' out-of-state contact with South Carolina, which cannot suffice."). The Alabama Supreme Court rejected this argument, holding that because the "defendants knew or should have known that the treatment processes could not and did not remove the [PFAS]-containing chemicals from the wastewater," the receiving WWTP's actions did not break the causal chain. *Ex parte Aladdin Mfg. Corp.*, 305 So.3d at 232–

51

33. The court emphasized that defendants' availment to the forum was based on more than mere foreseeability: by continuing to discharge contaminated wastewater, defendants engaged in a "purposeful direction of efforts towards" Alabama. *Id.* at 263–37 (quoting *Triad Hunter, LLC*, 132 N.E.3d at 1285).

By hauling their leachate dozens of miles across the State of North Carolina from their landfills to Lumberton's WWTP (which is far closer to South Carolina than the landfills themselves), RRD's and SCD's jurisdictional conduct is arguably more purposeful than the discharges in *Aladdin*. The fact that RRD has recently changed course, opting instead to discharge its leachate to the local sewer, only underscores that sending it to Lumberton was an elective choice. *Cf. Cockrell*, 363 S.C. at 494, 611 S.E.2d at 510 (no personal jurisdiction over defendants who certified baseball bat as meeting NCAA regulations where they "had no control over the distribution of the bats" in South Carolina).

Finally, due process fairness factors weigh heavily in favor of this Court's jurisdiction. South Carolina has a strong interest in adjudicating this dispute because it involves the contamination of waterways on which Plaintiff relies to provide drinking water to over 100,000 South Carolina residents. Resolving Plaintiff's claims in this Court in a single action is far more convenient and efficient than the alternative of bifurcating Plaintiff's claims via dual actions filed in separate states but for the same injuries. Defendants, which operate in North Carolina, will not suffer any unusual burden in having to litigate in the neighboring State of South Carolina. And although North Carolina also has an interest in this case, its interest is surely the same as South Carolina's in ensuring that landfills do not recklessly pollute public water supplies with toxic chemicals.

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

**I.      Plaintiff properly seeks an award of attorney's fees and prejudgment interest.**

PRET uniquely argues that Plaintiff's "prayer for relief for attorneys' fees should be dismissed" because attorney's fees are only recoverable when "authorized by contract or by statute." PRET MIS, at 20–21. Also, it wildly seeks dismissal of Plaintiff's request for prejudgment interest. *See id.* Both arguments are procedurally improper and baseless.

As a threshold matter, Rule 12(b)(6) tests the legal sufficiency of a complaint to state a cause of action, and here, Plaintiff's requests for attorney's fees and interest are not causes of action. Because Rule 12(b)(6) applies to claims, not remedies, PRET's motion is procedurally improper.

Nevertheless, Plaintiff "seeks a declaratory judgment," among other relief, alleging Defendants' contamination constitutes an "irreparable injury for which there is no adequate remedy at law"; and it requests an "order and decree" requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety." Complaint, ¶¶ 2, 76, 88. If Plaintiff prevails and obtains the requested declaratory judgment, attorney's fees are clearly available.

Plaintiff's recovery of attorney fees is authorized by South Carolina's Uniform Declaratory Judgments Act, which provides that "[i]n any proceeding under this chapter the court may make such award of costs as may seem equitable and just." S.C. Code Ann. § 15-53-100. Under this statute, courts have discretion to award attorney's fees and costs to a prevailing party. *See Greene-Mackey v. Bevins*, Op. No. 2021-UP-256, 2021 WL 2822419, at *1 (S.C. Ct. App. July 7, 2021); *cf. Marshall v. Ismie Mut. Ins. Co.*, 2:24-cv-00223-DCN, 2024 WL 4495355 *8 (D.S.C. Oct. 15, 2024) (insured entitled to costs and fees when prevailing against insurance company in declaratory judgment action); *Canopius U.S. Ins., Inc. v. Sloan*, 6:12-1919-TMC, 2013 WL 530318 (D.S.C. Feb. 11, 2013) (same); *Darden v. Witham*, 258 S.C. 380, 188 S.E.2d

53

776 (1972) (ex-husband in declaratory judgment ordered to pay attorney fees). *See generally Historic Charleston Holdings, LLC v. Mallon*, 381 S.C. 417, 436, 673 S.E.2d 448, 458 (2009) (observing that the decision to award statutory attorney's fees "rest[s] within the sound discretion of the trial court"). In any event, PRET's argument is premature. This Court can address whether Plaintiff should recover attorney's fees if and when Plaintiff prevails on its claims and petitions the Court for such an award.

PRET's aim at Plaintiff's prayer for relief for pre-judgment interest is even less defensible. It argues that, "[b]ecause Plaintiff will not be required to comply with the EPA's regulation until 2029," there is no "fixed condition" for determining interest. PRET MIS, at 21. This strawman—that Plaintiff's only injury is future regulatory enforcement—must fail here as it does elsewhere. As explained throughout this brief, PRET cannot rewrite Plaintiff's complaint to allege future "regulatory enforcement" injuries instead of the existing property injuries that are plainly set out in the operative pleadings.

## J.     This Court should not stay this case or decline jurisdiction.

Fiber and PRET ask the Court to stay or dismiss these cases so that they can be referred to the South Carolina Department of Environmental Services ("DES"). Fiber MIS, at 4, 15; PRET MIS, at 2, 9. They invoke the doctrine of primary jurisdiction as the basis for the stay or dismissal, vaguely contending that "the legislature [has] entrusted [DES] with addressing the exact harm alleged here" via the South Carolina State Safe Drinking Water Act ("SCSDWA"), S.C. Code Ann. §§ 44-55-10 to -120. Fiber MIS, at 15; PRET MIS, at 9.

This unjustified delay tactic falls well outside the scope of the primary jurisdiction doctrine. *See Local Union No. 189, Amalgamated Meat Cutters Etc. v. Jewel Tea Co., Inc.*, 381 U.S. 676, 686 (1965) (Frankfurter, J., dissenting) ("[T]he doctrine of primary jurisdiction is not a doctrine of futility; it does not require resort to 'an expensive and merely delaying administrative

54

proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency.'" (quoting *Fed. Maritime Bd. v. Isbrandtsen Co.*, 356 U.S. 481 (1958))).

Where a case or a factual issue therein is beyond "the conventional experience of judges" and "within the special competence" of an administrative agency, the primary jurisdiction doctrine provides courts discretion to stay a case or dismiss it without prejudice in order to refer the matter to the agency. *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996); *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956); *see also Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 449–50 (M.D.N.C. 2015). The doctrine is intended to promote "desirable uniformity" in regulation and leverage "the expert and specialized knowledge of the agenc[y] involved." *W. Pac. R.R. Co.*, 352 U.S. at 64.

This case involves only South Carolina common law claims, including claims of private and public nuisance, trespass, and negligence, gross negligence, and/or recklessness. These claims are firmly within this Court's conventional experience and competence. *See Nix v. The Chemours Company FC*, 2023 WL 6471690, at *6 (E.D.N.C. Oct. 4, 2023) (observing the Plaintiff's state law property claims "fit comfortably within" the court's expertise but not the state environmental agency's). Plaintiff asserts no claims under the SCSDWA, its federal analogue, or any other state or federal statute.

To invoke DES's purported exclusive authority to enforce the SCSDWA, Defendants suggest that the SCSDWA preempts cases such as this, involving common law claims against upstream polluters for contaminating a public water supply. *See* Fitesa MIS, at 4, 15; PRET MIS, at 2, 9. But nothing in the plain text of the act indicates a legislative desire to do so. Moreover, courts interpreting the federal SDWA have routinely held that the statute does not preempt state

55

common law claims. *See, e.g.*, *Russell v. Tyson Farms, Inc.*, 450 F. Supp. 3d 1266, 1271, 1273 (N.D. Ala. 2020); *Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 597–98 (M.D. La. 2003); *Hartwell Corp. v. Superior Court*, 38 P.3d 1098, 1107 (Cal. 2002). Defendants' notion that DES possesses some unique authority or expertise necessary to resolving this case is belied by the fact the PFAS MCLs were issued *by EPA*, not DES.

Plaintiff is also unaware of—and neither Fiber nor PRET identifies—any action by DES to control the PFAS discharges by either Defendant.[24] This reality reinforces the conclusion that a judgment for Plaintiff would not interfere with DES's regulation of PFAS. *See Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1313 (N.D. Ga. 2022) (emphasizing that the Georgia environmental agency "has not initiated a rulemaking or other administrative proceeding to regulate the discharge of PFAS from industrial sources in Georgia" and has not "taken enforcement action against [defendant]," in denying stay). And even if DES was currently taking action against Fiber's or PRET's PFAS discharges, that, too, would not necessarily require staying or dismissing this case under primary jurisdiction doctrine. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5–6; *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 683 (W.D. Mich. 2021); *Cape Fear Pub. Util. Auth. v. The Chemours Company FC, LLC*, 2019 WL 13300188, at *10 (E.D.N.C. Apr. 19, 2019); *Dew v. E.I. du Pont de Nemours and Co.*, 2019 WL 13117100, at *10 (E.D.N.C. Apr. 17, 2019); *Yadkin Riverkeeper*, 141 F. Supp. 3d at 451.

Finally, Fiber and PRET Brass are not the first defendants in a PFAS contamination lawsuit to assert primary jurisdiction as grounds for a stay or dismissal. To date, most—and very likely *all*—of these attempts have been unsuccessful. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5-6;

---

[24] To be clear, DES has recently begun to include monitoring requirements for PFAS when discharge permits come up for renewal. However, these monitoring requirements do not set limits for the amount of PFAS that permittees may release via their wastewater discharges.

*Parris*, 595 F. Supp. 3d at 1312-13; *Zimmerman*, 542 F. Supp. 3d at 683; *Cape Fear Pub. Util. Auth.*, 2019 WL 13300188, at \*10; *Dew*, 2019 WL 13117100, at \*10. Defendants' attempt should meet the same result.

**K.      The United States is not a necessary party.**

Nan Ya argues the United States is a necessary party under Rule 19(a), SCRCP, due to potential PFAS discharge from the site of a former Air Force base in Myrtle Beach (the "AFB"), and this action should be dismissed under Rules 19(b) and 12(b)(7), SCRCP, because the United States is indispensable but cannot be joined as a party. *See* Nan Ya Am. MIS. This argument is devoid of merit—the United States is not a necessary, indispensable, or even ***relevant*** party to this action.

The first of many flaws in Nan Ya's position is that it seeks to inject issues of aqueous film forming foam ("AFFF") contamination where Plaintiff expressly disclaims any damage from AFFF. Nan Ya's exhibits make clear that the potential PFAS being discharged from the AFB is from the use of AFFF at the site. *See, e.g.*, Nan Ya Am. MIS, Ex. 2, at 2 (stating the subject of the memorandum is "Final Site Inspection Report for *Aqueous Form Filming Foam* [sic] Areas at Former Myrtle Beach Air Force Base" (emphasis added)); *id.* at 3 ("The following subsections describe migration pathways and potential targets within the range of influence of the former Myrtle Beach AFB. Because of the nature of areas where *potential releases of AFFF may have occurred*, groundwater, surface water, soil, and sediment were sampled and their migration pathways evaluated in this SI report." (emphasis added)).

Plaintiff's complaint precludes any relevance of AFFF contamination at all, with the following disclaimer:

> Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, MilSpec, or other

57

variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

Complaint, ¶ 8.

Such disclaimers are effectual. For example, in a case brought by the State of South Carolina against 3M Company and other defendants asserting PFAS-related claims similar to those brought by Plaintiff here, "South Carolina specifically disclaimed recovery for PFAS contamination from Aqueous Film Forming Foam, or AFFF." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, C.A. No. MDL No. 2:18-mn-2873-RMG, 2024 U.S. Dist. LEXIS 64206, at *14 (D.S.C. Feb. 29, 2024). 3M removed the action to federal court, "invoking federal officer removal under 28 U.S.C. § 1442(a)(1) and federal enclave jurisdiction under § 1441(a)," and it argued "federal officer removal [was] proper because some of the contamination at issue in this case overlaps with, or has commingled with, PFAS contamination from AFFF products that 3M supplied to the United States military per a military-created specification, referred to as MilSpec AFFF." *Id.* at *14–15. In its order granting remand, however, the district court found that the State's "disclaimers moot 3M's government contractor defense because, whether or not 3M meets the requirements for the defense, it cannot be held liable in this case for PFAS contamination originating from AFFF." *Id.* at *19.

Plaintiff's disclaimer must be given its full effect in this litigation and squarely precludes any notion that *any* AFFF discharger is a "necessary" or "indispensable" party. Needless to say, Plaintiff cannot sue for injuries that it has disclaimed. The United States is not a relevant party to this action, much less a necessary or indispensable one.

Even disregarding Plaintiff's AFFF disclaimer, the United States is not a necessary or indispensable party under Rule 19. The Rule provides:

ELECTRONICALLY FILED – 2025 Mar 28 2:34 PM – HORRY – COMMON PLEAS – CASE#2024CP2601523

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Rule 19(a), SCRCP.

The South Carolina Supreme Court "has interpreted Rule 19, SCRCP to require that a party be a 'necessary party' to be joined in an action pursuant to the rule." *Ex parte Gov't Emps. Ins. Co. v. Goethe*, 373 S.C. 132, 137, 644 S.E.2d 699, 701 (2007). "A necessary party is one whose rights must be ascertained and settled before the rights of the parties to the action can be determined." *Id.* (quoting *Slatton v. Slatton*, 289 S.C. 128, 130, 345 S.E.2d 248, 249 (1986)).

Here, no right of the United States "must be ascertained and settled" for the full adjudication of this action, and complete relief between Plaintiff and the existing defendants can be reached without the United States being made a party. Plaintiff seeks monetary damages from Defendants for property injures and the abatement of public and private nuisances through installation of upgraded water filtration technologies. Such relief "can[] be accorded among those already parties" to this action. Rule 19(a)(1); *see e.g.*, *Tinoco v. San Diego Gas & Elec. Co.*, 327 F.R.D. 651, 658 (S.D. Cal. 2018) ("Plaintiffs seek only monetary damages from [Defendant]. Should Plaintiffs prevail, they could recover damages from [Defendant] in the United States' absence. The requested relief does not require the United States to take action or change any policy."); *id.* at 659 ("Therefore, the Court is able to fashion meaningful relief between Plaintiffs and [Defendant] in the United States' absence. The Court finds the United States is not a necessary party under Rule 19(a)(1)(A).").

59

Nan Ya argues there cannot be complete relief without the United States because (1) "[u]nless the United States is a party, it cannot be forced to provide documents (other than through the singularly imperfect use of a FOIA request) or witnesses" as part of discovery in this action, and (2) if any existing Defendant is found to be liable to Plaintiff, "there would have to be a determination of what percent of any damage suffered by plaintiff each defendant is responsible for. Inevitably, therefore, it must be determined what percentage of environmental contamination of the waters at each intake point is the result of discharge from the AFB site." Nan Ya Am. MIS, at 7–8. Neither of these is an appropriate ground for joinder.

First, Nan Ya's only claimed prejudice—its desire to serve discovery on the United States instead of seeking documents through FOIA requests—is immaterial to a Rule 19 analysis. *See S.C. Dep't of Health & Env't Control v. Fed-Serv Indus., Inc.*, 294 S.C. 33, 38, 362 S.E.2d 311, 314 (Ct. App. 1987) ("[G]eneral consideration of efficiency or convenience of the parties are not sufficient to require joinder . . . ."). Nan Ya cites no authority for the proposition that having to use FOIA instead of discovery tools moves the needle in any way, and courts that have considered the argument have rejected it. *See, e.g.*, *Hefley v. Textron, Inc.*, 713 F.2d 1487, 1498 (10th Cir. 1983) ("According to Textron, if the federal rules are read liberally in light of the goals they were intended to promote, rules 14, 19, and 20 allow the joinder of immune parties solely for the purposes of discovery and the assessment of comparative fault. We disagree."); *id.* ("We have found no cases which approve of the use of rule 19 simply to allow greater discovery, and we can discern no policy which such an expansion of the rule would promote.").[25]

---

[25] As Nan Ya stated in its Amended Memorandum, "Rule 19 is the same as the federal rule, so that decisions by federal courts on issues surrounding necessary and indispensable parties are important to consider." Nan Ya Am. MIS, at 5.

60

Likewise, South Carolina law is clear that a party's status as a joint tortfeasor—who, if added as a defendant, would be subject to apportionment of liability under the South Carolina Uniform Contribution Among Tortfeasors Act ("UCATA")[26]—does not render it a necessary or indispensable party under Rule 19. "[A]dditional parties are not necessary to a complete determination of [a] controversy unless they have rights which must be ascertained and settled before the rights of the parties to the suit can be determined." *Smith v. Tiffany*, 419 S.C. 548, 562, 799 S.E.2d 479, 486 (2017) (quoting *Doctor v. Robert Lee, Inc.*, 215 S.C. 332, 335, 55 S.E.2d 68, 69 (1949)). "If the defendant and the parties sought to be brought in were joint tort-feasors, the decisions of this Court are clear to the effect that [the] defendant would have no right to bring in as an additional defendant a joint tortfeasor who was not made a party by the plaintiff." *Id.* at 562, 799 S.E.2d at 487. "Accordingly, mere joint tortfeasors are not necessary or indispensable parties to an action under Rule 19, SCRCP." *Id.* "To allow a defendant against the will of the plaintiff to bring in other joint tortfeasors as defendants would deny the plaintiff the right to name whom he should sue." *Id.* (quoting *Doctor*, 215 S.C. at 335, 55 S.E.2d at 69); *see also id.* at 564, 799 S.E.2d at 488 (recognizing "two centuries of common law establishing a plaintiff's right to choose which tortfeasors, if any, she will sue"); *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 345, 698 S.E.2d 559, 560 (2010) ("It is well-settled that a plaintiff has the sole right to determine which co-tortfeasor(s) she will sue."). As *Smith* makes evident, Nan Ya's desire to join the United States as a party for purposes of liability apportionment is contrary to South Carolina law.[27]

---

[26] S.C. Code Ann. §§ 15-38-10 to -70.

[27] In construing the UCATA, the *Smith* court recognized the act contemplates that not all tortfeasors may be defendants in an action and the courts do not have the authority to override that legislative determination. *See* 419 S.C. at 556–59, 799 S.E.2d at 483–85. However, Nan Ya does retain the right to argue the "empty chair" defense against the United States if it so chooses,

ELECTRONICALLY FILED – 2025 Mar 28 4:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

For its part, the United States has no—and indeed claims no—interest in Plaintiff's water supply, property, or water system, or any other interest "relating to the subject of th[is] action." Rule 19(a)(2). This Court should be skeptical of Nan Ya's attempt to achieve dismissal based on unarticulated, unclaimed, and unasserted rights of a non-party.

Nan Ya cites *Goddard v. Fairways Development General Partnership*, but this case is nothing like *Goddard*. Nan Ya Am. MIS, at 5. There, the plaintiffs sought the dissolution of a planned unit development ("PUD"), and the PUD's governing documents allowed dissolution only "with the consent of 100% of the [property] owners." 310 S.C. 408, 410, 426 S.E.2d 828, 830 (Ct. App. 1993). On appeal, the Court of Appeals found a property owner that had been dismissed from the action was an indispensable party because the relief sought in the action "affect[ed] her property interests." *Id.* at 412, 426 S.E.2d at 831.[28] Here, a judgment between Plaintiff and Defendants will not affect any property (or other) interest of the United States. *Cf. McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 951 (4th Cir. 2020) (recognizing that Fourth Circuit cases in which joinder was allowed "involve a situation where the contracts or obligations of the 'necessary' party were being interpreted or were otherwise directly at issue").

The fact that the United States, like Defendants, may have discharged PFAS into the environment does not create an interest in the United States related to this action. *See McKiver v.*

---

and it can seek contribution from the United States if it believes that is owed. *See* S.C. Code Ann. § 15-38-15(D) ("A defendant shall retain the right to assert that another potential tortfeasor, whether or not a party, contributed to the alleged injury or damages and/or may be liable for any or all of the damages alleged by any other party."); S.C. Code Ann. § 15-38-20(A) ("[W]here two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them.").

[28] The same is true of *EEE Minerals, LLC v. North Dakota*, which Nan Ya also cites. There, the court similarly found the United States was "a required party because it owns significant oil, gas, and other mineral interests in and under the lands that are the subject of this lawsuit." 318 F.R.D. 118, 125 (D.N.D. 2016).

62

*Murphy-Brown, LLC*, 980 F.3d 937, 952 (4th Cir. 2020) ("'[E]ven if [an absent party] is alleged to have played a central role' in the action at issue, 'and even if resolution of the action will require the court to evaluate the absent party's conduct,' that party 'in many cases . . . will not have interests that warrant protection under Rule 19(a)(1)(B)(i).'" (quoting *Ward v. Apple Inc.*, 791 F.3d 1041, 1050 (9th Cir. 2015))); *see, e.g.*, *Goethe*, 373 S.C. at 136, 644 S.E.2d at 701 ("We find that although GEICO may be affected by the outcome of the family court action, its interest is insufficient to meet the requirements for joinder pursuant to Rule 19(a)(2)(i), SCRCP.").

Despite acknowledging that the United States "would not be bound by any judgment as to its potential causation of Plaintiff's damages," Nan Ya argues that it could be "subject to being forced to pay 'an equitable share' of the costs of correcting contamination for the release of these chemicals" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Nan Ya Am. MIS, at 7, 8. But any obligation under CERCLA for the United States to remedy PFAS pollution at the AFB exists independently of this action. Nan Ya does not, and cannot, show how Plaintiff's case could create any "inconsistent obligations" for the United States or itself. Again, Plaintiff has disclaimed causes of action and damages related to AFFF PFAS, so no judgment in this action will have any effect on the AFB cleanup or the United States' obligations under CERCLA.

Finally, even if the United States were a necessary party and unable to be joined, it is not indispensable such that dismissal of this action would be required.

> If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures,

ELECTRONICALLY FILED – 2025 Mar 28 2:34 PM – HORRY – COMMON PLEAS – CASE#2024CP2603528

the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Rule 19(b), SCRCP.

As is shown above, a judgment in this action, even in the United States' absence, will adequately afford relief among the current parties and will not prejudice the United States or any current party as a result of the United States' nonjoinder. Nan Ya's desire to apportion liability to the United States and seek documents from the United States in discovery does not amount to prejudice under Rule 19. Moreover, Nan Ya's suggestion that Plaintiff has an adequate, alternative remedy against the United States is irrelevant, as Plaintiff is not seeking relief from the United States. Consequently, Rule 19(b)'s factors weigh heavily against finding the United States is an indispensable party.

In sum, the United States is not an indispensable, necessary, or even relevant party to this action. Thus, joinder under Rule 19(a) and dismissal under Rules 19(b) and 12(b)(7) would be inappropriate

## IV. CONCLUSION

Based on the foregoing, Plaintiff respectfully asks that this Court deny Defendants' motions in full and allow all of Plaintiff's claims to survive dismissal and proceed to discovery in this litigation.

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2603523

Respectfully submitted,

 /s/ John B. White. Jr.
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

February 28, 2025

ELECTRONICALLY FILED – 2025 Mar 28 2:54 PM – HORRY – COMMON PLEAS – CASE#2024CP2605523

# EXHIBIT 3

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 24 3:52 PM - GREENWOOD COUNTY - COMMON PLEAS - CASE#2024CP2400735

STATE OF SOUTH CAROLINA
COUNTY OF GREENWOOD

IN THE COURT OF COMMON PLEAS
EIGHTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

---

Greenwood Commissioners of Public Works,

*Plaintiff*,

v.

Cone Mills Receiver, LLC *et al.*,

*Defendants*.

C.A. No. 2024-CP-24-00735

STATE OF SOUTH CAROLINA
COUNTY OF LAURENS

IN THE COURT OF COMMON PLEAS
EIGHTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

---

Laurens County Water and Sewer Commission,

*Plaintiff*,

v.

Cone Mills Receiver, LLC *et al.*,

*Defendants*.

C.A. No. 2024-CP-30-00734

1

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS**

Plaintiffs, Greenwood Commissioners of Public Works ("GCPW") and Laurens County Water and Sewer Commission ("LWSC") (collectively "Plaintiffs"), hereby submit this Response in Opposition to the Supplemental Memorandum in Support of Defendants' Motion to Dismiss filed on behalf of Defendants by Unichem Specialty Chemicals, LLC ("Unichem") on March 17, 2025.

## I.   INTRODUCTION

In their Amended Complaints, Plaintiffs alleged:

> Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the direct and/or indirect discharge of these PFAS into the Reedy River, Saluda River, and Lake Greenwood, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

Complaints, ¶ 91.

Many Defendants, in their motions to dismiss and supporting memoranda, argued that a duty to Plaintiffs could only "be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *E.g.*, T&S Brass and Bronze Works, Inc. Memo., at 17–18 (quoting *Madison v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656–57 (2006)). Unichem similarly argued in its memorandum that it owed no duty to Plaintiffs because it had no duty "to control the conduct of another or to warn a third person or potential victim of danger." Unichem Memo., at 13 (quoting *Madison*, 371 S.C. at 136, 638 S.E.2d at 656). Specifically, Unichem argued it "had no duty to ensure that the Mauldin Road WWTP would treat the wastewater in a way that avoids any risk of harm to third parties, and therefore owed no duty to the Plaintiff." *Id.*

2

Plaintiffs explained in their Consolidated Response in Opposition to Defendants' Motions to Dismiss ("Opposition") that they were not alleging Defendants had an affirmative duty to act that was untethered to their industrial operations, nor were they alleging Defendants had a duty to control any third party. Opp'n, at 24–26. Instead, and as will be discussed further below, Plaintiffs reiterated that the duty they alleged Defendants owed them was the duty to act with due care in carrying out their industrial operations, and specifically as it relates to this litigation, the duty not to discharge PFAS into the environment.[1] *Id.* at 26–30.

At the March 11, 2025 hearing on Defendants' motions, counsel for Defendants repeated the arguments from their filings and further argued that Plaintiffs were attempting to impose a duty on them under South Carolina tort law relating to "volunteers" or "Good Samaritans," wherein a person or entity provides aid or a service to a third party. *See* Mar. 11 Hr'g Tr., attached as Exhibit 1, at 79:22–80:7 ("Mr. Lutz talked about the assumes to act duty under negligence. And I would just point out to the court, I mean, this assumes to act body of law is where we get things like the Good Samaritan law. These are situations where someone's injured on the road and you stop to help out and the law says, 'If you undertake to render aid to someone who is injured on the road, then you have assumed an obligation to that person to not do something that would cause them greater harm or that because of Your—their reliance on you that—that someone else doesn't come

---

[1] *Compare* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7(a) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm."), *with id.* § 37 ("An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the *affirmative duties* provided in §§ 38-44 is applicable." (emphasis added)); *see also id.* §§ 38–44 (imposing a duty based on statute, prior conduct, special relationship, an undertaking, or taking charge of another); RESTATEMENT (SECOND) OF TORTS, § 284 ("Negligent conduct may be *either*: (a) an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another, *or* (b) a failure to do an act which is necessary for the protection or assistance of another and which the actor is under a duty to do." (emphases added)).

3

to help them.' This is not that situation at all."). However, Plaintiffs' position is not that Defendants' duty arises out of any aid or service they provided to a third party.

In its Supplemental Memorandum, Unichem maintains its erroneous position that Plaintiffs allege Defendants' duty to them arises out of a voluntary undertaking to a third party. *See, e.g.*, Unichem Supp. Memo., at 3 (asserting "the applicable standard for determining whether a duty" exists in this litigation is reliant on Defendants providing a service to a third party). Once again, Plaintiffs make no such allegation in their Amended Complaints. By stating they owe Plaintiffs no duty under "affirmative duty" or "volunteer / Good Samaritan" tort law, Defendants are advancing straw man arguments. Plaintiffs alleged in their Amended Complaints, and have consistently argued, that Defendants' duty to them arises out of their industrial operations, which they voluntarily[2] engage in, and which create an unreasonable risk of harm to others.

Defendants' repeated attempts to improperly recharacterize Plaintiffs' allegations and the basis of their negligence liability should not be allowed to continue, and Plaintiffs should no longer be required to refute arguments by Defendants against a position Plaintiffs have never taken. Instead, Defendants must confront Plaintiffs' actual allegations and theory of liability head on. Once made to do so, their arguments all fail, and South Carolina law clearly imposes upon them a duty to Plaintiffs not to discharge PFAS into the waterways upstream of Plaintiffs and their properties.

---

[2] To be clear, use of this word is not intended to suggest that Defendants' industrial operations confer upon them "volunteer" or "Good Samaritan" status for purposes of applying South Carolina tort law. Rather, it is merely intended to note Defendants' volitional conduct—i.e., Defendants have willingly chosen to engage in their various industries.

4

## II.  ARGUMENT

### A.    Defendants' Duty.

In their Opposition, Plaintiffs demonstrated that South Carolina tort law requires an actor to exercise due care to ensure its conduct does not create a risk of harm to others.[3] *See, e.g.*, *Ramey v. Carolina Life Ins. Co.*, 244 S.C. 16, 24, 135 S.E.2d 362, 366 (1964) (acknowledging "there is a duty upon all to exercise reasonable care not to injure another"). Without a doubt, this duty applies to businesses, including Defendants, carrying out their operations. As our Supreme Court explained nearly a century and a half ago, "No doubt it is the legal duty of a person engaging in any business dangerous to others to exercise due care in providing against such dangers, and the absence of such care as the case requires would be negligence . . . ." *Davis v. Columbia & G. R. Co.*, 21 S.C. 93, 104 (1884); *see also Eargle v. Sumter Lighting Co.*, 110 S.C. 560, 566–67, 96 S.E. 909, 911 (1918) ("The law imposes on those who employ such agencies the duty of exercising the same degree of care for the protection of their employees *that it imposes upon them for the protection of the public*, and that is 'ordinary care'—such care as an ordinarily prudent person should exercise in the circumstances--sometimes called 'due care.'" (emphasis added)); *Jones v. Seaboard Air Line R.R. Co.*, 67 S.C. 181, 195, 45 S.E. 188, 193 (1903) (noting the duty of a railroad company to construct its piers and bridges prudently "flows from the duty imposed upon all to so use their own property as not to injure others").

This law has not changed, and Defendants' attempts to silo Plaintiffs' negligence claims into narrower, inapplicable branches of tort law do not relieve them of this fundamental duty. The cases that Plaintiffs cite in their Opposition further bolster the fact that this duty applies in the context of pollution generally, and with respect to PFAS specifically. Unichem complains that

---

[3] Plaintiffs incorporate the relevant arguments and cited law from their Opposition here. *See* Opp'n, at 24–30.

5

"these cases either (i) do not discuss the issue of whether a duty is recognized by South Carolina law or (ii) the relevant facts and law are plainly distinguishable." Unichem Supp. Memo., at 2. However, the fact that the cases do not contain extensive discussions of the duty merely reflects that this is settled, well-established law, and the facts in those cases are not materially distinguishable such that they would fail to support Defendants' duty to Plaintiffs here. Accordingly, Unichem's arguments are unfounded.

**B.      Plaintiffs' South Carolina Authorities.**

Unichem begins its attack on Plaintiffs' position with another attempt at misdirection: "To begin with, the Moving Defendants agree with Plaintiffs that *Madison* sets forth the applicable standard for determining whether a duty is created by a voluntary undertaking . . . ." Unichem Supp. Memo., at 3. Unichem then cites the following language from *Madison*:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

*Madison*, 371 S.C. at 136, 638 S.E.2d at 657 (quoting RESTATEMENT (SECOND) OF TORTS, § 323). This is disingenuous for two reasons: first, as stated above (and as argued in their Opposition, and as alleged in their Amended Complaints), Plaintiffs do not ground Defendants' liability on any "service[ they rendered] to another." *Id.* Thus, this quote from *Madison*, which describes the "volunteer" or "Good Samaritan" branch of tort law, as well as section 323 of the Restatement (Second) of Torts, is entirely irrelevant to this litigation. Second, Plaintiffs have never taken the position that *Madison* "sets forth the applicable standard for determining" Defendants' duty. Admittedly, Plaintiffs did cite to *Madison*—once—in their Opposition. But this was done *only* in response to Defendants' nearly uniform, and misguided, reliance on this case in their motions to

6

dismiss. *See e.g.*, T&S Brass and Bronze Works, Inc. Memo., at 17–18 (arguing a duty to Plaintiffs could only "be created by statute, a contractual relationship, status, property interest, or some other special circumstance" (quoting *Madison*, 371 S.C. at 136, 638 S.E.2d at 656–57); Opp'n, at 25 (citing the full relevant portion of *Madison*, which provides that a person who acts must do so with due care regardless of statutory, contractual, or other obligation, in order to refute Defendants' reliance on the isolated language they cited and provide "[a] fair and complete statement of the law Defendants invoke").[4] Unichem then similarly argues that under *Madison*, "there is there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." Unichem Supp. Memo., at 4 (quoting *Madison*, 371 S.C. at 136, 638 S.E.2d at 656). Again, however, Plaintiffs do not argue that Defendants were required to control the conduct of others, such as relevant wastewater treatment plants ("WWTP"), or warn Plaintiffs of any danger. Unichem's assertion that Plaintiffs have taken the position that *Madison* controls is yet another straw man argument that Plaintiffs and this Court should not be forced to spend their time unraveling.

### 1.     *Chestnut*, *Joyner*, and *Parker*.

As is shown above and in Plaintiffs' Opposition, South Carolina tort law clearly imposes a duty on businesses to act with due care in carrying out their operations. Moreover, Plaintiffs have cited  many cases that show that a duty of due care *has regularly* been found both in the context of water pollution generally in South Carolina and in the specific context of PFAS elsewhere. But because Unichem denies their applicability, Plaintiffs will address each of Unichem's arguments in turn.

---

[4] Unichem also notes Plaintiffs' "Amended Complaints do not identify any such voluntary undertaking by the Defendants as a service to the Plaintiffs, nor to any other person," but that is for good reason: it is not the basis of Defendants' duty. Unichem Supp. Memo., at 4.

Again, the fact that *Chestnut*, *Joyner*, and *Parker* do not expound upon the tort theories underpinning the duties they recognize is not the fatal omission Unichem would have this Court believe. *See* Unichem Supp. Memo., at 5 (complaining that these cases "do not even discuss the creation or existence of an actionable duty"). Rather, it should go without saying that judicial opinions often cite to or reference black letter law without reverting to first principles and "reinventing the wheel" in each instance. Likewise, the fact that these cases recognize and apply a duty of care to businesses that generate water pollution simply underscores that such a duty is well-recognized and need not be supported by thorough explication in every instance.

As for *Chestnut* in particular, the procedural posture of that case may have been the appeal of a dismissal of a negligence claim (among others) due to the type of damages alleged; however, for the Supreme Court to reverse and reinstate the claim on remand, the Court necessarily found that the plaintiffs alleged a cognizable duty. Unichem's assertion that the *Chestnut* court did "not [address] whether a duty had been properly alleged" is contradicted by the opinion itself, wherein the Court stated, "[h]ere, appellants have pled all four elements of a negligence claim[, including] duty." *Chestnut v. AVX Corp.*, 413 S.C. 224, 228, 776 S.E.2d 82, 84 (2015); *see also id.* ("[W]e find the complaint sufficiently pleads a negligence cause of action on behalf of appellants, and therefore reverse the dismissal of this claim.").[5]

Moreover, the *Chestnut* court likely did not discuss the existence of a duty because it cited *Babb v. Lee County Landfill S.C., LLC*, wherein such a duty was previously recognized. *See id.* ("In *Babb* . . . , we held a plaintiff could maintain an environmental negligence suit based upon

---

[5] Had the Supreme Court believed plaintiffs had not pled a cognizable duty, it almost assuredly would have affirmed the trial court's dismissal of the negligence claim on that basis rather than reinstating and remanding a non-viable claim, in order to preserve judicial resources. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal.").

offensive odors if the complaint alleged either 'physical injury [to the plaintiff] or property damage.'" (quoting *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 153, 747 S.E.2d 468, 481 (2013))). Importantly, *Babb* answered the following certified questions (among others) from the United States District Court for the District of South Carolina:

> When a plaintiff contends that offensive odors have migrated from a neighbor's property onto the plaintiff's property, may the plaintiff maintain an independent cause of action for negligence or is the plaintiff limited to remedies under trespass and nuisance?
>
> [and]
>
> If an independent cause of action for negligence exists under South Carolina law when a plaintiff contends that offensive odors have migrated from a neighbor's property onto the plaintiff's property, does the standard of care for a landfill operator and breach thereof need to be established through expert testimony?

*Id.* at 136–37, 747 S.E.2d at 472.

The Supreme Court provided the following answer to the first question above: "We hold that while it may be possible for a plaintiff to recover in negligence for offensive odors, we stress that such a claim would have to satisfy the elements of negligence like any other claim, and the mere offensive *smell* of odors would not be enough." *Id.* at 152–53, 747 S.E.2d at 480–81. If South Carolina law did not recognize a duty in this context, the Supreme Court would have so stated. Rather than answering that the negligence claim could not be maintained due to a lack of duty, however, the *Babb* court even discussed the standard of care for a landfill operator that is responsible for migrating offensive odors. *See id.* at 153–54, 747 S.E.2d 468, 481. Such a discussion would have been irrelevant, and improper, if no duty existed, because without a duty of care, there can be no standard of care. *See Doe v. Wal-Mart Stores*, Inc., 393 S.C. 240, 247, 711 S.E.2d 908, 912 (2011) ("[I]f no duty has been established, evidence as to the standard of care is

9

irrelevant. Only when there is a duty would a standard of care need to be established."). Clearly, *Chestnut* and *Babb* both recognize a duty applicable to Defendants.

Concerning *Joyner*, Plaintiffs cited that case for the proposition that when Defendants carry out their industrial operations, they have a duty to do so with due care. Opp'n, at 25. Although *Joyner* may not explicitly discuss "duty," it essentially provides that acting with "due care" is the applicable duty, and failing to act with "due care" is a breach of that duty:

> Now, what is negligence? Negligence, as held in many cases and as laid down by all text-writers upon the subject, is defined to be the absence of due care. What is due care? Due care is a relative term, each case having its own requirements in that respect; or, in other words, each subject-matter under the control and management of a person having its own demands as to due care. Consequently, what would be due care as to one matter, would not necessarily be so as to another. On this account it has been impossible for the law to establish any precise standard or legal definition of due care suited to every case, and which the trial judge should deliver to the jury as matter of law, to be compared by them with the evidence, so as to reach a satisfactory conclusion on the question whether or not due care is absent or present in a special case. All, therefore, that the law has determined as a general rule, and all that the judge in charging upon this subject need say, is that the presence of due care negatives negligence, and that the absence of such care constitutes negligence, or, rather, affirms its presence . . . .

*Joyner v. S.C. Ry. Co.*, 26 S.C. 49, 51-52, 1 S.E. 52, 53 (1887).

The duty to act with due care, which *Joyner* long ago recognized, is the same duty that Plaintiffs invoke. This duty required Defendants to use due care in disposing of toxic chemicals and to avoid discharging PFAS into the waters upstream of Plaintiffs and their properties. Unichem asserts "the obligation to act with due care only arises following the creation of a duty," then cites the portion of *Madison* stating "one who assumes to act, even though under no obligation to do so, thereby becomes obligated to act with due care." Unichem Supp. Memo., at 6 n.5 (quoting *Madison*, 371 S.C. at 136, 638 S.E.2d at 656–57). But Unichem ignores the consequence of the

10

language it cites: once Defendants "assumed to act" in their industries, they were "obligated to act with due care."

Unichem next suggests that *Joyner* and *Parker* are not controlling because they addressed the propriety of jury instructions, and "a jury does not decide whether a duty exists; that responsibility remains with the court." Unichem Supp. Memo., at 6. This is nonsensical. Plaintiffs do not dispute that the existence of a duty is a question of law for the court; however, a jury instruction is a statement of the law *by* the trial court *to* a jury, and not the jury's determination of what it believes the law to be. *See Stephens v. CSX Transp., Inc.*, 415 S.C. 182, 197, 781 S.E.2d 534, 542 (2015) ("A trial court must charge the current and correct law."). Accordingly, when an appellate court approves a jury instruction, it is ruling that the statement of law in the instruction is correct, and the instructions approved in *Joyner* and *Parker* are correct statements of the law as determined by the South Carolina Supreme Court. Thus, their descriptions of negligence, once approved by the Supreme Court, carry as much weight as any other ruling by that court on the issue.

Notably, the *Parker* court explicitly approved the statement of law Plaintiffs cited in their Opposition. *See* Opp'n, at 27; *Parker v. Simmons*, 163 S.C. 42, 56, 161 S.E. 169, 173–74 (1931) ("The second question raised by the exceptions is: Was there error in the Judge's charge in reference to negligence and recklessness? In disposing of this question we deem it sufficient to state that an examination of the entire charge, which will be reported with the case, convinces us that the trial Judge, in charging the jury on the question of negligence and recklessness, was fair to the defendants and they have no cause for complaint.").

11

## 2.    *Ravan*, *Conestee Mills*, **and** *Johnston*.

Unichem argues *Ravan*, *Conestee Mills*, and *Johnston* are inapplicable because they are factually distinguishable—this is wrong. These cases may not present the exact same facts as are present this litigation, but the duties recognized therein nonetheless apply to Defendants here.

Unichem first argues *Ravan* is inapplicable because in that case, the defendant decided where to dispose of the industrial waste it transported, and was not a "mere hauler" of the waste, whereas here, Plaintiffs have not alleged "that Defendants were responsible for selecting where their wastewater was ultimately discharged." Unichem Supp. Memo., at 6–7. Not so. Plaintiffs alleged that, "[d]espite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, PFBS, and GenX Chemicals are hazardous to human health, Defendants indirectly discharged industrial wastewater contaminated with these chemicals into the Enoree River, which they knew or should have known contaminated Plaintiff's property and its water supply." Complaints, ¶ 57. In other words, despite knowing the consequences of doing so, Defendants chose to dispose of their PFAS in their wastewater instead of selecting alternative disposal methods.

Unichem also takes an overly narrow view of the significance of *Ravan*. The takeaway from the opinion is that, had Waste Management been a "mere hauler" of waste, the scope of its duty would have been confined to that role. However, because its role was broader, its duty was broader. *See Ravan v. Greenville Cnty.*, 315 S.C. 447, 468, 434 S.E.2d 296, 309 (Ct. App. 1993) (acknowledging there is "a significant difference between a company [that] brings abnormally hazardous waste into the world and one [that] as a conduit transports that waste without untoward incident." (quoting *Kenney v. Sci., Inc.*, 497 A.2d 1310, 1327 (N.J. Super. Ct. 1985))). In distinguishing the duties owed by a mere transporter of hazardous waste and a company that creates the waste and "brings [it] into the world," the court observed that the duty of a mere transporter was necessarily more limited because "the release of chemicals at the [disposal] site

12

was not a natural consequence of the transportation of waste." *Id.* at 468–69, 434 S.E.2d at 309. Here, however, as Plaintiffs alleged in their Amended Complaints, the proliferation of PFAS into the environment was the natural consequence of Defendants' discharge of PFAS-laden wastewater. The *Ravan* court imposed a duty of care on Waste Management because "Waste Management purchased the tickets from the county that permitted dumping in the landfill." *Id.* at 469, 434 S.E.2d at 309 (Ct. App. 1993).

Here, Defendants' role is even broader—they not only chose to dispose of PFAS via their wastewater (as Waste Management chose where to dispose of the hazardous waste at issue in that action), but they also chose to use PFAS in their industries, which necessitated the disposal of PFAS in the first place. Their role, therefore, is akin to that of both Waste Management (the waste transporter) and Waste Management's customers (which generated the hazardous waste), and their duty is correspondingly broader. *Ravan* clearly supports Plaintiffs' argument that as PFAS users and dischargers, Defendants had a duty to use and discharge their PFAS with due care.[6] Unichem's attempt to distinguish *Ravan* from this case is unpersuasive and should be rejected.

Concerning *Conestee Mills*, Unichem argues Defendants "are not alleged to have any statutory rights or obligations related to the maintenance of public sewage or water systems." Unichem Supp. Memo., at 7. Again, this misses the point and is immaterial. In *Conestee Mills*, the City of Greenville argued as a defense that the sewer system it constructed and maintained was authorized by legislation, but the court rejected the defense, reasoning:

---

[6] As noted above, Unichem protests in its Memorandum that some cases Plaintiffs cite in their Opposition do not directly discuss or address the defendants' duty. In *Ravan*, however, one of the discrete issues on appeal was whether Waste Management owed a duty of care to the plaintiff, and the opinion includes a discussion of that duty. *See id.* at 467, 434 S.E.2d at 308 ("On appeal, Waste Management argues (1) it did not owe a duty of care to Ravan . . . ."); *id.* ("In order for Ravan to recover in negligence against Waste Management, he must show Spartan had a duty of care not to dump toxic chemicals into the landfill . . . .").

13

> While it was lawful to construct the sewer system, and the plaintiffs have received compensation for the injury to their property incident to the construction thereof, it by no means follows that either the city authorities or the sewer commissioners have the right to act in excess of the powers conferred upon them by law. In short, it was the duty of the sewer commissioners to use due care in the construction of the sewer system, and the same duty devolved upon the city authorities in the operation and maintenance thereof.

*Conestee Mills v. Greenville*, 160 S.C. 10, 26, 158 S.E. 113, 119 (1931). As is made clear, the duty recognized in *Conestee Mills* was not based on any statutory right or obligation. Rather, it was a common law duty of due care that supported the plaintiff's negligence claim. *See id.* at 19, 158 S.E. at 116 ("The action in the instant case is grounded, not upon the construction of the sewerage system, which was authorized by act of the Legislature, but upon the negligence of defendant in the operation of that system—for which a cause of action clearly lies.").

Similarly, the duty recognized in *Johnston* did not arise out of the "violation of [any] applicable regulations, permit requirements, or other rules" as Unichem suggests. Unichem Supp Memo., at 8. In that case, the plaintiffs alleged that the defendants owed them "a duty of reasonable care" and a "duty to follow the law . . . and other related rules as they apply to Defendants' operation of the landfill." *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 540 (D.S.C. 2024). This is because the plaintiffs asserted causes of action for *both* negligence/gross negligence and negligence per se. *See id.* at 534. Although the *Johnston* court granted the defendants' motion to dismiss the plaintiffs' negligence per se claim, *id.* at 542, it denied their motion to dismiss the negligence/gross negligence claim because the plaintiffs sufficiently alleged the claim, including a duty on the part of the landfill. Nowhere in its opinion did the *Johnston* court state that the "duty of reasonable care" the plaintiffs alleged was inapplicable or that the defendants' duty was based solely on statute, regulation, or rule. *See id.* at 540–41 ("Plaintiffs allege that Defendants have been negligent, grossly negligent, and reckless in a number of specific

14

ways, including failing to utilize proper operating procedures and technology and attempting to handle more waste than they can handle. . . . The Court finds that these allegations are sufficient to state a claim for negligence, gross negligence, and recklessness at this stage of litigation."). Accordingly, Unichem's argument does nothing to diminish the applicability of *Johnston* to this litigation.

### 3.     *Byerly*, *Rayfield*, *Edwards*, and *Edward's of Byrnes Downs*.

Although these cases do not involve pollution, they nonetheless support Plaintiffs' position that Defendants had a duty of reasonable care in the operation of their industries. For example, in *Byerly*, the South Carolina Supreme Court found the undertaking voluntarily assumed by Santee Cooper was "yearly inspections of docks and piers solely for the purpose of ensuring that the docks and piers conform to structural requirements of permits issued by Santee Cooper." *Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992). As a result, Santee Cooper's duty was limited "to us[ing] due care to discover structural nonconformity with permits." *Id.* at 445, 415 S.E.2d at 799. Similarly, Defendants here voluntarily engaged in their various industries, and as a result, their duty was to exercise due care in the carrying out of their operations. Plaintiffs do not allege that their duty extends outside of their industrial operations, as Unichem's argument suggests. Plaintiffs do not allege, for example, that Defendants had a duty to control the conduct of the WWTPs or remove pollutants from their wastewater that they did not introduce. Although not in the pollution context, *Byerly* reiterated the broad principle that "[a]t common law, where there is no duty to act, but an act is voluntarily undertaken, the actor assumes a duty to use due care." *Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992).

Unichem's criticism of *Rayfield* is similarly unavailing. Unichem suggests that this case stands for the proposition that "duties created by voluntary undertaking a service to another are strictly limited under South Carolina law." Unichem Supp. Memo., at 9. Notwithstanding that

15

Plaintiffs have not alleged Defendants have "undertak[en] a service" to them, the WWTPs, or any other relevant entity (as is explained above), the portion of *Rayfield* that Unichem cites merely stands for the uncontroversial proposition "that a person usually incurs no liability for failure to take steps to benefit others or to protect them from harm not created by his own wrongful act. In other words, a person has no duty to protect another from harm inflicted by a third person." *Rayfield v. S.C. Dep't of Corrs.*, 297 S.C. 95, 100–01, 374 S.E.2d 910, 913 (Ct. App. 1988). To be clear yet again, Plaintiffs have not alleged that Defendants owe them any such duty. Instead, Plaintiffs cited *Rayfield* for the proposition that Defendants are liable for "harm . . . created by [their] own wrongful act[s]," i.e., their improper discharge of PFAS.

Unichem next argues that *Edwards* "emphasized the necessity of a special relationship to create an *affirmative* duty of care, which is simply not present here." Unichem Supp. Memo., at 9 (emphasis added). Again, however, Plaintiffs are not arguing Defendants had an affirmative duty to act that was independent of their conduct in carrying out their industrial operations. As Plaintiffs have alleged and repeatedly argued, Defendants voluntarily engaged in their industrial operations, and as a result they had a duty to do so with due care. Thus, no special relationship is required here. Additionally, the *Edwards* court found the defendants there owed the plaintiff a duty for two reasons: (1) their relationship with a third party, who assaulted the plaintiff, and (2) "their actions in creating the risk of harm." *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 293, 688 S.E.2d 125, 130 (2010). Plaintiffs do not rely on the first *Edwards* ground to establish Defendants' duty; instead, Plaintiffs cited *Edwards* because it recognizes that when an actor creates a risk of harm, it may be liable to those harmed by that conduct. Here, Defendants "creat[ed] the risk of harm" to Plaintiffs (and others) by improperly disposing of PFAS in their wastewater. Accordingly, Unichem's argument that *Edwards* requires a special relationship between Plaintiffs and

Defendants is incorrect. *Cf. id.* at 293–94, 688 S.E.2d at 130 ("Respondents created a situation that they knew or should have known posed a substantial risk of injury to Edwards. . . . Respondents' duty is one of due care . . . .").

Plaintiffs similarly cited *Edward's of Byrnes Downs* for the basic proposition that there is a "common law duty to exercise due care to avoid injury or damage to others." Opp'n, at 26. Unichem's attempt to require an isomorphic mapping between the facts of *Edward's* and this litigation do not change this fundamental tenet of South Carolina tort law or preclude its application here. The fact that Defendants did not "enter[] a contract with any party or third party for the construction or maintenance of a structure adjacent to or in which Plaintiffs resided . . . [or have] a contract to maintain Plaintiffs' water treatment system" is entirely irrelevant to whether they owed Plaintiffs a duty of care as alleged in Plaintiffs' Amended Complaints.

## C.     Plaintiffs' Out-of-State Authorities.

Unichem's primary argument against the out-of-state cases Plaintiffs cite in their Opposition relies on the fact that those states have adopted section 324A of the Restatement (Second) of Torts, while South Carolina has not. *See* Unichem Supp. Memo., at 10–11. This is yet another red herring argument that has no bearing on this litigation. Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS, § 324A.

Once again, Plaintiffs do not allege that Defendants have "undertake[n], gratuitously or for consideration, to render services to" Plaintiffs or any other third party. As a result, the fact that

17

South Carolina has not adopted section 324A or incorporated the rationale therein into South Carolina's common law is inconsequential.

Moreover, *Johnson* does not rely on section 324A[7] or suggest that its ruling was based on Georgia tort law recognizing a duty to third parties when services are rendered to another. *See Johnson v. 3M*, 563 F. Supp. 3d 1253, 1319–24 (N.D. Ga. 2021). Instead, the *Johnson* court relied on the following proposition of tort law, which also applies in South Carolina:

> Certain duties are inherent in human society. A owes B the duty to so handle his affairs or conduct his business and control the material forces with which he deals as not to injure the person or property of B. A violation of this duty is a wrong which may support an action for damages. 'Negligence' itself is a failure to exercise the degree of care demanded by the circumstances.

*Id.* at 1321 (quoting *Sims v. Am. Cas. Co.*, 206 S.E.2d 121, 127 (Ga. App. 1974)); *see also id.* ("The Georgia courts recognize a duty not to engage in conduct that will result in pollution of state waters (including non-navigable streams) rendering them unfit for their ordinary purposes by downstream users."). This is the same duty recognized by the South Carolina cases cited above and in Plaintiffs' Opposition.

Additionally, the language Unichem cites, which references foreseeability, merely addresses the scope of the duty that the *Johnson* court recognized. *See* Unichem Supp. Memo., at 11; *Johnson*, 563 F. Supp. 3d at 1319 ("A legal duty to exercise ordinary care is the obligation to conform to a standard of conduct under the law for the protection of others against the foreseeable, unreasonable risk of harm from such conduct."); *id.* at 1320 ("Plaintiff counters that he is not alleging Defendants had a 'general duty to all the world,' but rather, that Defendants' duty arises from the foreseeability that their conduct would contaminate downstream water supplies with

---

[7] Section 324A is not cited once in the *Johnson* opinion.

PFAS chemicals. This alleged duty is not 'limitless,' as Defendants contend because the foreseeability of the risk of harm circumscribes the scope of the duty."). South Carolina law similarly requires a foreseeability analysis in determining the scope of a recognized duty. *See, e.g.*, *Easterling v. Burger King Corp.*, 416 S.C. 437, 449, 786 S.E.2d 443, 449 (Ct. App. 2016) (stating the court "must analyze the scope of Burger King's duty [to a customer] by employing [a] balancing test to determine . . . if a crime was foreseeable"). Unichem also cites *Oulla v. Velazques* for the proposition that foreseeability alone does not give rise to a duty. *See* Unichem Supp. Memo., at 11. However, foreseeability is relevant in determining the scope of a recognized duty, such as the duty Defendants owed Plaintiffs, and foreseeability of injury certainly does not preclude finding that a duty exists. Accordingly, Unichem's argument regarding foreseeability fails, just like its argument regarding section 324A.

In sum, section 324A has no bearing on *Johnson* or this litigation, and *Johnson*, along with the other out-of-state PFAS cases cited in Plaintiffs' Opposition, did not apply any tort law not recognized in South Carolina that would render their reasoning inapplicable here. And although not binding on this Court, they are nonetheless persuasive.

Finally, the fact that the out-of-state cases Plaintiffs cited involved individual plaintiffs also does not limit their applicability to this litigation. In all of the cases, the court found that the duty owed by the PFAS dischargers was a broad duty to exercise reasonable care in the disposal of PFAS and to avoid polluting the environment. *See* Opp'n, at 29–30. Such a duty certainly applies to Plaintiffs with the same force that it applied to the individual plaintiffs in those cases. *See also Aqua N.C., Inc. v. Corteva, Inc.*, No. 7:23-CV-16-D, 2024 U.S. Dist. LEXIS 120406, at *12 (E.D.N.C. July 9, 2024) (finding PFAS dischargers owed *a water utility provider* "a duty to exercise ordinary care"). Finally, Unichem suggests that *Utilities Board of Tuskegee v. 3M Co.* is

19

inapplicable here because "the claims were asserted against only PFAS manufacturers, not users, and proceeded under product liability theories not applicable here." Unichem Supp. Memo., at 12. However, that case involved a negligence claim, and not only products liability claims. *See Utils. Bd. of Tuskegee v. 3M Co.*, No. 2:22-CV-420-WKW, 2023 U.S. Dist. LEXIS 21983, at \*22–34 (M.D. Ala. Feb. 9, 2023) (addressing the plaintiff's negligence claim). Additionally, the *Tuskegee* court found PFAS manufacturers had "a duty to exercise reasonable care when supplying chemicals where the foreseeable and normal use of those chemicals, as supplied, causes the dangerous contamination of public drinking water." *Id.* at \*25. Although Defendants here are dischargers, not manufacturers, the reasoning underlying the recognition of the duty in *Tuskegee* applies here with equal force—Defendants similarly had "a duty to exercise reasonable care when [discharging] chemicals where the foreseeable and normal [release] of those chemicals, as [discharged], causes the dangerous contamination of public drinking water." *Id.*

### III. CONCLUSION

Based on the foregoing, Plaintiffs GCPW and LWSC respectfully ask that this Court reject Unichem's arguments, submitted on behalf of itself and other Defendants; find that, pursuant to well-established South Carolina tort law, Defendants owed Plaintiffs a duty of reasonable care; and deny dismissal of Plaintiffs' negligence claims on that ground.

Respectfully submitted,

 /s/ John B. White. Jr.
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988

20

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiffs*

March 24, 2025

# EXHIBIT 4

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA
COUNTY OF SPARTANBURG
SOUTH CAROLINA CIRCUIT COURT 7
DOCKET NOS.: 2024-CP-24-00735; 2024-CP-30-00734
2025-CP-30-00005


GREENWOOD COMMISSIONERS OF PUBLIC WORKS,
LAURENS COUNTY WATER AND SEWER COMMISSION,
CITY OF CLINTON, SOUTH CAROLINA,
                    PLAINTIFFS,


vs.


CONE MILLS RECEIVER, ET AL.,
BASF CORPORATION, ET AL.,
                    DEFENDANTS.



          H E A R I N G
     BEFORE THE HONORABLE GRACE G. KNIE



DATE:              MARCH 11, 2025
LOCATION:          SOUTH CAROLINA CIRCUIT COURT 7




                    LEGAL EAGLE
               Post Office Box 5682
          Greenville, South Carolina 29606
                    864-467-1373
               depos@legaleagleinc.com

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

2

APPEARANCES:

    JEROME TAPLEY, ESQUIRE
    RYAN LUTZ, ESQUIRE
    AKIRA WATSON, ESQUIRE
    CORY WATSON, PC
    2131 MAGNOLIA AVE S.
    BIRMINGHAM, ALABAMA 35205


    JOHN B. WHITE, JR., ESQUIRE
    JOHN B. WHITE, JR. P.A.
    291 S. PINE STREET
    SPARTANBURG, SOUTH CAROLINA 29302

       ATTORNEY FOR THE PLAINTIFFS,


    RICHARD WILLIS,  ESQUIRE
    WILL DUBOSE, ESQUIRE
    JOHN TAMASITIS, ESQUIRE
    WILLIAMS MULLEN
    FIRST CITIZENS BANK BUILDING
    1230 MAIN STREET, SUITE 330
    COLUMBIA, SOUTH CAROLINA 29201

       ATTORNEY FOR THE DEFENDANT T&S BRASS & BRONZE
     WORKS, INC.,


    LOLY TOR, ESQUIRE
    K&L GATES, LLP
    ONE NEWARK CENTER, 10TH FLOOR
    NEWARK, NEW JERSEY 07102

       ATTORNEY FOR THE DEFENDANTS CRYOVAC, INC. &
       CRYOVAC, LLC,


    RYAN HEBSON, ESQUIRE
    BURR & FORMAN
    420 NORTH 20TH STREET, SUITE 3400
    BIRMINGHAM, ALABAMA 35203

       ATTORNEY FOR THE DEFENDANT FIRST SOURCE WORLDWIDE,
       LLC and OPPERMANN WEBBING, INC.,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

JAMES WEATHERHOLTZ, ESQUIRE
WOMBLE BOND DICKINSON LLP
5 EXCHANGE STREET
CHARLESTON, SOUTH CAROLINA 29401

    ATTORNEY FOR THE DEFENDANT UNICHEM SPECIALTY
    CHEMICALS, LLC,


JAMIE CARROLL, ESQUIRE
CARROLL & WEISS, LLP
2870 PEACHTREE ROAD NW, SUITE 193
ATLANTA, GEORGIA 30305

    ATTORNEY FOR THE DEFENDANT MILLIKEN & COMPANY,


GREG ENGLISH, ESQUIRE
WYCHE, P.A.
200 EAST BROAD STREET, SUITE 400
GREENVILLE, SOUTH CAROLINA 29601

    ATTORNEY FOR THE DEFENDANT FIBERTEX, INC., JAIN-
    CHEM, LTD., and NICCA USA INC.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

4

INDEX

PROCEEDINGS............................................... 5

CERTIFICATE OF TRANSCRIBER.............................. 138

EXHIBITS

(NONE MARKED)

(THIS TRANSCRIPT MAY CONTAIN QUOTED MATERIAL.  SUCH MATERIAL

IS REPRODUCED AS READ OR QUOTED BY THE SPEAKER.)

5

THE COURT: All right. Thank you all. We're on the record with civil action numbers 24-CP-42-734/735 and the city of Clinton case as well, if y'all will bear with me. Let me get that number. And 25-CP-30-0005.

Thank you all very much for your materials. I felt there's a wall being built around me in my office and down here, but I certainly do appreciate the effort that it takes to put all that together and to get it here via FedEx, hand delivery, or US Postal Service. I do appreciate it. I've been reading, and I also want to tell you all how much I appreciate the information because this topic is very specialized.

So, in civil action numbers 24-735 and 734, that would be -- I'm just going to make that easier, Greenwood and Laurens County. I understand there are nine defendants, they're the same defendants, and that there are seven motions to dismiss that have been filed on behalf of all defendants except for what, Cone -- Cone Mills Receiver; is that correct? There was an answer filed, and I know there are some answers that have been filed. I see you, Shane, good morning. And -- and motions to dismiss, but there is not a motion to dismiss regarding that defendant, correct?

MS. TOR: Correct Your Honor.

THE COURT: Okay. And Cryovac, Inc. and Cryovac, LLC filed a joint motion, correct?

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

6

MS. TOR:  We already filed two separate motions, one for Greenwood and one for Laurens.

THE COURT:  Right, but the -- the two defendants filed together.

MS. TOR:  Oh, yes, I apologize, yes.

THE COURT:  Yes, and you are?

MS. TOR:  Loly Tor for K&L Gates on behalf of Cryovac.

THE COURT:  Okay.  And I'll ask you all, sorry, forgot to -- my AA told me to tell y'all, use the mics, and y'all please identify yourselves.  I know y'all are famous nationwide, but for my benefit, if you will please just identify yourselves when you address me, okay?

All right.  And so I -- I  know that there are also several motions to stay regarding discovery and I just want to make sure that I understand that the plaintiffs have not agreed to stay discovery in any case.  Would that be correct?  And who's going to be responding on behalf of the plaintiffs?

MR. TAPLEY:  Your Honor, Jerome Tapley for the plaintiffs.

THE COURT:  And we stand up here.

MR. TAPLEY:  I apologize.

THE COURT:  Welcome.  Okay.  And so you all have not agreed to stay the discovery, but you have granted some extensions that I may not be aware of.

MR. TAPLEY:  That is correct, Your Honor.

7

THE COURT:  Because the discovery has not been filed, right?  In -- in the court's file?

MR. TAPLEY:  We haven't filed a motion to compel, no, Your Honor.

THE COURT:  No, I mean, but -- but the discovery that has been sent has not been included in the filings with the clerk, correct?

MR. TAPLEY:  That's correct, Your Honor.

THE COURT:  That would be correct, okay.  And so y'all just understand that I don't have the benefit of what you've been exchanging, okay?

MR. TAPLEY:  Yes, Your Honor.

THE COURT:  With regard to that.  Okay.  So I have been handed an agenda, thank you.  And so we will -- the way that this will work, we have plenty of time, okay?  And I want you all to take your time.  As Mr. Willis stressed to me at the status conference, he -- I -- I believe that he wished to treat these as separate cases, although some of the arguments are going to be consolidated, right?

And let me just back up one more time and say that I know that I boasted and said I was going to put together a steering committee and I was going to do that by that Monday following that Friday status conference.  But then after reflecting on the arguments made, I thought that it might be premature.  And so I -- I have -- I have a tentative list,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

8

but the list is fluid and changing because as y'all know, Richardson Lewis is now removed. And -- and so those eight or nine cases are no longer before me. And I -- I would stress to you all to let my office know if that happens with any of the other pending cases.

I was notified yesterday by the clerk's office in Gaffney that now there is a city of Gaffney case that -- that has also, there have been some motions filed. And y'all just please understand that the way that I'm finding out about this is through the clerk's offices throughout the State and, of course, plaintiff's counsel as well, okay?

Okay. And the last thing before -- before we start. I do have availability the last week of March going into April, and I think my staff did email you all and let you know that as -- as we are trying to schedule more hearings, okay?

All right. And so does everybody have the agenda? I'm -- I'm assuming that Mr. Willis provided it since he's featured first.

MR. WILLIS: Yes, ma'am.

THE COURT: Okay. And does everybody have it?

MR. WHITE: Yes.

THE COURT: Okay. And are we expecting anybody to be addressing me on Webex, or are these all just folks observing?

MR. WILLIS: I think they're all observers for the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

9

defense, Your Honor.

THE COURT:  Okay.

MR. WILLIS:  They may have some issues they want to raise with you, but we tried to get all of the lawyers who are going to address you today on the issues of the motion to be here live.

THE COURT:  Okay.  Thank you, and before you all leave, let me have English Mosley, my law clerk, circulate a very basic sign-in sheet or something so that I know who is here physically, the Webex we have a record of.  All right.  So this is Ms. Mosley (indicating), okay?

All right.  And this is Ms. Searcy (indicating).  I know that you all have probably been dealing with her a lot about this, and to keep it simple in my office, when you all are communicating and emailing, it's best to email to my AA.  We, English -- I'm also admin. for Common Pleas and the Circuit, and so English is up to here with defaults, okay?  And so it's just simpler that way.

All right.  And so is there any objection to then first hearing from the movants?  I will give the then respondents an opportunity to argue and then movants an opportunity to reply, okay?  Okay.

MR. TAPLEY:  No objection, Your Honor.

THE COURT:  Okay.  And we -- the tech person did make sure that was plugged in and working this morning.  If -- if

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

10

y'all want to feel more comfortable at the podium, that's fine.  Okay.

MR. WILLIS:  Thank you, Your Honor.  May it please the court.  I'm Richard Willis for, in -- in this motion, the defendant, T&S Brass.  Although, as Your Honor knows, we represent a number of other defendants, and obviously these issues are related and -- and -- and cross-extend to -- to the other cases.

Your Honor, I spoke with Mr. White before Your Honor came in with regard to what the best way -- the best agenda to handle this or the best process.  We have tried to separate out the issues and had different lawyers address different issues as we're going through.  If Your Honor finds that you would prefer to hear this motion issue by issue, rather than have the defendants get up and talk for an hour, and then the plaintiffs talk for an hour, and then have a reply, it -- we're -- we're flexible, Your Honor.  And however you want to do it is -- is fine with us, and I think Mr. White said the same thing.  It might be better to do this issue by issue, and I will just leave that up to the court.

THE COURT:  How are y'all prepared to argue?

MR. WHITE:  Your Honor, for the court.  May I please the court, John White.  We're prepared to issue, as you alluded to earlier, in that we would take issue by issue.  You would make your argument, we'd make our argument, and you would

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

11

have an opportunity to reply.

MR. WILLIS:  And if -- if that -- Your Honor ---

THE COURT:  If that's what y'all ---

MR. WILLIS:  --- if the court wants to do it that way, that's fine.  We'll be glad to do it that way.

THE COURT:  Well, I'm not trying to interfere with your thought process, okay?

MR. WILLIS:  Right.  There is -- there is some overlap.

THE COURT:  Issue by issue is fine, but whatever you think is most efficient, okay?

MR. WILLIS:  Well, why don't we try it issue by issue and see where we get, Your Honor?

THE COURT:  Okay.  Thank you.

MR. WILLIS:  And -- and Your Honor, with regard to the stay, I think I can probably take care of that.  So the -- the basis for the stay, requesting a stay for discovery, is we wanted discovery to be stayed until Your Honor got here and decided these motions to dismiss.  And I think that whether the plaintiff agreed to that or not -- that I think that's sort of the process that we've sort of fallen into here.

So if Your Honor grants the motions to dismiss, obviously it might -- it would have an impact on discovery. If the cases are dismissed completely, there would be no discovery because the cases would be over, and presumably

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

12

they would go up on appeal. But if Your Honor is going to grant a partial motion to dismiss or deny them all, then obviously discovery would then commence, and we have no objection to that.

So, Your Honor, for the purposes of this motion today, I wanted to say a little bit about T&S Brass. Every defendant in these cases is a little different. T&S Brass is a manufacturing company. They're located in Travelers Rest, South Carolina. They employ approximately 250 people. They've been in operation since 1947, and so they're one of the older industrial manufacturing citizens of the State.

They manufacture brass fittings, specialty products for food services, industry, commercial plumbing, essentially plumbing equipment and -- and brass fittings for plumbing, faucets, that sort of thing.

They discharge their wastewater to the Mauldin Wastewater Treatment Plant pursuant to a pre-treatment permit issued by Mauldin -- the Mauldin plant that's authorized by the Federal Clean Water Act and by DHEC, now DES regulations, and they're in compliance with their permit. They don't discharge wastewater to a stream or a river or to Lake Greenwood.

And while there may be PFAS compounds, and I'm just going to link -- lop all of these chemicals together, Your Honor, and call them PFAS if that's okay. While there may be

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

13

PFAS compounds in their wastewater, I don't know that for sure, but that's alleged, and of course, Your Honor has to assume that the factual allegations are true for the purposes of this motion.

Like all the defendants in this litigation, their contribution to the overall load of PFAS and drinking water in South Carolina is very, very small. And whether it finds its way to plaintiff's intake is -- is obviously a factual question. But therein lies one of the problems with this litigation, because the way it's brought, it seeks to impose what could be enormous costs on a small subset of selected industrial clients and whose contribution to the overall load of PFAS in surface water and drinking water would -- is grossly disproportionate, much smaller than what the -- the total is. And -- and that's particularly true because of the way the case has been pled and the effort to disclaim any liability for PFAS contamination related to firefighting foam. Now, we understand the reason that's been done is to keep this case out of federal court.

If, Your Honor, I don't know whether Your Honor has had a chance to look at the recent Fourth Circuit opinion on the motions to remand in the cases that were removed, the Maryland case and the State of South Carolina case. I have a copy of that opinion here, Your Honor, if -- if -- if you haven't had a chance to see it. And that -- that just --

14

that opinion just came out last week, Your Honor, and it's interesting. It doesn't directly affect our emotions, but it illustrates one of the problems we have here with this case, because in that case, the Fourth Circuit basically said the effort to disclaim liability for firefighting foam when contamination to surface water and groundwater caused by firefighting foam is one of the major, if not the major source of PFAS contamination to groundwater, are to surface water is problematic.

And for the purposes of the removal, they basically rejected that artful pleading and said there may be federal officer jurisdiction here regardless of how the case has been pled and they remanded the case back to Judge Gergel to make some findings and so we expect he'll make a ruling on that, and then it'll go back up to the Fourth Circuit.

But as a matter of introduction, I think it's important to note what these cases before you are and what they're not. How are they different from the cases that are in the multi-district litigation in federal court?

T&S Brass, Your Honor, does not make PFAS compounds. It uses PFAS compounds, or it did at one time in its operation. And unlike the cases that were before you but have been removed to federal court, none of the so-called AFFF manufacturing defendants, such as 3M, DuPont, Chemours, Tyco, all the defendants who basically are in the MDL and who have

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

15

funded the -- the MDL settlement.  None of these manufacturing clients have been sued in the cases that Mr. White has brought.  And had they been sued, these cases would also have been removed by 3M to federal court.  Instead, these cases have sued various defendants that are alleged to use PFAS compounds in their processes, or perhaps did so at some point in the past, and with regard to some, in the quite distant past.

And as Your Honor is aware, the -- the effort to disclaim liability for FFF -- AFFF, leaves a huge orphan share in this case.  It leaves a -- a chemical that's primarily responsible for the contamination that plaintiffs are complaining of, but there's no one there to answer for that.  And so the net result of this sort of selective choice of targets by the plaintiff is that a small subset of the total contribution to PFAS and drinking water, has -- the plaintiffs have sort of chosen to impose all of their past, present, and future costs on this small subset, which is not only strikes our clients as sort of massively unfair, but it -- it really is an existential threat to these defendants, Your Honor.  These are not big companies.  This is -- most of these claims are not covered by insurance.

And so if -- if this -- if these cases go forward in an effort to impose, you know, what's been estimated by some as 50 million or 60 million dollars or some large number in

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

16

terms of what it's going to cost to install water treatment systems in order to get the PFAS levels down to four parts per trillion, and this is -- this is a massive cost that no one really knows what it's going to be.  And that's again an existential threat to a number of these defendants.

And what is also frustrating is that the plaintiffs seem to be attempting to impose this liability through State of South Carolina common law causes of action, nuisance, negligence, and trespass.  And in so doing, we believe that they are sort of trying to cram a square peg into a round hole.  The square peg being their claims, the round hole being the -- these common law causes of action that don't really fit these claims or that will have to be bent out of shape in order to accommodate them.

And interestingly, Your Honor, in an effort to avoid federal court, plaintiffs have ignored a cause of action and a remedy that Judge Gergel and other commentators have sort of pointed to as, if there's going to be a litigation solution to the PFAS problem, that remedy probably lies in a private party cost recovery action under federal CERCLA. Under Sections 107 and Section 113 of CERCLA, where a party that's had to respond to the release of a hazardous substance can sue the generators of that hazardous substance to recover their response costs if they're consistent with federal regulation.  And what -- what a CERCLA claim would do, Your

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

17

Honor, is provide a vehicle for fair allocation of responsibility which we don't have, unfortunately, under South Carolina law.

So if, Your Honor dismisses these cases, I -- I do want the court to understand that there is a remedy for the plaintiffs in this case. They can go to federal court and they can bring a CERCLA action against the parties that they believe to be responsible.

So our clients came to court today concerned that they're being selectively victimized for a problem that they had no role in or an exceedingly small one, if at all, just because they're industrial entities and they're easily and unfairly demonized. So that's really all I want to say from an introductory standpoint. That's why these motions are important to us, Your Honor, and they're not your run-of-the-mill Rule 12 motion.

I remember arguing a case before Judge Buckner many years ago down in Hampton County and I said, "Your Honor, I have a motion to dismiss." and he sort of rolled -- rolled his eyes and I said, "Your Honor, this is not the your run-of-the-mill motion to dismiss," and he said, "Mr. Willis, every motion you make is a run-of-the-mill motion to dismiss," and of course he denied that motion. But I think Your Honor has given -- in giving us the time and have -- and looking at the briefs I think you recognize that these are

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

18

some interesting issues at least.

So, Your Honor, let me talk -- let me start by talking about Rule 12.  And this is not surprisingly the only thing that the defendants and the plaintiffs agree on.  So there -- there's at least one issue where there's a general agreement, and that is Rule 12's pleading standards and how it's supposed to work.  And it goes without saying, but I will say it anyway, that the court's inquiry here is limited to the four corners of the complaint, and we realize that.

We realize that the court must assume the well-pleaded facts and reasonable inferences to be drawn from the complaint are true, but the court is not required to presume the propositions of law are correct.  And that in any motion to dismiss, and these motions are no different.

The overriding question before the court is, do the complaints read in a light most favorable to the plaintiff, state a justiciable controversy.  Stated otherwise, do the facts as alleged state valid causes of action under South Carolina law.

Unfortunately, our agreement with the plaintiff ends there.  They argue that they have stated causes of action, and this is a justiciable controversy, and we argue that they have not, and it is not.  So to conserve Your Honor's time and attention, the moving defendants have conferred, and we've attempted to identify some common arguments and assign

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

19

roles.  And we've handed up the agenda.

And so my role today, Your Honor, substantively, is to address what we've identified as the justiciability issue, specifically standing and ripeness.  Mr. Hebson will address failure to join indispensable parties.  Ms. Tor will address trespass and nuisance.  Mr. Weatherholtz will address negligence and traceability.  Mr. Tamasitis will address the municipal cost recovery rule.  Mr. Dubose will address primary jurisdiction.  And Mr. Carroll will address statute of limitations.  And then I'll try to wrap it up.  And so to that extent, Your Honor, we'll permit that, we'll try to stay in our lanes.

So let me begin to talk about justiciability.  And, Your Honor, justiciability, as we pointed out in our brief, incorporates stand -- sort of, both -- both the issue of standing and the issue of ripeness.  But essentially what we're saying is because of the uncertainty as to the finality of the regulatory requirements that will ultimately apply to PFAS contamination in groundwater, surface water, and drinking water, and because the ultimate remediation technologies and treatment technologies that will be required to treat PFAS to drinking water standards are certain to change over time.

We believe this litigation is premature, and we believe that at least this aspect of the case should be dismissed

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

20

without prejudice or stayed until more is known and we have more certainty.  And as Your Honor knows, the regular -- the regulatory landscape continues to change and has changed even after the plaintiffs have filed suit.

Most recently, on January 21, 2025, under the due administration, the Office of Management and Budget has withdrawn EPA's proposed rule on Clean Water Act effluent limitation guidelines and standards for PFAS manufacturers. And this decision was part of a broader regulatory freeze that was mandated by an executive order from President Trump. The -- these withdrawn rules would have established technology-based effluent limitations that would apply to the companies that were manufacturing PFAS and then, as a -- as a consequence, had PFAS in their discharge.

Now, that doesn't affect the four parts per trillion -- 10 parts per trillion maximum contaminant limit for drinking water which is at the core plaintiffs case, but they do affect the amount of PFAS that can be put into wastewater which then has an effect on what the cost will be in terms of hitting those drinking water standards.  Now, those drinking water standards are also in a bit of flux because as we pointed out in our brief on page six, there are three separate legal actions pending that challenge EPA's PFAS drinking water rules, including the MCLs, the maximum contaminant limits for drinking water, including one of the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

very trade associations that purports to represent the water provider plaintiffs in this case.

Now, plaintiffs say in their brief that we're wrong about that. Not because the litigation doesn't challenge the regulations, because it does, but because they say it doesn't challenge EPA's underlying scientific findings concerning the need to remove PFOS and PFOA and related compounds from drinking water. But then they go on to say, and I quote, they say, "Instead, the parties challenged the MCLs for mixtures of various PFOS compounds, and they complained that EPA's enforceable limits for PFOA and PFOS were too close to MCL goals to be economically feasible, posing risk to water affordability."

Now, Your Honor, I don't want to be obtuse here, but that's exactly what we're saying. That's consistent with our point. That there's ongoing litigation challenging whether these standards are going to ultimately be in force and effect in 2029 when they're alleged to become effect or when they're planned to become effective.

So those are just two illustrations of why this case is not ripe. As the Court knows, these PFAS drinking water standards are not planned to go into effect until April of 2029, so that's four-and-a-half years from now. There are no current legal standards for PFAS in drinking water, and the underlying rule on PFAS in effluent has been withdrawn.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

22

There's no current requirement on the -- on the plaintiff's part to incur any costs or damages with regard to PFAS, and I -- I looked at their complaint carefully to see whether there was a clear allegation that they had incurred costs that identified those costs, and I really couldn't find that.  There's some allusions to, well, maybe they would have to, maybe there's some monitoring that they have to do, maybe they've done some investigative analysis to determine what defendants use PFAS.  I don't believe those would be recoverable damages.  But we also know that the cleanup technologies and its ultimate cost is certain to change over the next four years.  Maybe it'll get worse.  Maybe it'll get better.  No one knows.

But the bottom line, Your Honor, is there's no present way for anyone, much less a jury, to determine with any degree of certainty what the plaintiffs will be required to do in 2029, if then or if ever.  Now, to get around that argument, plaintiffs argue in their brief that the defendants have mischaracterized their allegations, and they say that we -- we've argued that plaintiffs' injuries arise from regulatory obligations rather than defendants' ongoing contamination of their properties.

But, Your Honor, again, if you're limited to the four corners of the complaint and you just read the complaint, the truth is they allege both.  Both damages they're going to

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

23

suffer because of future regulatory compliance costs. The cost of installing new water treatment systems to remove PFOS and PFOA from drinking water, and they also allege that they have current contamination on their property that they believe they can sue for.

And, Your Honor, the -- if you just look at paragraph 73 of their complaint, you see they say -- they state, "Plaintiff has sustained special injuries as a result of defendant's public nuisance, including, but not limited to the loss of use of its property." And this is the operative language that I'm focused on. "The inability to provide potable water to customers without concentrations of PFOA, PFOS, et cetera, deemed unsafe by EPA. Expenses associated with future acquisition, installation, and operation of required treatment technologies to remove unsafe concentrations of these PFOS from water." So, in fact, they do seek future costs of required treatment technologies. And our point is, at this stage, that is uncertain and speculative.

Your Honor, to have a justiciable controversy, you have to have injury-in-fact, and their legally protected interests must be both concrete and particularized. That's language from the US Supreme Court cases that we cite in our brief. Their -- their damages have to be actual or imminent, which means on the -- on the horizon, certain to happen, not

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

24

conjectural or hypothetical.  And where plaintiffs' claims are contingent on future events that haven't come to pass and may never, then this aspect of their claim is not ripe, and it should be dismissed without prejudice for it to be brought at a later time.

I think, Your Honor, if -- if we were here before you in a -- in a simpler context, where this was just a lawsuit between two private businesses, and one business was suing to recover costs that it might have to incur four years from now.  You would have no hesitancy in saying, "Okay.  That's fine.  I'm going to dismiss the case, re-file it when that eventuality comes to pass."  And you would be correct in doing so.  And this case, while a little bit more complicated than that, is really no different.

The fact that plaintiffs -- that plaintiffs are also seeking damages for alleged past and present contamination presently on its property that they claim devalues its property, interferes with its ability to do business, that doesn't save the claims for the -- the -- the future treatment technologies they're going to have to incur.  And, Your Honor, frankly, that's the big elephant in the room.  That's the big number that has an extential -- existential threat to the defendants in this case.

So, the fact that there are no present regulatory standards for permissible levels of PFOA or PFOS in soil or

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

25

groundwater means that there is, in fact, no present ascertainable damages flowing from these allegations. Some sort of regulatory standard is necessary to determine what is permissible, what levels would be considered negligent, particularly since PFAS compounds, as the court knows, are everywhere. They're ubiquitous, and they're found in dozens of different sources, including, even domestic wastewater and, Your Honor, even rainfall has PFAS in it.

Let me mention briefly, Your Honor, the concept of redressability. For a -- for a case to be justiciable, the injury must also be, "Redressable through the claims that have been asserted." For example, take -- take the claim for injunctive relief. Let's suppose that the court, after the trial of this case, decides to enjoin T&S Brass from using or discharging PFAS. Well, that doesn't redress the issue, the problem that the plaintiffs have, because publicly-owned treatment works are the ones who directly discharge wastewater to the lake and stream systems, the wastewater treatment plants that we claim are indispensable parties but aren't in the case, not T&S Brass. They don't discharge to lakes or stream systems where plaintiffs then draw their water to convert to drinking water. So if that's the case, even if T&S Brass is discharged and joined, there will still be high levels of PFAS from other sources who haven't been sued, particularly the primary one, which is firefighting

26

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

foam.  So, Your Honor, the claim, what that means is the plaintiff's claims are not redressable by the reliefs plaintiffs seek, and therefore the case is not justiciable.

With regard to standing, Your Honor, as we say in our brief, the plaintiffs don't own the water in Lake Greenwood. They don't own the water in the Reedy River that they withdraw from.  The State of South Carolina owns that water, and it has its own lawsuit seeking damages, and that one is the one that went up to the Fourth Circuit and has been sent back down to Judge Gergel to deal with the question of remand.  So plaintiffs can't seek the same damages that the State of South Carolina is seeking.  And although they claim -- although they claim that damage in their complaint, they argue that the contamination interferes with their right to use Lake Greenwood.  And there'll be more on that later, Your Honor, when we get to the municipal cost recovery rule.

So, defendants aren't mischaracterizing the nature of plaintiff's case.  They're mischaracterizing it in their brief in an effort to get past this motion.  Your Honor, don't take my word for it.  Just read the complaint. Paragraph 40, it -- it -- it talks repeatedly about imposing the future cost of treatment of water and PFAS in water, which is what we believe is not ripe and is too uncertain to seek recovery for at this time.

If you look at paragraph 44 of their complaint,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

paragraph 61, paragraph 67, 67B requests that the jury award damages to fund the acquisition, installation, and operation of new water treatment technology at plaintiff's wastewater treatment plant or at plaintiff's drinking water treatment plant to remove legacy PFOS, PFOA, et cetera. So they are seeking future costs. Paragraph 76, and then in there, prayer for relief, subparagraph E.

So, Your Honor, I'm referring the court to language directly in the complaint, so we don't have to pretend that plaintiffs aren't seeking recovery for future PFAS treatment systems. And that cost is -- is unknown, and it's speculative. It may never be required. And so that's why their claims are not ripe.

In conclusion, Your Honor, on the ripeness issue. Your Honor has the authority to dismiss this aspect of the case until more is known. Your Honor also has authority to -- to just stay it or set it aside or bifurcate the case between what the plaintiffs say -- now say in their brief, their cases about current contamination. Well, if that's the case, we can deal with that. If -- if their case is as they argue, just like a run-of-the-mill groundwater contamination case where ground waters move from one property to another and it's caused property devaluation, that's one thing.

But to allege in their complaint that they're also entitled to these future speculative damages that might be

28

massive as to, you know, asking a subset of defendants to fund an entire wastewater treatment system that's going to serve everyone, that -- that part of the case is not ripe. It's premature, it's uncertain, it's speculative, it's contingent on future events that may or may not occur. So we ask the court to dismiss these claims or stay these cases until we can get some certainty as to what we're dealing with. Thank you, Your Honor.

THE COURT: Thank you.

MR. TAPLEY: Good morning, Your Honor.

THE COURT: Good morning.

MR. TAPLEY: Jerome Tapley for the plaintiffs, and may it please the court. I have some responses to the argument that was just made, but I would ask the court before I start, if the court has any questions, I would be happy to take any questions from the court.

THE COURT: Yes, sir. I'm happy (inaudible).

MR. TAPLEY: Your Honor, I want to put these cases before you this morning into a little better context than we heard earlier. Between Greenwood and Laurens County, the two utilities collectively serve about 65,000 customers. If you assume for a moment that those customers average about four people per household unit, we're getting real close, Your Honor, then to a quarter of a million people affected by the contaminated source of their drinking water. And I know much

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

was made of T&S Brass's specific facts of how large their company is or isn't, but the fact of the matter is these defendants have collectively made a very big mess for the people who live downstream. And that mess has serious health implications for the peoples in those communities.

Your Honor, I want to touch on the Fourth Circuit case for a moment that was referenced. It has nothing to do with these cases. It has to do with a very obscure federal defense called federal officer defense. None of these defendants claim they're federal officers, nor could they. That's something that's present in another series of litigation, but really has nothing at all to do with the cases at hand.

Moreover, Your Honor, there's no allegation in this case that what's happening downstream in Laurens and Greenwood has anything to do with AFFF. There are no AFFF allegations in the complaint. There's no AFFF evidence in front of the court. We dispute that this is an AFFF case. It's where it belongs here in State court in South Carolina because this is a South Carolina common law case. And the facts of this case fits the South Carolina common law perfectly, Your Honor. I did hear that the application of South Carolina common law was somehow unfair. I don' t know that I've ever heard a lawyer argue that the common law was unfair. At this point, its foundations are about 900 years old.

30

As to the justiciability of the claims in these -- in these two cases, and the justiciability of the common law claims specifically in these cases, these cases are about past, present, and future property injuries under South Carolina common law. It is true that regulatory standards are a yardstick by which some of those damages might be measured. But it is not true that the damages stem solely from regulatory standards.

As far as the cases which are pending in federal court challenging the drinking water standards as they concern PFAS. Two things are true there. One, those standards are sufficiently concrete to allow those cases to be ripe for adjudication. And I don't understand how, on the one hand, defendants can argue that the standard is not sufficiently concrete to make a challenge of the standard ripe for adjudication, yet it's not ripe enough to be an issue in this case. The mere fact that that case exists shows that the standard is live and actionable.

Your Honor, it's also true and it's in our complaint that plaintiffs in these cases have until '29 to come into compliance with the now valid drinking water standards. But they cannot wait until the '29 to do something. What they're going to have to do in terms of engineering solution, costing out the construction of that solution, creating budgets, coming up with the revenue to build that solution,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

31

constructing that solution all in an environment, Your Honor, where the need and the demand in the economy for this type of technology and for this type of construction has ballooned since the issue of the new regulations.

So what might have cost a certain dollar amount two years ago is a very different environment now. So they've got to go through this process. They've got to start measuring, which they're doing now, coming up with the different options, evaluating the different options with engineering experts, design a plan for construction of a new filtration plant, and begin that construction, and get that done by 2029. It is not entirely certain that that is even possible. It may be that some of our clients have to ask for grace and an extension of time in order to come into compliance with the new standard. But to say this is not real, that they don't have to do anything and we can wait until 2029. 2029 is way too long. I'm not sure right now is enough time, nor are our clients.

Also, I want to be very clear, Your Honor, on this issue of the PFAS, which these defendants undisputably discharged upstream of our clients in South Carolina. It is absolutely clear that when they discharged these pollutants to their local sewer, they knew or should have known that those pollutants were going to get into the creeks, streams, ultimately the rivers, and travel downstream. They also knew

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

32

that under the law, they can't discharge any pollutants without a permit.  It is undisputed and will remain undisputed that no defendant in this case ever had a permit to discharge PFAS pollutants.

On the issue of water and the use of water coming out of Lake Greenwood.  Our clients -- our clients have property on the lake.  They have riparian rights, the rights to access and use that water under South Carolina law.  They also, Your Honor, and I think this is critically important, they have a permit from the State of South Carolina telling them how much water they can remove.

Moreover, they can only take water from that source.  They can't decide, okay, this is polluted.  Let's go look for another place and go start drawing water there.  The State has to approve of their withdrawal of water, and that's because the State manages all the waters of the State.  This is their water source.  This is their property located on this water source, and when they use that water source, they now have to install additional filtration in order to meet the standard.

Your Honor, also back to the standard and to the EPA's determination, one thing that is in our papers and don't want the court to lose sight of it, what has not been challenged in any of the litigation challenging the drinking water regulations is the health findings.  There's no challenge to

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

that, Your Honor. There's no challenge to this huge body of scientific research which says there's no safe level of these chemicals in drinking water. That's the MCLG. The MCLG, the health advisory, and the health determinations by EPA, no matter how this litigation goes in federal court, will remain.

So to be clear, Your Honor, we have current damages. Those damages stem from the contamination of our property with a pollutant that nobody ever gave them permission to release into the environment. Many of those chemicals were released days ago, weeks ago, months ago, years ago.

PFAS is a very interesting chemical in how it reacts in the environment. This is not like a tractor-trailer wreck, which occurs on the interstate and spills a bunch of diesel fuel into a river. Scientists can measure that. They can monitor that plume as it travels downstream all the way to the ocean. And they can give really precise, predictable information to water utilities downstream as to when that plumes going to pass them by, when not to take water out, when to rely on reserves, and then when it's all clear again, that's not PFAS.

PFAS binds to soil along the river and then it gets stirred up again and makes another migration with the next rain. It binds to organic matter that's fallen from trees and plants into the river, and then he gets stirred up again

34

and migrates a little further with the next rain. It is referred to as a forever chemical because there is not a natural process in the environment which destroys these chemicals or degrades these chemicals in any relevant period of time.

This problem, Your Honor, will remain far past the expiration of the lives in this courtroom. It will for generations be a problem in these rivers and in Lake Greenwood. The only practical, reliable, and sensible way to address this problem is the method chose by plaintiffs. It is to install filtration where the water is taking -- is taken from the environment and converted into drinking water, and to remove the chemicals. So that the citizens in Greenwood and Laurens County that rely on these two utilities for their drinking water can have reliable, safe drinking water that is no longer contaminated with the PFAS, which these defendants released into the environment.

And, Your Honor, there was mention of if this were a different case, a simpler case between two businesses about some future speculative damage which may or may not occur. I don't know how that has anything to do with this case. This case is not about something future and speculative. I don't know what the argument about changes in technology has to do with this case, because I'll tell you, I think if this were a different, simpler case of a man who herniated a disc in his

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

35

back at work, and the defendant in that case stood before Your Honor and said, Your Honor, there's a lot of upcoming new changes in back surgeries. It might be cheaper in a year or two from now. We don't really know what it ought to cost to fix his back, but his doctor says I know what surgery he needs right now. I don't think Your Honor would buy that argument for a minute. The same's true here.

Our clients are working with their engineers, and they know what the available technologies are, and they're going to choose from those to provide the water to their customers in the way they're required to provide it, and in a way that is safe, based on the health determinations that are yet to be challenged, and frankly, aren't subject to challenge.

Your Honor, thank you for your time.

THE COURT: Okay. Thank you. Okay. Mr. Willis?

MS. WILLIS: Briefly, Your Honor. Counsel said these defendants have made this mess, and as I'm sure the court knows, if -- if the court has spent any time getting general information about PFAS just from the Internet, the -- the point is everyone has made this mess. Homes generate PFAS contamination in their domestic wastewater every time they flush the toilet. There's PFAS in rainfall. It's not just these defendants.

And -- and the reason why we brought, Your Honor, the -- the -- the Fourth Circuit case to your attention is it does

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

36

have something to say about this litigation because it says this effort to disclaim any liability associated with firefighting foam.  When firefighting foam has been recognized by EPA and DHEC as the primary source of PFAS contamination to lakes and rivers, because this firefighting foam has been used for decades by fire departments, by airports, by Department of Defense facilities, by Department of Energy facilities.  And it's -- and it's concentrated with PFAS because that's good at putting out fires.  And it's sprayed all over the ground, and it gets in ditches, and it gets in storm water runoff, and it finds its way to streams and lakes.  And it is the primary source, but not in this case.

We can't point our finger at that and say our share of PFAS is only one percent.  It's 99 percent firefighting foam because South Carolina law does not permit us to do that. And I take no umbrage from criticizing common law.  Your Honor knows there is a debate raging in the legislature right now about whether or not South Carolina's allocation law is fair.  So that's the reason we -- we cited that.

With regard to the observation that because challenging the regulations is right for adjudication, and therefore this case should be ripe, well, there's obviously a difference. You can challenge regulations before they're final.  And so that's what's going on there.  So that doesn't mean this case

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

37

is ripe, it just means that case is ripe.

Defendants knew or should have known that there was PFAS contamination in their wastewater. That's a problem for the plaintiff as well, Your Honor. They knew or should have known. And they have statutes of limitations that they have to comply with that Mr. Carroll will be talking about in a minute.

Your Honor, if this case was just about the current situation, current property damage at the plaintiff's facility, I think we could probably figure out a way to go forward, but it's about more than that. It's about these future costs that are huge. And those are the ones we believe are too speculative for a jury to base a decision on. And -- and there's no prejudice, no harm at all to the plaintiffs to separate that out, to carve that out, and say, come back to me when you're more certain as to what it's going to cost to respond to the federal regulations when they become final. Thank you.

THE COURT: Thank you, Mr. Willis. Okay. Anything else? I'm being a little informal. I don't want this to be a ping-pong back and forth, back and forth, but on that issue. Any -- anything else, earth shattering? I will let Mr. Willis respond.

MR. TAPLEY: Yep.

THE COURT: You're not required to.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

38

MR. TAPLEY:  I'm going to be very brief.  Your Honor, just to remind the court that the purpose of this hearing and the court's inquiry into whether or not plaintiffs have pled a case is limited to the four corners of the complaint.  All this new supposed evidence about AFFF that we didn't plead in our complaint really has nothing that needs the court's attention.

THE COURT:  Okay.  Thank you.

MR. WILLIS:  We agree on the standard, Your Honor.  We understand it's limited to the four corners of the complaint.  Thank you.

THE COURT:  Thank you.  Okay.  So are we ready now to move Mr. Hebson?

MR. HEBSON:  Yes, Your Honor.

THE COURT:  Good morning.

MR. HEBSON:  Good morning, Your Honor.  May it please the court.  My name is Ryan Hebson from Burr & Forman, and we represent Oppermann Webbing and First Source Worldwide in connection with these cases.  And my role today is just to talk very briefly about the issue of the failure to join indispensable parties.  And here, this is the wastewater treatment facilities.

And, Your Honor, I just have three quick points that really are based on the allegations of the complaint as written.  And first, Your Honor, I'd just point out that not

39

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

all of the defendants have currently moved to dismiss or to join these wastewater treatment plants as indispensable parties.  However, as Your Honor is well aware more than I am, not all defenses are subject to waiver in the same way as, say, personal jurisdiction, and more like subject matter jurisdiction.  The failure to join an indispensable party can be raised -- later in the case, can be raised on a motion for judgment on the pleadings.  It can be raised on a motion for judgment on the pleadings. It can be raised on the court's own motion and all the way up to trial, Your Honor.  And so the failure to raise it is not subject any of the defendants to waiver.

My second point, Your Honor, just goes straight to the -- the text of Rule 19.  It states, in pertinent part, "A person who is subject to service of process and whose joined or will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if, in his absence, complete relief cannot be accorded among those already parties."

And, Your Honor, on this issue, it really is all about the allegations and the complaint.  In paragraph 72 is one example, and it really does state these kind of facts, allege them throughout.  It says that plaintiffs have a right to potable water that is reasonably pure and safe and free from PFAS.  And amongst the relief that's being sought in the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

40

complaint, and this is in a number of paragraphs, including 66, 72, and 89, "Plaintiff seeking injunction to require the defendants to cease all discharges into the Reedy River, the Saluda River and Lake Greenwood."

And, Your Honor, earlier plaintiffs counsel said defendants have made a big mess for people who live downstream. And, Your Honor, that's where this issue of the failure to join these wastewater treatment plants really come in, come into fruition, and come into effect here because these defendants do not discharge directly into any of the river waters and did like into Lake Greenwood into the Saluda River or into the lower Reedy River. Rather they are taking their wastewater to wastewater treatment plants who then treat the water before it is discharged. And so to say that these defendants are discharging into the water is not exactly the right way to look at it. And, Your Honor, this is also alleged specifically in the complaint and this is paragraph four, where it says, "Defendants discharge these products to surface water via certain wastewater treatment plants located upstream. These wastewater treatment plants include the Mauldin Road Wastewater Treatment Plant, the Lower Reedy Wastewater Treatment Plant, and Piedmont Regional Wastewater Treatment Plant."

And so, Your Honor, it is, if this is about discharges into the river, and certain of the relief that's being

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

41

requested is to have an injunction to stop the discharging into the river, then it needs to be noted that it's the wastewater treatment plants which, for whatever reason, have not been named as defendants in these cases.  These are the entities that are actually discharging into the river.  These are the entities that are tasked with treating the wastewater before discharging it into the river.

And, Your Honor, this is an issue that has come up before in other cases and I would direct, Your Honor, to a case from the Alabama Supreme Court which is ex parte advance disposal services south.  That citation is 280 Southern 3rd 356 and in that case dealt with a similar fact pattern where a landfill was disposing of leachate into a wastewater treatment facility.  The wastewater treatment facility was then treating it and discharging it into the river.  The plaintiffs in those cases were asking for an injunction against the discharges by advanced disposal, the defendant in the case, into these wastewater treatment facilities.  And the issue there was that advanced disposal in that case was only making up a small portion of the amount of wastewater that was going into the facilities being treated and then discharging.  In part and part, here's what the Alabama Supreme Court said, "The majority of the affluent being discharged -- discharged into the river will continue to reach the plaintiff's water supply even if an injunction is

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

42

ordered for advanced disposals leachate."

And here, Your Honor, that's exactly the same situation. These defendants make up only a small portion of the wastewater that is going into these wastewater treatment plants. It is then the wastewater treatment plants that are treating it and discharging it into the river. Any injunction against the defendants that would cease them -- that would stop them from discharging into the wastewater treatment plant will have no impact on any of the other non-parties who are also using these wastewater treatment plants. And without these wastewater treatment plants in the case, the same discharging will be occurring by the wastewater treatment plants.

And finally, Your Honor, my third point that I just wanted to bring up is in plaintiff's opposition brief, in response to the issue of a necessary and indispensable party not being joined in this case, they point out that under South Carolina law, a joint tortfeasor is not considered a necessary and indispensable party. And, Your Honor, we don't dispute that. However, the law is also clear that when you look at the allegations of these complaints, these wastewater treatment plants are not mere joint tortfeasor. They are much more than that.

And I would direct, Your Honor, just to one case. This is an 11th Circuit opinion in Laker Airways versus British

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

43

Airways, and the citation is 182 Federal Third 843. And in that case, really the key issue there is that a joint tortfeasor that would otherwise not be subject to being joined as a necessary and indispensable party is no longer a mere joint tortfeasor, but becomes necessary when an active participant in the allegations. And here that's exactly what these wastewater treatment plants are. They're alleged throughout these complaint allegations. They are the only entities that are discharging into the water from anything coming from the defendants.

And, Your Honor, as -- as you'll see as we kind of continue through this, it kind of illuminate -- it's kind of helps to illuminate the issues that you'll hear about on these wastewater treatment plants being such a necessary and indispensable party because they will come up time and again throughout all of the other allegations -- throughout all of the other arguments being made. Thank you, Your Honor.

THE COURT: Thank you.

MR. LUTZ: Good morning, Your Honor. Ryan Lutz on behalf of the plaintiffs. The plaintiff has a fundamental right to choose which tortfeasors to sue. South Carolina law is clear on that and there's 200 years of precedent stating that mere joint tortfeasors are not indispensable parties. It's called the, "Plaintiff chooses rule," Your Honor. You're not required to sue someone whom you make no claim.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

44

We have alleged in this case that the industrial defendants use PFAS in their industrial process knowing that PFAS is toxic, bio-accumulative, resists degradation, meaning it can't be broken down in the environment, and incapable of treatment at the wastewater treatment plant facilities. They knew all of these things, Your Honor, and they sent their wastewater to the wastewater treatment facilities anyway. We allege, Your Honor, that the wastewater treatment facilities are a mere passive conduit for defendants PFAS to contaminate these rivers and lakes which plaintiff draws their water source from.

It is the defendant's burden to prove under Rule 19 that the wastewater treatment plants are indispensable parties, and I didn't hear any argument on how Rule 19 applies to any of the wastewater treatment plants that are involved in these cases. I didn't hear how complete relief, which is the first subsection under the rule cannot be accorded among those already parties. And I didn't hear how there is an interest from the wastewater treatment plants relating to the subject of the action.

Rule 19 only requires joinder of necessary parties. A necessary party is one whose rights must be ascertained and settled, ascertained and settled, before the rights of the parties to the action can be determined. And that's simply not the case here, Your Honor. There are no rights that must

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

45

be ascertained, and there are certainly no rights that must be settled before plaintiff can seek the relief under negligence and nuisance that they seek from these industrial users of PFAS. Thanks, Your Honor.

THE COURT: Thank you. Y'all be reminded to silence your phones.

MR. HEBSON: Your Honor, thank you again. Ryan Hebson from Burr & Forman. First, Your Honor, I believe we did address the text of Rule 19 as it is for this burden. We understand -- we understand that. And the text is, again, clear that if in the absence -- if in the absence of complete relief, can -- that an absent party shall be joined as a party in the action if, in his absence, complete relief cannot be accorded among those already parties. And here, that's exactly what we've discussed today.

These wastewater treatment plants are the ones, as alleged in the complaint and as are the facts, that are discharging into the rivers. If these nine defendants are enjoined from using these wastewater treatment plants, that's not going to stop these wastewater treatment plants from discharging from every other customer's wastewater that they receive. And this is again alleged in paragraph four.

And, Your Honor, the fact the plaintiffs seek an injunction to require these defendants to cease all discharges will not stop any of the PFAS coming from regular

46

people who use sewers and regular customers, other industrial customers. All of those will still be utilizing these wastewater treatment plants. That is exactly going to the to the rule itself, Rule 19. And so while we understand that there is some case law out there that discusses different parameters of Rule 19 as a means of helping to understand when certain fact patterns arise, such as the ex parte government employees case the plaintiff's counsel cited from, the rule itself is very clear that when complete relief cannot be accorded, that that necessary party must be joined. And that's exactly what we have here today, Your Honor.

And second, Your Honor, the other comment that was made is how these are mere joint tortfeasors, and as I discussed, that's not with respect what we see in the allegations of the complaint, and that's not the fact that Rule 19 exists shows that there are exceptions to the plaintiff chooses rule. There are exceptions to not all joint tortfeasors have to be joined when a plaintiff decides that the plaintiff does not want to join them, because here, these are not mere joint tortfeasors. Here, as in Laker Airways, as the 11th Circuit discussed, these are entities that emerge as active participants in the allegations. This case is about discharges into the water, and the entities that are discharging into the water are the wastewater treatment plants. Thank you, Your Honor.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

47

THE COURT: Thank you. Okay. Anything else on that?

MR. TAPLEY: No, Your Honor. Thank you.

THE COURT: Okay. All right. Next.

MS. TOR: Good morning, Your Honor. May it please the court. Loly Tor from K&L Gates, and I represent the Cryovac defendants. So I'm addressing both trespass and nuisance, but I'll begin with trespass and then come back again to -- to discuss nuisance.

One thing I do want to just make a note of, too, that's separate from the trespass and nuisance argument, one thing that the plaintiff's counsel had said is that it's undisputable that the defendants discharged PFAS into the water. I just want to note, for the record, it will, in fact, be disputed if we get to that point that there was these discharges into the water.

So just going to trespass, this is a basic law school question. What is trespass? And the Supreme Court of South Carolina has addressed this in detail in the Babb decision. They defined it as an action to recover for an unlawful entry by another onto one's real property. And then a cause of action for trespass, it protects a property owner's right to exclusive possession of his land. And there are multiple infirmities in the plaintiff's claim for trespass based on this very basic law. One is that there's no entry onto the plaintiff's property, and two, that there's no interference

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

48

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

with the possession.

So under South Carolina Supreme Court precedent and Babb, there has been no physical invasion. And what the Supreme Court did, it distinguished between tangible and intangible invasions of land. And it held there that the Supreme Court held in South Carolina, they're adhering to the traditional rule requiring an invasion by a physical, tangible thing for a trespass to exist. And the parties do not disagree that this is the law, but we do disagree about whether PFAS in water is a tangible -- physical, tangible thing.

And I submit, Your Honor, that Babb answers that question. The PFAS molecules in water are not a physical, tangible thing. And in Babb, the -- the thing at issue were odors. And what the plaintiffs say is that PFAS is not the same as an odor. It can be found and it can be measured. But Babb expressly disagrees with the plaintiff's position.

The court held that South Carolina will not adhere to this traditional rule requiring invasion -- I'm sorry, it will adhere to the traditional rule requiring invasion by the fiscal tangible thing, and it's going to adhere then to the dimensional test. And the court rejected those cases that deviated from the dimensional test. And those cases are like the case here. For example, the first case was Oregon Court found a trespass when fluoride gases and microscopic

49

particles entered the plaintiff's property.

In the second case, Alabama Court found that lead and sulfoxide emissions that settled onto the plaintiff's property constituted a trespass. But the Babb court said, no, we are not going to do that in South Carolina. The PFAS molecules at issue in this case are the same as those fluoride molecules, the microscopic particulates, and the lead and sulfoxide emissions. They do not constitute trespass under the dimensional test adopted by Babb.

The plaintiff points to Judge Coble's decision in the State of South Carolina versus 3M from July of 20 -- July 23rd, 2024 that they attached their brief, and Judge Coble found that PFAS did constitute a trespass. And with all due respect to Judge Coble, his decision is inconsistent with Babb. And Judge Coble said that PFAS is a tangible thing, but that is not consistent with Babb's holdings.

Now, plaintiff's counsel today gave a perfect example of what a tangible invasion is. The fuel spill after the tractor-trailer crash. And that, in fact, is a tangible invasion into water, but that is not, and I agree with plaintiff, that is not what PFAS is.

In every other case, the plaintiffs rely on to support their position that PFAS can be an intrusion. They all predate Babb, except for one, the Weatherford case. And that is the only case that was decided after Babb from the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

50

District of South Carolina.  And respectfully to the court in Weatherford, it's not consistent with Babb, and it should not be followed by this case -- by this court.

In all the other cases, as I mentioned, they do predate Babb, but they also have no discussion about trespass, or they do actually involve tangible items.

So in Johnson versus Hoechst, there's no discussion about trespass claim, because that wasn't the subject of the appeal.  In Kelly versus Para-Chem, again, no details about trespass, other than that there was a contamination.  In Tillman, there was, in fact, tangible items.  The defendant had pumped sludge and green fluids into the land.  And in Shockley, you also had tangible items.  There were barrels of hazardous waste.  Those are not the same as what we have here.

The second point with respect to why there is no entry, even putting aside the dimensional test, there was no entry onto the plaintiff's property.  The plaintiff alleges the defendants discharged the PFAS-contaminated wastewater into the Reedy and Saluda rivers.  And that water then passes through the wastewater treatment plants, as you've heard many times today.  And then the water eventually reaches Lake Greenwood.  And at that point, the plaintiffs use their water intakes to draw the water out of Lake Greenwood and onto their property.  The plaintiffs voluntarily caused the water

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

51

to enter their property.  The defendants did not cause the water to enter the property.  The plaintiffs took the affirmative action, and without that affirmative action of drawing the water from Lake Greenwood, that water would not have entered onto their property.

Now, the defendant -- the plaintiffs respond that the defendants knew that the water would ultimately reach the plaintiff's property.  Even if that were true, that is not a substitute for the actual entry onto the plaintiff's property.  And the plaintiffs -- the cases that the plaintiffs cite in their brief, in support of their position, all had actual entry onto their property.

In Snow versus City of Columbia, homeowners there had standing water in their basement from a leaking pipe.  And, in fact, in Snow, the city did not know that the pipe underneath the home was leaking.  So there was no trespass at the end of the day because the entry of the water into the homeowner's land was not the result of the voluntary act by the city.

In Weatherford versus DuPont, the allegations were that the defendant sold chemicals to textile plants and didn't provide disposal instructions.  The textile plants didn't dispose of the chemicals properly, and the chemicals then actually reached the defendant's soil -- I'm sorry, reached the plaintiff's soil by leaching into the soil.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

52

Lastly, in Shockley versus Hoechst Celanese Corp., the barrels of waste leak -- leaked chemicals into the soil and eventually into the plaintiff's groundwater.  All different from the allegations in the complaint here that did not have any actual entry onto the plaintiff's property, unless the plaintiff actually drew that water itself.

Lastly, Your Honor, here we have no interference with possession as required for trespass.  The plaintiffs have no exclusive right to possession of the water, as my colleagues have already mentioned.  The riparian owner has a right to use the water, but does not have an exclusive right of possession.  And in the defendant's motions to dismiss, we did cite the case for that proposition, White versus Whitney.

One last point, Your Honor, with respect to trespass.  The trespass claim, this is set forth in Babb.  Damages for trespass are not the damages that the plaintiffs seek here, so even if they can establish their claim, they're not entitled to the damages that they seek.  The damages available for trespass is a loss of the rental value of the property, and not the damages that the plaintiffs seek here.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. TAPLEY:  Thank you, Your Honor, Jerome Tapley again.  Our complaint makes clear that plaintiffs have alleged the common law toward a trespass.  There has been a physical,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

53

tangible intrusion onto plaintiffs' property.  The amount of PFAS in the water that is their water source and their riparian right is tangible and measurable.  They say that these chemicals aren't tangible, that there's somehow some intangible thing out there, like a thought.  But they bought them in buckets and drums, and used them in their industrial process in their businesses, and then discharged the leftover in their industrial sewage.  Judge Coble's decision is absolutely in line with Babb.  There's nothing about PFAS that's any different than the PCB in the Tillman case.

Your Honor, the fact remains they intended to use PFAS in their businesses.  They knew or should have known it was going to be present in their industrial sewage coming from their plants.  They knew no one ever permitted them to have PFAS in their industrial sewage.

They knew or should have known that the WWTPs where they were sending their sewage had no ability to remove PFAS from their industrial sewage.  They knew or should have known that the WWTP, when it was done treating the sewage, would discharge that water to the streams and rivers of South Carolina.  And it'd be hard for them to convince anyone they didn't know that rivers flowed downstream and that folks lived down there.

The notion that the trespass really doesn't occur until the plaintiff takes the water out of Lake Greenwood and that

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

54

-- this is not part of something they did -- completely alters the facts in the case and in life.  The very purpose of these pieces of property along Lake Greenwood is to withdraw water and make drinking water that serves the communities around it.  It's not accidental that some water came out of the lake and into their filter plant.  That's the reason these utilities bought that property.  It's the reason they maintain that property because it is adjacent to the water, which is their water source for their utility.

Their PFAS is on plaintiff's property.  It was the natural occurrence of events that that would occur.  They knew all this would happen or should have known this would happen when they released it into the environment.  Thank you, Your Honor.

THE COURT:  Thank you.

MS. TOR:  Your Honor, Loly Tor.  I think this cause of action is the perfect example of the square peg and round hole that my colleague mentioned earlier today.

First, I want to say that the defendants are not the ones saying that the PFAS is intangible -- intangible.  It is the Supreme Court and Babb that says this, and I would just like to read from Babb because it addresses exactly the argument that the plaintiffs are now raising.

And so in Babb, at page 146, the court says, "In reaction to modern science's understanding of microscopic

55

anatomic particles, a divergent lines of decisions have discarded the dimensional test and permitted recovery for trespass without regard to whether the intrusion was by a tangible object, but rather by considering the nature of the interest harmed."  That is what Babb has rejected.  And it is not -- Babb is not saying that PFAS or that a molecule cannot be measured.  Even odors can be measured.  Even the molecules that are in odors can be measured.  That is not what Babb is saying.  What Babb is saying is that it is going to adopt the dimensional test, and plaintiffs cannot satisfy that test here.

And what Babb is also saying is that it is not the molecules that are the items that have the dimension, but it's the water.  The water itself that may be traveling through, and not the trace chemicals in the water.  There is simply no trespass here onto the plaintiff's property.

The plaintiffs cannot change the elements of what a trespass is by arguing that they are the ones that have this property for the sole purpose of doing this thing of taking -- cleaning the water.  Trespass requires that the water be purposefully put onto the property by the water or the element, whatever it might be.  It has to purposely be put onto the property by the defendant and that's not what occurred here.  And plaintiffs admit that they are the ones that drew the water onto the property.  Thank you, Your

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

56

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Honor.

THE COURT:  Thank you.  Okay.  Anything else on trespass?

MR. TAPLEY:  No, Your Honor.

THE COURT:  Okay.  Nuisance.

MS. TOR:  Loly Tor, Your Honor, for the Cryovac defendants.  With respect to nuisance, there are two, what -- the first argument I'd like to point out for you, Your Honor, is that there is no control over the instrumentality.  For both public and private nuisance, one of the elements is that the defendant has to have control over the instrumentality of the nuisance at the time that it occurs.

And again, Supreme Court precedent on this issue, Clark versus Greenville County.  And the Supreme Court there said, "If the defendant doesn't have control of the property at the time of the alleged nuisance, that defendant cannot be held liable for the nuisance."

And in Clark, "The defendant sent materials to a landfill.  The plaintiffs allege that the areas downstream of the landfill showed evidence of impact from those materials." The Supreme Court -- or the court affirmed, the circuit court said the defendants could not be held liable because they had no control over the materials once they reached the landfill. The plaintiff's argument here is that nothing more than saying, no, defendants, you did, in fact, have control, but

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

57

this is not what is pled in the complaint. For example, as to Cryovac, but it's the same allegation made as to all the defendants. The allegation is, "Cryovac's facility discharges industrial wastewater contaminated with products that contain -- that contain or degrade to these PFAS to the lower Reedy WWTP. The lower Reedy WWTP cannot remove Cryovac's PFAS, which it discharges into the Reedy River upstream of Lake Greenwood and plaintiff's water intakes. It is the defendants that discharge into the wastewater treatment plants, and it's the wastewater treatment plants that then discharge to the rivers upstream of Lake Greenwood. This is no different than the solid waste and Clark going to landfill.

Now, with respect specifically to the private nuisance. Nope, a private nuisance cannot result from alleged contamination of a public body of water. And a private nuisance that produces damages -- a private nuisance, excuse me, and it produces damages to one or two people. And it can't be a damage to the public.

And one example of this, Your Honor, that we provided in our briefs, the Priselac versus Chemours case, it's about a body of water being contaminated. Although it's a North Carolina case, it does provide insight as to what this would look like. So the alleged contamination there was to the Cape Fear River, surrounding air, soil, and groundwater. And

58

what the court said there, that the alleged contamination of drinking water was not something that affected only the plaintiff. It affected the public because the water was from a public utility. In response, the plaintiffs point to Cape Fear versus -- Cape Fear versus Chemour's case in their brief. And the court there said there was a private nuisance.

But in that case, Your Honor, there was no argument about whether the defendants had actually discharged or had control -- excuse me, had control over the instrumentality of the nuisance, that it wasn't an issue in the Cape Fear case. So that is not something that can be used to establish or to support their argument that they do have a private nuisance here.

Now, the same is actually true here, as in the Priselac case. There's alleged contamination of a public body of water, Lake Greenwood, where we can see here, even from the two lawsuits brought by the two different water districts, it's a public interest and it's not a private one.

Plaintiff says, "But I have alleged injury." The plaintiffs -- both of them say, "We've alleged injuries to our own private property." But that's not correct. What they've alleged is injury to the water that the plaintiffs are taking in from Lake Greenwood. And the plaintiffs, in their complaint, define nuisance, and this is in paragraph

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

59

60.  They define the nuisance as the contamination of the Reedy River, Saluda River, and Lake Greenwood.  In their briefs they tend to define it differently but that's not what it is alleged in the complaint.  And this is no different from a public nuisance.

And a public nuisance, Your Honor -- so the public nuisance claim, that cannot be brought by a private entity. It must be brought by the State, unless that private entity has suffered a special injury.  But here, there is no special injury.  The plaintiffs have alleged the same injury that's suffered by the public-at-large based on their allegations. It's a contamination of drinking water.

And pointing to Cape Fear, again, which the plaintiffs had relied on, the court there found no special injury to the public water district.  That would allow the public water district to assert a claim of its own for public nuisance. There, the nuisance was a contamination of the water, and that was a public nuisance that was not -- did not create a special injury to the plaintiff.

And again, Your Honor, I want to point out the remedy available for a nuisance is the same as trespass, as pointed out by the court in Babb.  It is the loss of rental value. It is not the damages that the plaintiffs seek here.  Thank you, Your Honor.

THE COURT:  Thank you.  And to be clear throughout, you

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

60

we're referring to the amended complaints that were filed on August the 23rd in both, correct?

MS. TOR:  Yes.

THE COURT:  Okay.  Thank you.  Please continue.

MR. TAPLEY:  Your Honor, Jerome Tapley again.  On this issue of control, the defendants, I don't think, are ever going to argue in this case that they somehow lacked control of their property and their facility.  I think it's going to be undisputed, although somebody might tell me I'm wrong, that they used the PFAS.  Nobody snuck in at night and poured it down the drain.  They locked their facilities when people weren't there.  Their property was secured, and the PFAS got there through an operation of their business, the way they wanted to operate it.  And they controlled that operation.  They controlled the use of that PFAS.  They controlled the discharge of that PFAS, the amounts of more PFAS that they bought, the amounts they discharged down their sewer.  And they knew what was going to happen to that PFAS when it went down their industrial sewer.

Now, on this topic of special injury, the water utilities, which I think should be clear from our complaint, are not like the public-at-large.  They're not complaining of some injury -- some injury from not being able to enjoy Lake Greenwood like members of the public do to recreate.  They're not complaining of some ability to boat up and down the river

or some ability to fish up and down the lake that's been impaired by the contamination with PFAS. They're talking about their unique situation, their special injury, which gives them standing to bring a claim in public nuisance.

As I've mentioned before, their property is on Lake Greenwood. And owning property adjoining a body of water comes with riparian rights for the property owner. These riparian rights have been interfered with. That's an injury for nuisance as a result of the PFAS contamination. And defendants did this through their acts, which they controlled at their factories and their buildings upstream. When they released that PFAS, knowing it was going to a sewer which could not treat it, and emptying into a stream or river which flowed downstream to Lake Greenwood, where the riparian owner sat on the banks of the lake, drawing water out to filter and treat it for the surrounding community. This is clearly a special injury under South Carolina law. And the injury suffered by Greenwood and Laurens County is very different from the injury suffered by the public-at-large. Thank you, Your Honor.

THE COURT: Thank you.

MS. TOR: Two quick points, Your Honor. First is that I did not hear the plaintiff argue at any point that the control -- that the defendants did not have control of the water after it left, or excuse me, once it reached the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

62

wastewater treatment plant.  The arguments that the plaintiffs are making with respect to control all address what happens on the plaintiff's -- I'm sorry, on the defendant's property before it reached the wastewater treatment plant.  At that point, the defendants no longer have control, and that's simply a matter of fact, based on the allegations in the complaint and based on the law.

Second, Your Honor, with respect to, I guess, the elements with respect to reaching the riparian rights, Your Honor.  So nuisance is a disturbance with the plaintiff's property, not with the riparian rights, Your Honor.  And I don't believe that the plaintiffs have actually alleged in their complaint that it is their riparian rights that have been affected by the nuisance.  They allege that the water has been contaminated and that is a public nuisance.  That is not a special injury to the -- to the plaintiffs.  They simply have not alleged anything different from what the public -- public's injury would be, which is the alleged inability to have water that does not contain PFAS or does not meet the MCLs.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. TAPLEY:  Your Honor, I just want to make two brief points.  One, Sloan versus City of Conway, a 2001 South Carolina decision, recognized a utility's proprietary interest in the drinking water, that it removes and treats

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

63

for its customers.

Second, it's important to note, Your Honor, that their control occurs every time they flush a toilet in their facility.  Every time they flush PFAS water down.  There's a new participation in the nuisance every time they discharge.  It didn't happen one time, and then it was over.

It's a continuing action by the way they run and operate their business.  It has been continuing over time.  They continue to engage in the maintenance of the nuisance, and they do it at their facility with their personnel.  This is not a stagnant thing that occurred once.  It ain't a car wreck.  This happens again and again and again throughout the day.  I just want to make sure that's real clear because that's in our complaint, and their arguments don't always directly address our complaint, but rather a case they wish we'd filed.  Thank you, Your Honor.

THE COURT:  Thank you.  Anything else on that?

MS. TOR:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Why don't we take 10 minutes before we get to negligence, okay?  Thank you.

                    (OFF THE RECORD)

THE COURT:  All right.  We're back on the record with civil action numbers 24-24-735.  Okay.  We have finished with nuisance.  Thank you, Ms. Tor and Mr. Tapley.  And now we're moving on to negligence.

64

MR. WEATHERHOLTZ:  That is correct, Your Honor.  Good morning, James Weatherholtz.  May it please the court.  I'm here on behalf of defendant, Unichem Specialty Chemicals, LLC.  And with me here in the courtroom today is Andi McDonald.  She's an associate at my firm in Charleston. We're both with Womble.  And just wanted the court to be aware that she's here today.  All of the work that went into the briefing and to providing these materials to the court came directly from -- from her.

THE COURT:  Well, thank you.  People are not normally that generous.

MR. WEATHERHOLTZ:  No, she's -- she -- she deserves all the credit for what you're about to hear, Your Honor. Assuming it's pleasing to the court.

Your Honor, my job this morning is to cover the negligence argument on behalf of all of the defendants. There are certain arguments that everyone has made.  There are other arguments that only Unichem has made.  I will walk through each of those as a -- as a short preview.  I will spend most of my time this morning talking about the existence of a legal duty, but I will also touch on breach, proximate cause, and damages.

Your Honor, you have heard at length this morning from my colleagues about the facts and the context that are important for the negligence argument, but I just want to

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

65

reiterate because -- because one fact in particular is central to, I think, the negligence and the nuisance and trespass claims.  And that is the fact that these defendants did not discharge their waste into the environment.  They didn't discharge directly into any rivers or streams or to Lake Greenwood.  They discharged their waste pursuant to permits to wastewater treatment plants.

So what we have here for the negligence analysis is a situation where the plaintiffs in this case, who are not members of the public, they are water providers.  The plaintiffs are suing these defendants for discharges that they did not make either directly onto their property or even into the water from which they draw to provide their services to their residents.  They're suing us for discharges of waste that came from wastewater treatment plants.  Companies that -- that are in the business of treating the water that -- that is then discharged to the bodies of water that -- that plaintiffs complain of.

Your Honor, as you know, the existence of a duty is a legal question.  That's a question for the court.  If there is no legal duty, then the negligence claim fails.  In order for a duty to arise, the parties must have a relationship under South Carolina law.  There are a number of different ways that our courts have said a relationship that's sufficient to give rise to a duty can arise, and some of

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

66

those are by statute, by contract, relationship, property interest, or some other special circumstance.  There are a number of cases in this State that talk about individualized sets of circumstances where our courts have reviewed those facts and made a determination that as a matter of law, a duty does exist in this situation.

Our position here today, Your Honor, and the position that we put forth in our briefs is that there is simply no legal duty in this situation that has been recognized by South Carolina law.

Plaintiffs, in their complaint, have not even alleged facts that would be sufficient to give rise to the existence of a duty because they haven't alleged the different ways that our courts recognize how a duty comes about, and I've mentioned those previously.

In their opposition brief, the plaintiffs say two things, essentially.  The first thing that they say is that these defendants voluntarily undertook a duty.  And this comes up in the context of a first party who does something that causes an injury to a third party, which is the situation that we have here.  What they say is that if you volunteer to perform some act or to do something for another person, then by virtue of the fact that you volunteered, you now owe a duty.  And what I would say is just on its face, Your Honor, that's -- that's really a misinterpretation and a

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

misapplication of the voluntary duty standard under South Carolina law.

I think the best case to use to talk about this concept is the Madison case.  That was a vulnerable adult who was put into the custody and care of a mental facility.  She snuck out one night, and she was abused by some third-party actors.  A claim was brought on behalf of her and her family against the facility, and the facility took the position that it did not owe a duty to her because it couldn't control the actions of these third parties, and it didn't have a duty to warn.  The State looked carefully at that and said, no, as a facility that took her in with knowledge that she is a vulnerable adult, under these circumstances, we will recognize a duty.  The Madison case specifically defines what it means under South Carolina law when someone voluntarily undertakes a duty, and it says, "To render services to another which he should recognize as necessary for the protection of the other person or their things."

And there's just no allegation here that these businesses who are doing nothing but operating their businesses undertook a special duty to protect the interests of these water providers downstream who receive water from the lakes that has passed through a wastewater treatment plant.  I think if you took the plaintiff's argument about voluntary -- voluntarily undertaking duties at face value,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

68

then every business in the State of South Carolina that is simply operating its businesses would therefore have a general duty of care to -- to the public, and -- and -- and that's simply not the case under our law.

The next thing, Your Honor, they say is that these defendants knew or should have known that what they were doing posed a substantial risk of injury to them or to the public.  And essentially what they're saying here is that because this was foreseeable, that -- that their activities would cause harm, that they therefore have a duty under South Carolina law.  And -- and I would submit, Your Honor, and the position of the defendants in this case is that that is simply not -- not the law in South Carolina.

There's a great discussion of this concept in the Oulla case, and that's O-u-l-l-a.  I'll have to spell it for you because I'm sure I'm not pronouncing it right.

THE COURT:  I'm following along.

MR. WEATHERHOLTZ:  Oh, okay.

THE COURT:  Okay.  In your brief.

MR. WEATHERHOLTZ:  Okay.  Wonderful.

THE COURT:  Moving from Madison to, and you pronounce it, Oulla.

MR. WEATHERHOLTZ:  Oulla, yes, ma'am.  Court of Appeals case from 2019, that's a situation where the Court of Appeals was able to analyze and answer this question of what duty

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

69

does a first-party actor owe to a third party, even if it is foreseeable that something that the first party does could cause harm.

And just briefly, Your Honor, the facts of that case, Super-Sod was loading a truck for a customer. The customer left with pallets of sod on the truck. One of those pallets fell off on the roadway. It caused a backup on the roadway. Somewhere in that line of traffic, there was a rear-end collision. The plaintiff got injured. The plaintiff sued both the driver of the truck who was operating the truck on the highway with the pallets and the loader of the truck.

What the Supreme Court said in that case was basically two things. One, under the statutes of South Carolina, the loader does not have a duty to protect the interests of the public when they are simply loading these vehicles.

The other thing that it said that's important for today's discussion is that under the common law, the State of South Carolina does not recognize Restatement of Torts second, Section 324A. What South Carolina does recognize is Section 323. And 323 talks about the duties that a first party owes to a second party when the first party voluntarily decides to -- to undertake a duty to provide protection to that person or their things. What South Carolina specifically rejected is 324A, which extends that duty to third parties.

70

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

And -- and -- and ultimately, the conclusion of that case leaves us with the holding that under South Carolina law, even if a first party does something that is foreseeable, that it's foreseeable that it could cause damage to a third party, that first party does not have a duty unless one of these special circumstances applies, because we've rejected that section of the restatement that -- that gives rise to that potential claim.

And so what the court said in that case is that the loader has no -- no liability. And what the court said is the loader may have responsibility to the truck driver for the way that they loaded the pallets on the truck if that contributed to the accident later on, but that the -- that the loader doesn't have a duty to the plaintiff who was drive -- riding in the car.

And the parallel here is that we're the loader. These defendants who discharge their waste to the wastewater treatment plants are third parties as to the water providers. And under South Carolina law, there's just -- there's no duty that arises in that situation.

The third thing that the plaintiffs do in their opposition brief in response to this argument is they quote a series of cases. Some of these cases are South Carolina law cases. Others are cases from outside this jurisdiction.

Your Honor, I would say with respect to the cases that

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

71

are outside this jurisdiction, those states may not have the same interpretation of -- of the common law as to where duties arise to third parties. They likely have different adoptions of the restatement. And -- and those cases wouldn't be applicable or binding on this court.

Your Honor, there are four or five cases that deal with South Carolina law. Those cases are distinguishable for various reasons. I -- I won't walk through those, but if the court is interested, I could talk about them, or if the court is interested, we could do some supplemental briefing on those, but for each of the cases that the plaintiffs cite, those cases are not this case. This is a case where water providers are alleging that water discharged by defendants that has passed through a water -- a wastewater treatment plant has caused them injury, and they're alleging that under South Carolina law, a duty is owed, and -- and none of those cases they cite are that case.

One other aspect, too, that we would ask the court to consider in the context of the negligence claim, is this concept of control. And Ms. Tor has already explained to the court our position on that. But I would submit to the court that the same concept is at play here.

The Miller case is the best example of where our courts in South Carolina have said, "If a party doesn't have control of the thing that causes the harm, then that party cannot

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

72

have any duty to the person who is harmed."  And that involved an operator of a plant next to a lake that had a specific agreement with the local municipal -- municipality that they had obligations to control the water level to the extent that they couldn't take too much out, but all responsibility for controlling the water level getting too high was with the local municipality.  And the court said that -- that they just didn't have a duty because they didn't control the water level and its discharge over the dam.

I want to talk just briefly, Your Honor, about breach.  That's one of the elements that the amended complaint is required to plead in order to survive the 12(b)(6) pleading standard.  They, the plaintiffs, in this case have not alleged a specific violation of any standard of care.  As they've set forth, I think, in their pleadings and in the complaint, there were no rules or regulations.  There were no statutes or standards that governed the discharge of these chemicals, and they have not been able to cite to any actual breach of a standard that would be required in order to sustain a claim for negligence.

And then the last point, Your Honor, I would make is as to damages.  In order to establish a claim for negligence, you have to have suffered damages under South Carolina law, and this is the Babb case.  You have to have suffered damages in the form of physical injury or property damage, and I

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

73

think that there should be no dispute that the plaintiffs here are not alleging physical injury.  The plaintiffs have said that they have suffered property damage, but I -- I haven't yet heard them articulate how their systems, or their property, or their equipment has actually been damaged today by the alleged presence of the PFAS from -- from these selected defendants that they have chosen to -- to sue in this case.

So I think that -- that's an issue that the plaintiffs will have to wrestle with as they figure out what their specific allegations of damages are in this case.  But I would submit to the court that until the plaintiffs can articulate actual property damage today to their facilities or equipment caused by this, the presence of this PFAS, that they -- they would not be able to sustain a claim for negligence.

And then, Your Honor, I will cover in a moment an argument on traceability.  There is one final piece of the negligence cause of action related to primary assumption of the risk, and Mr. John Tamasitis is going to cover that.  I don't know if, Jerome, would you prefer to do that after you respond to this, or?

MR. TAPLEY:  Sure.

MR. WEATHERHOLTZ:  Ryan?

MR. LUTZ:  Yeah, let's do it.  Let's respond to this.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

74

MR. WEATHERHOLTZ: Okay. Let's do it one at a time, Your Honor. Well, then I'll yield the floor to Mr. Lutz, and -- and we'll do assumption of the risk next.

MR. LUTZ: Good morning, Your Honor. Ryan Lutz again on behalf of plaintiffs. Defense counsel spent most of his time on duty, and I think that's a good place to start because plaintiffs have provided the -- the court with a number of cases that are directly on point to this case, where courts across the country have found negligence has been adequately pled against industrial dischargers who send their PFAS-laden waste to a wastewater treatment plant that passes through and contaminates rivers and lakes downstream. They haven't attempted at all to distinguish this case, their duty under South Carolina, with the cases that we have provided the court in, Your Honor.

I'm just going to, there's a few cases to talk about. One is the -- first one is the Johnson case, and that's a case that we are lead counsel in. It's a case pending in federal court in front of Judge Totenberg in the Northern District of Georgia. And she found that defendants have a duty, this is a quote, "To exercise reasonable care in their use and disposal of unreasonably dangerous chemicals such as PFAS and/or products containing PFAS in operating their various facilities to avoid pollution of the State's waterways and injury to members of the downstream public."

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

That's this case, Your Honor.  Those are the allegations that we've made here.

Another case, Ryan versus Greif.  Facilities that use and dispose of PFAS contaminated materials knowing of the risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal owe foreseeable victims of such contamination a duty of care.

There's another case in the Northern District of Georgia, Paris versus 3M.  Discharger of PFAS, "Has a duty to exercise reasonable care in its use and disposal of unreasonably dangerous chemicals, such as PFAS, to avoid pollution of State waterways and injury to downstream users."

Finally, Your Honor, there's another case, Severa, that was in the -- in New Jersey, finding that defendants had a duty of care with regard to the proper handling of PFAS.

So, Your Honor, that's the duty of care that we have alleged that defendants have.  They have a duty of care when they chose to use these PFAS chemicals in their industrial process.  They acted.  They chose to act to use these in their industrial process, and that means that they had a duty of care to handle them, use them, and dispose of them with due care.

And, Your Honor, not only do we have other PFAS cases that we've cited in our brief.  We have a case here in South Carolina, dealing with pollution, and you -- you -- you -- I

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

76

-- I think you -- you'll notice when you look at these cases, none of the cases that defendants cite have anything to do with pollution. We're talking about pollution cases here, Your Honor. They cite cases that have nothing to do with pollution.

But another case that is on point with our case that we cited in our brief, Your Honor, is Ravan versus Greenville County. And in that case, there was a waste disposer who was hired to haul the waste to a landfill and that toxic, hazardous waste left the -- the landfill and contaminated plaintiff's property. And the hauler of the waste contended that it had no duty under South Carolina law because it was a mere hauler of the waste, but the -- the court on appeal agreed that a -- a mere hauler of hazardous waste extends only to the safe transfer -- transport of the waste while it is in the hauler's possession and control. But because waste management and not its customers chose the location for the disposal of the waste, its role consisted of more than mere hauling of waste to the landfill.

That's no different here, Your Honor. The defendants who had control of their use of PFAS and the control of the methods that they disposed of their PFAS sent their waste just like from a landfill to a third party and it contaminated the plaintiffs' property.

So we've cited, Your Honor, a bunch of cases that are on

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

77

point dealing with pollution, dealing with PFAS, and defendants haven't even attempted to distinguish this case from any of those.  And that, frankly, Your Honor, just goes to the -- the -- the strength of -- of -- of the duty in plaintiff's argument.

One thing I'd like to mention, too, about the duty, you know, the defendants make the argument in their briefs and they make the argument here that there has to be a duty created by statute, a contractual relationship, some sort of status, or property interests, or some other special interest.  And while that's correct, that's only part of the law.  The other part of the law, which is precedent from 100 -- more than 100 years ago that has been followed ever since, states, "Moreover, it has long been the law that one who assumes to act even though under no obligation to do so, thereby becomes obligated to act with due care."

And that's the situation here, Your Honor.  The defendants assumed to act when they chose to use PFAS in their industrial processes, and they assumed to act when they chose how to dispose of these chemicals that they knew were toxic, persistent, resistant to degradation, bioaccumulative, and incapable of treatment at the conventional wastewater treatment plants that they sent their waste to.

Your Honor, I'm just going to address, obviously you have a ton of paper to -- to look at, and so I'm just going

to address the arguments that were raised by the defense counsel. I think the next argument that they raised was that we didn't adequately allege a -- a breach of -- of a duty. We've already discussed, Judge, we allege a duty, which was the duty to use due care in handling, using, and disposing of PFAS to avoid creating an unreasonable risk of harm. And that includes preventing direct and/or indirect discharges of PFAS to South Carolina waters. And they breached this duty by allowing PFAS to escape their facilities and contaminate the South Carolina waters. That's all that's required under Rule 8, Your Honor, is fair notice. We've provided that. And I think that's it on breach.

With respect to damages, we've pled that defendants contaminated and injured plaintiffs' properties by placing toxic and environmentally persistent chemicals into plaintiffs' drinking water source, which they have a proprietary interest in, which my colleague, Mr. Tapley, talked about earlier, onto their land, which runs adjacent to these lakes and rivers, into their treatment plants, and their facilities and the infrastructure. We have clearly alleged that they have damaged our property.

And we've cited a case, the Chestnut case, which is dispositive here. In Chestnut, the holding, the court found, appellants have pled all four elements of a negligence claim, duty, breach, proximate cause, and damages. In alleging

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

damages, appellants contend their property is damaged, is worthless, damaged, and/or devalued by the harmful and dangerous chemicals on their real property.

And that's exactly what we have alleged here, Your Honor. Nothing more is required. And with that, I'm done. Thank you.

MR. WEATHERHOLTZ: Very briefly. Your Honor, Mr. Lutz talked about a number of cases from Georgia that he says are exactly on point with this case where the Georgia courts have found that a duty exists. What I would point out is that Georgia has adopted Restatement of tort second, Section 324A, which is the third-party liability section that our courts in South Carolina have specifically rejected. So whatever the courts in Georgia have done are not binding on this court, and -- and even more, they were making decisions under a body law that -- that just doesn't exist here, Your Honor.

Ultimately, I would just go back to the Oulla case. The -- the plaintiffs, in order to sustain a claim for negligence here, they have to overcome the language of that case that rejects 324A and that says that -- that there is no liability to third parties, even where it's potentially foreseeable.

Mr. Lutz talked about the assumes to act duty under negligence. And I would just point out to the court, I mean, this assumes to act body of law is where we get things like the Good Samaritan law. These are situations where someone's

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

80

injured on the road and you stop to help out and the law says, "If you undertake to render aid to someone who is injured on the road, then you have assumed an obligation to that person to not do something that would cause them greater harm or that because of Your -- their reliance on you that -- that someone else doesn't come to help them."  This is not that situation at all.  I mean, again, we're talking about businesses who allegedly discharged PFAS to a wastewater treatment plant, and the claims are not by the public.  The claims of injury here are being brought by water providers whose -- whose sole obligation to their customers is to provide clean water and to do with that water whatever they need to do to -- to satisfy their obligations to their customers.

Your Honor, the Ravan case, just briefly, that -- that case was looking specifically at the hauler of the toxic waste.  It looked closely at what the role of that company was.  I would point out that that case was on review from a motion for directed verdict and a judgment notwithstanding the verdict, so it was a highly deferential standard that was applied, and the parties don't line up in that case in the same way that the parties are structured here.  And I'll stop there.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.  Anything else, Mr. Lutz?

MR. LUTZ:  Yes, Your Honor, just one quick.  Ryan Lutz,

81

again, for the plaintiff.  The Oulla case involved a sod manufacturer that placed pallets on a truck -- truck -- truck trailer that later fell and injured a motorist.  But the Oulla case is distinguishable from our case because the sod manufacturer loaded the pallets at the direction of the customer who negligently failed to secure them.  So they did not find a duty on behalf of the sod manufacturer by merely placing the pallets of the sod on the trailer as its customer directed.

This case is not similar to our case.  There was no direction by the wastewater treatment plants to discharge PFAS into their facilities, and that was a choice that defendants made on their own.  Thank you, Your Honor.

THE COURT:  Okay.  So Mr. Weatherholtz, before you come back up on the next issue, and Mr. Lutz, with regard to Mr. Weatherholtz's request, if I wanted supplemental briefing concerning common law of different States, because the cases that were cited would be held to a different standard, and that argument -- or that request was made, I think, at 11:43.  Yes, five days.

MR. WEATHERHOLTZ:  Thank you, Your Honor.

THE COURT:  Is that all right with you?

MR. LUTZ:  And do you want us to respond?

THE COURT:  Five and five.

MR. LUTZ:  So respond at the same time?

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

82

THE COURT:  No, five.

MR. LUTZ:  Five and five.  Yes, Your Honor, that works for us.

THE COURT:  Thank you.  Okay.  Next.  Traceability.

MR. WEATHERHOLTZ:  Your Honor, just before I get to traceability, I'm going to ask Mr. Tamasitis to talk about this assumption of risk argument as part of the negligence argument.

MR. TAMASITIS:  Your Honor, John Tamasitis on behalf of T&S Brass.  This is an argument that only T&S Brass brought, and it's in addition to the arguments made by Mr. Weatherholtz with regards to negligence.

T&S Brass contends that plaintiff's negligence claims fails because it's voluntary -- voluntary conduct of intaking, treating, and selling potable water and additional public utilities to residents in its respective areas of service, constitute a primary implied assumption of risk which is recognized under South Carolina law for any injury it now complains of.

Primary implied assumption of risk arises when the plaintiff impliedly assumes those risks that are inherent in a particular activity.  It is not an affirmative defense.  Rather, the doctrine goes to the initial determination of whether defendant's legal duty actually encompasses the risks that are encountered by plaintiff.  And that's the Davenport

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

case from 1998.

Under the doctrine, the focus is not on the plaintiff's conduct in assuming the risk, but it's on the defendant's general duty of care, and so it pairs nicely with Mr. Weatherholtz's arguments earlier. The doctrine is simply another way of stating that a plaintiff has failed to establish a prima facie case of negligence by failing to establish that a duty exists.

This situation in South Carolina courts most often is recognized when a plaintiff is a spectator or a participant in sporting events. That's how it originated.

However, the South Carolina courts have applied the doctrine in other situations. There's the Singleton case, which is a personal injury action involving injuries sustained from a wild animal bite. There's the Humphrey case, which is cited in our brief, where a chemical plant worker was found to impliedly assume the risk of injury cutting into a line containing -- containing hazardous chemicals while attempting to remove a potable water line.

Involuntarily assuming the role of a public water provider, plaintiffs freely and involuntarily exposed themselves to PFAS and other unregulated contaminants, which it clearly knew and appreciated it as a known risk inherent in its role -- in its role as a public water provider.

Indeed, there is an entire regulatory and permitting

84

scheme that is imposed by state and federal governments under the Clean Water Act that provides for handling waterborne contaminants that apply to public water systems. Those standards and techniques protect public health by limiting the levels of -- of a minimum of 90 contaminants in drinking water. Plaintiffs assumed to act and accepted permits to intake raw water to subsequently treat and produce potable drinking water and assume the inherent risk that the water may contain unregulated contaminants like PFAS.

I took notes earlier. Plaintiff had stated that defendants must have a permit for every pollutant that it sends to the POTWs. That's not the law. They only need a permit for those pollutants the PI -- POTWs have identified in their permits, and PFAS has not yet been identified.

While plaintiffs use water sources to sell water pursuant to a permit, that permit is not required of the plaintiffs. They sought out a permit to treat water in a reservoir and to sell it to the community regardless of the pollutants, whether it be lead, organic matter, PFAS, et cetera. The plaintiffs assume that responsibility for whatever purpose and now want to guarantee against what they agreed to do.

As such, any duty of defendants to discharge their industrial wastewater to the wastewater treatment plants with reasonable care does not encompass the injuries allegedly

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

85

sustained by the plaintiff's intake of raw water that they assumed to act under the doctrine of the primary implied assumption of risk.  Thank you.

THE COURT:  Okay.  Thank you.

MR. LUTZ:  Ryan Lutz again, Your Honor.  First and most obvious, PFAS contamination is not a risk inherent to water providers that is unlike the getting hit by a baseball at a baseball game.  We don' t assume that industrial users will discharge toxic, bioaccumulative, persistent chemicals either directly or indirectly into the waters of the State of South Carolina.

The plaintiff has established, I believe, Your Honor, a duty here, and that duty is dispositive of this issue.  They had a duty to exercise due care in their use, handling, and disposal of PFAS.  As the defense counsel argued, Your Honor, I mean, this is just a duty, and it's just an allegation that plaintiffs have not adequately led a prima facie case of defendant's duty.  We just went over that, Your Honor.  I'm not going to repeat what we just discussed, but this primary implied assumption of the risk does not apply here because the defendants had a duty that they breached.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. TAPLEY:  Your Honor, if I might on this permit issue, because I think it would help the court.  Defense

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

86

counsel just said that they can discharge anything they want to as long as their permit doesn't say they can't.  That's absolutely not the law.  It's exactly backwards.

I would point the court to city and county of San Francisco versus the EPA.  A decision that came out March 4th of this year where the Supreme Court finally, clearly identified for all courts, including the federal courts, of what a permit under the Clean Water Act actually allows.  The court said, "A critical component of the Clean Water Act regulatory scheme is the National Pollutant Discharge Elimination System, NPDES, which makes it unlawful to discharge pollutants into covered bodies of water unless authorized by permit."  And it makes sense, Your Honor.  A parking permit to park here at the courthouse doesn't give me permission to park at the hospital.  You're permitted to do what the permit says you can do, and nothing more.  Thank you, Your Honor.

MR. TAMASITIS:  Your Honor, just to clarify, T&S Brass doesn't have an NPDES permit.  It only has a pretreatment permit.  Thank you.

THE COURT:  Okay.  Thank you.  Traceability?

MR. WEATHERHOLTZ:  Your Honor, James Weatherholtz again on behalf of defendant, Unichem.  I believe that Unichem may be the only party who made this argument about traceability.  Simply, the position we're taking here is that we don't

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

87

believe the plaintiffs in their amended complaint are able to show or even allege properly that the PFAS they claim is on their property is the same PFAS that was discharged by these defendants.  And the reason we believe that -- that this is an argument that's squarely before the court today is because of the other allegations in the plaintiffs' amended complaint.

I understand that the plaintiffs will say this is premature and that proof will bear this out, but their complaint also alleges that PFAS is pervasive in industrial, commercial, consumer products.  They say that it's persistent in the environment.  It's highly mobile, water-soluble.  It remains in the environment for decades of legacy industrial use.  I think that -- that even today during these hearings, the plaintiffs have said that every time somebody flushes the toilet, they're putting PFAS into their discharge, which makes its way to their water.

And -- and what I would submit to the court is I don't think you can have it both ways, Your Honor.  Even at the pleading stage of this case, to say that it's everywhere all the time and it's being put out by -- by all users of water, but then at the same time allege that -- that you are able to identify the -- the discharge from these defendants in a way that could sustain a claim, in this case, for negligence.  Thank you.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

88

THE COURT: Thank you.

MR. LUTZ: Ryan Lutz again, Your Honor. Thank you. Defendants contend that we cannot specifically trace at the pleading stage the chemicals they discharged from their facilities to the chemicals that are in the waters and that have, that the plaintiffs intake for their -- for their drinking water.

It's obvious, obviously, Judge, that's a fate and transport issue. There are experts and discovery that is certainly going to be required to -- to identify that and to -- and to show the specific ways in which PFAS chemicals travel from the defendant's facilities all the way downstream to the intake where plaintiffs obtain their water. So not only is this -- not only is this a premature argument, it's also -- it also conflates the -- the pleading standard with the underlying merits of the case.

And, Your Honor, we cited -- I mean, there -- there's a whole page of allegations where we are citing that defendants use chemical -- use these PFAS chemicals in their processes, they send them to the wastewater treatment plants, they pass through the plant -- plants, they -- they travel downstream and they contaminate a plaintiff's water supply, they damage plaintiff's property and plaintiff's infrastructure. And we've made all those allegations, Your Honor. Those are on page 47 of our brief. So I'm not going to sit here and read

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

89

them to you, but there's plenty of allegations that would defeat their argument.

Not only that, Your Honor, we've cited too, a number of, again, PFAS cases. Outside of this jurisdiction, the Johnson case we've cited, where -- where the court denied dismissal based on the argument that PFAS are ubiquitous and that plaintiffs can't state a claim.

And then there's other -- there's two other cases, Judge, that are actually cases here in South Carolina. One is the State's case and the other is a case in -- in the -- in the District Court of South Carolina. Those cases are South Carolina versus 3M and Weatherford versus EI DuPont. And those are cases we cited that support our position that we have adequately alleged the facts that are necessary to -- to get past this argument.

And so, Your Honor, in sum, I mean, this is a -- this is a premature argument. This is part of what the -- the discovery process will -- an extensive part of the discovery process will -- will deal with this. This will be part of an extensive amount of expert proof. It's also conflating the pleading standard that we have, Your Honor, with the underlying merits. And so it's premature. Nonetheless, plaintiff has adequately alleged the traceability of these chemicals. Thank you, Your Honor.

THE COURT: Thank you.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

90

MR. WEATHERHOLTZ:  Your Honor, James Weatherholtz, again.  Just one thing.  I think that the plaintiffs continue to talk about PFAS in general terms.  They've alleged that all of these defendants put it into the water system, but what we're talking about is the specific allegation of how the plaintiffs intend to prove or even allege that the PFAS they complain of that causes property damage to their property comes specifically from each of these defendants and we don't believe they can do it.  And our point at this pleading stage is that they haven't even alleged or attempted to do that in the amended complaint.

MR. LUTZ:  Nothing further.

THE COURT:  Okay.  All right.  Thank you.  We're moving to Mr. Tamasitis.  Municipal cost recovery rule.

MR. TAMASITIS:  Thank you, Your Honor.  John Tamasitis on behalf of T&S Brass.  May it please the court.  Excuse me.

As stated in their complaints, plaintiffs are duly elected commissions authorized to provide potable water and additional public utility services to their residents pursuant to statute.

Under the municipal cost recovery rule, whereas plaintiffs are going to refer to it later, the free cost recovery or the free cost recovery rule, public expenditures made in the performance of governmental functions and services, like those sought by plaintiff to monitor its water

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

quality and upgrade its surface water treatment plants, are not recoverable in tort.  This rule is based in large part on the constitutional separation of powers.  It was first identified by the US Supreme Court in 1947 in the Standard Oil case.

And the seminal case on this doctrine is from the Ninth Circuit in 1983, the City of Flagstaff versus Atchison, Topeka, and Santa Fe Railroad Company.  In that case, the city attempted to recover from the railway the cost associated with emergency response after the derailment of tank cars carrying explosive gas.  The city's theories were negligence and conduct of an ultra-hazardous activity.

The court held that the cost of public services from protection from safety hazards is to be borne by the public as a whole, not a sense against -- not assessed against the tortfeasor whose negligence creates the need for the service.

What the decision in Flagstaff basically said was it did not turn -- the analysis did not turn on the underlying theory of tort liability, whether it be negligence, trespass, nuisance, or on the question of proximate cause, but it turned on two things, the identity of the claimant, a government entity, and the nature of the cost.

Essentially, where such services are provided for by the government, and the costs are spread across the public through fees and taxes, the tortfeasor, as well as insurance

companies, business entities, the public-at-large, and other municipalities, do not expect a demand for reimbursement.

There's an expectation from the business community and the public that would be upended if the court were to create an entirely new scheme of liability to compensate governments for increased costs to provide the services that they agreed to provide.

The fundamental premise behind tort law is to allocate losses by courts in the most efficient and practical way possible. Creating an expectation among businesses and the public that certain losses are going to be allocated appropriately so that individuals may govern their conduct accordingly. Here, there's a regulatory structure, as I talked about before, and a permitting scheme that overlays the provision of public water in South Carolina. These commissions and municipalities receive federal and state funding to support and improve those services. None of these funding mechanisms are even mentioned in plaintiffs in this case. The expectation of the parties in this case is that it will be handled through a regulatory mechanism. However, plaintiffs come to court asking to break the societal contract.

Plaintiffs are correct that South Carolina has not yet had reason to consider and adopt this doctrine. However, we believe that the analysis is perfectly suited for this unique

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

case and should be adopted by the court. And we've cited to several courts that have adopted a municipal cost recovery rule.

The plaintiff presents four arguments in opposition to this doctrine. First, they argue that the doctrine does not apply here for the, "Simple reason that plaintiffs' respective water provisions of drinking water to paying customers is neither free nor public as contemplated by the doctrine."

And then they cited the case in the Northern District of Georgia that I believe was talked about earlier, where an individual filed suit against the PFAS manufacturers. First of all, because it was an individual plaintiff, not a government entity bringing the claim, the court's analysis of the doctrine passed its initial determination that the doctrine wasn't applicable is simply dicta.

Section 531.670 of the South Carolina Code provides that any city or town or special service district may, after acquiring a waterworks or sewer system, furnish water to persons for reasonable compensation within such city or town or such special service district.

Our Supreme Court has recently rejected the unsupported premise that plaintiffs present here, that the public freely enters into contracts with public water providers for water and sewer service -- services. That's the Azar v. City of

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

94

Columbia case, 414 SC 307 from 2015.  I don't believe we cited that in our brief, but I do have copies that I can hand up to the court.

Let me -- I just want to go through some of the ordinances in Laurens County.  Section 3381 of the Laurens County Code of Ordinances, which governs residential subdivision standards and construction, "Provides that a certificate of occupancy shall not be granted to a building or use without a connection to a well or public water."

Section 33-101, which discusses general standards for multifamily residential developments, "Provides that all proposed multifamily development consisting of greater than 15 dwelling units must be served by public water."

Section 33-113, "Requires that all proposed open space residential developments must be served by public water and sewer utilities."  Greenwood County has the same.  Under its subdivision regulation, Greenwood County defines utilities as any utility service to a subdivision, including water, and says in Section 6-6-34b that all subdivision proposals within the county to have public utilities and water systems located and constructed.

The services of water and sewer are essential in a civilized society, and it strains credulity that plaintiffs argue on one hand, they are bringing these actions to protect the public.  And on the other hand, such services are the

95

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

result of a -- result of a commercial arm's length transaction where they are operating as an independent commercial-like entity.  Plaintiffs can't have it both ways.

Second, plaintiffs contend that the doctrine recognizes exceptions where the acts of a private party create a public nuisance which the government seeks to abate and where the government incurs expenses to protect its own property.  We cited the case of Chicago versus Beretta USA Corp from the Illinois Supreme Court.  This actually addresses this issue head on, and it does disagree with the court in Flagstaff.

Admittedly, the rule in Flagstaff does seem to suggest that the doctrine is only available where we're dealing with single discrete disasters, such as fires, explosions.  However, we contend that it defies common sense to suggest that the more predictable the expense, such as alleged contamination of the water supply by previously unknown contaminants that the EPA deems to be a contaminant that has escaped federal and permitting oversight, which, Your Honor, will happen again in the future, the greater the ability of the city to recover its costs in tort.  The potential unintended consequences of that rule are staggering.

I don't want to look at this case that we have right now in a vacuum.  There are 18 cases right now that have been brought under these local PFAS litigation cases.  There are similar defendants in all of these cases.  Bankrupt these

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

96

companies in an effort to upgrade government facilities and the consequences and to avoid consequences at the ballot box are not something that should be allowed to happen.  And the municipal cost recovery rule addresses that.

We argue that when the need for government services in response to an alleged and continuing nuisance that impacts the public is ongoing and significant, as the plaintiffs allege here.  The municipal cost recovery rule is even stronger, not weaker, because the legislature is better able to handle and consider the need for cost recovery legislation than in the case of sudden disasters.

Indeed, if the legislator -- legislature concludes that the cost of conduct necessitates improvements to services rather than by the taxpayers in general, it has the ability to enact a statute expressly authorizing the recovery of such costs.  No such statute exists for these cases.

Third, the plaintiffs argue that the Supreme Court has recognized that a public water provider has a proprietary interest in the water it sells.  And because the doctrine only relates to a governmental services and functions, then the doctrine does not apply to water provider cases.

Again, in Azar, the Supreme Court called into question a similar argument made by the city of Columbia in that case and its so-called proprietary interest in the sale of water.  In fact, proprietary in this context is essentially an

accounting concept that refers to governmental activities for which a fee is charged to external users for goods or services, thus bearing a closer resemblance to a private business in terms of funding rather than a tax.

With no supporting authority, the city vastly overestimates the significance of its purported proprietary interest in arguing that it somehow holds a private ownership stake in the water.  And thus makes the sale of that water into the community more akin to a private commercial transaction.  These are government services that they are seeking to recover costs for.

Pursuant to statute and -- and as a public water provider, plaintiffs enjoy a monopoly in their service areas for providing and selling water services.  Unlike investor-owned utilities, plaintiffs' rates are not subject to review and regulation by the Public Service Commission. Instead, those rates are set by elected politicians, their commissioners, with no independent third-party review.

Accordingly, the legislative functions and regulatory framework in place to set the rates and negotiate with the public for future enhancements to their facility are most appropriately borne by the government through the legislative process.  This is not an area for judicially created common law to govern the reimbursement to governments for the services that are they are mandated by statute to provide.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

In reality, the relief sought by the plaintiffs in these cases represents a form of taxation by litigation where the taxpayers actually reside outside of the service areas so that the commissioners can avoid the democratic process within their service areas by adjusting rates.  As a result, the claims on this should be dismissed.  As to the judicial system, it is not the appropriate branch of government to handle these types of claims.  Thank you.

THE COURT:  Thank you.  And yes, I would like to review that case, the 2015 City of Columbia.

MR. TAMASITIS:  Yes, Your Honor.

MR. WATSON:  Good morning, Your Honor.  My name is Akira Watson.  I represent Greenwood and Laurens County.  First of all, I think that we are now on the same page with defense counsel on the fact that it is not clear at all that the State of South Carolina recognizes the free public services doctrine or the municipal cost recovery rule.  Defendants have cited no South Carolina clause -- cases applying the doctrine or recognizing it.  I've searched and found no such cases either.  For the reasons I'll explain, this case is not an appropriate vehicle for a South Carolina court to recognize free public services doctrine for the first time.

Now, the doctrine holds that for certain government services, legislative bodies have already determined the funding mechanism.  For example, fire and police services are

99

funded through general taxation in their communities.  In those instances, allowing these government entities to recover the cost of their services in tort would interfere with that legislative determination.  Indeed, the case of Flagstaff versus Santa Fe Railway out of the Ninth Circuit is -- is the lead case on free public services doctrine.

And as defense counsel stated, application of the doctrine turns on two factors, the identity of the claimant and the nature of the costs, and that is the public and free components of the doctrine, respectively.  However, where the defense argument fails is that they have only really focused on plaintiffs' identity as governmental -- governmental entities, as water utilities.  They've totally bypassed the nature of the costs involved.

Indeed, free public services doctrine doesn't apply here because our clients' provision of drinking water to paying customers is neither free nor public as contemplated by the -- by the doctrine.  It's not free because our utilities bill for their water service on a usage rate, and second of all, it's not public because it's not available to the public-at-large.  Our water is only available to paying customers within our service area.  When the fire department puts out a fire, you don't get a bill from them, but every month you pay a water bill to your utility.

Defendants have cited no cases in which free public

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

100

services doctrine has barred a tort recovery by a water system, a public utility, or indeed any government agency that's funded primarily by billing customers.

South Carolina Code 5-31-670 authorizes municipal water authorities in water districts like plaintiff to charge reasonable rates for their water service. This is the legislative determination here. Water utilities are responsible for funding themselves, not funded through taxes. We collect -- we collect rates based on water used. And so, the determination isn't upset by a tort recovery.

Defense counsel also mentioned the fact that Flagstaff recognizes exemptions from the doctrine for tort recovery by government entities to abate public nuisances, which we allege, and to address damage to the government's own property, which we also allege.

Now, they brought up the case City of Chicago versus, I believe it was Beretta. And that case involved an alleged nuisance posed by gun violence in the city of Chicago. However, the services in that case were unlike the services that are present here. In that case, it was the increased strain on police and emergency medical care services, which again, the nature of the cost factor is funded through taxation, not through usage rates. And with that, I yield my time.

MR. TAMASITIS: Briefly, Your Honor, if I may approach,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

101

I've got that case here to hand up to you.

THE COURT:  And if you don't mind handing that to opposing counsel, thank you.

MR. TAMASITIS:  I have plenty of copies for everybody. Your Honor, just one point.  And this is the distinction with regards to the payments that are made, and the distinction that the plaintiffs are trying to make regarding the nature of the cost being billing for services for the use versus taxes.  And while I try not to be flippant, the water use, as I cited in some of those ordinances, is mandated by these counties in some areas.  And so whether you're paying for that service, that fire service or police service, with your real estate taxes or local taxes at the end of the year, or you're paying for it on a month-to-month basis, you are still paying those fees to a government entity.

And as I discussed and as is highlighted in the Azar case, the proprietary interest or the proprietary capacity that the water providers routinely cite is essentially just an accounting tool to say it's not a tax, it's a proprietary -- it's a proprietary interest.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. WATSON:  May it please the court.

THE COURT:  Yes.

MR. WATSON:  You know, the Azar case, I may have seen it in researching this, but I'll reiterate, this case doesn't

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

102

recognize free public services doctrine in the State of South Carolina.  And that's all.

THE COURT:  Okay.  Next.

MR. DUBOSE:  Good afternoon, Your Honor, and may it please the court.  Will Dubose of Williams Mullen, appearing on behalf of T&S Brass.  I'm here to discuss the primary jurisdiction issue, and this applies to T&S Brass.  It applies to the -- the Greenwood case, as well as the Laurens case, and I understand that Fiesta-Simmonsville has also moved on this basis.  But if Your Honor is so inclined, I would represent to the court that this issue applies to all of these PFAS cases, inherently.

I'd like to start by calling back to something that, Your Honor, noted at the beginning of this hearing.  When you were talking about all the boxes and papers that are stacking up in your office, this is a very specialized topic.  And when you said that, it made my ears perk up because it goes right to the heart of primary jurisdiction.  The key inquiry in primary jurisdiction is whether there are factual issues within the special competence of an administrative agency. And the reality is that water regulation, water quality on a molecular level like this are complex and technical issues.

Since the Clean Water Act was passed in 1948, the legislature has stacked statutes, and then agencies have stacked regulations on that foundation.  We've got the South

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

103

Carolina Pollution Control Act in 1950. We've got the Federal Safe Drinking Water Act in 1974. We've got the South Carolina Safe Drinking Water Act in 1976. And then in the years after those statutes and acts were passed, we've got the regulatory and permitting scheme that we have today. And the wastewater discharges that are complained of in this case, they were done pursuant to that permitting scheme. They were done under permits.

And earlier in this hearing, plaintiff's counsel said that no permit has ever been issued to discharge PFAS, but I think that kind of misses the point. There are multiple different kinds of permits. You've got an NPDES permit. That's for direct discharge. Well, most of the defendants in this case don't do direct discharge. They send their water to a wastewater treatment plant or POTW first, and that regulatory scheme is for pretreatment. That's the kind of permitting that T&S Brass has. Then the wastewater treatment plants and POTWs, they have their own permitting scheme as well.

And if you dig into the hundreds of pages of regulations connected to this permitting scheme, in reality, the defendants here, in pretreatment context, only need to identify the permit -- need to identify and get permitting for the substances identified by the wastewater treatment plants. And PFAS to date has not been identified by the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

104

POTWs.

Plaintiffs also claim that this is their only practical and reliable way to address PFAS in water, and that it would be too late if they have to wait until 2029 to do anything about it. But they have an opportunity to appeal every single POTW permit, NPDES permit, pretreatment permit, any regulatory decision made by DES, they have an opportunity to appeal that and say, hey, Department of Environmental Services, we have to comply with PFAS drinking water standards in 2029. We need your help. We need you to start considering PFAS as a part of these permits. They chose not to do that and chose to attempt to circumvent 77 years of regulatory schemes after just four months after the EPA announced the PFAS drinking water standards. That's when this case was filed.

Now, even if you do dismiss this case, they can still do that. And they also claim DES isn't taking action here. But they acknowledge that the department is and has implemented new monitoring requirements specific to PFAS. And that's the first step in regulatory action as it relates to this framework.

Now, speaking about the law here, I think the plaintiffs and the defendants in this case agree on the principles underlying primary jurisdiction. It applies when there are factual issues that are within the special competence of an

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

105

administrative agency, and it gives the trial court discretion to either stay or dismiss without prejudice in order to refer the matter to the agency.  We both agree that the goal is to promote uniformity and regulation and leverage the expert and specialized knowledge of the agency.

So what are the issues of fact that need specialized knowledge?  For one, where exactly is the PFAS coming from?  Traceability questions that have been raised earlier in this hearing.  How long has the PFAS been in the environment?  Who discharged it?  What impact does AFFF have on plaintiffs' claim damages, on plaintiffs' ability to comply with PFAS drinking water standards in 2029?  What impact does PFAS -- what impact is coming from wastewater in terms of the PFAS that's in the environment?  And most importantly, what's the most efficient way to treat it?  What are the feasibility concerns related to treatment?  There are many factual questions that need the specialized knowledge and expert knowledge of agencies, but the reality is these are not common questions considered by South Carolina common law.  These are regulatory questions, commonly considered by agencies.

If this case proceeds to a jury trial, even with all the expert testimony in the world, it's not within the keen of a jury to determine the cost of upgrades to a water treatment facility.  That's for regulatory bodies.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

If the court grants an injunction in this case, that'd be upending the current regulatory scheme. That'd be essentially adding permit requirements into every single NPDES permit, every single wastewater treatment permit, and the pretreatment permits that most of the defendants in this case have. And it would essentially invalidate the existing permits for wastewater.

I also want to briefly clarify what primary jurisdiction is not. It's not ripeness. We heard plenty from Mr. Willis about ripeness earlier this morning. But it's also not exhaustion. Exhaustion deals with exclusive jurisdiction. Primary jurisdiction is also not preemption. There's no complete conflict between state and federal law here. Instead, we've got concurrent jurisdiction. The court has subject matter jurisdiction to decide negligence claims. We're not arguing with that. But the agencies also have jurisdiction to determine how we should go about getting PFAS out of our water. And they haven't been afforded an opportunity to do so.

And so we're asking, Your Honor, to stay this case or dismiss it without prejudice to allow a regulatory decision to be made. Thank you.

THE COURT: Thank you. All right. Yes, sir.

MR. WATSON: All right. May it please the court. Akira Watson again. First off, like free public services doctrine,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

107

it's also unclear the extent to which South Carolina recognizes the doctrine of primary jurisdiction. There's only one published decision, Fullbright versus Spinnaker Resorts, out of the South Carolina Supreme Court in 2017 that addresses primary jurisdiction, and the Supreme Court was skeptical about the doctrine. It also noted the lack of South Carolina cases involving primary jurisdiction, and it ultimately didn't grant a dismissal or a stay on the basis of the doctrine.

Now, as far as the substance of primary jurisdiction doctrine, it's discretionary doctrine, where a case or factual issue is beyond the conventional experience of judges, but within the special competence of an administrative agency, the court may stay or dismiss the case and refer the matter to the agency.

Now, this case involves common law tort and property claims that are well within this court's competence and experience. The Department of Environmental Services, on the other hand, doesn't resolve these types of claims and has little to offer in resolving them. I'd point out the fact that the MCLs at issue, which the defendants cite in their briefs as a basis for primary jurisdiction being invoked, were issued by EPA, not the Department of Environmental Services.

Defense counsel mentioned state and federal statutes

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

108

that implicate the permitting scheme that is potentially at issue in this case.  However, I would note that nothing in the text of either the South Carolina Safe Drinking Water Act or the Water Pollution Control Act indicates that the Department of -- of Environmental Services has exclusive jurisdiction over issues touching safe drinking water or industrial discharges of PFAS.  And, in fact, the federal statutes that are the analog to the State statutes, and that is the Safe Drinking Water Act and the Clean Water Act, expressly provide a right for citizen plaintiffs to sue to enforce, thus negating an inference that the responsibility for enforcing clean water and discharges of pollutants rests solely with the administrative agencies.

Moreover, the South Carolina Safe Drinking Water Act and its federal counterpart are really about regulating plaintiffs' utilities and the water that they provide, not about regulating discharges from industrial facilities into State waters.

There are a lot of practical problems with defendants' requests here.  Defendants have just asked for a stay or dismissal, and essentially for the court to figure out what the substance of that dismissal, or more specifically, what the stay would be.  What issues would the court be referring to DES?  Defendants haven't specified a list.  The court cannot -- or excuse me, the Department of Environmental

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

109

Services cannot adjudicate tort claims.  What would be the time line for a stay?  The proposed end date?  How would the court know when to lift the stay?  Here, defendants have no answers.

As mentioned in our brief, defendants can point to no regulatory action by the Department of Environmental Services to regulate PFAS, nor any PFAS-related enforcement actions that are specific to their facilities.  Moreover, even if they could, that still would not warrant staying or dismissing the case under primary jurisdiction doctrine.

Indeed, in the case of Nix versus Chemours out of the Eastern District of North Carolina in 2023, that case involved contamination from a PFAS manufacturing facility that had contaminated local drinking water supplies.  That facility was subject to a consent order by the North Carolina Department of Environmental Quality.  Defendants raised primary jurisdiction doctrine, the Court denied it.  And in fact, I'd point out, Your Honor, that this argument has been raised by defendants in a lot of PFAS contamination cases.  Those cases are cited in our brief.  As far as I can tell, it has never been successful.

Really, this argument about primary jurisdiction, and -- and as well as free public services, these are obscure doctrines.  The fact that defendants are arguing for dismissal on these bases really shows that they're grasping,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

110

and it underscores the strength of our case and why their motion should be denied.  Thank you.

MR. DUBOSE:  Your Honor, there is another reported case in South Carolina that considers the primary jurisdiction doctrine.  It's the Medical University of South Carolina versus Taylor.  Citation is 249 SC 99 1987.  It is a Court of Appeals case, but in that case, the court declined to rule and found that primary jurisdiction applied and that the matter should have been decided by the agency.  That is South Carolina authority.  Additionally, other courts in South Carolina, the Supreme Court specifically, has not had a lot of opportunities to consider the doctrine.  They haven't needed to.  But the US Supreme Court has recognized the doctrine since 1907.

Additionally, DES and permitting decisions do go to the underlying problem here, PFAS and water.  And it's a whole lot more feasible for the Department of Environmental Services to implement new regulations that apply to all of the permits that everybody who discharges wastewater has to have than for defendants to drag -- or for plaintiffs to drag every single defendant that emits wastewater into a case and try to resolve it that way.  We're also not arguing for exclusive jurisdiction here.  This is primary jurisdiction.  And as I said earlier, it's a matter that occurs where there's concurrent jurisdiction, but an inherently regulatory

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

111

matter.

Plaintiffs made reference to the Safe Drinking Water Act and how that applies to the plaintiffs.  I don't disagree with that, but the South Carolina Pollution Control Act, the related regulations that apply to discharge permits, and the Clean Water Act, that's what speaks to the defendant's duties here and that regulatory scheme.

As for the questions about the specifics of any kind of a stay in this case, we're happy to provide additional briefing to outline those specifics.  But really, it's as simple as the case has stayed.  Plaintiffs put the issue to the department, and if they're not satisfied with whatever develops, we'll come back here.  But right now, there's been no opportunity for the department to make a decision on this.

Additionally, you said that these are obscure doctrines, that primary jurisdiction is obscure.  Well, these are fairly unprecedented cases, and we ask that, Your Honor, consider these arguments.  Thank you.

THE COURT:  Thank you, Mr. Dubose.  Anything else?

MR. WATSON:  No, Your Honor.

THE COURT:  Okay.  Let me just ask you all for planning purposes.  I was going to break for about 10 minutes and come back and finish up the statute of limitations and motion to stay, or do y'all want an hour?

MR. WILLIS:  We're prepared to move forward, Your Honor.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

112

It's obviously up to you.

THE COURT:  Ten minutes.  Thank you.  I'll see y'all at one o'clock.  Thank you.

(OFF THE RECORD)

THE COURT:  Be seated, please.  Okay.  We are back on the record with civil action numbers 24-CP-30-734 and 24-24-735, as well as 25-30-05.  Okay.  We are up to statute of limitations.  It's an issue that we're taking up in the motions to dismiss.

MR. CARROLL:  Good afternoon, Your Honor.  My name is Jamie Carroll, and I'm appearing for Milliken.  At the risk of everybody's blood sugar getting even lower, I'll -- I'll try to -- to move along fairly promptly.

I'm speaking, Your Honor, because while Milliken raises many of the same arguments that the other defendants do, there is one that it alone raises, which is the statute of limitations.  And our -- an overview of my argument is, Your Honor, is that the discovery rule obviously applies, but it is a legal issue, and, Your Honor, can decide it.  So we'll go through the facts that are in the complaint.  And then the plaintiffs try to preserve the action, even applying the discovery rule, by arguing nuisance and trespass, continuing nuisance and continuing trespass.  And I don't believe either of those hold up.

So first, Your Honor, let's look at the facts as alleged

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

113

in the complaint and the time line for Milliken.  So Milliken owned the Judson Mill from 1960 to 2015 and sold it in 2017. The plaintiffs added Milliken to their lawsuit in 2024 Obviously, South Carolina has a three-year statute of limitations for property damage, and Milliken has not had any ownership or control in seven years.  So on the face, it's time-barred, but obviously the plaintiffs say, we didn't know about it.

So let's, Your Honor, look at the -- the timing that they have in their complaint.  So they cite the 2016 EPA health advisory, and that's at paragraph 34 of their complaint.  And in that, Your Honor, the EPA recounts the actions which led to the advisory opinion.  One of those was in 2012, and what it says is, "The EPA required all water systems with more than 10,000 customers to measure PFOS and PFOA for at least one year in the 2013 to 2015 time period."

And as the plaintiffs admit in their complaints, Your Honor, both of those were covered by that.  In paragraph two of the Laurens complaint, it states that it serves approximately 40,000 customers.  Greenwood states at paragraph two that it serves 23,500 customers.  So the upshot is, Your Honor, both of these water systems had to measure PFOS and PFOA for at least a year in either 2013, 2014, 2015.

Now, I mentioned the health advisory, and let's look at what it says, Your Honor.  And this is what the plaintiff,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

114

I'm only citing how the plaintiff characterizes it.  In paragraph 34, they say that it is, this health advisory arose from peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of the human population exposed to PFOA, PFOS.  What they note is that exposure over certain levels may result in adverse health effects, including developmental delays to fetuses, cancer, testicular and kidney, liver effects, immune effects, thyroid effects, and other adverse effects.  So that occurred in 2016.

2019, the MDL with Judge Gergel is established, and there are many water system cases in there.  2022, the EPA updates the health advisory, and plaintiffs again quote this in their complaints at paragraph 36, saying, "The level at which negative health effects occur are much lower than previously understood, and the EP lowered the interim levels for maximum contaminant goals for PFO -- for all PFAS.  Then in 2023, they proposed maximum contaminant levels.  Then these were finalized in April 2024, and that's detailed in the complaints at paragraphs 38 to 42.

So, Your Honor, if you look at all that, and that was all we had, I assume the plaintiffs would say that their statute did not begin to run until 2024.  If that's all we had, but the plaintiffs themselves say this is not what they had.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

115

I've got two quotes, Your Honor, at pages 5 and 6 of their complaints. So this is the plaintiff's language from page five. "Defendants recast plaintiffs' cases fundamentally concerning regulatory compliance rather than what they actually are, straightforward State law claims arising from past, present, and future property claims." So, Your Honor, a regulatory time line is not the be-all and end-all, according to the plaintiffs.

Now, if there were any question about what the plaintiffs' complaints say, go to the next page. They say on page six, and I quote, "Plaintiffs' complaints speak for themselves. These are not regulatory compliance claims, but straightforward State law causes of action based on defendants' ongoing contamination of the land, surface water treatment plants, infrastructures, and water sources -- water sources," excuse me, "with PFAS chemicals." See complaints paragraphs 1-7, 57 to 95. That's on page six.

So, Your Honor, if it's not about regulatory compliance, and the plaintiffs state it's not, and it is about past, present, and future property claims, then, Your Honor, we do need to look at when the discovery rule accrued. And you, Your Honor, that is an objective decision that -- that you can make, not a subjective one. And that's stated in the Hedgepath case, which both the plaintiffs and we cite as -- as the authority on this.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

116

So I will give you three quotes, Your Honor, from Hedgepath. So obviously, I've already said it's objective and not subjective. These quotes, Your Honor, "Whether a particular plaintiff knew he had a claim is not the test. Rather, courts must decide whether the circumstances of the case would put a person of common knowledge and experience on notice that some right of his had been invaded or some claim against another party might exist." So, Your Honor, the objective determination is whether a regular old person might be on notice that some claim -- I'm sorry, some right had been invaded or some claim might exist.

Now, Hedgepath goes on to say, Your Honor, that statutes of limitation begin to run from this point and not when advice of counsel is sought or a full-blown theory of recovery is developed.

So, Your Honor, that is when you start to look. So if you apply Hedgepath to this case, since it's not a regulatory compliance case, doesn't really matter when 2024 comes, right, and the -- and the standards are finalized by the EPA. We submit, Your Honor, that when that statute began to run, could have been 2013 to 2015, when they had to measure PFAS and PFOS, according to the EPA, and both these water systems had to do it, or 2016, when they put the health advisory out and cited the adverse health effects, including developmental delays to fetuses, again, this is a quote, cancer, liver

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

117

effects.

Your Honor, even if the PFOS and PFOA were below the 2024 standards, then in 2013 and 2015 when they measured them, that doesn't matter because the plaintiffs themselves say it doesn't matter.  The plaintiffs say judge us on straightforward State law claims.

Your Honor, if -- if you judge these on when a -- a someone with common knowledge should have known that a claim might accrue or some right might have been invaded, it can't be past 2016, Your Honor.  These are water systems.  They've been measuring PFAS.  They get the EPA advisory in 2009 that says, hey, and this is, again, quoted in the plaintiff's complaint. 2009, it says, "We're -- we're not sure about human health effects."  2016, they say, "Human health effects."  2019, Judge Gergel, right down the road, sets up an MDL talking about PFAS in not only AFFF.  I'm not going down and dragging that red here, Your Honor. What I'm saying is, water systems are in Judge Gergel's MDL.  These guys, the plaintiffs should have known, they do this every day, no later than 2016.  And that's a decision, Your Honor, that you get to make.  This is an objective standard, not a subjective standard.  So it really doesn't matter what they're going to tell you about what they knew and when.  You can look at the record they have put before you and make this decision.

Now, how do they try to save it?  They say, well,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

118

continuing nuisance and continuing trespass. Both of those, Your Honor, fail for this reason. Clark v. Greenwood County has already been cited on the -- by Ms. Tor, I think, on the nuisance issue. And there was talk about control. I think Mr. Tapley was arguing about control. Your Honor, the -- the -- the control that is at issue in a continuing nuisance claim is not the control of the alleged polluters. Here's what Clark says, and here's a quote, Your Honor, appellants neither -- and this is speaking of the Clarks, "Appellants neither alleged nor produced any evidence that corporate respondents had control over the landfill or the hazardous waste once it was deposited at the landfill. As such, they couldn't be held liable for nuisance." Your Honor, the control is not what we do at the plant. The control is what happens downriver. We have no control over what happens for a continuing nuisance claim, and that is fatal to their claim.

As to trespass, Your Honor, continuing trespass, similar reasoning applies, but the test is slightly different. It's black letter South Carolina law, as quoted in Hedgepath, "Trespass is any intentional invasion of the plaintiff's property." That's been -- that's been South Carolina law for at least 40 years, probably earlier. Hedgepath site's case is going back 40 years.

It's undisputed that Milliken intended to send its

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

119

wastewater to the Mauldin Road treatment plant, But there is no evidence, there's no allegation that it intended for the wastewater to go to plaintiffs' intake valves.

Now, Ms. Tor also made the -- made the arguments about intangible matter and about no entry, but Your Honor, there's no intent as well here.

So, in sum, Your Honor gets to decide when the discovery rule runs. And for -- from what the plaintiffs have put in their complaint, that's 2016. If Your Honor wanted to say it went to 2019 when Judge Gergel said, y'all come on down, and plenty of water systems did. But you can't -- that's when the discovery rule runs, 2016, and you can't save it with continuing nuisance or continuing trespass, because it's fatal to have no control and no intent. Thank you, Your Honor.

THE COURT: Thank you.

MR. TAPLEY: Your Honor, I think there's finally an agreement in the courtroom that plaintiff is master of his complaint. And that the case on a motion to dismiss has to be judged by plaintiff's actual complaint, not the one defense lawyers wished we'd filed. Let's be clear about what's in the complaint, and let's be clear about South Carolina law. South Carolina is clear that Your Honor has the ability and the power to dismiss this case if plaintiff has pled a time-barred action. Plaintiff has not pled a

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

120

time-barred action.

2016 Health Advisory absolutely notified these plaintiffs that 70 parts per trillion or more of PFOA or PFOS was troublesome. Even said might be health effects above 70 parts per trillion. That was told of them in 2016.

Plaintiffs never had a reading that high of PFOS and PFOA. Plaintiffs do not, Your Honor, have epidemiologists on staff. Plaintiffs do not have toxicologists on staff. Our plaintiffs don't do medical studies, and our plaintiffs don't do animal studies. We rely on other people to do that and tell us what it means. And as of 2016, based on the samples plaintiffs in this case took, they were led to understand that there was nothing to worry about at the time.

Now, counsel is correct. That changed in 2024 for plaintiffs. In 2024, they were told with the new health advisory and with the MCLG, that in terms of health effects for human populations, it's now the -- the overall view of the scientific community that there is no safe level. No safe level as of 2024. That's the only time that the statute could have reasonably begun to run.

Moreover, Your Honor, Milliken may have sold this property or shut this plant down in 2015, you said. But they shut it down and didn't remediate the property. And now every time there is a significant rainfall event, the PFAS is scattered all across that property, makes it way to the

121

surface waters again, and is flushed down the river toward our intake.

Also, Your Honor, in their pleadings, they make a very interesting argument, or in their briefing. They claim that the claim involving the Judson Mill site is both unripe and time-barred. Unripe and time-barred. They say too much time has passed from first suffering an injury and then the injury was never suffered. Their argument on the application of the statute of limitations falls from its own internal contradiction. Again, their argument is both too late and too early. But they've got it right when they read our complaint. It is plaintiff's allegation that the statute of limitation is continuing to run with every release from that old, unremediate -- unremediated property.

And finally, Your Honor, I'll just touch on the other part of our argument, that this court's powers for restitution, when it invokes its power in equity, is very broad. And there's South Carolina opinions and authority that we've cited to the court in our brief on this issue. But South Carolina courts recognize that, Your Honor, when fashioning the remedy of abatement, exercising its equity powers, absolutely has the authority to force Milliken and others to participate in an abatement remedy which results in the construction and funding of new water filtration on the plaintiff's properties so they can continue in its role of

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

122

providing safe drinking water.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. CARROLL:  Your Honor, Jamie Carroll again, two brief points.  If Mr. -- Mr. Tapley wants to say that Greenwood and Laurens, the argument's sort of like, ain't nobody here but us chickens.  We don't know anything until we were told this by the EPA.

Your Honor, that's not the test.  The test, and we both cite it in our briefs, is Hedgepath.  It's an objective test, and it's if someone knew when some right might have been violated or some claim might arise.  Hedgepath specifically says it's not when you go to a lawyer and have a full-blown theory of recovery.  So it's not when they met -- went to Mr. White, it's when you knew something.  And since they are so -- plaintiffs do want to have it both ways, they want to say, well -- we'll rely on the regulation sometimes, we'll rely on the tort claim sometimes.  But, Your Honor, if you say this PFAS needed to be remediated now, you worried about it then.  That's when the statute began to run.

When these two water systems were unnoticed, that some right might have been violated.  And, Your Honor, that can't be passed 2016.  Doesn't really matter when Milliken had the plant.  I would argue that if the plant were still up and running.

And then lastly, on this point about arguments being

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

123

internally inconsistent, as you -- that's a fantastic jury argument, Your Honor, but it doesn't work on a judge because Your Honor knows that people make series of arguments all the time.  I'm sure you've had a dog bite case where the guy said, my dog didn't bite you, and if he did, he was provoked.  Well, those two things are internally inconsistent, right?  How can you make those?  Well, you make them because we make these arguments because any one of these arguments, if Your Honor grants them, are fatal to the claim.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. TAPLEY:  Your Honor, I'll finish very briefly.  I promise you, if Greenwood and Laurens had to file this case in 2017, they would be arguing, but your levels are way below 70 parts per trillion, and you don't have an injury.  You don't have an injury.  But now, with the benefit of hindsight and the attempts to get a case dismissed, they say even though you had no proof that you were injured in 2016, and everything your regulator told you led you to believe you weren't injured in 2016, you had a case.  That ain't South Carolina law, Your Honor.

In order to bring a claim, you have to have a concrete injury.  And they didn't know they had an injury.  Until the medical and scientific community coalesced, and in 2024, finally determined no safe level.  It went from 70 to

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

124

nothing, and 70 to nothing was all the world to determine whether or not there was an injury in these cases.  Thank you, Your Honor.

MR. CARROLL:  Nothing further, Your Honor.  Thank you.

THE COURT:  Thank you.  Okay.  Are y'all ready to move back to Mr. Willis?

MR. WILLIS:  Thank you, Your Honor.

THE COURT:  For the discovery issues.

MR. WILLIS:  Yes, ma'am.  So as I said earlier, Your Honor, all -- all our motion for stay asks is that there be no discovery until Your Honor decides these motions to dismiss.  And we know whose parties are in and what claims are in or out.  And the plaintiffs to their credit, have cooperated with us on that and have not pushed that issue. So we're -- we're content to simply say let's not do discovery until Your Honor can decide these motions. And then if Your Honor denies them or grants them in part, denies them in part, then discovery would go forward.  So that's all we really have to say about the stay.  We're not seeking to stay beyond Your Honor's decision on the motions.

What I do want to ask, or I guess alert the court, is what we're going to be doing tomorrow.  We -- we don't intend, Your Honor, to come in and replow all the old ground that we plowed today.  Your Honor's been taking furious notes and paying close attention to the arguments.  And we greatly

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

125

appreciate the time that you've given us. Frankly, this is unprecedented for a motion to dismiss. And so we -- we don't want to abuse the court's time and resources.

There are some lawyers that have some additional things to say. The cases tomorrow are a little different than the cases today. So you'll be hearing from Mr. Barnett on a failure to join the United States government. You'll be hearing from Merritt Abney with Nelson Mullins on some of the negligence, trespass, and nuisance aspects of that. The cases tomorrow that are different from what we talked about today. And Mr. Knowlton on prejudgment interest and attorney's fees and on primary jurisdiction, and he's been on the call, so I'm sure he'll -- he's been listening and won't try to plow old ground.

We have an issue dealing with personal jurisdiction that we'd like to talk about with regard to one of -- or two of the landfill clients in the Grand Strand case. And so that's all we have for tomorrow. We don't think it'll be nearly as long and as arduous as today. I just want to thank, Your Honor, for Your time.

With regard to what the court should do, as -- as Your Honor knows, we're asking for all of the cases to be dismissed, but the court certainly has the power to dismiss some aspects of some claims, but not dismiss as to others. To dismiss some damages that aren't recoverable under some

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

126

causes of action, even though they've been pled, the court has the authority to ask the plaintiffs to make their complaint more definite and certain.  We still haven't really seen any specific allegation of any costs that they have incurred thus far which would be part of the justiciability argument.

But Your -- Your Honor certainly knows what you can and can't do with a Rule 12 motion to dismiss.  You don't need me to tell, Your Honor.  So thank you for your time.  I want to thank our opponents for their civility and the substantive nature of the arguments.  This is an interesting case, and we ask that our motions be granted.  Thank you very much.

THE COURT:  Thank you, Mr. Willis.

MR. TAPLEY:  Your Honor, just briefly as far as plaintiffs' position on the motions to stay discovery.  At this point, defendants have sort of fashioned their own stay of discovery by not responding until the court rules.  We -- we do believe that the motions are due to be denied and the cases should move forward, Your Honor, and we hope the court rules in that way.

And we've heard from defense counsel that they believe that once your court -- once Your Honor has ruled that Discover will be live and open, we haven't filed the discovery in front of Your Honor, as I told you earlier today, but then much hay was made about the fact that we sued

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

127

some people and not other people.  I want to be real clear. The discovery, which is pending right now, is very targeted Who'd you buy the PFAS from?  How much did you buy?  And when did you buy it?  Because if there are other people that need to be added to this case, we want to do that, Your Honor, but we need discovery from defendants to get there.  Thank you.

THE COURT:  Okay.  Anything about tomorrow?

MR. TAPLEY:  Your Honor, I agree that it'd be a travesty to waste the court's time replowing old ground, so we'll be here and ready to address anything raised by the defendants, but hopefully we can be very respectful of the court's time.

THE COURT:  Okay.  Okay.  But also today we have -- I mean, some of you, I think, are going to leave, but we also have the city of Clinton's cases, right?

MR. ENGLISH:  Yes, ma'am.

THE COURT:  Okay.  Our motions.  And so this is a little unusual because I don't have representatives from the clerk's office here who are usually very vocal about when we break for lunch, and court reporters as well.  And so I'm happy to keep going, but happy to take a break.  I think my staff may need to take a break for, y'all can maybe alternate if you want to, but I'm happy to keep going if y'all are.  It doesn't matter to me.  I rarely eat lunch, so, okay?

MR. ENGLISH:  Your Honor, I think my argument will be about five minutes or less, so I think, but I'm happy to take

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

128

a break if people need it.

THE COURT:  I'm fine, then.  Let's keep going.

MR. ENGLISH:  Thank you, Your Honor.  I'm Greg English with the Wyche Law Firm.  With me is my law partner, Rita Bolt Barker.

In the city of Clinton case, which was just filed in 2025, we represent three defendants, Fibertex, Nicca, and Jain-Chem.  And so I'd -- I'd like to -- we filed a motion to dismiss the amended complaint on February 27th.  I'd like to incorporate the arguments made in that motion in support of our motion to dismiss and incorporate the arguments that have been made by the defense counsel on the Laurens and Greenwood cases in support of that.

I would like briefly to elaborate on one of those arguments, and that is that the plaintiffs lack standing to seek as damages the cost of removing State license discharges from waters of the State.  All of these cases, Your Honor, present the court with a fundamental question, and that is whether the plaintiffs, on the one hand, have a property right to water of the State to be free of discharges by the defendants, even though those discharges flow through state-licensed water treatment plants.  Or do the plaintiffs, on the other hand, take waters of the State subject to those discharges licensed by the State?

And you heard, Your -- Your Honor heard the plaintiffs

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

129

assert that they have a property right to this water, and that's important to their case because tort law, as the Babb case points out, provides for damages to bodily injury, which isn't an issue here, or property damages.  And the plaintiff's complaint is based, at least in part, on this theory that they own the water and that their water has been damaged.  But that's not the case.

The -- the truth is the plaintiffs take the waters of the State subject to the discharges licensed by the State and so have no standing to complain about the quality of the water allowed by the State because the State, not the plaintiffs, owns the water that the plaintiffs use.  And that's the Jowers versus DHEC case that was in, that's tab 17 of the notebook we delivered on behalf of Milliken.  And the Jowers case makes clear that the State owns all the property below the high water mark of any navigable stream, and all navigable rivers are juris publicae.

That's also the theory behind the Attorney General's case in the State versus 3M.  The State of South Carolina is currently suing the manufacturers of PFAS, saying that you've damaged our water.  We want to recover the cost of repairing the damage that you've done to the water, and the plaintiffs here, in essence, are trying to double dip on their theory.

So for its waters, it is the State that decides when and how to meet its water quality standards.  And that's under

130

the South Carolina Pollution Control Act that we cited in our motion, and that's South Carolina Code Section 48-1-100 that says it is DHEC -- DHEC or DES now, that has jurisdiction to determine and set standards and enforcement for the waters of the State.

That's also clear from the State Safe Drinking Water Act, which is South Carolina Code section 44-55-410, which was tab 21 of the -- the binder we delivered on behalf of Milliken in the Greenwood and Laurens case. And that statute basically says that the counties are authorized to set up wastewater treatment plants to take waters that are discharged by industrial users.

Now, currently, the State has until 2029 to decide how to address PFAS, and that may change, but even if it doesn't, the State is likely going to require the wastewater treatment plants to remove PFAS, who can then turn around and seek money from these same defendants for that cost. And here, the plaintiffs have not ownership of that water, but the right to use it.

And the Jowers case cites White versus Whitney Manufacturing that says, "That a person alongside a stream has no property in the water itself but a simple usufruct which, while it passes along," a right to use. And so that use is subject to discharges allowed by the States, including from those wastewater treatment plants.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

131

So therefore, these defendants should not be faced with all of the cost of removing their own PFAS from their discharges, the cost of new equipment, that the wastewater treatment plants will likely obtain, and that's part of the reason these wastewater treatment plants, and we submit DES, are necessary parties in this case.

And then on top of that, new equipment by the plaintiffs to clean up the waters of the State.  So whatever else Your Honor rules, we ask that you rule that plaintiffs lack standing to recover damages to the waters of the State -- waters of the State of discharges from the wastewater treatment plants.

And I'll say that we also ask for an extension of time to answer because this is a fairly new case for us.  I know normally if you deny motions, there's 15 days.  We ask for 60, and we would ask that we not have to do discovery until we're able to put together our answer.  Thank you.

MR. WATSON:  May it please the court?

THE COURT:  Yes.

MR. WATSON:  Akira Watson, on behalf of the city of Clinton.  These defendants' arguments fails for two reasons. First of all, they grossly misconstrued our lawsuit as seeking to require these defendants to clean up waters of the State.  They say that we have an ownership, or that we are claiming an ownership interest in these waters of the State,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

132

and that's a term of art referring to the surface waters like rivers and streams.

The reality is, is we've made clear in our earlier arguments, this case is about contamination of plaintiffs' property with defendants' PFAS, impairment of our ability to use our property, our real property, to treat and supply drinking water to our customers. It's not about redressing damage to State waters. Defendants' contamination of our property is a ripe concrete injury for which we have standing, as my colleagues -- colleagues have explained.

Second, their arguments, although they're labeled as standing arguments, are really based on preemption. And even under their misframing of the case, the cited Pollution Control Act of South Carolina doesn't preempt suits like this. Now, defendants, misframing starts with saying that we seek to impose a zero-part patrolling standard for PFAS upon waters of the State by requiring defendants to clean up the waters to this standard. They say South Carolina, not the city of Clinton, owns the waters of the State. We have no issue with that proposition.

They say South Carolina is given the Department of Environmental Services Jurisdiction to enforce water quality standards in waters of the State, and they cite from the South Carolina Pollution Control Act, South Carolina Code 48-1-100. According to them, because imposing a zero-part

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

133

per trillion PFAS standard on State waters would usurp DES's jurisdiction over those waters are claims we don't have standing for.

Again, this case is not about cleaning up waters of the State. It's about redressing damage to our water treatment facilities and other properties that have been contaminated with the penance PFAS.

Now, the text of the Pollution Control Act doesn't vest exclusive jurisdiction in the Department of Environmental Services with respect to waters of the State. That cited section of the act provides that the Department of Environmental Services, "Is the agency of State government having jurisdiction over the quality of air and waters of the State of South Carolina."

Note that the statute refers to DES being the agency of State government having jurisdiction, it doesn't say that DES is the only agency or entity that has jurisdiction. And in fact, the Pollution Control Act's federal analog, the Clean Water Act, has been held in International Paper versus Ouellette from the Supreme Court in 1987. Not to preempt the application of a State's common law against discharges occurring in that State. And that covers the situation that we're dealing with today.

Moreover, the Clean Water Act, as well as the Federal Safe Drinking Water Act, both have savings clauses that

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

134

establish that federal standards are the floor, not the ceiling. And moreover, authorizing citizen suits to enforce those acts.

Now, important point here is that the State water quality standards for waters of the State that defendants refer to are incorporated into the permit limits that are set pursuant to the Clean Water Act. And under the Clean Water Act, because plaintiffs are able to bring a citizen suit, it tends to show that there is no exclusive interest in the Department of Environmental Services with respect to those waters. But again, that's taking defendant's framing of the case, which goes against the pleadings.

Finally, with their request for a stay, we are strongly opposed to a 60-day stay of discovery in these cases. These defendants haven't even been served with discovery right. I believe they haven't. But again, as my colleague, Mr. Tapley, has explained, discovery at this stage is -- is targeted towards identifying what other entities should be in this suit, and with a 60-day stay, we're talking about at least three months before we get any response to discovery from these defendants. Thank you, Your Honor.

THE COURT: Okay. And so in this case, 25-35, City of Clinton, discovery was not served with the initial pleadings?

MR. WATSON: Yes, that's correct.

THE COURT: It was.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

135

MR. WATSON:  It was not served.

THE COURT:  It was not served.

THE COURT:  So right now there's no outstanding discovery, Mr. English?

MR. ENGLISH:  That's correct, Your Honor.

THE COURT:  Okay.  Thank you for clarifying that.  Those filings are not part of the record generally, so I didn't want to have to email you all later and get five different responses.  Okay.

MR. TAPLEY:  Just to add to plaintiff's argument, we likewise, for the city of Clinton case, adopt the arguments made in Greenwood and Laurens from this morning, Your Honor.

THE COURT:  Thank you.  Mr. English?

MR. ENGLISH:  Briefly in reply, the plaintiffs claim that their suit does not seek cleanup of the water of the State.  It's just their property.  But in the city of Clinton case, and I'm -- I'm sure this is in the other complaints too, paragraph 55 says, "Defendant's conduct has approximately caused the contamination of the Enoree river and of plaintiff's land."  In paragraph 56, it says, "Defendants, a lot of other words, cause unreasonable interference with plaintiff's right to use and enjoy its property and its right to use the water of the Enoree river."

So they're definitely claiming some sort of property right in the waters of the State.  And the solution to that,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

136

if they're really not, would be for Your Honor to issue an order dismissing the complaint to the extent that it seeks to recover cost for a water filtration system or other systems designed to clean up the waters of the State. I'm sure they won't consent to that because they really are seeking that, even though it's not their water and they don't have a property right in it.

With regard to the preemption claim, we're not claiming preemption. They cite to the Pollution Control Act that says that it -- it's not preemptive, but it also says that it doesn't give a private right of action, and they've not pled a cause of action under the Pollution Control Act.

And he talked about citizen suits under the Clean Water Act, that they could bring that, but they -- those haven't been pled. So I think those arguments are non-responsive. Thank you.

THE COURT: Okay. Thank you. Anything else?

MR. WATSON: No, Your Honor.

THE COURT: All right. Anything else that y'all want me to take up while we're all here?

MR. WILLIS: Nothing further from T&S Brass, Your Honor, thank you.

MR. WEATHERHOLTZ: Your Honor, James Weatherholtz. One question to clarify the supplemental briefing. Was it South Carolina cases or cases outside of South Carolina? What --

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

137

what specifically was the court asking for?

THE COURT:  You -- you suggested that you would be willing to do that, and so whatever you deem is approved.

MR. WEATHERHOLTZ:  Perfect.  Thank you, Your Honor.

THE COURT:  Anything else?  Okay.  So tomorrow I'll see y'all at 9:30.

(THERE BEING NOTHING FURTHER, THIS HEARING IS CONCLUDED.)

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

138

**CERTIFICATE OF TRANSCRIBER**

State of South Carolina

County of Spartanburg


I, JENNIFER JAEGER, a court-approved transcriber, do hereby certify that the foregoing is a true, accurate and complete Transcript of Record of the proceedings had and evidence introduced in the hearing of the captioned case, relative to appeal, in South Carolina Circuit Court 7, Spartanburg County, South Carolina, on the 11th day of March, 2025.

That I am not related to nor the employee of any of the parties hereto, nor related to or employed by any attorney or counsel employed by the parties hereto, nor interested in the outcome of this action.

*Jennifer Jaeger*
_____

Jennifer Jaeger, Reporter
Notary Public for S.C.
Commission Expires: 10/28/2032

# EXHIBIT 5

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA           Docket Number
                                  2024-CP-26-05523
GENERAL SESSIONS

COUNTY OF HORRY

---------------------------------

GRAND STRAND WATER AND            )
                                  )
SEWER AUTHORITY,                  )
                                  )
          Plaintiff,              )
                                  )
vs.                               )
                                  )
BURLINGTON INDUSTRIES, INC.,      )
                                  )
          Defendant.              )
---------------------------------  )
                                  )

                    March 12, 2025

              MOTION TO DISMISS HEARING

B E F O R E:

The Honorable Grace Gilchrist Knie, Presiding Judge.

C O U R T:

South Carolina Circuit Court 7

T R A N S C R I B E D  B Y:

Barbie Teboe, Transcriber


                    Legal Eagle
                 107 LeGrand Blvd.
                Greenville, SC 29607
                   864-467-1373
            transcripts@legaleagleinc.com

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

A P P E A R A N C E S:

**ATTORNEYS FOR THE PLAINTIFFS**

JOHN B WHITE, Esq.
John B White Law, PA
PO Box 2465
Spartanburg, SC 29304

F. JEROME TAPLEY, Esq.
HIRLYE "RYAN" LUTZ, Esq.
AKIRA WATSON, Esq.
Cory Watson Attorneys
2131 Magnolia Avenue South
Birmingham, AL 35205

**ATTORNEYS FOR THE DEFENDANTS**

RICHARD H. "DICK" WILLIS, Esq.
Williams Mullen
First Citizens Bank Building
1230 Main Street
Suite 330
Columbia, SC 29201

MERRITT ABNEY, Esq.
Nelson Mullins Riley & Scarborough, LLP
151 Meeting St., Ste. 600
Charleston, SC 29401

ROBERT KNOWLTON, Esq.
Haynsworth Sinkler Boyd, PA
PO Box 11889
Columbia, SC 292111889

STAN BARNETT, Esq.
305 North Civitas Street
Mt. Pleasant, SC 29464

ZACHARY BROWN, Esq.
McAngus Goudelock & Courie, LLC
201 West. Mcbee Ave
2nd Floor
Greenville, SC 29601

KONSTANTINE DIAMADUROS, Esq.
Maynard Nexsen
104 South Main Street, Suite 900
Greenville, SC 29601

ROBERT OSBORNE, III, Esq.
Parker Poe Adams & Bernstein, LLP
850 Morrison Dr., Suite 400
Charleston, SC 29403

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

<u>INDEX</u>

| DESCRIPTION | PAGE |
|---|---|
| <u>WEDNESDAY, MARCH 12, 2025</u> | <u>4</u> |
| | |
| RIGHTNESS | |
|     Argument by Mr. Willis - Defense | 6, 9 |
|     Argument by Mr. Tapley - Plaintiff | 10, 10 |
|     Argument by Mr. Barnett - Defense | 11, 23, 26 |
|     Argument by Mr. Lutz - Plaintiff | 18, 26 |
|     Argument by Mr. Abney - Defense | 26 |
| | |
| TRESPASS | |
|     Argument by Mr. Tapley - Plaintiff | 31, 32 |
|     Argument by Mr. Lutz - Plaintiff | 34 |
|     Argument by Mr. Abney - Defense | 36 |
| | |
| PRE-JUDGMENT AND ATTORNEYS' FEES | |
|     Argument by Mr. Knowlton - Defense | 37, 49 |
|     Argument by Mr. Lutz - Plaintiff | 48 |
| | |
| PRIMARY JURISDICTION | |
|     Argument by Zach Brown - Defense | 51, 54 |
|     Argument by Mr. Watson - Plaintiff | 53, 55 |
| | |
| PERSONAL JURISDICTION | |
|     Argument by Mr. Willis - Defense | 56, 84 |
| | |
| DUE PROCESS | |
|     Argument by Mr. Willis - Defense | 61 |
|     Argument by Mr. Watson - Plaintiff | 75 |
| | |
| JURISDICTIONAL DISCOVERY | |
|     Argument by Mr. Watson - Plaintiff | 88 |
|     Argument by Mr. Willis - Defense | 89 |
|     Argument by Mr. Osborne - Defense | 90 |
| CLOSING | |
|     By Mr. Tapley - Plaintiff | 91 |
|     By Mr. Willis - Defense | 91 |
| | |
| Recess | 50, 94 |
| | |
| Certificate of Transcriber | 95 |

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

P R O C E E D I N G S

(Whereupon, the following proceedings started at 04:22.)

THE COURT:  All right.  Thank you.  We are on the record. It is now 9:40, and I apologize for the delay.  There was a technical issue.

On WebEx, we are on the record with regard to Grand Strand Water and Sewer Authority versus Aladdin Manufacturing Corporation, et al.  This is Civil Action Number 2024-CP-26-5523.

I'm Judge Knie.  Today is March the 12th.

Let me have -- well, there's a lot of folks here.  Is there a point person today?  We had hearings yesterday.  And so that started, I guess, an outline of how we would be -- or an agenda of how we would be handling at least these initial motions to dismiss.

Is this it, Mr. Willis?

MR. WILLIS:  Yes, ma'am, Your Honor.

THE COURT:  Okay.  Is that correct, Mr. White?

MR. WHITE:  Yes, ma'am, Your Honor.

THE COURT:  Okay.

And so the agenda -- there's a paper agenda here.  I'm not sure if the folks on WebEx have had an opportunity to review it.  But we are going to start with an opening from Mr. Willis and continue.

Have there been any filings or anything exchanged that

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

has not made it into the Court's file since -- yesterday there was a reply in support of a motion to -- of the Motion to Dismiss filed by Red Rock Disposal, LLC. Is there anything else on the way or anything that has not made its way into the file that you-all are aware of?

(No audible response.)

THE COURT: Okay. And so there are six motions to dismiss. And GFL and Waste Industries are no longer defendants?

MR. WATSON: That's correct, Your Honor.

MR. WILLIS: That's correct, Your Honor.

THE COURT: Okay.

MR. WILLIS: (Indiscernible) --

THE COURT: Are there any other defendants that have been dismissed that you-all -- I know you-all have a lot of stuff going on, but are you-all aware of any other that have been dismissed?

MR. TAPLEY: No, Your Honor.

THE COURT: Okay.

MR. WILLIS: And, Your Honor, just for clarity, there were four GFL entities that had been sued in the Grand Strand case. (Indiscernible) has voluntarily dismissed two of them. Two are still in: Sampson County Disposal, it's an LLC in North Carolina; and Red Rock Landfill is an LLC in North Carolina. Those are both GFL entities, and they remain

MR. WILLIS

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

defendants in the case.

THE COURT: Okay.

Okay. And so is everyone in agreement that the format -- that the way that we argued yesterday will work? And we will handle the issues and -- at one at a time and allow you all to argue those? That worked very well for me, okay, in my note taking and being able to follow you-all in your respective memoranda and briefs that have been filed. I have those and I'm able to flip and tab. And, understand, I'm numbering your arguments as well. So it's very helpful to me.

Okay. So unless there's anything else, we'll start then with Mr. Willis.

MR. WILLIS: Thank you, Your Honor. May it please the Court.

I told Ryan Lutz that I was going to steal a joke from him to start off. He said to me this morning, "Why am I thinking about the movie, 'Groundhog Day,' as I walk in?

And, of course, to make sure Your Honor doesn't get bored with us and throw us out of the courtroom, we are not going to replow the ground yesterday -- the ground today that we plowed yesterday.

There are some lawyers that are going to argue the same issues that we dealt with yesterday, but different clients, different context. So we're -- but we'll try not to belabor any points that we went over yesterday.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

THE COURT:  Thank you.

MR. WILLIS: But with the exception of one thing, and that's why I'm -- I just wanted to start on this justiciability issue.

We learned a lot yesterday by listening to Mr. Tarpley (sic) and plaintiff's' counsel argue.  And we were a little confused, frankly, coming into the hearing from the brief, which seemed to say that the plaintiffs were not asking for the future cost of upgrading their water treatment system in order to remove PFAS or whatever standards would be applicable at the time.  But, again, it seemed to be very clear from the complaint that that was one of the things they were seeking.

And so I opened yesterday by saying, "I think the truth is that they're seeking both: damages for the current condition of their property, as well as future damages or future costs of having to upgrade their wastewater systems to deal with PFAS."

And I just want to make sure that I'm right about that. If -- I should stand corrected.  I'd like to know that because I think it's important that the defendants know very clearly what they're being sued for.  I think it's clear from the complaint, but if for some reason I'm wrong, I would ask my colleagues on the other side to correct me.

The second point I would make as I went back over the amended complaint last night, trying to find a clear

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

allegation that the plaintiffs have incurred past costs, not that there are -- not that there is PFAS on their property; that's clearly alleged.  But whether or not they've incurred any costs or damages, out-of-pocket money that they've paid as a result of that up to this point.  And I still don't see that.  And so maybe we can get some clarity on that today in so far as the Grand Strand case supplies, because the complaints, while they're similar, are not identical.

So that's really all we have to say about rightness, Your Honor.  And with that, I'll be happy to answer any questions the Court might have.  But I think we made our positions, both sides, clear yesterday.

Thank you very much.

THE COURT:  Okay.  Thank you, Mr. Willis.

MR. TAPLEY:  Your Honor, I would start by saying I think our complaint is clear, that the plaintiffs are seeking damages for the current condition of their property and what it will take to restore their property to a usable condition, either through damages and tort or abatement under nuisance through equity.  And that does include the necessary construction of new apparatus to filter out the PFASs in their source waters.

I think our complaint's also clear that the plaintiffs have incurred past damages as of this moment.  They have certainly spent money to test to ascertain what the levels of

PFAS are in their source waters; to evaluate which technologies would be feasible giving the current condition and construction of their filtration operations; to consult with experts on pilot programs to test various technologies in order to get some real, on-the-ground field measurements as to the effectiveness of the technologies; and they've also been in the process of evaluating what the costing would be, both for construction and operation and maintenance of those new filtering technologies on their properties.

But, Your Honor, I guess I'll just sum up by saying this: those are all great questions for discovery. And once discovery's no longer stayed, we'll fully develop this case. And that's the way they normally proceed.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Tapley.

Mr. Willis?

MR. WILLIS: Yes, ma'am.

I just point out --

That's helpful, by the way. Thank you, Mr. Tarpley. (sic)

And I agree that ferreting all that out is the purpose of discovery, but I do think it has to be alleged in the complaint for a cause of action to be stated.

And I would point out that the testing requirement would apply to plaintiffs anyway, whether there was PFAS from these

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. TAPLEY                          10

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

defendants or not, the need to evaluate what technologies would be viable for removing PFAS would have to be incurred anyway, even if these defendants that they've sued never put a molecule of PFAS into their waste stream because there's so many other sources of PFAS out there where they -- that they have not sued over or they've attempted to disclaim and the same with regard to consulting with experts. So I'm not sure those are damages that could be recoverable against the defendants. But if they have alleged that, I think that checks that box.

Thank you, Your Honor.

MR. TAPLEY: Just very briefly.

Your Honor, I want to clear. Again, these motions are to heard on the four corners of the plaintiffs' document. There are no allegations of other sources of PFAS. There's no evidence of other sources of PFAS. The facts in front of the Court are these defendants being the source of PFAS. And so they keep saying it like it's Gospel-truth that it's coming from other places, but it's just not in front of the Court.

THE COURT: Anything on that, Mr. Willis?

MR. WILLIS: No, ma'am. Thank you.

(Pause.)

THE COURT: Okay. Mr. Barnett?

MR. BARNETT: Yes, ma'am.

It is my task -- and I will apologize to everyone that

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

has to listen to me.  I managed to come down with a really bad cold yesterday --

THE COURT:  Can you turn on your camera?

MR. BARNETT:  -- which is why I'm not there.

Pardon?

THE COURT:  Can you turn -- there you are.  Okay.

Well, we appreciate your joining us this way.  And I hope that you feel up to making your argument.  If not, there are plenty of lawyers here.

MR. BARNETT:  No.  No.  She called me, but I certainly didn't want to inflict my contamination -- to use an over-used word -- on anybody else.

It is my task to talk about why --

THE COURT:  Mr. Barnett, who do you represent?

MR. BARNETT:  I represent Nan Ya Plastics Corporation, America.

THE COURT:  Thank you.  Yes, sir?

MR. BARNETT:  We believe that the United States government is an indispensable party, and not just a necessary party, but an indispensable party.  My colleague just said about the -- plaintiff that there was no evidence that there was no other source of PFAS chemicals before the Court.

As is I think appropriate in making such a motion, I sent portions of two reports prepared by the Department of Defense about the old Myrtle Beach Air Force Base, which, unless the

Department of Defense is involved, and I suggest to you that they are not, but Myrtle Beach Air Force Base is a contributing source of the PFAS chemicals that the plaintiff complains about: PFOS, PFOA, PFDS, PFHXS. And the concentrations of these chemicals in the surface water and ground water, which is flowing and has been flowing for decades, into the Intracoastal Waterway, range from two-and-a-half million parts per trillion to 51,900 parts per trillion. These are enormous concentrations. When some of the literature talks about extremely small concentrations, these are huge.

In my reply memo that I filed last week, I included a copy of a report that DHEC, now DES, made public, in which they identify current and former military bases in South Carolina as the largest contributor of PFAS chemicals into sources for drinking water. The Myrtle Beach data shows that that is obviously the case.

(Indiscernible) I think undisputed (indiscernible) Myrtle Beach Air Force Base site is putting these chemicals into the Intracoastal Waterway only two-and-a-half miles from the waterway intake point that plaintiff has and about 10 miles, give or take, from the Bull Creek intake point. I don't think that it could be argued with a straight face that the government's acts -- and continuing acts because they're not doing anything to clean this up -- aren't contributing

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. BARNETT                                    13

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

whatever PFAS molecules are found at the plaintiffs' intake points.

The plaintiff is, as my colleague, Mr. Willis, noted, in its complaint, is specifically seeking to recover an amount of money sufficient to pay for the removal of these various chemicals from plaintiffs' water system by funding the acquisition, installation, operation, and treatment technology and so forth.

Well, it's -- this plea is cast in terms of requiring them, the defendants, to remove their chemicals. Well, I suggest that it's most -- it's not possible for Nan Ya, assuming it -- and it denies that it's contributing any -- and your refraining of the others of the 14 defendants' name, to clean up their chemicals, when the United States government is contributing such a huge amount. And there are probably other sources as well, but I doubt any of them are on par with, you know, two-and-a-half million parts per trillion of one of these chemicals.

The prayer for relief also asks that all the defendants abate the nuisance they have created and abate their trespass. I don't know how you do that either if there are such huge contributions of pollutants -- same pollutants from other sources. Because a PFOS molecule that comes down the Pee Dee River from one of the defendants' facilities -- if that is, in fact, current at all, is indistinguishable from a PFOS

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

molecule that comes from the old Myrtle Beach Air Force Base site. I'm mean they're -- it's not like they carry little signs that say, "I'm from the Myrtle Beach Air Force Base site," or "I'm from the Lake City POTW." That's just not the way it is.

If this case goes forward without the United States as a party, I would suggest that that would run afoul of Rule 19(b). Excuse me. I'm shuffling here. I don't think it can be argued based on the undisputed -- about the contribution of PFAS chemicals by the old air force base site that there can be complete relief without the United States as a party.

The plaintiff claims the United States is not claiming an interest. That's true. United States hasn't said a word in this litigation about it. United States in its DOD reports has, as one would expect because it's obvious -- has noted how close a -- the discharge is to one of plaintiff's intake points. They mentioned it in the report that deals with the air force base site. They don't have to claim an interest to have an interest.

The United States can be sued in a cost recovery action, under CERCLA or RCRA or the Safe Drinking Water Act, they can be sued under the Federal Tort Claims Act. The notion that this case would go forward and a jury would make, perhaps, the declaration that United States government was responsible for 99 percent of the contamination the plaintiffs complain of,

MR. BARNETT                                    15

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

the notion that that wouldn't have an effect on the federal government, I think is just incorrect.

It's much like the case that I've cited from a court, I think in North Dakota, which dealt with a land ownership -- a mine ownership question in which the Court acknowledged the United States government could not be bound by a finding, but that it would be affected by a finding in supplemental -- subsequent proceedings.

Where the federal government potentially is prejudiced by a case like this going forward without it presence, the Supreme Court has said there's a very strong bias into not letting cases like that go forward, even where the federal government cannot be made a party.  Because avoiding a prejudice to the federal sovereign is of preeminent importance in the minds of the Supreme Court.

In this case, the federal government can be made a party. There are several routes to do that.  The Federal Tort Claims Act is one, although it -- there's a very short statute of limitation for the Federal Tort Claims actually -- it's only two years, also the Safe Drinking Water Act, CERCLA and RCRA.

Now, the best evidence that that is true is the MDO case that Judge Gergel has, just across the harbor from where I am in Charleston, where he has all of the federal PFAS in the country.  He issued an order on February the 27th, not too many days ago, in which he denied a motion to dismiss by the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. BARNETT                                    16

United States government in all of the cases in which people were seeking relief from them.  And he noted that there were over 30 of them.  I apologize; I haven't had a chance to wade through the --- all the many, many, many, many cases on the MDO site.  But I take Judge Gergel at his word, that there are over 30 of them.

And he notes the kinds of claims made against the government:  Federal Tort Claims Act, CERCLA, RCRA.  He did not mention, oddly, the Safe Drinking Water Act, but I believe there is one case before him where that is an issue, I think brought by the state of Mexico.  The State of New Jersey has a case as well.  It isn't just states, though, that have filed these actions against the federal government.  Private entities, non-government entities, a bunch of dairies have sued the United States government for contribution of PFAS chemicals into the water that affects their operations.

So it is clearly possible for the plaintiff to pursue the federal government in achieving what it says its goal is. They say the goal is to get something in place to allow administrative orders who are to filter out these chemicals. Well, if the United States government is by far the largest contributor of these chemicals, as they seem to be -- and they certainly are well-funded -- I can't imagine why they wouldn't want to go after the federal government because that's the best way to achieve the goal.  But they get to make that

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

decision.  But they don't get to say, I don't believe -- God knows I've been wrong many times before, but I don't think they get to say that it's irrelevant, that the United States government is contributing such huge amounts of these chemicals into the water, two-and-half-miles away from one of their intake points.

The plaintiff also says that discovery is not necessary to consider this question about whether the government's responsible or not.  I suggest that it is.  FOIA can be a very effective tool, but it's imperfect.  (Indiscernible) depositions under FOIA.  And it may be that the government would -- I don't know, I -- the government sometimes takes position that -- particularly with defense-related documents, that they're just not going to turn them over.  And you've got to -- you have to fight for them.  They can't get away from that in discovery if they're a party.

Last point I would make is just a factual point.  The Intracoastal Waterway at the place where plaintiffs' intake structures are -- where both of them are, on the Intracoastal Waterway and then down the southwest a little bit at Bull Creek, those are both tidal waterways.  So half the day water flows one direction, half the day, the water flows in the other direction.  So the intake point is slightly to the -- two-and-a-half miles to the northeast of the old air force base site, now the airport -- Myrtle Beach Airport.  That does

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

not mean it's upstream because there is no upstream and downstream on a tidal waterway.  The water that is draining from the Myrtle Beach Air Force Base will flow, twice a day, to the intake point that plaintiff has on the Intracoastal Waterway.  And the rest of the day, it will flow to the southwest.  And eventually, that water gets down to where the Bull Creek intake point is.

Your Honor, I've covered my points, I believe, hopefully without too much irritation from my voice.

THE COURT:  Thank you, sir.

MR. BARNETT:  Yes.

(Pause.)

.....MR. LUTZ:  Good morning, Your Honor.

Ryan Lutz again, on behalf of Grand Strand.

The defendants have made a big deal out of this potential contribution of the United States to the PFAS load that is found in plaintiffs' water sources.  In their brief, Your Honor, they cite the final site inspection report for Aqueous Form Filming Foam areas at the former Myrtle Beach Air Force Base.

And they state -- this is a quote directly from the report: "Because of the nature of areas where potential -- potential releases of AFFF may have occurred, ground water, surface water, soil, and sediment were sampled and their migration pathways evaluated in this SI report."  "May have

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

occurred," "potential."

What the defendants don't tell you, what's also in this report is the conclusion that both the ground water and surface water pathways were deemed incomplete, meaning that the government, through this complex fate and transport evaluation that required many experts and all sorts of testing, the government could not establish that PFAS from the old air force base was causing contamination in the Intracoastal Waterway.

Now, Judge, that's not in our complaint, clearly. But that just reinforces the reason why this extra stuff the defendants want to come in and argue about that's not in the complaint, can be the subject of discovery. And it's also going to be the subject of extreme expert proof. The fate and transport of chemicals from anywhere -- from the defendant's facilities, from the air force base, that has got to be evaluated in discovery and in -- by our experts, by their experts. And that just shows you why this stuff should not be considered in a motion to dismiss.

But, Judge, the -- I still -- the defendants are still dancing around this Rule 19. They haven't explained how Rule 19 requires the U.S. as a necessary or indispensable party. They didn't explain how the wastewater treatment plants were a necessary or indispensable party yesterday. And the reason they don't explain it is because they can't. It

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

doesn't apply to Rule 19.

And we have cited the case law, Your Honor.  It's -- their argument is really about apportionment.  It's about contribution of a potential joint tortfeasor.  And as we discussed yesterday, Your Honor, mere joint tortfeasors are not necessary or indispensable parties to an action under Rule 19.  That's been the law for 200 years, two centuries of law; it's called the Plaintiff Chooses Rule.  We get to choose the tortfeasors that we believe are liable to the plaintiff.

So, Your Honor, back to necessary and indispensable parties.  Rule 19 requires that a necessary party is one whose rights must be ascertained and settled before the rights of the parties to the action can be determined.  What rights of the United States must be ascertained and settled before we can proceed on a tort theory against these defendants for polluting the waterways?  None.  None.

And so, Judge, we've identified and provided a bunch of case law on this subject, examples of where there are necessary parties.  And that arises in a contractual obligation or where a party has a property interest, okay.

The McKiver case versus Murphy-Brown recognized -- this is the Fourth Circuit cases.  And they collect -- the fourth circuit case and the collected cases in which joinder was allowed.  And they state joinder was allowed.  It involves situations where contracts or obligations of the necessary

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. LUTZ                                           21

party were being interpreted or were otherwise directly at issue.  That's not the case here.

And this is a quote: "Even in/if an absent party is alleged to have played a central role in the action at issue, and even if resolution of the action will require the Court to evaluate the absent party's conduct, that party in many cases will not have interest that warrant protection under Rule 19. The same is true here.

We cited another case:  EEE Minerals, LLC.  This is the case that Mr. Barnett discussed; cited by defendants.  The court -- that -- in that case, the court found that the United States was a required party because, "It owns a significant oil, gas, and other mineral interest in and under the lands that are subject of this lawsuit."  That's not the case here.

Another case cited by the defendants, Goddard, involved a planned unit development.  And the governing documents allowed dissolution only with the consent of all the property owners.  Again, contractual.  And when one of the property owners had been dismissed from the action, the court found that it was an -- or he was an indispensable party because the relief sought in action, "Affected her property interests."

And then, Judge, we also cited Tenneco versus San Diego Gas and Electric Company:  "Should plaintiffs prevail, they could recover damages from the defendant in the United States's absence."  This is where plaintiffs were seeking

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

monetary damage from defendants.

So, "Plaintiffs seek only monetary damages from defendant. Should plaintiffs prevail, they could recover damages from the defendant in the United States' absence. The requested relief does not require the United States to take action or change any policy. Therefore the Court is able to fashion meaningful relief between plaintiffs and defendant in the United States' absence. The court finds the U.S. is not a necessary party under Rule 19." It's not one here, Judge.

They argue they can't get complete relief because they can't obtain the discovery they want from the United States because FOIA is an imperfect method of discovery.

Judge, we've cited a number of cases that have specifically rejected that contention. I'm not going to go into them, Your Honor. They're cited in our brief. That's the Hefley versus Textron case. And there's a few other cases.

So Your Honor, their desire to portion liability and to seek documents from the United States does not amount to prejudice, and it does not amount to the complete relief element that they are complaining about.

So in conclusion, Your Honor, the U.S. is not a necessary party. There will be complete relief without the U.S. They have no claim and, in fact, claims no interest in the plaintiffs' water supply, the property that plaintiffs own,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

the water system, the infrastructure, or any other interest relating to the subject of this case.  They had no contractual obligation and they have no property interest in the matter. Rule 19 does not apply here.

Thank you.

THE COURT:  Anything in reply?

MR. BARNETT:  Yes, Your Honor.  Briefly.  I promise I'll be brief.

First, of all, my colleague talked about certain statements in the -- one of the reports I submitted, the one that is cite specific for the Myrtle Beach Air Force Base.  He left out this -- I'll just read the sentence:  "PFOS and PFOA were present in surface water collected from AFFF Area 9 at concentrations exceeding the US EPA LHAs suggesting a release-to-surface water has occurred.  This includes surface water at northernmost discharge point where surface water leaves the former base boundary and enters the Intracoastal Waterway."

That is an unambiguous statement by the (indiscernible) Department that these chemicals are leaving the old Myrtle Beach Air Force Base and were flowing into the Intracoastal Waterway two-and-a-half miles from one of the intake points.

My colleague also said that the only prejudices we're arguing is we can't do discovery.  No.  That is, one, that is a problem; but it's not the main prejudice.  The main prejudice derives from what the plaintiff is seeking, the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. BARNETT                                    24

prayer for relief, which is asking, not just for money damages for past damages suffered, whatever those are; it's asking that the nuisance be abated; that the nuisance created by these 14 defendants would be abated and that their trespass would be abated.

Well, if the United States government -- which I said it is clear, it is contributing huge quantities of this stuff into the waterway, is not a party and can -- and therefore can't be forced not to do that anymore, it's just not possible for these defendants to abate their nuisance and their trespass. You can't just carve it out from someway.

The problem here is -- that I think -- not to be too obnoxious, but it seemed that what the plaintiff is doing is the old square peg in a round hole; they're trying to pursue a cost-recovery action as if this were a CERCLA action or a RCRA action or a Safe Drinking Water action, without actually pursing those remedies created by Congress for this specific fact scenario. That's why Congress created those. Plaintiff doesn't want to use those for whatever reason. They're trying to use common law concepts to avoid whatever problem they wanted to avoid.

To seek a judgment requiring these 14 defendants to "remove their" and it lists all the chemicals, "from plaintiffs' water system by funding the acquisition, installation, and operation of treatment technology capable of

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

removing them."

To say that it is in any way fair or equitable or sensible to go forward and to achieve that goal while leaving completely out of the picture the United States government, which is apparently, according to Dick, one of the largest contributors of these chemicals. It makes no sense. It just makes no sense. I -- so I suggest it would be fundamental error to allow this case to go forward without -- well, to dismiss it and let the plaintiffs do what the Congressionally created remedies allow them to do, which is to pursue everybody, including the United States government.

Thank you, Your Honor.

THE COURT: Thank you.

Anything else?

MR. LUTZ: Yeah. One -- Yes, Your Honor. Just real quick.

THE COURT: Mr. Barnett, we're being very informal. I'll let you reply if it's something (indiscernible).

MR. BARNETT: Pardon me?

THE COURT: You're being very informal. Mr. Lutz is going to address the Court one more time.

MR. BARNETT: Oh. Okay.

THE COURT: And then I will allow you to reply.

Yes.

MR. BARNETT: Thank you.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. LUTZ:  Your Honor, it's not fair is not an element of a Rule 19 issue.  It seems like they're complaining about joint and several liability.  And, again, that's not a Rule 19 issue.

That's it.  Thanks.

THE COURT:  Thank you.

Anything else, Mr. Barnett?

MR. BARNETT:  I don't -- I'll just read the part of the Rule.

Rule 19(b) provides,  "If a party -- it is necessary under criteria set forth in 19(a) cannot be made a party, the Court shall determine whether inequity, which, of course, means fairness and good conscience the action should proceed among the parties."

And I'm just suggesting that it can't, for the reasons I've maybe beaten to death already.

THE COURT:  Thank you very much.

Are we ready to move to the next issue?

MR. ABNEY:  Thank you, Your Honor.

I'm Merritt Abney with Nelson Mullins in Charleston.  And I have two defendants in this case: Mohawk Industries and Aladdin Manufacturing.

Aladdin is a subsidiary of Mohawk, and it operated what was known as the Oak River Mill near Bennettsville until the mill closed in 2020.  The mill lies near the Pee Dee River

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

approximately 80 miles from plaintiff's Bucksport facility on Bull Creek.

Of course, Mohawk is a flooring company and Mohawk makes carpet, but Mohawk did not make carpet at Oak River Mill. It made yarn, which it then shipped out of state to be used in the making of carpet.

And I understand the 12(b)(6) standard. I understand you have to accept as true plaintiff's allegation that we used PFAS at the mill. But I wanted to make that point clear at the outset of this case.

I'm going to address plaintiff's claims for trespass, negligence, and nuisance. Mr. Weatherholtz and others yesterday stole most of my thunder on these arguments, so I'm just going to make a few brief points, primarily related to the trespass claim. And then I'll take my seat.

First, I want to follow up on the discussion yesterday related to the BABB case. Plaintiff's trespass claim fails because alleged contamination by PFAS is not an invasion by a physical, tangible thing as required by BABB. BABB expressly held that intrusions by microscopic particulates or similarly intangible infiltrations of contaminants onto plaintiffs' property do not constitute actionable trespass. The plaintiff tries to distinguish BABB by arguing -- as did Judge Coble in the AG case, that BABB was really just about odors. But that's just not the case. While it is true that BABB involved

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

odors emanating from a landfill and that's how the district court framed the certified question to our Supreme Court, the Court's holding is undeniably much broader than that.

By retaining the dimensional test, the Supreme Court rejected the opinions in Oregon and Alabama that held that intrusions of fluoride particles and sulfoxide emissions, respectively, were sufficient to constitute a trespass despite their intangible nature.  BABB flatly rejected that notion for South Carolina.

So the point that I really want to emphasize today is that there is no meaningful distinction, for purposes of the trespass claim as plaintiffs would have it, between supposedly benign molecules that comprise the odors at issue in the BABB case on the one hand, and the allegedly harmful PFAS molecules at issue here.  That distinction may matter for some causes of action, but it absolutely does not for trespass.  The distinction that does matter and the one that the court adopted in BABB is between mere molecules and other particulates on the one hand and tangible bodies on the other. Only the latter can constitute trespass under BABB.

Plaintiff's trespass claim fails because PFAS, just like fluoride or sulfoxide, are just molecules and they're measured in parts per trillion, and therefore they are the quintessential example of microscopic particulates that BABB says cannot constitute trespass.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. ABNEY                                    29

What BABB also makes clear is that trespass today is really reserved for situations where, for example, I walk onto your property without your permission.  It requires an intentional, unauthorized entry onto another's property by a tangible body.  And in that situation, you're entitled to damages, whether I do any harm on your property or not.

But, Aladdin, by discharging water into the Great Pee Dee River, whether that water contained PFAS or not, plainly did not enter onto plaintiffs' property more than 80 miles downstream.  And that's true particularly, given the plaintiff, by turning on it's pumps is the one who voluntarily brought that water onto that property.  Plaintiffs' cause of action for trespass simply does not fit the facts that plaintiff has pled in this complaint.

Now, I want to turn very briefly to the negligence cause of action and discuss just the question of the duty of care in connection with the negligence claim.

I wholeheartedly agreed with Mr. Weatherholtz' argument yesterday regarding why those Georgia cases that the plaintiffs rely on very heavily, for the proposition that defendants here had a duty of care are inapplicable in South Carolina, which has expressly rejected the standard applied in those -- by those courts.  I know you're going to get some supplemental briefing on that issue, so I'm not going to address that in detail here today.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. ABNEY                                    30

But I do want to follow up on the question of duty in light of some of the comments made by plaintiffs' counsel during the discussion on the statute of limitations yesterday.

As we know, a duty may be created by statute, contractual relationship, status property interest, or some other special circumstance.  The foreseeability of an injury standing alone does not give rise to a duty absent one of those relationships or circumstances.

The plaintiff here does not allege that defendants' discharges into the river violated any statute, any regulation, or the conditions of any permit.  The only regulation mentioned in the complaint that I saw is the MCL Rule which was adopted in 2024, two years after my client closed the Oak River Mill.

Moreover, plaintiffs' facility in Bucksport lies more than 80 miles from the Mill.  And plaintiff does not claim any relationship of any kind with my clients or any other defendant in this case.  Instead, they make the conclusory allegation that we have a duty to use care in the handling, use, and disposal of products degrading to PFAS.

Setting aside the failure to allege any relationship or circumstance giving rise to a duty, plaintiff fails to allege how the risk of the harm for which it seeks recovery, in the complaint, the cost of complying with the rule was foreseeable years before the rule was ever enacted in 2004.  And as for

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

any harm that the plaintiff claims to have already incurred, plaintiff's counsel argued yesterday that despite knowing for years that PFAS was in the water and that litigation regarding that was already underway, they did not have knowledge sufficient to give rise to a cause of action until 2024 because it wasn't until that time that regulators and scientists reached some consensus that no level of PFAS in drinking water is appropriate.

If that's the case, how on earth would the potential harm about which the plaintiffs are suing here be foreseeable to the defendants before that time?  These plaintiffs are the ones providing drinking water to the people in South Carolina. If they could not foresee that PFAS was dangerous until 2024, how could we have?

Because the plaintiff hasn't alleged any facts to establish foreseeability, much less a relationship or circumstance giving rise to a duty under South Carolina law, we argue the negligence claim should be dismissed as well.

And the -- as to the nuisance claim, I think those issues were pretty thoroughly covered yesterday, so as promised, I will take my seat.

Thank you.

THE COURT:  Okay.  Thank you.

And so who is responding to trespass?

MR. TAPLEY:  I will, Your Honor.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. TAPLEY                                                32

THE COURT:  Mr. Tapley?

MR. TAPLEY:  Jerome Tapley for the plaintiffs.  May it please the Court.

Your Honor, we talked about this briefly yesterday, so I won't belabor the point.  But I do think it's worth pointing out.  He talks about how many miles their facility is from the Bull Creek intake.  I want to call the Court's attention back to the simple fact that there is nothing which happens in nature that can remove or degrade PFAS.  Everything they put in the water from their tail pipe -- and I want to be clear about Mohawk and their operation.  They have a NPDES discharge permit.  They pour their contaminated water directly into the river.  They don't run it through somebody else first.  It's just pouring out right there into the river.  And every gallon of contaminated water that comes out of that lagoon where they hold their industrial wastewater from that old mill goes directly into the river and travels undisturbed all the way to the Bull Creek intake.  There's nothing which happens in that river environment to remove it, degrade it, or diminish it.

Your Honor, we cited a whole host of cases saying that contaminated water, water with chemicals in it, is a trespass under South Carolina law.  And I would call the Court's attention back to those cases.

On the final issue, and then I'll turn it over to my colleague, Mr. Watson.  But on the final issue that he

MR. TAPLEY                                    33

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

raised -- and I just want to touch on the statute of limitation issue, he pointed out that plaintiffs didn't know until 2024 when the scientific community as a whole made known to the public that it was now the consensus that no level of PFAS was appropriate in drinking water. And he raised the question of, "If plaintiffs didn't know until 2024, how could Mohawk have known?"

Well, Your Honor, discovery's going to show you how Mohawk could know. We have deposed Mohawk before in other cases. We've got the receipts. They knew. And that's going to come to be clear here in this court case when we present evidence from discovery here about what Mohawk knew and when it knew it.

I'll turn it over now to Mr. Watson.

THE COURT: So is Mr. Watson responding to nuisance or negligence or both?

MR. TAPLEY: Your Honor --

THE COURT: Mr. Lutz?

MR. TAPLEY: Yes.

THE COURT: Okay. I'm learning you-all's names now, so its much easier.

MR. TAPLEY: Your Honor, I really didn't offer much on nuisance because he really just adopted arguments from yesterday. I'll do the same.

THE COURT: From his -- was it Ms. Torr or Lorr?

MR. LUTZ                                    34

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. ABNEY:  Ms. Torr, I believe.

THE COURT:  Ms. Torr --

MR. ABNEY:  Yes.

THE COURT:  -- did an excellent job --

MR. ABNEY:  I thought so.

MR. TAPLEY:  So I'll adopt my position --

THE COURT:  -- yesterday as well.  She brought attention to Judge Coble's order and the problems in BABB.

Yes.  Okay.  Mr. Lutz?

MR. LUTZ:  Your Honor, Ryan Lutz again.  Thank you.

Since Mr. Willis stole my Groundhog Day joke, I --

MR. WILLIS:  I'm sorry about that.  Take credit.

MR. LUTZ:  You know, we have stealing arguments, stealing jokes.  I mean, what's next?  All kidding, Your Honor, for the record.

But, Your Honor, we went over this yesterday.  Duty -- the defendants leave out half of the duty.  They always talk about the affirmative duty that may be created by statute, contractual relation status, property interest, or some other special circumstance.  But what they don't tell you, Your Honor, is -- and this in Madison.  This is a case they cite.  This is 100 years of precedent.  "It has long been the law that one who assumes to act, even though under no obligation to do so, thereby becomes obligated to act with due care."  And that's exactly what the defendants did here when they

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

used, disposed of, and handled PFAS chemicals that they knew were toxic, bioaccumulative, can't be broken down in the environment, and incapable of treatment at the wastewater treatment plants. They knew this stuff. It was entirely foreseeable to them when they know that their chemicals that they allowed to escape their premises and they didn't dispose of properly, would go the wastewater treatment plan untreated, and into the rivers. That is entirely foreseeable. Environmental contamination and pollution is entirely foreseeable.

We have cited a number of cases, not just in Georgia, but for around the country. Your Honor, we've cited cases here in South Carolina: Chestnut, Raven -- I discussed Raven yesterday, Conestee Mill, Johnston; all cases involving pollution. They've cited none; no cases on point -- cite -- talking about pollution and duties.

And so, Your Honor, we've discussed duties. They had a duty under this -- they had a duty to exercise due care when they handled these chemicals and when they disposed of it. And they had choices. They had many choices. They didn't have to dispose of them through the wastewater treatment plants. They could have hired an environmental carrier to haul these chemicals off. They can be treated through other methods. I mean, this is -- it's not like -- defendants act like they can use whatever chemicals they want in their

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

industrial processes and send them off to the wastewater treatment plants, and then they wipe their hands of it.

What if they sent radioactive material to the wastewater treatment plants. No duty? Of course they have a duty, Judge, especially where the failure to exercise due care creates an unreasonable risk of physical harm and injury. That's common law.

Judge, that is -- we cite it. That's Edwards of Burns-Downs recognizing there is a common-law duty to exercise due care to avoid injury or damage to others.

So, Your Honor, this duty argument that the defendants make should not hold water. With respect to foreseeability, I've sort of touched on foreseeability, Your Honor, but that's basically a causation argument. What are the natural and probably consequences of sending toxic PFAS to a wastewater treatment plant that can't treat it? Widespread, environmental contamination; that's what the natural and probably consequences are.

And that's all I have, Your Honor. Thank you.

THE COURT: Anything else?

MR. ABNEY: Just very briefly, Your Honor.

The -- I'll just say that the cases I think they are referring to were discussed yesterday, which, Mr. Weatherholtz, I think characterized as cases applying the Good Samaritan rule; where you go out and volunteer to help

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

someone, you've got to use due care in assisting them.  Those are not a good fit for this case.  They don't seem to apply here.  I understand that will be part of the subject of supplemental briefing that is coming, and so I won't wade into that again.

Thank you.

THE COURT:  Thank you, Mr. Abney.

Okay.  Anything else, Mr. Lutz?  Mr. Tapley?

MR. TAPLEY:  No, Your Honor.

THE COURT:  Okay.

Prejudgment interest and attorneys' fees?

MR. KNOWLTON:  Thank you, Your Honor.  I'm Robert Knowlton with Haynsworth Sinkler Boyd, to represent PRET Advanced Materials in this lawsuit.  Our law firm also represents about five other defendants in other cases before you and those that have been removed.

I want to touch on not only attorneys' fees and prejudgment interests, but a third topic as well, that have not been addresses before.

First, if you will, Your Honor, let me give you a little bit of context about PRET.  It is the current owner of the plant in Johnsonville, South Carolina, where it recycles carpet.  And I know this is Rule 12, but I think I will tie this back in on my third point that I'll be addressing.

PRET has only owned the plant since 2015, but purchased

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

the plant from Wellman out of bankruptcy.  And Wellman operated the plant for decades before then.  So that's going to present a lot of issues.

The complaint does not allege and PRET does not make, sell, or distribute PFAS as defined in the complaint, nor does it -- as far as I can ascertain at this point, purchase it to use in the recycling of carpet.

PRET, like some of the other defendants, does not discharge its waster water into a public body of water, rather it sends it to the Johnsonville Wastewater Treatment Plant, where it treats it, where it's hired to treat it, and then discharges it into the river.  There is no -- into the Lynches River.  There's no allegation that PRET or Johnsonville Wastewater Treatment Plant operated in violation of a permit.

And, Your Honor, I'm, I guess, a visual learner.  If I can turn on the overhead?

THE COURT:  Okay.  As I understand it from my technical expert, that is going to block WebEx -- the WebEx camera.

MR. KNOWLTON:  Well, Your Honor, if you would prefer, if you'd rather not --

THE COURT:  And since there's no jury here, do you-all object to -- I'm assuming that opposing counsel has seen this?

MR. KNOWLTON:  This is the exhibits to my memorandum.

THE COURT:  Okay.

MR. KNOWLTON:  So we can do it by just having you refer

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

to it, if you prefer.

THE COURT:  Okay.  I have it.

MR. KNOWLTON:  Okay.  We'll do it --

THE COURT:  And I'm happy to view it as you go through it as long as there's no objection from counsel for the plaintiffs.

Any objection?

MR. TAPLEY:  No, Your Honor.

THE COURT:  And so you-all see what I'm refering to?  It is a bound, spiral tabs A through E.  Thank you very much for this.

MR. KNOWLTON:  This is -- the motion and the memorandum both have the same five exhibits.  And they're previously filed and produced.

Your Honor, Exhibit A simply shows you that the Johnsonville Wastewater Treatment Plant, where PRET sends its discharge, is 22-and-a-half miles as the crow flies, from plaintiff's Bull Creek Surface wastewater treatment plant.

Exhibit B simply shows that that Johnsonville Wastewater Treatment Plant is even farther away; it's 32.4 miles, roughly, from the Myrtle Beach plant -- Surface Wastewater Treatment Plant owned by plaintiffs.  And those are the two intake points that are at issue.  And I'll circle back to that in my third point.

But here's, basically, the theory of the plaintiff

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

against PRET, and that is that some third party made Scotchguard or some PFAS, sold it to another third party that applied it to carpet; that carpet was sold to yet another third party who used the carpet for its entire, useful life; washing it, cleaning it, vacuuming it, and then sent it to PRET for recycling. And they say some of those PFAS molecules may still have been lingering on by the time it got at the end of its useful life to PRET; and that some of those molecules may have gone to its discharge to Johnsonville, go down the stream over 20 miles to their intake point. In the meantime, as I think plaintiff said yesterday, everyone flushing between there and then is going to be discharging PFAS because anybody who used a Teflon pan or Scotchguard on their clothes or -- there are hundreds of uses that created PFAS that are being discharged into the waste stream. Plaintiff knowingly withdraws its water in Bull Creek for -- to treat it and then send it out as drinking water.

Now, let me get back to the discrete topics. First, the claim for attorneys' fee should be stricken. In plaintiffs' complaint, in Paragraphs 78, 90, 111, and the prayer at Paragraph D seeks attorneys' fees. And those would be in its private and public nuisance claims and in its negligence claim and, of course, in the general prayer for relief. It's well known that South Carolina follows the American Rule, which is, unless you have a contract or statute that authorizes the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

award of attorneys' fees, you pay your own (indiscernible).

Plaintiff alleges no contract with PRET. As plaintiffs' counsel has made it very clear that they've only asserted four common law causes of action against PRET in this lawsuit: the two nuisance claims, trespass, and negligence. That is no statutory basis for attorneys' fees. There is no such basis for an award of attorneys' fees in this case, and it should be stricken and void further litigation on the point.

In response, at Page 53 and 54 in its -- plaintiffs' brief, plaintiff posits that it has alleged a claim for declaratory judgment under the South Carolina Declaratory judgment Act, which is -- it starts at 15-53-100 of the South Carolina Code. That statute is mentioned nowhere in the complaint. The word "declaratory judgment" is set forth in Paragraph 2. There is no separately identified cause of action but for declaratory judgment. Plaintiff has not said what it would want the Court to declare. That usually is reserved to interpret party's obligations under written instruments. And those are the kind of cases they cite.

They cite -- here -- first of all, there's no contract at all between these parties. And anything would be entirely duplicative of the common law causes of action. It just -- has not been alleged and there's not a basis. And even under that statute, the cases they've cited are entirely inapposite. They cited a couple of insurance cases. It's well-known and

MR. KNOWLTON                                              42

an exception if you're an insurance company and you see you're insured for declaration of one of those coverage under policy, and the insurance company loses, the insured gets some attorneys' fees.  That's obviously not the case here.

If there is -- there's another case they cite, Darden versus Witham, which relied on an underlying statute involving divorces.  Obviously, not the case here.

There's another case they cite that was a boundary line dispute between two neighbors where the Court had to ascertain the boundary between those two neighbors; nothing like that here.

The final case they cite --

And that's an unpublished decision that wouldn't be binding anyway.

Finally, they cite the historic Charleston Holdings verus Milon case -- or Mallon, I suppose, is how you pronounce that. And that involved an argument by the plaintiff for an award of attorneys' fee under an LLC statute that authorized prevailing party attorneys' fees if you prevailed in a derivative action. The Court on appeals reversed the trial court and said the award was improper because the plaintiff had not even properly claimed it or pled a case under that LLC statute.  Obviously, we have no such statute here.

So the point is, there is no proper claim for attorneys' fees.  There is no declaratory judgment action fee.  And that

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

claim should be stricken and void further litigation on that point.

Similarly, the claim -- the plaintiff claims -- or asks for, in its prayer at Paragraph D, for pre-judgment interest. Under South Carolina Code Section 34-31-20, a party may receive an award of pre-judgment interest if it is for a claim for a sum certain. Obviously, here, the claim is completely unknown. A typical tort claim where nobody has any idea at the outset what the amount in controversy is. And it certainly does not fit that. And we've also cited the Brooklyn Bridge case. And there's abundant case law under 34-31-20 showing that this common law torts for unknown amounts does not entitle you to award a pre-judgment interest. Again, that should be stricken at this point and no need for further litigation on that.

Your Honor, let me -- may I address the third point I wanted to make. And it ties in to foreseeability and some of these other claims. And that is, we argued that the PRET or Johnsonville Wastewater Treatment Plant is not upstream from the Grand Strands Myrtle Beach Surface Water Treatment Plant. And if you look at Exhibit C, you will see labeled on there the Myrtle Beach Surface Water Treatment Plant. And "B" on that map is Winyah Bay. And the bridge going over towards Winyah Bay, where it's one of the more beautiful spots in South Carolina, I think. You come out of Georgetown; you see

the confluence of some of the rivers to the left.  You see Winyah Bay to the right, the marshes; you see osprey nests. Beautiful site and you feel like you're getting close to the beach.

Here, plaintiff does not seem to -- and by the way, this is a U.S. -- United States Geological Survey Map that shows which way the water is flowing in the water way.  And you'll see the monitoring location.  It shows it is flowing downstream from there, past the Myrtle Beach Surface Water Treatment Plant, on to Bull Creek, and then into the Winyah Bay and the Atlantic Ocean.  Charleston folks that just the Ashlee and Cooper Rivers form the Atlantic Ocean, but these rivers contribute to  it as well.

And "D", once again shows U.S.G.S. map, and it shows where the Johnsonville wastewater treatment plant is.  And, Your Honor, the Google maps reflects that from the confluence of Bull Creek and the waterway, it is 14 miles upstream on the waterway, to the Myrtle Beach Surface Water Treatment Plant.

And we have cited case law in our footnote on Page 5 of our memo, making it clear the Court can take judicial notice even in a Rule 12 motion of government maps.  The Court can obviously take judicial notice of the law of gravity: water flows downhill.  And it's -- you do not have to accept an allegation that water flows 14 miles upstream.  That is not what happened.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. KNOWLTON                                    45

Now, plaintiffs address this in their memo.  And I found it confusing, but I'm sure I'll be corrected if I misinterpreted it.  But this is what I understand.  They addressed this in the footnote on page 19 and in their opposition at Page 45 to 46.  And my understanding of their argument is that they do not dispute that the Myrtle Beach Surface Water Treatment Plant is not downstream from Johnsonville wastewater treatment plant.  What they argue instead is that the Bull Creek Surface Water Treatment Plant, which I showed you was on the map at the Exhibit A.  Their -- my understanding is that Bull Creek pulls water out -- that station pulls water out of Bull Creek for treatment and distribution to customers for drinking water.

The argument they're making is that Bull Creek sends its drinking water to customers, apparently upstream of the Myrtle Beach Surface Water Treatment Plant and then they discharge it to a wastewater treatment plants -- all these customers do, who all flush their PFAS into a wastewater treatment plant upstream of the Myrtle Beach plant, back into the waterway, and then the Myrtle Beach treatment plant takes it in voluntarily from there.

And I submit, Your Honor, if that is what they're saying -- and I think it is.  I'm sure they will correct me if I'm wrong, but that breaks the chain of causation so thin so many times, it can't possibly be foreseeable that somebody 23

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. LUTZ                                     46

miles upstream from Bull Creek intentionally sent molecules to its drinking water intake at Myrtle Beach, 14 miles upstream after the confluence. And that's half the claim here. And that's why I think that's important. We could spend a lot of resources trying to deal with all of that, but I just think that is an implausible, unworkable theory that has got to break the foreseeability causation change as well.

And so that's why we would ask that the claim for recovery for damages with respect to the Myrtle Beach Surface Water Treatment Plant be stricken, because it would have to go through not only that -- those molecules downstream into the bull Creek plant, but then to customers -- then to their wastewater treatment plant upstream, and then to Myrtle Beach. And if they get the treatment facility they're talking about in Bull Creek, that water will be clean before it -- of PFAS before it ever went to customers. So there would be no need to have the identical expensive technology for -- with respect to the PRET PFAS at that location.

Thank you, Your Honor.

THE COURT: Thank you.

MR. LUTZ: Thank you, Your Honor. Ryan Lutz, again.

PRET recycles carpet. Carpet contains PFAS. And PRET disposes of the PFAS in their waste stream. Those are the allegations that we've made about PRET.

On the issue of attorneys' fees and pre-judgment

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. LUTZ                                           47

interest, it's our contention that both arguments are, really, procedurally improper and premature.  These are issues that are typically handled, you know, when we have a judgment way down the line.

Rule 12(b)(6) tests the legal sufficiency of plaintiffs to state a cause of action.  It applies to claims, attorneys' fees, and  pre-judgment interest are not causes of action.  They're not claims.  So 12(b)(6) is the wrong vehicle to challenge this.

Even so, we have alleged that we are seeking a declaratory judgment.  We don't have to cite the statute in our complaint to adequately allege a declaratory judgment under the Declaratory Judgment Act, it authorizes an prevailing party to obtain fees, costs; and that's at the discretion of the Court.  It happens after the end of the case.  You know, the cases that we cited were just cited for the proposition that fees and expenses of this case can be awarded under the Declaratory Judgment Act.  I'm not saying that they're on point in the sense of having to do with a nuisance/negligence/pollution case versus some other insurance breech.

With respect to the  pre-judgment interest, we've set out present injuries.  We've talked about the real property damages.  And the pre-judgment interest is -- can be available to us just like in a car wreck, Your Honor, when someone

suffers an injury and doesn't get treatment for a year later or two years later, they still get to recover pre-judgment interest.

With respect to PRET's argument about it not being responsible for the Myrtle Beach treatments plants having -- or actually the plaintiffs' water having been contaminated with their PFAS, they introduced extrinsic evidence that we contest, obviously, and we have explained in the complaint how their PFAS goes from their facility all the way down to the Intracoastal Waterway. It goes into Bull Creek, passes through the systems, discharges into the Waccamaw River and it flows into the Intracoastal Waterway where plaintiff pulls their water.

Your Honor, that is -- we explicitly explain how this occurs in Paragraphs 55 through 58. This will also be a subject of expert testimony on fate and transport, which is why this extrinsic evidence should not be considered, especially on a Rule 12(b)(6), where you are required to look at the four corners of the complaint.

We have alleged plausible pathways by which the defendants' chemicals pollute the water ways.

And that's all I have, Your Honor. Thank you.

THE COURT: Thank you.

Anything else? Mr. Knowlton?

MR. KNOWLTON: Just -- could I be very brief, Your Honor?

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

THE COURT: Yes, sir.

MR. KNOWLTON: I think dismissal of the attorneys' fees and pre-judgment interest without prejudice at this point is appropriate. They have not asserted a claim for declaratory judgment.

But on this argument about the wastewater treatment plants in Myrtle Beach, in Paragraph 56 through 59, they do talk about it. And that I find confusing. But what they say is that the -- in 58, they say the Conway WWP is an industrial users and that use portable water from Bull Creek. So they're not -- they do not argue -- and I've not heard them argue -- I do not understand them to argue against gravity, that somehow it gets down to Bull Creek and goes 14 miles upriver to this intake. You can take judicial notice that that is not the case.

What they say is that they send this water from Bull Creek to other customers, and then because that water is then set in above the wastewater treatment -- I mean, the intake in Myrtle Beach. That has got to be a break in the causation and foreseeability.

It says in 61, again, that the PFAS was not removed in the wastewater treatment plants that went in upstream of the waterway. But that is two times removed from Bull Creek where this flows, and I submit that for foreseeability and causation, that that is going to be completely inappropriate

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

and rule -- that is a proper Rule 12 issue, that foreseeability is beyond the breaking point at that point for sure. And we rely on the other arguments, of course, that the entire case should be dismissed, but certainly the claim with respect to the expenses for the Myrtle Beach plant should be stricken.

Thank you.

THE COURT: Thank you very much.

Okay.

MR. LUTZ: Nothing further.

THE COURT: Okay. Thank you.

All right. Why don't we take 10 minutes. When we come back, Mr. Knowlton will be up again.

MR. KNOWLTON: I think that was it for me, Your Honor.

THE COURT: Okay.

So you have also covered the advanced materials?

MR. KNOWLTON: Yes. PRET Advanced Materials is the name of my client. But that third point was what I wanted to make.

THE COURT: Okay. All right. Thank you.

Okay. And so then next it's going to be primary jurisdiction. Okay?

Thank you-all. We'll be right back.

(Recess from 01:26:52 to 01:46:37.)

THE COURT: All right. We're back on the record with Civil Action Number 24-CP-26-5523, Grand Strand Water and

MR. BROWN                              51

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Sewer Authority versus Aladdin Manufacturing Corporation, et al.

We are on the agenda prepared by defense counsel.  And next, according to the agenda, is primary jurisdiction.

MR. BROWN:  Yes.  Thank you, Your Honor.  Good morning.  May it please the Court.

Zach Brown, here, from Fiber Industries.  McAngus Goudelock & Courie is my firm.  And we actually represent multiple defendants in both cases that you are handling, but also that have been removed.

Your Honor, I'm going to speak briefly.  I know that's famous, last words.  But I'm going to address primary jurisdiction arguments.  And our position that in the alternative, if you do not decide to dismiss this case, you should stay this case on the grounds of primary jurisdiction.

Primary jurisdiction applies where a claims originally cognizable in the courts and comes into play whenever enforcement of the claim requires the resolution of issues, which under a regulatory scheme have been placed within the special competence of an administrative body.

Your Honor, in that case, the judicial process -- or under that doctrine, the judicial process is suspended pending referral of such issues to the administrative body for review.  The legislature in South Carolina entrusted the Department of Environmental Services with the regulatory authority to

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

address the exact claims, the exact harms that the plaintiffs have brought this suit to recover.

In the South Carolina State Safe Drinking Water Act, SC Code 44-55-10, it outlines both the regulatory scheme, the framework, but also the enforcement power of the Department of Environmental Services.

Your Honor, the act exclusively vests enforcement authority in the Department, and if requested by the department, the attorney general.  That's 44-55-60 within the code.  The doctrine of primary jurisdiction is intended to promote desired uniformity in regulation.

Your Honor, this is a portion of both briefs.  And, actually, I think that portion that I just read is from the plaintiffs' brief in response.  It is not that the courts do not have the ability to handle issues at common law that the plaintiff have alleged in their complaint.  That is not what we're saying.

We're saying that for these claims to be addressed by a court or this Court, they have to first be addressed by the Department of Environmental Services to determine what exactly should be recovered and what should be reviewed and enforced by the Department of Environmental Services.

The entire reason the regulation exists is to leverage the expertise and specialized knowledge of the agency.  And in primary jurisdiction of DES, they would be able to address all

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

of the issues that stem from both the EPA and the South Carolina Safe Drinking Water Act under that scheme.

And thank you, Your Honor.

THE COURT:  Thank you, Mr. Brown.  Nice to see you.

MR. BROWN:  Yes.

MR. WATSON:  Good morning, Your Honor.

Akira Watson here for Grand Strand.

I covered primary jurisdiction doctrine yesterday.  So I'm going to go ahead and incorporate the arguments that were made by plaintiffs in the Greenwood and Lawrence County cases. I'm just going to hit the main points, though, of those arguments.

primary jurisdiction doctrine gives the Court discretion where a case or factual issue therein is beyond the conventional experience of judges and within the special competence of an administrative agency.  The Court may stay or dismiss the case and refer the case to agency.

As I said yesterday, this case here involves common law tort and primary claims that are well within the Court's competence and experience.  DES doesn't adjudicate tort claims and has little to offer.  Again, defendants just asked for a stay without saying exactly the Court would be referring to the Department, what specific issues, what would be the timeline of the stay, the proposed end date; how would the Court know that the stay needs to be lifted?  The defendants

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

don't say.

Again, if we're looking at agency expertise that could be useful to this case DES didn't propose the PFAS MCL Rule; EPA did.  Furthermore, defendants are unable to point to any regulatory action taken by DES to either control or regulate PFAS generally or take enforcement at their facilities specifically.

And, finally, in our brief we provided a number of cases in which defendants have -- will raise this argument in the context of common law claims for PFAS contamination.  Again, most -- and I think very likely, all of these primary jurisdiction arguments have been rejected in the PFAS contamination cases.

Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Brown?

MR. BROWN:  Your Honor, very brief.

The reason that DES has not addressed PFAS under their regulatory authority is because the rule from the EPA only became effective in April of 2024, not even a year ago.

Additionally, Your Honor, I want to bring up one of the cases that was cited by counsel from a different jurisdiction, the Hartwell Court versus Superior Court matter.  I believe it's out of California.  In the concurring opinion in the court's opinion in that case, in Hartwell Court, they envision

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

a scenario where an award of damages in an underlying case and in that underlying case, would actually interfere with the agency's official duties under the California Regulatory Framework.  That's why we're asking for the stay in the alternative of a dismissal, because we've had this rule from the EPA for less than a year and DES needs to look at these issues to determine if there's anything that could be addressed by the courts down the road.

Thank you, Your Honor.

THE COURT:  Thank you.

Anything else on that, Mr. Watson?

MR. WATSON:  Yes, Your Honor.

Your Honor, the reply by defense counsel just illustrates why this request for a stay is nothing more than an unjustified delay tactic.

DES has been sitting on this rule forever a year before deciding whether it's going to do anything with respect to PFAS.  How long are our water utilities expected to wait on the agency to take some sort of action of its own to regulate PFAS?  We've got contamination now and a deadline under that EPA rule by 2029 to get the PFAS out.

That's all, Your Honor.

MR. BROWN:  Nothing further, Your Honor.

THE COURT:  Okay.

MR. BROWN:  Thank you.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

THE COURT:  Thank you, both.

Okay.  Mr. Willis?

MR. WILLIS:  May it please the Court.

Your Honor, this is our 12(b)(2) motion to dismiss for lack of personal jurisdiction.

In this case, in the Grand Strand case, Mr. Diamaduros and I represent two landfills in North Carolina.  One is called the Sampson Regional Disposal site.  It's called -- I think we've referred to it as SRD.  And then the other one is the Red River Disposal site.

RRD, Red River, is -- or Red Rock.  I apologize.  Is about 40 miles from the Lumberton Wastewater Treatment Plants where its leachate goes.  And the Sampson Landfill is about 70 miles from the Lumberton waster water discharge.  The Lumberton Wastewater Discharge is about 20 miles from the border of North Carolina/South Carolina, I think.  I may be a little wrong on that, but somewhere between 15 and 20 miles.

The -- I have maps here if the Court needs that, but I don't think the Court does.  And given the document camera issues, we'll -- if the Court wants to see it, I'm happy to hand them up.

So the reason that it's important that the Court realize that this is a 12(b)(2), not a 12(b)(6) motion is that the rules on personal jurisdiction motions under Rule 12 are a little different than under 12(b)(6).  There's no presumption

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

given to the plaintiffs' allegations of personal jurisdiction that the Court must assume that they're true. It works a little different.

If personal jurisdiction is alleged in the complaint and supported by well-pleaded facts, then that states a prima facie case. But that case can be rebutted by affidavits from the defense supporting the argument that there should be no personal jurisdiction. And that's what's occurred here.

And that essentially shifts the burden back to the plaintiffs to decide whether they want to rest on their allegations and their pleadings or whether they want to submit counter affidavits or whether they want to conduct jurisdictional discovery.

We made this motion in December of 2024. There's been no request, no effort to conduct jurisdictional discovery, and, of course, there's no stay of discovery in this case. That was a part of the motion that was made. So Your Honor basically has the record before you to decide this issue.

So in sort of confirming that that was the process in South Carolina, I went back to the office last night. And I ran across a case, Your Honor, that we did not include in our brief. And I'd like to hand it up. I've got copy for the plaintiffs.

(Pause.)

MR. WILLIS: Your Honor, this is a Court of Appeals

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

called Sullivan versus Hawker Beechcraft Corporation.  And it involves an airplane crash that occurred in York County where the flight originated from Ohio.  And plaintiffs originally brought the case in Ohio.  Then they -- it was dismissed.  They missed the statute of limitation.  So they came to South Carolina because we had a longer statute of limitations and they filed it there.  And so some of the Ohio defendants moved to dismiss for lack of personal jurisdiction.  The trial court granted the motion, denied the request for jurisdictional discovery, and then it went up to the Court of Appeals.

And I think it was Judge Konduros that wrote the opinion.  And it's a typical -- Konduros, yeah.  It's a typical opinion.  She's a very good writer.  And it's just very clear.  And as I read the opinion last night, I thought, you know, this is going to be helpful to provide this to the Court today.

And so, Your Honor, it -- on page 4 of that opinion, the -- Judge Konduros begins her analysis.  And she says, "The determination of whether a court may exercise personal jurisdiction over a non-resident" -- which is what we have here -- "involves a two-step analysis.  The trial court must, Number 1, determine whether the South Carolina long-arm statute applies.  And, Number 2, whether the non-resident's contacts with -- his contacts in South Carolina are sufficient to satisfy due process.

And I've argued these motions before, Your Honor, and

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

read briefs.  And both sides tend to take the Supreme Court -- the South Carolina Supreme Court's statement that the long-arm statute extends to the farthest bounds of jurisdiction permitted under the due process clause of the United States Constitution.  And they sort of conflate those two issues and the argument on personal jurisdiction just becomes about minimum contacts.

But I actually went back and I read the long-arm statute.  And it's interesting because plaintiffs can't satisfy the long-arm statute here.  And so if that's the first step -- let's take a look at the long-arm statute and what it says.

And that long-arm statute, as the Court is aware, can be found at 36-2-803.  And it says in sub-paragraph A:  "a Court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the persons."  Number -- part 3 would be the first one that'd be relevant: the person's commission of a tortuous act, in whole or in part in this state; or Number 4: causing tortious injury or death in this state by an act or omission outside this state if he regularly does or solicits business in state.  Now, under our affidavits, neither Sampson nor Red Rock do that.  In fact, they're not even permitted by law to do that.  They can only take North Carolina waste.  They don't solicit any waster material, any solide waste or trash, that sort of thing, from South Carolina.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. WILLIS                                                60

The second bullet point would be whether the defendant engages in any other persistent course of conduct.  So persistent source of conduct means it would be something that you would do over and over again, that directly causes tortious injury or death in the state.

And then the last bullet point would be "or derives substantial revenue from goods used or services rendered in this state."  So the only bullet point, then, that would be relevant would be "Engages in any other personal -- persistent course of conduct in this state."  That phrase, "In this state" modifies each one of those bullet points.  And that case makes that clear.

So, Your Honor, just looking at the allegations of the plaintiff's complaint through the lense of the South Carolina long-arm statue, the long-arm statute does not provide personal jurisdiction.

Plaintiffs' complaint alleges, very clearly, that Red Rock and Sampson Acts occurred in North Carolina.  And, of course, that's what they allege because that's what they must allege.  There's no evidence that Red Rock or Sampson do any business do any business in South Carolina, come to South Carolina, directly dispose of waters in South Carolina.  They say at Paragraph 20, that their first allegation in the complaint, that says:  Red Rock and Sampson's act occurred in North Carolina.  They quote: "Sampson and Red Rock transport

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

leachate from these North Carolina landfills to the Lumberton Wastewater Treatment Plant in Lumberton, North Carolina. So that's the act. The transportation -- or sending of leachate, which is waster water from a landfill, to a plant in Lumberton, North Carolina.

So what you have here is under the long-arm statute, it clearly falls within sub-paragraph 4, causing tortious injury or death in this state, which is alleged, by an act or mission outside the state, which is what we have. And so for there to be personal jurisdiction, both Sampson and Red Rock have to engage in any other persistent course of conduct in this state. And they clearly do not do that.

And, really, realistically, the inquiry should end there. The Court really doesn't need to go and read South Carolina and U.S. Supreme Court cases about personal jurisdiction and what's required if right up front the long-arm statute can't be met. But if for some reason the Court thinks it can be met, then lets go on to the due process issue.

With the exercise of personal jurisdiction over Sampson and Red Rock comport with due process. The affidavit that we submitted in support of our motion is attached to this exhibit A to our motion and it very clearly says -- and I don't think it's even possible to dispute this, that Sampson is a North Carolina company. Their sole business is operation the Sampson County landfill, which is in Roseboro, North Carolina.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. WILLIS                                          62

They are not registered to do business in South Carolina. They do not do business in South Carolina. They don't own, lease, maintain any property in South Carolina. They don't have an office, place, or business -- or a mailing address in South Carolina. They don't have any employees here. They don't advertize, solicit business, or engage any marketing in South Carolina. In fact, they could not do that because they're only authorized to take waste from North Carolina. And that's finally -- and it says, the Sampson County landfill does not accept waste from outside of North Carolina. And same applies to Red Rock.

So there is literally no connection to South Carolina by any conduct by Sampson or Red Rock. So would it be fair, under the due process clause, would it be authorized under due process for them to be sued in South Carolina and have to defend a case here?

And, Your Honor, the controlling case law for you, as you know, is not cases from Montana or Ohio or Alabama. It's what does the South Carolina Supreme Court said about this? That's -- those are your masters in this case. You have to follow South Carolina Supreme Court precedent and United States Supreme Court precedent.

And the leading case that comes closest to fitting the facts here, where you've got an out-of-state defendant engaging in out-of-state activity that may arguabley be

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. WILLIS                                         63

foreseeable that it might have some indirect impact in South Carolina.  But leading case on that is Coggeshall versus Reproductive Endocrine Associations of Charlotte, that -- and then the other one would be the baseball bat case. And we'll talk about that in a minute, the Cockrell case.

So, Coggeshall, it's a 2007 case -- it says, "Jurisdiction can only attach if the plaintiff identifies some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state.  So it's the purposeful availment that we're dealing with here. And clearly that does not exist under the facts that the plaintiff have pled.

And note that the South Carolina Supreme Court doesn't say, "Or an act that the defendant knows or should know could cause in South Carolina."  That's the foreseeability test. And that doesn't appear in any South Carolina Supreme Court statements.  The South Carolina doesn't base personal jurisdiction on foreseeability of harm.  That's not the test. Purposeful availment of the privilege of conducting activities within the state is the test.

Other language, Your Honor, that the South Carolina Supreme Court has used, in the South Plastics versus Southern Community Bank case, that's 423 South Carolina.2d 128 cited in our briefs.  It's a 1992 case.  "Due process requires showing that defendants have directed their activities to a resident

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

of South Carolina."

Well, Sampson and Red Rock have only directed their activities to Lumberton, North Carolina's wastewater treatment plant.  And foreseeability, again, is not the test.

In a U.S. Supreme Court case, the Nicastro case, where the U.S. Supreme Court rejected the stream of commerce test for the purposeful availment test.  Supreme Court said, "The Court's principal inquiry in this type of jurisdictional assessment is whether the defendant derives -- or, I'm sorry -- whether the defendant's activities manifest an intention to submit to the power of the sovereign, being South Carolina.  No mention of foreseeability as part of that test.

So the question is, is foreseeability enough?  Because that's the argument that plaintiffs make in their brief, is, "Well, you purposefully -- Sampson, you and Red Rock purposefully send your leachate to Lumberton.  And it's foreseeable that that's going to flow downstream to -- through the Pee Dee River and eventually find its way some 150 miles to Myrtle Beach."  So the question is, is foreseeability enough?  And both the Supreme Court of the United States and South Carolina Supreme Court say it's not.

The U.S. Supreme Court says, "It's consistently held that foreseeability of causing injury in another state is not a sufficient benchmark for exercising personal jurisdiction."  That's the Burger King versus Rudzewicz case, 471 U.S.462.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

It's a 1985 case. We cite that in our brief. And then again in this Nicastro case, "It is the defendants' actions, not his expectations, that empower a state to subject him to judgment."

So let's look at the South Carolina cases and what they say about foreseeability. And controlling South Carolina cases have consistently held foreseeability of an impact in another state isn't enough to comport with due process.

So I mentioned the Cockrell case, Your Honor, that's cited in our brief. And I would suggest Your Honor take a look at that case. It's in our materials that we sent to the Court. It's the baseball bat case where a student athlete was hit in the head by a line drive when he was pitching and was seriously injured. And it was an aluminum baseball bat.

And so the student sued Hillerich & Bradsby, who manufacture baseball bats, H&B. And they also sued the University of Massachusetts Research Center that studied the bat and the director of that research center. And so the University of Massachusetts and the director moved to dismiss on lack of personal jurisdiction. And the trial court granted the motion. But the plaintiff in that case argued, "Well, its foreseeable that a bat that they certified might be sold in South Carolina. In fact, it's virtually certain that that would happen. And the Supreme Court again said, "The foreseeability that is critical to due process analysis is not

the mere likelihood that a product" -- in that case a bat, but you could substitute the word leachate for bat and you get instructive authority -- the foreseeability to due process analysis is not the mere likelihood that a product, a bat," or a leachate, "will find its way into the forum state.  Rather, it is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being hailed into court there."  And they cite the World-Wide Volkswagen case as authority for that.  And that's an opinion by Justice Whaler in that baseball bat case.

And then if you look at -- Your Honor, if you look at World-Wide Volkswagen.  And that's a U.S. Supreme Court case that talks again about foreseeablility.  And it clearly holds that the mere foreseeability that a product -- in this case a Volkswagen -- would wind up in an accident in Oklahoma is not enough to establish personal jurisdiction.  Personal jurisdiction under the due process clause requires purposeful availment of the laws of the forum state by the defendants' direct conduct.

Now, that baseball bat case also talks about third-party conduct.  And we have that here, as well, Your Honor. Cockrell is also controlling because it deals with contacts that are due to the unilateral actions of some other entity. In that case, it was Hillerich and Bradsby that distributed the bat in South Carolina.  And so like the Lumberton

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

wastewater treatment plant, we have here, where the plaintiff alleges that Sampson and Red Rock send their leachate to Lumberton for treatment, just as Hillerich and Bradsby send the bat to South Carolina. There's no jurisdiction as to University of Massachusetts or the director because they don't control that. And the court state that, "Further, the focus must center on the contacts generated by the defendant and not on the unilateral actions of some other entity." They go on to say, "The bats did not arrive in South Carolina through the respondent's efforts. H&B unilaterally distributed and sold them in South Carolina. The respondents had no control over the distribution of the bats and did not profit from their sale."

And, similarly here, once the leachate goes to Lumberton, Sampson and Red Rock have no control over where Lumberton ultimately, discharges its wastewater.

The Cockrell case also cites another case called Mussalli versus W.W. Norton and Company. This is a -- sort of a strange case, involving somebody who wrote an article and made a movie that was arguably defamatory. And it was shown in South Carolina. They were sued here. And the Supreme Court -- our South Carolina Supreme Court said in that case, "The fruits of the defendant's labor arrived in South Carolina not through his efforts, but through the efforts of others, and therefore cannot be the basis for jurisdiciton." And

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

that's what we have here.  The leachate from Sampson and Red Rock arrives in South Carolina according to the plaintiffs' allegations, through the actions of the Lumberton wastewater treatment plant, not directly through Sampson and Red Rocks' actions.

Now, not surprisingly, Your Honor, the main case the plaintiffs cite in opposition to our position is an Alabama case.  And it's the ex parte Aladdin case.  And I went back last night and I reread this.  And I don't know whether Your Honor has a copy of it.  We didn't cite it in our briefs.  And I asked Mr. Tarpley if he had provided you with case law notebooks, and he said he had not.  So I would like to hand this case up, too.

Thank you, Your Honor.  Well --

and I don't know whether Mr. Tarpley was involved in that case.  He probably was.

Was that one of you-all's cases?

MR. TAPLEY:  Who's the plaintiff?  No.

MR. WILLIS:  No.  Okay.

But in any way -- in any event, Your Honor, that -- it's a interesting case to read.  And it's interesting because at the outset, it's important for the Court to see that if you're going to follow that Aladdin case, as opposed to controlling case law in South Carolina, you need to know what the procedural background of that case was.  Because that case

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. WILLIS                                        69

turns on a couple of procedural points that would apply in Alabama, but they don't apply here.

First, it was before the Alabama Supreme Court on an extraordinary writ called a Petition for Mandamus." And I'm -- I've got some experience with that. I had a case in Mobile where a lawnmower turned over, and there was a case of privilege there that we had to deal with. And we went up to the Supreme Court on a Petition for Mandamus.

And the Petition for Mandamus in Alabama -- and I'm sure Mr. Tarpley can correct me if I'm wrong; I'm not an Alabama lawyer -- but my experience from that lawnmower case and from the -- reading this opinion, the Court makes it clear that the petitioner must satisfy a heavier burden than an ordinary appeal. In an appeal based on Mandamus, the petitioner must show a "Clear, legal right to the order sought." So the Court sort of has a benefit of the doubt standard of proof that they apply in Mandamus. And they give the benefit of the doubt to the plaintiff -- or to the non-moving party. And that obviously doesn't exist here.

Second, Alabama has a procedure that's a little different than we use here in considering a motion to dismiss based upon lack of personal jurisdiction. And the opinion -- the Aladdin opinion, goes into all of that.

Where the plaintiff's allegations of personal jurisdiction over the defendant are initially taken as true in

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Alabama, here it would be considered a prima facie establishment. But if the defendants contest those statements with affidavits, then in Alabama the plaintiffs must submit counter affidavits. And then if there's a conflict between the defendants' affidavit and the plaintiff's affidavits, then the Court "Must resolve all conflicts in favor of the plaintiff. And only if no affidavit -- no counter affidavits are submitted by the plaintiff can the motion be granted."

Well, needless to say, we don't do it that way here. Here, if the jurisdictional allegations are disputed by the defendant, which we have done, and supported by an affidavit, which we have done, then the plaintiff's entitled to jurisdictional discovery. They can't rely on the allegations of their pleadings.

And if the plaintiff fails to conduct jurisdictional discovery, there's no presumption or obligation to read the complaint as it pertains to personal jurisdiction in a light most favorable to the plaintiff. The court simply looks at the evidence and decides whether there's personal jurisdiction. And so, again, although this motion to dismiss has been pending since December, there's been no effort to seek any jurisdictional discovery.

Now, Your Honor, if you look at the substance of the Aladdin case, it was a very split court. As best I can tell, there are a lot of justices on the Alabama Supreme Court.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. WILLIS                                71

This appears to me, as I counted it last night, to be a 4-to-3 decision with a couple of justices having to recuse themselves.  So it's a split court.  It's just not an authoritative decision.  And the cases that they cite -- the Alabama Supreme Court cites, that the find persuasive, are cases from outside their jurisdiction.  But if you read those cases, none of them involve discharges of waste to or by a third party that is not in the forum state, which is what we've got here.

All of those cases that the Aladdin court found persuasive, all involved a direct targeted discharge by the defendant into the forum state, which we don't have here.

Finally, Your Honor, as both sides point out, elements of fairness and practicality enter into the court's due process analysis.  And the reason this is important is because the claims against Sampson and Red Rock in this case, have a little twist on them that isn't present as to the other 12 defendants.

Because Sampson and Red Rock are North Carolina companies, we initially believe that Lex Loci Delicti would govern choice of law here, the substantive choice of law that's going to apply to the substantive claims -- I think both sides -- the plaintiffs and the defendant agree that South Carolina law applies to the personal jurisdiction question.  In fact, they allege that directly in their

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

complaint. But the underlying substantive law of negligence, nuisance, trespass, contribution allocation, plaintiffs allege in their complaint that the North Carolina Law would apply to Sampson and Red Rock. We don't necessarily agree with that, but it's interesting to give that some thought. And they talk about in their brief why that is. And I, frankly, had not read the international paper case, but it's a very interesting case, Your Honor.

And I've got a copy of that as well. And I'd like to hand that up to the Court.

(Pause.)

MR. WILLIS: And I think it was maybe Mr. Lutz cited this case yesterday in a context of clean water act preemption. But this is a really interesting case. And this was a case where International Paper Company had a paper mill on Lake Champlain.

I've been to Lake Champlain. It's a giant, beautiful, fresh water lake. It's one of the few natural lakes in the United States. And the border of Lake Champlain -- part of Lake Champlain border is in New York; part of it is in Vermont. Sort of the border goes right through the lake.

And so International Papers' waste is discharged into the New York side of Lake Champlain. But they got sued by residents of the Vermont shore, claiming that their discharge created a nuisance. And so International Paper moved to

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

dismiss the case.  And the argued that the Clean Water actually had a preemptive effect and preempted state law claims being brought against them.

And for a rather convoluted analysis, the Supreme Court says, "No, that's not right.  But it would be unfair to subject International Paper to Vermont Clean Water laws.  And so what we're going to do here is we're going to have New York law apply to International Papers' discharges.  New York law applies to the substantive claims, but they can still be brought in Vermont.

And so imagine if we had to do that here.  If Your Honor doesn't grant this motion to dismiss and there are 2 defendants from North Carolina and 12 defendants from South Carolina and we go in front of a jury, imagine the complexity of Your Honor's jury charge, when 12 defendants have South Carolina law but 2 have North Carolina law.

And those practical considerations enter into the due process analysis.  And so the most practical and fair result here, Your Honor, would be for you to dismiss Sampson and Red Rock because there is no direct activity that they engaged in directed at a South Carolina resident, and foreseeability is not the test.  The most practical result would be to dismiss them and the plaintiffs can always sue them in North Carolina. In fact, the plaintiffs make the argument in their brief that it would be convenient for South Carolina Red Rock to defend

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

the case in South Carolina.  They're just right across the border.

Well, if it's convenient for them, it would be just as convenient to the plaintiff to go to North Carolina if they feel like Red Rock and Sampson have made a substantial contribution to the PFAS that they're complaining about.  So they can sue these companies in North Carolina.  That's where that -- there is general jurisdiction over them there.  And they can sue them for  tort in South Carolina.  But they can't sue them here in South Carolina because there is no contact.

In conclusion, and I'm sure the -- everybody is happy to hear me use that phrase -- Sampson and Red Rock have no -- there's no evidence of any purposeful availment; foreseeability in South Carolina is not enough.  Jurisdiction can't be based on the acts of a third party.  Under the long-arm statute, jurisdiction here cannot be based upon acts occurring in North Carolina because there is not persistent course of conduct that takes place in this state.  So plaintiff's claims fail to satisfy the long-arm statute.  And there's just no evidence that defendants could purposely directed their activities to a resident of South Carolina.

Sending leachate to a North Carolina wastewater treatment plant, even if it's possible that the PFAS might eventually wind up in South Carolina isn't purposeful availment or a conduct directed at a South Carolina resident.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Now, if the Court is inclined to hold your ruling in abeyance and order jurisdictional discovery here, obviously if the Court wants us to do it, we'll participate in that. But that's one reason I handed up that Sullivan case, because in that Sullivan case, the lower court held you don't need jurisdictional discovery. And that was affirmed. And I don't believe jurisdictional discovery is necessary here. I don't think it will show anything that hasn't already been put in our affidavit or alleged by the plaintiff.

That's all I have, Your Honor. Thank you for listening to me.

THE COURT: Thank you.

Mr. Watson?

MR. WATSON: May it please the Court. Akira Watson.

I promise I won't be as long-winded as Mr. Willis here.

I want to start with this matter that defense counsel raised at the beginning of his argument about whether separate analysis under the South Carolina long-arm statute is also required in addition to the due process analysis.

I want to note that defense counsel filed two replies yesterday; one of them less than 24 hours before the start of this hearing, didn't raise this issue of a separate statutory analysis. Also didn't raise it in their main brief. The first time that we're hearing about it is at this hearing.

Defense counsel relies a lot on the case -- or excuse

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

me -- yes, relies on the case of Cockrell.  That's a Supreme Court case.  And I've got some language here from it.

South Carolina Supreme Court said, "South Carolina's long-arm statute, which includes the power to exercise personal jurisdiction over causes of action arising from tortous injuries in South Carolina has been construed to extend to the outer limits of due process.  Because South Carolina treats its long-arm statute as co-extensive with the due process cause, the sole question becomes whether the exercise of personal jurisdiction would violate due process."

And indeed, in that case -- that's the baseball bat case. The court only engaged in the due process analysis, sort of skipping over the statutory analysis.

And, okay, it's worth noting, we also cite Cockrell in our opposition brief for that same point.  To the extent that the Court believes that separate analysis under the language of the long-arm statute would be helpful to the Court, we would request 5 days for supplemental briefing on that issue.

That's our request on that.

THE COURT:  Okay.  Thank you.

MR. WATSON:  I also want to address what defense counsel said about the sort of matters that the Court has allowed to consider under 12(b)(2), motion to dismiss over personal jurisdiction.

Yes, defendants are allowed to rebut the jurisdictionally

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

relevant complaint allegations with extrinsic evidence, such as through affidavits.  However, as to jurisdictional allegations that are unrebutted by such extrinsic evidence, those allegations are taken as true.

And I'll note -- I've got a lot of paper up here -- the affidavit submitted on behalf of these North Carolina landfills -- we'll just cover the facts, the counsel spoke about the fact that North Carolina landfills, they only operate in North Carolina, they only take North Carolina waste, they don't have employees in South Carolina .  That's fine.  because in this case, there's not nexus between those hypothetical, having employees or the other business activity that would be in South Carolina, and the causes of issue are -- excuse me -- causes of action brought by Grand Strand.

Now, in the purposeful availment prong, North Carolina landfills' relevant jurisdictional conduct here is collecting their leachate from their landfills.  And I will note, Your Honor, those landfills are not located, themselves, in any watersheds that are relevant to this case.  The watersheds that those landfills are located on empty into the Atlantic Ocean in North Carolina.  What these landfills do is, instead of, for example, having a direct discharge of their leachate into those watersheds or sending it to a local wastewater treatment provider located on those watersheds, they collect all of the leachate from their landfills, haul it across the

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

state of North Carolina to a location that is much closer than their landfills actually are, to the border of South Carolina. And they send that leachate to the Lumberton wastewater treatment plant where their PFAS pass through the wastewater treatment plant to enter the Lumber River, which shortly flows downstream into South Carolina. The relevant jurisdictional conduct here is sending their waste into the formed state of South Carolina.

Your Honor, we have pleaded and it is not rebutted by any extrinsic evidence submitted by the landfills that this defendant knew that PFAS are persistent in the environment, that they knew that they resist conventional wastewater treatment like that used in Lumberton. They knew that these PFAS are mobile in the environment, especially in water.

Morever, Your Honor, in light of the affidavit submitted by these defendants, we also submitted to the Court a consent decree entered in a case involving the Sampson County landfill. It was brought by residents around that landfill that complained that the landfill was leaking PFAS and contaminating their water supply.

Sampson County settled that case and is a participant in the Consent Decree. They have actual knowledge that the leachate, including the leachate that they are sending to Lumberton is, in fact, contaminated with PFAS. We also submitted the Clean Water Act Notice of Intent letter that was

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. WATSON                                          79

sent to Sampson Landfill as well as other entities related to both Sampson Landfill and Red Rock Disposal. That letter discusses the issue, not only of the PFAS specifically at the Sampson Landfill, but the issue of PFAS and landfill and leachate generally. This was knowledge that was generally aviable to these landfills.

So, again, these defendants know, or at the very least should know that they are sending leachate to Lumberton, that that leachate is contaminated with PFAS that is persistent in the environment, mobile in the environment, and passes through conventional wastewater treatment processes, and these defendants know or should that they PFAS, in fact, pass through the Lumberton wastewater treatment system. And they know or should know that the Lumberton system discharges to a river.

Your Honor, knowing that your conduct is causing harm in a forum and nevertheless persisting in that conduct, that is purposeful direction to the forum. Every time those landfills collect that leachate, knowing that there's PFAS in it, and they send it to the wastewater treatment plant that is closer to the state of South Carolina than their actual landfills are, they are purposefully directing their actions towards South Carolina.

And, indeed, this case is on all fours with cases we've cited in our briefs that involve purposeful availament based

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. WATSON                                          80

on knowingly sending pollution to he forum.  Defense counsel wants to say, that's mere foreseeability.

Let me just read a passage from the ex parte Aladdin case, decided by the Alabama Supreme Court.  And this is holding the -- these carpet manufacture defendants in Georgia purposefully availed themselves to the jurisdiction of Alabama by sending their PFAS-contaminated waster water through a treatment plant and into the river.  This is at Page 20 of the document, bottom paragraph.

THE COURT:  Which paragraph?

MR. WATSON:  Right-hand column, bottom paragraph, begins, 'We reiterate."

THE COURT:  Yes, sir.

MR. WATSON:  We reiterate that foreseeability alone is insufficient to concur specific personal jurisdiction.  In this situation, however, Center Waters and Gadsden Waters, allegations, which we were required to take as true, demonstrate that the remaining defendants continue to discharge PFC -- and that's a synonym for PFAS, containing chemicals in their industrial waster water, despite allegedly knowing that the chemicals would enter the Kush River.  The remaining defendants are alleged to have expressively and directly aim the polluted water not only at Dalton utitlies or the LAS, which was part of Dalton Utilities Treatment system in Georgia, but also Alabama through the continuing flow of

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

the polluted waster water from the remaining defendant's clients into the Coosa River and it's tributaries and ultimately to the sites in Alabama where the injuries conclude.  Thus we conclude that pursuant to the allegations in these complaints, the remaining defendants knowingly and directly aimed tortious actions at Alabama.

Sending your wastewater is activity.  And knowing that the wastewater is likely to cause injury in the forum state and doing it anyways, that's purposeful direction.

Now, defendants say, "Hold on a minute; the wastewater plant, that's unilateral conduct of a third party, and you can't -- that breaks off the jurisdictional train.

Let's talk about the cases in which a unilateral conduct of a third-party's been held to bar jurisdiction -- personal jurisdiction, and see how those cases compare to these pollution cases.

The baseball bat case, Cockrell versus Hillerich and Bradsby is a great example.  You've got the student who's injured during a baseball game.  He was pitching the ball .  The ball was hit with the bat, inures the student.  Student sues the manufacture of the bat, and in issue, they sued this research center in Massachusetts.

Now, there are only -- jurisdictional conduct that was alleged was that they certified all of the bats that are sold in the United States as meeting NCAA regulations.  Court held

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

these Massachusetts defendants did not have influence over the bat and manufacturers distribution of the bats to the markets, including South Carolina.  That's not what this case is.

Another case the defendants cite:  Helicopteros, Masimal de Columbia, from the U.S. Supreme Court, 1984.  There, the Columbian helicopter operator accepted a check drawn from a Texas bank account.  I should have said, "Accepting a check drawn from a Texas bank account."  That's unilateral conduct from a third-party.  That doesn't subject you to specific personal jurisdiction in Texas.  Again, that's not what this case is.

We've got ex parte Aladdin, appealed from the 9th circuit, Horne versus Mobile water and Sewer system from Mississippi, Triad Hunter from -- Versus Eagle Natrium in Ohio.  Those are all cases in which sending your contaminants across state lines with knowledge that they are likely to cause harm there and continuing in it, that subjects you to personal jurisdiction.  That's what's going on in this case.

As far as the due process fairness factors, Your Honor, South Carolina has a clear interest in the contamination of its water bodies and the impairment of the South Carolina utilities' ability to provide clean drinking water.  North Carolina surely got an interest that is compatible with that. North Carolina doesn't want its industry sending pollutants into rivers across state lines.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. WATSON                                    83

Defense counsel's already mentioned and agrees their burden is minimal.

And, finally, it's more efficient for us to litigate this in this action than have to refile in North Carolina.  That's just silly.

Now, I don't know --

Are you covering towards the law separately?  Or --

UNIDENTIFIED SPEAKER:  I'm happy to talk about it.

THE COURT:  He just pointed out that it would be difficult on the trial judge in charging the law to a jury in 2-and-a-half to three years from now when this is actually tried, if it gets to that point.  Right?

MR. WATSON:  Right.

THE COURT:  Okay.  He was just pointing out that that would not be practical, but really didn't argue the conflicts of laws.

MR. WATSON:  Well, Your Honor, I think --

THE COURT:  I'm happy for you -- I mean, I think that's premature.

MR. WATSON:  Yeah.

THE COURT:  I think Mr. Willis was just informing the Court that that would be a possibility.

MR. WILLIS:  Counsel may be right, Your Honor.  North Carolina substantive law may apply to our clients.  I haven't looked at that carefully.  I think the case could be

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

distinguished, but I don't think Your Honor has to resolve that issue to decide this issue.

I do think we agree that it's South Carolina substantive law on personal jurisdiction.

THE COURT: Okay.

And, so I'm not going to force you to --

MR. WATSON: Okay. Well, I'll just say, Your Honor, we're just following what the Supreme Court has said in International Paper versus (indiscernible). We want to have these common law claims (indiscernible) holds that applying South Carolina common law to a North Carolina entity would preemptive. That's all we're trying to avoid here.

Thank you, Your Honor.

THE COURT: Does the plaintiffs -- or does the plaintiff in this case agree to jurisdictional discovery on this issue? I mean, it just --

MR. WATSON: We can. I'm not sure how much -- if the Court would like it, we would consent to it. Yes.

THE COURT: Okay. All right. Thank you, sir. Thank you, Mr. Watson.

Anything else, Mr. Willis, on that?

MR. WILLIS: Yes, ma'am.

We don't believe jurisdictional discovery is necessary, Your Honor, but if they want to do it, obviously, we'll participate in it. I mean, that's commonly done in cases

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

where personal jurisdiction is established.

And, frankly, Your Honor, these arguments aren't silly. This is a substantive issue. And why -- I mean, the Court needs to be right on this, however it rules. And if it needs discovery in order to feel more confident in its ruling, then we'll do the discovery. Because we don't want to build -- I mean, we don't want to lead Your Honor into an error and neither do the plaintiffs. It's a complicated case.

If we build a jurisdictional defect into this case from the get-go, I think 2 or 3 years from now we're going to regret having done that. Now, obviously, the -- it can be raised then. I mean, this isn't a raise it now and forever give it up. If we decide a year from now that there's no personal jurisdiction, Your Honor, can revisit that. But I just -- you know, I take umbrage on that argument being called silly. It's not silly. You know, the argument that Sampson and Red Rock are not in the relevant water shed, that's not in the complaint. That's interesting to know. I'd like to look at that.

The argument that proximity is somehow relevant, there's really no case law that supports that in South Carolina. It's proximity of the action out of state is -- if it's in Charlotte as opposed to in Raleigh, that -- it doesn't matter. If it's out of state, it's out of state.

You know, as we've already said and has been alleged,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

these landfills don't send their wastewater directly into South Carolina.  And the reason that's important, Your Honor, is because the Horne case and the Triad case that the Aladdin Court cited as persuasive -- one's from Mississippi, I think the other one is from a case in the mid-west.  Those cases involve direct discharge by the defendant.  The one was the city of Mobile.  They were sending water to Mississippi because they wanted to get it out of Alabama because a hurricane was coming and it did damage in Mississippi.  And so it was a direct discharge by the defendant to Mississippi.

And I think in the other case -- involved direct discharge from a smelter that it was in-- one state into a river in the other state.  Here, we don't have that.  We have this indirect issue.

And I hear counsel arguing strongly and effectively, "Defendants knew, defendants knew, defendants knew."

Well, that's just not a relevant personal jurisdiction factor.  If it was, World-wide Volkswagen would have been decided differently.  Volkswagen knew that their vehicle could be in a wreck in Oklahoma.  That wasn't enough.

The research lab in Massachusetts and the research director knew that Hillerich and Bradsby sold bats all over the country and one of -- a bat that they certified could wind up in South Carolina.  That's not enough.  But the courts talk about this in terms of foreseeability as opposed to knowledge.

MR. WILLIS                                  87

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

But it's the same thing.

But the courts do say, and we cite it in our brief, it's what the defendant does. It's the act, not what the defendant knows. And that's why if you look at the -- that's why you have to look at the long-arm statute. It's all talking about conduct, actions, actions; not knowledge or expectations.

One thing I neglected to mention, Your Honor, and I apologize to the Court and to my co-counsel. Phil Comella, the Taff Law Firm; we're local counsel for them for these landfill cases. They are regular counsel for GFL, who owns these landfills. Mr. Camilla is on the call. We just haven't gotten them -- we still have some information to get them admitted pro-hop. But they're going to be involved in the case. And -- but I wanted to note that they are on the call. And I wanted to introduce Mr. Comella and -- to the Court, and also note that we do distinguish the Aladdin case, Your Honor, in our reply brief.

And I realize it was only filed yesterday. And we're happy for -- I want -- I didn't want to sandbag my friends on the other side by coming up with an argument that I hadn't put in my brief. We're happy to brief this issue of -- with the long-arm strategy. Five days is fine for us if the Court wants -- if the Court feels like it needs it. I think that's pretty basic stuff. I frankly don't think we need to brief it. But if the Court wants briefing on it, we're happy to

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

participate in that.

Thank you, Your Honor.

THE COURT: Okay. Thank you very much.

And Mr. Comella, I've -- C-o-m-e-l-l-a. Thank you for joining us.

All right.

MR. COMELLA: Thank you.

THE COURT: Anything else, Mr. Watson, before Mr. Willis makes his closing? And I'll give you, what, Mr. Willis 5 days, and then Mr. Watson 5 days. Would that be fair, since Mr. Watson is stating that that is not included in the amended reply in support of motion to dismiss that was filed on yesterday at 11:30 a.m. Is that correct?

MR. WATSON: That works for us, Your Honor.

THE COURT: Okay. So --

MR. WILLIS: Yes, ma'am. Thank you, Your Honor.

THE COURT: Mr. Willis will have 5 days and then Mr. Watson.

MR. WATSON: I just want to speak briefly on the issue of jurisdictional discovery. I believe in our brief, we cite some case law about the court's consideration about extrinsic evidence versus complaint allegations that have not been rebutted by such evidence. Our position is that the relevant jurisdictional allegations are still unrebutted. And we don't believe that jurisdictional discovery is necessary. However,

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

if the Court disagrees or thinks that it would assist and be determination here of personal jurisdiction over these landfills, but we're happy to agree to it.  I think that's sort of similar.  Yeah.

Thank you.

THE COURT:  Thank you.  Anything else, Mr. Willis, on that -- for the 12(b)(2)?

MR. WILLIS:  No, ma'am.  That's fine.  We'll be happy to brief the long-arm statute issue.  And I -- we finally found something we agree on.  We don't think jurisdictional discovery is necessary.  But if the Court wants us to do it, we will.  I don't think it will take long.

Really, Your Honor, in terms of closing, Your Honor knows our positions.  You --

THE COURT:  Okay.  Wait a minute.  Just one moment.

Anything else from anyone before Mr. Willis makes his closing?

Yes, sir.

MR. OSBORNE:  Good afternoon, Your Honor.  Robert Osborne, on behalf of Elevate Textiles, INC.

I just wanted to be clear.  We filed a --

THE COURT:  Can you come up to the mic, please?

MR. OSBORNE:  Sure.

THE COURT:  I'm sorry.  WebEx is not going to pick you up.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

MR. OSBORNE:  Understood.

THE COURT:  Even though your voice carries pretty well.

Can you state that again?

MR. OSBORNE:  Yes, ma'am.

I'm Robert Osborne, on behalf of Elevate Textiles, INC. This was not on the agenda, but Elevate, as a precautionary measure, when it filed its motion to dismiss in December, filed a motion to stay discovery.  Just for a matter of housekeeping.  It's largely moot at this point.  The plaintiffs, as Mr. Willis mentioned yesterday, have not pushed the issue.  I know Mr. Willis addressed this yesterday.  We'd adopt those arguments and simply say we believe it's within the court's discretion to issue a stay until the Court's made their decision on these motions to dismiss.

THE COURT:  Okay.  Yes, sir.

MR. OSBORNE:  Thank you.

THE COURT:  I do see that motion listed.  And I apologize for not calling on you independently.  And you said you're Mr. Osborne?

MR. OSBORNE:  Osborne.  That's right.

THE COURT:  All right.  Thank you.

MR. OSBORNE:  Thank you, Your Honor.

THE COURT:  Okay.  Anything else before we have closing? I see some new faces in the crowd but none brave enough to come up and address the Court yet.

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Normally, you're not very shy.  So okay.

Come on, Mr. Willis, then.  We'll have your closing, sir.  Thank you.

MR. WILLIS:  Your Honor, I had nothing substantive to add.  Just to thank the Court for your attention and your furious note taking.  This is -- it's been a lot to go through, probably the longest motion to dismiss hearing I've ever participated in my 42 years of being a lawyer.  And I just really appreciate the Court for giving us the time and effort.  And that's just what being a lawyer is all about.  And we've enjoyed it.

THE COURT:  Okay.  Thank you very much.

MR. WILLIS:  Thank you.

THE COURT:  And Thank you all for your preparation, your efficiency.

Yes, sir?  Mr. Tapley?

MR. TAPLEY:  I just wanted to offer a closing, too, Your Honor.

Your Honor, I'll be brief.  A lot of facts, frankly, got made up here in the past two days.  And they certainly are outside the four corners of the complaints at issue.

Your Honor, these cases are not exactly simple, but they're not impossible, either.  And a lot of comments were made that somehow these cases are undoable or unworkable.  Well, not to boast, Your Honor, but I tried one of these

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

cases. I mean, we're still early in the U.S. history of PFAS litigation.

But in 2020, before any of these regulations came out from EPA, I tried a case for 7 weeks in front of a federal jury in Ohio on behalf of a man who had cancer that was caused by PFAS. He got a $50 million verdict from the jury, and it was affirmed on appeal all the way to the U.S. Supreme Court. I say that because I know there haven't been many of these cases tried. And I think I know every lawyer whose tried one. And I don't see one of them in this courtroom. But it's been done. And it's doable.

Your Honor, we also did our homework before we filed these cases. And we've done testing with our experts. These defendants did and are doing what we alleged they've done. And I think the one fact that sort of has to get cleared up that was repeated numerous times was that somehow, everybody in the community is adding PFAS to the water when they flush the toilets in their home. That's not what I said and that's not what I meant.

It is true that almost every toilet that's flushed in a home in South Carolina releases PFAS. And it's because people in South Carolina are polluted with PFAS, these defendants' PFAS. Human beings are what's known as an environmental sink for PFAS. Our bodies absorb it. It's a foreign chemicals not known in nature before the 1930s. Our bodies have a hard time

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

processing it, don't know what to do with it.  And so it builds up in the body until the body can finally excrete it.

But it's not because it's coming from somewhere other than the predominant source for people, which is drinking water.  And that's why we now have a drinking water regulation.

Finally, Your Honor, I heard that we should wait for everything to become more certain and wait and let Grand Strand find out what its regulators are going to do about this and what they're going to tell them.

Well, I can tell you, you can ask Grand Strand right now. They know what their regulator has told them to do.  And they know what they're going to do, which is meet this requirement to be in compliance by 2029.  And they're going to spend huge sums of money getting prepared and building the infrastructure that will allow them to do that.  There's nothing uncertain about my client's obligations from what the regulators have told them.  And they know what they've got to do in order to stay in compliance.

Thank you, Your Honor.

THE COURT:  Thank you.

Anything else?

MR. WILLIS:  No, Your Honor.  We'll save our jury argument for when we're in front of the jury.  But we look forward from learning from Mr. Tarpley and help try one of

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

94

these cases.

THE COURT:  Okay.  Thank you.

All right.  And so from a practical standpoint, the business end of it, I'm going to review everything.  That's the beauty of WebEx.  I can review you all; I can review parts of it.  I've made notes as to the beginning and end of the timing of everyone's arguments.  I've numbered your arguments. And so I will issue probably instructions for orders.  And -- but it won't be a one-line instruction.  And I will do that as quickly as I can.  I think we've had about 8 or 9 hours of court.  And so it may take a while for me to go back through it, listen to it, and make more notes about it.

I also am waiting.  Yesterday, there's a 10-day deadline from Mr. Weatherholtz.  I believe he requested an opportunity to -- he and Mr. Lutz are on my sheet with red checkmarks to get me something within 10 days.  And now, Mr. Willis and Mr. Watson, also, are that status.

If you get it in sooner, that's better.

Okay.  I start a new docket next week, civil jury trials here.  And so this just happened to be a chambers week for me, which is fortunate.  So I'll devote some time to this today and tomorrow.

Thank you very much.  That will conclude the hearing.

(At 02:59, the hearing concluded.)

> **END OF TRANSCRIPT.**

ELECTRONICALLY FILED - 2025 Mar 28 2:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

95

CERTIFICATE OF TRANSCRIBER

State of South Carolina

County of Horry


    I, BARBIE TEBOE, a court-approved transcriber, do hereby certify that the foregoing is a true, accurate, and complete Transcript of Record of the proceedings and evidence introduced in the trial of the captioned case, relative appeal, in the Court of General Sessions for Horry County, South Carolina, on the 12th day of March, 2025.

    I further certify that I am neither of kin, counsel, nor interest to any party hereto.


March 25, 2025


_Barbie K. Teboe_

Barbie Teboe,
Transcriber

ELECTRONICALLY FILED - 2025 Mar 31 8:54 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA )     IN THE COURT OF COMMON PLEAS
COUNTY OF SPARTANBURG )
)
)
IN RE: )
)     NOTICE OF HEARING
)
PFAS LITIGATION )
COORDINATED DOCKET )
)
)
_____ )

Pending motion hearings have been set in the PFAS Litigation cases (2024-CP-44-0558 City of Union v. Milliken & Company; Suminoe Textile of America Corporation; and Tietex International, LTD) for **9:30 a.m. on Tuesday, April 1, 2025**, at the **Spartanburg County Courthouse in Courtroom 6D** and will be on Judge Knie's virtual courtroom.

Counsel has been notified via electronic mail.

IT IS SO ORDERED at Spartanburg, South Carolina this __28th__ day of March, 2025.

_____
Honorable Grace Gilchrist Knie
Circuit Judge
S.C. PFAS Litigation

Page **1** of **1**

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA
COUNTY OF UNION

IN THE COURT OF COMMON PLEAS
SIXTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc.; Archroma U.S., Inc.; Arkema, Inc.; Atotech USA, LLC; BASF Corporation; Clariant Corporation; Corteva, Inc.; Crown Health Care Laundry Services, LLC; Daikin America, Inc.; DuPont de Nemours, Inc.; EIDP, Inc.; Everest Textile USA, LLC; Georgia-Pacific Corrugated, LLC; Huntsman International, LLC; Isothermal Textile Services, LLC; Milliken & Company; Santolubes, LLC; Santolubes Manufacturing, LLC; Santolubes Spartanburg Holdings, LLC; Siemens Corporation; Solvay Specialty Polymers USA, LLC; Solvay USA, LLC; Suminoe Textile of America Corporation; Supplyone Rockwell, Inc.; The Chemours Company; Tietex International, Ltd.; Ultimate Textile, Inc.; and Upstate Anodize, LLC,

*Defendants*.

C.A. No. 2024-CP-44-00558

**AMENDED SUMMONS**
(JURY TRIAL DEMANDED)

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED and required to answer the Amended Complaint in this action, a copy of which is hereby served on you, and to serve a copy of your Answer to the Amended Complaint on the subscriber at 291 S. Pine Street, Spartanburg, SC 29302, within 30 days after service hereof, exclusive of the day of such service, and if you fail to answer the

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Amended Complaint, judgment by default will be rendered against you for the relief demanded in

the Amended Complaint.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

June 4, 2025

2

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA
COUNTY OF UNION

IN THE COURT OF COMMON PLEAS
SIXTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

City of Union, South Carolina,

　　　　　　　　　　　　　　*Plaintiff*,
　　　　v.

AGC Chemicals Americas, Inc.; Archroma U.S., Inc.; Arkema, Inc.; Atotech USA, LLC; BASF Corporation; Clariant Corporation; Corteva, Inc.; Crown Health Care Laundry Services, LLC; Daikin America, Inc.; DuPont de Nemours, Inc.; EIDP, Inc.; Everest Textile USA, LLC; Georgia-Pacific Corrugated, LLC; Huntsman International, LLC; Isothermal Textile Services, LLC; Milliken & Company; Santolubes, LLC; Santolubes Manufacturing, LLC; Santolubes Spartanburg Holdings, LLC; Siemens Corporation; Solvay Specialty Polymers USA, LLC; Solvay USA, LLC; Suminoe Textile of America Corporation; Supplyone Rockwell, Inc.; The Chemours Company; Tietex International, Ltd.; Ultimate Textile, Inc.; and Upstate Anodize, LLC,

　　　　　　　　　　　　　　*Defendants*.

C.A. No. 2024-CP-44-00558

**AMENDED COMPLAINT**
(JURY TRIAL DEMANDED)

Plaintiff, CITY OF UNION, SOUTH CAROLINA, by and through the undersigned counsel, brings this action against the above-named Defendants for compensatory and punitive damages, injunctive relief, and abatement of a nuisance, and alleges as follows:

1

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**STATEMENT OF THE CASE**

1. Plaintiff, City of Union, South Carolina, brings this action to address Defendants' ongoing contamination of the Broad River and its tributaries and Plaintiff's properties with certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); perfluorohexane sulfonate ("PFHxS"); and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").

2. As Plaintiff has recently discovered, Defendants have discharged and continue to discharge products that contain or degrade to these PFAS to the Broad River and its tributaries, which travel downstream to Plaintiff's water intake, thereby contaminating Plaintiff's properties and the domestic water supply for approximately 6,100 water customers in Union County. Plaintiff seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated and ongoing PFAS contamination.

3. Plaintiff provides potable water to Union County residents. It owns and occupies two properties at issue in Union County. At 108 Calhoun Street, Union, South Carolina 29379, Plaintiff operates its surface water treatment plant ("SWTP") and related buildings, improvements, property, and equipment that make up its water treatment and distribution system. Plaintiff's other property abuts the Broad River at 1269 River Road, Lockhart, South Carolina 29364, where its water intake withdraws raw water from the Broad River for treatment at the SWTP before distribution to customers.

4. Defendants own and/or operate industrial facilities upstream of Plaintiff's water intake and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes ("Discharger

2

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Defendants") or otherwise supply these products to Discharger Defendants' manufacturing facilities ("Supplier Defendants"). Discharger Defendants then discharge wastewater contaminated with these products to surface waters in the Broad River upstream of Plaintiff's water intake, either directly or via certain wastewater treatment plants ("WWTPs"). These WWTPs include the A. Manning Lynch WWTP in Spartanburg, South Carolina; the Broad River WWTP in Gaffney, South Carolina; the Inman WWTP in Inman, South Carolina; the Forest City WWTP in Forest City, North Carolina; and the Spindale WWTP in Spindale, North Carolina.

5.     Industrial wastewater from Discharger Defendants' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes, are discharged to the Broad River or tributaries thereof, and flow downstream to Plaintiff's water intake on the Broad River. As a direct and proximate result of Defendants' actions, Plaintiff has suffered losses to the use and enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with dangerous concentrations of PFAS.

6.     Defendants' PFAS contaminate Plaintiff's water source at concentrations well exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, Defendants' PFAS.

7.     As a result of Defendants' intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring

3

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies at Plaintiff's SWTP that will remove Defendants' PFAS from drinking water. In addition, based on Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

## DISCLAIMER

8.     Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

9.     Plaintiff's causes of action against Everest Textile USA, LLC; Isothermal Textile Services, LLC; and Ultimate Textile, Inc. arise under North Carolina law. Plaintiff brings no cause of action against these Defendants under South Carolina law.

10.     Plaintiff's causes of action against the remaining Defendants arise under South Carolina law.

11.      Plaintiff brings no cause of action against, and seeks no relief from, any Defendant under federal law or statute.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to Article V of the Constitution of the State of South Carolina and sections 5-7-30 and 14-1-80 of the South Carolina Code.

13.     This Court has personal jurisdiction over all Defendants, consistent with due process and South Carolina's long-arm statute, section 36-2-803 of the South Carolina Code.

4

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

14.     Venue is also properly in this Court pursuant to sections 15-7-10 and -30 of the South Carolina Code because the subject of the action is for injuries sustained to Plaintiff's property located in Union County, and the most substantial part of Defendants' alleged acts or omissions giving rise to Plaintiff's claims occurred in Union County. *See id.* at § 15-7-30(B) ("If there is more than one defendant, the action may be tried in any county where the action properly may be maintained against one of the defendants pursuant to this section.").

## PARTIES

### I.    Plaintiff

15.     Plaintiff is a municipal corporation organized and existing under the laws of South Carolina. *See* S.C. CODE ANN. §§ 5-7-10, *et seq.*; 5-31-610. Through its Public Works Department, Plaintiff provides potable water services to its customers.

16.     Plaintiff owns two properties at issue. The first is located at 108 Calhoun Street Union, South Carolina 29379, where Plaintiff operates its SWTP. Approximately 10 miles to the northeast, Plaintiff owns land riparian to the Broad River, where it operates a surface water intake that supplies raw water to the SWTP.

17.     Plaintiff's SWTP provides potable water to residents of Union County.

### II.    Discharger Defendants

18.     Defendant **BASF Corporation ("BASF")** is a Delaware corporation that operates an industrial facility located at 3455 Southport Road, Spartanburg, South Carolina 29302. There, BASF uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of surfactants for personal care and cleaning applications. As part of its processes, the BASF facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch

5

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

WWTP cannot remove BASF's PFAS, which it discharges to the Pacolet River upstream of the Broad River and Plaintiff's surface water intake. BASF's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water source.

19.     Defendant **Crown Health Care Laundry Services, LLC ("Crown")** is a Delaware limited liability company authorized to do business in South Carolina. Crown owns and operates a commercial laundromat located at 355 Old Greenville Road, Spartanburg, South Carolina 29301, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals. As part of its processes, the Crown facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch WWTP cannot remove Crown's PFAS, which it discharges to the Pacolet River upstream of the Broad River and Plaintiff's surface water intake. Crown's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water source.

20.     Defendant **Everest Textile USA, LLC ("Everest")** is a North Carolina limited liability company that owns and operates an industrial facility located at 1331 W. Main Street, Forest City, North Carolina 28043. There, Everest uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of synthetic fabrics. As part of its processes, the Everest facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Forest City WWTP. The Forest City WWTP cannot remove Everest's PFAS, which it discharges to the Second Broad River, an upstream tributary of the Broad River, and Plaintiff's surface water intake. Everest's PFAS resist

6

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

environmental degradation, flow downstream from the Second Broad River into the Broad River, and thereby contaminate Plaintiff's properties and its water source.

21.     Defendant **Georgia-Pacific Corrugated, LLC ("GPC")** is a Delaware limited liability company authorized to do business in South Carolina. GPC owns and operates an industrial facility located at 3100 Southport Road, Spartanburg, South Carolina 29302. There, GPC uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of corrugated packaging products. As part of its processes, the GPC facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch WWTP cannot remove GPC's PFAS, which it discharges to the Pacolet River, an upstream tributary of the Broad River, and Plaintiff's water intake. GPC's PFAS resist environmental degradation, flow downstream from the Pacolet River into the Broad River, and thereby contaminate Plaintiff's properties and its water source.

22.     Defendant **Isothermal Textile Services, LLC ("ITS")** is a North Carolina limited liability company authorized to do business in South Carolina. ITS owns and operates an industrial facility located at 1148 Withrow Road, Spindale, North Carolina 28160. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in performing commercial laundry operations. As part of its processes, ITS's facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Spindale WWTP. The Spindale WWTP cannot remove ITS's PFAS, which it discharges to the Second Broad River upstream of Plaintiff's Broad River water intake. ITS's PFAS resist environmental degradation, flow downstream the Broad River, and thereby contaminate Plaintiff's property and its water source.

7

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

23.     Defendant **Milliken & Company ("Milliken")** is a Delaware corporation with its principal place of business in South Carolina. Milliken owns and operates at least four industrial facilities at issue in this case: the Magnolia Finishing Plant and Allen Plant, located respectively at 157 and 164 New Milliken Road, Blacksburg, South Carolina 29702; the Dewey Plant, located at 1440 Campton Road, Inman, South Carolina 29349; and the Spartanburg Headquarters, located at 920 Milliken Road, Spartanburg, South Carolina 29303. At each location, Milliken uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in textile finishing, chemical manufacturing, and additional operations in the textile industry. As part of their processes, each Milliken facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to surface waters: the Magnolia Finishing Plant and Allen Plant to the Broad River via direct discharge; the Dewey Plant to Lawson's Fork Creek, an upstream tributary of the Broad River, via the Inman WWTP; and the Spartanburg Headquarters to the Pacolet River, an upstream tributary of the Broad River, via the A. Manning Lynch WWTP. The Inman and A. Manning Lynch WWTPs cannot remove Milliken's PFAS, which they discharge upstream of the Broad River and Plaintiff's water intake. Milliken's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water source.

24.     Defendants **SantoLubes, LLC** and **SantoLubes Manufacturing, LLC** are Delaware limited liability companies; and **SantoLubes Spartanburg Holdings, LLC** is a South Carolina limited liability company **(collectively, "SantoLubes")**, each of which are authorized to do business in South Carolina. SantoLubes owns and operates an industrial facility located 2155 West Croft Circle, Spartanburg, South Carolina 29302. There, SantoLubes uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

manufacture of lubricants and specialty chemicals. As part of its processes, the SantoLubes facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch WWTP cannot remove SantoLubes' PFAS, which it discharges to the Pacolet River, an upstream tributary of the Broad River, and Plaintiff's water intake. SantoLubes' PFAS resist environmental degradation, flow downstream from the Pacolet River to the Broad River, and thereby contaminate Plaintiff's properties and its water source.

25.     Defendant **Siemens Corporation ("Siemens")** is a Delaware corporation authorized to do business in South Carolina. Siemens owns and operates an industrial facility located at 1320 Old Georgia Road, Roebuck, South Carolina 29376. There, Siemens uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of electrical products. As part of its processes, the Siemens facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch WWTP cannot remove Siemens' PFAS, which it discharges to the Pacolet River, an upstream tributary of the Broad River, and Plaintiff's water intake. Siemens' PFAS resist environmental degradation, flow downstream from the Pacolet River to the Broad River, and thereby contaminate Plaintiff's properties and its water source.

26.     Defendant **Solvay USA, LLC ("Solvay USA")** is a Delaware limited liability company authorized to do business in South Carolina. Solvay USA operates a facility located at 399 Sims Chapel Road, Spartanburg, South Carolina 29306. There, Solvay USA uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of surfactants and other chemical products. As part of its processes, the Solvay USA facility discharges industrial wastewater contaminated with products that contain or degrade to

9

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch WWTP cannot remove Solvay USA's PFAS, which it discharges to the Pacolet River upstream of the Broad River and Plaintiff's water intake. Solvay USA's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and water source.

27.     Defendant **Suminoe Textile of America Corporation ("Suminoe")** is a South Carolina corporation that owns and operates an industrial facility located at 10 Commerce Drive, Gaffney, South Carolina 29340. There, Suminoe uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of its processes, the Suminoe facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Broad River WWTP. The Broad River WWTP cannot remove Suminoe's PFAS, which it discharges to Peoples Creek, an upstream tributary of the Broad River, and Plaintiff's water intake. Suminoe's PFAS resist environmental degradation, flow downstream from Peoples Creek into the Broad River, and thereby contaminate Plaintiff's properties and its water source.

28.     Defendant **SupplyOne Rockwell, Inc. ("SupplyOne")** is a Virginia corporation authorized to do business in South Carolina. SupplyOne operates an industrial facility located at 1360 Old Georgia Road, Roebuck, South Carolina 29376. There, SupplyOne uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX in the manufacture of packaging products. As part of its processes, the SupplyOne facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch WWTP cannot remove SupplyOne's PFAS, which it discharges to the Pacolet River, a tributary upstream of the Broad River, and Plaintiff's water

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

intake. SupplyOne's PFAS resist environmental degradation, flow downstream from the Pacolet River into Broad River, and thereby contaminate Plaintiff's properties and water source.

29.     Defendant **Tietex International, Ltd. ("Tietex")** is a South Carolina corporation that owns and operates an industrial facility located at 3010 N. Blackstock Road, Spartanburg, South Carolina 29301. There, Tietex uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of nonwoven fabric products. As part of its processes, the Tietex facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the A. Manning Lynch WWTP. The A. Manning Lynch WWTP cannot remove Tietex's PFAS, which it discharges to the Pacolet River upstream of the Broad River, and Plaintiff's water intake. Tietex's PFAS resist environmental degradation, flow downstream from the Pacolet River to the Broad River, and thereby contaminate Plaintiff's properties and its water source.

30.     Defendant **Ultimate Textile, Inc. ("UTI")** is a North Carolina corporation that owns and operates an industrial facility located at 1437 US-221, Rutherfordton, North Carolina 28139. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in textile manufacturing and related operations. As part of its processes, UTI's facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Spindale WWTP. The Spindale WWTP cannot remove UTI's PFAS, which it discharges to the Second Broad River upstream of Plaintiff's Broad River water intake. UTI's PFAS resist environmental degradation, flow downstream the Broad River, and thereby contaminate Plaintiff's property and its water source.

31.     Defendant **Upstate Anodize, LLC ("Upstate")** is a South Carolina limited liability company authorized to do business in South Carolina. Upstate owns and operates an industrial

11

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

facility located at 2215 Beech Street, Gaffney, South Carolina 39240. There, Upstate uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in metal finishing operations. As part of its processes, the Upstate facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Broad River WWTP. The Broad River WWTP cannot remove Upstate's PFAS, which it discharges to Peoples Creek, an upstream tributary of the Broad River, and Plaintiff's water intake. Upstate's PFAS resist environmental degradation, flow downstream from Peoples Creek to the Broad River, and thereby contaminate Plaintiff's properties and its water source.

### III.    Supplier Defendants

32.    Defendant **AGC Chemicals Americas, Inc. ("Asahi")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Asahi has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

33.    Defendant **Arkema, Inc. ("Arkema")** is a Pennsylvania corporation authorized to do business in South Carolina. Among other acts and omissions, Arkema has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

34.    Defendant **Atotech USA, LLC ("Atotech")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Atotech has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more Discharger Defendants in this Action.

12

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

35.     Defendant **Clariant Corporation ("Clariant")** is a New York corporation authorized to do business in South Carolina. Among other acts and omissions, Clariant has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

36.     Defendant **Archroma U.S., Inc. ("Archroma")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Archroma has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

37.     Defendant **Daikin America, Inc. ("Daikin")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Daikin has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

38.     Defendant **EIDP, Inc. ("Old DuPont")**, f/k/a E.I. du Pont de Nemours and Company, is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Old DuPont has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

39.     Defendant **The Chemours Company ("Chemours")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Chemours has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

13

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

40.     Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, Corteva has assumed PFAS-related liabilities from Old DuPont.

41.     Defendant **DuPont de Nemours, Inc. ("New DuPont")**, f/k/a DowDuPont, Inc., is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, New DuPont has assumed PFAS-related liabilities from Old DuPont.

42.     Defendant **Huntsman International, LLC ("Huntsman")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Huntsman has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

43.     Defendant **Solvay Specialty Polymers USA, LLC ("Solvay")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Solvay has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

44.     PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

45.     The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are

14

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

colloquially termed "forever chemicals," as terminal PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

46.    There are both polymer and non-polymer PFAS. Non-polymer PFAS include substances like PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals). Polymer PFAS include fluoropolymers and side-chain fluorinated polymers that are often the active chemistry in the PFAS-containing products sold and utilized by Defendants.

47.    There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS—meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are all terminal PFAS.

48.    Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

49.    Further, PFAS are manufactured by either electrochemical fluorination ("ECF") or telomerization.

50.    PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water. Exposure is dose-additive, meaning that exposure to low levels of multiple PFAS, which

15

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

individually would pose little or no risk, can result in a combined dose capable of causing adverse health effects.

51.     While there are thousands of different PFAS chemicals, current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, PFBS, and GenX Chemicals. Depending on the type of PFAS, negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

52.     PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues even in the United States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

53.     Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace "long-chain" PFAS like PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and environmentally persistent, and some short-chain PFAS products nevertheless still contain PFOA and PFOS and their precursors. Terminal short-chain PFAS include PFBS and GenX Chemicals.

54.     Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS.[1] The advisory levels at that time

---

[1] U.S.E.P.A., Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS) (Jan. 8, 2009), *available at* https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems."[2]

55.     On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water.[3] Superseding the 2009 provisional levels, the 2016 levels for PFOA and PFOS were 70 ppt, independently or in the aggregate. EPA explained that its new health advisories "identify the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."[4]

56.     EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including

---

[2] *Id.*

[3] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016).

[4] *Id.*

17

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals."[5]

57.     On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels.[6] EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"—finding "associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer."[7] Concerned with the public health implications of its data, EPA issued interim levels pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

58.     Simultaneously, EPA also issued health advisories for the first time covering PFBS and GenX Chemicals. EPA reported that "GenX Chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer."[8] For PFBS, it noted studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

---

[5] *Id.*

[6] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

[7] *Id.*

[8] *Id.*

18

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

59.     In March of 2023, EPA issued proposed maximum contaminant levels ("MCLs") and maximum contaminant level goals ("MCLGs") for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals.[9] An MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

60.     At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."[10] Therefore, it proposed MCLG levels for both chemicals at zero ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found."[11]

61.     Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PFHxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA:

---

[9] PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142).

[10] *Id.*

[11] *Id.*

19

10 ppt; PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety."[12] If greater than 1.0, then "potential risk is indicated."[13]

62.     EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses."[14]

63.     EPA finalized its proposed MCLs and MCLGs on April 10, 2024.[15] In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children."[16]

64.     The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to

---

[12] *Id.*

[13] *Id.*

[14] U.S.E.P.A., *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution* (Dec. 14, 2023), *available at* https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

[15] U.S.E.P.A., PFAS Nat'l Primary Drinking Water Regulation Rulemaking (Apr. 10, 2024), *available at* https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version).

[16] U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024); *see also* U.S.E.P.A., Final PFAS Nat'l Drinking Water Regulation Landing Page, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

these two PFAS without risk of health impacts."[17] According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk."[18]

65.    EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations.

66.    EPA's April 10, 2024 regulation imposed a deadline of 2027 for Plaintiff to begin conducting and reporting regular PFAS monitoring and a deadline of 2029 for Plaintiff to comply with all MCLs.

67.    On May 14, 2025, EPA affirmed its intention to maintain the April 10, 2024 regulation MCLs and MCLGs for PFOA and PFOS, but it announced plans to propose extending the MCL compliance deadline by two years, to 2031, "[t]o allow drinking water systems more time to develop plans for addressing PFOA and PFOS where they are found and implement solutions."[19] Although EPA announced its intention to rescind the MCLs concerning PFNA, PFHxS, and GenX Chemicals, as well as the Hazard Index covering mixtures of PFBS, PFNA, PFHxS, and GenX Chemicals, it did so "to ensure that the determinations and any resulting drinking water regulation follow the legal process laid out in the Safe Drinking Water Act.," and EPA did not retract its prior statement that the science shows that exposure to these types of PFAS

---

[17] U.S.E.P.A., *Presentation: Overview EPA PFAS NPDWR* (Apr. 10, 2024).

[18] U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024).

[19] U.S.E.P.A., *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS* (May 14, 2025), *available at* https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos [hereinafter *EPA 2025 MCL Announcement*].

is linked to significant health risks.[20] At the same time, EPA expressed the importance of protecting public health and "ensur[ing] that polluters are held responsible."[21]

68.     EPA's recent announcement stated that "EPA plans to issue a proposed rule this fall and finalize this rule in the Spring of 2026."[22] Under the April 10, 2024 final National Primary Drinking Water Regulation, Plaintiff must begin conducting and reporting regular PFAS monitoring by 2027, and Plaintiff must comply with all MCLs by 2029. EPA's planned rule would extend Plaintiff's MCL compliance deadline for PFOA and PFOS from 2029 to 2031.

## II.     Contamination of the Broad River and Plaintiff's Water Supply with PFAS

69.     Plaintiff's surface water intake rests on the Broad River in Union County, South Carolina, which draws water from the river for treatment at Plaintiff's SWTP before distribution to customers.

70.     Discharger Defendants' industrial facilities, and/or their applicable WWTPs, operate along the Broad River or one of its tributaries upstream of Plaintiff's water intake.

71.     PFAS sampling of the Broad River upstream of Plaintiff's water intake confirms the presence of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals throughout the river system. These PFAS flow downstream and contaminate the water at Plaintiff's water intake at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intake confirms the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source.

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

22

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

72.    Discharger Defendants are, or were, owners and operators of manufacturing plants upstream of Plaintiff's water intake. In their industrial processes, Discharger Defendants utilize, or utilized, products that contain or degrade to PFOS, PFOA, PFHxS, PFNA, PFBS, and/or GenX Chemicals. Discharger Defendants' industrial processes generate industrial wastewater containing these PFAS, which Discharger Defendants ultimately discharge to surface waters upstream of Plaintiff's water intake.

73.    Defendants' PFAS and their precursors flow downstream to Plaintiff's water intake, damaging Plaintiff's property and contaminating its water source.

74.    All Defendants knew or should have known that conventional water treatment technologies used by direct discharger Defendants and WWTPs cannot remove PFAS from wastewater. All Defendants also knew or should have known that their treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

75.    Despite knowing of the adverse health and environmental effects of PFAS, particularly the chemicals' capacity to endanger drinking water supplies when released to surface waters, Supplier Defendants did not require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's properties.

76.    Plaintiff's SWTP utilizes conventional water treatment technologies to treat raw water, none of which remove PFAS. Instead, Plaintiff's SWTP requires new water treatment technologies to do so.

77.    All Defendants knew or should have known that conventional treatment technologies used by public water systems like Plaintiff's cannot remove Defendants' PFAS from water that is treated and distributed as potable drinking water.

23

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**III.    Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

78.    All Defendants have long known that PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic; that they cannot be removed by conventional water and wastewater treatment methods; and that there is no safe dose for PFOA and PFOS.

79.    Old DuPont pioneered the field of PFAS chemistry in the middle of the twentieth century, and it was long a leader in the industry. Old DuPont's knowledge of the properties of PFAS, including knowledge of the compounds' chemistry, toxicology, environmental fate, and effects on human health has been virtually unmatched, typically exceeding that of government regulators, the scientific community, and the public.

80.    Old DuPont has maintained an in-house staff of doctors, environmental engineers, industrial hygienists, and scientists in health-related fields, as well as a corporate industrial medicine program. Old DuPont was thus well equipped to understand the potential dangers of exposing people to PFAS via drinking water.

81.    By the early 1960s, Old DuPont understood PFOA and PFNA to be toxic based on studies that found exposure to the chemicals to increase liver size in rats, and by the mid-1960s, if not earlier, Old DuPont knew that PFOA could leach from waste into water and groundwater.

82.    In 1978, Old DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. Old DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but it did not disclose this to the public or to EPA. Three years later, Old DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works

24

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

facility near Parkersburg, West Virginia, where PFOA concentrations exceeded Old DuPont's own Community Exposure Guideline.

83.     In 1991, Old DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The prior study showed elevated liver enzymes in the blood of Old DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, Old DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

84.     By 1999, at the latest, Old DuPont knew that PFOA was present in its products based on telomer PFAS chemistry.

85.     In or around December 2005, Old DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, Old DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, Old DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." Old DuPont made those statements against the advice of its own Epidemiology Review Board, which urged it not to make public statements asserting that PFOA does not pose any health risks. In 2005, EPA levied a record-setting $16.5 million civil penalty against Old DuPont for failing to disclose to EPA information about the health risks of PFOA and about the company's environmental releases of PFOA in West Virginia and Ohio.

86.     For decades, Old DuPont purchased the PFOA it used in the manufacture of Teflon and other products from 3M Company ("3M").

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

87.     In May 2000, 3M announced it would phase out its manufacture and sale of products based on long-chain PFAS, including PFOA and PFOS, by 2002. In its public announcement of the phaseout, 3M cited the chemicals' environmental persistence and its finding that PFOS was present in the blood of the general public.

88.     In response to 3M's phaseout announcement, and despite the public concerns 3M cited for its phaseout decision and Old DuPont's own internal knowledge of the risks to human health and the environment posed by PFOA, Old DuPont did not cease using PFOA or eliminate PFOA from its products. Instead, Old DuPont opened its own plant to manufacture PFOA to use in the manufacture of Old DuPont's products.

89.     As demonstrated by its material safety data sheet for PFOA, Old DuPont knew PFOA required disposal by incineration by at least 1991.

90.     Old DuPont participated in the Telomer Research Program ("TRP") that was convened by EPA in the early 2000s to coordinate research and data on PFOA and PFAS manufactured by the telomerization process. The TRP consisted of the leading telomer-based PFAS manufacturers. Through its participation in the TRP, Old DuPont obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

91.     In 2015, Old DuPont spun off its Performance Chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as the environmental liabilities) to Chemours. Chemours inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

26

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

92. Huntsman uses PFAS manufactured by other Supplier Defendants, including Old DuPont and Chemours, to blend with other non-PFAS components in the manufacture of the PFAS products it sells. Upon information and belief, Huntsman has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

93. Daikin is a subsidiary of Daikin Industries, Ltd., which has been in the PFAS business in Japan since the 1940s. It entered the U.S. market in the early 1990s, establishing manufacturing operations in Decatur, Alabama, adjacent to 3M's plant there.

94. Daikin purchased PFOA from 3M for use as a processing chemical in its manufacture of fluoropolymers. Daikin knew from the early 1990s that PFOA was carcinogenic, bioaccumulative, environmentally persistent, and soluble in water.

95. Though fully aware of the reasons that 3M decided to withdraw its products based on long-chain PFAS in 2000, Daikin rushed to fill as much of the PFAS market left by 3M as possible, with the specific intent to prevent customers from shifting to non-PFAS products.

96. Underscoring its position as one of the world's leading PFAS manufacturers, Daikin participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

97. Daikin was well aware of the need to incinerate or otherwise treat wastewater to remove PFAS; indeed, Daikin practiced incineration for the PFAS-containing wastewater generated at its Decatur, Alabama facility by or around the mid-2000s.

27

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

98. Asahi is a subsidiary of AGC, Inc., f/k/a Asahi Glass Co., Ltd., a Japanese company that has manufactured and sold PFAS products since at least the 1970s. Upon information and belief, Asahi has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

99. Underscoring its position as one of the world's leading PFAS manufacturers, Asahi participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

100. Arkema is a subsidiary of Arkema S.A., a French company formed in 2004 from a reorganization of Total S.A.'s chemicals business. Arkema S.A. and its predecessors have been manufacturing PFAS since at least the 1950s. Upon information and belief, Arkema has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

101. Atotech uses PFAS manufactured by other Supplier Defendants to blend with other non-PFAS components in the manufacture of the PFAS products it sells. Upon information and belief, Atotech has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOS, and/or their precursors, are present in the products it manufactures and sells.

28

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

102. Atotech was aware of the environmental and human health concerns that 3M cited in its phaseout of PFOS-based products from the U.S. market, yet for years after 3M's phaseout announcement it continued to supply products it knew contained or could degrade to PFOS.

103. Clariant was formed in 1995 and was previously known as Sandoz Chemical Corporation and as Sodeyco, Inc. Upon information and belief, Clariant has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

104. Underscoring its position as one of the world's leading PFAS manufacturers, Clariant participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

105. Archroma was formed in 2013 through the sale of Clariant's textile, paper, and emulsions business to SK Capital Partners. Archroma inherited Clariant's expertise, resources, and knowledge of PFAS.

106. Solvay is the successor of Solvay Solexis, Inc. and Ausimont USA, Inc. Upon information and belief, Solvay has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells. At its Gloucester County, New Jersey facility, Solvay's use of PFOA and PFNA in the manufacture of fluoropolymer products has caused severe contamination of drinking water, surface waters, groundwater, and soils in the surrounding vicinity. In 2023, Solvay

29

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

settled a lawsuit brought by the State of New Jersey arising from this contamination for $393 million.

107. Safe or safer nonfluorinated alternatives to PFAS-based products exist, as demonstrated by some of Supplier Defendants' own current product offerings. Such nonfluorinated alternatives could have been commercially viable much earlier (and the harm to Plaintiff mitigated) if Supplier Defendants had not chosen to ignore the clear evidence of health and environmental dangers they possessed many years ago.

108. Despite Supplier Defendants' knowledge that their products contained or degraded to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals; that these PFAS were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove their PFAS from wastewater; and that Discharger Defendants discharged these PFAS to the Broad River, damaging and interfering with Plaintiff's property rights and public health, Supplier Defendants continued to sell products containing or degrading to these PFAS to Discharger Defendants. Specifically:

(a) Asahi continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Asahiguard and Surflon;

(b) Arkema continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Kynar;

(c) Atotech continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Fumetrol;

(d) Clariant continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva;

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

(e)     Archroma continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva and Fluowet;

(f)     Daikin continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Unidyne;

(g)     Old DuPont continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Teflon, Zonyl, and Capstone;

(h)     Chemours continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Capstone;

(i)     Huntsman continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Phobol and Oleophobol; and

(j)     Solvay continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Algoflon and Halar.

## IV.    Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.

109.    At all times relevant hereto, Supplier Defendants were directly involved in, and exercised control over, Discharger Defendants' use, handling, application, and disposal of Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

110.    Supplier Defendants specified the type and amount of PFAS-containing products to be used or applied, and the manner in which PFAS-containing products were to be used or applied, at Discharger Defendants' facilities upstream from Plaintiff's intake on the Broad River.

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

111.    Supplier Defendants designed and provided equipment for the use of their PFAS-containing products at Discharger Defendants' facilities upstream from Plaintiff's intake on the Broad River.

112.    Supplier Defendants jointly conducted research with Discharger Defendants for new PFAS-containing products as well as methods of using or applying these products.

113.    Supplier Defendants monitored the products manufactured by Discharger Defendants for the amount of PFAS-containing products used in the manufacture of Discharger Defendants' products in order to ensure those products met Supplier Defendants' specifications on the amount of PFAS-containing products to be used or applied.

114.    Some Supplier Defendants, including Archroma, Arkema, Huntsman, and Solvay, maintained offices and/or laboratories near Discharger Defendants' facilities upstream from Plaintiff's intake on the Broad River, and all Supplier Defendants were in constant contact with the Discharger Defendants concerning the use, handling, application, and disposal of their PFAS-containing products.

115.    Employees of the Supplier Defendants were routinely present in Discharger Defendants' facilities to provide direction, support, and technical assistance concerning the use, handling, application, and disposal of Supplier Defendants' PFAS-containing products.

116.    Supplier Defendants provided information to the Discharger Defendants concerning the health and environmental impacts of Supplier Defendants' PFAS-containing products, and the Discharger Defendants, at least in part, relied on this information.

117.    Supplier Defendants were familiar with the wastewater disposal practices of the Discharger Defendants' facilities, including that a portion of the Supplier Defendants' PFAS-containing products went into the Discharger Defendants' wastewater streams and that the

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

treatment methods used by the Discharger Defendants' on-site treatment works and receiving WWTPs could not remove Defendants' PFAS from the effluent. Supplier Defendants nevertheless failed to require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's property. Supplier Defendants continued to sell their PFAS-containing products to Discharger Defendants they knew or should have known were disposing of the products in an environmentally irresponsible manner.

118.    Supplier Defendants have been aware for many years of the presence of their PFAS chemicals in the Broad River and its tributaries upstream of Plaintiff's intake.

## V.    Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.

119.    Supplier Defendants actively worked to suppress and delay scientific understanding and government regulation of PFAS by, among other things, suppressing and altering critical internal studies documenting the harms of their PFAS-containing products, distorting public discourse on and downplaying the harmful effects of PFAS, misleading EPA on the safety of their PFAS-containing products and PFAS more generally, and hiring leaders in the scientific community to exert influence and suppress unwanted information contrary to their position.

120.    Supplier Defendants, by agreement and/or tacit understanding between them, each knowingly pursued a common plan and design and/or acted in concert to market and promote products they knew to be dangerous to the environment and human health. Supplier Defendants engaged in concerted conduct for the purpose of suppressing, concealing, and minimizing information on the risks to human health and the environment posed by PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and for the purpose of delaying, obstructing, and interfering with regulators' investigation and regulation of these chemicals.

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

121. The delay in PFAS regulation resulted directly from Supplier Defendants' concerted efforts, over decades, to conceal critical studies from the scientific community and simultaneously introduce studies and media downplaying the adverse effects of PFAS.

## VI. Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.

122. By 2013, Old DuPont understood that it faced massive, mounting environmental liabilities arising from its decades-long manufacture, use, marketing, sale, and distribution of PFAS, likely totaling in the billions of dollars.

123. Beginning in or around 2013, Old DuPont sought to isolate these PFAS-related liabilities from its billions of dollars in valuable assets and to evade responsibility for the environmental harms it caused. This scheme unfolded over several years and involved the creation of multiple new corporate entities.

124. The first major step in this scheme was the 2015 spinoff of Chemours, a newly formed entity that received Old DuPont's Performance Chemicals business. Along with this transfer, Old DuPont saddled Chemours with a significant portion of Old DuPont's environmental liabilities.

125. Per the separation agreement between Old DuPont and Chemours, Chemours assumed liabilities related to Old DuPont's manufacture, use, and sale of PFAS and agreed to indemnify Old DuPont against all liabilities associated with the Performance Chemicals business—regardless of when those liabilities arose and against whom those liabilities are asserted or determined.

126. Internally, Old DuPont knew that Chemours lacked the financial resources to adequately cover the PFAS-related liabilities Old DuPont had transferred to Chemours.

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

127.    In 2017, Old DuPont completed a merger with The Dow Chemical Company ("Old Dow") to create DowDuPont, Inc. This so-called "merger of equals" was carefully structured to avoid exposing Old Dow's assets to Old DuPont's PFAS liabilities. Rather than a true integration, this transaction served as a temporary restructuring vehicle by which Old DuPont sought to further separate the company's valuable assets from its PFAS liabilities and other environmental obligations.

128.    Following the merger, assets were stripped out of Old DuPont and transferred to DowDuPont, which then mixed and combined the assets of Old DuPont with the assets of Old Dow. DowDuPont then recognized its business into three distinct business segments: Agriculture, Materials Science, and Specialty Products.

129.    This restructuring paved the way for the creation of three independent companies by 2019: (1) Corteva, which holds the Agriculture business and became the parent holding company of Old DuPont; (2) Dow, Inc. ("New Dow"), which holds the Materials Science business and became the parent company of Old Dow; and (3) DuPont de Nemours, Inc. (i.e., New DuPont), which was formerly known as DowDuPont and retained the Specialty Products business as well as some non-core business segments and product lines once belonging to Old DuPont.

130.    Pursuant to the separation agreement between Corteva, New Dow, and DowDuPont/New DuPont, Corteva and New DuPont have each assumed responsibility for certain Old DuPont liabilities, including Old DuPont liabilities related to PFAS.

## VII.    Defendants Have Harmed Plaintiff and Plaintiff's Community.

131.    Discharger Defendants have, for decades, discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Broad River and its tributaries, which have caused, and continue to cause, contamination of these waters with PFAS chemicals exceeding

35

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

EPA's current health advisories, MCLGs, and MCLs. Indeed, absent new treatment technologies, Plaintiff cannot use its properties and exercise its property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

132.    Supplier Defendants have supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, while knowing that Discharger Defendants discharge wastewater laden with these PFAS to wastewater treatment facilities that cannot remove them from the wastewater before it is discharged to the Broad River upstream of Plaintiff's water intakes.

133.    Defendants' conduct has proximately caused the contamination of the Broad River and of Plaintiff's land, its SWTP, and its water treatment and distribution systems with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals—including PFOA and PFOS at concentrations above EPA's MCLGs and MCLs.

134.    Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in acts and omissions that have proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties and its right to use the waters of the Broad River, and has caused Plaintiff additional past, present, and future injury to property.

135.    Despite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, PFBS, and GenX Chemicals are hazardous to human health,

(a)    Discharger Defendants, directly or indirectly, discharged industrial wastewater contaminated with these chemicals into the Broad River or tributaries thereof, which they knew or should have known contaminated Plaintiff's property; and

36

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

(b)    Supplier Defendants continued to supply these chemicals to Discharger Defendants, knowing that they discharged these chemicals into the Broad River or tributaries thereof, which Supplier Defendants knew or should have known contaminated Plaintiff's property.

## FIRST CAUSE OF ACTION

### Private Nuisance

136.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

137.    Plaintiff is a municipal corporation engaged in constructing, operating, maintaining, improving, and extending a water treatment and distribution system for residents of Union County. It uses its properties for those purposes, including the withdrawal of raw water from the Broad River, the treatment of raw water into potable drinking water, and the distribution of treated potable drinking water to customers in Union County.

138.    Plaintiff owns riparian property abutting the Broad River, and Plaintiff has a riparian property right in the reasonable use of these waters, including for the provision of water to its customers.

139.    Through the conduct described herein, Defendants created, contributed to, and/or maintained a nuisance; that is, the contamination of the Broad River, with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals at concentrations exceeding those EPA deems unsafe for consumption.

140.    Due to Defendants' contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

141.    Defendants' contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties,

37

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

interferes with Plaintiff's properties and its property rights and riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

142.    Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

143.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to Defendants' contamination of the Broad River and Plaintiff's property, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

144.    In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

145.    The ongoing contamination of the Broad River and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its use of the Broad River to supply potable water to its customers.

146.    Defendants' interference with Plaintiff's use of its properties can be abated by funding the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

147.    Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## SECOND CAUSE OF ACTION

### Public Nuisance

148.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

149.    Plaintiff is a municipal corporation engaged in constructing, operating, maintaining, improving, and extending a water treatment and distribution system for residents of Union County. It uses its properties for those purposes, including the withdrawal of raw water from the Broad River, the treatment of raw water into potable drinking water, and the distribution of treated potable drinking water to customers in Union County.

150.    Plaintiff's customers use the water Plaintiff provides for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

151.    Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use—and thus free from contamination by Defendants' PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX Chemicals. Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

152.    Plaintiff has sustained special injuries as a result of Defendants' public nuisance, including but not limited to, the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by EPA; expenses associated with the evaluation, testing, acquisition, installation, operation, and maintenance of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of Defendants' contamination; interference with Plaintiff's right to use the Broad River; interference with the use of Plaintiff's SWTP and water treatment and distribution systems; and lost revenue.

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

153. As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to Defendants' contamination of the Broad River and Plaintiff's properties.

154. Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

155. As a result of the nuisance caused by Defendants, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

156. In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

157. Defendants' ongoing contamination constitutes a continuing threat to public health, safety, and order, and it constitutes irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

158. Defendants' contamination of potable water with unsafe concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

40

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

159.    Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, the costs of abatement in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

**THIRD CAUSE OF ACTION**

**Trespass**

160.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

161.    Plaintiff owns, possesses, and actively exercises its right to use its land, SWTP, and related buildings, improvements, property, and equipment that make up its water treatment and distribution systems.

162.    Discharger Defendants intentionally discharged and continue to discharge PFAS and/or PFAS-containing products to their applicable WWTPs, respectively, notwithstanding that they knew and/or reasonably should have known that:

(a)    these WWTPs cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging to surface waters upstream of Plaintiff's water intake on the Broad River;

(b)    Plaintiff draws water from the Broad River for the provision of safe potable water to its customers;

(c)    water Plaintiff draws from the Broad River is contaminated with the PFAS and/or PFAS-containing products these Defendants discharge to these WWTPs; and, thereby,

(d)    water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

163.    Defendant Milliken intentionally and directly discharged and continues to directly discharge PFAS and/or PFAS-containing products to the Broad River from the Magnolia Finishing

41

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Plant and Allen Plant, notwithstanding that Milliken knew and/or reasonably should have known that:

(a)     the wastewater treatment methods used by Milliken cannot remove its PFAS and/or PFAS-containing products from wastewater before discharging it to the Broad River;

(b)     Plaintiff draws water from the Broad River for the provision of safe potable water to its customers;

(c)     water Plaintiff draws from the Broad River is contaminated with the PFAS and/or PFAS-containing products that Milliken discharges to the Broad River; and, thereby,

(d)     water contaminated with Milliken's PFAS and/or PFAS-containing products invades Plaintiff's properties.

164.    Supplier Defendants intentionally supplied and continued to supply PFAS-containing products to Discharger Defendants notwithstanding that Supplier Defendants knew and/or reasonably should have known that:

(a)     Discharger Defendants discharged and continue to discharge, directly or indirectly, Supplier Defendants' PFAS-containing products and/or PFAS to on-site wastewater treatment facilities or publicly owned WWTPs that cannot remove Supplier Defendants' PFAS-containing products and/or PFAS from wastewater before discharge to the Broad River;

(b)     Plaintiff draws water from the Broad River for the provision of safe potable water to its customers;

42

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

(c)     water Plaintiff draws from the Broad River is contaminated with Supplier Defendants' PFAS-containing products and/or PFAS that Discharger Defendants directly or indirectly discharged to each river; and, thereby

(d)     water contaminated with high concentrations of Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

165.     Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals at concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

166.     Defendants' invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

167.     Discharger Defendants intend that, while using PFAS in their industrial processes, PFAS-containing wastewater generated by those processes be discharged to their applicable WWTPs. Defendant Milliken further intends and/or intended that, while using PFAS in its industrial processes at the Magnolia Finishing Plant and Allen Plant, PFAS-containing wastewater be directly discharged to the Broad River. Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

168.     Supplier Defendants intend that Discharger Defendants, while using Supplier Defendants' PFAS-containing products in their industrial processes, dispose of the resulting wastewater contaminated with Supplier Defendants' PFAS-containing products by directly or indirectly discharging it to surface waters. Supplier Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

43

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

169. Defendants' conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTP, and related buildings, improvements, property, and equipment that make up its water treatment and distribution systems. The damage to Plaintiff's properties is the direct and proximate result of Defendants' intentional conduct.

170. As a direct, proximate, and foreseeable result of Defendants' trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

171. Defendants' ongoing trespasses can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

<u>**FOURTH CAUSE OF ACTION**</u>

**Negligence, Gross Negligence, and/or Recklessness**

172. Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

173. Discharger Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the direct and/or indirect discharge of these PFAS into surface waters upstream of Plaintiff's SWTP, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

174. Discharger Defendants knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their

44

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

PFAS; and that surface waters—including the Broad River—were vulnerable to the contamination that has taken and now takes place.

175.    Discharger Defendants nonetheless negligently, recklessly, wantonly, and/or willfully breached their duty in causing products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to escape their premises and contaminate the Broad River, thereby interfering with Plaintiff's property rights and injuring Plaintiff's properties.

176.    Supplier Defendants have a duty to use due care in the manufacturing, formulation, handling, control, disposal, labeling, and creation and dissemination of requirements and instructions for the use and disposal of products containing or that degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to ensure the proper use and disposal of these products and prevent their improper use and disposal.

177.    Supplier Defendants had superior knowledge that their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contained in or degrading from their products were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove these PFAS; that conventional water treatment technologies utilized by water systems like Plaintiff's could not remove these PFAS; and that surface waters, including the Broad River, were vulnerable to the contamination that now takes place.

178.    By continually supplying their PFAS-containing products without providing their customers with proper instruction and/or direction on appropriate PFAS disposal measures, or otherwise preventing the discharge of their PFAS to surface waters, Supplier Defendants breached their duty of care and negligently, recklessly, wantonly, and willfully created the risk that their

45

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

PFAS would contaminate the Broad River, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

179.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including but not limited to loss in value; the cost of removing Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Defendants' PFAS; and other damages to be proved at trial.

180.    Defendants are jointly and severally liable to Plaintiff for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

### FIFTH CAUSE OF ACTION

#### Strict Products Liability – Failure to Warn
#### (Supplier Defendants)

181.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

182.    Supplier Defendants design, manufacture, formulate, promote, market, and/or distribute products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

183.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals are used by Discharger Defendants in a reasonably foreseeable manner and without substantial change in the condition of such products, and Supplier Defendants knew that Discharger Defendants purchase and use their products without inspection for defects.

46

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

184.    Supplier Defendants knew that the use of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals purchased or otherwise acquired from them would result in their products being discharged to surface waters, and thereby enter and contaminate the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

185.    Supplier Defendants knew that their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were environmentally persistent and bioaccumulative, that not all of their products are exhausted or adhere in Discharger Defendants' applications, that a portion of their products enter wastewater and are thus discharged via Discharger Defendants' sewer pipes, and that wastewater treatment facilities utilize conventional wastewater treatment methods that cannot remove their products from wastewater before it is discharged to surface waters that Plaintiff relies on to supply potable water to the public, making Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals unreasonably dangerous.

186.    Despite the known and/or foreseeable risk of contaminating potable water sources and Plaintiff's properties, Supplier Defendants fail to provide adequate warnings to Discharger Defendants and other users or to take any other precautionary measure to mitigate these hazards.

187.    Supplier Defendants fail to adequately describe such dangers or provide precautionary statements regarding such hazards, and they fail to provide instruction or direction on the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the labeling of their products.

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

188.    As a direct and proximate result of Supplier Defendants' failure to warn of the dangers and hazards posed by discharging their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, such PFAS have damaged Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

189.    As a direct, proximate, and foreseeable result of Supplier Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

190.    Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## SIXTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

191.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

192.    PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

48

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

193.    Supplier Defendants manufactured, formulated, handled, sold, and/or distributed products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, knowing that these PFAS have been, and are presently, discharged to surface waters, and thereby enter and contaminate the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

194.    Rather than require the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, Supplier Defendants required or permitted Discharger Defendants to discharge these products, which they knew to be hazardous, to surface waters upstream from Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

195.    Supplier Defendants knew that PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were environmentally persistent, bioaccumulative, dose-additive, and toxic; and Supplier Defendants knew there was no safe dose of PFOA or PFOS.

196.    Supplier Defendants knew or expected that these hazardous PFAS that they were manufacturing, formulating, handling, selling, and/or distributing would reach Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system while in essentially the same condition as when they left the hands of Supplier Defendants.

197.    Supplier Defendants manufactured, formulated, handled, sold, and/or distributed their products that were dangerous and unsafe for the uses and purposes for which they were intended despite knowing the consequences of their use and of exposure to their products.

49

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

198. Supplier Defendants or their agents were responsible for the unreasonably dangerous products sold and distributed to Discharger Defendants and received financial benefits from their sale and distribution.

199. As a direct, proximate, and foreseeable result of Supplier Defendants' ultrahazardous activities, their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals have damaged Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

200. As a direct, proximate, and foreseeable result of Supplier Defendants' ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

201. Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## SEVENTH CAUSE OF ACTION

### Strict Products Liability – Design Defect
### (Supplier Defendants)

202. Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

50

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

203.     PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

204.     Supplier Defendants knew that Discharger Defendants would purchase and use their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals without inspection for defects.

205.     Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

206.     Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were used in a reasonably foreseeable manner and without substantial change in their condition.

207.     Supplier Defendants knew that the use of their products containing or degrading to these PFAS in their intended manner would result in PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contaminating the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

208.     Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals sold and/or distributed to Discharger Defendants were and are defective in design and unreasonably dangerous for their intended use because:

(a)     PFAS resist environmental degradation;

51

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

(b)   PFAS cause extensive and persistent surface water contamination when used and discharged to surface waters in their foreseeable and intended manner;

(c)   PFAS contamination in drinking water poses significant threats to public health and property; indeed, there is no safe dose of PFOA or PFOS in drinking water;

(d)   Supplier Defendants failed to conduct and/or failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS; and

(e)   There are and were safe or safer alternatives to PFAS that Supplier Defendants could have employed in their products.

209.   Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were and are dangerous to a degree beyond that which was and is contemplated by the ordinary consumer.

210.   The foreseeable risk of harm to public health and property posed by Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals outweighed and outweigh the utility of such products and the cost to Supplier Defendants of reducing or eliminating those risks.

211.   A reasonable product manufacturer would have known of the significant dangers posed by Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

212.   As a direct, proximate, and foreseeable result of the use of Supplier Defendants' defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, these PFAS have damaged Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system,

52

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

213. As a direct, proximate, and foreseeable result of the use of Supplier Defendants' defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

214. Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## EIGHTH CAUSE OF ACTION

### Breach of Implied Warranties
### (Supplier Defendants)

215. Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

216. Supplier Defendants manufacture, sell, and distribute products to be used in Discharger Defendants' ordinary industrial applications with knowledge of the purposes for which Discharger Defendants use their products.

217. Supplier Defendants' products include those that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and Supplier Defendants know or have

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

reason to know that such products are not fit for the known and ordinary uses at Discharger Defendants' facilities.

218.    Supplier Defendants know that Discharger Defendants indirectly discharge Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to surface waters, including the Broad River.

219.    Supplier Defendants know that PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic, and Supplier Defendants know there is no safe dose of PFOA or PFOS.

220.    Supplier Defendants have breached applicable implied warranties, and as a result, Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system are contaminated with Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

221.    As a direct, proximate, and foreseeable result of Supplier Defendants' breaches of implied warranties, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial. Plaintiff is entitled to damages in an amount that will address its damages caused by Supplier Defendants' breaches of implied warranties.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands trial by jury, and respectfully requests that the Court grant the following relief where available:

54

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

(a)	Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(b)	Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate their trespasses onto Plaintiff's properties;

(c)	Enter a judgment and decree against all Defendants, jointly and severally, requiring them to remove their PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX chemicals from Plaintiff's water system by funding the evaluation, testing, acquisition, installation, operation, and maintenance of treatment technology capable of removing them;

(d)	Enter a judgment against all Defendants, jointly and severally, for past, present, and future compensatory damages in such amounts as the evidence shows Plaintiff to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, as applicable, in an amount sufficient to punish and penalize Defendants, and to deter them from repeating their wrongful conduct, and all costs; and

(e)	Award such other relief and further relief as this Court deems just, proper, and equitable.

*Signature Page Follows*

55

ELECTRONICALLY FILED - 2025 Jun 04 5:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Respectfully submitted,

*/s/ John B. White. Jr.*

John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

June 4, 2025

56

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

Milliken & Company; Suminoe Textile of America Corporation; and Tietex International, Ltd.,

*Defendants*.

C.A. No. 2024-CP-44-00558

**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**

This matter came before the Court on motions to dismiss and/or strike pursuant to Rules 8(a), 12(b)(1), 12(b)(6), and 12(f), SCRCP, that were filed in the above-captioned case by Defendants Milliken & Company ("Milliken"), Suminoe Textile of America Corporation ("Suminoe"), and Tietex International, Ltd. ("Tietex"). In this case, which has been assigned to this Court and is part of the *In re: PFAS Litigation Coordinated Docket*, Plaintiff City of Union, South Carolina ("Plaintiff") asserts causes of action for private nuisance, public nuisance, trespass, and negligence, gross negligence, and/or recklessness.

This Court held a hearing on April 1, 2025, during which the Court heard argument on the pending motions in this case. Before the hearing, the parties filed briefs in support of their positions.

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Having carefully considered the arguments, submissions, and the record in this case, as well as the applicable law, the Court concludes that Defendants' motions are respectfully **DENIED**.

## BACKGROUND[1]

Plaintiff alleges that, for decades, Defendants have knowingly and recklessly discharged toxic per- and polyfluoroalkyl substances ("PFAS") to the Broad River, contaminating Plaintiff's properties and the drinking water supplied to its customers with the chemicals. Plaintiff relies on and uses the Broad River as a vital source to draw and supply drinking water to thousands of water customers. But Plaintiff alleges that Defendants' PFAS contamination threatens the health of Plaintiff's customers and harms Plaintiff's properties, including, for example, its water treatment and distribution infrastructure. These man-made "forever chemicals" do not break down naturally in the environment, and they cannot be removed with conventional water treatment processes. As a result of Defendants' alleged PFAS pollution, Plaintiff alleges that its water treatment system cannot provide water that is not contaminated with these dangerous chemicals to over 34,000 customers that rely on Plaintiff for their drinking water.

Plaintiff is a municipal corporation, and through its Public Works Department, Plaintiff is responsible for supplying safe drinking water to its customers in Union County. Plaintiff owns and operates a surface water treatment plant ("SWTP") located in Union, which is part of its water treatment and distribution system, and Plaintiff also owns land riparian to the Broad River, where Plaintiff operates a surface water intake that supplies raw water to its SWTP.

---

[1] The following background is based on the allegations in Plaintiff's Complaint, filed December 16, 2024 (the "Complaint"), and does not constitute findings of fact by the Court.

2

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Plaintiff alleges that Defendants Milliken, Suminoe, and Tietex own and operate industrial facilities upstream of Plaintiff's drinking water intake on the Broad River, and that these Defendants have used and continue to use PFAS chemicals in their manufacturing operations. Plaintiff alleges that Defendants' operations generate PFAS-laden wastewater, which they directly or indirectly discharge to the Broad River and its tributaries. Plaintiff further alleges that Milliken owns and operates four industrial facilities at issue, two of which discharge PFAS-contaminated wastewater directly to surface waters (the Magnolia Plant and the Allen Plant). Plaintiff alleges that the other two Milliken facilities (the Dewey Plant and the headquarters location) discharge PFAS-contaminated wastewater to public wastewater treatment plants ("WWTPs") located upstream of Plaintiff's Broad River intake. Plaintiff also alleges Defendants Suminoe and Tietex also discharge PFAS-contaminated wastewater to upstream WWTPs.

Plaintiff alleges that the treatment processes used by the municipal WWTPs that receive Defendants' wastewater cannot remove PFAS, and the polluted effluent passes through the treatment processes and into surface waters unabated. Plaintiff alleges Defendants' PFAS-contaminated water then migrates downstream to Plaintiff's intake on the Broad River, causing injury to Plaintiff and its properties, which include Plaintiff's land, its SWTP, and the related buildings, improvements, infrastructure, and equipment that comprise Plaintiff's water treatment and distribution system.

Plaintiff further alleges that Defendants all knew or should have known that their chosen methods for disposing of their PFAS-contaminated wastewater would cause harm downstream. According to Plaintiff, by their very nature, PFAS are persistent in the environment and resist natural breakdown methods and water treatment methods. PFAS chemicals' stability, resistance to breakdown, and ability to repel oil and water make them desirable in Defendants' manufacturing

3

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

and industrial applications but also render them an environmental menace and a hazard to human health.

The Environmental Protection Agency ("EPA") and numerous scientific studies have linked PFAS exposure to serious human health effects, including immune system suppression, thyroid disorders, liver damages, reproductive and developmental harms (particularly in infants and pregnant women), and kidney, testicular, and liver cancers. While PFAS are used in a variety of products, Plaintiff alleges, a major source of human PFAS exposure is through consuming PFAS-contaminated drinking water.

In March 2023, EPA issued proposed maximum contaminant levels ("MCLs")—the enforceable maximum amount of a contaminant that may be delivered to any public water system user (based on existing detection technology)—and maximum contaminant level goals ("MCLGs")—a purely safety-based standard for the maximum amount of a contaminant in drinking water at which adverse human health effects are not known or anticipated to occur—for certain PFAS compounds. Then, in April 2024, EPA issued the final MCLs—the agency's first ever binding regulatory limits for PFAS in drinking water. EPA set MCLs at 4 parts per trillion ("ppt") for PFOA and PFOS, 10 ppt for certain other PFAS compounds, and issued a "hazard index" approach to control mixtures of those other PFAS compounds. At that time, EPA also set MCLGs for PFOA and PFOS at zero ppt based on the agency's determination that there is no safe level of exposure to these two compounds.

Public drinking water systems such as Plaintiff's must comply with the enforceable MCLs by April 2029, but the MCLGs mean that any level of PFOA and PFOS in drinking water presents a risk of adverse health impacts. PFAS levels at Plaintiff's drinking water source currently exceed both the MCLs and MCLGs, and Plaintiff's water treatment system was never designed to, and

4

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

cannot, remove Defendants' PFAS from the water. Plaintiff alleges that, as a result of Defendants' PFAS contamination, Plaintiff cannot supply drinking water to its customers that is free of PFAS contamination, and Plaintiff's property rights and properties—e.g., its land, SWTP, distribution lines, and other infrastructure—have been harmed. Plaintiff claims that, because of the contamination, it has suffered, currently suffers, and will continue to suffer significant harm and property injuries, resulting in enormous operational and financial burdens. Plaintiff therefore seeks both monetary and equitable relief to remedy that alleged harm and protect the communities it serves from the consumption of Defendants' PFAS.

Defendants deny Plaintiff's allegations and argue that the common law claims Plaintiff asserts are not appropriate avenues by which Plaintiff can seek relief.

### STANDARD OF REVIEW

South Carolina's pleading rules state that "[e]ach averment of a pleading shall be simple concise, and direct," and they do not require any "technical forms of pleading." Rule 8(e)(1), SCRCP. Courts must liberally construe pleadings "to do substantial justice to all parties." Rule 8(f), SCRCP; *Quality Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000). Pleadings provide notice to litigants of the issues in the case—"It is elementary that the principal purpose of pleadings is to inform the pleader's adversary of legal and factual positions which he will be required to meet on trial." *Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 574, 743 S.E.2d 778, 785 (2013) (quoting *S.C. Nat'l Bank v. Joyner*, 289 S.C. 382, 387, 346 S.E.2d 329, 332 (Ct. App. 1986)). While a complaint must plead facts showing that the plaintiff is entitled to relief, the complaint need not allege "the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987); Rule 8(a), SCRCP.

5

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

A motion under Rule 12(b)(6), SCRCP, tests the legal sufficiency of a plaintiff's complaint, but "it is not a vehicle for addressing the underlying merits" of the claims asserted. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925 (Ct. App. 2022). A court should only dismiss a claim under this rule if it fails "to state facts sufficient to constitute a cause of action." Rule 12(b)(6), SCRCP. "A ruling on a 12(b)(6) motion to dismiss must be based solely upon the allegations set forth on the face of the complaint and the motion cannot be sustained if facts alleged and inferences reasonably deducible therefrom would entitle the plaintiff to any relief on any theory of the case." *Toussaint v. Ham*, 292 S.C. 415, 416, 357 S.E.2d 8, 9 (1987); *accord Stiles v. Onorato*, 318 S.C. 297, 300, 457 S.E.2d 601, 602–03 (1995). Additionally, the court "must presume all well pled facts to be true" and "every doubt" should be resolved in the plaintiff's favor. *Morrow Crane Co. v. T.R. Tucker Constr. Co.*, 296 SC. 427, 429, 373 S.E.2d 701, 702 (Ct. App. 1988); *Cole Vision Corp. v. Hobbs*, 394 S.C. 144, 149, 714 S.E.2d 537, 539 (2011). "Further, the complaint should not be dismissed merely because the court doubts the plaintiff will prevail in the action," *Plyler v. Burns*, 373 S.C. 637, 645, 647 S.E.2d 188, 192 (2007), and "novel questions of law should not ordinarily be resolved on a Rule 12(b)(6) motion," *Chestnut v. AVX Corp.*, 413 S.C. 224, 227, 776 S.E.2d 82, 84 (2015).

A motion under Rule 12(f), SCRCP, raises objections to "any insufficient defense or any redundant, immaterial, impertinent or scandalous matter" in a pleading, and a court ruling on a Rule 12(f) motion "decides whether a party should be allowed to plead a defense or other matter." *Alladin Plastics, Inc. v. Wintenna, Inc.*, 301 S.C. 90, 93, 390 S.E.2d 370, 372 (Ct. App. 1990). The court should deny a motion to strike if it "raises merely a doubtful question or the case is such that justice may be promoted by a trial on the merits." *Mayes v. Paxton*, 313 S.C. 109, 115, 437 S.E.2d 66, 69 (1993). Additionally, when a defendant moves to strike and "challenges a theory of recovery

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

in the complaint, [it] is in the nature of a motion to dismiss," and the same standards applicable to a Rule 12(b)(6) motion must be used to evaluate the Rule 12(f) motion. *Grazia v. S.C. State Plastering, LLC*, 390 S.C. 562, 567, 703 S.E.2d 197, 199 (2010).

## CONCLUSIONS

In their motions, Defendants make the following arguments[2]: (1) Plaintiff's claims are non-justiciable because they are not ripe and Plaintiff lacks standing to bring them; (2) Plaintiff's claim for trespass fails because it did not adequately allege that Defendants committed any intentional, unauthorized entry resulting in a tangible intrusion that interfered with Plaintiff's exclusive possession of its properties; (3) Plaintiff's private and public nuisance claims fail because Plaintiff did not adequately allege Defendants controlled the source of the nuisance, interfered with Plaintiff's properties, committed an unlawful act, or proximately caused any cognizable damages; (4) Plaintiff's negligence claim fails because: Defendants owed it no duty; Plaintiff failed to allege facts to show Defendants breached any duty or proximately caused any recoverable damages that have been suffered by Plaintiff; and Plaintiff assumed the risk of any injury; (5) the "municipal cost recovery rule" precludes Plaintiff from recovering; (6) Plaintiff's case should be stayed and referred to the South Carolina Department of Environmental Services ("DES") based on the "primary jurisdiction" doctrine; (7) the Court should strike Plaintiff's request for attorney's fees and prejudgment interest; (8) Plaintiff lacks standing under the *parens patriae* doctrine to bring its

---

[2] Many of Defendants' arguments mirror those asserted by defendants in motions to dismiss filed in other lawsuits that are part of the *In re: PFAS Litigation Coordinated Docket*. *See Greenwood Comm'rs of Pub. Works v. Cone Mills Receiver, LLC et al.*, C.A. No. 2024-CP-24-00735 (Greenwood Cnty. Ct. Comm. Pleas); *Laurens Cnty. Water & Sewer Comm'n v. Cone Mills Receiver, LLC et al.*, C.A. No. 2024-CP-30-00734 (Laurens Cnty. Ct. Comm. Pleas); *Grand Strand Water & Sewer Auth. v. Aladdin Mfg. Corp. et al.*, C.A. No. 2024-CP-26-05523 (Horry Cnty. Ct. Comm. Pleas); *S.C. Pub. Serv. Auth., a/k/a Santee-Cooper v. China Jushi USA Corp. et al.*, C.A. No. 2024-CP-08-03336 (Berkeley Cnty. Ct. Comm. Pleas); *City of Clinton, SC v. BASF Corp. et al.*, C.A. No. 2025-CP-30-00005 (Laurens Cnty. Ct. Comm. Pleas); *Gaffney Bd. of Pub. Works v. Bommer Indus., Inc. et al.*, C.A. No. 2025-CP-11-00073 (Cherokee Cnty. Ct. Comm. Pleas).

4922-2554-8613 v.2

claims; and (9) Plaintiff's damages for trespass and nuisance are limited to either the lost rental value or the diminution in the market value of Plaintiff's real property.

Having carefully and fully considered the allegations in Plaintiff's Complaint, the parties' submissions, the arguments presented, and the applicable law, the Court makes the following conclusions:

**1.      Plaintiff's claims are justiciable.**

"Our courts will not address the merits of any case unless it presents a justiciable controversy." *Jowers v. S.C. Dep't of Health and Env't Control*, 423 S.C. 343, 353, 815 S.E.2d 446, 451 (2018) (quoting *Byrd v. Irmo High Sch.*, 321 S.C. 426, 430–31, 468 S.E.2d 861, 864 (1996)). "Justiciability encompasses several doctrines, including ripeness, mootness, and standing." *James v. Anne's Inc.*, 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010) (citing *Jackson v. State*, 331 S.C. 486, 490 n.4, 489 S.E.2d 915, 917 n.4 (1997)). "A plaintiff has standing to challenge legislation when he sustained, or is in immediate danger of sustaining, actual prejudice or injury from the legislative action." *Jowers*, 423 S.C. at 353, 815 S.E.2d at 451 (citing *Sea Pines Ass'n for Prot. of Wildlife, Inc. v. S.C. Dep't of Nat. Res.*, 345 S.C. 594, 600, 550 S.E.2d 287, 291 (2001)). South Carolina courts "have explained ripeness by defining what is not ripe, stating 'an issue that is contingent, hypothetical, or abstract is not ripe for judicial review.'" *Id.* (quoting *Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.*, 371 S.C. 224, 242, 638 S.E.2d 685, 694 (2006)). "The principles of justiciability developed by South Carolina appellate courts have grown out of the federal court's interpretation of 'the case or controversy' requirement contained in Article III of the United States Constitution." *Crescent Homes SC, LLC v. CJN, LLC*, 445 S.C. 164, 184, 912 S.E.2d 389, 399 (Ct. App. 2024) (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina*, at 125 (3d ed. 2016)).

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Defendants argue that these actions are premature because enforcement of the MCLs for PFAS will not begin until April 2029 and Plaintiff's obligations to comply with those regulations remain speculative and dependent on future developments. Defendants also contend that pending litigation in the D.C. Circuit and the current presidential administration are circumstances that could affect the final form of those regulations, such that Plaintiff's claims are not ripe. As to standing, Defendants argue that Plaintiff does not own the waters at issue, which are instead owned by the State of South Carolina, and Plaintiff therefore lacks a concrete injury.

But Plaintiff's Complaint pleads state common law causes of action, alleging that Defendants have maintained an ongoing PFAS contamination of its properties, including its land, SWTP, water distribution infrastructure, and water source. Plaintiff therefore alleges that it has suffered direct property injuries and interference with the use and enjoyment of its properties, including the inability to supply water free from unsafe concentrations of PFAS, incurring significant costs in investigating and identifying the sources of PFAS contamination, and property devaluation.

The Court concludes that the issues of ripeness and standing boil down to the same question here—does Plaintiff allege that it currently suffers concrete injury? Plaintiff's claims are not based on speculative future regulatory burdens but rather on existing and ongoing contamination of its land, infrastructure, and water source with PFAS. Plaintiff thus does not assert claims premised solely on compliance with future regulations. Instead, it seeks relief for actual and continuing property injuries allegedly caused by Defendants' discharges of PFAS-containing wastewater into rivers upstream of Plaintiff's water intake. The Complaint describes specific harms to Plaintiff's properties and water treatment and distribution system that have already occurred and continue to occur. Accordingly, the claims are ripe for judicial review.

9

4922-2554-8613 v.2

The Court also concludes that standing requirements are satisfied because Plaintiff has sufficiently alleged a personal stake in the outcome of the controversy and that Plaintiff's injuries are fairly traceable to Defendants' conduct. The Complaint alleges that Defendants' conduct has directly resulted in the contamination of Plaintiff's land, SWTP, water distribution infrastructure, and related property. Plaintiff further alleges that it has suffered and will continue to suffer concrete injuries, including contamination of its system, interference with its properties and operations, and the imposition of significant investigative and remedial costs. That Plaintiff does not own the waters of the State does not bar its ability to seek relief for injuries to its legally protected interests in its land and infrastructure.

Accordingly, Defendants' motions to dismiss on the grounds of justiciability are hereby **DENIED**.

**2.     Plaintiff has alleged an actionable claim for trespass.**

Under South Carolina law, "a trespass is any interference with one's right to the exclusive, peaceable possession of his property." *Ravan v. Greenville Cnty.*, 315 S.C. 447, 463, 434 S.E.2d 296, 306 (Ct. App. 1993); *see also Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 357, 559 S.E.2d 327, 337 (Ct. App. 2001) ("[T]respass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property . . . ." (quoting *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 286, 543 S.E.2d 563, 566 (Ct. App. 2001))). To state a claim for actionable trespass, a plaintiff must allege that the defendant invaded his property without permission through an affirmative, intentional act. *Snow v. City of Columbia*, 305 S.C. 544, 552–53, 409 S.E.2d 797, 802 (Ct. App. 1991). "The gist of trespass is the injury to possession, and generally either actual or constructive possession is sufficient to maintain an action for trespass." *Hawkins v. City of Greenville*, 358 S.C. 280, 296, 594 S.E.2d 557, 566 (Ct. App. 2004).

10

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Plaintiff alleges that Defendants are liable for trespass because Defendants have intentionally discharged wastewater containing PFAS products, and Defendants knew or should have known their PFAS-contaminated wastewater would enter and invade Plaintiff's properties, which include Plaintiff's land, SWTP, related buildings, improvements, and infrastructure and equipment that comprise Plaintiff's water treatment and distribution system. Further, Plaintiff alleges that Defendants' products and wastewater have physically invaded and altered its properties, and they continue to do so.

Defendants contend that Plaintiff has not sufficiently alleged two necessary elements in support of its trespass claim—a tangible, physical intrusion by Defendants and that their conduct was intentional. Defendants argue that PFAS cannot support an actionable invasion or interference, relying on *Babb v. Lee County Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013). They also argue that any alleged trespass was neither intentional nor unauthorized because their PFAS-contaminated wastewater passes through WWTPs before reaching Plaintiff's water source, where Plaintiff affirmatively withdraws water by activating its own water pump.

In *Babb*, the South Carolina Supreme Court answered certified questions from the federal district court, one of which asked if "South Carolina law recognizes a cause of action for trespass solely from invisible odors, rather than from a physical invasion such as dust or water." 405 S.C. at 144, 747 S.E.2d at 476. The Supreme Court answered that South Carolina law requires "an invasion by a physical, tangible thing for a trespass to exist, and accordingly, [it held] that odors cannot give rise to a trespass claim." *Id.* at 145, 747 S.E.2d at 476. While Defendants maintain that "PFAS molecules" are intangible, "microscopic" particles that cannot constitute a trespass under *Babb*, Plaintiff alleges that its properties were physically invaded with Defendants' PFAS-contaminated wastewater—indisputably tangible substances—causing past and continuing harm.

11

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Wastewater contaminated with PFAS, which persist indefinitely in the environment, is distinguishable from ephemeral, dissipating odors, and the *Babb* court even recognized that water constitutes a physical invasion. *See id.* at 144, 747 S.E.2d at 476. Plaintiff's allegations are therefore sufficient under *Babb* and decades of South Carolina precedent recognizing that chemical contamination via water is a physical invasion and actionable trespass, even if the individual contaminants are microscopic.[3]

Plaintiff also sufficiently alleges that Defendants' invasion via PFAS-contaminated wastewater was intentional. Intent exists if "the defendant acted voluntarily and [either] he knew or should have known the result would follow from his act." *Snow*, 305 S.C. at 553, 409 S.E.2d at 802. "[W]hile the trespasser, to be liable, need not intend or expect the damaging consequence of his entry, he must intend the act which constitutes the unwarranted entry on another's land." *Id.* That Defendants' allegedly PFAS-contaminated wastewater passes through WWTPs and travels downstream before reaching Plaintiff's intake, where Plaintiff withdraws water for treatment, does not negate Defendants' intent; constructive knowledge that an unwarranted entry will occur is

---

[3] *See, e.g.*, *Kelly v. Para-Chem. S., Inc.*, 311 S.C. 223, 224, 428 S.E.2d 703, 703 (1993) (affirming a jury verdict for plaintiff in an "action for trespass through groundwater contamination"); *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 418–19, 453 S.E.2d 908, 910–11 (Ct. App. 1995) (noting that the jury returned a trespass verdict in favor of Plaintiff whose properties were either within a plume of chemically-contaminated groundwater or near a contaminated creek); *In re Wildewood Litig.*, 52 F.3d 499, 501–02 (4th Cir. 1995) (noting that trespass claim was submitted to the jury in a case alleging "the release by [Defendant]'s plant of trichloroethane (TCE) into the groundwater in and surrounding the owners' properties"); *Tillman v. Highland Indus., Inc.*, 486 F. Supp. 3d 1026, 1040–41 (D.S.C. 2020) (finding that Plaintiff stated a trespass claim under South Carolina law where the complaint alleged chemical contamination of Plaintiff's property via Defendant's storm water discharge pipe); *Shockley v. Hoechst Celanese Corp.*, 793 F. Supp. 670, 672–74 (D.S.C. 1992) (upholding jury's determination that Defendant was liable for trespass in a case where Defendant's spilled chemicals contaminated groundwater and the contamination migrated to Plaintiff's property), *aff'd in part*, 996 F.2d 1212 (4th Cir. 1993) (affirming the jury's verdict for Plaintiff on trespass); *Weatherford v. E.I. Dupont de Nemours & Co.*, C.A. No. 4:22-cv-01427-RBH, 2023 WL 11015357, at *5 (D.S.C. Sept. 27, 2023) (concluding that Plaintiff "plausibly alleged a trespass claim" under South Carolina law based on PFAS-contaminated wastewater entering the environment via river discharges and agricultural sludge and contaminating Plaintiff's wells).

4922-2554-8613 v.2

sufficient. *See id.*; *Comm'rs of Pub. Works v. Costco Wholesale Corp.*, C.A. No. 2:21-cv-42-RMG, 2021 WL 5908758, at *8 (D.S.C. Dec. 13, 2021) (finding allegations "that Defendants knew or should have known that their flushable wipes are misleadingly labeled, do not disperse as advertised, and enter directly into Plaintiff sewer system" are "affirmative or willful acts, even if the actual flushing of the wipes into Plaintiff's sewer system is done by third parties"). If proven, Plaintiff's allegations that Defendants voluntarily discharged and disposed of their industrial wastewater containing PFAS when they knew or should have known their contaminated wastewater would enter and pollute Plaintiff's properties would establish the intent requirement of Plaintiff's trespass claim.

Additionally, Plaintiff's trespass claim is actionable because the unauthorized entry of Defendants' PFAS-contaminated wastewater onto Plaintiff's properties interfered with Plaintiff's right to the exclusive possession of its properties and caused harm to Plaintiff and its properties. *See Ravan*, 315 S.C. at 463, 434 S.E.2d at 306; *Snow*, 305 S.C. at 553, 409 S.E.2d at 802. Plaintiff does not allege trespass to the surface waters of the Broad River, from which it draws water for treatment. Instead, Plaintiff alleges that Defendants trespassed into the properties that Plaintiff owns—e.g., its land, SWTP, pipelines, and other components of its water treatment and transmission system—and from which Plaintiff has "the right to exclude all others," thereby invading Plaintiff's property rights and causing Plaintiff's damages. *Snow*, 305 S.C. at 552–53, 409 S.E.2d at 802; *see Weatherford v. E.I. DuPont de Nemours & Co.*, 2023 WL 11015357, at *5 (D.S.C. Sept. 27, 2023). And Plaintiff did not authorize the wrongful entry onto its properties by Defendants' PFAS-contaminated wastewater by withdrawing water from the Broad River for treatment as part of its routine operations, nor did Plaintiff somehow consent to PFAS

13

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

contamination by performing its essential function. In fact, Plaintiff expressly alleges that it did not consent to the entry of PFAS-contaminated water onto its properties.

In sum, Plaintiff's Complaint alleges all that is required to state a claim for unlawful entry onto its properties—Defendants affirmatively and intentionally discharged and disposed of PFAS-contaminated wastewater, knowing that it would invade Plaintiff's properties, and Plaintiff did not authorize or consent to the entry of PFAS-contaminated wastewater, which cannot be treated by Plaintiff's water treatment system and which has caused harm to Plaintiff's properties.

Accordingly, Defendants' motions to dismiss Plaintiff's trespass claim are hereby **DENIED**.

**3.      Plaintiff's allegations state claims for both private and public nuisance.**

"A nuisance is anything which works hurt, inconvenience, or damage; anything which essentially interferes with the enjoyment of life or property." *Neal v. Darby*, 282 S.C. 277, 285, 318 S.E.2d 18, 23 (Ct. App. 1984). A claim for private nuisance generally protects against unreasonable interference with the use and enjoyment of property, while public nuisance generally protects public rights—such as public order, health, and morals. *O'Cain v. O'Cain*, 322 S.C. 551, 560–62, 473 S.E.2d 460, 466 (Ct. App. 1996); *Overcash v. S.C. Elec. & Gas Co.*, 364 S.C. 569, 573–74, 614 S.E.2d 691, 621–22 (2005). Whether an interference constitutes a nuisance, however, depends on the facts. *Lefurgy v. Long Cove Club Owners Ass'n*, 313 S.C. 555, 558–59, 443 S.E.2d 577, 579 (Ct. App. 1994). Even lawful conduct "may become a nuisance by reason of circumstances, location, or surroundings." *Neal*, 282 S.C. at 286, 318 S.E.2d at 23.

Defendants argue they cannot be liable for creating a private or public nuisance because Plaintiff has not sufficiently alleged control, unreasonable interference, recoverable damages, or any "special injury." Defendants claim they lacked the requisite "control" over their respective contributions to the nuisance, disclaiming control over their PFAS-contaminated wastewater,

14

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

which they continually discharge and dispose of, because Defendants send their wastewater to WWTPs. Relying principally on *Clark v. Greenville County*, 313 S.C. 205, 437 S.E.2d 117 (1993), Defendants contend that the WWTPs' properties are the source of the PFAS contamination rather than their own. They also contend that the contamination of public bodies of water, such as the Broad River, cannot give rise to private or public nuisance because Plaintiff has not suffered any private property injuries.

The Court concludes that Plaintiff has stated claims for actionable nuisance—both private and public. While Defendants argue that contamination of public waters cannot support a nuisance claim, Plaintiff alleges that Defendants' PFAS contamination of surface waters has interfered with Plaintiff's private property, resulting in private injury. Further, in addition to Plaintiff's allegations that Defendants are causing substantial and unreasonable interference with Plaintiff's use of its properties, Plaintiff alleges that Defendants' PFAS-contaminated wastewater has endangered and continues to endanger the public health of the customers and communities that Plaintiff supplies with drinking water. Plaintiff's allegations of discrete injuries to its properties constitute a substantial and unreasonable interference with Plaintiff's property rights for purposes of stating a private nuisance claim, as well as special injuries to allow Plaintiff to sue for public nuisance. *See Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (1989); *Overcash*, 364 S.C. at 573–75, 614 S.E.2d at 621–22.

Additionally, the Court disagrees with the argument that Plaintiff's nuisance claim should be dismissed because Defendants lack "control" of their contaminated wastewater. Plaintiff alleges that Defendants, not the WWTPs, are the source of the nuisance. Plaintiff alleges Defendants owned and controlled their industrial facilities and the PFAS products used in their operations, and they disposed of their PFAS-contaminated wastewater at those facilities in a way that prevents

15

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Plaintiff from enjoying the use of its own properties. *See Clark*, 313 S.C. at 209, 437 S.E.2d at 119. Plaintiff alleges that Defendants continually discharge their PFAS-contaminated wastewater from their facilities either directly to upstream surface waters or to WWTPs with knowledge that the contamination passes through the WWTPs unchanged and flows directly into surface waters and onto Plaintiff's properties. Plaintiff has sufficiently alleged that Defendants controlled the nuisance.

Accordingly, Defendants' motions to dismiss Plaintiff's claims for private nuisance and public nuisance are hereby **DENIED**.

### 4.    Plaintiff's allegations state a claim for negligence.

"An essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 85, 502 S.E.2d 78, 81 (1998). The existence of a legal duty is a question of law. *McCord v. Laurens Cnty. Health Care Sys.*, 429 S.C. 286, 296, 838 S.E.2d 220, 225 (Ct. App. 2020). Plaintiff alleges that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others . . . ." (Compl. ¶ 86.)

In opposing Plaintiff's negligence claim, Defendants cite case law providing that "there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656–57 (2006). Because they deliver their industrial wastewater to various WWTPs and owe no duty to ensure that the WWTPs treat their wastewater in a way that does not risk harm to third parties, Defendants argue that they owe no duty of care to Plaintiff. Defendants further argue that a duty to Plaintiff may only be created "by statute, a contractual relationship, status, property interest, or some other special circumstance," none of which are applicable here. *Id.*

16

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Plaintiff responds that it does not allege Defendants have a duty to protect it from third parties, and that Defendants conflate different tenets of South Carolina law. It explains that while an affirmative duty to act may only be created in certain circumstances, once a party voluntarily undertakes an act, it must exercise due care in doing so. Plaintiff contends that, by voluntarily engaging in their industrial activities, Defendants were required to do so with due care. Additionally, Plaintiff argues that Defendants also owed Plaintiff a duty because they "created a situation that they knew or should have known posed a substantial risk of injury" to Plaintiff. *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 294, 688 S.E.2d 125, 130 (2010); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").

The Court agrees with Plaintiff and concludes that the Complaint sufficiently alleges a legal duty of care under the circumstances. Plaintiff does not allege that Defendants owed a duty to protect Plaintiff from the independent actions of a third party, but instead that Defendants owed a duty of care arising from their own conduct, which created a risk of harm. Moreover, South Carolina courts have consistently recognized a duty of care in environmental pollution contexts, where parties who released pollution into the environment owed a duty to those exposed to the pollutants. *See, e.g.*, *Chestnut v. AVX Corp.*, 413 S.C. 224, 226, 776 S.E.2d 82, 83 (2015) (finding that a manufacturer who released hazardous chemicals beyond its plant's boundaries, contaminating surrounding properties, owed a duty of care to the affected property owners); *Ravan v. Greenville Cnty.*, 315 S.C. 447, 452, 434 S.E.2d 296, 299 (Ct. App. 1993) (holding that the defendant transporter of toxic chemicals owed a duty of care not only during the transport but also

17

in selecting a landfill location, thus extending its duty to mitigate risks associated with industrial waste disposal).

The Court concludes that the allegations in the Complaint, taken as true, sufficiently establish that Defendants owed a duty of care to Plaintiff because of Defendants' undertaking of industrial operations that posed a substantial risk of harm to Plaintiff's water system.

The Court furthermore concludes that the Complaint adequately pleads that Defendants breached their duties of due care in the handling, use, and disposal of PFAS by discharging the chemicals directly to surface waters or to municipal WWTPs with knowledge that PFAS are hazardous to human health, resistant to the treatment methods used by on-site treatment works or receiving WWTPs, and persist in the environment, and, further, that the treatment works and receiving WWTPs discharge Defendants' PFAS-contaminated wastewater to surface waters upstream from Plaintiff's water intake.

As for causation, "[p]roximate cause requires proof of both causation in fact and legal cause." *Bishop v. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id.* at 88–89, 502 S.E.2d at 83 (citation omitted). "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." *Id.* at 89, 502 S.E.2d at 83. "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.* "Ordinarily, the question of proximate cause is one of fact for the jury . . . ." *Hurd v. Williamsburg Cnty.*, 353 S.C. 596, 613, 579 S.E.2d 136, 145 (Ct. App. 2003) (quoting *McNair v. Rainsford*, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998)).

18

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Plaintiff alleges that PFAS are man-made chemicals that do not occur naturally in the environment, Defendants discharge PFAS-contaminated wastewater into bodies of water upstream of Plaintiff's properties, PFAS do not naturally degrade in the environment, and the PFAS that Defendants discharged flow downstream onto Plaintiff's properties. Plaintiff moreover alleges that Defendants knew that PFAS were in their waste streams and that PFAS are persistent and resistant to conventional wastewater treatment methods like those used by on-site treatment works or receiving WWTPs. The Court finds that Plaintiff has sufficiently alleged causation-in-fact and proximate cause. Plaintiff's allegations, taken as true, are sufficient to allege that Defendants are "but-for" causes of Plaintiff's injuries, and that its injuries were the "natural and probable consequences" of Defendants' alleged conduct. *Bishop*, 331 S.C. at 89, 502 S.E.2d at 83.

As for Defendants' argument that Plaintiff fails to allege actionable physical injury or property damage to support its negligence claim, the Court rejects this argument for the same reasons stated in Section 1 pertaining to justiciability. The Court concludes that the Complaint plainly alleges direct injuries to Plaintiff's properties caused by Defendants' PFAS, including the contamination of its land and treatment system and the inability to use its facilities to treat and supply drinking water without hazardous levels of PFAS.

Finally, Plaintiff argues that it did not assume the risk of PFAS contamination by voluntarily undertaking the role of a public drinking water utility, which necessarily requires Plaintiff to withdraw water from South Carolina waterways. The Complaint alleges that PFAS are manmade chemicals that do not occur naturally in the environment, such that PFAS contamination is not a risk inherent in Plaintiff's treatment and provision of clean drinking water. *See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 333 S.C. 71, 81, 508 S.E.2d 565, 570 (1998). The Complaint further alleges Defendants owed Plaintiff a duty to use due care in their handling,

19

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

use, and disposal of PFAS chemicals to avoid causing an unreasonable risk of harm, and Plaintiff alleges that Defendants breached these duties by discharging these hazardous chemicals into South Carolina surface waters, contaminating Plaintiff's property and causing Plaintiff's injuries. Plaintiff has sufficiently alleged facts to support the elements of its negligence claim.

Accordingly, Defendants' motions to dismiss Plaintiff's claim for negligence are hereby **DENIED**.

**5.    The "municipal cost recovery rule" does not apply.**

Defendants seek dismissal of Plaintiff's claims based on the municipal cost recovery rule (also known as the "free public services doctrine"), which they contend precludes the tort recovery Plaintiff seeks. The basis for the argument is that Plaintiff is a government entity pursuing tort claims to upgrade its SWTP, and that, under the municipal cost recovery rule, public expenditures made in the performance of governmental functions, like the costs of upgrading the SWTP, are not recoverable in tort.

Neither Defendants nor Plaintiff cite any South Carolina decisions applying the municipal cost recovery rule, and it is unclear whether the rule has been previously recognized in our jurisprudence. Nevertheless, in jurisdictions that have recognized it, the rule generally "provides that absent specific statutory authorization or damage to government-owned property, a county [or other government entity] cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Walker Cnty. v. Tri-State Crematory*, 284 Ga. App. 34, 37, 643 S.E.2d 324, 327 (2007). The municipal cost recovery rule rests on the premise that when legislative authorities have allocated the costs of public services across the public as whole, such as through taxes, courts should not intrude upon this legislative determination by authorizing tort recovery. *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983). In the *Flagstaff* decision, the Ninth Circuit explained that application of

20

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

the doctrine turns on "the identity of the claimant and the nature of the cost," which "combine to deny recovery." *Id.* at 324.

According to Plaintiff, Defendants' only real basis for invoking the municipal cost recovery rule is the fact that Plaintiff is a government entity. Plaintiff argues that the rule does not apply here because Plaintiff's provision of drinking water to paying customers is neither free nor public as contemplated by the doctrine. Rather, Plaintiff only provides drinking water to those customers who pay for the service.

The Court concludes that Plaintiff's claims should not be dismissed at this stage based on the municipal cost recovery rule.  Plaintiff is a municipal corporation, but its water services are not funded by taxes paid by the general public. Instead, its water services are funded through rates and fees collected from Plaintiff's customers, as the Legislature has expressly authorized Plaintiff to do. *See* S.C. Code Ann. § 5-31-670. Therefore, while Plaintiff is a government entity, its water services are neither "free" nor "public" for the purposes of applying the doctrine. *See Johnson v. 3M*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021) ("Unlike services such as police or fire protection, water service to paying customers is not free for all the public[.]"). In addition, the Court concludes that the municipal cost recovery rule does not apply because the claims at issue involve "damage to government-owned property." *Walker Cnty.*, 284 Ga. App. at 37, 643 S.E.2d at 327.

Accordingly, Defendants' motions to dismiss Plaintiff's claims on the basis of the municipal cost recovery rule are hereby **DENIED**.

**6.    There is no reason to stay this case based on "primary jurisdiction."**

Defendant Suminoe argues that the Court should dismiss or stay this case so it can be referred to DES on the grounds of primary jurisdiction, contending that the Legislature has entrusted DES with addressing the exact harm alleged here via the South Carolina State Safe

21

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Drinking Water Act ("SCSDWA"), S.C. Code Ann. §§ 44-55-10 to -120 (2018). According to Suminoe, the SCSDWA vests DES with exclusive enforcement authority with respect to issues in this case relating to the contamination of public water systems.

The primary jurisdiction doctrine does not involve subject matter jurisdiction; it is a discretionary doctrine that "applies where a claim is originally cognizable in the courts, and it comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 64 (1956). In determining whether to apply the doctrine to stay a case, the court considers whether the case "rais[es] issues of fact not within the conventional experience of judges" or which "requir[e] the exercise of administrative discretion," further taking into account "the expert and specialized knowledge of the agencies" and "desirable uniformity" in regulation. *Id.*

Plaintiff responds that this is an unjustified delay tactic that falls well outside the scope of the primary jurisdiction doctrine. Plaintiff emphasizes that it asserts only common law claims and does not seek relief under the SCSDWA or any other state or federal statute. Plaintiff furthermore points out that DES has not taken any action to control Defendants' PFAS discharges, and that it was EPA, not DES, that issued the MCLs for PFAS.

The Court declines to stay or dismiss this case based on the primary jurisdiction doctrine. The Court concludes that while the case involves regulatory standards and factual matters that intersect with the purview of DES, the case is ultimately based on common law tort theories of negligence, nuisance, and trespass that are well within the Court's competence and experience. While the SCSDWA vests DES with authority to enforce the Act and lacks a citizen-suit

22

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

enforcement provision, its text does not demonstrate a legislative intent for the SCSDWA to preempt or otherwise supersede common law claims relating to the contamination of public water systems.

Accordingly, Defendant Suminoe's request to dismiss or stay this case on the basis of primary jurisdiction is hereby **DENIED**.

**7.     The Court will not strike Plaintiff's request for attorney's fees or prejudgment interest at this time.**

Defendant Suminoe argues that the Court should strike Plaintiff's request for attorney's fees and prejudgment interest because Plaintiff has not identified any applicable statute or contract providing for an award of attorney's fees, and Plaintiff's claims are not for a sum certain or capable of being reduced to any certainty.

Plaintiff responds that Suminoe's motion is procedurally improper because Rule 12(b)(6), SCRCP, applies to claims and not remedies, and it tests the legal sufficiency of a complaint to state a cause of action. As for attorney's fees, Plaintiff further adds that it does seek a declaratory judgment, alleging that Defendants' PFAS contamination constitutes an irreparable injury for which there is no adequate remedy at law. Should Plaintiff prevail, it points out that attorney's fees are available under the Uniform Declaratory Judgments Act. *See* S.C. Code Ann. § 15-53-100.

The Court concludes that Defendant's motion is premature and not well-taken at this stage of the proceedings. Rule 12(b)(6) is directed to the sufficiency of claims, not specific forms of relief, and striking requests for remedies—such as attorney's fees or prejudgment interest—is not appropriate absent a clear legal bar. Moreover, Plaintiff has alleged a basis for declaratory relief, and the Uniform Declaratory Judgments Act permits the Court, in its discretion, to award attorney's fees in such actions. Likewise, Plaintiff's request for prejudgment interest cannot be evaluated until the nature and scope of damages, if any, have been established.

23

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Accordingly, the Court declines to strike Plaintiff's requests for attorney's fees and prejudgment interest at this early stage of the litigation, and Suminoe's motion to strike is hereby **DENIED**.

**8.     Plaintiff's public nuisance claim neither invokes nor requires *parens patriae* standing.**

Defendant Suminoe asserts that Plaintiff may not bring a public nuisance claim because only the South Carolina Attorney General has *parens patriae* authority to sue for harms suffered by the South Carolina public generally. Because the Attorney General brought an action to protect the State's natural resources and property from PFAS contamination, Suminoe contends that Plaintiff here is not a proper plaintiff to sue for public nuisance.

Plaintiff responds that it neither invokes nor requires *parens patriae* standing to bring any of its claims, and South Carolina law is clear that even private citizens have standing to sue for public nuisance when they have suffered special injuries, which are different in kind from those suffered by the general public. *See Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 78, 753 S.E.2d 846, 852 (2014); *Belton v. Wateree Power Co.*, 123 S.C. 291, 302, 115 S.E. 587, 590 (1922). Plaintiff contends that the Complaint satisfies the special injury requirement by pleading harm to its own interests caused by Defendants' PFAS contamination.

Because the Complaint alleges special, unique injuries to Plaintiff, the Court concludes that Plaintiff has standing to sue for public nuisance. Rather than suing on behalf of the public, Plaintiff alleges harm to its properties, which include its real property, SWTP, distribution system, and related infrastructure. These alleged injuries are different in kind from any injuries sustained by the public and any injuries to the State's natural resources and property. Plaintiff's allegations therefore satisfy "the special or particular injury requirement" for bringing a public nuisance cause of action. *Overcash v. S.C. Elec. & Gas Co.*, 364 S.C. 569, 575, 614 S.E.2d 619, 622 (2005).

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Accordingly, *parens patriae* standing does not apply, and Defendant Suminoe's request to dismiss Plaintiff's public nuisance claim on that basis is hereby **DENIED**.

**9.    Plaintiff's potential remedies for Defendants' alleged nuisance and trespass are not limited to the value of its real property.**

Defendants Suminoe and Tietex both argue that Plaintiff cannot recover the costs of funding new water treatment technology to remove Defendants' PFAS contamination under a nuisance cause of action, asserting that Plaintiff may only recover damages based on either the lost rental value or diminution in the market value of Plaintiff's property. Suminoe also argues that Plaintiff's trespass cause of action limits Plaintiff to the same damages, such that Plaintiff cannot recover the costs of acquiring, installing, and operating new water treatment technologies to remove PFAS under trespass or nuisance claims.

Plaintiff responds that Defendants' argument is premature because the Complaint satisfies the pleading requirements by pleading sufficient facts to support its claims for public nuisance, private, nuisance, and trespass, and it would be premature at this stage to determine the types of damages and remedies Plaintiff might be entitled to recover. Further, Plaintiff argues that Defendants' position is legally incorrect, relying on a misapplication of *Babb v. Lee County Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013), and *Hedgepath v. American Telephone & Telegraph Co.*, 348 S.C. 340, 559 S.E.2d 327 (Ct. App. 2001), and is contrary to South Carolina law, which permits the recovery of all damages resulting from a tortfeasor's nuisance or trespass and allows for abatement as an available remedy under both theories. *See Kelly v. Para-Chem S., Inc.*, 311 S.C. 223, 226, 428 S.E.2d 703, 705 (1993); *Winget v. Winn-Dixie Stores, Inc.*, 242 S.C. 152, 163, 130 S.E.2d 363, 369 (1963); *Knight v. Waggoner*, 359 S.C. 492, 496, 597 S.E.2d 894, 896 (Ct. App. 2004); *Home Sales, Inc. v. N. Myrtle Beach*, 299 S.C. 70, 81–82, 382 S.E.2d 463, 469 (Ct. App. 1989). Plaintiff contends that the equitable remedy of abatement allows it to recover

25

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

the costs to design, construct, and operate new water treatment technologies capable of removing Defendants' PFAS.

The Court agrees that Plaintiff's potential remedies under its private nuisance, public nuisance, and trespass causes of action are not limited to the lost rental value or diminution in market value of Plaintiff's property, and it declines to dismiss those claims or strike the requested relief. Although *Babb* states that the measure of damages for harm to property interests caused by a private nuisance or trespass is the value of the property affected, its holding is limited. *See Babb*, 405 S.C. at 141, 747 S.E.2d at 474. Here, unlike in *Babb*, Plaintiff alleges that Defendants' nuisance and trespasses have caused injuries to Plaintiff's property, and Plaintiff seeks recovery of costs to repair and remediate its property and the forward-looking remedy of abatement. Because restoration/clean-up costs and abatement were not at issue in *Babb*, its holding cannot be read as limiting the available remedies under private nuisance or trespass theories in all cases to the difference in the market or rental value of a plaintiff's real property.[4]

Accordingly, Defendants' request to limit Plaintiff's remedies for Defendants' alleged nuisance and trespass to the difference in the market or rental value of Plaintiff's property is hereby **DENIED**.

---

[4] Similarly, *Hedgepath* and *Ravan v. Greenville County*, 315 S.C. 447, 434 S.E.2d 296 (Ct. App. 1993), are distinguishable and limited to damages where the plaintiffs claimed permanent injury to real property that cannot possibly be abated. Here, in contrast, Plaintiff alleges that Defendants' PFAS contamination can be abated, and those cases therefore do not restrict Plaintiff's remedies to the value of its property.

4922-2554-8613 v.2

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

## CONCLUSION

In summation and based on the foregoing, the Court **DENIES** the motions to dismiss the Complaint and/or to strike filed by Defendants Milliken, Suminoe, and Tietex in this matter.

**SO ORDERED.**

27



Union Common Pleas

**Case Caption:**     City Of Union, South Carolina VS   Milliken & Company , defendant, et al

**Case Number:**     2024CP4400558

**Type:**               Order/Other

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-06-04 17:43:03    page 28 of 28

ELECTRONICALLY FILED - 2025 Jun 05 8:53 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF UNION | IN THE COURT OF COMMON PLEAS<br>SIXTEENTH JUDICIAL CIRCUIT |

IN RE:
PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v

C.A. No. 2024-CP-44-00558

AGC Chemicals Americas, Inc.; Archroma
U.S., Inc.; Arkema, Inc.; Atotech USA, LLC;
BASF Corporation; Clariant Corporation;
Corteva, Inc.; Crown Health Care Laundry
Services, LLC; Daikin America, Inc.; DuPont
de Nemours, Inc.; EIDP, Inc.; Everest Textile
USA, LLC; Georgia-Pacific Corrugated, LLC;
Huntsman International, LLC; Isothermal
Textile Services, LLC; Milliken & Company;
Santolubes, LLC; Santolubes Manufacturing,
LLC; Santolubes Spartanburg Holdings, LLC;
Siemens Corporation; Solvay Specialty
Polymers USA, LLC; Solvay USA, LLC;
Suminoe Textile of America Corporation;
Supplyone Rockwell, Inc.; The Chemours
Company; Tietex International, Ltd.; Ultimate
Textile, Inc.; and Upstate Anodize, LLC,

*Defendants*.

## MILLIKEN & COMPANY'S ANSWER

Defendant MILLIKEN & COMPANY ("Milliken") answers Plaintiff's Amended

Complaint and states as follows:

## GENERAL DENIAL

Milliken denies each and every allegation of Plaintiff's Amended Complaint which is not

specifically and expressly admitted hereafter.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## SPECIFIC DENIALS

Milliken denies the specific allegations of Plaintiff's Amended Complaint as follows:

## STATEMENT OF THE CASE

1.     Milliken admits Plaintiff asserts claims in this action, but Milliken denies any claims asserted against it have merit. Milliken denies all remaining allegations in this paragraph as to it.

2.     Milliken admits Plaintiff seeks certain relief in this action, but denies Plaintiff  is entitled to any relief. Milliken denies all remaining allegations in this paragraph as to it.

3.     Milliken is without sufficient information to answer the allegations in this paragraph and therefore denies the same.

4.     Milliken admits it owns and operates industrial facilities in South Carolina, and those facilities discharge wastewater to some wastewater treatment plants pursuant to valid discharge permits. Milliken denies it currently uses the products described in this paragraph at any location upstream of Plaintiff's water intake. Milliken is without sufficient information to answer the remaining allegations in this paragraph and therefore denies the same as to it.

5.     Milliken denies all allegations in this paragraph as to it.

6.     Milliken denies all allegations in this paragraph as to it.

7.     Milliken admits Plaintiff seeks punitive damages in this action, but denies Plaintiff is entitled to any such damages. Milliken denies all remaining allegations in this paragraph as to it.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**DISCLAIMER**

8.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

9.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

10.    This paragraph states legal conclusions that do not require a response. To the extent a response is required, Milliken denies the same.

11.    This paragraph states legal conclusions that do not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

**JURISDICTION AND VENUE**

12.    Milliken admits this Court has subject matter jurisdiction over the asserted claims, but Milliken denies any claims asserted against it have merit.

13.    Milliken admits this Court may exercise personal jurisdiction over it, but denies that jurisdiction rests on South Carolina's long-arm statute. Milliken is not required to answer allegations as to any other defendant.

14.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

3

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**PARTIES**

I.     **Plaintiff**

15.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

16.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

17.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

II.     **Discharger Defendants**

18.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

19.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

20.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

21.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

22.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

23.     Milliken admits it is a Delaware corporation with its principal place of business in South Carolina. Milliken admits it owned and operated the Magnolia Finishing Plant and Allen Plant in Blacksburg, South Carolina, the Dewey Plant in Inman, South Carolina, and the Spartanburg Headquarters in Spartanburg, South Carolina. Milliken denies the remaining allegations in this paragraph.

24.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

25.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

26.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

27.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

28.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

29.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

30.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

31.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

**III.    Supplier Defendants**

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

32.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

33.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

34.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

35.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

36.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

37.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

7

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

38.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

39.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

40.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

41.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

42.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

43. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

44. Milliken admits PFAS are man-made chemicals with strong carbon-fluorine bonds that have a number of characteristics and applications. Milliken denies the remaining allegations in this paragraph.

45. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

46. Milliken admits there are different types of PFAS. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

47. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

48. Milliken admits that polymer PFAS can degrade to terminal PFAS and precursor PFAS. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

49. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

50. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

51.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

52.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

53.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

54.     Milliken admits EPA published provisional drinking water health advisories related to PFOA and PFOS in 2009. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

55.     Milliken admits EPA published lifetime health advisory levels related to PFOA and PFOS in 2016. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

56.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

57.     Milliken admits EPA published health advisory levels related to PFOA and PFOS in 2022. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

58.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

59.     Milliken admits EPA published MCLs and MCLGs for certain PFAS in 2023. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

10

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

60. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

61. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

62. The paragraph consists of what purports to be a statement from a third party, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

63. Milliken admits EPA issued regulations regarding PFAS in 2024. The remainder of the paragraph consists of what purports to be a statements of law, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

64. Milliken admits EPA issued regulations regarding PFAS in 2024. The remainder of the paragraph consists of what purports to be a statement from a third party, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

65. Milliken admits EPA issued regulations regarding PFAS in 2024. The remainder of the paragraph consists of what purports to be a statement from a third party, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

11

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

66.    Milliken admits EPA issued regulations regarding PFAS in 2024. The remainder of the paragraph consists of what purports to be statements of law, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

67.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

68.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## II.    Contamination of the Broad River and Plaintiff's Water Supply with PFAS

69.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

70.    Milliken admits it owned and operated the Magnolia Finishing Plant and Allen Plant in Blacksburg, South Carolina, the Dewey Plant in Inman, South Carolina, and the Spartanburg Headquarters in Spartanburg, South Carolina. Milliken denies the remaining allegations in this paragraph as to it.

71.    This paragraph consists of statements regarding the Broad River and the locations of various facilities related to Lake Union, and no admission or denial from Milliken is required. To the extent a response is required, Milliken is without knowledge and information sufficient to admit or deny the accuracy of the information in this paragraph. Milliken further denies that its facilities are sources of PFAS contamination.

72.    Milliken admits it owned and operated the Magnolia Finishing Plant and Allen Plant in Blacksburg, South Carolina, the Dewey Plant in Inman, South Carolina,

12

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

and the Spartanburg Headquarters in Spartanburg, South Carolina. Milliken denies the remaining allegations in this paragraph as to it.

73. Milliken denies the allegations in this paragraph as to it.

74. Milliken denies the allegations in this paragraph as to it.

75. Milliken denies the allegations in this paragraph as to it.

76. Milliken denies the allegations in this paragraph as to it.

77. Milliken denies the allegations in this paragraph as to it.

**III. Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

78. Milliken denies the allegations in this paragraph as to it.

79. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

80. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

81. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

82. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

83. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

84. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

85. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

86.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

87.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

88.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

89.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

90.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

91.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

92.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

93.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

94.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

95.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

96.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

14

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

97.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

98.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

99.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

100.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

101.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

102.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

103.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

104.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

105.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

106.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

107.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

108.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## IV.    Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal

109.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

110.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

111.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

112.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

113.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

114.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

115.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

116.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

117.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

16

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

118.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## V.    Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.

119.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

120.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

121.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## VI.    Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.

122.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

123.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

124.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

125.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

126.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

127.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

128.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

129.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

130.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## VII.    Defendants Have Harmed Plaintiff and Plaintiff's Community.

131.    Milliken denies the allegations in this paragraph as to it.

132.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

133.    Milliken denies the allegations in this paragraph as to it.

134.    Milliken denies the allegations in this paragraph as to it.

135.    Milliken denies the allegations in this paragraph as to it.

## FIRST CAUSE OF ACTION
### Private Nuisance

136.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

137.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

138.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

139.    Milliken denies the allegations in this paragraph as to it.

18

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

140.    Milliken denies the allegations in this paragraph as to it.

141.    Milliken denies the allegations in this paragraph as to it.

142.    Milliken denies the allegations in this paragraph as to it.

143.    Milliken denies the allegations in this paragraph as to it.

144.    Milliken denies the allegations in this paragraph as to it.

145.    Milliken denies the allegations in this paragraph as to it.

146.    Milliken denies the allegations in this paragraph as to it.

147.    Milliken denies the allegations in this paragraph as to it.

## SECOND CAUSE OF ACTION
Public Nuisance

148.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

149.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

150.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

151.    Milliken denies the allegations in this paragraph as to it.

152.    Milliken denies the allegations in this paragraph as to it.

153.    Milliken denies the allegations in this paragraph as to it.

154.    Milliken denies the allegations in this paragraph as to it.

155.    Milliken denies the allegations in this paragraph as to it.

156.    Milliken denies the allegations in this paragraph as to it.

157.    Milliken denies the allegations in this paragraph as to it.

19

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

158.     Milliken denies the allegations in this paragraph, including subparts (a) and (b), as to it.

159.     Milliken denies the allegations in this paragraph as to it.

## THIRD CAUSE OF ACTION
Trespass

160.     Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

161.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

162.     Milliken denies the allegations in this paragraph, including subparts (a)-(d), as to it.

163.     Milliken denies the allegations in this paragraph, including subparts (a)-(d).

164.     Milliken denies the allegations in this paragraph, including subparts (a)-(d), as to it.

165.     Milliken denies the allegations in this paragraph as to it.

166.     Milliken denies the allegations in this paragraph as to it.

167.     Milliken denies the allegations in this paragraph as to it.

168.     Milliken denies the allegations in this paragraph as to it.

169.     Milliken denies the allegations in this paragraph as to it.

170.     Milliken denies the allegations in this paragraph as to it.

171.     Milliken denies the allegations in this paragraph as to it.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## FOURTH CAUSE OF ACTION
Negligence, Gross Negligence, and/or Recklessness

172.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

173.    Milliken denies the allegations in this paragraph.

174.    Milliken denies the allegations in this paragraph as to it.

175.    Milliken denies the allegations in this paragraph as to it.

176.    Milliken denies the allegations in this paragraph as to it.

177.    Milliken denies the allegations in this paragraph as to it.

178.    Milliken denies the allegations in this paragraph as to it.

179.    Milliken denies the allegations in this paragraph as to it.

180.    Milliken denies the allegations in this paragraph as to it.

## FIFTH CAUSE OF ACTION
Strict Products Liability – Failure to Warn
(Supplier Defendants)

181.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

182.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

183.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

184.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

185.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

186.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

187.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

188.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

189.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

190. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

**SIXTH CAUSE OF ACTION**
Strict Products Liability – Ultrahazardous Activity
(Supplier Defendants)

191. Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

192. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

193. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

194. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

195. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

196.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

197.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

198.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

199.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

200.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

201.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

24

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

### SEVENTH CAUSE OF ACTION
Strict Products Liability – Design Defect
(Supplier Defendants)

202.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

203.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

204.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

205.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

206.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

207.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

208.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

209.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

210.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

211.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

212.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

213.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

214. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

**EIGHTH CAUSE OF ACTION**
Breach of Implied Warranties
(Supplier Defendants)

215. Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

216. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

217. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

218. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

219. This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

27

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

220.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

221.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## PRAYER FOR RELIEF

Answering the WHEREFORE paragraph following Paragraph 221, including subparagraphs (a)-(e) Milliken denies that Plaintiff is entitled to any of the relief requested, and prays:

a. For judgment in Milliken's favor on each and every Count contained in Plaintiff's Amended Complaint;

b. That all costs of the action, including reasonable attorneys' fees, be taxed upon Plaintiff;

c. That a trial by jury be had on all triable issues in this case; and

d. That this Court grant Milliken such other and further relief as the Court deems just, equitable, and proper.

28

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

Plaintiff's claims, in whole or in part, fail to state a claim upon with relief may be granted.

**SECOND AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, based on the doctrines of waiver, release, and/or estoppel.

**THIRD AFFIRMATIVE DEFENSE**

Milliken reserves any actions for contribution or indemnity against such third parties and reserves its right to remedies.

**FOURTH AFFIRMATIVE DEFENSE**

Plaintiff's failure to mitigate damages bars or reduces Plaintiff's recovery.

**FIFTH AFFIRMATIVE DEFENSE**

Should this Court find Plaintiff has sustained damages for which Milliken is responsible, which is expressly denied, Milliken is entitled to a set-off for payments paid or payable to Plaintiff for such damages.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred by the applicable statute of limitations and/or the doctrine of laches.

**SEVENTH AFFIRMATIVE DEFENSE**

This Court is the improper venue for the claims asserted against Milliken, or in the alternative, venue would be more appropriate in another forum.

29

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statute of repose.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by assumption of risk.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Milliken owed no legal duty to Plaintiff as alleged in the First Amended Complaint.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, based on a lack of causation. Milliken did not cause the alleged injury described by Plaintiff in the First Amended Complaint.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that there is no proximate cause between any alleged act or omission on the part of Milliken and any injury or damage allegedly suffered by Plaintiff.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that they are caused by the acts or omissions of Plaintiff or a third party. Additionally, to the extent Milliken was negligent, which negligence is denied and referenced only for purpose of this defense, Plaintiff was contributorily and/or comparatively negligent, such that Plaintiff's negligence exceeds any negligence of Milliken, and Plaintiff should be barred from recovery and/or or any recovery should by Plaintiff be off-set by the percentage of Plaintiff's negligence.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff failed to join one or more indispensable parties.

30

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

### FIFTEENTH AFFIRMATIVE DEFENSE

To the extent Plaintiff availed and/or failed to avail itself of funds from unnamed third parties, including without limitation unnamed potentially responsible parties, Milliken is entitled to a set off including interest.

### SIXTEENTH AFFIRMATIVE DEFENSE

The doctrine of unclean hands bars Plaintiff's claims.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are not justiciable for multiple reasons, including but not limited to because Plaintiff's claims are not ripe and/or have been mooted, and Plaintiff lacks standing and/or capacity to sue for its claims under federal and/or state constitutional, statutory, and common law.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are preempted by state and/or federal statutes, rules, and regulations, including but not limited to, the Clean Water Act, 33 U.S.C. § 1365 *et seq.*

### NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because all relevant actions by Milliken were permitted, privileged, and/or otherwise authorized under applicable federal, state, and/or local law, including but not limited to because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times, and Milliken used proper methods in designing, testing, and manufacturing its products in conformity with (i) federal and state regulations, standards, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; (iii) generally recognized and prevailing industry

31

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured and tested.

### TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of primary jurisdiction.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

An independent, intervening, and superseding cause, event, or negligence prevents any recovery by Plaintiff against Milliken.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

The damages sought by Plaintiff are too speculative or remote.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the municipal cost recovery rule and/or the public duty doctrine.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

Although Milliken denies Plaintiff is entitled to punitive damages, Milliken affirmatively pleads that any award of punitive damages would violate the South Carolina and United States Constitutions.

### TWENTY- FIFTH AFFIRMATIVE DEFENSE

Milliken may not be found liable for punitive damages where the conditions that form the basis of Plaintiff's claims are, and have been, the subject of state and/or federal regulatory oversight or action, and where there has been substantial compliance with the findings, orders, and directives of the responsible state and/or federal regulatory agency.

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## TWENTY- SIXTH AFFIRMATIVE DEFENSE

The recovery of punitive damages by Plaintiff based on the claims contained in the complaint would violate the constitutional safeguards provided to Milliken by the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States of America.

## TWENTY- SEVENTH AFFIRMATIVE DEFENSE

Milliken affirmatively pleads that any claim for punitive damages must comply with the South Carolina Noneconomic Damages Awards Act of 2005, S.C. Code Ann. § 15-32-200, *et seq.*, including, but not limited to, the punitive damages recovery limits imposed by S.C. Code Ann. § 15-32-530.

## TWENTY- EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for attorneys' fees and costs of litigation should be barred because Milliken has at no time been stubbornly litigious, acted in bad faith, or caused Plaintiff undue trouble or expense.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims for special damages are not stated with sufficient specificity and therefore should be dismissed.

## THIRTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of election of remedies.

33

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## THIRTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited by the economic loss rule.

## RESERVATION OF RIGHTS

Milliken does not admit or acknowledge that it bears the burden of proof and/or burden of persuasion with respect to any of the above defenses. The preceding defenses are pled in the alternative and do not constitute an admission Milliken is liable to Plaintiff, that Plaintiff has been or will be injured or damaged in any way, or that Plaintiff is entitled to any relief whatsoever. Milliken reserves its rights to rely on (i) any and all defenses and presumptions set forth in or arising from rule of law or statute of any state whose substantive law might control the relevant action, (ii) any other defenses set forth in any Answer or disclosure of affirmative defenses of any defendant in this action, (iii) any other defenses that may become apparent during fact or expert discovery in this matter, and (iv) to amend this document to assert any such defenses.

Respectfully submitted, this 17th day of June, 2025.

/s/ Gregory J. English
Gregory J. English (SC Bar No. 65470)
Rachel L. Anna (SC Bar No. 100486)
Rita Bolt Barker (SC Bar No. 77600)
WYCHE, P.A.
200 East Broad Street, Suite 400
Greenville, SC 29601-2892
Tel: (864) 242-8200
Fax: (864) 235-8900
ranna@wyche.com
rbarker@wyche.com

-and-

Jameson B. Carroll (*pro hac vice* admission to be sought)
Michael Weiss (*pro hac vice* admission to be sought)
CARROLL & WEISS LLP
2870 Peachtree Rd NW, Suite 193
Atlanta, GA 30305-2918

Tel: (404) 514-5061
jcarroll@carrollweiss.com
mweiss@carrollweiss.com

*ATTORNEYS FOR DEFENDANT*
*MILLIKEN & COMPANY*

ELECTRONICALLY FILED - 2025 Jun 17 3:28 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

35

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

City of Union, South Carolina,

            Plaintiff,

v.

AGC Chemicals Americas, Inc.; Archroma U.S., Inc.; Arkema, Inc.; Atotech USA, LLC; BASF Corporation; Clariant Corporation; Corteva, Inc.; Crown Health Care Laundry Services, LLC; Daikin America, Inc.; DuPont de Nemours, Inc.; EIDP, Inc.; Everest Textile USA, LLC; Georgia-Pacific Corrugated, LLC; Huntsman International, LLC; Isothermal Textile Services, LLC; Milliken & Company; Santolubes, LLC; Santolubes Manufacturing, LLC; Santolubes Spartanburg Holdings, LLC; Siemens Corporation; Solvay Specialty Polymers USA, LLC; Solvay USA, LLC; Suminoe Textile of America Corporation; Supplyone Rockwell, Inc.; The Chemours Company; Tietex International, Ltd.; Ultimate Textile, Inc.; and Upstate Anodize, LLC,

            Defendants.

IN THE COURT OF COMMON PLEAS

SIXTHTEENTH JUDICIAL CIRCUIT

C.A. No.: 2025-CP-44-00558

**SUMINOE TEXTILE OF AMERICA CORPORATION'S ANSWER TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant Suminoe Textile of America Corporation ("Suminoe"), denying each and every allegation not specifically admitted herein, hereby submits its Answer to Plaintiff City of Union, South Carolina's ("Plaintiff") Amended Complaint (the "Complaint").

**STATEMENT OF THE CASE[1]**

1.      Suminoe denies each and every allegation in Paragraph 1.

---

[1] The headers used in this Answer are for ease of reference and correspond to the headers set forth in Plaintiff's Second Amended Complaint. They do not constitute an admission by Suminoe as to any allegation in the Second Amended Complaint.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

2.      Suminoe denies each and every allegation in Paragraph 2.

3.      Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint, and therefore denies them.

4.      Suminoe denies each and every allegation in Paragraph 4.

5.      Suminoe denies each and every allegation in Paragraph 5.

6.      Suminoe denies each and every allegation in Paragraph 6.

7.      Suminoe denies each and every allegation in Paragraph 7.

## DISCLAIMER

8.      Paragraph 8 sets forth legal conclusions to which no response is required.  To the extent a response is required, Suminoe denies each and every allegation in Paragraph 8.

9.      The allegations in Paragraph 9 sets forth legal conclusions to which no response is required.  The allegations in Paragraph 9 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe denies each and every allegation in Paragraph 9.

10.     Paragraph 10 sets forth legal conclusions to which no response is required.  To the extent a response is required, Suminoe denies each and every allegation in Paragraph 10.

11.     Paragraph 11 sets forth legal conclusions to which no response is required.  To the extent a response is required, Suminoe denies each and every allegation in Paragraph 11.

## JURISDICTION AND VENUE

12.     Paragraph 12 sets forth legal conclusions to which no response is required.  To the extent a response is required, Suminoe denies each and every allegation in Paragraph 12.

13.     Paragraph 13 sets forth legal conclusions to which no response is required.  To the extent a response is required, Suminoe denies each and every allegation in Paragraph 13.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

14.     Paragraph 14 sets forth legal conclusions to which no response is required.  To the extent a response is required, Suminoe denies each and every allegation in Paragraph 14.

## PARTIES

### I.     Plaintiff

15.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint, and therefore denies them.

16.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Complaint, and therefore denies them.

17.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Complaint, and therefore denies them.

### II.     Discharger Defendants

18.     The allegations in Paragraph 18 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Complaint, and therefore denies them.

19.     The allegations in Paragraph 19 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint, and therefore denies them.

20.     The allegations in Paragraph 20 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

21.     The allegations in Paragraph 21 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint, and therefore denies them.

22.     The allegations in Paragraph 22 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Complaint, and therefore denies them.

23.     The allegations in Paragraph 23 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint, and therefore denies them.

24.     The allegations in Paragraph 24 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint, and therefore denies them.

25.     The allegations in Paragraph 25 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint, and therefore denies them.

26.     The allegations in Paragraph 26 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint, and therefore denies them.

27.     In response to Paragraph 27 of the Complaint, Suminoe admits that it is a South Carolina corporation that owns and operates an industrial facility located at 10 Commerce Drive, Gaffney South Carolina 29340. Suminoe denies each and every remaining allegation in Paragraph 27 that is directed at Suminoe. Suminoe states that the remaining allegations in Paragraph 27 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint, and therefore denies them.

28.     The allegations in Paragraph 28 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint, and therefore denies them.

29.     The allegations in Paragraph 29 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 of the Complaint, and therefore denies them.

30.     The allegations in Paragraph 30 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint, and therefore denies them.

31.     The allegations in Paragraph 31 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 of the Complaint, and therefore denies them.

### III.    Supplier Defendants

32.    The allegations in Paragraph 32 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 of the Complaint, and therefore denies them.

33.    The allegations in Paragraph 33 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 of the Complaint, and therefore denies them.

34.    The allegations in Paragraph 34 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 of the Complaint, and therefore denies them.

35.    The allegations in Paragraph 35 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 of the Complaint, and therefore denies them.

36.    The allegations in Paragraph 36 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

37.    The allegations in Paragraph 37 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 of the Complaint, and therefore denies them.

38.    The allegations in Paragraph 38 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint, and therefore denies them.

39.    The allegations in Paragraph 39 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 of the Complaint, and therefore denies them.

40.    The allegations in Paragraph 40 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the Complaint, and therefore denies them.

41.    The allegations in Paragraph 41 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 of the Complaint, and therefore denies them.

42.    The allegations in Paragraph 42 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the Complaint, and therefore denies them.

43.     The allegations in Paragraph 43 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 of the Complaint, and therefore denies them.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

44.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44 of the Complaint, and therefore denies them.

45.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 45 of the Complaint, and therefore denies them.

46.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47 of the Complaint, and therefore denies them.

47.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47 of the Complaint, and therefore denies them.

48.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48 of the Complaint, and therefore denies them.

49.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49 of the Complaint, and therefore denies them.

50.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 50 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

51.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 51 of the Complaint, and therefore denies them.

52.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 52 of the Complaint, and therefore denies them.

53.     Suminoe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 53 of the Complaint, and therefore denies them.

54.     In response to Paragraph 54 of the Complaint, Suminoe states that the publication referred to in Paragraph 54 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Suminoe denies the allegations in Paragraph 54.

55.     In response to Paragraph 55 of the Complaint, Suminoe states that the publication referred to in Paragraph 55 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Suminoe denies the allegations in Paragraph 55.

56.     In response to Paragraph 56 of the Complaint, Suminoe states that the publication referred to in Paragraph 56 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Suminoe denies the allegations in Paragraph 56.

57.     In response to Paragraph 57 of the Complaint, Suminoe states that the publication referred to in Paragraph 57 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Suminoe denies the allegations in Paragraph 57.

58.     In response to Paragraph 58 of the Complaint, Suminoe states that the publication referred to in Paragraph 58 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Suminoe denies the allegations in Paragraph 58.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

59.     In response to Paragraph 59 of the Complaint, Suminoe states that the publication referred to in Paragraph 59 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 59.

60.     In response to Paragraph 60 of the Complaint, Suminoe states that the publication referred to in Paragraph 60 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 60.

61.     In response to Paragraph 61 of the Complaint, Suminoe states that the publication referred to in Paragraph 61 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 61.

62.     In response to Paragraph 62 of the Complaint, Suminoe states that the publication referred to in Paragraph 62 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 62.

63.     In response to Paragraph 63 of the Complaint, Suminoe states that the publication referred to in Paragraph 63 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 63.

64.     In response to Paragraph 64 of the Complaint, Suminoe states that the publication referred to in Paragraph 64 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 64.

65.     In response to Paragraph 65 of the Complaint, Suminoe states that the publication referred to in Paragraph 65 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 65.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

66. In response to Paragraph 66 of the Complaint, Suminoe states that the publication referred to in Paragraph 66 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 66.

67. In response to Paragraph 67 of the Complaint, Suminoe states that the publication referred to in Paragraph 67 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 67.

68. In response to Paragraph 68 of the Complaint, Suminoe states that the publication referred to in Paragraph 68 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Suminoe denies the allegations in Paragraph 68.

## II.     Contamination of the Broad River and Plaintiff's Water Supply with PFAS

69. Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 69 of the Complaint, and therefore denies them.

70. Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 70 of the Complaint, and therefore denies them.

71. Suminoe denies the allegations in Paragraph 71 of the Complaint as they relate to Suminoe. Suminoe lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 71, and therefore denies them.

72. In response to Paragraph 72 of the Complaint, Suminoe admits only that it owns and operates a facility in Gaffney, South Carolina. Suminoe lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 72, and therefore denies them. Further answering the allegations of Paragraph 72, Suminoe asserts that, at all times, it complied with government permits issued to it relating to wastewater.

73. Suminoe denies each and every allegation in Paragraph 73.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

74.     Suminoe denies each and every allegation in Paragraph 74.

75.     Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 75 of the Complaint, and therefore denies them.

76.     Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 76 of the Complaint, and therefore denies them.

77.     Suminoe denies each and every allegation in Paragraph 77.

**III.     Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

78.     Suminoe denies each and every allegation in Paragraph 78.

79.     The allegations in Paragraph 79 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 79, and therefore denies them.

80.     The allegations in Paragraph 80 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 80, and therefore denies them.

81.     The allegations in Paragraph 81 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 81, and therefore denies them.

82.     The allegations in Paragraph 82 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 82, and therefore denies them.

83.	The allegations in Paragraph 83 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 83, and therefore denies them.

84.	The allegations in Paragraph 84 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 84, and therefore denies them.

85.	The allegations in Paragraph 85 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 85, and therefore denies them.

86.	The allegations in Paragraph 86 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 86, and therefore denies them.

87.	The allegations in Paragraph 87 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 87, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

88.     The allegations in Paragraph 88 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 88, and therefore denies them.

89.     The allegations in Paragraph 89 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 89, and therefore denies them.

90.     The allegations in Paragraph 90 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 90, and therefore denies them.

91.     The allegations in Paragraph 91 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 91, and therefore denies them.

92.     The allegations in Paragraph 92 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 92, and therefore denies them.

93.     The allegations in Paragraph 93 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 93, and therefore denies them.

94. The allegations in Paragraph 94 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 94, and therefore denies them.

95. The allegations in Paragraph 95 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 95, and therefore denies them.

96. The allegations in Paragraph 96 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 96, and therefore denies them.

97. The allegations in Paragraph 97 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 97, and therefore denies them.

98. The allegations in Paragraph 98 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 98, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

99.    The allegations in Paragraph 99 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 99, and therefore denies them.

100.    The allegations in Paragraph 100 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 100, and therefore denies them.

101.    The allegations in Paragraph 101 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 101, and therefore denies them.

102.    The allegations in Paragraph 102 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 102, and therefore denies them.

103.    The allegations in Paragraph 103 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 103, and therefore denies them.

104.    The allegations in Paragraph 104 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 104, and therefore denies them

105.    The allegations in Paragraph 105 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 105, and therefore denies them.

106.    The allegations in Paragraph 106 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 106, and therefore denies them.

107.    The allegations in Paragraph 107 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 107, and therefore denies them.

108.    The allegations in Paragraph 108 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 108, and therefore denies them including subparts (a) – (j).

## IV.    Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.

109.    The allegations in Paragraph 109 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 109, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

110.    The allegations in Paragraph 110 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 110, and therefore denies them.

111.    The allegations in Paragraph 111 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 111, and therefore denies them.

112.    The allegations in Paragraph 112 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 112, and therefore denies them.

113.    The allegations in Paragraph 113 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 113, and therefore denies them.

114.    The allegations in Paragraph 114 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 114, and therefore denies them.

115.    The allegations in Paragraph 115 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 115, and therefore denies them.

116.    The allegations in Paragraph 116 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 116, and therefore denies them.

117.    The allegations in Paragraph 117 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 117, and therefore denies them.

118.    The allegations in Paragraph 118 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 118, and therefore denies them.

**V.    Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.**

119.    The allegations in Paragraph 119 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 119, and therefore denies them.

120.    The allegations in Paragraph 120 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 120, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

121.     The allegations in Paragraph 121 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 121, and therefore denies them.

## VI.     Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.

122.     The allegations in Paragraph 122 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 122, and therefore denies them.

123.     The allegations in Paragraph 123 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 123, and therefore denies them.

124.     The allegations in Paragraph 124 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 124, and therefore denies them.

125.     The allegations in Paragraph 125 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 125, and therefore denies them.

126.     The allegations in Paragraph 126 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 126, and therefore denies them.

127.    The allegations in Paragraph 127 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 127, and therefore denies them.

128.    The allegations in Paragraph 128 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 128, and therefore denies them.

129.    The allegations in Paragraph 129 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 129, and therefore denies them.

130.    The allegations in Paragraph 130 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 130, and therefore denies them.

**VII.    Defendants Have Harmed Plaintiff and Plaintiff's Community.**

131.    Suminoe denies each and every allegation in Paragraph 131.

132.    The allegations in Paragraph 132 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 132, and therefore denies them.

133.    Suminoe denies each and every allegation in Paragraph 133.

134.    Suminoe denies each and every allegation in Paragraph 134.

135.    Suminoe denies each and every allegation in Paragraph 135 including subparts (a) and (b).

## FIRST CAUSE OF ACTION
### Private Nuisance

136.    Suminoe incorporates its responses to all prior allegations by reference as if fully set forth herein.

137.    Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 137 of the Complaint, and therefore denies them.

138.    Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 138 of the Complaint, and therefore denies them.

139.    Suminoe denies each and every allegation contained in Paragraph 139.

140.    Suminoe denies each and every allegation contained in Paragraph 140.

141.    Suminoe denies each and every allegation contained in Paragraph 141.

142.    Suminoe denies each and every allegation contained in Paragraph 142.

143.    Suminoe denies each and every allegation contained in Paragraph 143.

144.    Suminoe denies each and every allegation contained in Paragraph 144.

145.    Suminoe denies each and every allegation contained in Paragraph 145.

146.    Suminoe denies each and every allegation contained in Paragraph 146.

147.    Suminoe denies each and every allegation contained in Paragraph 147.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

## SECOND CAUSE OF ACTION
### Public Nuisance

148.    Suminoe incorporates its responses to all prior allegations by reference as if fully set forth herein.

149.    Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 149 of the Complaint, and therefore denies them.

150.    Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 150 of the Complaint, and therefore denies them.

151.    Paragraph 151 sets forth legal conclusions to which no response is required.  To the extent a response is required, Suminoe denies each and every allegation in Paragraph 151.

152.    Suminoe denies each and every allegation contained in Paragraph 152.

153.    Suminoe denies each and every allegation contained in Paragraph 153.

154.    Suminoe denies each and every allegation contained in Paragraph 154.

155.    Suminoe denies each and every allegation contained in Paragraph 155.

156.    Suminoe denies each and every allegation contained in Paragraph 156.

157.    Suminoe denies each and every allegation contained in Paragraph 157.

158.    Suminoe denies each and every allegation contained in Paragraph 158.

159.    Suminoe denies each and every allegation contained in Paragraph 159.

## THIRD CAUSE OF ACTION
### Trespass

160.    Suminoe incorporates its responses to all prior allegations by reference as if fully set forth herein.

161.    Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 161 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

162.    Suminoe denies each and every allegation contained in Paragraph 162 including subparts (a) – (d).

163.    The allegations in Paragraph 163 of the Complaint are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 163 of the Complaint, including subparts (a)-(d), and therefore denies them.

164.    The allegations in Paragraph 164 of the Complaint are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 164 of the Complaint, including subparts (a)-(d), and therefore denies them.

165.    Suminoe denies each and every allegation contained in Paragraph 165.

166.    Suminoe denies each and every allegation contained in Paragraph 166.

167.    Suminoe denies each and every allegation contained in Paragraph 167.

168.    Suminoe denies each and every allegation contained in Paragraph 168.

169.    Suminoe denies each and every allegation contained in Paragraph 169.

170.    Suminoe denies each and every allegation contained in Paragraph 170.

171.    Suminoe denies each and every allegation contained in Paragraph 171.

**FOURTH CAUSE OF ACTION**
**Negligence, Gross Negligence, and/or Recklessness**

172.    Suminoe incorporates its responses to all prior allegations by reference as if fully set forth herein.

173.    Suminoe denies each and every allegation contained in Paragraph 173.

174.    Suminoe denies each and every allegation contained in Paragraph 174.

175.    Suminoe denies each and every allegation contained in Paragraph 175.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

176.    The allegations in Paragraph 176 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 176, and therefore denies them.

177.    The allegations in Paragraph 177 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 177, and therefore denies them.

178.    The allegations in Paragraph 178 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 178, and therefore denies them.

179.    Suminoe denies each and every allegation contained in Paragraph 179.

180.    Suminoe denies each and every allegation contained in Paragraph 180.

**FIFTH CAUSE OF ACTION**
**Strict Products Liability – Failure to Warn**
**(Supplier Defendants)**

181.    Suminoe incorporates its responses to all prior allegations by reference as if fully set forth herein.

182.    The allegations in Paragraph 182 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 182, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

183.    The allegations in Paragraph 183 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 183, and therefore denies them.

184.    The allegations in Paragraph 184 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 184, and therefore denies them.

185.    The allegations in Paragraph 185 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 185, and therefore denies them.

186.    The allegations in Paragraph 186 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 186, and therefore denies them.

187.    The allegations in Paragraph 187 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 187, and therefore denies them.

188.    The allegations in Paragraph 188 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 188, and therefore denies them.

189.    The allegations in Paragraph 189 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 189, and therefore denies them.

190.    The allegations in Paragraph 190 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 190, and therefore denies them.

**SIXTH CAUSE OF ACTION**
**Strict Products Liability – Ultrahazardous Activity**
**(Supplier Defendants)**

191.    Suminoe incorporates its responses to all prior allegations by reference as if fully set forth herein.

192.    The allegations in Paragraph 192 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 192, and therefore denies them.

193.    The allegations in Paragraph 193 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 193, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

194. The allegations in Paragraph 194 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 194, and therefore denies them.

195. The allegations in Paragraph 195 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 195, and therefore denies them.

196. The allegations in Paragraph 196 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 196, and therefore denies them.

197. The allegations in Paragraph 197 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 197, and therefore denies them.

198. The allegations in Paragraph 198 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 198, and therefore denies them.

199. The allegations in Paragraph 199 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 199, and therefore denies them.

200.     The allegations in Paragraph 200 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 200, and therefore denies them.

201.     The allegations in Paragraph 201 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 201, and therefore denies them.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Supplier Defendants)

202.     Suminoe incorporates its responses to all prior allegations by reference as if fully set forth herein.

203.     The allegations in Paragraph 203 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 203, and therefore denies them.

204.     The allegations in Paragraph 204 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 204, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

205.     The allegations in Paragraph 205 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 205, and therefore denies them.

206.     The allegations in Paragraph 206 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 206, and therefore denies them.

207.     The allegations in Paragraph 207 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 207, and therefore denies them.

208.     The allegations in Paragraph 208 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 208, including subparts (a) – (e) and therefore denies them.

209.     The allegations in Paragraph 209 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 209, and therefore denies them.

210.     The allegations in Paragraph 210 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 210, and therefore denies them.

211.    The allegations in Paragraph 211 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 211, and therefore denies them.

212.    The allegations in Paragraph 212 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 212, and therefore denies them.

213.    The allegations in Paragraph 213 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 213, and therefore denies them.

214.    The allegations in Paragraph 214 are not directed at Suminoe and therefore do not require a response from Suminoe.  To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 214, and therefore denies them.

**EIGHTH CAUSE OF ACTION**
**Breach of Implied Warranties**
**(Supplier Defendants)**

215.    Suminoe incorporates its responses to all prior allegations by reference as if fully set forth herein.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

216. The allegations in Paragraph 216 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 216, and therefore denies them.

217. The allegations in Paragraph 217 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 217, and therefore denies them.

218. The allegations in Paragraph 218 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 218, and therefore denies them.

219. The allegations in Paragraph 219 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 219, and therefore denies them.

220. The allegations in Paragraph 220 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 220, and therefore denies them.

221. The allegations in Paragraph 221 are not directed at Suminoe and therefore do not require a response from Suminoe. To the extent a response is required, Suminoe states that it lacks

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 221, and therefore denies them.

## PRAYER FOR RELIEF

In response to the WHEREFORE Paragraph that follows Paragraph 221 of the Complaint, Suminoe denies any liability and further denies that Plaintiff is entitled to any of the relief sought in this Paragraph, including subparts (a) through (e).

## ADDITIONAL DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff or another third party, Suminoe further pleads the following additional defenses to all the individual claims alleged in the Complaint.  All of the following defenses are pled in the alternative and none of them constitute an admission that Suminoe is liable to Plaintiff or any third party, that Plaintiff or any third party has been or will be injured or damaged in any way, or that Plaintiff or any third party is entitled to any relief whatsoever.

## FIRST DEFENSE

The Complaint, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against Suminoe.

## SECOND DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of limitations and/or repose.

## THIRD DEFENSE

The Complaint, and each alleged claim contained therein, fails to join necessary and indispensable parties.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

## FOURTH DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the doctrine of laches, waiver, res judicata, estoppel collateral, estoppel, ratification, and unclean hands.

## FIFTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Plaintiff is not the real party in interest.

## SIXTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, to the extent Plaintiff has failed to exhaust administrative remedies.

## SEVENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrine of election of remedies.

## EIGHTH DEFENSE

Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, et seq., any damages recoverable from Suminoe should be limited to the percentage of the relative degree of fault of Suminoe as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

## NINTH DEFENSE

Any injuries and/or damages alleged by Plaintiff were caused or contributed to by the negligence or actual conduct of other persons, firms, corporations, or entities over whom Suminoe had no control or right of control and for whom Suminoe is not responsible.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

**TENTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff are barred by the doctrines of intervening cause and/or superseding cause.

**ELEVENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendants proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

**TWELFTH DEFENSE**

Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute.  Plaintiff alleges that it will be required to incur costs at some future date if the United States Environmental Protection Agency requires plaintiff to upgrade its systems to treat PFAS.  Until these costs are incurred, Plaintiff cannot recover.

Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency has set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether natural resources have been injured.

**THIRTEENTH DEFENSE**

Plaintiff's claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

**FOURTEENTH DEFENSE**

Plaintiff's claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Defendants

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

that are the subject of Plaintiff's claims. Defendants are not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

## FIFTEENTH DEFENSE

Plaintiff's claims are barred to the extent the "permit shield" doctrine and "federally permitted release" defense applies because any leachate was discharged pursuant to lawful permits.

## SIXTEENTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of primary jurisdiction.

## SEVENTEENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrines of contributory negligence and/or comparative fault, and/or other applicable common law or statutory doctrines.

## EIGHTEENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Suminoe's actions were in conformity with (i) any federal, state or other regulations, standards, guidelines, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; (iii) generally recognized and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured, handled, sold, distributed, and/or used.

## NINETEENTH DEFENSE

Any product manufactured, handled, designed, sold, distributed, or used by Suminoe and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

## TWENTIETH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because federal, state, and/or local authorities, departments and/or agencies authorized, ratified, or were aware of and acquiesced to actions taken by Suminoe that are the subject of Plaintiff's claims.  Suminoe is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority, department or agency.

## TWENTY-FIRST DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted and/or promulgated and/or issues by Congress, federal agencies, or the executive branch.

## TWENTY-SECOND DEFENSE

Suminoe asserts its rights to allocation, setoff or apportionment of fault pursuant to applicable law, as well as its rights to a proportionate reduction of any damages found against Suminoe based on the negligence, omissions or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

## TWENTY-THIRD DEFENSE

An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or is entitled to receive, from any source as a result of Plaintiff's alleged injuries.

## TWENTY-FOURTH DEFENSE

Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on Plaintiff's part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any.

## TWENTY-FIFTH DEFENSE

Suminoe and its agents and/or employees acted with due care and otherwise conducted themselves at all relevant times as reasonable people and/or entities under the circumstances.

## TWENTY-SIXTH DEFENSE

Suminoe has satisfied, fulfilled and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility.

## TWENTY-SEVENTH DEFENSE

Any alleged injury, damage or loss sustained by Plaintiff in connection with the subject matter of this action was not reasonably foreseeable to Suminoe.

## TWENTY-EIGHTH DEFENSE

Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive Suminoe of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

## TWENTY-NINTH DEFENSE

Plaintiff's claims may be barred for lack of proximate causation between any alleged act, omission, or product of Suminoe and the claims, damages, and harm alleged in Plaintiff's Complaint.

## THIRTIETH DEFENSE

Plaintiff's claims against Suminoe are barred by the economic loss rule.

## THIRTY-FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot prove that its alleged injuries were caused by exposure to PFAS allegedly contained in any product(s) manufactured, handled, distributed, used, or sold by Suminoe.

## THIRTY-SECOND DEFENSE

Suminoe affirmatively asserts as a defense, credit, or set-off against the damages claimed by Plaintiff, any payment, voluntary payment, or settlement (and any monies paid pursuant thereto) between Plaintiff and any other person or entity. Suminoe also asserts the affirmative defenses of satisfaction, payment, and release.

## THIRTY-THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that Plaintiff was exposed to a sufficient concentration or amount of PFAS, and/or for a sufficient duration, that has been reliably established, through scientific means, to be capable of causing Plaintiff's alleged injuries.

## THIRTY-FOURTH DEFENSE

To the extent that Plaintiff has split its claims, Plaintiff's claims are barred in whole, or in part, by the doctrine prohibiting claim splitting.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

## THIRTY-FIFTH DEFENSE

Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by Suminoe, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

## THIRTY-SIXTH DEFENSE

Suminoe cannot be held jointly and severally liable for the acts or omissions of third parties or other parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by acts, omissions, or products of Suminoe.

## THIRTY-SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred, and Suminoe may not be held liable under retroactive theories not requiring proof or fault or causation.

## THIRTY-EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Suminoe neither knew, nor should have known, that any of the chemicals or substances to which Plaintiff was allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of medical, scientific, technical, and/or industrial knowledge available to Suminoe at all times relevant to the claims or causes of action asserted by Plaintiff.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

### THIRTY-NINTH DEFENSE

Plaintiff's trespass claims are barred because PFAS molecules constitute "tangible" matter that will not support a trespass claim. *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 480 (2013).

### FOURTIETH DEFENSE

Suminoe is entitled to all procedural, substantive, and other protections, caps, and limitations provided by applicable state statutes and other state laws regarding Plaintiff's claims for compensatory and punitive damages. Suminoe specifically pleads the application of S.C. Code Ann. § 15-32-530 to this action.

### FORTY-FIRST DEFENSE

The Complaint fails to state a claim upon which punitive damages may be awarded. Nor did Suminoe engage in any conduct that would permit an award of punitive damages. And, any award of punitive damages would violate the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the excessive fines clause of the Eighth Amendment to the United States Constitution, and various articles and sections of the South Carolina Constitution.

### FORTY-SECOND DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the political question and separation of powers doctrines because their claims implicate issues of statewide importance that are reserved for state regulation.

### FORTY-THIRD DEFENSE

Plaintiff's claims against Suminoe may not arise out of the same transactions or occurrences as their claims against other defendants, as required for proper joinder of parties.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

**FORTY-FOURTH DEFENSE**

To the extent Plaintiff seeks equitable relief, Plaintiff is not entitled to equitable relief because Plaintiff has an adequate remedy at law, if Plaintiff is entitled to any remedy, and the alleged harm is not irreparable.

**FORTY-FIFTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the free public services doctrine and by the municipal cost recovery doctrine.

**FORTY-SIXTH DEFENSE**

Plaintiff's claims are barred to the extent that Plaintiff's alleged damages are speculative, uncertain, and hypothetical.

**FORTY-SEVENTH DEFENSE**

Plaintiff's damages, if any, may have been the direct and proximate result of facts and circumstances over which Suminoe exercises no control.

**FORTY-EIGHTH DEFENSE**

Plaintiff's nuisance claims are barred, in whole or in part, because they lack the legal authority or standing to bring a nuisance claim under South Carolina law.

**FORTY-NINTH DEFENSE**

Plaintiff's private nuisance claim is barred, in whole or in part, because Suminoe did not unreasonably interfere with Plaintiff's ownership or possession of land.

**FIFTIETH DEFENSE**

Plaintiff's nuisance claims against Suminoe are barred by the doctrine of "coming to the nuisance," the prior nuisance doctrine, and/or the doctrine of consent.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

## FIFTY-FIRST DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff is not a private person bringing an action for damages to real or personal property.

## FIFTY-SECOND DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff failed to plead that it suffered a particular damage beyond that which the public has experienced.

## FIFTY-THIRD DEFENSE

Plaintiff's trespass claim fails because Suminoe did not interfere with Plaintiff's right to the exclusive, peaceable possession of its property.

## FIFTY-FOURTH DEFENSE

Plaintiff's tort-based claims fail because Suminoe does not owe Plaintiff a duty under governing law.

## FIFTY-FIFTH DEFENSE

Plaintiff's tort-based claims fail because Suminoe did not breach any duty allegedly owed to Plaintiff.

## FIFTY-SIXTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

## FIFTY-SIXTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Suminoe complied at all relevant times with all applicable laws, including all legal and regulatory duties.

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

## FIFTY-SEVENTH DEFENSE

Plaintiff's claims may be barred, reduced, or limited pursuant to the applicable South Carolina statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

## FIFTY-EIGHTH DEFENSE

To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs.

## FIFTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Suminoe did not own, operate, or otherwise control the facilities or activities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

## SIXTIETH DEFENSE

Suminoe adopts by reference any additional applicable defense pled by any other defendant not otherwise pled herein.

## RESERVATION OF RIGHTS

Suminoe hereby reserves the right to amend this Answer, raise additional defenses as may be discovered during the course of this litigation and its continuing factual investigations, add cross-claims, or assert third-party claims pursuant to the provisions of the South Carolina Rules of Civil Procedure, the substantive law of South Carolina, and the inherent authority of this Court to manage the procedural aspects of this litigation. Any allegation not expressly admitted in this Answer is denied.

**WHEREFORE**, having fully answered Plaintiff's Amended Complaint, Suminoe Textile of America Corporation denies that Plaintiff is entitled to any of the relief requested in the

ELECTRONICALLY FILED - 2025 Jun 19 9:56 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

Amended Complaint, and respectfully prays for the dismissal of Plaintiff's Amended Complaint with prejudice and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

By: s/Robert Y. Knowlton
Robert Y. Knowlton, S.C. Bar No. 3589
John P. Boyd, S.C. Bar No. 72412
1201 Main Street, 22nd Floor (29201)
Post Office Box 11889
Columbia, SC 29211-1889
(803) 779-3080
bknowlton@hsblawfirm.com
jboyd@hsblawfirm.com

Frank T. Davis, S.C. Bar No. 66291
Jonathan D. Klett, S.C. Bar. 103208
One North Main, 2nd Floor
(864) 240-3211
fdavis@hsblawfirm.com
jklett@hsblawfirm.com

*Attorneys for Defendant Suminoe Textile of America Corporation*

June 19, 2025

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF UNION | ) | SIXTEENTH JUDICIAL CIRCUIT |
| | | |
| IN RE: | ) | |
| PFAS LITIGATION COORDINATED DOCKET | ) | |
| | ) | |
| City of Union, South Carolina, | ) | Civil Action No.  2024-CP-44-00558 |
| | ) | |
|               Plaintiff, | ) | |
|     vs. | ) | |
| | ) | |
| AGC Chemicals Americas, Inc.; Archroma U.S., | ) | **TIETEX INTERNATIONAL,** |
| Inc.; Arkema, Inc.; Atotech USA, LLC; BASF | ) | **LTD'S ANSWER** |
| Corporation; Clariant Corporation; Corteva, Inc.; | ) | |
| Crown Health Care laundry Services, LLC; | ) | |
| Daikin America, Inc.; DuPont de Nemours, Inc., | ) | |
| EIDP, Inc.; Everest Textile USA, LLC; Georgia- | ) | |
| Pacific Corrugated, LLC; Huntsman International, | ) | |
| LLC; Isothermal Textile Services, LLC; Milliken | ) | |
| & Company; Santolubes Spartanburg Holdings, | ) | |
| LLC; Siemens Corporation; Solvay Specialty | ) | |
| Polymers USA, LLC; Solvay USA, LLC; | ) | |
| Suminoe Textile of America Corporation; | ) | |
| Supplyone Rockwell, Inc.; The Chemours | ) | |
| Company; Tietex International, LTD., Ultimate | ) | |
| Textile, Inc.; and Upstate Anodize, LLC | ) | |
| | ) | |
|               Defendants. | ) | |
| | ) | |

Tietex International, LTD ("Tietex"), hereby submits its Answer to Plaintiff, City of Union's ("Plaintiff") Amended Complaint and would respectfully show to the Court that:

1. Each and every allegation of Plaintiff's Amended Complaint not expressly admitted is denied.

## **FOR A FIRST DEFENSE**

2. Tietex admits the allegations of Paragraph 1 of the Complaint only as they relate to Plaintiff's bringing of this action.  Tietex denies the remaining allegations of Paragraph 1.

1

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

3.    Tietex admits Plaintiff seeks certain relief in this action, but denies Plaintiff is entitled to any relief. Tietex denies all remaining allegations in this paragraph as to it.

4.    Upon information and belief, Tietex admits the allegations of Paragraph 3.

5.    As to the allegations contained in Paragraph 4, Tietex admits that it is located at 3010 N. Blackstock Road, Spartanburg, South Carolina 29301. Tietex further admits that in the past it has used products that contain PFOAs in its industrial process. Tietex denies the remaining allegations of Paragraph 4.

6.    Tietex denies the allegations asserted against it in Paragraph 5, including the allegations that Plaintiff is entitled to any of the requested forms of relief.

7.    Tietex denies the allegations contained in Paragraph 6, including the allegations that Plaintiff is entitled to any of the requested forms of relief.

8.    Tietex denies the allegations contained in Paragraph 7, including the allegations that Plaintiff is entitled to any of the requested forms of relief.

## DISCLAIMER

9.    The allegations of Paragraph 8 contain conclusions of law to which no response is required.  To the extent a response is required, those allegations are denied.

10.  The allegations of Paragraph 9 contain conclusions of law to which no response is required. To the extent a response is required, those allegations are denied.

11.  The allegations of Paragraph 10 contain conclusions of law to which no response is required. To the extent a response is required, those allegations are denied.

12.  The allegations of Paragraph 11 contain conclusions of law to which no response is required. To the extent a response is required, those allegations are denied.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## JURISDICTION AND VENUE

13. As to the allegations of Paragraph 12, Tietex admits this Court has subject matter jurisdiction over the asserted claims, but Tietex denies any claims asserted against it have merit.

14. As to the allegations of Paragraph 13, Tietex admits that this Court has personal jurisdiction over it but denies that jurisdiction rests on South Carolina's long-arm statute. Tietex is not required to respond to allegations as to any other defendant.

15. As to the allegations of Paragraph 14, Tietex denies that the substantial part of any act or omission by Tietex occurred in Union County. Tietex operates its facility in Spartanburg County.

## PARTIES

16. Upon information and belief, Tietex admits the allegations in Paragraph 15.

17. Upon information and belief, Tietex admits the allegations in Paragraph 16.

18. Upon information and belief, Tietex admits the allegations in Paragraph 17.

19. As to Paragraphs 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, and 43, Tietex lacks sufficient knowledge or information to respond to allegations directed at other defendants. As to Paragraph 29, Tietex admits that it is located at 3010 N. 3010 Blackstock Road, Spartanburg, South Carolina 29301, and that it operates an industrial facility there. Tietex denies the remaining allegations in Paragraph 29.

## FACTUAL ALLEGATIONS

20. As to the allegations of Paragraph 44, there are various definitions of the term "PFAS," and as such, Tietex demands proof of Plaintiff's definition and its relevance to the allegations in the Complaint. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 44 of the Complaint, and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

21. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45 of the Complaint, and therefore denies the same. Tietex demands strict proof of Plaintiff's allegation that "PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure" as stated in Paragraph 45.

22. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 46 of the Complaint, and therefore denies the same.

23. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47 of the Complaint, and therefore denies the same.

24. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48 of the Complaint, and therefore denies the same.

25. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 49 of the Complaint, and therefore denies the same.

26. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 50 of the Complaint, and therefore denies the same.

27. Tietex is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 51 of the Complaint, and therefore denies the same.

28. Tietex is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 52 of the Complaint, and therefore denies the same.

29. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 53 of the Complaint, and therefore denies the same.

30. Tietex admits EPA published provisional drinking water health advisories related to PFOA and PFOS in 2009 as alleged in Paragraph 54 of the Complaint. Tietex craves reference to

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

the document(s) referenced in Paragraph 54 of the Complaint, denies any remaining allegations that are inconsistent therewith, and demands proof of the same.

31. Tietex admits EPA published lifetime health advisory levels related to PFOA and PFOS in 2016 as alleged in Paragraph 55 of the Complaint. Tietex craves reference to the document(s) referenced in Paragraph 55 of the Complaint, denies any remaining allegations that are inconsistent therewith, and demands proof of the same.

32. Tietex craves reference to the document(s) referenced in Paragraph 56 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same.

33. Tietex admits EPA published health advisory levels related to PFOA and PFOS in 2022 as alleged in Paragraph 57 of the Complaint. Tietex craves reference to the document(s) referenced in Paragraph 57 of the Complaint, denies any remaining allegations that are inconsistent therewith, and demands proof of the same.

34. Tietex craves reference to the document(s) referenced in Paragraph 58 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same.

35. Tietex admits EPA published MCLs and MCLGs for certain PFAS in 2023 as alleged in Paragraph 59 of the Complaint. The remaining allegations in Paragraph 59 are legal conclusions to which no response is required. To the extent a response is required, Tietex craves reference to the document(s) referenced, denies any remaining allegations that are inconsistent therewith, and demands proof of the same.

36. Tietex craves reference to the document(s) referenced in Paragraph 60 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same.

37. Tietex craves reference to the document(s) referenced in Paragraph 61 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

38. Tietex craves reference to the document(s) referenced in Paragraph 62 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same. Further, MCLs are under appeal in the D.C. Circuit Court of Appeals and on May 14, 2025, that EPA announced its plan to rescind the MCLs for PFHxS, PFNA, PFBS, and GenX Chemicals, with possible further consideration.

39. Tietex craves reference to the document(s) referenced in Paragraph 63 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same. Further, MCLs are under appeal in the D.C. Circuit Court of Appeals and on May 14, 2025, that EPA announced its plan to rescind the MCLs for PFHxS, PFNA, PFBS, and GenX Chemicals, with possible further consideration.

40. Tietex craves reference to the document(s) referenced in Paragraph 64 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same. Further, MCLs are under appeal in the D.C. Circuit Court of Appeals and on May 14, 2025, that EPA announced its plan to rescind the MCLs for PFHxS, PFNA, PFBS, and GenX Chemicals, with possible further consideration.

41. Tietex craves reference to the document(s) referenced in Paragraph 65 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same.

42. In response to the allegations in Paragraph 66, on May 14, 2025, the EPA indicated that compliance for public water systems with PFOA and PFOS MCLs will be extended to 2031.  Other MCLs will be rescinded. Tietex craves reference to the document(s) referenced in the remaining allegations in Paragraph 66 of the Complaint, denies any remaining allegations that are inconsistent therewith, and demands proof of the same.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

43. Tietex craves reference to the document(s) referenced in Paragraph 67 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same.

44. Tietex craves reference to the document(s) referenced in Paragraph 68 of the Complaint, denies any allegations that are inconsistent therewith, and demands proof of the same.

45. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 69 of the Complaint, and therefore denies the same.

46. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 70 of the Complaint.

47. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 71 of the Complaint, and therefore denies the same. Further, Tietex denies any remaining allegations contained in Paragraph 71 of the Complaint.

48. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 72 of the Complaint.

49. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 73 of the Complaint.

50. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

allegations. Further, Tietex denies any remaining allegations contained in Paragraph 74 of the Complaint.

51. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 75 of the Complaint.

52. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 76 of the Complaint, and therefore denies the same.

53. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 77 of the Complaint.

54. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 78 of the Complaint.

55. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 79 of the Complaint.

56. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

allegations. Further, Tietex denies any remaining allegations contained in Paragraph 80 of the Complaint.

57. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 81 of the Complaint.

58. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 82 of the Complaint.

59. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 83 of the Complaint.

60. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 84 of the Complaint.

61. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 85 of the Complaint.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

62. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 86 of the Complaint.

63. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 87 of the Complaint.

64. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 88 of the Complaint.

65. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 89 of the Complaint.

66. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 90 of the Complaint.

67. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those

10

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

allegations. Further, Tietex denies any remaining allegations contained in Paragraph 91 of the Complaint.

68. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 92 of the Complaint.

69. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 93 of the Complaint.

70. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 94 of the Complaint.

71. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 95 of the Complaint.

72. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 96 of the Complaint.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

73. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 97 of the Complaint.

74. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 98 of the Complaint.

75. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 99 of the Complaint.

76. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 100 of the Complaint.

77. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 101 of the Complaint.

78. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

allegations. Further, Tietex denies any remaining allegations contained in Paragraph 102 of the Complaint.

79. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 103 of the Complaint.

80. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 104 of the Complaint.

81. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 105 of the Complaint.

82. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 106 of the Complaint.

83. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 107 of the Complaint.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

84. Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 108 of the Complaint, including subparagraphs (a) through (j), and therefore denies the same. To the extent the allegations in Paragraph 108, including subparagraphs (a) through (j) are directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations.

85. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 109 of the Complaint.

86. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 110 of the Complaint.

87. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 111 of the Complaint.

88. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 112 of the Complaint.

89. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those

14

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

allegations. Further, Tietex denies any remaining allegations contained in Paragraph 113 of the Complaint.

90. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 114 of the Complaint.

91. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 115 of the Complaint.

92. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 116 of the Complaint.

93. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 117 of the Complaint.

94. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 118 of the Complaint.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

95. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 119 of the Complaint.

96. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 120 of the Complaint.

97. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 121 of the Complaint.

98. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 122 of the Complaint.

99. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 123 of the Complaint.

100.    Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

allegations. Further, Tietex denies any remaining allegations contained in Paragraph 124 of the Complaint.

101.    Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 125 of the Complaint.

102.    Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 126 of the Complaint.

103.    Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 127 of the Complaint.

104.    Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 128 of the Complaint.

105.    Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 129 of the Complaint.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

106. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 130 of the Complaint.

107. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 131 of the Complaint.

108. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 132 of the Complaint.

109. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 133 of the Complaint.

110. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those allegations. Further, Tietex denies any remaining allegations contained in Paragraph 134 of the Complaint.

111. Tietex lacks sufficient knowledge or information to respond to allegations directed at a defendant other than Tietex, and to the extent a response is required, Tietex denies those

18

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

allegations. Further, Tietex denies any remaining allegations contained in Paragraph 135 of the Complaint, including subparagraphs (a) and (b).

## FIRST CAUSE OF ACTION
### Private Nuisance

112.     Tietex incorporates all prior responses by reference as if fully set forth herein.

113.     Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 137 of the Complaint, and therefore denies the same.

114.     Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 138 of the Complaint, and therefore denies the same.

115.     Tietex denies the allegations of Paragraph 139.

116.     Tietex denies it committed any contamination of the Broad River, and further, lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 140 of the Complaint, and therefore denies the same.

117.     Tietex denies the allegations of Paragraph 141 of the Complaint.

118.     Tietex denies the allegations of Paragraph 142 of the Complaint.

119.     Tietex denies the allegations of Paragraph 143 of the Complaint. Further, Tietex denies that Plaintiff is entitled to any of the requested forms of relief.

120.      Tietex denies the allegations of Paragraph 144 of the Complaint.

121.     Tietex denies the allegations of Paragraph 145 of the Complaint.

122.     Tietex denies the allegations of Paragraph 146 of the Complaint.

123.     Tietex denies the allegations of Paragraph 147 of the Complaint.

## SECOND CAUSE OF ACTION
### Public Nuisance

124.     Tietex incorporates all of its prior responses by reference as if fully set forth herein.

19

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

125.    Upon information and belief, Tietex admits to the allegations of Paragraph 149.

126.    Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 150 of the Complaint, and therefore denies the same.

127.    Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 151 of the Complaint concerning Plaintiff's customers and the EPA's regulations, and therefore denies the same. Tietex denies the remaining allegations of Paragraph 151.

128.    Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 152 of the Complaint, and therefore denies the same. Further, Tietex denies Plaintiff is entitled to any of the requested forms of relief in Paragraph 152.

129.    Tietex denies the allegations of Paragraph 153 of the Complaint.

130.    Tietex denies the allegations of Paragraph 154 of the Complaint.

131.    Tietex denies the allegations of Paragraph 155 of the Complaint.

132.    Tietex denies the allegations of Paragraph 156 of the Complaint.

133.    Tietex denies the allegations of Paragraph 157 of the Complaint. Further, Tietex denies Plaintiff is entitled to any of the requested forms of relief in Paragraph 157.

134.    Tietex denies the allegations of Paragraph 158 of the Complaint.

135.    Tietex denies the allegations of Paragraph 159 of the Complaint.

## THIRD CAUSE OF ACTION
### Trespass

136.    Tietex incorporates all prior responses as if fully set forth herein.

137.    Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 161, and therefore denies the same.

20

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

138.    Tietex denies the allegations of Paragraph 162 of the Complaint including subparagraphs (a) through (d).

139.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 163 of the Complaint as they are directed at a defendant other than Tietex. Therefore, Tietex denies the allegations contained in Paragraph 163 of the Complaint, including subparagraphs (a) through (d).

140.    Tietex denies the allegations of Paragraph 164 of the Complaint, including (a) through (d).

141.    Tietex denies the allegations of Paragraph 165 of the Complaint.

142.    Tietex denies the allegations of Paragraph 166 of the Complaint.

143.    Tietex denies the allegations of Paragraph 167 of the Complaint. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 167 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

144.    Tietex denies the allegations of Paragraph 168 of the Complaint. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 168 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

145.    Tietex denies the allegations of Paragraph 169 of the Complaint.

146.    Tietex denies the allegations of Paragraph 170 of the Complaint.

147.    Tietex denies the allegations of Paragraph 171 of the Complaint. Further, Tietex denies that Plaintiff is entitled to any of the requested forms of relief in Paragraph 171 of the Complaint.

**FOURTH CAUSE OF ACTION**
**Negligence, Gross Negligence, and/or Recklessness**

148.    Tietex incorporates all prior responses by reference as if fully set forth herein.

21

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

149.     Tietex denies the allegations of Paragraph 173 of the Complaint.

150.     Tietex denies the allegations of Paragraph 174 of the Complaint.

151.     Tietex denies the allegations of Paragraph 175 of the Complaint.

152.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 176 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

153.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 177 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

154.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 178 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

155.     Tietex denies the allegations of Paragraph 179 of the Complaint

156.     Tietex denies the allegations of Paragraph 180 of the Complaint

**FIFTH CAUSE OF ACTION**
**Strict Products Liability –Failure to warn**
**(Supplier Defendants)**

157.     Tietex incorporates all prior responses by reference as if fully set forth herein.

158.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 182 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

159.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 183 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

22

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

160.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 184 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

161.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 185 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

162.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 186 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

163.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 187 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

164.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 188 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

165.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 189 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

166.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 190 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## SIXTH CAUSE OF ACTION
### Strict Products Liability –Ultrahazardous Activity
### (Supplier Defendants)

167.    Tietex incorporates all prior responses by reference as if fully set forth herein.

168.    Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 192 of the Complaint, and therefore denies the same.

169.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 193 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

170.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 194 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

171.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 195 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

172.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 196 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

173.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 197 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

174.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 198 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

24

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

175.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 199 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

176.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 200 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

177.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 201 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability –Design Defect
### (Supplier Defendants)

178.     Tietex incorporates all prior responses by reference as if fully set forth herein.

179.     Tietex lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 203 of the Complaint, and therefore denies the same.

180.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 204 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

181.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 205 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

182.     Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 206 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

25

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

183. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 207 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

184. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 208 of the Complaint, including subparagraphs (a) through (e), as they are directed at a defendant other than Tietex, and therefore, denies the same.

185. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 209 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

186. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 210 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

187. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 211 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

188. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 212 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

189. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 213 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

190.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 214 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

## EIGHTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Supplier Defendants)

191.    Tietex incorporates all prior responses by reference as if fully set forth herein.

192.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 216 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

193.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 217 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

194.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 218 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

195.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 219 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

196.    Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 220 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

197. Tietex lacks knowledge or information sufficient to respond to the allegations contained in Paragraph 221 of the Complaint as they are directed at a defendant other than Tietex, and therefore, denies the same.

## PRAYER FOR RELIEF

198. In response to the unnumbered Paragraph appearing under the heading "PRAYER FOR RELIEF" below paragraph 221 of the Complaint, and the subparts contained therein, Tietex denies that it has committed any wrongful act or violated any law, denies that Plaintiff is entitled to any judgment or decree in its favor, denies that Plaintiff is entitled to any legal, equitable, or other relief in regard to any conduct on the part of Tietex, including injunctive, declaratory, or other relief, compensatory or punitive damages, attorneys' fees, costs, or other litigation expenses, or any other damages or other relief, and asks the Court to dismiss the Plaintiff's Complaint in its entirety.

## FOR A SECOND DEFENSE
### (Statute of Limitations and Repose)

199. Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations or repose.

## FOR A THIRD DEFENSE
### (Municipal Cost Recovery Rule)

200. As a governmental and/or special purpose entity, Plaintiff is barred from recovery in tort for expenditures made in the performance of governmental functions such as the provision of potable water to county residents.

## FOR A FOURTH DEFENSE
### (Compliance with Applicable Law & Standards of Care)

201. At all relevant times, Tietex complied with applicable federal, state, or other laws and regulations and with any applicable standards of care.

28

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## FOR A FIFTH DEFENSE
### (Permit and License)

202.   At all relevant times, Tietex acted in accordance with its duly issued permits and/or licenses.

## FOR A SIXTH DEFENSE
### (Intervening Acts or Omissions)

203.   Plaintiff's claim is barred, in whole or in part, because the damages complained were caused, in whole or in part, by the acts or omissions of others for whose conduct Tietex is not responsible.

## FOR A SEVENTH DEFENSE
### (Lack of Authority or Standing)

204.   Plaintiff lacks authority and/or standing to bring a claim predicated upon alleged injury to the public at large.

## FOR AN EIGHTH DEFENSE
### (Contribution)

205.   Although Tietex denies any liability, should Tietex, or any other party, be found liable for the damages alleged in the Complaint, then the liability and damage should be apportioned among all responsible parties and non-parties pursuant to S.C. Code Ann. § 15-38-10, *et seq.*

## FOR A NINTH DEFENSE
### (Comparative Negligence)

206.   Plaintiff's claims against Tietex are barred by the doctrine of contributory negligence.

## FOR A TENTH DEFENSE
### (Assumption of the Risk)

207.   Plaintiff's damages, if any, were caused by Plaintiff's actions when Plaintiff voluntarily and knowingly assumed the risk of incurring any of the injuries or damages alleged in the Complaint, and therefore, Plaintiff is not entitled to recover from Tietex.

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

## FOR AN ELEVENTH DEFENSE
### (No Damages/Setoff)

208. Any and all damages claimed by the Plaintiff may be recoverable against other Defendants. Therefore, Plaintiff does not have any remaining damages claims against Tietex.

209. To the extent Plaintiff is awarded any damages against Tietex, those damages must be set-off by the amount Plaintiff recovers from other Defendants.

## FOR A TWELFTH DEFENSE
### (Punitive Damages)

210. Tietex did not commit any willful, wanton, or reckless actions. Accordingly, punitive damages are not warranted.

211. Plaintiff is not entitled to an award of punitive damages because such damages can and often do violate the South Carolina and United States Constitution. Tietex reserves the right to challenge any award of punitive damages pursuant to the authority established by the United States Supreme Court and the South Carolina Supreme Court interpreting the United States and South Carolina Constitutions.

212. Pursuant to S.C. Code Ann. § 15-32-520, Tietex hereby requests trial bifurcation on the issues of actual damages and punitive damages. To the extent the Court submits the question of punitive damages to the jury, the award of punitive damages, if any, is subject to the caps and limitations set forth in S.C. Code Ann. § 15-32-530, and Tietex pleads and incorporates all defenses, limitations on damages, and other privileges contained in S.C. Code Ann. §§ 15-32-520 and 15-32-530 as if fully stated herein verbatim.

213. To the extent an award of punitive damages is excessive, such award violates due process guarantees.

214. The jury's unfettered power to award punitive damages in any amount it chooses is wholly devoid of meaningful standards and is inconsistent with due process guarantees.

30

215.     Any standard that allegedly governs imposition of punitive damages violates Tietex's due process rights because it is void for vagueness.

216.     Any award of punitive damages violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as well as Article I, §3 of the South Carolina Constitution because it is based upon the wealth and status of the defendant.

**FOR A THIRTEENTH DEFENSE**
**(No Interference)**

217.     Plaintiff's nuisance claims are barred, in whole or part, because Tietex did not cause an unreasonable and substantial interference with their enjoyment of their property or with a right common to the general public.

**WHEREFORE**, Tietex seeks judgment in their favor and against Plaintiff and for such other relief as this Court deems just and proper.

Respectfully Submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

s/Samuel W. Outten
Samuel W. Outten
SC Bar No. 4295
E-Mail: sam.outten@nelsonmullins.com
Laura T. McDonald
SC Bar No. 15997
E-Mail: laura.mcdonald@nelsonmullins.com
Megan Rushton
SC Bar No. 104241
E-Mail: megan.rushton@nelsonmullins.com
Post Office Box 10084 (29603-0084)
Greenville, SC  29601
(864) 373-2300

*Attorneys for Tietex International, LTD*

Greenville, South Carolina
July 1, 2025

31

ELECTRONICALLY FILED - 2025 Jul 01 12:52 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Clariant Corporation ("Clariant") via certified mail, restricted delivery, mailed on July 21, 2025, from Spartanburg, SC to Clariant's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 24, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 4, 2025

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clariant Corporation
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4911 92

2. Article Number (Transfer from service label)

9589 0710 5270 2352 5721 40

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Daniele Kriz*

☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

Daniele Kriz

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Arkema, Inc. ("Arkema") via certified mail, restricted delivery, mailed on July 21, 2025, from Spartanburg, SC to Arkema's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 24, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 4, 2025

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Arkema, Inc.
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4912 08

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5721 33

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  *Daniele Kriz*    ☐ Agent
                     ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

Daniele Kriz

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☑ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Georgia-Pacific Corrugated, LLC ("Georgia-Pacific") via certified mail, restricted delivery, mailed on July 22, 2025, from Spartanburg, SC to Georgia-Pacific's registered agent, United Agent Group, Inc., 6650 Rivers Avenue, North Charleston, SC 29406. The date of delivery was July 25, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 4, 2025

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Georgia-Paciiic Corrugated, LLC
c/o Registered Agent,
Untied Agent Group inc.
6650 Rivers Avenue
North Charleston. SC 29406

9590 9402 9285 4295 4911 16

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5722 25

PS Form **3811**, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X [signature]
☐ Agent
☐ Addressee

B. Received by *(Printed Name)* | C. Date of Delivery

Sydney Hughes | 7/25/25

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Solvay Specialty Polymers USA, LLC ("Solvay Specialty") via certified mail, restricted delivery, mailed on July 21, 2025, from Spartanburg, SC to Solvay Specialty's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 24, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 4, 2025

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Solvay Specialty Polymers USA, LLC
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4911 85

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5721 57

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *Daniele Kriz*
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery
2 4 JUL 2025

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

Daniele Kriz

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Solvay USA, LLC ("Solvay USA") via certified mail, restricted delivery, mailed on July 21, 2025, from Spartanburg, SC to Solvay USA's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 24, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 4, 2025

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Solvay USA, LLC
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia. SC 29169

9590 9402 9285 4295 4911 78

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5721 64

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Daniele Kriz*          ☐ Agent   ☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery

Daniele Kriz

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Supplyone Rockwell, Inc. ("Supplyone") via certified mail, restricted delivery, mailed on July 21, 2025, from Spartanburg, SC to Supplyone's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 24, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 4, 2025

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 04 2:07 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Supplyone Rockwell, Inc.
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia. SC 29169

9590 9402 9285 4295 4911 61

2. Article Number

9589 0710 5270 2352 5721 71

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Daniele Kriz*
☐ Agent
☐ Addressee

B. Received by (*Printed Name*)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

Daniele Kriz

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053        Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 05 4:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



# OUT OF STATE – RETURN OF SERVICE
## RUTHERFORD COUNTY SHERIFF'S OFFICE
## STATE OF NORTH CAROLINA

**COUNTY:** _Union_
**STATE:** _South Carolina_
**FILE #:** _2024-CP-44-00558_

I, _Max Gee_ , being duty sworn on oath, depose and say:
I am a resident of Rutherford County, State of North Carolina, a citizen of the United States, over the age of 21 years at the time of service herein, and not a party to the within action.

I received the within and hereto annexed Summons and Complaint on the:

_24_ Day of _July_ , _2025_
(Day)        (Month)        (Year)

I certify that this Summons and a copy of the complaint were received and served as follows:

| Date served: 7-31-25 | Time Served: 1:40 pm | Name of Defendant: PO-Wein Tien |
|---|---|---|

[X] By delivering to the defendant named above a copy of the summons and complaint.

[ ] By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

[ ] Other manner of service (specify):

[ ] Defendant WAS NOT served for the following reason:

**Deputy Sheriff:** _Dep. Max Gee_
**Name of Sheriff:** _____
**County of Sheriff:** _____
**Date of Return:** _8-1-25_

Sheriff Aaron Ellenburg
Rutherford County

Sworn to and Subscribed before me this the _31_ Day of _July_ , _2025_
(Day)        (Month)        (Year)

**Notary Public:** _Jessica Owens_
**My commission expires:** _3-7-29_



## JOHN B. WHITE JR. P.A.
### Law Firm

July 22, 2025

Rutherford County Sheriff's Office
Attn: Civil Process Division
198 N. Washington Street
Rutherfordton, NC 28139

> **RE:** *City of Union, South Carolina v. AGC Chemicals Americas, Inc., et al.*
> **Civil Action File No.: 2024-CP-44-00558**

Dear Sir or Madam:

Enclosed please find two (2) copies of the Amended Summons and Amended Complaint, along with corresponding letter to be served on the registered agent for named defendant, Everest Textile USA, LLC.

The registered agent for Everest Textile USA, LLC is Po-Wein Tien, 1331 W. Main Street, Forest City, NC 28043.

Please forward your executed proof of service to my office in the enclosed self-addressed, stamped envelope.

A check in the amount of $30.00 is enclosed for the service of same.

Thank you for your assistance in this matter.

Sincerely,

John B. White, Jr.

JBW/nmr
Enclosures

JOHN B. WHITE, JR.
jwhite@johnbwhitelaw.com

GRIFFIN LITTLEJOHN LYNCH
glynch@johnbwhitelaw.com

MARGHRETTA SHISKO
mshisko@johnbwhitelaw.com

291 SOUTH PINE STREET
P.O. BOX 2465
SPARTANBURG S.C. 29304
(864) 594-5988

ELECTRONICALLY FILED - 2025 Aug 05 4:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



# OUT OF STATE – RETURN OF SERVICE
## RUTHERFORD COUNTY SHERIFF'S OFFICE
## STATE OF NORTH CAROLINA

**COUNTY:** _Union_
**STATE:** _South Carolina_
**FILE #:** _2024-CP-44-00558_

I, _Max Gee_ , being duty sworn on oath, depose and say:
I am a resident of Rutherford County, State of North Carolina, a citizen of the United States, over the age of 21 years at the time of service herein, and not a party to the within action.

I received the within and hereto annexed Summons and Complaint on the:

_25_ Day of _July_ , _2025_
(Day)         (Month)         (Year)

I certify that this Summons and a copy of the complaint were received and served as follows:

| Date served: _7-31-25_ | Time Served: _2:10PM_ | Name of Defendant: _Anthony Guarriello_ |
|---|---|---|

☒ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ Other manner of service (specify):

☐ Defendant WAS NOT served for the following reason:

**Deputy Sheriff:** _RPL Max Gee_
**Name of Sheriff:** _____
**County of Sheriff:** _____
**Date of Return:** _8-1-25_

Sheriff Aaron Ellenburg
Rutherford County

Sworn to and Subscribed before me this the _31_ Day of _July_ , _2025_
(Day)         (Month)         (Year)

**Notary Public:** _Jessica Owens_
**My commission expires:** _3-7-26_

JESSICA OWENS
NOTARY PUBLIC
RUTHERFORD COUNTY, NC

ELECTRONICALLY FILED - 2025 Aug 05 4:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

25-02929

ELECTRONICALLY FILED - 2025 Aug 05 4:54 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



**JOHN B. WHITE JR. P.A.**
Law Firm

July 22, 2025

Rutherford County Sheriff's Office
Attn: Civil Process Division
198 N. Washington Street
Rutherfordton, NC 28139

      **RE:**   *City of Union, South Carolina v. AGC Chemicals Americas, Inc., et al.*
            **Civil Action File No.: 2024-CP-44-00558**

Dear Sir or Madam:

    Enclosed please find two (2) copies of the Amended Summons and Amended Complaint, along with corresponding letter to be served on the registered agent for named defendant, Ultimate Textile, Inc.

    The registered agent for Ultimate Textile, Inc. is Anthony Guarriello, 1437 US 221 Highway South, Rutherfordton, NC 28139.

    Please forward your executed proof of service to my office in the enclosed self-addressed, stamped envelope.

    A check in the amount of $30.00 is enclosed for the service of same.

    Thank you for your assistance in this matter.

                            Sincerely,

                            John B. White, Jr.

JBW/nmr
Enclosures

**JOHN B. WHITE, JR.**
jwhite@johnbwhitelaw.com

**GRIFFIN LITTLEJOHN LYNCH**
glynch@johnbwhitelaw.com

**MARGHRETTA SHISKO**
mshisko@johnbwhitelaw.com

291 SOUTH PINE STREET
P.O. BOX 2465
SPARTANBURG S.C. 29304
(864) 594-5988

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant AGC Chemicals Americas, Inc. ("AGC Chemicals") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to AGC Chemicals' registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

AGC Chemicals Americas, Inc.
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia. SC 29223

9590 9402 6821 1074 1986 05

2. Article Number *(Transfer from service label)*

9589 0710 5270 2831 0428 98

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X    Pam Johnson
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*
Pam Johnson

C. Date of Delivery
7/22

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ ___ Delivery Restricted Delivery
___ ail
___ ail Restricted Delivery
(over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Archroma US, Inc. ("Archroma") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to Archroma's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER: COMPLETE THIS SECTION**

- Complete items **1, 2,** and **3.**
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Archroma US, Inc.
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia. SC 29223

9590 9402 9220 4295 8225 17

2. Article Number (Transfer from service label)

9589 0710 5270 2831 0429 04

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X    Pam Johnson
☐ Agent
☐ Addressee

B. Received by (Printed Name)
Pam Johnson

C. Date of Delivery
7/22

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☑ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ ail Restricted Delivery
)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☑ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Atotech USA, LLC ("Atotech") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to Atotech's registered agent, Cogency Global Inc., 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Atotech USA, LLC
c/o Registered Agent,
Cogency Global Inc.
2 Office Park Court, Ste. 103
Columbia. SC 29223

9590 9402 9285 4295 4909 66

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5720 96

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  Pam Johnson
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery
Pam Johnson   7/22

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☑ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...ail
☐ ...ail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☑ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant BASF Corporation ("BASF") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to BASF's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BASF Corporation
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9220 4295 8225 24

2. Article Number *(Transfer from service label)*

9589 0710 5270 2831 0429 11

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X          Pam Johnson

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery

Pam Johnson          7/22

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

---

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant The Chemours Company ("Chemours") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to Chemours' registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Chemours Company
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia. SC 29223

9590 9402 9285 4295 4909 73

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5720 89

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X     Pam Johnson

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*

Pam Johnson

C. Date of Delivery

7/22

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Crown Health Care Laundry Services, LLC ("Crown Health Care") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to Crown Health Care's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 11:29 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Crown Health Care Laundry Services, LLC
c/o Registered Agent, CT Corporation System
2 Office Park Court, Ste. 103
Columbia. SC 29223

9590 9402 9220 4295 8225 31

2. Article Number (Transfer from service label)

9589 0710 5270 2831 0429 28

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  Pam Johnson                 ☑ Agent
                               ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Pam Johnson                     7/22

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ _____ ail
☐ _____ ail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant EIDP, Inc. ("EIDP") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to EIDP's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

EIDP, Inc.
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia. SC 29223

9590 9402 9220 4295 8225 48

2. Article Number *(Transfer from service label)*

9589 0710 5270 2831 0429 42

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X        Pam Johnson        ☐ Agent
                            ☐ Addressee

B. Received by *(Printed Name)*        C. Date of Delivery
Pam Johnson                            7/22

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☑ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
   il
   il Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☑ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☑ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053        Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Huntsman International, LLC ("Huntsman") via certified mail, restricted delivery, mailed on July 21, 2025, from Spartanburg, SC to Huntsman's registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. The date of delivery was July 25, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Result.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Huntsman International, LLC
c/o Registered Agent,
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

9590 9402 9285 4295 4911 23

2. Article Number (Transfer from service label)

9589 0710 5270 2352 5722 18

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Paul Sisofo
☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery
Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

2:25-cv-11014-RMG          Date Filed 08/15/25          Entry Number 1-1

ALERT: SEVERE WEATHER AND FLOODING ACROSS THE NORTH CENTRAL U.S. MAY DELAY FINAL DELIVERY OF YOUR MAIL AND PACKAGES. READ MORE › (HTTPS://A…

# USPS Tracking®

FAQs ›

Remove ✕

Tracking Number:

9589071052702352572218

Copy          Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was picked up at the post office at 10:33 am on July 25, 2025 in WILMINGTON, DE 19808.

**Get More Out of USPS Tracking:**

    **USPS Tracking Plus®**

### Delivered

Delivered, Individual Picked Up at Post Office
WILMINGTON, DE 19808
July 25, 2025, 10:33 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?** (https://faq.usps.com/s/article/Where-is-my-package)

| | |
|---|---|
| **Text & Email Updates** | ⌄ |
| **USPS Tracking Plus®** | ⌄ |
| **Product Information** | ⌄ |

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

Feedback

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Santolubes Manufacturing, LLC ("Santolubes Manufacturing") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to Santolubes Manufacturing's registered agent, National Registered Agents, Inc., 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Santolubes Manufacturing, LLC
c/o Registered Agent, National
Registered Agents, Inc.
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4909 42

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5721 19

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X  Pam Johnson    ☐ Agent  ☐ Addressee

B. Received by *(Printed Name)*  Pam Johnson

C. Date of Delivery  7/22

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ____ il
☐ ____ il Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Santolubes, LLC ("Santolubes") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to Santolubes' registered agent, National Registered Agents, Inc., 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 11:50 AM - UNION - COMMON PLEAS - CASE#2024CP4400558



**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Santolubes, LLC
c/o Registered Agent, National
Registered Agents, Inc.
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4909 59

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5721 02

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X  Pam Johnson
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery
Pam Johnson   7/22

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Siemens Corporation ("Siemens") via certified mail, restricted delivery, mailed on July 18, 2025, from Spartanburg, SC to Seimens' registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 22, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558



**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Siemens Corporation
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4909 80

2. Article Number *(Transfer from service label)*

9589 0710 5270 2831 0429 35

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X    Pam Johnson    ☐ Agent
     ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery
Pam Johnson    7/22

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:    ☐ No

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

STATE OF SOUTH CAROLINA

COUNTY OF UNION

IN RE:

PFAS LITIGATION COORDINATED DOCKET

City of Union, South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

SIXTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-44-00558

**PROOF OF SERVICE**

Plaintiff City of Union, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Upstate Anodize, LLC ("Upstate Anodize") via certified mail, restricted delivery, mailed on July 22, 2025, from Spartanburg, SC to Upstate Anodize's registered agent, Jeffrey R. Sperber, 2215 Beech Street, Gaffney, SC 29340. The date of delivery was July 28, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

ELECTRONICALLY FILED - 2025 Aug 11 12:03 PM - UNION - COMMON PLEAS - CASE#2024CP4400558

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Upstate Anodize, LLC
c/o Registered Agent,
Jeffrey R. Sperber
2215 Beech Street
Gaffney, SC 29340

9590 9402 9285 4295 4910 93

2. Article Number *(Transfer from service label)*

9589 0710 5270 2352 5722 49

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☒ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

Jeffrey Sperber    7-28-25

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☒ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ____ Mail
☐ ____ ail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt